No. 23-3058

_____

In the United States Court of Appeals for the Third Circuit

_____

Defense Distributed; Second Amendment Foundation, Inc.,
*Plaintiffs—Appellants*,

v.

Attorney General of New Jersey,
*Defendant—Appellee.*

_____

Appeal from the United States
District Court for the District of New Jersey
Case No. 3-21-cv-9867

_____

Appendix Volume I | pp. 1–132

_____

Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Josh Blackman
Josh Blackman LLC
1303 San Jacinto Street
Houston, Texas 77002
(202) 294-9003

Counsel for Appellants

# Table of Contents

**Item**                                                                      **Page**

Doc. 192     Notice of Appeal | Nov. 16, 2023 ...................................................... 1

Doc. 145     Order | April 19, 2021 ...................................................................... 4

Doc. 172     Order | April 13, 2022 .................................................................... 21

Doc. 58      Opinion | July 27, 2022 .................................................................. 22

Doc. 59      Order | July 27, 2022 ..................................................................... 58

Doc. 66      Opinion | October 25, 2022 ........................................................... 59

Doc. 67      Order | October 25, 2022 ................................................................71

Doc. 175     Memorandum Order | April 26, 2023............................................. 72

Doc. 186     Memorandum Opinion | June 14, 2023.......................................... 75

Doc. 187     Order | June 14, 2023 .................................................................... 83

Doc. 188     Opinion | September 29, 2023 ....................................................... 84

Doc. 189     Order | September 29, 2023.......................................................... 130

Doc. 190     Text Order | November 2, 2023 .....................................................131

Respectfully submitted,

Chad Flores

_____

|                               |                                    |
|-------------------------------|------------------------------------|
| Daniel L. Schmutter           | Chad Flores                        |
| Hartman & Winnicki, P.C.      | Flores Law PLLC                    |
| 74 Passaic Street             | 917 Franklin Street, Suite 600     |
| Ridgewood, New Jersey 07450   | Houston, Texas 77002               |
| (201) 967-8040                | (713) 364-6640                     |

Josh Blackman
Josh Blackman LLC
1303 San Jacinto Street
Houston, Texas 77002
(202) 294-9003

Counsel for Appellants

## Certifications

1.  At least one of the attorneys whose name appears on this brief is a member of the bar of this Court.

2.  The text of this document's electronic version matches its paper copies.

3.  A virus detection program, BitDefender Endpoint Security Tools major version 6, has been run on the file and no virus was detected.

4.  On March 11, 2024, this filing was served on the opposing party's counsel by delivering it through the Court's electronic docketing system to the following registered users of the system:

    Angela Cai
    Renee Greenberg
    Erin Hodge
    Timothy Sheehan

    */s/ Chad Flores*
    Chad Flores

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Defense Distributed,<br>Second Amendment Foundation, Inc.,<br>*Plaintiffs*,<br><br>v.<br><br>Matthew J. Platkin, New Jersey<br>Attorney General,<br>*Defendant*. | No. 3:21-cv-9867 |

### Plaintiffs' Notice of Appeal

All Plaintiffs appeal to the United States Court of Appeals for the Third

Circuit from the Documents 188 and 189 decision and order of September 29, 2023,

and the document 190 order of November 2, 2023.


Date: November 16, 2023       Respectfully submitted,

FLORES LAW PLLC        HARTMAN & WINNICKI, P.C.
Chad Flores             s/ Daniel L. Schmutter
cf@chadfloreslaw.com       Daniel L. Schmutter
917 Franklin Street, Suite 600    dschmutter@hartmanwinnicki.com
Houston, Texas 77002       74 Passaic Street
(713) 893-9440           Ridgewood, New Jersey 07450
                    (201) 967-8040

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Defense Distributed, *et al.* | No. 3:21-cv-9867 |
| *Plaintiffs*, | |
| v. | |
| Matthew J. Platkin,<br>New Jersey Attorney General, | |
| *Defendant*. | |

## Certificate of Service

FLORES LAW PLLC
Chad Flores
cf@chadflores.law.
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

HARTMAN & WINNICKI, P.C.
Daniel L. Schmutter
dschmutter@hartmanwinnicki.com
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

I, **DANIEL L. SCHMUTTER, ESQ.**, hereby certify as follows:

1.      I am an attorney at law admitted to practice before this Court and am a member of the firm of Hartman & Winnicki, P.C., attorneys for Plaintiffs in the above-captioned matter.  On November 16, 2023, I electronically filed and served the following documents on counsel of record  behalf of Plaintiffs:

a.      Plaintiffs' Notice of Appeal

I declare under penalty of perjury that the foregoing is true and correct.

> By: s/ Daniel L. Schmutter, Esq.
> Dated: November 16, 2023
> Daniel L. Schmutter, Esq.
> **HARTMAN & WINNICKI, P.C.**
> 74 Passaic Street
> Ridgewood, New Jersey 07450
> Phone: (201) 967-8040
> Fax:    (201) 967-0590
> dschmutter@hartmanwinnicki.com
> *Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:18-CV-637-RP |
| GURBIR S. GREWAL, et. al., | § § § | |
| Defendants. | § | |

## ORDER

Before the Court is Defendant Gurbir S. Grewal, the Attorney General of New Jersey's ("NJAG") motion to sever and transfer venue to the United States District Court for the District of New Jersey. (Dkt. 121). Having considered the parties' briefs, the record, and the relevant law, the Court finds that the motion should be granted.

## I. BACKGROUND

Plaintiffs Defense Distributed and the Second Amendment Foundation, Inc. ("Plaintiffs") bring seventeen claims against Defendants United States Department of State (the "State Department"), Michael R. Pompeo, former United States Secretary of State, Directorate of Defense Trade Controls, Sarah Heidema, Director of the Office of Defense Trade Controls, Mike Miller, the United States Department of State's Deputy Assistant Secretary of State for Defense Trade in the Bureau of Political-Military Affairs, (collectively, "Federal Defendants"), and Gurbir Grewal, the NJAG (together with Federal Defendants, "Defendants"). Plaintiffs brings this suit against Defendants based on alleged federal and state law violations. (*See* 2d Am. Compl., Dkt. 117).

Before joining Federal Defendants to this lawsuit, Plaintiffs claims as to the NJAG revolved around the NJAG's 2018 cease-and-desist letter warning Defense Distributed that its dissemination

App. 004

of printable gun files to New Jersey residents constituted a violation of New Jersey law. (2d Am. Compl., Dkt. 117, at 38–40). Plaintiffs also filed a lawsuit against the NJAG in the District of New Jersey (the "New Jersey Suit"), alleging substantially similarly causes of action. *Defense Distributed v. Att'y Gen. of N.J.*, No. 3:19-cv-4753, Dkt. 17 (D.N.J. Feb. 2, 2019). That action was stayed pending the resolution of this first-filed action. *Def. Distributed v. Att'y Gen. of N.J.*, 972 F.3d 193, 196–97 (3d Cir. Aug. 25, 2020). This Court previously dismissed Plaintiffs' claim against the NJAG for lack of personal jurisdiction. (Order, Dkt. 100, at 15; Final J., Dkt. 101). Plaintiffs appealed this Court's decision to the Fifth Circuit, which found that personal jurisdiction existed over the NJAG for the claims alleged in Plaintiffs' first amended complaint, namely because Plaintiffs' alleged injuries are "directly attributable to the cease-and-desist letter" the NJAG sent to Defense Distributed asking them to "to cease and desist from publishing printable-gun computer files for use by New Jersey residents." (Cease-and-Desist Letter, Dkt. 117-8); *Def. Distributed v. Grewal*, 971 F.3d 485, 496 (5th Cir. 2020), *cert. denied sub nom. Grewal, Att'y Gen. Of NJ v. Def. Distributed, Et Al.*, No. 20-984, 2021 WL 1163750 (U.S. Mar. 29, 2021).

Plaintiffs' second amended complaint, filed after the Fifth Circuit issued its mandate, added the Federal Defendants to this action based on their alleged failure to comply with the terms of a 2018 settlement agreement between Defense Distributed and the State Department to resolve litigation in this district regarding federal regulation of printable gun files. (*See* 2d Am. Compl., Dkt. 117, at 25). Under the terms of the settlement, the State Department agreed to promulgate rules creating an exception to various regulations for Defense Distributed's publication of printable gun files. (*Id.* at 25–28; Settlement Agreement, Dkt. 117-1). In their second amended complaint, Plaintiffs also complain of the NJAG's role in challenging actions taken by the State Department pursuant to the settlement agreement that would have allowed Defense Distributed to evade compliance with federal regulations regarding the international traffic of arms. (*Id.* at 19–39).

App. 005

On July 30, 2018, the NJAG, along with other state attorneys general, initiated an action in the United States Court for the Western District of Washington (the "Washington Suit"), claiming that certain actions taken by the State Department to fulfill its settlement agreement with Defense Distributed violated the Administrative Procedures Act ("APA"). (Dkt, 117, at 30); *State of Washington et al., v. United States Department of State et al.*, No. 2:18-cv-1115-RSL (W.D. Wash. 2018). The United States Court for the Western District of Washington granted summary judgment to the NJAG and the other state attorneys general on their APA claims, and vacated the State Department's actions that violated the APA. (Dkt. 117, at 32–33); *Washington v. United States Dep't of State*, 420 F. Supp. 3d 1130, 1148 (W.D. Wash. 2019), *appeal dismissed sub nom. State v. Def. Distributed*, No. 20-35030, 2020 WL 4332902 (9th Cir. July 21, 2020). The Ninth Circuit dismissed Defense Distributed's appeal of the decision, as well as its motion for reconsideration en banc. (*Id.* at 34); *State v. Def. Distributed*, No. 20-35030, Dkt. 32 (9th Cir. Jan. 5, 2021). Plaintiffs now allege that the NJAG's successful legal challenge to the State Department's unlawful actions constitutes tortious interference. (Dkt. 117, at 80–82). In their second amended complaint, Plaintiffs also bring new claims against NJAG based on New Jersey's passage of Senate Bill 2465, a portion of which criminalizes the manufacturing of printable guns in New Jersey ("§ 2C:39-9(l)(2)"). (2d Am. Compl., Dkt. 117, at 40–44, 79–80).

The NJAG now moves to sever the claims against him and transfer those claims to the United States District Court for the District of New Jersey, where Plaintiffs have filed the New Jersey Suit alleging the same claims against the NJAG. (Mot. Transfer, Dkt. 121, at 9–10). Plaintiffs filed two responses in opposition to the NJAG's motion, (Dkts. 124, 135), and Federal Defendants also filed a response, (Dkt. 136). The NJAG filed a reply in support of their motion, (Dkt. 141).

App. 006

## II.  LEGAL STANDARD

### A.  Motion to Sever

District courts have broad discretion when deciding a motion to sever. *Anderson v. Red River Waterway Comm'n*, 231 F.3d 211, 214 (5th Cir. 2000). Generally, courts consider the following factors when evaluating a motion to sever under Federal Rule of Civil Procedure 21: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *Paragon Office Servs., LLC v. UnitedHealthcare Ins. Co.*, 2012 WL 4442368, at *1 (N.D. Sept. 26, 2012).

When a motion to sever is combined with a motion to transfer, however, this analysis is "collapsed into an inquiry into the relative merits of convenience versus judicial economy." *In re Rolls Royce Corp.*, 775 F.3d 671, 680 (5th Cir. 2014). Where an action may have been brought against defendants in the proposed transferee court, "the claims against those defendants may be severed and transferred while the other claims are retained in the original court." *Balthasar Online, Inc. v. Network Sols.*, LLC, 654 F. Supp. 2d 546, 549–50 (E.D. Tex. 2009).

### B.  Motion to Transfer

Section 1404 provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). As such, "[t]he threshold question in applying the provisions of § 1404(a) is whether the suit could have been brought in the proposed transferee district." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004).[1] If so, the Court turns to

---

[1] Plaintiffs have already filed the New Jersey Suit against the NJAG in the United States District Court for the District of New Jersey and do not contest that venue is proper there. *See Def. Distributed v. Grewal*, D.N.J. No. 3:19-CV-4753, 2019 WL 462758.

4

consideration of "all relevant factors to determine whether or not on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989) (quoting 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3847, at 370 (1986)).

The relevant factors include matters of both private and public interest. *Volkswagen AG*, 371 F.3d at 203; *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004). The private-interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure witnesses' attendance; (3) the willing witnesses' cost of attendance; and (4) all other practical problems that make the case's trial easy, expeditious, and inexpensive. *Volkswagen AG*, 371 F.3d at 203 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). The public-interest factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having local issues decided at home; (3) the forum's familiarity with the governing law; and (4) the avoidance of unnecessary conflict-of-law problems involving the application of foreign law. *Id.* No single factor is dispositive. *Id.*

The Court must also "give some weight to the plaintiffs' choice of forum." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 63 n.6 (2013). However, the plaintiff's venue choice "is neither conclusive nor determinative. *In Re: Horseshoe Entertainment*, 337 F. 3d 429, 434 (5th Cir. 2003). Rather, the party seeking transfer must show "good cause": a moving party, in order to support its claim for a transfer, must satisfy the statutory requirements and clearly demonstrate that a transfer is "[f]or the convenience of parties and witnesses, in the interest of justice." *Humble Oil & Refining Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963). Thus, when the transferee venue is "not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008). But when the movant

App. 008

demonstrates that the transferee venue is clearly more convenient, "it has shown good cause and the district court should therefore grant the transfer." *Id.*

### III. DISCUSSION

#### A. Motion to Sever

The NJAG argues that Plaintiffs' claims against him should be severed because all the Rule 21 factors "weigh heavily in favor of severance." (Dkt. 121, at 24). The Federal Defendants respond that severance is inappropriate because the NJAG is properly joined and a necessary party to this action, and "Plaintiffs claims against State and Grewal are closely related." (Dkt. 136, at 5, 9). With regard to severance, Plaintiffs do not offer their own rebuttal but rather state that they "agree with and adopt the State Department's response." (Dkt. 135, at 2). Given that the NJAG does not argue that Defendants are improperly joined in this action, the Court will not address Federal Defendants' arguments on this point and will instead examine whether the factors elucidated in Rule 21 favor severance, with an emphasis placed on "judicial efficiency." *In re Rolls Royce Corp.*, 775 F.3d at 680.

First, the parties dispute whether the claims against the NJAG and the Federal Defendants arise out of the same transaction or occurrence. The parties' disagreement centers around whether the NJAG's filing of the Washington Suit, which successfully challenged certain actions taken by the State Department to comply with the settlement agreement, is part of the same transaction as the settlement agreement Plaintiffs claim Federal Defendants have failed to comply with as a result of the injunction issued in the Washington Suit. Indeed, Counts Fourteen and Sixteen complain of the NJAG's role in the State Department's failure to comply with the settlement agreement. (Dkt. 117, at 78, 80). Yet the parties all acknowledge that the Washington Suit, joined by 19 other state attorneys general, did not challenge the settlement agreement itself but rather certain actions taken by the State Department that violated with APA. The Federal Defendants even argue that all of Plaintiffs' nine claims against the NJAG relate to the 2018 settlement agreement, including Plaintiffs'

App. 009

claims regarding the New Jersey Senate's passage of a criminal statute, § 2C:39-9(l)(2), arguing that the NJAG's actions "are part of a series of related steps all targeting Plaintiffs." (Dkt. 136, at 7).

"Transactions or occurrences satisfy the series of transactions or occurrences requirement of Rule 20(a) if there is some connection or logical relationship between the various transactions or occurrences." *Americans for Fair Patent Use, LLC v. Sprint Nextel Corp.*, 2011 WL 98279, at *3 (E.D. Tex. Jan. 12, 2011). A relationship between transactions or occurrences is "logical" if there is some common nucleus of operative facts or law. *Hanley v. First Investors Corp.*, 151 F.R.D. 76, 79 (E.D. Tex. 1993). There is no strict rule for determining what constitutes the same transaction or occurrence. *Guedry v. Marino*, 164 F.R.D. 181, 184 (E.D. La. 1995) (citing *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974) ); *Corkern v. Hammond City*, 2012 WL 2597561, at *2 (E.D. La. July 5, 2012) ("transaction or occurrence" requirement is not a rigid test under joinder rules).

Here, Plaintiffs' claims against the Federal Defendants and the NJAG do not arise from the same transaction or occurrence, or series of transactions or occurrences. Instead, the occurrences that form the bases of Plaintiffs' claims against the NJAG and the Federal Defendants involved different parties and occurred in different places and at different times. Plaintiffs claims against the NJAG largely stem from the 2018 cease-and-desist letter, and other comments made by the NJAG, attempting to curb the dissemination of printable gun files to New Jersey residents, as well as New Jersey's recent passage of § 2C:39-9(l)(2), a criminal statute regarding printable gun files. (*See* 2d Am. Compl., Dkt. 117, at 70–86). While Plaintiffs also allege in Count Sixteen that the NJAG committed tortious interference, the NJAG rightly points out that this claim is likely barred by sovereign immunity. (Dkt. 141, at 5) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98, 106 (1984)). In any event, the Washington Suit challenged the State Department's violations of the APA, not the separate settlement agreement between Defense Distributed and the State Department. As such, Plaintiffs have not "identified any transaction or occurrence that factually connects all of the

App. 010

Defendants in a relevant or material way." *Tompkins v. Able Planet Inc.,* 2011 WL 7718756, at *2 (E.D. Tex. Feb. 17, 2011).

Second, the Court finds that the claims against the NJAG and the Federal Defendants do not involve common issues of fact and law that would council against severance. Although the Federal Defendants are correct that many of Plaintiffs' claims involve the legal question of whether Defense Distributed's actions are protected by the First Amendment, this is not the case for *all* of Plaintiffs' claims as the Federal Defendants seem to suggest. (Dkt. 136, at 8). In addition, the distinct facts underlying Plaintiffs' claims against Federal Defendants and the NJAG demonstrate that severance would likely promote judicial economy, rather than hamper it. Indeed, Plaintiffs' claims against the Federal Defendants revolve around a 2018 settlement agreement regarding Defense Distributed's compliance with federal regulations, a settlement agreement to which the NJAG was not a party. (*See* 2d Am. Compl., Dkt. 117, at 49–70). Plaintiffs' claims against the NJAG, in contrast, stem from the enforcement actions taken by the NJAG to prevent Defense Distributed from providing printable gun files to New Jersey residents. (*See* 2d Am. Compl., Dkt. 117, at 70–86). Any factual overlap between the claims against the NJAG and the Federal Defendants stemming from the Washington Suit will have a miniscule effect on resolving Plaintiffs' claims and would hardly serve the interests of judicial economy. *See In re Rolls Royce Corp.*, 775 F.3d at 681 ("While judicial economy is not the sole consideration for a district court facing a severance-and-transfer motion, it retains a cardinal role.").

These findings also apply to the final factor, which the Court finds similarly weighs in favor of severance since all of Plaintiffs' claims against the NJAG will rely on evidence distinct from those claims against the Federal Defendants. While the claims against the NJAG will require discovery into "the meaning of New Jersey laws and the intent of the NJAG's cease-and-desist letter," the claims against the Federal Defendants "largely turn on internal agency communications and potentially

App. 011

testimony from agency officials related to the agency's implementation of the Settlement Agreement." (Dkt. 121, at 25). In support of their position on this factor, the Federal Defendants state that "there will be substantial overlap in the witnesses and documentary proofs presented for each claim." (Dkt. 136, at 13). Having offered no support for their conclusory statement, the Court rejects the Federal Defendants' one-line argument and finds that this factor weighs in favor of severance.

The Court similarly finds that the NJAG is not a necessary party to this action, as asserted by the Federal Defendants. (Dkt. 136, at 9). While Federal Defendants posit that the NJAG must remain in this action to avoid the potential for "inconsistent obligations," the Federal Defendants offer no concrete examples of how this could be so. The fact that the NJAG, joined by other state attorneys general, successfully challenged unlawful actions by the State Department pursuant to its settlement agreement with Plaintiffs does not mean that inconsistent outcomes in Texas and New Jersey with regard to unrelated claims would subject Federal Defendants to "inconsistent obligations." Indeed, Plaintiffs claims against the NJAG largely revolve around the interpretation of New Jersey law, and this Court sees no reason to cabin its analysis to the parties present in the Washington Suit—a lawsuit regarding APA violations by the State Department, not enforcement actions by the NJAG.

Third, judicial economy, the paramount concern in a motion to sever brought along with a motion to transfer, would be best served by severing the NJAG's claims from those against the Federal Defendants. Although Plaintiffs and Federal Defendants contend that the Fifth Circuit has already ruled that this Court has jurisdiction over the NJAG for Plaintiffs' claims challenging New Jersey's newly-enacted criminal statute, this is simply not the case and this Court would undoubtably have to determine whether jurisdiction exists over the NJAG with regard to the newly-added claims. (Dkt. 135, at 3). While Plaintiffs are correct that they referred to § 2C:39-9(l)(2) in their motion for preliminary injunction, they ignore the fact that the Fifth Circuit's opinion did not assess any claims

9

against the NJAG regarding this criminal statute. (Mot. PI, Dkt. 67, at 3). Plaintiffs selectively quote from the Fifth Circuit's opinion to argue that it addressed then un-pleaded claims arising from § 2C:39-9(l)(2), when in reality those passages reveal that the Fifth Circuit relied on Plaintiffs' factual allegation that the NJAG verbally threatened Defense Distributed with criminal sanctions. (Dkt. 100, at 4) ("[P]laintiffs allege these actions by Grewal . . . threatening Defense Distributed with criminal sanctions at a live press conference."). Nowhere does the Fifth Circuit state that its decision applies to any un-pleaded claims regarding § 2C:39-9(l)(2), and the Court reminds Plaintiffs that specific jurisdiction must be established for each claim. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006) ("[S]pecific jurisdiction must be established for each claim"). The NJAG's concerns regarding this Court's jurisdiction over him with regard to the § 2C:39-9(l)(2) claims do not reflect an attempt to create "jurisdictional carveouts," as Plaintiffs insist, but rather an accurate understanding of how specific jurisdiction operates. This Court will thus save substantial judicial resources by severing the NJAG from this action and transferring the claims against him to a Court that clearly has personal jurisdiction over the NJAG with regard to the claims stemming from the criminal statute. Severing the NJAG from this action would further preserve judicial resources by allowing a New Jersey court to make determinations regarding the propriety of the NJAG's enforcement actions and the interpretation of § 2C:39-9(l)(2).

The fourth factor likewise weighs in favor of severance because prejudice to Plaintiffs and the Federal Defendants may be avoided by severing the claims against the NJAG and transferring them to a court that clearly has personal jurisdiction over all of Plaintiffs' claims against the NJAG. The Federal Defendants argue that it would suffer prejudice in having to litigate "the claims against it for allegedly failing to carry out activities under the settlement agreement without the presence of" the NJAG. (Dkt. 136, at 13). While Federal Defendants would clearly like to blame NJAG for their failure to abide by their settlement agreement with Plaintiffs, their failure to do so stems from their

App. 013

inability to carry out the settlement agreement in such a way that did not violate the APA, not the NJAG's actions that form the basis of Plaintiffs' claims against him. This factor thus weighs in favor of severance.

Based on the foregoing, the Court finds that the NJAG's motion to sever should be granted.

### B. Motion to Transfer

The NJAG also moves to transfer the now-severed claims against him to the United States District Court for the District of New Jersey, where Plaintiffs have brought the same causes of action against him. The Court will address the public and private factors relevant to transfer under 28 U.S.C. § 1404(a) below.

### 1. Public Interest Factors

To determine whether to transfer Plaintiffs' claims against the NJAG under § 1404(a), this Court must balance four public interest factors: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004). The NJAG asserts that transfer is warranted largely because of "New Jersey's strong interest in not having an out-of-state court determine the validity of it laws and the public interest in avoiding conflicting judgments on novel issues of constitutional law." (Dkt. 121, at 12). The Federal Defendants respond that because the NJAG successfully sought a stay of the later-filed New Jersey action brought by Plaintiffs' against him, the public interest factors weigh against transfer. Plaintiffs "agree with and adopt" the Federal Defendants' response, while adding a handful of additional arguments challenging the NJAG's arguments regarding the risk of conflicting rulings and interest in judicial economy. (Dkt. 135, at 2, 4).

App. 014

The first factor is neutral, as both the District of New Jersey and the Western District of Texas are among the busiest judicial districts in the country. (Dkt. 121, at 14; *see also* Low Decl., Dkt. 121-1). Evaluating the second and third factors together, the Court finds that they weigh in favor of transfer, as New Jersey has a strong interest in having Plaintiffs' claims relating to § 2C:39-9(l)(2), a New Jersey criminal statute, "examined by local state or federal courts—courts that have expertise interpreting its laws." *Def. Distributed v. Grewal*, 971 F.3d 485, 499 n.3 (5th Cir. 2020 Higginson, J., concurring) (quoting *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008)) ("From my review of cases against government officials who attempt to enforce a state law, so for no personal or commercial profit, the litigation has taken place in the governmental official's state."). In addition, New Jersey courts have greater "familiarity with New Jersey's overall statutory framework regulating firearms and the public policies those laws promote" and "have been the primary fora for deciding legal challenges to New Jersey firearms laws." (Dkt. 121, at 13).

The Federal Defendants respond that this Court has previously examined "complex First Amendment issues" and is "the most familiar with the lengthy procedural history and law" of this case. (Dkt. 136, at 17). While this Court has previously evaluated a First Amendment claim regarding printable gun files, Plaintiffs' First Amendment claims make up only two of Plaintiffs' seventeen causes of action in this case. (*See* Dkt. 117). Furthermore, the Federal Defendants have not suggested, and the Court is unaware of any reason to believe that, the District of New Jersey is not well equipped to evaluate "complex First Amendment issues," especially given that is has heard challenges to New Jersey firearms laws for over ten years. (Dkt. 121, at 13). Furthermore, the "lengthy procedural history and law" to which the Federal Defendants refer was dominated by questions of personal jurisdiction, which will be eliminated if the claims against the NJAG are transferred to the District of New Jersey.

12

App. 015

The fourth factor—avoiding unnecessary problems of conflict of laws—likewise weighs in favor of transfer. The NJAG argues that transfer to the District of New Jersey averts the potential for "conflicting rules and a possible split" between circuits regarding the interpretation of a New Jersey criminal statute and on constitutional issues. (Dkt. 121, at 14–15). Plaintiffs respond, without support, that the NJAG's arguments on the fourth factor should be disregarded because "they are not matters of venue." (Dkt. 135, at 4). The Court finds this argument curious as the risk of rulings that create conflicts is explicitly part of the venue analysis. *See In re Volkswagen AG*, 371 F.3d at 203 ("The public concerns include . . . the avoidance of unnecessary problems of conflict of laws."). Plaintiffs further argue, again without citing to any authority, that "the Court should disregard the concern for conflicting rulings because preclusion doctrines solve for that completely." (Dkt. 135, at 4). While Plaintiffs contend that "Grewal has no answer to this," the NJAG rightly responds that "preclusion rules would only prevent the parties in this and the New Jersey action from re-litigating these issues, but would not prevent an inter-circuit conflict on the meaning of § 2C:39-9(l)(2) that arises when New Jersey state courts in future actions adopt a meaning of § 2C:39-9(l)(2) in conflict with this Court's interpretation." (Reply, Dkt. 141, at 10). Furthermore, the District of New Jersey's ability to certify questions regarding § 2C:39-9(l)(2) to New Jersey state courts, and thus avoid any conflict in the interpretation of the state statute, weighs in favor of transfer. (Dkt. 141, at 9).

Lastly, Plaintiffs claim that because the NJAG successfully sought a stay of the New Jersey Suit pending the resolution of the instant action, he is estopped from arguing in favor of transfer. (Dkt. 135, at 4–5). The Court is once again perplexed by this argument. While Plaintiffs are correct that "a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory," the NJAG sought a stay because this action was filed first, not on the basis that this Court is the proper venue for the claims against him. (Dkt. 135, at 5) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 742–43 (2001)); *Def. Distributed v.*

13

*Att'y Gen. of N.J.*, No. 3:19-cv-4753, Dkt. 20 (D.N.J. Feb. 2, 2019). The NJAG's two arguments are thus entirely compatible, especially given that at that time he sought the stay of the New Jersey Suit, Plaintiffs had not added their § 2C:39-9(l)(2) claims and the NJAG was actively challenging personal jurisdiction in this Court. Plaintiffs unsubstantiated arguments must be rejected. The NJAG's arguments regarding the risk of conflicting rulings are thus not estopped, and the fourth factor weighs in favor of transfer.

Having found that the first public interest factor is neutral and the remaining factors weigh in favor of transfer, the Court next addresses the private factors pertinent to a motion to transfer venue under 1404(a).

## 2.   Private Interest Factors

The private interest factors this Court must evaluate to determine whether to transfer a case under 28 U.S.C. § 1404(a) include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d at 203.

The NJAG argues that the first three factors favor transfer because Plaintiffs' § 2C:39-9(l)(2) claim and Commerce Clause claim "turn on the meaning and intent of New Jersey state laws and on the intent of the NJAG's cease-and-desist letter, and the sources of proof relevant to these issues (including any non-party witnesses) are all in New Jersey." (Dkt. 121, at 15–16). The Federal Defendants respond that the NJAG has failed to meet his burden on the first three factors, as a "generalized reference to out-of-state witnesses does not suffice." (Dkt. 136, at 15). The Federal Defendants cite to *Hammers v. Mayea-Chang*, 2019 WL 6728446, at *7 (E.D. Tex. Dec. 11, 2019) for the proposition that the NJAG must "specify the format, relevance, or identity of particular documents or physical evidence" located in a different district. (Dkt. 136, at 15). The NJAG asserts

14

that the fact that the sources of proof are located in New Jersey "is obvious from the nature of the claims" since they challenge actions by state officials. (Dkt. 141, at 10). While the Court agrees that any documentation relevant to the preparation of the cease-and-desist letter and the enactment of § 2C:39-9(l)(2) are invariably located in New Jersey, because the NJAG did not specifically identify the "type of documents" or "the format of their storage (e.g. electronic or physical)," the Court finds that the first factor is neutral. *Hammers*, WL 6728446, at *8.

In *Hammers*, the court noted that although witnesses are sources of proof in a sense, their availability is properly evaluated under the second factor. *Id.* at *9. There, the court denied transfer where the moving party had made reference to first responder witnesses to the car accident at issue, yet the non-moving party disputed that any of those witnesses lived within the jurisdiction of the transferee court and there was no other evidence before the court that would allow it to "determine what and how important their testimony will be." *Id.* Here, in contrast, there is no such dispute—indeed, the state officials who prepared the cease-and-desist letter and passed § 2C:39-9(l)(2) are "necessarily based in New Jersey" and their testimony is likely necessary in resolving Plaintiffs' claims related to the state criminal statute. (Dkt. 141, at 10).

The Federal Defendants also point out that the NJAG failed to carry his burden on the first three factors by not considering the evidence to be presented by Plaintiffs, or the impact of transfer on Federal Defendants. First, while Plaintiffs may plan to present evidence more conveniently located in Texas, their decision to initiate a lawsuit in New Jersey against the NJAG belies any assertion that they will suffer prejudice in presenting evidence there. Second, the Federal Defendants have not elucidated how their ability to present evidence in support of their claims is hampered by the transfer of claims against the NJAG to New Jersey. Indeed, even if the Federal Defendants plan to blame their failure to fulfill the terms of the settlement agreement on the Washington Suit, information about that lawsuit is publicly available and does not require the presence of the NJAG.

15

As such, the second factor weighs in favor of transfer. Because neither party has briefed the Court on the cost of attendance for willing witnesses, the third factor is neutral.

With regard to the fourth factor, the NJAG contends that transfer to New Jersey "would obviate the need to adjudicate threshold jurisdictional issues undecided by the Fifth Circuit and thus make this litigation more expeditious and less expensive." (Dkt. 121, at 16). The Federal Defendants respond that transfer would require Plaintiffs to litigate their claims in both Texas and New Jersey. (Dkt. 136, at 16). Yet Plaintiffs are the ones who chose to file multiple lawsuits against the NJAG and, as discussed above, their claims against the Federal Defendants are not so intertwined with those against the NJAG as to warrant the claims being tried together. In addition, as the NJAG points out, Plaintiffs may more immediately seek relief against the NJAG in New Jersey rather than having to engage in further factual discovery and briefing regarding jurisdiction over the NJAG for Plaintiffs' § 2C:39-9(l)(2) claims in this Court. Accordingly, the fourth factor weighs in favor of transfer.

Based on the foregoing, the Court finds that because all the relevant factors are neutral or weigh in favor of transfer, the NJAG's motion to transfer the claims against him to the United States District Court for the District of New Jersey should be granted.

App. 019

### IV.  CONCLUSION

For the reasons given above, **IT IS ORDERED** that NJAG's Motion to Sever and Transfer Venue, (Dkt. 121), is **GRANTED**.

**IT IS ORDERED** that Plaintiffs' claims against the NJAG are **SEVERED** and shall be **TRANSFERRED** the United States District Court for the District of New Jersey.

**IT IS FINALLY ORDERED** that the NJAG's Unopposed Motion for Oral Argument, (Dkt. 144), is **MOOT**.

**SIGNED** on April 19, 2021.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

App. 020

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED and §
SECOND AMENDMENT §
FOUNDATION, INC., §
§
Plaintiffs, §
§
v. §                                            1:18-CV-637-RP
§
ANDREW J. BRUCK, *Acting Attorney General* §
*of New Jersey, in his official and individual* §
*capacities*, et al., §
§
Defendants. §

## ORDER

Before the Court is the Judgment and Mandate of the United States Court of Appeals for the

Fifth Circuit remanding Plaintiffs' Notice of Appeal, (Dkt. 146). (Judgment, Dkt. 171).

Pursuant to the Fifth Circuit Judgment, **IT IS ORDERED** that the Court's April 19, 2021,

Order, (Dkt. 145), severing Defense Distributed's claims against the New Jersey Attorney General

and transferring them to the United States District Court for the District of New Jersey, is

**VACATED**.

Additionally, pursuant to the Fifth Circuit's Judgment, the Court requests the District of

New Jersey to return the transferred case to the Western District of Texas, Austin Division, to be

reconsolidated with this matter.

**SIGNED** on April 13, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

**\*FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DEFENSE DISTRIBUTED *et al.*, | Civ. Action No. 19-04753 (FLW) |
| Plaintiffs, | **OPINION** |
| v. | |
| MATTHEW J. PLATKIN, Acting Attorney General of the State of New Jersey,[1] | |
| Defendant. | |

**WOLFSON, Chief Judge:**

This matter comes before the Court on the plaintiffs' motion to transfer this consolidated action, comprised of two cases, Civ. No. 21-09867 ("Texas action") and Civ. No. 19-4753 ("NJ action"), to the United States District Court for the Western District of Texas, where the Texas action originated. In the alternative, the motion requests that the Court transfer claims originally asserted in the Texas action back to Texas, while staying the remaining claims that were brought in this District. This Consolidated Action has a complicated history, but it generally involves constitutional challenges to enforcement actions that the Attorney General of New Jersey (the "NJAG" or "Defendant") took, under New Jersey law, against entities that seek to disseminate and consume information used to manufacture 3D-printed firearms. Defendant opposes the motion. For the reasons

---

[1]     Pursuant to Fed. R. Civ. P. 25(d), the Court substitutes Matthew J. Platkin, the Acting Attorney General of New Jersey, who has taken office during the pendency of this litigation. Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

1

set forth herein, the motion to transfer is **DENIED**.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    *Plaintiffs*

Plaintiff Defense Distributed ("DD") is a private corporation that has its principal place of business and headquarters in Austin, Texas. *See* Civ. No. 19-04753, ECF No. 17, Plaintiffs' First Amended Complaint ("N.J. Am. Compl.") ¶ 9. DD produces and disseminates digital firearms information ("DFI") related to manufacturing firearms using a three-dimensional ("3D") printer.[2] *Id.* ¶¶ 10, 29. The DFI that DD seeks to disseminate includes different types of coded computer files. One type, "Computer Aided Design files" ("CAD files"), can assist users in creating 3D models of physical objects, but CAD files "are not ready for insertion into" 3D printers. *See* Civ. No. 21-09867, ECF No. 117, Plaintiffs' Second Amended Complaint ("Texas SAC") ¶ 38. Another type, "Computer Aided Manufacturing files" ("CAM files"), serves the same purpose as CAD files and is "ready for insertion into" 3D printers. *Id.* ¶ 39.

Plaintiff Second Amendment Foundation ("SAF") is a non-profit membership organization incorporated under the laws of Washington State with its principal place of business in Bellevue, Washington. N.J. Am. Compl. ¶ 11. SAF "promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control." *Id.* ¶ 12. Some SAF members reside in New Jersey and seek to receive the DFI that DD produces, share information using DD's publication facilities, and republish DD's files. *Id.*

---

[2] Typically, 3D printed firearms are made from plastic parts that may bypass security systems, and they are printed without serial numbers or other types of identification.  As such, they are usually referred to as "ghost guns."  *See Gun Owners of Am., Inc. v. City of Phila.*, No. 21-2630, 2021 U.S. Dist. LEXIS 193662, at *2-3 (E.D. Pa. Oct. 7, 2021).

App. 023

The five other plaintiffs in this Consolidated Action are: 1) The Firearms Policy Coalition, Inc. and the Firearms Policy Foundation, which are both incorporated under the laws of Delaware and maintain their principal places of business in Sacramento, California; 2) The Calguns Foundation and the California Association of Federal Firearms Licensees, Inc., which are both incorporated under the laws of California and maintain their principal places of business in Sacramento, California; and 3) Brandon Combs, who "resides outside of New Jersey" in an unspecified location and is the founder and president of Firearms Policy Coalition, Inc., the founder and president of Firearms Policy Foundation, the secretary and executive director of The Calguns Foundation, and the founder and executive vice president of California Association of Federal Firearms Licensees, Inc. *See* N.J. Am. Compl. ¶¶ 13–17. The Court hereinafter refers to these five plaintiffs as the "Non-Texas Plaintiffs," (and, together with DD and SAF, "Plaintiffs"), as they were plaintiffs only in the NJ action, and not in the action originally filed in Texas. The Non-Texas Plaintiffs generally engage in advocacy related to the First and Second Amendments. *See id.*

B.    *DD's Settlement with the State Department*

DD began distributing DFI in December 2012, by posting files on its websites, Defcad.com and Defcad.org (collectively, "Defcad"). *See* N.J. Am. Compl. ¶¶ 30–32. DD also hosted its DFI files at a brick-and-mortar public library in Austin, Texas, where patrons could access the files via workstations at the library. *See id.* ¶ 33. In May 2013, the United States Department of State and other related entities (the "State Department") sent notice to DD that its publications may have violated federal firearms export regulations and required DD to obtain approval before publishing certain types of DFI. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015). DD and SAF sued the State Department in Texas, challenging its enforcement actions. *See id.* at 686. Following a period of litigation, the parties reached a settlement agreement in June 2018 (the "Settlement Agreement"), under which the State Department agreed to issue new

App. 024

regulations and a license authorizing DD to publish certain DFI. N.J. Am. Compl. ¶¶ 42–43; Texas SAC ¶ 89.

However, the State Department allegedly ceased complying with the Settlement Agreement following a series of actions that began in late-July 2018. On July 26, 2018, the NJAG—at that time, Gurbir Grewal—sent a cease-and-desist letter to DD threatening to bring an enforcement action for violations of New Jersey law if DD did not discontinue publication of its DFI in New Jersey through DD's websites and other means. N.J. Am. Compl. ¶ 49. As of July 27, 2018, the State Department had partially complied with the Settlement Agreement by issuing a notice of proposed rulemaking concerning DFI and a license to DD, and on July 27, 2018, DD resumed publication of its DFI. N.J. Am. Compl. ¶¶ 46, 53. On July 30, 2018, the NJAG filed suit against DD in New Jersey state court seeking to enjoin its publication of DFI in New Jersey. *See id.* ¶ 65.[3] That same day, the NJAG and other state attorneys general filed suit against the State Department, DD, and SAF in the United States District Court for the Western District of Washington, challenging the Settlement Agreement under the Administrative Procedure Act (APA). *See State of Washington et al., v. United States Department of State et al.*, Civ. No. 18-1115 (W.D. Wash. 2018).[4] The district court granted summary judgment on the APA claims and vacated the actions that violated the APA. *Washington v. United States Dep't of State*, 420 F. Supp. 3d 1130, 1148 (W.D. Wash. 2019), *appeal dismissed sub nom, State v. Def. Distributed*, No. 20-35030, 2020 WL 4332902 (9th Cir. July 21, 2020). The

---

[3] This case was later removed to federal court and has since been administratively terminated. *See* N.J. Am. Compl. ¶ 65.

[4] On the same day, the NJAG sent letters to DreamHost and Cloudflare, Inc., which provided internet security services to DD, suggesting that DD may have violated New Jersey law by publishing its DFI on Defcad. *See* N.J. Am. Compl. ¶¶ 60–64. The NJAG's letter to Cloudflare attached a copy of the July 26, 2018 cease-and-desist letter he sent to DD. *See id.* ¶ 64.

Ninth Circuit dismissed DD's appeal. *State v. Def. Distributed*, No. 20-35030, ECF No. 32 (9th Cir. Jan. 5, 2021).

      C.    *The Texas and New Jersey Actions*

      On the same day that the Washington suit was brought, DD and SAF initiated the Texas action against the NJAG in the United States District Court for the Western District of Texas (the "Texas District Court"). *See* N.J. Am. Compl. ¶ 57; Civ. No. 21-09867, ECF No. 1.[5] DD and SAF generally allege that the cease-and-desist letter violates the First Amendment as a restraint on speech. *See* N.J. Am. Compl. ¶ 58. On January 30, 2019, the Texas District Court dismissed the action against the NJAG for lack of personal jurisdiction. Texas ECF No. 100; *Def. Distibuted v. Grewal*, 364 F. Supp. 3d 681, 691, 693 (W.D. Tex. 2019). DD and SAF moved to amend the judgment on February 27, 2019, which the court denied on July 1, 2019. *See* Texas ECF Nos. 102, 109. DD and SAF appealed on July 31, 2019. *See* Texas ECF No. 110.

      On February 5, 2019, before moving to amend or appealing the judgment to the Fifth Circuit, DD and SAF, along with the Non-Texas Plaintiffs, filed a complaint and a motion for a preliminary injunction against the NJAG in the NJ action. *See* Civ. No. 19-04753, ECF No. 1, Complaint ("N.J. Compl.").[6] The case was assigned to the Hon. Anne Thompson, U.S.D.J. Several days later, Plaintiffs filed an Amended Complaint. *See* N.J. Am. Compl. Plaintiffs assert that the NJAG's actions violate their rights under the First and Second Amendments, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and the dormant Commerce Clause, and that the NJAG's actions are preempted by the federal Arms Export Control Act ("AECA") and the

---

[5] The Texas District Court ultimately transferred the Texas action to the District of New Jersey, where the case was docketed as Civ. No. 21-09867. The Court will hereinafter preface items filed on the docket in Civ. No. 21-09867 using "Texas ECF No."

[6] The Court will preface documents filed in Civ. No. 19-04753 using "N.J. ECF No."

Communications Decency Act ("CDA"). *See id.* As distinguished from the Texas action, the NJ action adds allegations pertaining to New Jersey's new law regulating firearms manufactured using a 3D printer, which New Jersey enacted on November 8, 2018. *See id.* ¶¶ 77–87. Under Senate Bill 2465, now codified at N.J.S.A. 2C:39-9, it is a third-degree felony to

> distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.

N.J.S.A. 2C:39-9(*l*)(2). Plaintiffs allege that N.J.S.A. 2C:39-9(*l*)(2) constitutes criminal censorship, that New Jersey enacted the law for the purpose of censoring DD and SAF members, and that the NJAG threatened to deploy the new law against DD and other ghost-gun companies. *See* N.J. Am. Compl. ¶¶ 77–87. After the law was enacted, Plaintiffs allege that DD "ceased offering, advertising, selling, or otherwise distributing [DFI] on [Defcad]." N.J. Am. Compl. ¶ 85.[7]

Additionally, unlike the Texas action, the NJ action asserts claims on behalf of the Non-Texas Plaintiffs. These plaintiffs operate the CodeIsFreeSpeech ("CIFS") project via CodeIsFreeSpeech.com, which became publicly accessible on July 31, 2018. N.J. Am. Compl. ¶¶ 88, 90. From that date through February 2, 2019, CodeIsFreeSpeech.com made available for download "digital instructions in the form of [CAD] files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a [3D] printer to

---

[7] On March 3, 2019, the NJAG filed a motion requesting a stay of the NJ action pending resolution of DD's and SAF's motion to amend the judgment in the Western District of Texas. *See* N.J. ECF No. 20. Judge Thompson granted a stay "until the action in the Western District of Texas (Civil Docket No. 18-637) is resolved and no other motions for relief and/or appeals are viable." N.J. ECF No. 26. Judge Thompson also dismissed DD's and SAF's motion for a preliminary injunction without prejudice. N.J. ECF No. 33. DD and SAF appealed both orders, and on August 25, 2020, the Third Circuit dismissed both appeals for lack of appellate jurisdiction. *See Def. Distributed v. Attorney Gen. of N.J.*, 972 F.3d 193 (3d Cir. 2020).

manufacture or produce a firearm, firearm receiver, magazine, or firearm component." *Id.* ¶ 90.
CIFS's publications during this period included, among content from other providers, files that DD
had published previously. *See id.* ¶ 91. On February 2, 2019, plaintiff Brandon Combs allegedly
received an email from Cloudflare regarding "Cloudflare Abuse," which reported that Cloudflare
had received a notification from the Office of the Attorney General of New Jersey ("OAGNJ"). *Id.*
¶ 94. The notification stated that Cloudflare had made files accessible via its datacenter that violate
N.J.S.A. 2C:39-9(*l*)(2), and ordered Cloudflare to remove the files within 24 hours. *Id.*[8] Due to the
takedown demand, "on February 2, 2019, CodeIsFreeSpeech.com made the [DFI] that it had
previously published inaccessible to anyone who browsed to or otherwise attempted to access those
files." *Id.* ¶ 95. Plaintiffs allege that but-for the NJAG's actions, CodeIsFreeSpeech.com "would
resume online publication of the files that it had published from July 31, 2018 to February 2, 2019,
to persons in the State of New Jersey." *Id.* ¶ 100.

On August 19, 2020, the Fifth Circuit reversed the Texas District Court's decision finding
that Texas lacked personal jurisdiction over the NJAG, holding that the NJAG's enforcement
actions against DD provided sufficient litigation-related contacts in Texas. *Def. Distributed v.
Grewal*, 971 F.3d 485, 495–97 (5th Cir. 2020). DD and SAF thereafter filed a Second Amended
Complaint ("Texas SAC") in the Texas action. *See* Texas ECF No. 117, Texas SAC. That Texas
SAC adds allegations pertaining to N.J.S.A. 2C:39-9(*l*)(2) that are nearly identical to those asserted

---

[8] The NJAG submitted a letter to Judge Thompson on February 12, 2019, taking the position that the
NJAG did not in fact issue the takedown order. N.J. Am. Compl. ¶ 96. Plaintiffs sought clarification
as to whether the NJAG would bring enforcement actions if DD, SAF, or CodeIsFreeSpeech.com
were to publish additional DFI. *Id.* ¶ 97. In subsequent correspondence, the NJAG responded that he
could not "provide any generalized assurances one way or the other regarding the enforcement of
Section 3(l)(2) if [Plaintiffs] intend to violate the plain terms of the statute." *Id.* ¶ 98. On the instant
motion, Defendant takes the position that "the February 2, 2019 communication was not in fact issued
by the NJAG, and was instead sent by an entity impersonating the NJAG." N.J. ECF No. 57 at 10
n.1 (citing N.J. ECF No. 9).

App. 028

in the NJ action. *Id.* ¶¶ 141–61. In addition, the Texas SAC adds claims against the State Department for violations of the APA and the First, Second, and Fourteenth Amendments, and for breach of contract, all in connection with the Department's apparent disavowal of the Settlement Agreement. *Id.* ¶¶ 184–254. As to the NJAG, the Texas SAC asserts the following claims: violations of the First and Second Amendments, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and the dormant Commerce Clause; that the NJAG's actions are preempted by the AECA and the CDA; and tortious interference with the Settlement Agreement and with DD's contracts with Cloudflare and DreamHost.

Before the Texas District Court, the NJAG moved to sever and transfer the claims against him to the District of New Jersey, which that court granted on April 20, 2021.[9] *See* Texas ECF No. 145; *Def. Distributed v. Grewal*, Civ. No. 18-637, 2021 WL 1614328 (W.D. Tex. Apr. 19, 2021). That day, DD and SAF appealed the transfer order to the Fifth Circuit. Texas ECF Nos. 146, 147. Once the Texas action was transferred to this District, on April 28, 2021, the NJAG filed a motion to consolidate the transferred Texas action (Civ. No. 21-09867) with the NJ action (Civ. No. 19-04753) (hereinafter the "Consolidated Action"). *See* N.J. ECF No. 41. Plaintiffs did not oppose the motion before the May 24, 2021 deadline, and Judge Thompson granted the motion on June 11, 2021.[10] *See* N.J. ECF No. 43. However, on June 23, 2021, the Fifth Circuit issued an order staying the Texas District Court's transfer order "pending further order" of the Fifth Circuit. *See Def. Distributed v. Grewal*, No. 21-50327, Doc. No. 00515911277 (5th Cir. June 23, 2021). In light of the Fifth Circuit's Order, Judge Thompson denied a request from the NJAG to set a status

---

[9] After severance, DD's and SAF's claims against the State Department remain in Texas.

[10] Indeed, the consolidation was appropriate, since the Complaints in both actions assert nearly identically claims as they relate to DD and SAF.

conference in the Consolidated Action pending "further guidance from the Fifth Circuit." *See* N.J.

ECF No. 46. Importantly, this matter remains a consolidated case, with the NJ member case terminated.

On April 1, 2022, the Fifth Circuit issued an Opinion concerning the Texas District Court's transfer order. *See Def. Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022). *Bruck* held that the Texas District Court erred in severing and transferring the claims against the NJAG to the District of New Jersey. *Id.* at 427. Without precedent,[11] a divided Fifth Circuit panel issued a writ of mandamus, vacating the Texas District Court's transfer order and ordering the Texas District Court to "[r]equest the District of New Jersey to return the transferred case to the Western District of Texas."[12] *Id.* at 436–37. As instructed, the Texas District Court issued an order on April 13, 2022, vacating its severance and transfer order, and "requesting" that the District of New Jersey return the matter to the Western District of Texas. *See* N.J. ECF No. 48.

Upon the Consolidated Action being assigned to me from Judge Thompson on April 19, 2022, N.J. ECF No. 50, I ordered the parties to file letters stating their positions regarding the Texas District Court's request. N.J. ECF No. 51. After reviewing the parties' submissions, I construed Plaintiffs' letter as a motion to transfer the Consolidated Action to the Western District of Texas, and subsequently ordered both parties to file opposition briefs, which were timely filed on June 6, 2022. *See* N.J. ECF Nos. 55–57.

## II.    LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought." 28 U.S.C. §

---

[11] *See infra*, n. 25.

[12] The Court will discuss, *infra*, the impact of the Fifth Circuit's Mandamus Order as to the Consolidated Action.

1404(a). The movant bears the burden of establishing that transfer is appropriate. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). Section 1404(a) "is [intended] 'to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Kremer v. Lysich*, Civ. No. 18-03676, 2019 WL 3423434, at *3 (D.N.J. July 30, 2019) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964)). Thus, the statute vests district courts "with a large discretion," *Solomon v. Cont'l Am. Life Ins. Co.*, 472 F.2d 1043, 1045 (3d Cir. 1973), "to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622).

A two-step analysis governs motions to transfer an action to another district court. First, courts must determine whether the proposed transferee district is one where the original action "might have been brought," which turns on "whether (1) venue is proper in the transferee district, and (2) the transferee district can exercise personal jurisdiction over all parties." *See Interlink Prods. Int'l, Inc. v. Crowfoot*, Civ. No. 20-7654, 2020 WL 6707946, at *6 (D.N.J. Nov. 16, 2020) (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 24 (3d Cir. 1970)). Second, if venue is proper and the transferee court would have personal jurisdiction, courts must assess a set of "private" and "public" interests "'to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.'" *Jumara*, 55 F.3d at 879 (quoting 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 3847 (2d ed. 1986)).

## III.    DISCUSSION

To analyze whether transfer is appropriate, the Court must first properly frame the specific relief that Plaintiffs request. The Texas District Court issued an order requesting that this Court return the Texas action to the Western District of Texas. But the Texas action is no longer pending as a

standalone case. Indeed, having received no objection from Plaintiffs, Judge Thompson consolidated that case with the NJ action—nearly a year before the Texas District Court issued its request. *See* N.J. ECF No. 43. Thus, this Court is faced with simply one Consolidated Action.

Based on this procedural posture, the Court construes Plaintiffs' motion to transfer as making three separate requests: first, Plaintiffs request that the Court retransfer the original Texas action, which has been consolidated, to the Western District of Texas, while allowing the NJ action to proceed in parallel in this Court. *See* N.J. ECF No. 56 at 4 (arguing that "Case number 3:21-cv-9867 belongs in Texas no matter what"). But, because this is one Consolidated Action, the Court construes Plaintiffs' request as a motion to sever and transfer the claims originally asserted in the Texas action. And, while Plaintiffs have not filed a formal motion to sever, the Court may decide whether severance is appropriate *sua sponte*. *See* Fed. R. Civ. P. 21. Second, Plaintiffs request that the Court transfer the entire Consolidated Action to the Western District of Texas. *See* N.J. ECF No. 54 at 1 (arguing that the Court should "return the entire controversy to the Western District of Texas"); N.J. ECF No. 56 at 6 (arguing that the Court should transfer "both cases to the Western District of Texas"). Third, Plaintiffs propose severing and transferring the claims originally asserted in the Texas action, while staying the remaining claims, *i.e.*, those filed in the NJ action, in this Court. *See* N.J. ECF No. 56 at 6.

Plaintiffs' first request is not tenable. "Before effecting . . . a severance, a judge should weigh the convenience to the parties requesting transfer against the potential inefficiency of litigating the same facts in two separate forums." *White v. ABCO Eng'g Corp.*, 199 F.3d 140, 144 (3d Cir. 1999). "'[The court] should not sever if the defendant over whom jurisdiction is retained is so involved in the controversy to be transferred that partial transfer would require the same issues to be litigated in two places.'" *Sunbelt Corp. v. Noble, Denton & Assocs., Inc.*, 5 F.3d 28, 33–34 (3d Cir. 1993) (quoting *Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d 1140, 1148 (5th Cir.1984), *overruled*

*on other grounds*, *In re Air Crash Disaster Near New Orleans, La., on July 9, 1982*, 821 F.2d 1147

(5th Cir. 1987)). Here, except for two tortious interference counts that were asserted only in the Texas

action, the remaining seven causes of action asserted against the NJAG in both the NJ action and

Texas action are identical and concern the same type of conduct. *Compare* Texas SAC (asserting

causes of action under the First and Second Amendments, the Equal Protection, Due Process, and

Commerce Clauses, the AECA and CDA, and for tortious interference with the settlement agreement

and with existing contracts), *with* N.J. Am. Compl. (asserting all the same claims except those for

tortious interference). Severing and transferring the claims in the Texas action to Texas while

allowing the remaining claims to proceed in parallel here, would therefore require Defendant to

litigate "the same issues . . . in two places." *Sunbelt*, 5 F.3d at 33–34.[13]

Thus, the Court's transfer analysis will focus on Plaintiffs' requests to transfer the entire

Consolidated Action to Texas or, in the alternative, sever and transfer the claims asserted in the Texas

action, while staying the remaining claims in this Court. Under many of the relevant factors, the

---

[13] The Fifth Circuit concluded that litigating DD's and SAF's claims against the NJAG together with their claims against the State Department in Texas would produce efficiencies. *See Def. Distributed*, 30 F.4th at 431–32. I am not persuaded. To the contrary, any such efficiencies fall far short of those derived from litigating DD's, SAF's, *and* the Non-Texas Plaintiffs' seven identical causes of action against the NJAG in one forum. *See In re Amendt*, 169 F. App'x 93, 96 (3d Cir. 2006) ("Adjudicating almost identical issues in separate fora would waste judicial resources."). That is particularly true where only three of the eight causes of action DD and SAF assert against the State Department overlap with causes of action they assert against the NJAG. *Compare* Texas SAC, *with* N.J. Am. Compl. The Fifth Circuit discounted the efficiency of litigating the Texas action and NJ action together in this Court because the circuit court concluded that DD and SAF were compelled to file suit in New Jersey due to the Texas District Court's allegedly erroneous decision on personal jurisdiction. *See Def. Distributed*, 30 F.4th at 432. But such reasoning does not address the issues concerning judicial efficiency and jurisdiction that the motion to transfer now presents to this Court. *See infra*. Indeed, as discussed *infra*, the equities do not cut in favor of DD or SAF, given that when they appealed the Texas District Court's personal jurisdiction order they could have simply awaited the Fifth Circuit's decision; however, that did not occur. Instead, DD and SAF filed a new case, bringing nearly-identical claims against Defendant in the NJ action, which resulted in the Consolidated Action.

Court's analysis as to each request is identical. And because one Consolidated Action is before the Court, the Court will analyze the transfer factors based primarily on Plaintiffs' request to transfer the entire Consolidated Action. However, where relevant, the Court will conduct a separate analysis as to Plaintiffs' third request regarding severance, transfer and a stay of the NJ action. Ultimately, the Court finds that transferring either the entire Consolidated Action, or only the claims asserted in Civ. No. 21-0986, is not warranted.

### A.     Whether Plaintiffs Could Have Brought the Action in Texas

#### 1.     Venue

The Court must first determine "whether . . . venue is proper in the transferee district." *See Interlink Prods. Int'l, Inc.*, 2020 WL 6707946, at *6 (citing *Shutte*, 431 F.2d at 24). Here, Plaintiffs maintain that venue for the Consolidated Action is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(2), which provides for venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *See* N.J. ECF No. 54 at 3. Defendant does not dispute that venue in the Western District of Texas is proper under Section 1391(b)(2). Because I find that transfer is not appropriate, even assuming proper venue, I will assume, without deciding, that the Western District of Texas is a proper venue for the Consolidated Action.

#### 2.     Personal Jurisdiction

The Court must next analyze personal jurisdiction in the transferee forum. A court may "exercise personal jurisdiction over a nonresident defendant" if (1) the state's long-arm statute confers jurisdiction, and (2) asserting jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999). "Because Texas' long-arm statute has been interpreted to extend to the limits of due process," the Court need only determine whether asserting jurisdiction in Texas over Defendant would violate the Due Process Clause. *Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999) (citing

13

App. 034

*Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990)).

Under the Due Process Clause, a court has jurisdiction over a nonresident defendant "when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'" *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir.1999) (quoting *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945)). Two different forms of personal jurisdiction can satisfy the requisite contacts: general and specific. *Ford Motor Co. v. Mont. Eighth Judicial Dist.*, 141 S. Ct. 1017, 1024 (2021). Here, Texas may not exercise general jurisdiction over the NJAG, as he is not "'essentially at home' in th[at] State." *Id.* (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)). Only specific jurisdiction is at issue.

A court has specific jurisdiction when three conditions are met. "First, the defendant must 'purposefully avail[ ] itself of the privilege of conducting activities in the forum State.'" *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317 (5th Cir. 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1024). "Second, the plaintiff's claim 'must arise out of or relate to' those purposeful contacts." *Johnson*, 21 F.4th at 317 (quoting *Ford Motor Co.*, 141 S. Ct. at 1025). Although "[a] defendant may have many meaningful ties to the forum," the court may not exercise jurisdiction unless those ties "connect to the plaintiff's claim." *Johnson*, 21 F.4th at 318. Third, exercising jurisdiction "must be 'fair and reasonable' to the defendant." *Johnson*, 21 F.4th at 318 (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)).

Transfer to a different district court is proper only where the plaintiff has an "unqualified right" to bring its claim "in the transferee forum." *Shutte*, 431 F.2d at 24. Transfer is not appropriate where "there is a very real question whether [the] plaintiff could have obtained jurisdiction" in the transferee court. *Id.* Here, because the personal jurisdiction analysis differs based on whether this

14

Court were to transfer the entire Consolidated Action or only the claims asserted in the Texas action, I conduct separate analyses for each request.

a)    Transfer of the Entire Consolidated Action

As discussed *supra*, the Consolidated Action includes claims asserted by the Non-Texas Plaintiffs. Those claims likely do not provide a basis for the transferee court to exercise specific jurisdiction over the NJAG, because they do not "'arise out of or relate to' [the NJAG's] purposeful contacts" in Texas. *See Johnson*, 21 F.4th at 317 (quoting *Ford Motor Co.*, 141 S. Ct. at 1025). To begin, the Non-Texas Plaintiffs are neither organized under the laws of Texas nor are they Texas residents. *See* N.J. Am. Compl. ¶¶ 13–17.[14] Moreover, the NJAG's alleged conduct underpinning these particular claims is not connected to Texas. Indeed, Plaintiffs allege that CodeIsFreeSpeech.com—a website the Non-Texas Plaintiffs operate that has no alleged connection to Texas—published DFI from July 31, 2018, through February 2, 2019. N.J. Am. Compl. ¶¶ 88, 90, 94. On February 2, 2019, the OAGNJ purportedly sent a notification to Cloudflare, a company based in California,[15] concerning potential violations of New Jersey law by CodeIsFreeSpeech.com. *See* N.J. Am. Compl. ¶ 94; N.J. ECF No. 18-3, Declaration of Brandon Combs ("Combs Decl.") Ex. B. The notification pertained to files that were accessible via Cloudflare's New Jersey datacenter. *See* N.J. Am. Compl. ¶ 94. And Cloudflare allegedly forwarded the notification to Combs, *see* N.J. Am. Compl. ¶ 94, who also does not have any connection to Texas. The OAGNJ's notification did list a

---

[14] Plaintiffs allege that "Brandon Combs resides outside of New Jersey," without specifying his state of residence. N.J. Am. Compl. ¶ 17. The Court therefore has no basis to infer, let alone find, that Combs is a Texas resident.

[15] Cloudflare has its principal place of business in California and is organized under the laws of Delaware. *See Cloudflare, Inc. Form 10-K* (Dec. 31, 2021) https://www.sec.gov/ix?doc=/Archives/edgar/data/1477333/000147733322000008/cloud-20211231.htm.

15

set of files concerning the "Liberator" firearm that DD, a Texas entity, had published previously. But, the mere fact that the OAGNJ's notification listed a set of files a Texas entity had published does not mean that the notification, sent to non-Texas entities, constituted outreach to Texas. Moreover, the republished set of DD files was only one among many from other DFI providers, with no alleged connection to Texas, that the notification covered. *See* N.J. Am. Compl. ¶¶ 91, 94. Thus, the Non-Texas Plaintiffs' claims based on the OAGNJ's notification do not "arise out of or relate to," *Johnson*, 21 F.4th at 317, actions the NJAG directed at Texas vis-a vis the cease-and-desist letter sent to DD.

Nor is it evident that the Non-Texas Plaintiffs' claims arise out of other actions that the NJAG allegedly directed at the transferee forum. The Non-Texas Plaintiffs allege that "they refrain from receiving and republishing [DD's] files for fear of being prosecuted by New Jersey." *See id.* ¶ 115. Based on that lone allegation, there is no basis to conclude that the Non-Texas Plaintiffs' claims arise out of threats the NJAG issued to DD. The NJAG sent his cease-and-desist letter to DD in Texas on July 26, 2018, which is *before* CodeIsFreeSpeech.com began publishing DFI, including DD's files, on July 31, 2018. *See* N.J. Am. Compl. ¶¶ 49, 90. Thus, the Non-Texas Plaintiffs' claims more accurately arise out of perceived threats the NJAG directed at *them*, including the notification sent to Combs via Cloudflare and the NJAG's refusal to provide assurances that he would not bring an enforcement action, under New Jersey law, against any plaintiff in the Consolidated Action. *See id.* ¶¶ 97–98. Because none of the Non-Texas Plaintiffs are based in Texas and, as far as the allegations indicate, none were targeted in Texas, the NJAG did not target the threats underlying their claims at Texas. These claims, therefore, do not arise out of, or relate to, the NJAG's contacts with Texas, casting considerable doubt over the Non-Texas Plaintiffs' "right" to bring their claims "in the transferee forum." *Shutte*, 431 F.2d at 24.

Next, I address whether the transferee court could exercise pendent personal jurisdiction over

16

the Non-Texas Plaintiffs' claims. Such jurisdiction "comes in two forms—pendent claim and pendent party personal jurisdiction." *Canaday v. Anthem Companies, Inc.*, 9 F.4th 392, 401 (6th Cir. 2021). Under "[p]endent *claim* jurisdiction, . . . a court's exercise of personal jurisdiction over one defendant as to one claim allows it to exercise personal jurisdiction with respect to related claims that it could not adjudicate in the anchor claim's absence." *Id.* (emphasis in original). On the other hand, "[p]endent *party* personal jurisdiction recognizes that a court's exercise of personal jurisdiction over one defendant as to a particular claim by one plaintiff allows it to exercise personal jurisdiction with respect to similar claims brought by other plaintiffs." *Id.* (emphasis in original). The latter doctrine is relevant here. DD, SAF, and the Non-Texas Plaintiffs all assert claims under the same causes of action, *see generally* N.J. Am. Compl., but as explained *supra*, only DD's and SAF's claims have a sufficient connection to Texas for purposes of specific jurisdiction.

There is at least a "very real question," *Shutte*, 431 F.2d at 24, whether the district court in the Western District of Texas could exercise pendent party personal jurisdiction over the Non-Texas Plaintiffs' claims against the NJAG. The parties have not identified any cases in the Fifth Circuit or the Western District of Texas that address pendent *party* jurisdiction, nor could the Court locate any.[16] However, the weight of authority outside the Fifth Circuit holds that the doctrine is inapplicable beyond a limited set of circumstances that are not relevant here. In *Canaday*, the Sixth

---

[16] In the Fifth Circuit, "specific personal jurisdiction [is] a claim-specific inquiry." *Seiferth*, 472 F.3d at 274. "A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *Id.* Thus, on multiple occasions, the Fifth Circuit has held that a district court lacked personal jurisdiction over a plaintiff's claims that were not connected to the forum, even though the court had jurisdiction over other claims asserted by the same plaintiff that arose out of the defendant's forum-related contacts. *See, e.g.*, *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 197–98 (5th Cir. 2019); *Seiferth*, 472 F.3d at 274–76. Though closely related, these cases do not address the specific posture at issue here, where multiple plaintiffs each bring identical claims, but only certain plaintiffs' claims are sufficiently connected to the defendant's contacts with the forum to support personal jurisdiction.

App. 038

Circuit refused to apply pendent party jurisdiction over claims by certain nonresident plaintiffs where the defendant's conduct underlying those claims did not relate to the forum, even though the court had personal jurisdiction over other plaintiffs' claims asserted under the same cause of action. *See* 9 F.4th at 395, 401–02. *Canaday* reached this conclusion based in part on the Supreme Court's decision in *Bristol Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017). There, the Court held that a court in California did not have specific jurisdiction over claims by non-resident plaintiffs that were not connected to the defendant's conduct in California, even though the court had jurisdiction over claims by other resident plaintiffs in the same suit. *See* 137 S. Ct. at 1782–84. As *Canaday* explains, "[i]f pendent party personal jurisdiction exists, *Bristol-Myers* should have come out the other way." 9 F.4th at 401. *Canaday* recognized that some courts assert pendent personal jurisdiction over claims lacking a relationship with the forum where a federal statute under which the plaintiff asserts another claim authorizes nationwide service of process. *See id.* at 401 (citing cases, none of which is from the Fifth Circuit). However, the plaintiffs in *Canaday* brought claims under the Fair Labor Standards Act (FLSA), which does not authorize nationwide service, and as such, the doctrine did not apply. *See id.*

In *Vallone v. CJS Solutions Group*, 9 F.4th 861 (8th Cir. 2021), the Eighth Circuit held that a district court did not have personal jurisdiction over similar claims to those at issue in *Canaday*. Like in *Canaday*, the plaintiffs in *Vallone* asserted FLSA claims, but some of the plaintiffs' claims did not arise out of, or relate to, the defendant's conduct in the forum state. *Id.* at 863–66. *Vallone* held that the district court had "properly excluded claims with no connection to [the forum state]" because "jurisdiction to entertain a claim with connections to [the forum]" does not "establish[] jurisdiction to hear another claim with no such connection." *Id.* at 866.

A sister district court in this Circuit also recently declined to apply pendent party personal jurisdiction. *See Travers v. FedEx Corp.*, __ F. Supp. 3d __, 2022 WL 407398, at *4–5 (E.D. Pa.

2022). In *Travers*, a nonresident plaintiff urged the court to apply pendent party personal jurisdiction over claims that were not connected to the forum given that the court had specific jurisdiction over similar claims another plaintiff asserted in the same action. *Id.* at *1, *4–5. *Travers* noted that the Third Circuit has only applied pendent personal jurisdiction over claims with no connection to the forum when the plaintiff asserts another claim in the same action under a federal statute that authorizes nationwide service. *See id.* at *4 and n.42 (citing *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 123 (3d Cir. 2020); *Robinson v. Penn Cent. Co.*, 484 F.2d 553, 555–56 (3d Cir. 1973)). But no such federal statute was at issue in *Travers*, and the court noted that "the majority position" among district courts rejects pendent party personal jurisdiction. *Id.* at *5 and n.45 (collecting cases). Accordingly, *Travers* refused to apply pendent party personal jurisdiction to the nonresident plaintiff's claims. *Id.* at *5; *see also Chernus v. Logitech, Inc.*, No. 17-673, 2018 WL 1981481, at *1, *6 (D.N.J. Apr. 27, 2018) (declining to exercise personal jurisdiction over claims by a nonresident plaintiff that lacked any connection to the forum even though there was no dispute that the court had personal jurisdiction over similar claims by a resident plaintiff that arose out of the defendant's contacts with the forum).

      Based on the foregoing case law, it is unlikely that a district court in Texas would assert pendent party personal jurisdiction over the Non-Texas Plaintiffs' claims.[17] Certain plaintiffs here— DD and SAF—assert claims that arise out of the NJAG's contacts with the forum, over which a court in Texas has personal jurisdiction. *See Def. Distributed*, 971 F.3d at 497. However, other plaintiffs— the Non-Texas Plaintiffs—are not residents of the forum, and their claims do not arise out of, or relate to, the NJAG's contacts with Texas, and no plaintiff asserts a claim under a federal statute authorizing

---

[17] In *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), the Fifth Circuit did not address whether a district court would have personal jurisdiction over the Non-Texas Plaintiff's claims asserted in the NJ action.

nationwide service.  Accordingly, like in *Canaday*, *Vallone*, and *Travers*, a district court in Texas likely would not assert personal jurisdiction over the latter claims. Based on all the foregoing reasons, I find that Plaintiffs do not have an "unqualified right" to bring these consolidated actions "in the transferee forum." *Shutte*, 431 F.2d at 24.

<blockquote>b)      Transfer of the Claims Asserted in The Texas Action</blockquote>

By contrast, Plaintiffs present a stronger case for personal jurisdiction over DD's and SAF's claims against the NJAG asserted in the Texas action. On that issue, in the Fifth Circuit held, on an appeal from a motion to dismiss, that Texas has personal jurisdiction over the NJAG with respect to these claims. *See Def. Distributed*, 971 F.3d at 497. The circuit reasoned that the NJAG sent his cease-and-desist letter to DD in Texas, and it construed the letter as ordering DD to cease its publications nationwide, not just in New Jersey. *Id.* at 492 & n.6. It also concluded that beyond the cease-and-desist letter, the NJAG's enforcement actions selectively targeted DD. *Id.* at 493. And, the court further emphasized that the cease-and-desist letter had a chilling effect on DD that in turn reduced Texans' access to DD's materials. *Id.* at 495–96. Based on these factors, the court concluded that DD's claims arose out of the NJAG's contacts with the forum. *Id.* at 497.[18]

Nevertheless, it is important to point out that even the Fifth Circuit recognized that certain factual disputes regarding personal jurisdiction remain. For example, the court's conclusion that the NJAG purposefully directed enforcement action at Texas was predicated on it construing the cease-and-desist letter as applying to publications outside New Jersey. *See id.* at 492 n.6. But the court recognized that the letter ordered DD to "'to cease and desist from publishing printable-gun computer files *for use by New Jersey residents*,'" which, the court acknowledged, "could be interpreted as a

---

[18] The Fifth Circuit's reasoning as to personal jurisdiction focuses entirely on DD and does not refer specifically to SAF. *See id.* at 491–97.

App. 041

limited instruction." *Id.* (emphasis in original). Although the court ultimately construed the letter as applying nationwide, it did so by resolving the factual dispute in the plaintiffs' favor, as it must on a motion to dismiss. *Id.* In fact, the concurrence explained that the panel did "not resolve the factual dispute of whether" the cease-and-desist letter applied to publications outside New Jersey. *Id.* at 497 n.1 (Higginson, J., concurring). Rather, if the NJAG did not "in fact" order DD to cease publications other than in New Jersey, the concurrence recognized that Fifth Circuit precedent would foreclose personal jurisdiction over the NJAG. *Id.* (citing *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008)). Thus, even with respect to DD's and SAF's claims against the NJAG, based on the Fifth Circuit's decision, the issue of personal jurisdiction in the transferee forum is not settled. In any event, as discussed *infra*, even if the transferee court has personal jurisdiction over the claims asserted by DD and SAF against Defendant, the *Jumara* factors nevertheless weigh against transfer.

### B.    Private and Public Interest Factors

#### 1.    Private Interest Factors

The private interest factors include (1) "the plaintiff's forum preference," (2) "the defendant's [forum] preference," (3) the forum where the claims arose, (4) "the convenience of the parties as indicated by their relative physical and financial condition," (5) "the convenience of the witnesses," and (6) "the location of books and records." *Jumara*, 55 F.3d at 879; *Interlink Prods. Int'l*, 2020 WL 6707946, at *7. Here, the analysis regarding transfer of the Consolidated Action and transfer of the claims in the Texas action is largely the same, such that the Court analyzes these alternatives together.

The first two factors largely counterbalance one another. Plaintiffs prefer Texas, as evidenced by DD's and SAF's choice to initially file suit in Texas and Plaintiffs' request to transfer the Consolidated Action to Texas. *See* N.J. ECF No. 54 at 4. Defendant prefers New Jersey, where the NJAG is located and from where he initiated many of the actions underlying Plaintiffs' claims. A plaintiff's choice of "forum is a paramount consideration in any determination of a transfer request,"

*Shutte*, 431 F.2d at 25, which "should not be lightly disturbed." *Jumara*, 55 F.3d at 879 (quotations and citations omitted). However, the plaintiff's choice "is not necessarily decisive," particularly where "the central facts of the lawsuit did not occur" in the plaintiff's chosen forum. *Interlink Prods. Int'l*, 2020 WL 6707946, at *7 (citing *Nat'l Prop. Inv'rs VIII v. Shell Oil Co.*, 917 F. Supp. 324, 327 (D.N.J. 1995)). While the Fifth Circuit concluded that the NJAG directed certain actions underlying DD's and SAF's claims at Texas, those actions nevertheless took place in New Jersey, which is also where N.J.S.A. 2C:39-9(*l*)(2) was enacted. The NJAG's actions underlying the Non-Texas Plaintiffs' claims also occurred in, and were directed toward, other districts. As such, Plaintiffs' chosen forum is not decisive; rather, the factors related to Plaintiffs' and Defendant's preferred fora are largely neutral.

The forum where the claims arose is also neutral. The NJAG sent his cease-and-desist letter to DD in Texas, and he referred to DD specifically in his speech at the signing ceremony for SB 2465. *See* N.J. Am. Compl. ¶¶ 49–50, 80–81. But many of the other allegedly unlawful actions occurred elsewhere. The NJAG forwarded his cease-and-desist letter to DD's internet security providers, both of which are located in California. *See* N.J. Am. Compl. ¶¶ 60–64. He sued the State Department in Washington State seeking to enjoin its Settlement Agreement with DD, and he sued DD in New Jersey state court seeking to enjoin its publication of DFI. *See* N.J. Am. Compl. ¶¶ 65–66. With respect to the Non-Texas Plaintiffs, the OAGNJ sent notice to Cloudflare, a California company, that CodeIsFreeSpeech.com may have violated New Jersey law. *See* N.J. Am. Compl. ¶¶ 88–100. Combs received the notice from Cloudflare, *See* N.J. Am. Compl. ¶ 94, and there is no indication that he or any of the other Non-Texas Plaintiffs is located in Texas. In fact, where a plaintiff's claims turn on a state's cross-border enforcement actions in the plaintiff's state of residency, courts typically find that the "events giving rise to the claims" occurred where the relevant state officials are located. *See Interlink Prods. Int'l*, 2020 WL 6707946, at *7. Thus, contrary to

Plaintiffs' position, there is no basis to conclude that Texas is the "center of gravity" for either the Consolidated Action or the claims in the Texas action.

Nor do convenience considerations or the location of books and records weigh decidedly in favor of either party. The NJAG's litigation resources likely outweigh Plaintiffs', which slightly favors Plaintiffs' preferred forum. *See Maliki v. Holy Redeemer Hosp.*, Civ. No. 15-1591, 2016 WL 4161094, at \*2 (D.N.J. Aug. 5, 2016) (citing *Jumara*, 55 F.3d at 879). But the officials behind the enforcement actions that underpin Plaintiffs' claims are all located in New Jersey, as are the documents associated with those actions. And Plaintiffs concede that the likelihood they will need to adduce technical evidence located in Texas is "low." ECF No. 54 at 4. In any event, neither party contends that any of its witnesses or other evidence would be unavailable in either proposed forum. Convenience factors therefore do not favor either party. *See Interlink Prods. Int'l*, 2020 WL 6707946, at \*7 (citing *Jumara*, 55 F.3d at 879) (noting that convenience factors "would sway the court only if there were witnesses who were unavailable in one of the forums, or if documents could be produced in one district but not the other").

Accordingly, the private interest factors are in equipoise and do not compel the outcome of Plaintiffs' motion.

> 2.    *Public Interest Factors*

The relevant public interest factors include (1) "the enforceability of the judgment," (2) "practical considerations that could make the trial easy, expeditious, or inexpensive," (3) "the relative administrative difficulty in the two fora resulting from court congestion," (4) "the local interest in deciding local controversies at home," (5) "the public policies of the fora," and (6) "the familiarity of the trial judge with the applicable state law in diversity cases." *Jumara*, 55 F.3d at 879–80; *Interlink Prods. Int'l*, 2020 WL 6707946, at \*7.

a)    Enforceability

Concerns regarding the enforceability of a judgment in this case, *Jumara*, 55 F.3d at 879, do not favor either proposed forum. "[W]hen both forums are federal district courts, this factor has little relevance because it is unlikely that there would be any significant difference in the difficulty of enforcing a judgment rendered by one federal forum or the other." *See Interlink Prods. Int'l*, 2020 WL 6707946, at *8 (citing 17 Moore's Federal Practice – Civil § 111.13 (2020)).

b)    Practical Considerations

The relevant "practical considerations," *Jumara*, 55 F.3d at 879, include judicial economy and an interest in avoiding duplicative litigation in different courts. *CIBC World Mkts. v. Deutsche Bank Sec., Inc.*, 309 F. Supp. 2d 637, 651 (D.N.J. 2004) (citing *Cont'l Grain Co. v. Barge FBL–585*, 364 U.S. 19, 26 (1960)). The implications for judicial economy differ based on whether the Court transfers the Consolidated Action or only the claims asserted in the Texas action, and the Court therefore analyzes each approach separately. Nevertheless, under either approach, judicial economy weighs against transfer.

(1)    Transfer of the Entire Consolidated Action

Transferring the entire Consolidated Action to Texas would not promote judicial economy because, as set forth *supra*, the Western District of Texas likely does not have personal jurisdiction over the Non-Texas Plaintiffs' claims against the NJAG. Transferring the Non-Texas Plaintiffs' claims to Texas would therefore require the Texas District Court to conduct discovery and resolve issues concerning personal jurisdiction, which weighs heavily against transfer. *See Interlink Prods. Int'l*, 2020 WL 6707946, at *9 (finding that the "practical considerations" favored venue in a district that "undoubtedly ha[d] personal jurisdiction over [the defendants]"); *see also Multistate Legal Studies, Inc. v. Marino*, Civ. No. 96-5118, 1996 WL 786124, at *11 (C.D. Cal. Nov. 4, 1996) ("Courts have repeatedly held that a change of venue from a forum where there is a difficult question of

24

personal jurisdiction or venue to a district where there are not such uncertainties serves the interest of justice.") (collecting cases). Litigating those claims in this Court would "obviate[] the need for the parties and the Court to expend limited resources on jurisdictional preliminaries." *Interlink Prods. Int'l*, 2020 WL 6707946, at \*9.

    If the Texas District Court finds that it does not have personal jurisdiction over the Non-Texas Plaintiffs' claims, there is a reasonable probability that they would ultimately end up litigating their claims in this Court. Although the Non-Texas Plaintiffs assert the same causes of action against the NJAG as DD and SAF, *see generally* N.J. Am. Compl.,[19] the Non-Texas Plaintiffs have emphasized, during another phase of this litigation, that their claims are distinct from the claims asserted by DD and SAF, because "they have a different publication history, different threat history, and different course of future conduct." *See* Appellants' Reply Br., Nos. 19-1729 & 19-3182, 2020 WL 1067470, at \*10–11 & n.2 (3d Cir. Feb. 28, 2020). The Non-Texas Plaintiffs also maintain that "the injunction . . . they seek will necessarily be individualized and unique to their circumstances." *Id.* at \*11. As such, it is likely that the Non-Texas Plaintiffs will litigate their claims in this Court should I transfer the Consolidated Action to Texas. And as explained previously, the efficiencies derived from litigating Plaintiffs' seven identical causes of action against the NJAG in one forum far outweigh any advantages of separately litigating DD's and SAF's claims against the NJAG in Texas. *See In re Amendt*, 169 F. App'x 93, 96 (3d Cir. 2006) ("Adjudicating almost identical issues in separate fora would waste judicial resources.").[20]

---

[19] The Non-Texas Plaintiffs do not assert claims for tortious interference with the Settlement Agreement or existing contracts, which DD and SAF have asserted.

[20] Plaintiffs also argue that litigating claims against the State Department in the same forum as those against the NJAG would allow for the Executive Branch to express its views concerning the meaning of federal statutes and regulations. *See* ECF No. 54 at 4. They do not, however, identify any particular issues that may require deference in this case, where most claims center on the constitutionality of New Jersey statutes. In any event, even if such issues arise, a federal court may permit a federal

Additional efficiencies flow from the Third Circuit's authority to certify questions of New Jersey state law to the Supreme Court of New Jersey, *see* N.J. Court Rules 2:12A-1, which "could interpret [N.J.S.A. 2C:39-9(*l*)(2)] to avoid, not force, a novel and difficult constitutional showdown." *Def. Distributed*, 30 F.4th at 439 (Higginson, J., dissenting). For example, Plaintiffs' claim under the Due Process Clause asserts a void-for-vagueness challenge based on alleged ambiguity as to the DFI files N.J.S.A. 2C:39-9(*l*)(2) covers. *See* Mot. for Inj. Pending Appeal at 17, No. 21-50327 (5th Cir. May 28, 2021). The Supreme Court of New Jersey could interpret N.J.S.A. 2C:39-9(*l*)(2) not to govern the files for which the statute allegedly creates ambiguity. By contrast, Plaintiffs do not contend that any complex issues of Texas state law may require certification to the Supreme Court of Texas.

(2)    Transfer of the Claims Asserted in The Texas Action

Plaintiffs' proposal that the Court transfer DD's and SAF's claims against the NJAG in the Texas action back to Texas, while staying the Non-Texas Plaintiffs' claims in the NJ action, would not prevent duplicative litigation. For the reasons stated *supra*, the Non-Texas Plaintiffs have expressed an intention to litigate their claims, which are distinct from those that DD and SAF assert, regardless of how DD and SAF proceed. Thus, there is no reason to expect that the Non-Texas Plaintiffs would abandon their claims in this Court following a decision in Texas.

Moreover, preclusion would not necessarily expedite review in this Court. If the final judgment in Texas dismisses DD's and SAF's claims against the NJAG, its decision would not likely

---

"agency to intervene if a party's claim or defense is based on . . . a statute or executive order administered by the . . . agency" or "any regulation, order, requirement, or agreement issued or made under the statute or executive order." Fed. R. Civ. P. 24(b)(2). Any efficiencies gained from avoiding the slim chance of intervention by the State Department in the Consolidated Action before this Court, or any potential deference to the State Department, do not outweigh the efficiencies gained from litigating Plaintiffs' claims in one forum, without the need to address jurisdictional predicates.

26

preclude the Non-Texas Plaintiffs' claims against the NJAG, here. Collateral estoppel only applies when "the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication." *See Hitchens v. Cty. of Montgomery*, 98 F. App'x 106, 111 (3d Cir. 2004) (citing *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357–58 (3d Cir.1999)). The Non-Texas Plaintiffs would not be parties to the action in Texas, and they likely would not be in "privity" with a party either. Privity generally exists "'only when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation,'" and "[v]irtual representation . . . 'requires a relationship by which the party in the suit is the legally designated representative of the non-party.'" *Hitchens*, 98 F. App'x at 112–13 (quoting *Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 176–77 (3d Cir.1994)). Here, where the Non-Texas Plaintiffs' claims arise from distinct facts and they seek individualized injunctive relief, there is no reasonable inference that they would "invest[] [DD and SAF] 'with the authority to represent [them] in [the Texas] action.'" *Hitchens*, 98 F. App'x at 114 (quoting Restatement (Second) of Judgments § 41).[21]

Relatedly, Plaintiffs contend that the NJAG's earlier request for a stay of the NJ action pending resolution of DD's and SAF's motion to amend the judgment in the Western District of Texas, *see* N.J. ECF No. 20, judicially estops the NJAG from opposing Plaintiffs' request for a stay on this motion. *See* N.J. ECF No. 56 at 6. Judicial estoppel is an "equitable doctrine" that a court may invoke "at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotations and citations omitted). The doctrine generally "prevents a party from prevailing . . . on an argument" in one case or phase of a case, "and then relying on a contradictory argument to prevail in another" case

---

[21] Even if the Texas District Court grants a final judgment in favor of DD and SAF, this Court would still need to resolve potentially difficult estoppel issues, as collateral estoppel only applies if "the identical issue was previously adjudicated," *see Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006).

or phase thereof. *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 221 (3d Cir. 2015). "It does not prevent the assertion of all inconsistent positions but 'is designed to prevent litigants from playing fast and loose with the courts.'" *Thompson v. Real Estate Mortg. Network, Inc.*, 822 F. App'x 136, 137 (3d Cir. 2020) (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996)).

Plaintiffs' position is unpersuasive. In determining whether judicial estoppel applies, courts analyze whether a party adopted a position that is "clearly inconsistent with an earlier position." *New Hampshire*, 532 U.S. at 750–51; *Carlyle*, 779 F.3d at 221–22. No such inconsistency is apparent here. When the NJAG previously sought a stay in the NJ action, a separate case in which DD and SAF asserted nearly identical causes of action against the NJAG was then proceeding in the Texas action. *See* N.J. ECF No. 20. By contrast, in the current posture, all claims against the NJAG are now consolidated before this Court. *See* N.J. ECF No. 43. Opposing a stay that would *create* parallel litigation against the NJAG in two separate courts is consistent with requesting a stay on one action when parallel litigation in separate courts already exists. Thus, there is no basis to find that judicial estoppel is applicable here.

c)    Court Congestion

The relative level of court congestion, *Jumara*, 55 F.3d at 879, does not favor either forum. Neither party raises this issue nor submits any relevant data concerning congestion in either court. As other courts have recognized, ordinarily "'relative congestion of the respective courts' dockets is not a factor of great importance' on a motion to transfer." *Eastman v. First Data Corp.*, Civ. No. 10-4860, 2011 WL 1327707, at *5 (D.N.J. Apr. 5, 2011) (quoting *Kisko v. Penn. Cent. Transp. Co.*, 408 F. Supp. 984 (M.D. Pa. 1976)); *Interlink Prods. Int'l*, 2020 WL 6707946, at *9 (same).

d)    Local Interests

"[T]he local interest in deciding local controversies at home," *Jumara*, 55 F.3d at 879, weighs

decidedly against transferring this case to Texas, be it the Consolidated Action or only the claims asserted in the Texas action. Although the analysis largely overlaps with respect to these alternatives, I will also independently analyze each proposal.

Where plaintiffs seek "a ruling that would potentially impair" a "state regulatory scheme," particularly one that advances substantial interests such as firearms safety, the "local interest[s]" factor typically favors the state whose laws are being challenged. *See Interlink Prods. Int'l*, 2020 WL 6707946, at *10 (finding that the local interests factor favored transfer to California where the plaintiff challenged California regulations governing the efficiency of in-state appliances, which implicated the state's "substantial" interest in water conservation). Here, the claims against the NJAG all turn on actions taken to enforce New Jersey law or in connection with New Jersey's firearms regulations. Indeed, it is difficult to overstate New Jersey's interests in the constitutionality of a law enacted to prevent its citizens from manufacturing deadly weapons entirely outside of the state's regulatory regime. And the Third Circuit has recognized, albeit in a different context, that states have an "interest in deterring the manufacture of unsafe products within [their] borders." *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 48 (3d Cir. 1988).[22]

This Court respectfully declines to follow the Fifth Circuit's conclusion that the local interest factor favors Texas as a forum. *See Def. Distributed*, 30 F.4th at 435–36. The Fifth Circuit reasoned that Texas's interests predominate because "[t]he [NJ]AG has 'projected himself across state lines and asserted a pseudo-national executive authority' in Texas by seeking 'to bar Defense Distributed from publishing its materials anywhere,' chilling its speech, and reducing 'Texans' access to [its] materials.'" *See id.* at 435 (quoting *Def. Distributed*, 971 F.3d at 492–95). Considerations including

---

[22] Although *Lacey* concerned a state's interests in regulating the products manufactured by a corporation domiciled within its borders, *see id.*, its logic applies with equal force to the circumstances at issue here, where a state law addresses unregulated manufacturing of firearms.

App. 050

"the location of the injury, witnesses, . . . the [plaintiffs'] residence," and the "place of the alleged wrong" therefore ostensibly favored Texas. *See Def. Distributed*, 30 F.4th at 435 (citing *In re Volkswagen of America*, 545 F.3d 304, 317–18 (5th Cir. 2008); *Watson v. Fieldwood Energy Offshore, LLC*, 181 F. Supp. 3d 402, 412 (S.D. Tex. 2016)).

But in connection with Plaintiffs' request to transfer the entire Consolidated Action, the posture at issue here differs from that which the Fifth Circuit faced. Only DD's and SAF's claims were before the Fifth Circuit, and those claims turned primarily on the NJAG's actions directed at DD. By contrast, the Consolidated Action before this Court also includes the Non-Texas Plaintiffs, none of which is located in Texas, and whose claims against the NJAG derive primarily from actions his office directed at other states. The Non-Texas Plaintiffs also premise their claims on an inability to publish DFI acquired from providers other than DD, which have no alleged connection to Texas. *See* N.J. Am. Compl. ¶ 76 (noting that CodeIsFreeSpeech.com stopped publishing DD's files "and files like them" in response to the NJAG's actions); *id.* ¶¶ 91, 94 (indicating that the purported takedown demand directed at CodeIsFreeSpeech.com covered DFI that did not derive from DD). Thus, Texas's interest in the Consolidated Action falls well below any interest it had when DD and SAF were the only plaintiffs.

Even focusing only on DD's and SAF's claims, the Fifth Circuit both overstates Texas's interests and downplays New Jersey's. According to the Fifth Circuit, Texas's interests predominate in large part because the NJAG's actions against DD "reduc[ed] 'Texans' access to [its] materials.'" *See Def. Distributed*, 30 F.4th at 435 (citing *Def. Distributed*, 971 F.3d at 492–95). Yet, the Fifth Circuit does not account for the fact that DD seeks to publish DFI nationwide. *See, e.g.*, N.J. Am. Compl. ¶ 87 (alleging that the NJAG's actions prevented DD from making its DFI available for "download by the public" and from participating in "national" media campaigns); *Washington*, 420 F. Supp. 3d at 1138 & n.1 (noting that 20 state attorneys general filed suit to enjoin DD's settlement

30

agreement with the State Department). Accepting the Fifth Circuit's assumption that the NJAG sought to prosecute publications outside New Jersey, which is hardly a settled interpretation,[23] nothing alleged in the various complaints suggests that the NJAG's actions uniquely restricted Texans' access to DD's materials as compared to citizens in other states, including New Jersey. In fact, the only plaintiff that brought suit in Texas based on its inability to access DD's materials— SAF—is based in Washington State, and SAF alleges that some of its members who seek to access DFI actually reside in New Jersey. *Compare* Texas SAC ¶¶ 10–12, *with* N.J. Am. Compl. ¶¶ 11–12. In any event, there is no basis to conclude that Texas citizens represent a disproportionate percentage of SAF's members—let alone the broader set of individuals whose access to DD's materials was allegedly restricted by the NJAG —which would somehow tip the scale in favor of transferring this case to Texas.

The Fifth Circuit also significantly understates New Jersey's interest in this litigation, which undoubtedly challenges New Jersey law. According to the Fifth Circuit, New Jersey's "interest is considerably diminished because the Texas court's ruling will have no direct effect on New Jersey's citizens." *Def. Distributed*, 30 F.4th at 435. That is true, says the Fifth Circuit, because a declaration from the Texas District Court that N.J.S.A. 2C:39-9(*l*)(2) is unconstitutional would only preclude the NJAG from enforcing the statute against DD and SAF, and it would not prevent the NJAG "from enforcing the law in New Jersey." *Id.* But that is not true, since Plaintiffs challenge N.J.S.A. 2C:39-9(*l*)(2) both as-applied and facially. *See* N.J. Am. Compl. ¶¶ 129, 137, 145, 155, 165, 172, 179; Texas SAC ¶¶ 265, 273, 281, 291, 301, 308, 315. A decision that N.J.S.A. 2C:39-9(*l*)(2) is facially unconstitutional would prevent the NJAG from enforcing the statute writ large. *See Bruni v. City of*

---

[23] As the dissent emphasizes, the NJAG "express[ly] and emphatic[ally]" denied, "twice to [the Fifth Circuit] panel, that it seeks to enforce New Jersey law in Texas." *Def. Distributed*, 30 F.4th at 440 (Higginson, J., dissenting).

*Pittsburgh*, 824 F.3d 353, 362 (3d Cir. 2016) ("A successful as-applied challenge bars a law's enforcement against a particular plaintiff, whereas a successful facial challenge results in complete invalidation of a law.") (quotations and citations omitted). Moreover, the Fifth Circuit's conclusion that as-applied relief would not directly affect New Jersey citizens does not necessarily follow. Plaintiffs do not limit their requested declaratory or injunctive relief to the NJAG's enforcement actions outside New Jersey. *See* N.J. Am. Compl. ¶¶ 183–88. Hence, under the Fifth Circuit's reasoning, the Texas District Court could conclude that enforcing N.J.S.A. 2C:39-9(*l*)(2) against DD's publications in Texas violates certain constitutional rights, but somehow enforcing the same statute against DD's publications in New Jersey could simultaneously pass constitutional muster. It does not cite to any authority for that remarkable proposition, and I do not find it persuasive. Rather, plainly, the as-applied relief requested by Plaintiffs would prevent the NJAG from enforcing the statute against DD and SAF in New Jersey, which would surely affect New Jersey citizens.

For these reasons, I find that the local interests factor substantially favors New Jersey as a forum.

e)    Familiarity with Applicable Law

The "familiarity of the trial judge with the applicable state law," *Jumara*, 55 F.3d at 879–80, does not heavily favor either forum, and, if anything, it favors New Jersey. These cases primarily involve causes of action arising under federal law, with which "all federal courts are presumed to be equally 'familiar.'" *Kalawa v. United States*, Civ. No. 19-16089, 2020 WL 3603205, at *6 (D.N.J. July 2, 2020) (quoting *Liggett Grp. Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 537 (D.N.J. 2000)). Plaintiffs assert two tortious interference claims against the NJAG that could require application of Texas law. *See* Texas SAC. But as explained *supra*, Plaintiffs do not identify any complex issues concerning tortious interference that may arise, and in any event, sovereign immunity would likely bar the tortious interference claims. *See King v. Christie*, 981 F. Supp. 2d 296, 310 n.12

(D.N.J. 2013) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–06 (1984)) (recognizing that a plaintiff suing in federal court "may not bring state law claims . . . against the State," including state officials, "regardless [of] the type of relief it seeks"). On the other hand, authoritative interpretation of N.J.S.A. 2C:39-9(*l*)(2) is most likely to be relevant to the constitutional claims. Because this Court has familiarity and experience with interpreting New Jersey law, this factor weighs slightly in favor of denying transfer.[24]

Given the considerations analyzed herein, I find that the public interest factors weigh against transferring the Consolidated Action to Texas or transferring the claims asserted in the Texas action.

### C.    Comity and Law-of-the-Case Doctrine

Finally, Plaintiffs maintain that comity or law-of-the-case doctrine "dictate that this Court should defer to the Fifth Circuit's decision and accept the Western District of Texas's retransfer request *without* second-guessing or relitigating the venue decision at issue." ECF No. 54 at 1. Neither doctrine dictates transfer in this case.

The Fifth Circuit's decision does not require this Court to transfer the Consolidated Action or DD's and SAF's claims against the NJAG. The Fifth Circuit ordered the Texas District Court to "*[r]equest* the District of New Jersey to return the transferred case to the Western District of Texas." *See Def. Distributed*, 30 F.4th at 437 (emphasis added). In doing so, the Fifth Circuit acknowledged that it "lacks power to order" this Court to "return . . . the case," *see id.* at 423, implicitly recognizing that this Court would "seriously consider" the Fifth Circuit's request while also conducting "its own assessment of whether litigation resolving New Jersey law should be decided in Texas." *See id.* at 440 (Higginson, J., dissenting).[25] This Court has duly considered the Fifth Circuit's Opinion. After

---

[24] The parties do not raise any issues concerning "the public policies of the fora," *Jumara*, 55 F.3d at 879, that would favor either forum.

[25] Notably, Plaintiffs do not cite a single case in which a district court requested another district court

App. 054

exercising my independent judgment, I conclude that transferring the Consolidated Action, or DD's and SAF's claims in the Texas action, is neither appropriate nor warranted.

The cases applying the comity doctrine cited by Plaintiffs do not "dictate that this Court should defer to the Fifth Circuit[] . . . *without* second-guessing or relitigating" its decision. In the cases cited by Plaintiffs, courts invoked comity to prevent one district court from granting relief that would have conflicted with another district court's prior binding order. *See, e.g., Feller v. Brock*, 802 F.2d 722, 724, 727–28 (4th Cir. 1986) (invoking principles underlying comity to reverse a preliminary injunction order issued by one district court that directly conflicted with a prior permanent injunction order issued by another district court); *U.S. for Use & Benefit of Mosher Steel Co. v. Fluor Corp.*, 436 F.2d 383, 385 (2d Cir. 1970) (invoking comity to affirm a district court's order transferring proceedings to another district court that had previously issued a binding order on "virtually the same" issue raised in the later-filed litigation); *AXA Belgium, S.A. v. Century Indem. Co.*, Civ. No. 09-9703, 2010 WL 199709, at *3 (S.D.N.Y. Jan. 11, 2010) (invoking comity to transfer to one district court a motion to compel arbitration on issues that could have undermined that court's ability to enforce a binding arbitral award involving the same parties that it had entered previously); *Exxon Corp. v. U.S. Dep't of Energy*, 594 F. Supp. 84, 89–90 (D. Del. 1984) (invoking comity to deny relief that another district court's outstanding injunction foreclosed); *Common Cause v. Judicial Ethics Comm.*, 473 F. Supp. 1251, 1253–54 (D.D.C. 1979) (invoking comity to decline a request for disclosure of certain financial documents, an action which another district court's prior outstanding order prohibited under a stay pending appeal of a related jurisdictional issue).

---

to retransfer an action, let alone a case where such a request was granted. This Court is not aware of any such case, either. Tellingly, in the Fifth Circuit, neither DD and SAF "nor the majority opinion cite[d] any mandamus case, *ever*, reversing a grant of a joint severance and transfer motion." *See Def. Distributed*, 30 F.4th at 438 (Higginson, J., dissenting)(emphasis added).

Here, there is no prior binding order with which this Court's decision to deny transfer would conflict. A district court issued a non-binding request that this Court transfer the Texas action back to Texas. *See Def. Distributed*, 30 F.4th at 423. Contrary to Plaintiffs' position, denying retransfer would not constitute "a serious interference with the jurisdiction [or] outstanding injunction of . . . a court of coordinate standing," nor would it constitute a "'usurpation'" of a court's "continuing power to supervise and modify its injunctions." *Exxon Corp.*, 594 F. Supp. at 89 (quoting *Mann Manufacturing Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971)); N.J. ECF No. 54 at 2. Plaintiffs do not cite to any authority supporting a different outcome under law-of-the-case doctrine.

Furthermore, as Plaintiffs emphasize, "[l]aw-of-the-case policies apply with even greater force to transfer decisions" because "transferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation." 18B Wright & Miller, Federal Practice & Procedure § 4478.4 (3d ed. West 2022); N.J. ECF No. 54 at 3. But "vicious circle[s]" arise where a "transferee court" rejects a transferor court's order and transfers the case back, creating the possibility of endless retransfers between the two courts. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 806–07, 816–17 (1988) (discussing "vicious circle" in context where one court of appeals ordered the transfer of a case to another circuit, the court of appeals for which in turn transferred the case back). There is no similar risk of a "vicious circle" where, as here, the Texas District Court issued a non-binding request for retransfer, which I decline, allowing the litigation to proceed in this forum.

Accordingly, I find that neither comity nor law-of-the-case doctrine dictates transfer of Consolidated Action or severance and retransfer of the Texas action to the Western District of Texas.

## IV.    CONCLUSION

In essence, Plaintiffs' transfer motion seeks to turn back the clock to a time before they filed the NJ action in this District.  Indeed, since DD and SAF appealed to the Fifth Circuit the Texas

35

District Court's decision to sever and transfer the Texas action, a separate NJ action was filed in this Court and a consolidation of that case with the Texas action also occurred, which resulted in additional claims and the inclusion of other plaintiffs. Accordingly, the considerations for transfer are procedurally and factually distinct from those considered by the Fifth Circuit. Having conducted independent analyses of all the *Jumara* factors, as I must, for the reasons set forth herein, the motion to transfer is **DENIED**.

An appropriate form of Order is filed herewith.

Date: July 27, 2022                                    /s/ Freda L. Wolfson
                                                       Hon. Freda L. Wolfson
                                                       U.S. Chief District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| DEFENSE DISTRIBUTED *et al.*,<br><br>     Plaintiffs,<br><br> v.<br><br>MATTHEW J. PLATKIN, Attorney General<br>of the State of New Jersey,[1]<br><br>     Defendant. | Civ. Action No. 19-04753 (FLW)<br><br>**ORDER** |

   **THIS MATTER** having been opened to the Court by Daniel L. Schmutter, Esq., counsel for

the plaintiffs, on a motion to transfer; it appearing that Erin Hodge, Esq., Deputy Attorney General,

counsel for Defendant New Jersey Attorney General, opposes motion; the Court having considered

the parties' submissions in connection with the motion to transfer pursuant to Fed. R. Civ. P 78, for

the reasons set forth in the Opinion filed on this date, and for good cause shown,

   **IT IS** on this 27th day of July, 2022,

   **ORDERED** that Plaintiffs' motion to transfer is **DENIED**.

              /s/ Freda L. Wolfson
              Hon. Freda L. Wolfson
              U.S. Chief District Judge

---

[1]   Pursuant to Fed. R. Civ. P. 25(d), the Court substitutes Matthew J. Platkin, the Acting
Attorney General of New Jersey, who has taken office during the pendency of this litigation. Fed. R.
Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity
dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor
is automatically substituted as a party.").

App. 058

**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEFENSE DISTRIBUTED *et al.*, | |
| Plaintiffs, | Civ. Action No. 19-04753 (FLW) |
| v. | **OPINION** |
| MATTHEW J. PLATKIN, Attorney General of the State of New Jersey, | |
| Defendant. | |

**WOLFSON, Chief Judge:**

This matter comes before the Court on a motion for reconsideration of this Court's July 27, 2022 decision (the "July 27 Opinion") denying transfer of this case to the Western District of Texas, and on a second motion to transfer based on a concurrence to a September 16, 2022 Order of the Fifth Circuit. The Attorney General of New Jersey opposes the motions. For the reasons set forth herein, the motions are **DENIED**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The complex factual and procedural background of this case is set forth in detail in the July 27 Opinion. *See Defense Distributed v. Platkin*, No. 19-04753, 2022 WL 2967304, at \*1–4 (D.N.J. July 27, 2022). To briefly summarize, until recently, this consolidated action had been comprised of two cases, Civ. No. 21-09867 (the "Texas action") and Civ. No. 19-04753 (the "NJ action"), both of which involve constitutional challenges to enforcement actions that the Attorney General of New Jersey (the "NJAG" or "Defendant") took, under New Jersey law, against entities that seek to disseminate and consume information used to manufacture 3D-printed firearms. Plaintiff Defense

1

Distributed ("DD"), a private corporation that produces and disseminates digital firearms information ("DFI") related to manufacturing firearms using a 3D printer, and Plaintiff Second Amendment Foundation ("SAF"), a nonprofit organization which advocates for the right to keep and bear arms, initiated the Texas action against the NJAG in the Western District of Texas (the "Texas District Court"), alleging that the NJAG's efforts to discontinue DD's publication of DFI in New Jersey were violative of the U.S. Constitution and certain federal statutes. *See id.* Following the Texas District Court's dismissal of the Texas action for lack of personal jurisdiction, rather than waiting for the outcome of their appeal to the Fifth Circuit, DD and SAF filed the NJ action in the District of New Jersey, alleging similar claims against the NJAG and adding five additional plaintiffs, which this Court refers to as the "Non-Texas Plaintiffs."[1] *See id.* When the Fifth Circuit reversed the Texas District Court's dismissal of the Texas action on jurisdictional grounds, DD and SAF amended their complaint in the Texas action, adding claims against the NJAG and the U.S. State Department. *See id.* The NJAG subsequently moved to sever and transfer the claims against him to the District of New Jersey, which the Texas District Court granted. *See id.* (citing *Defense Distributed v. Grewal*, Civ. No. 18-637, 2021 WL 1614328 (W.D. Tex. Apr. 19, 2021)). Once the Texas action was transferred to the District of New Jersey, the Texas action and the NJ action were consolidated upon the unopposed motion of the NJAG. *See id.*

DD and SAF, however, appealed the transfer decision to the Fifth Circuit, which ultimately held that the Texas District Court erred in severing and transferring the claims against the NJAG to the District of New Jersey. *See id.* (citing *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022)).

---

[1] The Non-Texas Plaintiffs are: (1) The Firearms Policy Coalition, Inc.; (2) the Firearms Policy Foundation; (3) The Calguns Foundation; (4) the California Association of Federal Firearms Licensees, Inc.; and (5) Brandon Combs, who is the founder and president of Firearms Policy Coalition, Inc., the founder and president of Firearms Policy Foundation, the secretary and executive director of The Calguns Foundation, and the founder and executive vice president of California Association of Federal Firearms Licensees, Inc. *See id.*

2

A divided Fifth Circuit panel issued a writ of mandamus, vacating the Texas District Court's transfer order and mandating the Texas District Court to request that the District of New Jersey return the transferred case to the Texas District Court—extraordinary relief that has never been provided in such context. *See id.* Accordingly, the Texas District Court issued an order vacating its severance and transfer order and requested that this Court send the matter back to Texas. *See id.* Because the Fifth Circuit's mandate does not bind this Court, I requested the parties to submit briefing on the propriety of transfer according to Third Circuit law. *See id.* Following briefing, I issued my July 27 Opinion, which denied "requests to transfer the entire Consolidated Action to Texas or, in the alternative, sever and transfer the claims asserted in the Texas action." *Id.* at *6.

Perhaps to gain a tactical advantage, after issuance of the July 27 Opinion, that same day, DD, SAF, and the Non-Texas Plaintiffs voluntarily dismissed their claims originally asserted in the NJ action pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). ECF No. 60. DD and SAF ("Plaintiffs") then filed a motion for reconsideration of the July 27 Opinion, emphasizing that, due to the voluntary dismissal, they are the only remaining plaintiffs in this case, which now consists solely of the claims originally asserted in the Texas action. ECF No. 61. The NJAG opposed the motion on August 23, 2022. ECF No. 63.

Meanwhile, even though their claims have been transferred to New Jersey, Plaintiffs have continued to litigate their claims against the NJAG in the Texas District Court and the Fifth Circuit. On July 22, 2022, the Texas District Court dismissed Plaintiff's motion for a preliminary injunction against the NJAG with respect to its efforts to preclude distribution of DFI under New Jersey law, reasoning that "limits on its jurisdiction" prevented consideration of claims against the NJAG, unless

this case were returned to Texas.[2]  *See Defense Distributed v. U.S. Dep't of State*, No. 18-637 (W.D. Tex.), ECF No. 176.  Plaintiffs appealed that decision, which remains pending before the Fifth Circuit.  *See Defense Distributed v. Platkin*, No. 22-50669 (5th Cir.).

Relevant here, on September 16, 2022, the same Fifth Circuit panel that issued the writ of mandamus, further issued an order expediting Plaintiffs' appeal as to the preliminary injunction request and, separately, addressed the transfer issue once again. *See Defense Distributed v. Platkin*, 48 F.4th 607 (5th Cir. 2022) (the "September 16 Order").  Specifically, in a concurrence to the September 16 Order, Hon. James C. Ho and Hon. Jennifer Walker Elrod "respectfully ask[ed] the District of New Jersey to return the case to the Western District of Texas as requested, and thereby join its sister district courts nationwide in this act of inter-district comity, mutual respect, and courtesy." *Id.*  Subsequently, on September 21, 2022, Plaintiffs filed a second motion to transfer, citing the concurrence to the Fifth Circuit's September 16 Order.  ECF No. 64.  The NJAG opposed the motion on September 23, 2022.  ECF No. 65.

## II.    DISCUSSION

The Court addresses both Plaintiffs' motion for reconsideration and second motion to transfer in turn.  Simply put, neither motion demonstrates a sufficient factual or legal basis warranting the transfer of this action to the Texas District Court.

### A.    Motion for Reconsideration

Federal Rule of Civil Procedure 59(e) and Local Civil Rule 7.1 govern motions for reconsideration, which are considered "extremely limited procedural vehicle[s]." *Resorts Int'l v. Greate Bay Hotel & Casino, Inc.*, 830 F. Supp. 826, 831 (D.N.J. 1992).  Indeed, requests for

---

[2] Plaintiffs sought a preliminary injunction in Texas despite there being no claims against the NJAG pending in Texas such that any court there would have a basis to issue an injunction. Indeed, it bears noting that Plaintiffs could, if they so choose, request a preliminary injunction in this Court, where their suit has been pending since April 2021 and proper jurisdiction exists.  Yet, they have not.

App. 062

reconsideration "are not to be used as an opportunity to relitigate the case; rather, they may be used only to correct manifest errors of law or fact or to present newly discovered evidence." *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011) (citing *Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.*, 602 F.3d 237, 251 (3d Cir. 2010)); *see also Church & Dwight Co., Inc. v. Abbott Labs.*, 545 F. Supp. 2d 447, 450 (D.N.J. 2008) ("The Court will grant a motion for reconsideration only where its prior decision has overlooked a factual or legal issue that may alter the disposition of the matter."). Pursuant to Local Civil Rule 7.1(i), a litigant moving for reconsideration must "set[ ] forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked." L. Civ. R. 7.1(i). In doing so, the moving party must demonstrate at least one of the following grounds: (1) "an intervening change in the controlling law"; (2) "the availability of new evidence that was not available" prior to entry of judgment; or (3) "the need to correct a clear error of law or fact or to prevent manifest injustice." *See Blystone*, 664 F.3d at 415. Importantly, "[a] party seeking reconsideration must show more than a disagreement with the Court's decision, and 'recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'" *G-69 v. Degnan*, 748 F. Supp. 274, 275 (D.N.J. 1990) (citations omitted). "A motion that merely raises a disagreement with the Court's initial decision is not an appropriate reconsideration motion, but should be dealt with in the normal appellate process." *Church & Dwight Co.*, 545 F. Supp. 2d at 450.

Here, Plaintiffs' motion, even viewed in the most favorable light, seeks reconsideration based on procedural gamesmanship, but it ultimately fails to raise any grounds for reconsideration beyond mere disagreement with this Court's decision. Indeed, Plaintiffs' motion is based entirely on their voluntary dismissal of the claims originally asserted in the NJ action. However, it is clear that the dismissal was prompted by the Court's adverse July 27 Opinion, as an effort to undercut the Court's stated concern regarding duplicative litigation. *See Defense Distributed*, 2022 WL 2967304, at *11–

13.  Plaintiffs argue that the July 27 Opinion relies on the premise that the Texas action and NJ action would be prosecuted simultaneously in different courts if the claims in the Texas action were transferred back to the Texas District Court.  *See* ECF No. 61-1 at 1.  Notwithstanding the fact that this aspect of the Court's analysis hardly amounts to the "decision's lynchpin," Plaintiffs now assert that voluntary dismissal of the claims originally brought in the NJ action "puts the issue beyond doubt by establishing as a matter of law that simultaneous litigation cannot occur." *Id.* at 2.  By dismissing the Non-Texas Plaintiffs, Plaintiffs acknowledge that the issue of duplicative litigation was a valid concern at the time of the Court's decision.  Yet, confusingly, Plaintiffs posit that the Court was "demonstrably wrong" when ruling on this issue.  The fact remains that the NJ action had been pending in the District of New Jersey for over three years and had been consolidated with the Texas action since June 2021.  *See* ECF No. 43.  Plaintiffs' calculated decision in dismissing the claims asserted in the NJ action critically undermines their motion as the dismissal should have been executed, and their "argument . . . could have been raised[,] prior to the entry" of the adverse July 27 Opinion.  *See Boretsky v. Governor of N.J.*, 433 F. App'x 73, 78 (3d Cir. 2011).  This after-the-fact dismissal does not warrant the Court to reconsider.

In any event, the rationale underpinning the Court's July 27 Opinion holds firm regardless of the voluntary dismissal.  First, although Plaintiffs argue that the dismissal now precludes duplicative litigation, the voluntary dismissal "without prejudice," ECF No. 60 at 2, does not represent the Non-Texas Plaintiffs "abandon[ing] their claims." *See Defense Distributed*, 2022 WL 2967304, at *12. As this Court previously recognized, "the Non-Texas Plaintiffs have expressed an intention to litigate their claims, which are distinct from those that DD and SAF assert, regardless of how DD and SAF proceed," and nothing prevents them from re-filing in this Court.  *See id.*  In this way, voluntary dismissal without prejudice of the Non-Texas Plaintiffs' claims is not materially different from "Plaintiffs' [previous] proposal that the Court transfer DD's and SAF's claims against the NJAG in

the Texas action back to Texas, while staying the Non-Texas Plaintiffs' claims in the NJ action"—a proposition this Court has already found "would not prevent duplicative litigation." *See id.* Second, and more importantly, the dismissal of those claims does not impact the various other independent reasons enumerated in the July 27 Opinion for denying Plaintiffs' transfer motion. *See id.* at *10–16. Indeed, even if only the claims originally asserted in the Texas action remain, transfer is not appropriate. While there is no need to rehash this Court's analysis of Plaintiffs' transfer motion under *Jumara v. State Farm Insurance Co.*, 55 F.3d 873 (3d Cir. 1995), those factors, such as this Court's familiarity with New Jersey law, New Jersey's interest in the litigation, and lingering disputes regarding personal jurisdiction over the NJAG in the Texas District Court, continue to weigh heavily against transfer. *See id.* at *10, 13–16. Notably, Plaintiffs' motion fails to offer any arguments that the Court's analysis, pursuant to *Jumara*, is somehow plagued by "a clear error of fact or law." *See Blystone*, 664 F.3d at 415. Accordingly, because Plaintiffs fail to demonstrate grounds for reconsideration of this Court's July 27 Opinion, Plaintiffs' motion to reconsider is denied.

**B.    Second Motion to Transfer**

Plaintiffs' second motion to transfer rests entirely on the concurrence to the September 16 Order of the Fifth Circuit—quoting the concurrence in full (the "Concurrence"). ECF No. 64-1 at 3–4. In sum, the two concurring judges of the Fifth Circuit panel write that there is "no substantive reason . . . why this case should . . . proceed in New Jersey rather than Texas," and "respectfully ask the District of New Jersey to honor" the panel's prior decision in *Defense Distributed v. Bruck* "and grant the request to return the case back to the Western District of Texas—consistent with the judiciary's longstanding tradition of comity, both within and across the circuits, as repeatedly demonstrated by district courts nationwide." *Defense Distributed*, 48 F.4th at 607. Notwithstanding the concurring judges' invitation, the Court is unable to find any valid legal justification warranting transfer based on the rationale expressed in the Concurrence or elsewhere in the record. Indeed, as

7

noted *supra*, my reasons for the decision in the July 27 Opinion remain valid.  Because this issue has garnered the continued attention of at least two Fifth Circuit judges, I will fully address the Concurrence's concerns.

First, the circumstances giving rise to the transfer dispute are unprecedented.  As recognized by Judge Higginson in his dissent to the Fifth Circuit's mandamus, neither the litigants "nor the majority opinion cites any mandamus case, ever, reversing a grant of a joint severance and transfer motion."  *See Bruck*, 30 F.4th at 438 (Higginson, J., dissenting).  There is good reason why the Fifth Circuit's mandamus is an isolated outlier, particularly as "once a transferor court sends the case file to the transferee court, 'the transferor court—and the appellate court that has jurisdiction over it— lose all jurisdiction over the case and may not proceed further with regard to it.'"  *See Ricketts v. Att'y Gen.*, 897 F.3d 491, 494 (3d Cir. 2018) (quoting *White v. ABCO Eng'g Corp.*, 199 F.3d 140, 143 n.4 (3d Cir. 1999)); *see also In re Red Barn Motors, Inc.*, 794 F.3d 481, 484 (5th Cir. 2015) (stating that "transfer to another circuit removes the case from our jurisdiction" and "using mandamus to undo a completed inter-circuit transfer risks provoking a possible conflict between the Circuits") (internal quotations and citation omitted).  As such, the Fifth Circuit's mandamus to vacate the severance and transfer and "[r]equest the District of New Jersey to return the transferred case to the Western District of Texas," and the subsequent order of the Texas District Court, were just that, requests, which do not bind this Court.  *Bruck*, 30 F.4th at 436–37.  Tellingly, the Fifth Circuit panel repeatedly acknowledged this, finding that it "lack[ed] power to order a return of the case to our circuit" and that this Court is one "over which [the Fifth Circuit] exercises no control."  *Id.* at 423.  Thus, as to the concurring judges' view that they are "unaware of any district court anywhere in the nation to have ever denied such a request," *see Defense Distributed*, 48 F.4th at 608, I am compelled to note that my decision applied Third Circuit law, and that the Fifth Circuit's request may have been improvidently made.  In other words, the purported lack of precedent with respect to this Court's

refusal to transfer is preceded by the lack of precedent as to the mandamus vacating the original severance and transfer order when jurisdiction had been divested. *See, e.g.*, *In re United States*, 273 F.3d 380, 383 (3d Cir. 2001) ("This is not to say that an appellate court indefinitely maintains jurisdiction for purposes of evaluating the effectiveness of a transfer. Obviously, once the transferee court proceeds with the transferred case, the decision as to the propriety of transfer is to be made in the transferee court."); *In re Nine Mile Ltd.*, 692 F.2d 56, 57 (8th Cir. 1982) (following transfer out-of-circuit "[n]either we nor the district court could reconsider the transfer order at that time" because "transfer of the case file deprived the courts in this circuit of jurisdiction").

Second, given the nonbinding nature of the Fifth Circuit's mandamus and the Texas District Court's transfer request, principles of comity do not weigh on this Court's transfer decision. *See Defense Distributed*, 2022 WL 2967304, at *16–17 (explaining that "courts invoke[] comity to prevent one district court from granting relief that would have conflicted with another district court's prior binding order" and "there is no prior binding order with which this Court's decision to deny transfer would conflict"). Plaintiffs appear to suggest that, in light of the Concurrence, comity somehow requires that this Court return the case to Texas, despite my independent conclusion that transfer would be inappropriate under Third Circuit law. But comity in no way requires that I substitute the analysis of the Fifth Circuit for my own. As a matter of inter-circuit courtesy, and consistent with this Court's respect for the decisions of other circuits, this Court "duly considered the Fifth Circuit's Opinion" granting mandamus. *See id.* at *16. And, as a district court within the geographic jurisdiction of the Third Circuit, this Court independently assessed the factors enumerated in *Jumara*, concluding that transfer is "neither appropriate nor warranted." *See id* at *6–16. While Plaintiffs and the Concurrence may not agree with that decision, this Court is not obligated to apply nonbinding out-of-circuit law in this case, and the doctrine of comity is not a valid means to achieve such a result. Indeed, the consistent use of language such as "request" and "ask" in the Concurrence

9

represents a continued acknowledgment of the nonbinding effect of Fifth Circuit law on this Court. *See Defense Distributed*, 48 F.4th at 607–08.  For the same reason, law-of-the-case principles do not mandate transfer.  *See Defense Distributed*, 2022 WL 2967304, at *17.

Finally, none of the cases cited in the Concurrence, upon which Plaintiffs exclusively rely, supports transfer here.  The Concurrence cites *In re United States*, 273 F.3d 380 (3d Cir. 2001) for the proposition that federal courts, in the Third Circuit and elsewhere, typically honor out-of-circuit transfer requests.  *See Defense Distributed*, 48 F.4th at 607.  But, in that case, the Third Circuit expressly instructs that "[o]nce the transferee proceeds with the transferred case, the decision as to the propriety of transfer is to be made in the transferee court."  *In re United* States, 273 F.3d at 384.  As the transferee court, this Court "proceed[ed] with the transferred case" by consolidating the Texas action and the NJ action without opposition from Plaintiffs.  *See* ECF No. 43.  Deciding the propriety of the transfer was thus well within the purview of this Court under Third Circuit law.  *See In re United States*, 273 F.3d at 384.

The Concurrence also cites to cases, relied upon by Plaintiffs here, in which the transferee court exercised its own discretion to return a case to the transferor court—a materially and procedurally distinct scenario from where, as here, the transferee court proceeded with the transferred case and independently found that re-transfer would be inappropriate.  *Cf. United States v. Petty*, No. 22-cr-49, 2022 WL 1590609, at *2 (W.D.N.Y. May 19, 2022) ("Under the unique circumstances of this case, this Court finds that it has the authority to transfer the case back . . . and that it should exercise its discretion to do just that."); *Herman v. Cataphora Inc.*, No. 12-04965, 2013 WL 275960, at *2 (N.D. Cal. Jan. 24, 2013) (granting transfer back to transferor court in "extraordinary circumstance" where "[a] grave miscarriage of justice would result if an administrative glitch were to deprive the Plaintiffs of an opportunity to seek appellate review in the transferor circuit").  Nor does Plaintiffs' motion find support in cases where the transferee court stayed its proceedings

10

pending adjudication of a reconsideration motion by the transferor court based on a "stipulation of the parties," *see Tlapanco v. Elges*, No. 15-cv-2852, 2017 WL 4329789, at *3 (S.D.N.Y. Sept. 14, 2017), or in which the transferee court re-transferred the case because the transferor court "made the transfer in error" and "due to a clerical error, the case was physically forwarded too quickly," *see CCA Glob. Partners, Inc. v. Yates Carpet, Inc.*, No. 05-CV-221, 2005 WL 8159381, *2 (N.D. Tex. Dec. 22, 2005). Plainly, those circumstances did not occur here. Even in cases where the transferee returned a case to the transferor court following the request of the corresponding appellate court, re-transfer was entirely discretionary, and the requests, acknowledging jurisdictional limitations, did not at the same time purport to vacate the transferor court's original transfer order. *Cf. In re Nine Mile Ltd.*, 692 F.2d at 57–58 (transferee court, exercising discretion, returned case to transferor court in order to confer jurisdiction "so that the district court could properly reconsider its transfer order, with review in this Court if necessary"); *Fine v. McGuire*, 433 F.2d 499, 500 n.1 (D.C. Cir. 1970) (transferee court, exercising discretion, "return[ed] the file in the District Court action to this jurisdiction to permit orderly consideration" of mandamus challenge to original transfer). In short, the authority cited by Plaintiffs and the Concurrence provides no indication that the transferee court, faced with a request to return a case to the transferor court, is compelled to do so because of the request itself, comity, or otherwise, particularly when doing so would be contrary to the analysis and findings of the transferee court.

This Court has issued a detailed opinion setting forth the reasons why transfer back to the Texas District Court is unwarranted. *See Defense Distributed*, 2022 WL 2967304, at *6–17. Any further disagreement with that decision "should be dealt with in the normal appellate process," *Church & Dwight Co.*, 545 F. Supp. 2d at 450, in the circuit with jurisdiction over the case—the Third Circuit. *See Ricketts*, 897 F.3d at 494.

**III.    CONCLUSION**

For the reasons set forth above, Plaintiffs' motion for reconsideration and second motion to transfer are **DENIED**. The parties are directed to proceed with the litigation without additional delay, including in responding to Plaintiffs' Second Amended Complaint. An appropriate Order shall follow.


Date: October 25, 2022                                      /s/ Freda L. Wolfson
                                                            Hon. Freda L. Wolfson
                                                            U.S. Chief District Judge

12

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DEFENSE DISTRIBUTED *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>MATTHEW J. PLATKIN, Attorney General of the State of New Jersey,<br><br>    Defendant. | Civil Action No. 19-04753 (FLW)<br><br>**ORDER** |

**THIS MATTER** having been opened to the Court by Daniel L. Schmutter, Esq., on behalf of Plaintiffs Defense Distributed and Second Amendment Foundation, Inc. ("Plaintiffs"), upon a motion for reconsideration of this Court's July 27, 2022 Opinion and a second motion to transfer to the Western District of Texas; it appearing that Tim Sheehan, Esq., on behalf of the Attorney General of the State of New Jersey, Matthew J. Platkin, opposed the motions; the Court having considered the parties' written briefs without oral argument, pursuant to Fed. R. Civ. P. 78; for the reasons set forth in the Opinion filed on this date, and for good cause shown,

IT IS on this 25th day of October 2022,

**ORDERED** that Plaintiffs' motion for reconsideration is **DENIED**; and it is

**FURTHER ORDERED** that Plaintiffs' second motion to transfer is **DENIED**.

/s/ Freda L.  Wolfson
Freda L.  Wolfson
U.S. Chief District Judge

1

**App. 071**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| DEFENSE DISTRIBUTED et al., | |
| Plaintiffs, | Civil Action No. 19-4753 (MAS) (TJB) |
| v. | (consolidated with No. 21-9867) |
| MATTHEW J. PLATKIN, Attorney General of the State of New Jersey, | **MEMORANDUM ORDER** |
| Defendant. | |

This matter comes before the Court upon Defendant Matthew J. Platkin, Attorney General of New Jersey's ("Defendant") Motion to Dismiss Plaintiffs Defense Distributed and Second Amendment Foundation, Inc.'s ("Plaintiffs") Second Amended Complaint (ECF No. 69) and Plaintiffs' Motion to Transfer (ECF No. 78). Before reaching these motions, the Court must address the state of the docket in this consolidated matter.

On June 11, 2021, Member Case 21-9867 (the "Member Case") was consolidated into Lead Case 19-4753 (the "Lead Case"). (ECF No. 43.) As a result, on May 17, 2022, the Member Case was closed. (*See* ECF No. 55.) On July 27, 2022, all Plaintiffs in the Lead Case voluntary dismissed the Lead Case, while preserving Plaintiffs' claims asserted in the previously closed Member Case. (ECF No. 60.) Plaintiffs then moved to transfer the Member Case to the Western District of Texas. (ECF No. 64.) On October 25, 2022, this Court denied Plaintiffs' Motion to Transfer and ordered Defendant to respond to Plaintiffs' Second Amended Complaint in the Member Case. (ECF No. 66, 67.)

Pursuant to the Court's inherent authority to control its docket, and pursuant to Plaintiffs' voluntary dismissal of the Lead Case and the Court's October 25, 2022 Order making the Second Amended Complaint in the Member Case the operative pleading in this matter,

**IT IS** on this 26ᵗʰ day of April 2023, **ORDERED** as follows:

1.      This matter is deconsolidated, the Lead Case (Case No. 19-4753) is closed, and the Member Case (Case No. 21-9867) is reinstated.

2.      Defendant's Motion to Dismiss (ECF No. 69) and Plaintiffs' Motion to Transfer (ECF No. 78) in the Lead Case are administratively terminated.

3.      As the operative Second Amended Complaint in the Member Case (ECF No. 117) includes United States State Department Defendants that are no longer parties to this action, **Plaintiffs are directed to file, within fourteen (14) days, a Third Amended Complaint in this Member Case**, removing any allegations or claims against State Department Defendants.

4.      Defendant may refile its Motion to Dismiss in the Member Case, if it so chooses, after filing of a Third Amended Complaint by Plaintiffs.[1]

5.      As the Motion to Transfer has already been fully brief in the Lead Case, the Court directs the Clerk's Office to file Plaintiffs' Motion to Transfer from the Lead Case (ECF No. 78), Defendant's Opposition (ECF No. 79), and Plaintiffs' Reply (ECF No. 80) on the Member Case docket (Case No. 21-9867).

---

[1] After the Third Amended Complaint is filed, the Court will decide Plaintiffs' Motion to Transfer before adjudicating any Motion to Dismiss filed by Defendant.

App. 073

6.    The Clerk's Office is also directed to activate Plaintiff's Motion to Transfer in the

Member Case upon docketing.


**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

App. 074

<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

DEFENSE DISTRIBUTED *et al.*,

         Plaintiffs,

         v.

MATTHEW J. PLATKIN, Attorney General
of the State of New Jersey,

         Defendant.

---

Civil Action No. 21-9867 (MAS) (TJB)

**MEMORANDUM OPINION**

---

<u>**SHIPP, District Judge**</u>

      This matter comes before the Court upon Plaintiffs Defense Distributed and Second Amendment Foundation, Inc.'s (collectively, "Plaintiffs") Motion to Transfer or Stay. (ECF No. 176.) Defendant Matthew J. Platkin, the Attorney General of New Jersey ("Defendant") opposed (ECF No. 177), and Plaintiffs replied (ECF No. 178). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons below, the Court denies Plaintiffs' Motion to Transfer or Stay.

## I.      <u>BACKGROUND</u>

      The Court adopts the factual background outlined in its First Transfer Opinion dated July 27, 2022 (First Transfer Op., ECF No. *58[1]) and its Second Transfer Opinion dated October 25, 2022 (Second Transfer Op., ECF No. *66). This is the fourth time Plaintiffs have asked the Court

---

[1] ECF numbers preceded by an asterisk refer to filings in the former lead-case, No. 19-4753, which has since been closed. (*See* ECF No. 175.)

to transfer this case to the Western District of Texas, whether directly or through motions to reconsider. (*See* ECF Nos. *56, *61, *64, 176.) Plaintiffs' efforts revolve around a writ of mandamus issued by the Fifth Circuit. (*See* ECF No. *48.) Specifically, the Fifth Circuit's writ in *Defense Distributed v. Bruck* directed a Texas district court to "request" that the District of New Jersey return this case to Texas nearly a year after it was transferred and consolidated with another action in this District.[2] 30 F.4th 414, 436-37 (5th Cir. 2022).

In June 2022, Plaintiffs first moved to transfer this matter. (Pls.' First Transfer Mot., ECF No. *56.) In July 2022, for the reasons outlined in a 36-page opinion, Chief Judge Wolfson denied Plaintiffs' transfer request. (*See* First Transfer Op.) The same day the denial was issued, Plaintiffs voluntarily dismissed their Complaint in Civ. No. 19-4753 and filed a Motion for Reconsideration of their denied transfer request. (Pls.' Recons. Mot., ECF No. *60-61.) While the reconsideration motion was still pending, Plaintiffs filed a Second Motion to Transfer this matter to the Western District of Texas. (Pls.' Second Transfer Mot., ECF No. *64.) In October 2022, Chief Judge Wolfson denied Plaintiffs' Motion for Reconsideration and Second Motion to Transfer. (Second Transfer Op.)

On January 23, 2023, after two Motions to Transfer and one Motion to Reconsider the denial of a transfer, Plaintiffs filed the instant Motion, labeled a Motion to Transfer, but substantively a Motion to Reconsider Chief Judge Wolfson's Second Transfer Opinion. (Pls.' Third Transfer Mot., ECF No. 176; *see* Pls.' Moving Br. 4, ECF No. 176-1 (asking the Court to "reconsider the prior transfer decisions").) It appears Plaintiffs' only reason for so moving is

---

[2] As previously mentioned, the actions, Civ. No. 21-9867 and Civ. No. 19-4753, have since been deconsolidated after Plaintiffs voluntary dismissed Civ. No. 19-4753. (ECF Nos. *60, 175.) This deconsolidation of actions, however, has no bearing on whether this Court will find transfer more or less appropriate for the reasons articulated in Chief Judge Wolfson's Second Transfer Opinion. (*See generally* Second Transfer Op. 4-7.)

App. 076

because a new judge has been assigned to the case. (Pls.' Moving Br. 4 (asserting that "in light of the case's reassignment, the Court should now reconsider the prior transfer decisions").)

## II.     LEGAL STANDARD

Reconsideration under Local Civil Rule 7.1 is "an extraordinary remedy" that is rarely granted. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 215 F. Supp. 2d 482, 507 (D.N.J. 2002) (citations omitted). It requires the moving party to set forth the factual matters or controlling legal authorities it believes the Court overlooked when rendering its decision. *See* L. Civ. R. 7.1(i). To succeed on a motion for reconsideration, a movant must show at least one of three factors: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted [or denied] the motion [at issue]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).

A motion for reconsideration is not an opportunity to "ask the court to rethink what it ha[s] already thought through." *Interfaith Cmty. Org.*, 215 F. Supp. 2d at 507 (alteration in original) (quoting *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990)). "Rather, the rule permits a reconsideration only when 'dispositive factual matters or controlling decisions of law' were presented to the court but were overlooked." *Id.* (quoting *Khair v. Campbell Soup Co.*, 893 F. Supp. 316, 337 (D.N.J. 1995)).

## III.     DISCUSSION

First, this Court must acknowledge the unprecedented nature of this case. As Chief Judge Wolfson recognized in the First Transfer Opinion, "Plaintiffs do not cite a single case in which a district court requested another district court to retransfer an action, let alone a case where such a

3

request was granted." (First Transfer Op. 33 n.25.) This Court remains unaware of any such case, and it remains notable that neither Plaintiffs nor the *Bruck* majority opinion "cite[d] any mandamus case, *ever*, reversing a grant of a joint severance and transfer motion." (*Id.* (emphasis in original) (citing *Bruck*, 30 F.4th at 438 (Higginson, J., dissenting)).)

Second, and importantly in the instant matter, the Court doubts Plaintiffs' propriety in bringing the present motion, as this Court's stance on transferring this case was made clear through two different transfer motion denials and one denial of reconsideration. (*See* First Transfer Op. 36; Second Transfer Op. 11.) Plaintiffs had 84 days (12 weeks) to file a writ of mandamus with the Third Circuit between the filing of the Second Transfer Opinion and the reassignment of this case—they chose not to seek such relief.[3] (*See generally* Second Transfer Op.) Instead, Plaintiffs now seek an impermissible second "bite at the apple" in the district court simply because the case has been reassigned.[4] *Compare Tischio v. Bontex, Inc.*, 16 F. Supp. 3d 511, 532 (D.N.J. 1998) (stating that reconsideration motions should not give the parties "an opportunity for a second bite at the apple"), *with* Pls.' Moving Br. 4 (asserting that "in light of the case's reassignment, the Court should now reconsider the prior transfer decisions," but citing no changes in the law, new evidence,

---

[3] Importantly, this fact is also a key reason the Court will not grant Plaintiffs a stay in this matter so that they can seek a writ of mandamus with the Third Circuit. *Infra* Footnote 8. Plaintiffs have already had ample time to seek such writ.

[4] Plaintiffs contend that they are *required* to seek reconsideration of Chief Judge Wolfson's decisions before petitioning the Third Circuit for a writ of mandamus because otherwise the Third Circuit will be unable to consider the writ with a new judge overseeing the case. (Pls.' Moving Brief 4.) In making this argument, Plaintiffs rely on *In re Sch. Asbestos Litigation*. 977 F.2d 764 (3d Cir. 1992). There, the Third Circuit issued a writ to disqualify the presiding district judge and reassign the case to a new judge due to a conflict of interest. *In re Sch. Asbestos Litig.*, 977 F.2d at 798. The Third Circuit did not, however, issue a writ to the then-unknown newly assigned judge regarding future consideration of erroneously denied motions because such writ would be premature before a new judge was assigned to the case. *Id.* at 771, 795. Here, such refusal to consider Plaintiffs' writ is unlikely because unlike *In re School Asbestos Litigation*, the newly assigned judge is not unknown. Moreover, this case does not involve a judge who must be disqualified for a conflict of interest.

or overlooked matters). While the Court finds that it would be appropriate to deny Plaintiffs'
transfer request as an impermissible second attempt for reconsideration of Chief Judge Wolfson's
Second Transfer Opinion, out of an abundance of caution, the Court will consider the merits of
Plaintiffs' motion.

When a case in the Third Circuit is reassigned and a newly-assigned judge must reconsider
an opinion authored by his or her predecessor, the new judge should apply the same standard they
would have if they themselves had written the opinion being reconsidered. *See Onishi v. Chapleau*,
No. 20-13001, 2022 WL 980620 (D.N.J. Mar. 31, 2022) (applying traditional reconsideration
standard after case had been reassigned); *Essex v. Atena, Inc.*, No. 17-13663, 2020 WL 13560099
(D.N.J. Apr. 20, 2020) (using traditional reconsideration standard for a motion filed after movant's
first motion for reconsideration was denied and the case was subsequently reassigned). As
previously mentioned, for a plaintiff to succeed on a motion for reconsideration, they must show
at least one of three factors: "(1) an intervening change in the controlling law; (2) the availability
of new evidence that was not available when the court granted [or denied] the motion [at issue];
or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's
Seafood Café*, 176 F.3d at 677 (citation omitted).

Plaintiffs do not identify any intervening change in the controlling law or any new
evidence. (*See generally* Pls.' Moving Br.) Instead, they assert only that Chief Judge Wolfson
made a clear error of law in denying Plaintiffs' Motion to Transfer.[5] (*Id.* at 2, 4.) Specifically,
Plaintiffs argue that Chief Judge Wolfson should have granted transfer because: (1) "*Bruck* is the

---

[5] Notably, Plaintiffs do not explain in detail how they allege Chief Judge Wolfson errs. Plaintiffs
assert that "[t]o perform the requested reconsideration . . . the Court need not receive any additional
briefing. Plaintiffs' prior filings supply all of the reasons to grant the transfer requests." (Pls.'
Moving Br. 5.)

law of the case;" (2) "*Bruck* was rightly decided;" and (3) "apart from whether or not *Bruck* was

rightly decided, comity principles compel" this Court to adhere to that decision. (Pls.' Moving Br.

2.) Upon review of Chief Judge Wolfson's decisions, however, the Court finds she made no clear

error of law in denying Plaintiffs' Motions to Transfer.

First, it is important to note that regardless of whether *Bruck* was rightly decided, it is not

binding on this Court. The Fifth Circuit reiterated a similar point in its most recent opinion

regarding Plaintiffs' efforts to transfer this case, stating that "the issuance of the mandamus [in

*Bruck*] merely ordered that the district court *request* the return of the case from New Jersey—

nothing more." *Def. Distributed v. Platkin*, 55 F.4th 486, 492 (5th Cir. 2022).[6] As such, Plaintiffs'

argument that "*Bruck* is the law of the case" is rejected, and therefore, whether *Bruck* was rightly

decided is irrelevant to this Court's analysis.[7] (Pls.' Moving Br. 2.) Accordingly, Chief Judge

Wolfson's decision denying transfer on grounds that *Bruck* was rightly decided and that it was the

law of this case was not a clear error of law.

Second, regarding Plaintiffs' comity doctrine argument, Chief Judge Wolfson reviewed an

extensive list of the cases cited by Plaintiffs in contending that comity requires this Court to

_____

[6] The Fifth Circuit also noted that "[t]here was a solution to the jurisdictional morass in which
Plaintiffs found themselves: They could have moved for a stay of the district court's transfer order
before the case was transferred." *Platkin*, 55 F.4th at 492. Yet, Plaintiffs took no such action, and
even when the case was transferred to New Jersey, Plaintiffs failed to oppose Defendant's motion
to consolidate this matter. That consolidation helped tip the balance further toward denying
transfer back to Texas. (*See* First Transfer Op. 8, 30.)

[7] In fact, Third Circuit law does not favor the transfer of this case. In her First Transfer Opinion,
Chief Judge Wolfson engaged in an extensive review of the private and public interest factors that
the Court must weigh when deciding whether to transfer a case out of the District of New Jersey.
(First Transfer Op. 21-33.) Upon analyzing Plaintiffs' transfer request under Third Circuit law
(and considering the Fifth Circuit's opinion granting mandamus), Chief Judge Wolfson found that
the relevant factors militated again transfer. (*Id*. at 26; Second Transfer Op. 7 (stating that the
*Jumara* factors, "such as this Court's familiarity with New Jersey law, New Jersey's interest in the
litigation, and lingering disputes regarding personal jurisdiction over the NJAG in the Texas
District Court . . . weigh heavily against transfer.").)

transfer this case to Texas and found that all such cases involved a prior *binding* order from another court. (First Transfer Order 33-35.) As just established, this case does not involve any binding order from another court. (*Id.* at 35.) In the Second Transfer Opinion, Chief Judge Wolfson again addressed comity, correctly noting that "this Court is not obligated to apply nonbinding out-of-circuit law in this case, and the doctrine of comity is not a valid means to achieve such a result." (*Id.* at 9.) The Fifth Circuit itself recently noted that although it respects other federal courts, it "cannot embrace an argument [for comity] that would, in effect, allow the decision of an out-of-circuit district court to impel [it] toward 'extraordinary' relief that would be otherwise inappropriate." *All. for Hippocratic Med. v. Food & Drug Admin.*, No. 23-10362, 2023 WL 2913725, at *19 (5th Cir. Apr. 12, 2023). For these reasons, Plaintiffs' contention that comity compels this Court to transfer this matter is rejected. Chief Judge Wolfson did not err in refusing to transfer this matter on comity grounds.

In sum, Plaintiffs do not present any changes in the law, new evidence, or persuasive arguments as to how Chief Judge Wolfson committed clear legal error in refusing Plaintiffs' transfer request. As such, Plaintiffs' motion to reconsider Chief Judge Wolfson's Second Transfer Opinion is denied.

IV.    **CONCLUSION**

For the foregoing reasons, and for the reasons stated in the First and Second Transfer Orders (ECF Nos. *58, *66), the Court denies Plaintiffs' Motion for Transfer or Stay.[8]  The Court will enter an order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[8] To warrant a stay of this action pending Plaintiffs' hypothetical petition for mandamus, Plaintiffs would need to show they meet the four-factor test for such stays. *See In re Citizens Bank, N.A.*, 15 F.4th 607, 615 (3d Cir. 2021) (articulating test as (1) whether movant is "likely to obtain mandamus relief", (2) whether movant will suffer irreparable harm, (3) "whether a stay would substantially injure" the nonmovant, and (4) the public interest). Plaintiffs provided one sentence addressing these factors; the Court is unpersuaded. (Pls.' Moving Br. 5.) As described above, Chief Judge Wolfson's well-reasoned opinion does not indicate that Plaintiffs are likely to succeed. Additionally, Plaintiffs cite no caselaw in support of their contention that they will suffer irreparable harm. The only case they cite, *In re Citizens Bank*, involved harmful evidence set to be displayed at trial in a matter of weeks. 15 F.4th at 622. No such harm is alleged here. Instead, Plaintiffs' decision not to seek a petition for mandamus in the three months prior to this case's reassignment indicates that any harm they may face is not, in fact, immediate. Since "[t]he first two factors . . . are the most critical" and Plaintiffs have not carried their burden of proof on either, this Court denies their motion to stay. *Id.* at 616.

8

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DEFENSE DISTRIBUTED *et al.*,

           Plaintiffs,

           v.

MATTHEW J. PLATKIN, Attorney General
of the State of New Jersey,

           Defendant.

Civil Action No. 21-9867 (MAS) (TJB)

**ORDER**

This matter comes before the Court upon Plaintiffs Defense Distributed and Second Amendment Foundation, Inc.'s (collectively, "Plaintiffs") Motion to Transfer or Stay. (ECF No. 176.) Defendant Matthew J. Platkin, the Attorney General of New Jersey ("Defendant") opposed (ECF No. 177), and Plaintiffs replied (ECF No. 178). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. Accordingly, for the reasons set forth in the accompanying Memorandum Opinion, and other good cause shown,

      **IT IS,** on this <u>14th</u> day of June 2023, **ORDERED** as follows:

1.      Plaintiffs' Motion to Transfer or Stay (ECF No. 176) is **DENIED.**

 

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DEFENSE DISTRIBUTED *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 21-9867 (MAS) (TJB) |
|  | **OPINION** |
| MATTHEW J. PLATKIN, Attorney General of the State of New Jersey, | |
| Defendant. | |

**SHIPP, District Judge**

      This matter comes before the Court upon Defendant Matthew J. Platkin, the Attorney General of New Jersey's ("Defendant" or "State") Motion to Dismiss Defense Distributed ("DD") and Second Amendment Foundation, Inc.'s ("SAF") (collectively "Plaintiffs") Third Amended Complaint ("TAC"). (ECF No. 181.) Plaintiffs opposed (ECF No. 184), and Defendant replied (ECF No. 185). After careful consideration of the parties' submissions, the Court decides Defendant's motion without oral argument pursuant to Local Civil Rule 78.1. For the reasons outlined below, Defendant's motion to dismiss is granted. Counts One through Seven are dismissed without prejudice, and Counts Eight and Nine are dismissed with prejudice.

I.    **BACKGROUND**[1]

    A.    **Factual Background**

        *i.    The Parties*

DD is a Texas corporation founded by Cody Wilson ("Wilson"). (TAC ¶¶ 4, 8, ECF No. 180.) Wilson currently serves as DD's director. (*Id.* ¶ 9.) DD "exists to promote the Second Amendment's individual right to keep and bear [a]rms." (*Id.* ¶ 30.) In service to this ideal, DD has published, is publishing, and intends to continue publishing digital firearms information to the American public. (*Id.*) SAF is a Washington-based non-profit membership organization. (*Id.* ¶ 10.) "SAF promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control." (*Id.* ¶ 11.) Some members of SAF seek out DD's digital firearms information, and some SAF members "seek to share their own computer files by utilizing [DD's] facilities." (*Id.*)

Defendant is the current New Jersey Attorney General ("NJAG"). (*Id.* ¶ 13.) In his capacity as NJAG, Defendant is responsible for all of New Jersey's civil and criminal enforcement efforts. (*Id.*)

        *ii.    Publishing of Digital Firearms Information*

"Digital firearms information," as Plaintiffs use the term, is information in the form of coded computer files that acts as an "information store."[2] (*Id.* ¶¶ 24, 25, 28.) This "digital firearms

---

[1] For the purpose of considering the instant motion, the Court accepts all factual allegations in the TAC as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[2] This digital firearms information exists in a wide variety of computer file formats, such as portable document format ("PDF"), Standard for the Exchange of Product Data ("STEP") files, and plain text files. (TAC ¶ 25.)

information" includes, in part, Computer Aided Design files ("CAD Files") and Computer Aided Manufacturing files ("CAM Files"). (*Id.* ¶¶ 26-27.) CAD Files are files primarily used for abstract design wherein a user can "construct and manipulate complex [two-dimensional ("2D") and three-dimensional ("3D")] digital models of physical objects." (*Id.* ¶ 26.) CAD Files are not ready for insertion into object-producing equipment such as a 3D printer. (*Id.*) CAM Files, on the other hand, can be used to construct and manipulate 2D and 3D models of physical objects. (*Id.* ¶ 27.) Unlike CAD Files, CAM Files are ready for insertion into object-producing equipment such as a 3D printer. (*Id.*)

From December 2012 to May 2013, DD published a substantial set of computer files with digital firearms information to its website, Defcad.com ("DEFCAD"). (*Id.* ¶ 41.) Any visitor to the website could download the published digital firearms information for free. (*Id.*) Some of the digital firearms information published via DEFCAD during this period included: (1) files concerning a single-shot firearm known as the "Liberator"; (2) files concerning a magazine for AR-15 rifles; and (3) diagrams of firearm components. (*Id.*) These computer files, in addition to other digital firearms information published by DD, were downloaded "millions of times" by site visitors. (*Id.* ¶ 42.)

In July 2018, DD again published a substantial set of computer files with digital firearms information to DEFCAD and let any site visitor download the information for free. (*Id.* ¶ 43.) This downloadable information included, in part: (1) files concerning an assembly of the AR-15 rifle and magazine; (2) SOLIDWORKS part (".sldprt") files about firearm components; and (3) plain text files about firearm assembly methods. (*Id.*) These files were downloaded "hundreds of thousands of times." (*Id.* ¶ 44.)

3

Later that year, between August and November 2018, DD again published a substantial set of computer files with digital firearms information. (*Id.* ¶ 46.) This time, however, DD made its computer files available for mailed shipment on physical storage devices like USBs and SD cards. (*Id.* ¶ 46.) To accomplish this mailed delivery, DD used an ecommerce platform on DEFCAD to facilitate all online orders, and then used the U.S. Postal Service ("USPS") to deliver the firearms information ordered by DD's website visitors. (*Id.*) It is unclear whether DD customers had to pay for the digital firearms information shipped in this physical form. (*See id.*)

On March 27, 2020, DD published a substantial set of computer files with digital firearms information via DEFCAD. (*Id.* ¶ 49.) This group of files is still published on DEFCAD to date. (*Id.* ¶ 55.) The files published during this period include: (1) original and legacy firearm models; (2) CAD Files; (3) CAM Files; and (4) blueprints and drawings (*Id.* ¶ 49.) Unlike DD's prior periods of publication, however, the current publication period does not let DEFCAD visitors download files freely. (*Id.* ¶ 50.) Instead, DEFCAD now utilizes secure end-to-end encryption, screens DEFCAD visitors that attempt to access files, deems some DEFCAD visitors ineligible for file distribution, prevents DEFCAD files from being made available outside the United States, and does not make any files available to New Jersey residents or persons who lack a federal firearms license. (*Id.* ¶¶ 49-54.)

While DD's March 2020 computer files continue to be available on DEFCAD, all computer files published by DD prior to March 2020, while no longer available on DEFCAD, continue to be available on the Internet more generally. (*See id.* ¶ 56.) This is because many recipients of DD information persistently republish DD files online via their own websites. (*Id.*) While DD ceased publishing new digital firearms information due to the current legal climate, DD intends to publish digital firearms information in the future when it is legal to do so. (*Id.* ¶ 57.) Specifically, DD seeks

to, in part, make all previously published digital firearms information, including the information published in 2012, 2013, 2018, and 2020, freely available to DEFCAD visitors. (*Id.*) DD also plans to publish additional CAD, CAM, and computer files with other digital firearms information in the future. (*Id.*)

>    iii.    *The NJAG's Alleged Censorship of DD's Speech*

On July 26, 2018, the NJAG issued DD a formal cease-and-desist correspondence (the "Correspondence"). (*Id.* ¶ 120.) The Correspondence instructed DD to cease publishing digital firearms information "for use by New Jersey residents." (*Id.* ¶ 121.) The Correspondence stated that the publishing of digital firearms information was a violation of New Jersey's public nuisance and negligence laws. (*Id.*) The Correspondence concluded that legal action would be brought against DD by August 1, 2018 if DD's efforts to publish digital firearms information did not cease. (*Id.*)

That same day, the NJAG issued a press release informing the public that if DD failed to comply with the NJAG's demands, legal action would follow. (*Id.* ¶ 122.) The press release also took the position that posting digital firearms information online is "no different than driving to New Jersey and handing out hard-copy files on any street corner." (*Id.*)

On July 27, 2018, DD replied to the NJAG with a letter stating that all of DD's actions "are fully protected by the First Amendment" and that the NJAG's attempts to restrict DD's publications constitute an unconstitutional prior restraint in violation of the United States Constitution. (*Id.* ¶ 123.) Nevertheless, DD stated in its letter that it would attempt to restrict files made available on the Internet to prevent them from being downloaded within New Jersey. (*Id.*)

On July 30, 2018, the NJAG contacted one of DD's Internet security service providers, DreamHost. (*See id.* ¶¶ 124-26.) The NJAG informed DreamHost that DD planned to use

App. 088

DEFCAD in a manner that violated DreamHost's Acceptable Use Policy. (*Id.* ¶ 127.) Moreover, the letter informed DreamHost that DD's publication of digital firearms information violates New Jersey law. (*Id.*) That same day, the NJAG sent Cloudflare, Inc. ("Cloudflare"), another of DD's Internet security service providers, a copy of the Correspondence. (*Id.* ¶ 128.)

On November 8, 2018, the New Jersey Legislature passed Senate Bill 2465, later codified at N.J. Stat. Ann. 2C:39-9(*l*)(2) (the "Challenged Statute"). (*Id.* ¶ 129; *see also* N.J. Stat. Ann. 2C:39-9(*l*)(2).) The law, in pertinent part, reads as follows:

> [I]t is a second[-]degree crime for:
>
> . . .
>
> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a [3D] printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: '[3D] printer' means a computer or computer-driven machine or device capable of producing a [3D] object from a digital model; and 'distribute' means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

N.J. Stat. Ann. 2C:39-9(*l*).

DD alleges that the Challenged Statute was passed in order to "jail" DD, SAF, and anyone else that shares digital firearms information. (TAC ¶¶ 130, 135.) At the signing ceremony for the Challenged Statute, New Jersey Governor Phil Murphy referred to DD when he stated that the

NJAG "issued [the Correspondence] to the companies that deal in ghost guns,[3] saying explicitly that New Jersey is off limits to them." (*Id.* ¶ 136.) The NJAG then said, at the same signing ceremony, that the Challenged Statute was a "stronger tool" that the NJAG could use to stop DD founder Cody Wilson and his supporters from releasing digital firearms information online. (*Id.* ¶ 137.) The NJAG also stated that he hoped to "stop the next Cody Wilson" and that the NJAG will come after any "ghost gun company" that is "contemplating making a printable gun." (*Id.* ¶¶ 138-39.)

In light of the Challenged Statute's passage, DD ceased its activities in New Jersey because it feared that the NJAG would commence enforcement of the new law against DD at any moment. (*See id.* ¶¶ 141-42.) DD and SAF took legal action against the Challenged Statute shortly thereafter. *Def. Distrib., et al. v. Grewal*, No. 19-4753, ECF No. 1.

### B.    Procedural Background

This case has a long and contentious procedural history that is well-documented on the docket and need not be revisited in full. As such, the Court recites only the procedural history necessary to contextualize the instant motion.

### i.    *Relevant History from Previous Litigation Between the Parties*

Almost all cases in the United States addressing 3D-printed guns in the context of the First and Second Amendment stem from an initial action filed by Plaintiffs in the Western District of Texas in 2015. *See Def. Distrib. v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 701 (W.D. Tex. 2015). This first case (the "First Texas Case") was brought by Plaintiffs against the United States

---

[3] "Typically, 3D[-]printed firearms are made from plastic parts that may bypass security systems, and they are printed without serial numbers or other types of identification. As such, they are usually referred to as 'ghost guns.'" *Def. Distrib. v. Platkin*, 617 F. Supp. 3d 213, 221 n.2 (D.N.J. 2022) (citing *Gun Owners of Am., Inc. v. City of Philadelphia*, No. 21-2630, 2021 WL 4627556, at *1 (E.D. Pa. Oct. 7, 2021)).

App. 090

Department of State (the "State Department"). *See generally id.* In that action, Plaintiffs sought an allowance to publish digital firearms information on DEFCAD despite the State Department's concerns that the practice violated the International Traffic in Arms Regulations ("ITAR") and jeopardized national security. *Id.* at 689-90.

Years later, on June 29, 2018, the State Department entered into a settlement agreement in the First Texas Case whereby the federal government agreed:

> [1] [to] publish a notice of proposed rulemaking and final rule revising the United States Munitions List [("USML")] to allow the distribution of [CAD] files for the automated production of [3D-printed] weapons[;] [2] to announce a temporary modification of the USML to allow such distribution[;] . . . and [3] to issue a letter to DD [and others] that the CAD files are approved for public release and unlimited distribution.

*Washington v. U.S. Dep't of State*, 315 F. Supp. 3d 1202, 1203 (W.D. Wa. 2018). Shortly thereafter, various Attorneys General, including the NJAG, sued the State Department (the "First Washington Case") for various administrative procedure violations and for allowing DD to publish digital firearms information containing code for use in a 3D printer. *See generally id.*

Not long after the filing of the First Washington Case, the instant matter was separately filed in the Western District of Texas against the NJAG and the State Department. (ECF No. 1.) Various procedural or administrative appeals stemming from the First Texas Case, the First Washington Case, and the instant matter comprise much of the jurisprudence regarding whether the distribution of digital firearms information is constitutionally protected speech. *See, e.g.*, *Def. Distrib. v. Bruck*, 30 F.4th 414, 421-23 (5th Cir. 2022); *Def. Distrib. v. Att'y Gen. of N.J.*, 972 F.3d 193, 195-97 (3d Cir. 2020); *Def. Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 454-56 (5th Cir. 2016); *Defense Distrib.*, 617 F. Supp. 3d at 221-24; *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130, 1135-39 (W.D. Wash. 2019); *Washington v. U.S. Dep't of State*, No.

C18-1115RSL, 2019 WL 1318704, at *1-2 (W.D. Wash. Mar. 22, 2019); *Washington v. U.S. Dep't of State*, No. C18-1115RSL, 2018 WL 5921011, at *1-2 (W.D. Wash. Nov. 13, 2018); *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1250-54 (W.D. Wash. 2018). This Court, for the first time, reaches the merits of DD's constitutional contentions separate and distinct from any breach of contract claims it brought against the State Department. *See Def. Distrib. & Second Amend. Found.*, No. 18-637, 2023 WL 2544334, at *7 (W.D. Tex. Mar. 15, 2023).

> ii.    *Recent Procedural History in this Matter*

On April 26, 2023, the Court deconsolidated this matter from *Defense Distributed et al. v. Grewal*, Civ. No. 19-4753, after certain plaintiffs voluntarily dismissed their claims in that action. (*Def. Distrib., et al. v. Grewal*, No. 19-4753, ECF No. 60.) Plaintiffs then filed the TAC in this matter (ECF No. 180), which Defendant moved to dismiss (ECF No. 181). Plaintiffs opposed the motion (ECF No. 184), and Defendant replied (ECF No. 185). On June 14, 2023, this Court denied Plaintiffs' third and final attempt to transfer this matter to the Western District of Texas (ECF No. 187), concluding a years-long dispute over the proper forum for this case to be litigated. With the procedural tapestry woven, the Court now turns to the merits of Defendant's motion.

Plaintiffs' TAC alleges nine causes of action: (1) violation of the First Amendment's freedom of speech and of the press (Count One); (2) violation of the Second Amendment's right to keep and bear arms (Count Two); (3) violation of the Fourteenth Amendment's equal protection clause (Count Three); (4) violation of the Fourteenth Amendment's due process clause (Count Four); (5) violation of the dormant Commerce Clause (Count Five); (6) federal preemption through the Arms Export Contract Act ("AECA") (Count Six); (7) federal preemption through the Communications Decency Act ("CDA") (Count Seven); (8) tortious interference with a settlement agreement between DD and the State Department (Count Eight); and (9) tortious interference with

existing contracts (Count Nine). (TAC ¶¶ 175-246.) All of these claims arise from the passing of the Challenged Statute and Defendant's sending of the Correspondence to DD.

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 8(a)(2)[4] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted).  The court, however, may ignore legal conclusions or factually unsupported accusations that merely state that the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

---

[4] All references to "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

## III.    **DISCUSSION**

The manufacturing of "ghost guns" is a relatively recent phenomena, and legal jurisprudence stemming from the practice is therefore in its infancy. *See N.Y. State Rifle & Pistol Assoc. v. Bruen*, 142 S. Ct. 2111, 2180 (2022) (Breyer, J., dissenting) (anticipating, in light of current Second Amendment jurisprudence, challenges with how courts will assess the constitutionality of ghost guns). In fact, this case is one of the first in the country to assess both whether CAD and CAM Files are protected speech under the First Amendment and whether the Second Amendment allows an individual a constitutional right to manufacture firearms. *See, e.g.*, *Rigby v. Jennings*, 630 F. Supp. 3d 602, 615-16 (D. Del. 2022); *Fahr v. City of San Diego*, No. 21-1676, 2021 WL 4895974, at *4 (S.D. Ca. Oct. 20, 2021).

Ultimately, Plaintiffs bring nine causes of action against the Attorney General of New Jersey consisting of: (1) First Amendment Claims; (2) Second Amendment Claims; (3) Fourteenth Amendment Due Process Claims; (4) a dormant Commerce Clause claim; (5) federal preemption claims; and (6) state law tortious interference claims.[5] (TAC ¶¶ 175-246.) The Court will address each grouping of these claims in turn.[6]

---

[5] All of Plaintiffs' constitutional claims are brought pursuant to 42 U.S.C. § 1983. (TAC ¶¶ 175-246.)

[6] The Court notes Plaintiffs' contention that Defendant's motion should be denied because Defendant's motion to dismiss did not address Plaintiffs' allegations of "[c]ivil censorship (via [the Correspondence]) [but only] criminal censorship" via the passing of the Challenged Statute. (Pls.' Opp'n Br. 2, ECF No. 184.) The Court does not read Defendant's motion to dismiss as failing to address the constitutionality of the Correspondence. While Plaintiffs insist that Defendant must do two separate factual analyses, one addressing Defendant's alleged civil restrictions on Plaintiffs' speech, and one for criminal restrictions on Plaintiffs' speech, such contention is somewhat perplexing considering Plaintiffs makes no effort to separate their nine Counts in this manner. As such, Plaintiffs' contention that "[t]he [NJ]AG's failure to argue about civil censorship means that those claims survive no matter what" is unpersuasive. Moreover, Plaintiffs cite no case law to support their contentions on this issue.

**A.**     **First Amendment Claim (Count One)**

Plaintiffs allege three First Amendment violation theories: (1) unconstitutional speech restrictions; (2) prior restraint; and (3) overbreadth. (TAC ¶¶ 175-85.) Defendant moves to dismiss each theory. (*See generally* Def.'s Moving Br., ECF No. 181-1.) The Court addresses each in turn.

*i.*     *Unconstitutional Speech Restrictions*

The alleged speech at issue in this matter, as described by the Challenged Statute, is:

> [D]igital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a [3D] printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.

N.J. Stat. Ann. 2C:39-9(*l*).[7] Before delving into a First Amendment analysis as to whether this alleged speech can be regulated, the Court must recognize the difficulty of the First Amendment question presented.[8] *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 451 (2d Cir. 2001) ("The[] realities of what code is and what its normal functions are require a First Amendment analysis that treats code as combining nonspeech and speech elements." (citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386 (1969)).

---

[7] The Court notes that the Challenged Statute does not appear to stop DD from discussing the best way to 3D print a firearm or from distributing non-utilizable information, such as sheet instructions, to a resident in New Jersey. *See* N.J. Stat. Ann. 2C:39-9(*l*). Instead, the only "speech" that the Challenged Statute appears to regulate is digital instructions that can be "used to program" a 3D printer to construct a 3D-printed firearm. (*See* Def.'s Moving Br. 13 (stating that the Challenged Statute "does not restrict any components that express ideas advocating for printable firearms, such as instructional files[, instead] New Jersey law is specifically concerned with the unregulated distribution of the functional capability to make firearms, not the communicative content of code or its ability to convey a particular message").)

[8] *See also* Xiangnon Wang, *De-Coding Free Speech: A First Amendment Theory for the Digital Age*, 2021 WIS. L. REV. 1373, 1406 (2021) (identifying two key reasons it is difficult to assess whether computer code is protected speech: (1) because "code challenges how [courts] perceive the boundary between 'speech' and 'conduct'"; and (2) "because code can be used in many ways" such as "calculating taxes, vacuuming floors, or for engaging in public discourse").

12

Whether computer code constitutes protected speech is a question of first impression in this District and this Circuit, and the question has not yet been addressed by the Supreme Court. In fact, only a handful of courts across the country have ruled on the issue at all. The courts that have taken on the issue have not yet taken a definitive stance on a critical question: whether all computer code is speech protected by the First Amendment, or whether some computer code, while speech generally, is functional or nonexpressive such that it is unprotected by the First Amendment.[9] *See e.g.*, *Rigby*, 630 F. Supp. 3d at 616 n.15 (denying a motion for preliminary injunction as to a First Amendment claim on nearly identical facts to this case while assuming 3D-printing computer code was protected First Amendment speech and noting "[t]he Court is skeptical that [the challenged statute] implicates the First Amendment" but stating that the Court need not decide the issue because the defendant prevailed on other grounds); *Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 9 (D.D.C. 1996) ("As a threshold matter, for the purpose of addressing the dispositive issue whether [a] regulation is justified and permissible, the Court will assume that the protection of the First Amendment extends to [] source code.")

The Court does not find this avoidance constructive where, as here, the issue of whether computer code is protected by the First Amendment is directly at issue and it appears that the alleged "speech" may be serving to effectuate an entirely non-expressive function: printing a firearm with little human involvement. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) (rejecting "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea" let alone where a person intends

---

[9] *See also* Mark C. Bennett, *Was I Speaking to You? Purely Functional Source Code as Non-covered Speech*, 92 N.Y.U. L. REV. 1494, 1514 (2017) (identifying that when courts are considering this question they are often "inclined to assume the presence of speech [rather] than to decide the question definitively").

13

to create an object through use of a machine (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968))); *Spence v. State of Washington*, 418 U.S. 405, 410 (1974) (considering non-verbal speech and noting that for a court to determine if such speech is expressive and protected the court must combine "the nature of [plaintiffs'] activity . . . with the factual context and environment in which it was undertaken" before concluding whether the expression or speech is protected); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 159 (3d Cir. 2002) (noting that where speech "does not involve the use of words" that speech can only be protected if it is "expressive" as opposed to non-expressive). As such, the Court finds that it is necessary to reach this oft-avoided question on the facts of this case.

Courts generally agree that computer code constitutes a form of speech. *Corley*, 273 F.3d at 449-50 (collecting cases) (concluding "that computer code conveying information is 'speech'"); *see also Junger v. Daley*, 209 F.3d 481, 484-85 (6th Cir. 2000); *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435 (N.D. Cal. 1996) (noting that "the functionality of a language does not make it any less like speech"). There is, however, an open question as to whether computer code is always *protected* speech.[10] Specifically, many of the courts that have dealt with this issue

---

[10] An assortment of speech is unprotected by the First Amendment. For example, "[s]pecific criminal acts are not protected speech even if speech is the means for their commission." *United States v. Gonzalez*, 905 F.3d 165, 192 (3d Cir. 2018) (quoting *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017)). This is because "[s]peech intended to bring about a particular unlawful act has no social value," and is thus, in a sense, nonexpressive. *United States v. Hansen*, 143 S. Ct. 1932, 1947 (2023). Nonexpressive conduct, like sleeping on sidewalk, is also unprotected by the First Amendment. *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996). This is because certain conduct may not be "sufficiently imbued with elements of communication to fall within the scope of the First" Amendment. *Johnson*, 491 U.S. at 404 (citation omitted). With this in mind, the Court notes that just because computer code has elements of both conduct and speech does not mean that all computer code is *per se* protected by the First Amendment. Some greater analysis must occur, and while "[i]t is possible to find some kernel of expression in almost every activity a person undertakes" it is this Court's responsibility to ascertain whether "such a kernel is . . . sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

14

App. 097

acknowledge a distinction between expressive computer code, which is constitutionally protected, and functional computer code, which may not be. *See Corley*, 273 F.3d at 449 (concluding source code is speech, but suggesting that where code operates "mechanically" and "without intercession of the mind or will of the recipient," it may not be speech, while crediting a previous Second Circuit decision that found that where a programmer communicates through code to the user of the program, such speech is protected, but where a programmer communicates through code with a machine or computer, such speech is "never protected"); *Junger*, 209 F.3d at 485 (finding on the facts of the case before the court that source code "is an expressive means for the exchange of information and ideas about computer programming" but not addressing the constitutional status of source code where the code only serves a functional use that does not serve to assist in the exchange of information or ideas about computer programming); *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 222 (S.D.N.Y. 2000) (assuming, in the context of a preliminary injunction, that "executable code is sufficiently expressive to merit some constitutional protection" but later noting that the computer code at issue in the case did not serve the goals of the First Amendment due to its functionality); *Karn*, 925 F. Supp. at 9 & n.19 (assuming that source code with expressive qualities like the source code in the case before the court, which contained comments embedded within the code serving an instructive purpose, is protected, but casting doubt that source code without such comments would be protected, stating that "[s]ource codes are merely a means of commanding a computer to perform a function."). This Court is inclined to follow the courts before it that have recognized a First Amendment distinction between expressive and non-expressive, functional computer code, as such distinction arises logically from, and is

App. 098

consistent with, the First Amendment more generally.[11] *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("It is true that restrictions on protected expression [in the context of the First Amendment] are distinct from restrictions on economic activity or, more generally, [from] nonexpressive conduct.")

With this distinction in mind, the TAC lacks sufficient information regarding DD's computer code for the Court to analyze the sufficiency of Plaintiffs' allegations. The above outlined fact-intensive First Amendment standard necessarily requires detailed, technical allegations regarding the types of computer code at issue in this case (i.e., source code, origin code, other), how that code is used (i.e., precisely how the writer or user of the code might interact with the code), whom or what is communicating through the code (programmer-to-human communication, human-to-machine communication, or other), and for what purpose the computer code operates (i.e., to perform a function, to express an idea, or some combination thereof). While some of this information is contained in the TAC, the TAC does not engage in a sufficiently detailed account of DD's computer code for the Court to conduct the necessary analysis. (*See* TAC ¶¶ 24-29.) As such, Plaintiffs will be provided an opportunity to clarify their allegations, consistent with this Opinion, as to the type of code comprising the digital firearms information, how that code produces a firearm, and whether the programming communication that is being regulated is between a human and human, a machine and a human, or some hybrid of both.

---

[11] Were the Court to credit Plaintiffs' position that all computer code, including the alleged speech in this case, is protected as expressive under the First Amendment, then an AI-operated lawnmower which runs on code with no human involvement, an online recruiting service that develops software, or an automated household vacuum performing its core function of cleaning a home could all potentially constitute speech under the First Amendment. Xiangnon Wang, *De-Coding Free Speech*, 2021 Wis. L. Rev. at 1377 (providing several of these challenging examples in the context of viewing code as speech). No reasonable interpretation of First Amendment jurisprudence compels this Court to reach such a conclusion. *See Johnson*, 491 U.S. at 404; *Spence*, 418 U.S. at 410.

The Court notes separately that it is unclear what speech Plaintiffs perceive the Challenged Statute as regulating. As previously noted, the Challenged Statute explicitly regulates only computer code that "is used to program" a 3D printer. N.J. Stat. Ann. 2C:39-9(*l*). Plaintiffs, in the TAC, appear to suggest, for example, that the Challenged Statute regulates information that "conveys knowledge without advocating action" such as "plain text . . . files" containing "notes, instructions, and comments." (TAC ¶¶ 24-25.) Plaintiffs also allege, however, that the Challenged Statute regulates distribution of CAM Files, which are "ready for insertion into object-producing equipment." (*Id.* ¶¶ 25, 28.) These forms of computer code appear to be materially different for purposes of the Court's analysis. Should Plaintiffs wish to allege all computer code they offer on DEFCAD is protected speech, they will need to allege how each form of digital firearms information they offer constitutes protected speech based on the general distinction outlined above, and how the Challenged Statute regulates each form of code.

In light of the above findings, the Court does not reach any discussion of content-neutrality as the Court is not yet persuaded that the speech the Challenged Statute regulates is protected. As such, Plaintiffs' direct speech regulation theory of First Amendment violation is rejected at this time.

App. 100

    *ii. Prior Restraint and Overbreadth*

  As the Court has yet to establish whether DD's digital firearms information constitutes protected speech, the Court does not reach Plaintiffs' prior restraint or overbreadth theories.[12] Accordingly, Count One is dismissed without prejudice.

  **B. Second Amendment Claim (Count Two)**

  Plaintiffs allege that the Challenged Statute abridges the individual right to keep and bear Arms under the Second Amendment. (TAC ¶¶ 187.) More specifically, Plaintiffs allege that Defendant's conduct "infringes the individual right to make and acquire Arms, which is part and parcel of the right to keep and bear arms." (*Id.* ¶ 190.) Defendant moves to dismiss Plaintiffs' Second Amendment claim arguing: (1) that "a limitation on the distribution of printable gun files does not implicate the plain text of the Second Amendment" because computer code does not constitute an "Arm"; and (2) even if the Second Amendment is implicated, the Second Amendment only protects a "law-abiding citizen[']s right to armed self-defense," and by subverting background check laws by using computer code to print a gun, the manufacture of a 3D-printed gun is unlawful. (Def.'s Moving Br. 19-22.) Plaintiffs in opposition argue that the "right to self-manufacture firearms and to maintain them" is at issue in this case and that the right to self-manufacture firearms has been recognized since the colonial period. (Pls.' Opp'n Br. 23-30.)

---

[12] The Court notes that to the extent Plaintiffs seek to contend the Challenged Statute is an unconstitutional prior restraint, the Court need not reach that issue unless DD's digital firearms information is found to be protected speech. The Court does note, however, that it is skeptical that the Challenged Statute constitutes a prior restraint where it outlines a punishment for speech *after* such impermissible speech occurs. *Cf. Alexander v. United States*, 509 U.S. 544, 553 (1993). To the extent that Plaintiffs intend to contend that the Correspondence constitutes a prior restraint, Plaintiffs provide no case law as to whether a cease-and-desist correspondence can constitute a prior restraint. (*See generally* Pls.' Opp'n Br.) Should Plaintiffs file a fourth amended complaint and wish to reallege their prior restraint claim, they are advised to take note of this deficiency in their briefing.

While a 3D-printed gun itself may be an "Arm," the computer codes sent to someone else to manufacture such an "Arm" does not constitute an "Arm" under the Second Amendment. The term "Arms" in the Second Amendment was defined by the Supreme Court. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). Specifically, the Supreme Court held that "[t]he 18th-century meaning" of "Arms" is no different from the meaning today." *Id.* "Arms" are "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (citing to "Timothy Cunningham's important 1771 legal dictionary" defining "arms" (quoting 1 A NEW AND COMPLETE LAW DICTIONARY)). Computer code cannot be worn for defense, taken into ones hands, or used to cast down an enemy. Only the firearm or weapon it creates can perform such function.

Plaintiffs, however, do not appear to be alleging that computer code constitutes an "Arm" so much as they are alleging that the Second Amendment's "keep and bear" language protects a right to self-manufacture a firearm. (TAC ¶ 190.) Plaintiffs, therefore, allege that the Challenged Statute violates the Second Amendment's right to "keep and bear Arms" by criminalizing the manufacture of 3D-printed arms without a license. (*See id.* (alleging that the Challenged Statute infringes the individual right to make and acquire Arms, which is part and parcel of the *right to keep and bear* Arms).) As to this assertion, the Court is not satisfied that Plaintiffs have Article III standing to bring such a claim. *Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, No. 22-2030, 2023 WL 5539276, at *4 (3d Cir. Aug. 29, 2023) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (internal quotation marks and citation omitted)). While Defendant did not identify Article III standing as a cause for dismissal of Plaintiffs' Second Amendment claim, Article III standing implicates this Court's subject-matter jurisdiction. *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d

261, 269 (3d Cir. 2016) ("Article III standing is essential to federal subject[-]matter jurisdiction and is thus 'a threshold issue that must be addressed before considering issues of prudential standing.'" (citation omitted)). As such, the Court must be satisfied that standing exists before adjudicating Plaintiffs' Second Amendment claim. *N.J. Second Amend. Soc'y v. N.J. Press Assoc.*, No. 22-2938, 2023 WL 5740239, at *1 (3d Cir. Sept. 6, 2023) ("Standing is a jurisdictional requirement . . . so when its conditions are unmet, [courts] have no authority under Article III to consider the merits of the case." (citations omitted)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868))).

　　To establish Article III standing, a plaintiff must demonstrate: "(1) an injury-in-fact[;] (2) a sufficient causal connection between the injury and the conduct complained of[;] and (3) a likelihood that the injury will be redressed by a favorable decision." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (citations omitted). The "injury in fact" inquiry is often determinative of standing. *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021) (citations omitted). "A plaintiff seeking to establish [an] injury in fact 'must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). "To be 'concrete,' an injury must be 'real, or distinct and palpable, as opposed to merely abstract.'" *Finkelman*, 810 F.3d at 193 (quoting *N.J. Physicians, Inc. v. President of the United States*, 653 F.3d 234, 238 (3d Cir. 2011)). "To be sufficiently 'particularized,' an injury must 'affect the plaintiff in a personal and individual way.'" *Id.* (quoting

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 n.1 (1992)). Where a plaintiff is an association seeking to invoke associational standing, it may "bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citation omitted).

Here, the TAC does not appear to allege a concrete and particularized Second Amendment injury. (*See generally* TAC.) There is no allegation in the TAC that DD, SAF, or any member of either entity attempted to or was prevented from 3D printing a firearm but could not do so. (*Id.*) Instead, the TAC focuses exclusively on DD's reluctance to publish digital firearm information as a result of the Challenged Statute and the Correspondence. These allegations only invoke a First Amendment injury. With no allegations that either Plaintiff or any association member sought to manufacture a 3D-printed firearm and could not as a result of the Challenge Statute or the Correspondence, Plaintiffs have failed to allege a concrete and particularized Second Amendment injury. As such, Plaintiffs fail to allege an injury-in-fact capable of establishing Article III standing to challenge the Challenged Statute on Second Amendment grounds. The Court, therefore, is

unable to satisfy itself that it has subject-matter jurisdiction over Plaintiffs' Second Amendment claim, and dismisses Count Two without prejudice.[13]

**C.    Fourteenth Amendment Claims (Counts Three and Four)**

Under the Fourteenth Amendment, Plaintiffs allege two violations: (1) violation of the equal protection clause through selective enforcement (Count Three); and (2) violation of the due process clause for lack of fair notice, overbreadth, and deprivation of property (Count Four). (TAC ¶¶ 194-211.)

*i.    Count Three: Selective Enforcement*

Defendant contends that Count Three fails because the TAC identifies no parties who have violated the Challenged Statute, let alone any parties who violated the Challenged Statute and were not prosecuted. (Def.'s Moving Br. 27-28.) Accordingly, Defendant contends that Count Three is not ripe for adjudication as there has been no enforcement of the Challenged Statute. (*See id.*) Moreover, Defendant contends that Plaintiffs' conclusory allegation that the NJAG "disagrees with the content" of DD's speech and "dislikes the persons involved in the speech" is not evidence of improper motive or intent. (*Id.* at 29.) Plaintiffs argue in opposition that their allegation that Defendant "took action against [DD] but not similarly situated persons engaged in publication of

---

[13] Although Count Two is dismissed on standing grounds, the Court notes that should Plaintiffs be able to show that the plain text of the Second Amendment contains a right to self-manufacture a firearm, under *Bruen*, Defendant will have a burden to show how the Challenged Statute comports with this Nation's "historical tradition." *See Bruen*, 142 S. Ct. at 2126. Specifically, the Supreme Court established in *Bruen* that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Range v. Att'y Gen. of the U.S. of Am.*, 69 F.4th 96, 100 (3d Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2126). In such case, the government may regulate that conduct "[o]nly if a firearm regulation is consistent with this Nation's historical tradition." *Id.* Ultimately, it is the government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Here, Defendant did not provide any historical analysis justifying its regulation. Should Defendant wish to move to dismiss any renewed Count Two, Defendant will be expected to brief in accordance with *Bruen*.

App. 105

[DD files] because [Defendant] disagrees with the content of [DD's] speech" is sufficient to survive the pleading stage. (Pls.' Opp'n Br. 30-31.)

The Fourteenth Amendment prohibits states from denying "any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. This clause protects individuals "against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)). To prevail on a selective enforcement claim under the equal protection clause, Plaintiffs must demonstrate: (1) that they were "treated differently from other similarly situated individuals; and (2) that this selective treatment was based on an 'unjustifiable standard . . . or to prevent the exercise of a fundamental right.'" *Dique v. N.J. State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010) (quoting *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)). To sustain their claim, Plaintiffs must provide evidence that a government decisionmaker took a particular course of action because it would have adverse effects on Plaintiffs. *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012); *see Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs' selective enforcement claim fails because they do not allege that the NJAG treated similarly situated parties differently in enforcing the Challenged Statute or sending the Correspondence. To the contrary, Plaintiffs allege that other 3D-printed gun manufacturers and information distributors were treated similarly. (*See* TAC ¶ 136 ("The Attorney General . . . issued a cease-and-desist letter to the *companies* that deal in ghost guns" (emphasis added)); ¶ 138 (quoting the Attorney General as saying "[e]arlier this year, we went after some of the biggest *players* in this industry" and directing his comments toward "*anyone* who is contemplating making

23

a printable gun" (emphasis added)).) As such, Plaintiffs fail to plausibly allege that the Challenged Statute itself was passed to selectively prevent Plaintiffs from acting. For these reasons, Plaintiffs' selective enforcement theory must fail. Accordingly, Defendant's motion to dismiss Count Three is granted, and Count Three is dismissed without prejudice.

　　　　ii.　　*Count Four: Due Process Violations*

　　　　Defendant next contends that Plaintiffs' due process claim fails. (Def.'s Moving Br. 29-32.) Plaintiffs allege three theories of due process violation: (1) vagueness; (2) overbreadth; and (3) deprivation of property. (*See* TAC ¶¶ 206-08.) First, Plaintiffs do not expound upon their overbreadth theory, and the Court cannot discern any due process-related overbreadth theory separate and distinct from Plaintiffs' overbreadth theory mentioned in the context of the First Amendment. (*Id.* ¶ 206 ("The NJAG's conduct forbids a substantial amount of constitutionally protected speech; as such, it is an unconstitutional deprivation of liberty and property without due process of law."); *see generally* Pls.' Opp'n Br.) As such, the Court construes Plaintiffs' due process and First Amendment overbreadth theories as resting on the same factual allegations. Accordingly, for the reasons stated earlier in this Opinion, the Court does not reach this issue pending determination of whether the digital firearms information at issue in this litigation is protected speech. If Plaintiffs intend to bring this due process-overbreadth theory again, Plaintiffs are encouraged to better clarify their theory in the due process context if they intend to defeat any renewed motion to dismiss.

　　　　Second, Plaintiffs' deprivation-of-property theory relies on the factual allegation that the NJAG "deprive[d] [DD] and SAF of a license issued by the Secretary of State pursuant to federal law . . . without supplying adequate pre-deprivation notice and an opportunity to be heard." (*Id.* ¶ 208.) The State Department is no longer a party to this matter, and Plaintiffs fail to plausibly

allege how this claim is sustainable in the absence of the State Department. (*Id.*) Moreover, as Defendant correctly notes, "no injunction could be granted against the NJAG that would result in [the State Department] restoring a license that the Western District of Washington has held violates the APA." (Def.'s Moving Br. 31-32; *see also Washington v. Dep't of State*, 420 F. Supp. 3d at 1135-39.) As such, even if Plaintiffs could state a claim for relief, Plaintiffs fail to allege how any deprivation-of-property theory by Plaintiffs is redressable under Article III. In light of the Western District of Washington's holding, therefore, Plaintiffs do not have Article III standing to bring a deprivation-of-property claim. *Finkelman*, 810 F.3d at 193 (finding that to establish Article III standing, a plaintiff must demonstrate . . . a likelihood that the injury will be redressed by a favorable decision.")

Finally, Plaintiffs aver that the Challenged Statute is void for vagueness. (TAC ¶ 206.) A statute is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). A statute need not be "vague in all its application[s]" to be void for vagueness. *Johnson v. United States*, 576 U.S. 591, 597-98, 603 (2015).

Plaintiffs assert that "it is impossible for a speaker to know what counts as 'code . . . *that may be* used to' engage in" programming a 3D printer to produce a firearm because "what 'may be used' by one programmer can be totally useless to another." (Pls.' Opp'n Br. 32-33 (alteration in original).) Plaintiffs' contention that the code may be useless to some programmers does not render the language of the statute so vague that it fails to provide a person of ordinary intelligence fair notice of what is prohibited.

25

The Challenged Statute provides that it is a second-degree crime to facilitate the manufacturing of a firearm by distributing "digital instructions" that may be used to program a 3D printer to manufacture a firearm or firearm components. N.J. Stat. Ann. 2C:39-9(*l*)(2). The term "may," which Plaintiffs contend renders the Challenged Statute vague, in the context it is used, appears to refer to any digital instruction *with the capability* to program a 3D printer to produce a firearm. This does not appear to be a vague prohibition as a person of ordinary intelligence can conclude from this language that any digital instruction capable of programming a 3D printer to produce a firearm or firearm component is prohibited.[14] Instead, when read as a whole, the Challenged Statute's language clearly defines the type of digital files and the methods of distribution that qualify as prohibited conduct. *See* N.J. Stat. Ann. 2C:39-9(*l*)(2). In this way, the Challenged Statute alleviates the risk of arbitrary and discriminatory enforcement by setting forth a cognizable standard. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 503 (1982) (finding that where an ordinance was "sufficiently clear" the "speculative danger of arbitrary enforcement d[id] not render the ordinance void for vagueness" (citation omitted)). Therefore, because a person of ordinary intelligence is given fair notice of the types and files prohibited by the statute and what function those files cannot be used to perform, and because there is no risk of discriminatory enforcement of the statute, Plaintiffs' claim that the Challenged Statute is void for vagueness fails. Accordingly, Count Four is dismissed without prejudice.

---

[14] To the extent the parties disagree as to what type of digital instruction is capable of "programming" a 3D printer to produce a firearm, the Court does not reach such issue here where, as elaborated upon in the Court's First Amendment analysis, the Court does not yet have before it sufficient briefing to assess the nature and capability of the computer code at issue in this matter.

### D.    Dormant Commerce Clause Claim (Count Five)

Defendant next moves to dismiss Plaintiffs' dormant Commerce Clause claim. (Def.'s Moving Br. 22-26.) Plaintiffs allege that the Challenged Statute "directly regulates interstate commerce by projecting New Jersey law into other states" and "discriminate[s] against interstate commerce" without serving a compelling governmental interest. (TAC ¶¶ 212-21.) Moreover, Plaintiffs contend that the Challenged Statute "expressly projects New Jersey's law . . . throughout the entire Union," because regulating website publications creates "extraterritorial discrimination" violative of the dormant Commerce Clause. (Pls.' Opp'n Br. 34 (quoting *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997).) Defendant, on the other hand, contends that the Challenged Statute is neutral, does not regulate conduct beyond the State of New Jersey, and creates no impermissible extraterritorial effects. (Def.'s Moving Br. 22-26.)

The Commerce Clause states that "Congress shall have [the] Power . . . [t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. "This affirmative grant of authority to Congress 'also encompasses an implicit or "dormant" limitation on the authority of the States to enact legislation affecting interstate commerce.'" *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 237-38 (3d Cir. 2022) (quoting *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 35 F.3d 813, 823 (3d Cir. 1994)). "When evaluating whether a statute violates the Commerce Clause, [courts] examine the statute's effect on interstate commerce." *Id.* at 238 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). "[W]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [courts] generally str[ike] down the statute without further inquiry." *Instructional Sys.*, 35 F.3d at 824 (quoting *Brown-Forman*, 476 U.S. at 579). "When, however, a statute only has indirect effects on interstate commerce and

27

regulates evenhandedly, [courts] examine[] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman*, 476 U.S. at 579 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Just this year, in *National Pork*, the Supreme Court clarified its dormant Commerce Clause jurisprudence. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374-80 (2023). In *National Pork*, a California law, Proposition 12, was challenged under the dormant Commerce Clause. *Id.* at 365. The law banned "the in-state sale of certain pork products derived from breeding pigs confined in stalls so small they cannot lie down, stand up, or turn around." *Id.* at 364. Two groups of out-of-state pork producers challenged the law and argued that it "unconstitutionally interferes with their preferred way of doing business in violation of" the dormant Commerce Clause. *Id.* at 363-64.

The Supreme Court in *National Pork* set forth a comprehensive history of dormant Commerce Clause jurisprudence. *Id.* at 368-71. The Supreme Court identified, in part, "that state laws offend the Commerce Clause when they seek to '"build up . . . domestic commerce' through 'burdens upon the industry and business of other States,' regardless of whether Congress has spoken." *Id.* at 369 (quoting *Guy v. City of Baltimore*, 100 U.S. 434, 443 (1880)). This behavior, i.e., building up one state's economy to the detriment of other states' economies, is the type of behavior that constitutes "discriminatory" conduct violative of the dormant Commerce Clause. *See id.* at 369-70 (confirming this definition of "discriminatory" in modern cases and finding that "the Commerce Clause prohibits the enforcement of state laws 'driven by . . . "economic protectionism–that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."'" (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008)). Importantly, however, the Supreme Court noted that, "absent discrimination, 'a State may exclude

from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to' the interest of its citizens." *Id.* at 369 (quoting *Guy*, 100 U.S. at 443).

Here, Plaintiffs expressly bring a "discrimination-based claim" against Defendant. (Pls.' Opp'n Br. 34.) From Plaintiffs' briefing, it appears that they raise a "discrimination-based" claim in an effort to try and distance their dormant Commerce Clause claim from *National Pork* by noting that the plaintiffs in *National Pork* "disavow[ed] any discrimination-based claim." (*Id.* (quoting *Nat'l Pork*, 598 U.S. at 370).) While this assertion is true, it does not make the Supreme Court's interpretation of dormant Commerce Clause jurisprudence concerning discriminatory and non-discriminatory challenges any less relevant to Plaintiffs' "discrimination-based claim." As such, the Court rejects Plaintiffs' attempts to subvert *National Pork*.

As mentioned above, the Supreme Court in *National Pork* identified that, "state laws offend the Commerce Clause when they seek to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States,'" regardless of whether Congress has spoken. *Nat'l Pork*, 598 U.S. at 369 (quoting *Guy*, 100 U.S. at 443)). This antidiscrimination principle is at the heart of most dormant Commerce Clause challenges, and it follows from this principle that "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" is prohibited under the dormant Commerce Clause. *Id.* ("[A]ntidiscrimination principles lie[] at the 'very core' of our dormant Commerce Clause jurisprudence." (quoting *Dep't of Revenue of Ky.*, 553 U.S. at 337-38)). Here, the Challenged Statute clearly does not discriminate against out-of-state corporations.

The Challenged Statute provides that any "person" in New Jersey is prohibited from manufacturing a firearm without a proper manufacturer's license or registration, and any distribution of digital firearms information to a person in New Jersey "who is not registered or

licensed as a manufacturer" is a crime. N.J. Stat. Ann. 2C:39-9(*l*). While it is certainly true that Plaintiffs, out-of-state corporations dealing in a now criminalized activity in New Jersey, are economically restricted by the Challenged Statute, such restriction is not a *per se* violation of the dormant Commerce Clause. *See Nat'l Pork*, 598 U.S. at 371-76 (rejecting plaintiffs' argument that the dormant Commerce Clause suggests an "almost *per se*" rule "forbidding enforcement of state laws that have the "'practical effect of controlling commerce outside the state,' even when those laws do not purposely discriminate against out-of-state economic interests"). This is because the Challenged Statute treats in-state and out-of-state distributors of digital firearms information equally: whether a company is a New Jersey or Texas-based digital firearms information distributor, it is illegal for that company to distribute such information into New Jersey. For these reasons, Plaintiffs' "discrimination-based claim" under the dormant Commerce Clause fails as alleged.

The Court's analysis does not end there, however. There are at least two ways to show a state statute facially violates the dormant Commerce Clause: (1) facial discrimination; or (2) direct regulation. *Instructional Sys.*, 35 F.3d at 824 ("When a state statute *directly regulates or discriminates* against interstate commerce . . . [courts] generally [strike] down the statute without further inquiry.") (emphasis added) (quoting *Brown-Forman*, 476 U.S. at 579). Plaintiffs, while claiming to only bring a "discrimination-based claim," also clearly allege and argue that the Challenged Statute directly regulates interstate commerce where Plaintiffs invoke the phrase "extraterritorial discrimination." (TAC ¶ 216 ("The NJAG's conduct violates the dormant Commerce Clause doctrine regarding laws that directly regulate interstate commerce."); Pls.' Opp'n Br. 34 (referring to the Challenged Statute's regulation as "extraterritorial discrimination," a phrase that conflates legal terms related to direct regulation and direct discrimination); *TitleMax*,

30

24 F.4th at 238 (finding that "[o]ne way a challenged statute can 'directly regulate' interstate commerce is if the statute has 'extraterritorial effects' that adversely affect economic production (and hence interstate commerce) in other states" (quoting *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261-62 (3d Cir. 2006))).)[15] As such, the Court briefly assesses whether the Challenged Statute violates the dormant Commerce Clause by directly regulating interstate commerce.

Plaintiffs appear to argue that the Challenged Statute creates extraterritorial effects by regulating what information can be published on the Internet, i.e., by prohibiting the distribution of digital instructions capable of producing a 3D-firearm on the Internet. (Pls.' Opp'n Br. 34; N.J. Stat. Ann. 2C:39-9(*l*).) The regulation of information published on the Internet, such as digital firearms information that is free to download, can be particularly challenging in this context. This is because, as the Second Circuit in *Dean* noted in 2003, "the [I]nternet does not recognize geographic boundaries, [and as such,] it is difficult, if not impossible, for a state to regulate [I]nternet activities without 'projecting its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 334 (1989)). Nevertheless, *National Pork* again offers useful insight into why a State's regulation of Internet behavior within that State does not directly regulate interstate commerce. Specifically, the Supreme Court in *National Pork* sets forth the following persuasive analysis:

> In our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior. State income tax laws lead some individuals and

---

[15] Facial discrimination is a separate dormant Commerce Clause violation theory from direct regulation and extraterritorial effects. *See Instructional Sys.*, 35 F.3d at 824. "Extraterritorial discrimination," stated conjunctively, is Plaintiffs' creation, as this Court could find no case law using this phrase and Plaintiffs provide no case law using this phrase. (*See generally* Pls.' Opp'n Br.) As such, the Court assumes that Plaintiffs allege both theories of dormant Commerce Clause violation separately and addresses both.

> companies to relocate to other jurisdictions. Environmental laws
> often prove decisive when businesses choose where to manufacture
> their goods. Add to the extraterritorial-effects list all manner of libel
> laws, securities requirements, charitable registration requirements,
> franchise laws, tort laws, and plenty else besides. Nor, as we have
> seen, is this a recent development. Since the founding, States have
> enacted an immense mass of [i]nspection laws, quarantine laws,
> [and] health laws of every description that have a considerable
> influence on commerce outside their borders. [An] "almost *per se*"
> rule against laws that have the "practical effect" of "controlling"
> extraterritorial commerce would cast a shadow over laws long
> understood to represent valid exercises of the States'
> constitutionally reserved powers. It would provide neither courts nor
> litigants with meaningful guidance in how to resolve disputes over
> them. Instead, it would invite endless litigation and inconsistent
> results.

*Nat'l Pork*, 598 U.S. at 374-75 (internal quotation marks and citations omitted). Moreover, as

directly applicable to this matter, the Supreme Court in *Strassheim* noted that the dormant

Commerce Clause does not, for example, prohibit one state from prosecuting citizens of another

state for "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental

effects within it." *Strassheim v. Daily*, 221 U.S. 280, 285 (1911). The Supreme Court then

reaffirmed this notion in *National Pork*, emphasizing that, "absent discrimination," the dormant

Commerce Clause does not forbid states from prohibiting "the sale therein of articles which, in its

judgment . . . are prejudicial to' the interests of its citizens." *Nat'l Pork*, 598 U.S. at 369 (quoting

*Guy*, 100 U.S. at 443).

Here, Plaintiffs contend that because the Challenged Statute regulates the Internet by

criminalizing the transmittal of information via the Internet to New Jersey residents, it violates the

dormant Commerce Clause. First, the Supreme Court stated in *National Pork* that the dormant

Commerce Clause does not prevent a state from criminalizing behavior originating in another state

that might produce detrimental effects within the state. *Id.* That is precisely what is happening

here. DD, a Texas corporation, published information on the Internet that New Jersey determined

produced detrimental effects in the State of New Jersey. As such, New Jersey criminalized the behavior in the Challenged Statute *but only in New Jersey*. This action does not violate the dormant Commerce Clause even if it produces some modicum of extraterritorial effects.

Second, Plaintiffs' suggestion that any regulation of the Internet is effectively a regulation "throughout the entire Union" is not tenable. (Pls.' Opp'n Br. 34.) Web-content providers, for example, frequently control content flows from state to state and can do so by conditioning access to certain content on the presentation of payment information or by geographical filtering.[16] As such, just because a state regulates certain behavior on the Internet within its borders does not necessarily establish that the state directly regulates interstate commerce by creating extraterritorial effects. For these reasons, any contention by Plaintiffs that the Challenged Statute directly regulates interstate commerce is also rejected. Accordingly, the Court finds that the Challenged Statute does not directly regulate interstate commerce and does not discriminate against out-of-state interests.

Finally, the Court briefly mentions the *Pike* balancing test. *See Brown-Forman*, 476 U.S. at 579 (finding that "[w]hen . . . a statute only has indirect effects on interstate commerce and regulates evenhandedly," courts then conduct a *Pike* balancing test (citing *Pike*, 397 U.S. at 142)). "Under that test, '[w]here [a state] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Yerger v. Mass. Turnpike Auth.*, 395 F. App'x 878, 883 (3d Cir. 2010) (citing *Pike*, 397 U.S. at 142). Other than baldly asserting that "[t]he NJAG's conduct imposes burdens on interstate

---

[16] Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 YALE L.J. 785, 809-10 (2001).

33

commerce that are clearly excessive in relation to putative local benefits," Plaintiffs' TAC provides no further allegations as to what burden is placed on interstate commerce and how that burden outweighs New Jersey's interest in "preventing individuals 'from manufacturing deadly weapons entirely outside of the state's regulatory regime.'" (Def.'s Reply Br. 14, ECF No. 185; *see generally* TAC.) As such, the Court cannot conduct the *Pike* balancing test, and Plaintiffs' dormant Commerce Clause claim, Count Five, is dismissed without prejudice.[17]

     **E.**     **Federal Preemption Claims (Counts Six and Seven)**

     Defendant next argues that the Challenged Statute is not preempted by either the AECA or CDA. (Def.'s Moving. Br. 35.) "The doctrine of preemption is derived from the Supremacy Clause of Article IV of the Constitution, which provides that 'the Laws of the United States . . . shall be the supreme Law of the Land.'" *Lupian v. Joseph Cory Holdings*, 905 F.3d 127, 131 (3d Cir. 2018) (citing U.S. CONST. art. VI). "There are three types of federal preemption: field preemption, implied conflict preemption, and . . . express preemption." *Id.* (citation omitted). "Express preemption occurs when a federal law contains express language providing for the preemption of any conflicting state law." *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395 (3d Cir. 2010) (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)). "Implied conflict preemption occurs

---

[17] Moreover, the Court cautions Plaintiffs that if they wish to amend their dormant Commerce Clause allegations, the Supreme Court in *National Pork* clarified that "'no clear line' separates the *Pike* line of cases from [the Supreme Court's] core antidiscrimination precedents." *Nat'l Pork*, 598 U.S. at 377. To be clear, the Supreme Court held that *Pike* is only intended to be utilized where a state law does not discriminate on its face to assess whether there is nevertheless, in effect, a "discriminatory character [to] the state regulation[.]" *Id.* at 377-78. As noted by the Court above, the Challenged Statute does not discriminate either facially or implicitly against interstate commerce on the facts alleged because there is no allegation that out-of-state distributors of firearms information like DD are treated less favorably than New Jersey distributors of the same information. (*See generally* TAC.) To this end, if Plaintiffs seek to amend their dormant Commerce Clause claim, such amended claim must account for the Supreme Court's *Pike* interpretation outlined in *National Pork*.

when it is either impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). Finally, field preemption "arises when a state law or regulation intrudes upon a 'field reserved for federal regulation.'" *Id.* at 396 (quoting *United States v. Locke*, 529 U.S. 89, 111 (2000)).

> i.    *AECA Preemption Analysis (Count Six)*

Defendant moves to dismiss Plaintiffs' claim that the AECA and the related ITAR preempt the Challenged Statute. (*See* Def.'s Moving Br. at 35-38.) Defendant contends that the Challenged Statute does not forbid anything that federal law authorizes and that it is possible to comply both with the federal regulations applicable to Plaintiffs' digital firearms data and the Challenged Statute, which prohibits distribution in New Jersey. (*See id.*) Defendant specifically highlights that relevant agency rulemakings indicate that such federal administrative rules do not purport to displace existing federal or state law. (*See id.* at 36.) In opposition, Plaintiffs contend that "[b]y seeking to criminalize Plaintiffs' publication of matters that the State Department has expressly authorized for publication, New Jersey seeks to have its legislature take over the President's job of 'control[ling] the import and export of defense articles.'" (Pls.' Opp'n Br. at 36 (citing 22 U.S.C. § 2778(a)(1)).) Plaintiffs further dispute that it is possible to comply with both federal and state law where "the federal law goes far beyond not forbidding conduct and *affirmatively licenses it*." (*Id.* at 37 (emphasis in original).)

"The AECA regulates the export of arms, ammunition, and other military and defense technology." *Washington v. U.S. Dep't of State*, 443 F. Supp. 3d 1245, 1250 (W.D. Wa. 2020) (citing 22 U.S.C. § 2778(a)(1)), *vacated on other grounds by* 996 F.3d 552 (9th Cir. 2021). Under

App. 118

the AECA, "the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The same section of the AECA authorizes the President to "promulgate regulations for the . . . export of such articles and services." *Id.* The President delegated the authority to promulgate implementing regulations to the Secretary of State. *Washington*, 443 F. Supp. 3d at 1250. Those regulations, the ITAR, are administered by the Directorate of Defense Trade Controls (the "DDTC"). 22 C.F.R. § 120.1(a); *see Stagg, P.C. v. U.S. Dep't of State*, 983 F.3d 589, 595 (2d Cir. 2020). A "list of items designated as 'defense articles and defense services' is identified as the" USML and appears within the ITAR. *Stagg*, 983 F.3d at 595 (citing 22 C.F.R. § 121.1).

"Under the AECA, any person 'who engages in the business of manufacturing, exporting, or importing any' of the items on the USML must register" with DDTC and obtain a license from the State Department. *Id.* (citing 22 U.S.C. § 2778(b)(1)(A)(i)). "The ITAR specify that 'engaging in such a business requires only one occasion of manufacturing or exporting or temporarily importing a defense article or furnishing a defense service.'" *Id.* (citing 22 C.F.R. § 122.1(a)). "Each of the 21 categories designated as 'defense articles or defense services' in the USML is defined to include 'technical data' either 'relating' or 'directly related' to the listed articles." *Id.* (citing 22 C.F.R. § 121.1). "[T]he term 'technical data' is defined to include '[i]nformation . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance[,] or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions[,] or documentation.'" *Id.* (quoting 22 C.F.R. § 120.10(a)(1)). "Computer software for the production of a Category I firearm or its components using a 3[D] printer ("3D gun files"), such as [CAD] files, is 'technical data' subject

to the AECA and ITAR." *Washington*, 433 F. Supp. 3d at 1251. And "[s]ince about 2013, it had

been the government's position that posting [3D] gun files on the [I]nternet was an 'export' subject

to the AECA and ITAR." *Id.*

      Relevant here, on January 23, 2020, the State Department and Commerce Department

published two separate but related final rules affecting regulation of the technical data at issue in

this action under the AECA. First, the State Department published a final rule revising the USML.

*See* 85 Fed. Reg. 3819 (Jan. 23, 2020) ("State Rule"). The State Rule, among other things, removed

all non-automatic firearms up to .50 caliber and related technical data from Category I of the

USML. *See id.* at 3823. Second, a companion final rule published by the Commerce Department

confirmed that such technical data would still be controlled on the Commerce Control List

("CCL") of the Export Administration Regulations ("EAR"). *See* 85 Fed. Reg. 4136 (Jan. 23,

2020) ("Commerce Rule"). Pursuant to the EAR, notwithstanding the Commerce Department's

jurisdictional exemption for "published" technology or software, it retains jurisdiction over:

> '[S]oftware' or 'technology' for the production of a firearm, or
> firearm frame or receiver, . . . that is made available by posting on
> the [I]nternet in an electronic format . . . and is ready for insertion
> into a computer numerically controlled machine tool, additive
> manufacturing equipment, or any other equipment that makes use of
> the 'software' or 'technology' to produce the firearm frame or
> receiver or complete firearm.

15 C.F.R. § 734.7(c).

      Against this federal regulatory framework, Plaintiffs claim that Defendant's use of the

Challenged Statute to stop Plaintiffs' publication of digital firearms data "is preempted by the

federal government's exclusive authority over foreign affairs." (Pls.' Opp'n Br. at 35; *see*

TAC ¶¶ 224-26.) Plaintiffs also emphasize that, prior to the State Rule and the Commerce Rule,

the State Department issued Plaintiffs a license to publish the firearms data at issue. (*See* TAC

¶¶ 75-82, 224.) Aside from such broad and conclusory assertions, however, nothing in the TAC or opposition to Defendant's Motion demonstrates federal preemption of the Challenged Statute.

First, the Challenged Statute is not expressly preempted by the relevant federal statutory provisions and regulations as the regulations do not "contain[] express language providing for the preemption of any conflicting state law." *Kurns*, 620 F.3d at 395. Nor do Plaintiffs argue as much.

Second, the Challenged Statute and the federal framework regulate distinct conduct, and thus there is no basis to find the Challenged Statute invalid under a field preemption theory. While Plaintiffs' basic contention that the federal government retains exclusive authority over foreign affairs is correct, it hardly follows that states are therefore unable to regulate goods, services, or data available within their borders via the Internet. Field preemption "exists if 'federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.'" *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 269 (3d Cir. 2004) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

Here, the State Rule explicitly contemplates supplementary regulation of domestic distribution of defense articles, including technical data related to firearms. Specifically, the State Rule provides that "[n]either the AECA nor ITAR expressly provide the Department with authority to regulate the distribution of technical data in the United States to U.S. persons." 85 Fed. Reg. 3819, 3822. The State Rule further states that "the AECA does not provide the Department with the authority to . . . regulate the domestic distribution among U.S. persons of any defense article," and that "[d]omestic activities that do not involve release to foreign persons are generally left to other federal agencies—and the states—to regulate." 85 Fed. Reg. 3819, 3822-23. Similarly, the Commerce Rule states that "the domestic transfer of commodities is outside" the Commerce Department's jurisdiction and that "nothing in this final rule affects existing federal or state laws

38

that pertain to the manufacture, possession, use, or commercial sale of firearms." 85 Fed. Reg. 4136, 4141. Because the Challenged Statute merely supplements the federal regulatory framework, New Jersey's prohibition of Plaintiffs' technical data within its borders absent proper licensing does not intrude upon the federal government's authority over the import and export of defense articles, including via the Internet, under the AECA.[18] Indeed, as the federal government acknowledges, there is ample room in the legislative field for state regulation.

Third, the Challenged Statute does not prevent Plaintiffs' compliance with the relevant federal law. Conflict preemption exists "where it is impossible for a private party to comply with both state and federal law" or "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Id.* (quoting *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006)).

---

[18] The Commerce Rule notes that "[t]he release of controlled technology in the United States would only be regulated to the extent it would constitute a deemed export (i.e., release to a foreign person)." 85 Fed. Reg. 4136, 4141. The Commerce Rule further explains that, in general, the Commerce Department maintains "controls over the 3D printing of firearms when such software and technology is posted on the [I]nternet." 85 Fed. Reg. 4136, 4142. The fact of federal controls in this area, however, does not prevent supplementary state regulation providing for further restriction applicable only to distribution within state borders. Mere regulatory overlap does not imply field preemption. *See Farina v. Nokia Inc.*, 625 F.3d 97, 116 (3d Cir. 2010) (explaining that the "presumption against pre-emption" "applies with particular force in fields within the police power of the state," including "the field of public health and welfare" and that "the presence of federal regulation, however longstanding, does not by itself defeat the application of the presumption" (citing *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009))).

Here, Plaintiffs are obligated to comply with the licensing requirements of ITAR and EAR with respect to the export of technical data and the Challenged Statute, which applies only to distribution within New Jersey's borders. *See* N.J. Ann. Stat. § 2(C):39-9(*l*)(2). Plaintiffs' only particularized argument as to any conflict between these federal and state regimes is that they were allegedly previously granted a license for "unlimited distribution" of technical firearm data by the State Department as part of a settlement agreement related to a separate litigation and that the Challenged Statute forbids conduct that was approved by the license. (*See* TAC ¶¶ 77-79, 224-26.) But the existence of such a license is refuted by Plaintiffs' own allegations. (*See id.* ¶¶ 83-119.) In fact, Plaintiffs allege that the State Department ultimately "disavowed" and "refused to supply" such a license. (*See id.* ¶¶ 98-106.) Moreover, as described above and as Defendant highlights, the State Department is no longer responsible for the licensing procedures that apply to the technical data, or the majority of technical data, at issue in this matter. (*See* Def.'s Moving Br. at 32 n.9.) Notably, rather than establishing the Challenged Statute as an obstacle to the federal scheme, Plaintiffs' own allegations appear to demonstrate that dual compliance proves no issue, as Plaintiffs admit that their publications of technical data from March 2020 to present were not made available to persons outside the United States and were similarly made unavailable to persons in New Jersey who lack a firearms license. (*See* TAC ¶¶ 52-53.) Plaintiffs' TAC, therefore, fails to set forth any convincing basis for conflict preemption.

In sum, Plaintiffs' AECA preemption claim is less an argument about preemption than it is an apparent grievance with the State Department's supposed repudiation of a previous settlement agreement. In opposing Defendant's Motion, Plaintiffs offer no reasoning or authority supporting the conclusion that the federal regulatory scheme invalidates New Jersey's efforts to preclude illicit

distribution of technical firearms data within its borders. As such, Defendant's Motion is granted as to Count Six, and Plaintiffs' AECA preemption claim is dismissed without prejudice.

       *ii.      CDA Preemption Analysis (Count Seven)*

       Plaintiffs also allege that § 230(c)(1) of the CDA expressly preempts the Challenged Statute. (*See* Pls.' Opp'n Br. 37-38 (citing 47 U.S.C. § 230(e)(3)).) Defendant moves to dismiss arguing that § 230(c)(1) only applies if the relevant content at issue did not originate from the website operator itself, i.e., did not originate from DD. (Def.'s Moving Br. 36-37.) Defendant then argues that the plain text of the Challenged Statute "applies to the actor's *own* distribution of printable gun files, and is silent regarding" a website's accountability for the posts of another. (*Id.* at 37.) In opposition, Plaintiffs argue that the Challenged Statute is preempted because it does in fact criminalize the republishing of digital firearms information provided by another information content provider. (Pls.' Opp'n Br. 38.)

       The CDA provides, in relevant part, that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Essentially, this provision "bars attempts to treat websites as publishers or speakers of content posted by others." *Hepp v. Facebook*, 14 F.4th 204, 209 (3d Cir. 2021); *see also Backpage.com, LLC v. Hoffman*, No. 13-03952, 2013 WL 4502097, at *6 (D.N.J. Aug. 20, 2013) ("[W]hat matters is not the name of the cause of action . . . [but] whether [it] inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009))). "The CDA reflects Congress's decision not to treat websites and other providers of interactive computer services like . . . information providers, such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing

defamatory material written by others." *Obado v. Magedson*, 612 F. App'x 90, 93 (3d Cir. 2015) (citing *Green v. Am. Online (AOL)*, 318 F.3d, 465, 471 (3d Cir. 2003)). The CDA expressly preempts any state or local law that is inconsistent with any provision of the CDA. *See* 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

The question here is whether enforcing the Challenged Statute against DD for publication of digital firearms information to its own website, DEFCAD, would "treat" DD as the "publisher or speaker" of that content. *See Backpage.com*, 2013 WL 4502097, at *6 (citation omitted). The parties do not dispute that DD is an interactive computer service as defined in 47 U.S.C. § 230(f).[19] The TAC alleges that DD is a provider of an "interactive computer service," as defined in § 230(f), because it is a provider and user of an interactive online service at DEFCAD. (TAC ¶ 230.) Critically, however, "[b]y its terms, § 230 provides immunity [only] to [a party] as a publisher or speaker of information *originating from another information content provider*." *Green*, 318 F.3d at 471 (emphasis added).[20] In other words, § 230 only grants immunity to a computer service provider from liability "that would hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content" originating from an entity other than itself. *Id.* (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

---

[19] Section 230(f)(2) defines "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f).

[20] An "information content provider" is defined under § 230(f)(3) to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f).

42

Here, the Court finds that § 230(c)(1) does not apply to the instant case. As plead in the TAC, the content at issue in this case is the digital firearms information that DD published, from 2012 through 2020, to its own website, DEFCAD. (TAC ¶¶ 41, 43, 46, 49, 50, 55, 56.) Indeed, the basis for DD's liability under the Challenged Statute is DD's own posting of information onto its own website, not any "actions quintessentially related to a publisher's role" that would implicate protection under § 230. *Green*, 318 F.3d at 471. Thus, because the Challenged Statutes does not seek to treat DD as the publisher of a third party's statements, CDA protection under § 230 does not apply.[21] Accordingly, the Court grants Defendant's Motion to Dismiss with respect to Plaintiffs' CDA preemption claim and dismisses Count Seven without prejudice.

### F.    Tortious Interference Claims (Counts Eight and Nine)

Finally, Plaintiffs bring two state-law tortious interference claims. (TAC ¶¶ 236-46.) Sovereign immunity, however, protects Defendant from both Counts.

The Eleventh Amendment "grants a state immunity" from being sued by private parties in federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002) (citation

---

[21] In their opposition brief, Plaintiffs focus their arguments on "Plaintiffs' right to *republish* digital firearms information that was provided by other people engaged in the open-source development process." (Pls.' Opp'n Br. 38 (emphasis in original).) Specifically, they allege that the Challenged Statute criminalizes the distribution of information regardless of whether information was republished. (*Id.*) For instance, the Challenged Statute could penalize DD if it were to republish digital firearms information from a third party. This argument is unavailing, however, given the TAC fails to contain any allegations of republishing. The only allegation with respect to republishing is that "many recipients of [DD]'s digital firearms information have persistently republished those same files online *via their own websites*," not on DD's own website. (TAC ¶ 56 (emphasis added).) The TAC does not allege any facts as to whether DD even allows for other information content providers, besides itself, to post or host content onto its website. Nor does the TAC allege any specific incidents in which DD republished a third party's digital firearms information or even that such republishing would be subject to penalty under the Challenged Statute. As such, Plaintiffs' alleged increased risk of future liability under the Challenged Statute based on republishing is a hypothetical and speculative harm that is insufficient to sustain their CDA preemption claim. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (stating that "allegations of 'possible future injury' are not sufficient to satisfy Article III" standing).

omitted); *see also MCI Telecomms. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 503 (3d Cir. 2001) (collecting cases). "This immunity extends to state agencies and departments." *MCI Telecomms.*, 271 F.3d at 503. "[A] suit against a state official in his or her official capacity is not a suit against the official[,] but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). A state, however, "may waive its Eleventh Amendment immunity" by either voluntarily invoking federal jurisdiction when bringing a suit or by making a clear declaration that it intends to submit itself to federal jurisdiction. *Allen v. N.J. State Police*, 974 F.3d 497, 505 (3d Cir. 2020) (citing *MCI Telecomms.*, 271 F.3d at 504). "Waiver of Eleventh Amendment immunity will be found 'only where the state's consent is stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Id.* (citing *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 345 (3d Cir. 2003)).

Here, Plaintiffs are private actors bringing this federal lawsuit against the NJAG for actions taken in his official capacity. Plaintiffs seek only declaratory and injunctive relief, in addition to attorney's fees. (TAC ¶¶ 246, 250.) Typically, where Plaintiffs seek injunctive relief against state officials to end ongoing violations of federal law, such claims are not barred by the Eleventh Amendment. *MCI Telecomms.*, 271 F.3d at 513-14 (citations omitted).  Importantly, however, this Eleventh Amendment exception does not apply where, as here, a plaintiff brings state law claims against a state actor. *King v. Christie*, 981 F. Supp. 2d 296, 310 n.12 (D.N.J. 2013) (finding a plaintiff "may not bring state law claims . . . against the State regardless [of] the type of relief it seeks" (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-06 (1984))). As such, in order for Plaintiffs' state law claims to proceed at all, Plaintiffs must show that Defendant waived sovereign immunity.

App. 127

Plaintiffs first contend that Defendant waived immunity by "voluntarily proceeding in federal court against the Plaintiffs" in the First Washington Case. (Pls.' Opp'n Br. 39 (citing *Lapides*, 535 U.S. at 619).) In *Lapides*, the Supreme Court held in the context of a defendant's removal of a matter to federal court from state court that "a State's voluntary appearance in federal court amount[s] to a waiver of its Eleventh Amendment immunity." 535 U.S. at 619 (citing *Clark v. Barnard*, 108 U.S. 436, 447 (1883)). Critically, Defendant neither filed this action nor voluntarily appeared in federal court by removing this action from state court like the defendant in *Lapides*. Plaintiffs were the only party that decided to litigate this matter voluntarily in a federal court where they chose to file their claims against the NJAG in a Texas federal court. (Compl., ECF No. 1.) Further, the Court is unpersuaded that *Lapides* stands for the proposition that Defendant's filing of the First Washington Case in a separate, but factually adjacent, matter constitutes a waiver of sovereign immunity in a Texas/New Jersey matter that Defendant did not voluntarily file or remove to federal court. *See Lombardo v. Pa. Dep't of Pub. Welfare*, 540 F.3d 190, 198 (3d Cir. 2008) (holding that in light of *Lapides*, a "State's ability to raise sovereign immunity when it is involuntarily brought into federal court[]" is not affected). Plaintiffs certainly cite no case law that leads this Court to make such a conclusion. (*See* Pls.' Opp'n Br. 39.) As such, Plaintiffs fail to plausibly allege that Defendant waived sovereign immunity and therefore Plaintiffs' state law claims cannot succeed against Defendant. Accordingly, Counts Eight and Nine are dismissed with prejudice.

**IV.    <u>CONCLUSION</u>**

For the reasons discussed in this Opinion, Defendant's motion to dismiss is granted. Counts One through Seven are dismissed without prejudice. Counts Eight and Nine are dismissed with prejudice. The Court will issue an Order consistent with this Opinion.

s/ Michael A. Shipp

**Michael A. Shipp**
**United States District Judge**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DEFENSE DISTRIBUTED *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, Attorney General of the State of New Jersey, <br><br> Defendant. | Civil Action No. 21-9867 (MAS) (TJB) <br><br> **ORDER** |

This matter comes before the Court upon Defendant Matthew J. Platkin, the Attorney General of New Jersey's ("Defendant") Motion to Dismiss Defense Distributed and Second Amendment Foundation, Inc.'s ("Plaintiffs") Third Amended Complaint. (ECF No. 181.) Plaintiffs opposed (ECF No. 184), and Defendant replied (ECF No. 185). For the reasons outlined in the Court's Opinion,

   **IT IS** on this <u>29th</u> day of September 2023, **ORDERED** that:

1. Defendant's motion to dismiss is **GRANTED**.

2. Counts One, Two, Three, Four, Five, Six, and Seven are **DISMISSED WITHOUT PREJUDICE**.

3. Counts Eight and Nine are **DISMISSED WITH PREJUDICE**.

4. Plaintiffs will be granted 30 days from the filing of this Order on the docket to file a fourth amended complaint.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**Subject:** Activity in Case 3:21-cv-09867-MAS-TJB DEFENSE DISTRIBUTED et al v. GREWAL et al Order
**Date:** Thursday, November 2, 2023 at 9:24:58 AM Central Daylight Time
**From:** njdefiling@njd.uscourts.gov
**To:** njdefiling@njd.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of New Jersey [LIVE]

### Notice of Electronic Filing

The following transaction was entered on 11/2/2023 at 10:24 AM EDT and filed on 11/2/2023
**Case Name:**          DEFENSE DISTRIBUTED et al v. GREWAL et al
**Case Number:**        3:21-cv-09867-MAS-TJB
**Filer:**
**WARNING: CASE CLOSED on 09/29/2023**
**Document Number:** 190(No document attached)

**Docket Text:**
**TEXT ORDER: This matter comes before the Court upon review of its docket. On September 29, 2023, the Court entered an Order directing Plaintiffs to file a Fourth Amended Complaint within 30 days (ECF No. [189]). No Fourth Amended Complaint was timely filed. Out of an abundance of caution, the Court will grant Plaintiffs fourteen additional days from the date of this Text Order to file a Fourth Amended Complaint. If Plaintiffs fail to do so, the remaining counts in Plaintiffs' Third Amended Complaint will be dismissed with prejudice. So Ordered by Judge Michael A. Shipp on 11/2/2023. (jdb)**

**3:21-cv-09867-MAS-TJB Notice has been electronically mailed to:**

ANGELA CAI    angela.cai@njoag.gov, Siobhan.Michaud@njoag.gov

DANIEL L. SCHMUTTER    dschmutter@hartmanwinnicki.com, daniel@allmail.net, lmaloney@hartmanwinnicki.com

RENEE GREENBERG    renee.greenberg@law.njoag.gov

TIM SHEEHAN    tim.sheehan@law.njoag.gov

**3:21-cv-09867-MAS-TJB Notice has been sent by regular U.S. Mail:**

DANIEL NIGHTINGALE


ERIN HODGE
NJ OFFICE OF THE ATTORNEY GENERAL
DIVISION OF LAW
25 MARKET STREET
TRENTON, NJ 08611

HANNAH ROBLYER


JOSH BLACKMAN
1303 San Jacinto Street
Houston, TX 77002