No. 23-3058

---

In the United States Court of Appeals for the Third Circuit

---

Defense Distributed; Second Amendment Foundation, Inc.,
*Plaintiffs—Appellants*,

v.

Attorney General of New Jersey,
*Defendant—Appellee.*

---

Appeal from the United States
District Court for the District of New Jersey
Case No. 3-21-cv-9867

---

Appendix Volume II | pp. 133-394

---

Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

Josh Blackman
Josh Blackman LLC
1303 San Jacinto Street
Houston, Texas 77002
(202) 294-9003

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Counsel for Appellants

# Table of Contents

**Item**                                                                              **Page**

Doc. 117        Plaintiffs' Second Amended Complaint | April 19, 2021 .................133

Doc. 180        Plaintiffs' Third Amended Complaint | May 5, 2023 ..................... 249

*Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. Apr. 1, 2020). .................... 340

*Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. Aug. 19, 2022) .....................355

*Defense Distributed v. Platkin*, 48 F.4th 607 (5th Cir. Sept. 16, 2022) ................. 382

*Defense Distributed v. Platkin*, 55 F.4th 86 (5th Cir. Dec. 15, 2022)..................... 384

Respectfully submitted,

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

Josh Blackman
Josh Blackman LLC
1303 San Jacinto Street
Houston, Texas 77002
(202) 294-9003

Counsel for Appellants

**Certifications**

1.  At least one of the attorneys whose name appears on this brief is a member of the bar of this Court.

2.  The text of this document's electronic version matches its paper copies.

3.  A virus detection program, BitDefender Endpoint Security Tools major version 6, has been run on the file and no virus was detected.

4.  On March 11, 2024, this filing was served on the opposing party's counsel by delivering it through the Court's electronic docketing system to the following registered users of the system:

    Angela Cai
    Renee Greenberg
    Erin Hodge
    Timothy Sheehan

<div align="center" style="float:right">

*/s/ Chad Flores*
Chad Flores

</div>

Case 1:18-cv-00637-RP   Document 117   Filed 11/10/20   Page 1 of 89

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § | Case No. 1:18-CV-637 |
| Plaintiffs, | § § § | |
| v. | § § | |
| UNITED STATES DEPARTMENT OF STATE, MICHAEL R. POMPEO, in his official capacity as Secretary of State; DIRECTORIATE OF DEFENSE TRADE CONTROLS; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary of Defense Trade Controls; SARAH HEIDEMA, in her official capacity as Director of Policy, Office of Defense Trade Controls Policy, | § § § § § § § § § § § § | PLAINTIFFS' SECOND AMENDED COMPLAINT |
| and | § § | |
| GURBIR GREWAL, Attorney General of the State of New Jersey | § § § § | |
| Defendants. | § | |

_____

**Table of Contents**

I.      Introduction.............................................................................................. 4

II.     Parties..................................................................................................... 5

        A.      Defense Distributed ................................................................... 5

        B.      Second Amendment Foundation, Inc........................................... 5

        C.      The State Department ................................................................ 6

        D.      Gurbir Grewal ......................................................................... 7

III.    Subject Matter Jurisdiction ................................................................... 7

IV.     Venue ..................................................................................................... 8

V.      Permissive Joinder ................................................................................. 9

VI.     Facts ..................................................................................................... 10

        A.      Digital Firearms Information is Speech. .................................... 10

        B.      Defense Distributed's Digital Firearms Information Publications. ..................... 12

                1.      Defense Distributed's 2012–2013 Publications...................... 14

                2.      Defense Distributed's July 2018 Publications. ...................... 15

                3.      Defense Distributed's August–November 2018 Publications. ................. 16

                4.      Defense Distributed's 2020-Present Publications.................... 17

                5.      Published files will always remain online. ............................ 18

                6.      Defense Distributed's Future Publications. ............................ 18

        C.      The State Department's International Traffic in Arms Regulations..................... 19

        D.      *Defense Distributed I*: Litigation .......................................... 21

        E.      *Defense Distributed I*: Settlement Agreement ........................ 24

        F.      Settlement Agreement Fulfillment Begins................................. 28

        G.      The State Department Stopped Fulfilling the Settlement Agreement ................. 30

                1.      The State Department disavowed the license. ....................... 34

                2.      After disavowal, the State Department refused to supply a license.......... 35

                3.      The State Department disavowed the Temporary Modification.............. 36

                4.      After disavowal, the State Department refused to supply a Temporary Modification....................... 36

                5.      The State Department failed to supply the required regulatory changes. . 37

        H.      Grewal Censors Defense Distributed........................................ 38

                1.      Grewal Engages in Civil Censorship .................................... 38

                2.      Grewal Engages in Criminal Censorship............................... 40

        I.      Irreparable Harm................................................................... 45

App. 134

|   |   | 1. | The State Department's illegal conduct causes irreparable harm. | 45 |
|   |   | 2. | Grewal's illegal conduct causes irreparable harm. | 47 |
| VII. | Causes of Action Against the State Department | | | 49 |
|   | A. | Count One: APA § 706(2)(A). | | 49 |
|   | B. | Count Two: APA § 706(2)(B). | | 52 |
|   | C. | Count Three: APA § 706(2)(C). | | 53 |
|   | D. | Count Four: APA § 706(2)(D). | | 56 |
|   | E. | Count Five: Breach of contract. | | 58 |
|   | F. | Count Six: Freedom of Speech and of the Press | | 60 |
|   | G. | Count Seven: Right to Keep and Bear Arms | | 64 |
|   | H. | Count Eight: Due Process | | 67 |
| VIII. | Causes of Action Against Grewal. | | | 70 |
|   | A. | Count Nine: 42 U.S.C. § 1983—Freedom of Speech and of the Press | | 71 |
|   | B. | Count Ten: 42 U.S.C. § 1983—Right to Keep and Bear Arms | | 73 |
|   | C. | Count Eleven: 42 U.S.C. § 1983—Equal Protection | | 74 |
|   | D. | Count Twelve: 42 U.S.C. § 1983—Due Process | | 75 |
|   | E. | Count Thirteen: 42 U.S.C. § 1983—Commerce Clause | | 76 |
|   | F. | Count Fourteen: 42 U.S.C. § 1983—Arms Export Control Act | | 78 |
|   | G. | Count Fifteen: 42 U.S.C. § 1983—Communications Decency Act | | 79 |
|   | H. | Count Sixteen: Tortious Interference with the Settlement Agreement | | 80 |
|   | I. | Count Seventeen: Tortious Interference with Existing Contracts | | 81 |
| IX. | Requests for Relief | | | 82 |
|   | A. | Defense Distributed and SAF should prevail against the State Department. | | 82 |
|   | B. | Defense Distributed and SAF should prevail against Grewal. | | 85 |

App. 135

## I.    Introduction

1.      This case concerns extraordinarily important questions of free speech regarding the First Amendment right to speak about the Second Amendment.  Defense Distributed and the Second Amendment Foundation are peaceful, law-abiding organizations committed to preserving, protecting, and promoting America's individual right to keep and bear Arms in both traditional and modern contexts.   At stake now is the modern right to speak about the Second Amendment by sharing computer files with digital firearms information.  Even though federal free speech laws protect this freedom with full force, both the United States Department of State and the New Jersey Attorney General are breaking the law multiple times over with unprecedented acts of censorship.

2.      The State Department can never abridge the freedom of speech—especially where, as here, the State Department made a legally-enforceable contract to protect Defense Distributed and the Second Amendment Foundation's right to engage in the speech at issue by performing a series of administrative obligations.  But instead of performing those critical protective obligations, the State Department violated administrative law in failing to comply.  Hence, Defense Distributed and the Second Amendment Foundation sue the State Department to halt this wrongdoing and obtain remedies due to them under the Administrative Procedure Act and other federal law.

3.      Meanwhile, New Jersey's Attorney General is abridging Defense Distributed and the Second Amendment Foundation's freedom of speech as well.  He denies the right to share digital firearms information because he cannot stand to let people speak out in favor of the Second Amendment.  Through a torrent of civil and criminal enforcement actions, Grewal has punished and threatens to continue punishing Defense Distributed and the Second Amendment Foundation's members for exercising their right to speak freely about firearms.  Hence, Defense Distributed and the Second Amendment Foundation sue Grewal to halt his censorship under 42 U.S.C. § 1983.

II.     **Parties**

     A.     **Defense Distributed**

4.     Plaintiff Defense Distributed is a private business corporation that is headquartered and has its principal place of business in Austin, Texas.  It did so at all relevant times in the past.

5.     Currently and at all relevant times in the past, most of Defense Distributed's activities, including research, design, development, manufacturing, and publishing occurred in and around Austin.

6.     Currently and at all relevant times in the past, all of Defense Distributed's employees lived in or near Austin.

7.     Currently and at all relevant times in the past, a public library that displayed Defense Distributed's publications from time to time has been in Austin, Texas.

8.     Cody Wilson founded Defense Distributed.

9.     Cody Wilson serves as Defense Distributed's Director.

     B.     **Second Amendment Foundation, Inc.**

10.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of the State of Washington.  SAF's principal place of business is in Bellevue, Washington.

11.     SAF promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control.  Some SAF members seek to receive the computer files that Defense Distributed seeks to publish, and some SAF members seek to share their own computer files by utilizing Defense Distributed's facilities.  These SAF members seek to exchange this information because of its technical, scientific, artistic, and political value.

5

12.     SAF brings this action on behalf of itself.  SAF also brings this action on behalf of its members because at least one of its members would have standing to sue in his own right, the interests the suit seeks to vindicate are germane to the SAF's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

## C.     The State Department

13.     Defendant the United States Department of State is, and was at all relevant times, an executive department of the United States subject to the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 551(1).  The United States Department of State is located at 2201 C Street, Northwest, Washington, District of Columbia 20520.

14.     Defendant Michael R. Pompeo is United States Secretary of State.  He is sued in his official capacity.  In that capacity, he oversees the United States Department of State, its Bureau of Political Military Affairs, and its Directorate of Defense Trade Controls.  He is responsible for the federal conduct that is the subject of this action and for the related acts and omissions alleged herein.

15.     Defendant Directorate of Defense Trade Controls is, and was at all relevant times, a component of the United States Department of State's Bureau of Political Military Affairs subject to the APA.  *See* 5 U.S.C. § 551(1).  The Directorate of Defense Trade Controls is located at SA-1 Columbia Plaza, 2401 E Street Northwest, Washington, District of Columbia 20037.

16.     Defendant Mike Miller is the United States Department of State's Deputy Assistant Secretary of State for Defense Trade in the Bureau of Political-Military Affairs (PM).  He is sued in his official capacity.  In that capacity, he is responsible for the federal conduct that is the subject of this action and for the related acts and omissions alleged herein.

6

17.     Defendant Sarah Heidema is the Director of the Office of Defense Trade Controls Policy within the Directorate of Defense Trade Controls.  She is sued in her official capacity.  In that capacity, she is responsible for the conduct that is the subject of this action and for the related acts and omissions alleged herein.

### D.     Gurbir Grewal

18.     Defendant Gurbir Grewal is the New Jersey Attorney General.  In that capacity, he is responsible for all of the New Jersey civil and criminal enforcement efforts at issue.  He is sued for declaratory and injunctive relief in his official capacity.  Grewal's counsel expressly consented to the Plaintiffs' submission of a second amended complaint updating the claims against him.

## III.     Subject Matter Jurisdiction

19.     28 U.S.C. § 1331 supplies the Court with original federal question jurisdiction over this action because it arises under the Constitution and laws of the United States.

20.     28 U.S.C. § 1332 supplies the Court with original diversity jurisdiction over this action because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

21.     28 U.S.C. § 1343 supplies the Court with original federal question jurisdiction over this action because it is an action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and statutes providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

22.     28 U.S.C. § 1367 supplies the Court with supplemental subject-matter jurisdiction over the action's state-law claims because the state-law claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  The action's state-law claims do not raise novel or

**App. 139**

complex issues of state law.  The action's state-law claims do not substantially predominate over the claim or claims over which the district court has original jurisdiction.

23.     This action seeks declaratory, injunctive, and other relief pursuant to the Constitution of the United States of America, 5 U.S.C. § 702, 5 U.S.C. § 705, 5 U.S.C. § 706, 28 U.S.C. § 1651(a), 28 U.S.C. § 2201, 28 U.S.C. § 2202, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

24.     There exists an active, justiciable controversy amongst the parties about whether the State Department complied with the Settlement Agreement attached to this complaint as Exhibit A.  Declaratory relief will resolve this controversy and eliminate the burden imposed on Plaintiffs' stemming therefrom.

25.     There exists an active, justiciable controversy amongst the parties about what the Settlement Agreement attached to this complaint as Exhibit A still requires of the State Department.  Declaratory relief will resolve this controversy and eliminate the burden imposed on Plaintiffs stemming therefrom.

26.     There exists an active, justiciable controversy amongst the parties about whether Grewal's civil and criminal censorship actions violate Defense Distributed and SAF's rights under the Constitution and other federal laws.  Declaratory relief will resolve this controversy and eliminate the burden imposed on Plaintiffs stemming therefrom.

IV.     **Venue**

27.     This Court constitutes a proper venue for this action because a substantial part of the events or omissions giving rise to the claims occurred here.  *See*  28 U.S.C. § 1391(e)(1)(B).

28.     This Court constitutes a proper venue for this action because a substantial part of the property that is subject of the action is situated here.  *See* 28 U.S.C. § 1391(b)(2).

8

29.     This Court constitutes a proper venue for this action because this is an action against officers and agencies of the United States, a plaintiff resides in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred here.  *See* 28 U.S.C. § 1391(e)(1)(B).

30.     This Court constitutes a proper venue for this action because this is an action against officers and agencies of the United States, a plaintiff resides in this judicial district, and a substantial part of the property that is subject of the action is situated here.  *See* 28 U.S.C. § 1391(e)(1)(C).

31.     This Court constitutes a proper venue for this action because this is an action against officers and agencies of the United States, a plaintiff resides in this judicial district, and no real property is involved in the action.  *See* 28 U.S.C. § 1391(e)(1)(C).

32.     This action arises from actions that the State Department took and intends to take against Defense Distributed's activities in Austin, Texas and Defense Distributed's property in Austin, Texas.

33.     This action arises from actions that Grewal took and intends to take against Defense Distributed's activities in Austin, Texas and Defense Distributed's property in Austin, Texas.  *See Def. Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020).

## V.     Permissive Joinder

34.     Grewal and the State Department can be permissively joined as defendants in this action because the claims against them are with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences.  *See* Fed. R. Civ. P. 20(a)(2)(A).  The common transactions and/or occurrences include but are not limited to the execution, temporary fulfillment, temporary enjoyment, and violation of the Settlement Agreement described *infra* Part V.E-H.

9

35.     Grewal and the State Department can be permissively joined as defendants in this action because questions of law and/or fact common to all defendants will arise in the action.  *See* Fed. R. Civ. P. 20(a)(2)(B).  The common questions include but are not limited to (1) whether the publications at issue qualify speech for purposes of federal free speech law, (2) if so, which species of constitutional scrutiny applies to government actions implicating that speech, and (3) whether anything about the nature of the speech warrants elevated or lowered scrutiny.

## VI.     Facts

### A.     Digital Firearms Information is Speech.

36.     This action concerns digital firearms information.  Digital firearms information is "digital" because it exists in the form of coded computer files, as opposed to analog media like printed books.  It is "information" because it conveys knowledge without advocating action.  It pertains to both entire firearms and individual firearm components, and addresses their physical properties, production methods, and uses.

37.     Digital firearms information exists in a wide variety of computer file formats.  Common formats include portable document format (.pdf) files, DWG (.dwg) files, Standard for the Exchange of Product Data ("STEP") (.stp) files, stereolithography (.stl) files, Initial Graphics Exchange Specification (.igs) files, SoLiDworks PaRT (.sldprt) files, and SketchUp (.skp) files, as well as plain text (.txt) files with notes, instructions, and comments.

38.     Digital firearms information includes, but is not limited to, what authorities refer to as "Computer Aided Design files" or "CAD files."  *See, e.g.*, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020).  CAD files are used primarily for abstract design.  Users with the requisite computer hardware, software,

App. 142

and expertise can employ CAD files to construct and manipulate complex two- and three-dimensional digital models of physical objects.  These models serve a wide variety of important purposes apart from object fabrication.  Examples include the computerized study of object properties, rendition of object images for product visualization, and parametric modeling of object families.  According to authorities, CAD files are not ready for insertion into object-producing equipment such as computer numerically controlled machine tools and additive manufacturing equipment (e.g., 3D printers).  *See, e.g.*, *id.*

39.     Digital firearms information also includes, but is not limited to, what authorities refer to as "Computer Aided Manufacturing files" or "CAM files."  *See, e.g.*, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020).  Like CAD files, CAM files can be used to construct and manipulate the digital two-  and three-dimensional models of physical objects that serve design purposes apart from production.  According to authorities, unlike CAD files, CAM files are ready for insertion into object-producing equipment such as computer numerically controlled machine tools and additive manufacturing equipment (*e.g.*, 3D printers).  *See, e.g.*, *id.*

40.     With respect to 3D-printing processes in particular, CAD files and CAM files do not produce anything automatically.  They are not functional software.  They do not self-execute.  They are mere information stores.  To fabricate an object as designed in a CAD or CAM file, a user must know how and choose to orchestrate a process involving substantial additional software (to interpret and implement the files into the motions of a 3D print head), substantial additional hardware (e.g., the computer running the software, the 3D printer), substantial physical labor, substantial amounts of time, and the requisite raw materials.

11

41.     The physical laws governing 3D-printer fabrication processes apply to all objects, including firearms.  Even with a perfectly accurate set of digital firearms information, the most powerful software, and a state-of-the-art 3D printer, the digital model of a firearm component does not fabricate the component on its own.  Firearm component fabrication is not an automatic process.  It occurs only if and when a person chooses to perform a complex series of actions entailing considered volition and judgment, such as adapting and tailoring the design, selecting suitable component materials, choosing an effective manufacturing process, and opting to personally complete an extensive set of fabrication steps with the requisite software, hardware, and raw materials.

**B.      Defense Distributed's Digital Firearms Information Publications.**

42.     Defense Distributed exists to promote the Second Amendment's individual right to keep and bear Arms.  To that end, Defense Distributed has published, is publishing, and intends to continue publishing digital firearms information to the American public.

43.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing is an important expression of technical, scientific, artistic, and political matter.  Each and every computer file at issue has these values in the abstract, apart from any application that the information's recipient might choose to devote it to. Akin to blueprints, each computer file's sole purpose is to supply information in the abstract.  It is constitutionally protected speech in every respect.

44.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing includes, but is not limited to, what authorities refer to as "Computer Aided Design files" or "CAD files."  *See, e.g.*, Control of Firearms, Guns,

12

App. 144

Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020).

45.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing includes, but is not limited to, what authorities refer to as "Computer Aided Manufacturing files" or "CAM files." *See, e.g.*, *id.*

46.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing includes, but is not limited to, non-CAD and non-CAM files such as plain text (.txt) files with notes, instructions, and comments.

47.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing pertains to both entire firearms and to individual firearm components.  A representative example of the digital firearms information that Defense Distributed has published concerns the single-shot pistol known as the "Liberator."

48.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing does not and is not intended to advocate action.  It especially does not advocate or intend to advocate any imminent action.

49.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing does not and is not intended to incite action.  It especially does not incite or intend to incite any imminent action.

50.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing does not and is not intended to produce action.  It especially does not produce or intend to produce any imminent action.

51.     None of the digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing involves "imminent" fabrication.  The 3D-printing

13

technologies at issue necessarily require a user to knowingly apply deliberate, focused will over the course of an extended period of time to fabricate an object.

52.     Defcad.com (hereinafter "DEFCAD") is a website for which Defense Distributed is and at all relevant times has been responsible.  Via DEFCAD, Defense Distributed has published, republished, and facilitated the distribution of a wide variety of digital firearms information.

### 1.     Defense Distributed's 2012–2013 Publications.

53.     From approximately December 2012 to May 2013, Defense Distributed published a substantial set of computer files with digital firearms information to DEFCAD by letting any site visitor download them directly for free.  The computer files with digital firearms information published via DEFCAD during this period included the following:

(a)     files concerning a single-shot firearm known as the "Liberator";

(b)     files concerning a firearm receiver for AR-15 rifles;

(c)     files concerning a magazine for AR-15 rifles;

(d)     stereolithography (.stl) files about firearm components;

(e)      Initial Graphics Exchange Specification (.igs) files about firearm components;

(f)     SoLiDworks PaRT (.sldprt) files about firearm components;

(g)     SketchUp (.skp) files about firearm components;

(h)     Standard for the Exchange of Product Data ("STEP") (.stp) files about firearm components;

(i)     diagrams of firearm components;

(j)     renderings;

(k)      "read me" plain text files about firearm assembly methods;

14

(l)      "read me" plain text files about the National Firearms Act and the Undetectable Firearms Act; and

(m)     software licenses.

54.     The computer files that Defense Distributed published to DEFCAD during this period were downloaded millions of times.

**2.      Defense Distributed's July 2018 Publications.**

55.     From the evening of July 27, 2018 until the afternoon of July 31, 2018, Defense Distributed published a substantial set of computer files with digital firearms information to DEFCAD by letting any site visitor download them directly for free.  The State Department provided advance approval of these publications.  The computer files with digital firearms information so published via DEFCAD during this period included the following:

(a)      files concerning a single-shot firearm known as the "Liberator";

(b)      files concerning an assembly of the AR-15 rifle and magazine;

(c)      files concerning an assembly of the AKM rifle and magazine;

(d)      stereolithography (.stl) files about firearm components;

(e)      Initial Graphics Exchange Specification (.igs) files about firearm components;

(f)      SoLiDworks PaRT (.sldprt) files about firearm components;

(g)      SketchUp (.skp) files about firearm components;

(h)      Standard for the Exchange of Product Data ("STEP") (.stp) files about firearm components;

(i)      diagrams of firearm components;

(j)      renderings;

(k)      NC files concerning fire control pocket milling;

15

**App. 147**

(l)   "read me" plain text files about firearm assembly methods;

(m)   "read me" plain text files about the National Firearms Act and the Undetectable Firearms Act; and

(n)   software licenses.

56.   The computer files that Defense Distributed published to DEFCAD during this period were downloaded hundreds of thousands of times.

57.   During this period, Defense Distributed also published the same computer files with digital firearms information at a brick-and-mortar public library in Austin, Texas by hosting the computer files in formats that patrons could access via computer workstations.

**3.   Defense Distributed's August–November 2018 Publications.**

58.   From approximately August 2018 to November 2018, Defense Distributed distributed a substantial set of computer files with digital firearms information via the mail by making its computer files available for shipment on physical storage devices. Defense Distributed did so by using an ecommerce platform on DEFCAD to facilitate the transaction and using the U.S. Postal Service as its means of delivering the information. After customers entered an order using DEFCAD's online ecommerce platform, Defense Distributed put the information on a USB drive or SD card and mailed the drive or card to customers via the U.S. Postal Service.

59.   During this period, Defense Distributed also offered and advertised its mailed distribution of digital firearms information to potential recipients. These efforts included advertisements and offers on DEFCAD itself, participation in trade shows, and e-mail advertisements.

60.   For anyone dealing with digital firearms information, the postal mail alternative to internet publication is not an adequate substitute. Internet communication of and about Defense

16

Distributed's digital firearms information is essential for many reasons.   Moreover, internet communication is important because it is the *only* way to ensure open source development and commitment to the public domain/ placement outside the bounds of intellectual property strictures.

### 4.      Defense Distributed's 2020-Present Publications.

61.      From March 27, 2020, to present, Defense Distributed published a substantial set of computer files with digital firearms information via DEFCAD.  The computer files with digital firearms information published via DEFCAD during this period include original and legacy firearms models, CAD data, CAM data, blueprints and drawings.

62.      Unlike Defense Distributed's prior periods of publication on DEFCAD, Defense Distributed in this publication period did not let DEFCAD visitors download files freely.  In this publication period, Defense Distributed used DEFCAD to facilitate secure file transfer via electronic transmissions that comply with current federal law by, *inter alia*, utilizing secure end-to-end encryption.

63.      Unlike Defense Distributed's prior periods of publication on DEFCAD, Defense Distributed in this publication period did not let DEFCAD visitors access the files at issue without any screening.  In this publication period, Defense Distributed's screening procedures deemed certain DEFCAD visitors ineligible for file distribution.

64.      Unlike Defense Distributed's prior periods of publication on DEFCAD, Defense Distributed in this publication period did not let DEFCAD make files available to persons outside the United States.

65.      Unlike Defense Distributed's prior periods of publication on DEFCAD, Defense Distributed in this publication period did *not* make its files available to residents of and persons in the State of New Jersey who lack a federal firearms license.

17

66.     As compared to Defense Distributed's prior methods of publication on DEFCAD, Defense Distributed's latest method of publication on DEFCAD substantially burdens Defense Distributed's exercise of free speech and would not be utilized but for the wrongful actions of the State Department and Grewal.

67.     Currently, Defense Distributed continues to publish a substantial set of computer files with digital firearms information via DEFCAD in the manner that it has done so since March 27, 2020.  The number of files published in this manner to date is at least 16,354.

**5.     Published files will always remain online.**

68.     The computer files with digital firearms information that Defense Distributed published in the past will always be available on the internet, regardless of whether or not Defense Distributed itself continues to publish them.  Without any coordination, many recipients of Defense Distributed's digital firearms information have persistently republished those same files online via their own websites.  The independently-republished versions of Defense Distributed's files are not hidden in dark or remote recesses of the internet.  Simple Google searches yield the republished Defense Distributed files with ease.

**6.     Defense Distributed's Future Publications.**

69.     To the extent that and as soon as it is legal to do so, Defense Distributed currently intends to publish the following computer files with digital firearms information online at DEFCAD by letting any site visitor download them directly for free:

(a)     The computer files that Defense Distributed published online via DEFCAD from December 2012 to May 2013.  These include CAD files, CAM files, and non-CAD and non-CAM files.

18

(b)      The computer files that Defense Distributed published online via DEFCAD from July 27, 2018, to July 31, 2018.  These include CAD files, CAM files, and non-CAD and non-CAM files.

(c)      The computer files that Defense Distributed published via the mail from late August 2018 through early November 2018.  These include CAD files, CAM files, and non-CAD and non-CAM files.

(d)      The computer files that Defense Distributed published online via DEFCAD from March 27, 2020, to present.  These include CAD files, CAM files, and non-CAD and non-CAM files.

(e)      Computer files authored by Defense Distributed that Defense Distributed has not published before.  These include CAD files, CAM files, and computer files with other digital firearms information.

**C.      The State Department's International Traffic in Arms Regulations.**

70.      The Arms Export Control Act of 1976, 22 U.S.C. ch. 22 (the "AECA"), addresses the President's authority to control the import and export of defense articles and defense services.

71.      The International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130 ("ITAR"), constitute AECA's primary implementing regulations.

72.      The State Department administers the AECA and the ITAR.  Within the State Department, primary responsibility for administering the AECA and the ITAR lies with the Directorate of Defense Trade Controls ("DDTC") in the Bureau of Political-Military Affairs.

73.      The AECA provides that "no defense articles or defense services . . . may be exported or imported without a license for such export or import."  22 U.S.C. § 2778(b)(2).  It provides for criminal penalties up to a $1,000,000 fine and 20 years in prison for "[a]ny person

19

who willfully violates any provision of this section ... or any rule or regulation issued under this section." *Id.* § 2778(c).

74.    The AECA authorizes the President "to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List." *Id.* § 2778(a)(1).  The President, by executive order, has delegated to the State Department the authority to regulate under the AECA and to designate defense "articles" and "services" for inclusion on the United States Munitions List ("USML"). *See* Exec. Order No. 13,637, § 1(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013).

75.    DDTC has from time to time promulgated regulations known as the International Traffic in Arms Regulations ("ITAR"). *See* 22 C.F.R. pts. 120-130 (2019). The ITAR make it unlawful to, *inter alia*, "export or attempt to export from the United States any defense article or technical data or to furnish or attempt to furnish any defense service for which a license or written approval is required" without such a license. *Id.* § 127.1(a)(1).

76.    The ITAR's definition of "export" includes the "actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner." *Id.* § 120.17(a)(1).  The ITAR also provides that a "deemed export," defined as "[r]eleasing or otherwise transferring technical data to a foreign person in the United States," constitutes an "export." *Id.* § 120.17(a)(2).

77.    The ITAR also include, at 22 C.F.R. § 121.1, the USML, which enumerates the "articles, services, and related technical data [that] are designated as defense articles or defense services" for purposes of the AECA and ITAR. Id. § 121.1(a).  The USML organizes the designated items into twenty-one categories, encompassing various forms of weaponry,

20

ammunition, explosives, military-type equipment and vessels, toxicological agents, classified data, and more.  Each of the twenty-one categories includes as a designated item "[t]echnical data" and "defense services" that are "directly related to the defense articles" listed in that category. *See, e.g.*, id. §§ 121.1(I)(i), (II)(k), (III)(e), (IV)(i), (V)(j), (VI)(g), (VII)(h).  The ITAR define "technical data" to include "[i]nformation ... required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a)(1).

### D. *Defense Distributed I*: Litigation

78.    "*Defense Distributed I*" refers to a federal civil action docketed in the United States District Court for the Western District of Texas, Austin Division as *Defense Distributed, et al. v. United States Department of State, et al.*, No. 1:15-CV-372-RP (W.D. Tex.), and in the United States Court of Appeals for the Fifth Circuit first as *Defense Distributed, et al. v. United States Department of State, et al.*, No. 15-50759 (5th Cir.) and later as *Defense Distributed, et al. v. United States Department of State, et al.*, No. 18-50811 (W.D. Tex.).  *Defense Distributed I* yielded the following reported opinions:

(a)    *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015)

(b)    *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) (panel opinion)

(c)    *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 461–76 (Jones, J., dissenting)

(d)    *Def. Distributed v. U.S. Dep't of State*, 865 F.3d 211 (5th Cir. 2017) (Elrod, Jones, Smith and Clement, JJ., dissenting from the denial of rehearing en banc)

(e)    *Def. Distributed v. United States Dep't of State*, 947 F.3d 870 (5th Cir. 2020).

79.    The plaintiffs in *Defense Distributed I* were Defense Distributed, SAF, and an individual SAF member, Conn Williamson.

21

80.     The defendants in *Defense Distributed I* match the defendants in this case: the United States Department of State, the Secretary of State, the State Department's Directorate of Defense Trade Controls, the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs, and the Acting Director of the Office of Defense Trade Controls Policy Division.   They are referred to collectively as "the State Department."

81.     *Defense Distributed I* concerned four categories of computer files defined by that action's pleadings: the "Published Files," the "Ghost Gunner Files," "CAD Files," and the "Other Files."  Together, these categories of files are referred to as the "*Defense Distributed I* Files."

    (a)     The "Published Files" category of *Defense Distributed I* Files consists of ten separate sets of files.  It includes stereolithography (.stl) files about firearm components, Initial Graphics Exchange Specification (.igs) files about firearm components, SoLiDworks PaRT (.sldprt) files about firearm components, SketchUp (.skp) files about firearm components, Standard for the Exchange of Product Data ("STEP") (.stp) files about firearm components, diagrams of firearm components, renderings, "read me" plain text files about firearm assembly methods, "read me" plain text files about the National Firearms Act and the Undetectable Firearms Act, and software licenses.  From approximately December 2012 to May 2013, Defense Distributed published these files to DEFCAD for free download by the public.

    (b)     The "Ghost Gunner Files" category of *Defense Distributed I* Files consists of software, data files, project files, coding, and models containing technical

22

App. 154

information for a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts.

(c)     The "CAD Files" category of *Defense Distributed I* Files consists of STEP (.stp) and stereolithography (.stl) files about a lower receiver to the AR-15 rifle.

(d)     The "Other Files" category of *Defense Distributed I* Files consists of files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet; provided, however, that this category only extends insofar as those files regard items that, as of June 29, 2018, were exclusively: (i) in Category I(a) of the United States Munitions List, as well as barrels and receivers covered by Category I(g) of the United States Munitions List that are components of such items; or (ii) items covered by Category I(h) of the United States Munitions List solely by reference to Category I(a), excluding Military Equipment.

82.     *Defense Distributed I* began after the State Department used the AECA and ITAR regime to impose an illegal prior restraint on public speech concerning technical firearms data, including the *Defense Distributed I* Files.  Under this regime, the State Department required that Defense Distributed obtain prior United States government approval before publication of the *Defense Distributed I* Files could occur on the internet and at other public venues.

83.     The *Defense Distributed I* plaintiffs challenged the legality of the State Department's enforcement of the AECA/ITAR regime vis-à-vis the *Defense Distributed I* Files. In particular, they challenged the State Department's governance of the *Defense Distributed I* Files

23

App. 155

as ultra vires action not authorized by the statutes and regulations at issue, and as violations of the First, Second, and Fifth Amendments of the Constitution.

84.     At a preliminary stage, the district court in *Defense Distributed I* denied the *Defense Distributed I* plaintiffs' motion for a preliminary injunction. *Def. Distributed v. Dep't of State*, 121 F. Supp.3d 680 (W.D. Tex. 2015).

85.     An interlocutory appeal of the *Defense Distributed I* preliminary injunction denial was taken to the Fifth Circuit.  A divided Fifth Circuit panel affirmed the district court's decision. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  But it declined to reach the merits, ruling solely based on "the balance of harm and the public interest." *Id.* at 461.

86.     The merits of *Defense Distributed I*'s preliminary injunction were, however, reached by two important opinions.  Judge Jones emphasized the protected nature of this speech in a panel dissent: "the State Department's application of its 'export' control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint." *Id.* at 463–64. (Jones, J. dissenting).  The judges dissenting from the denial of rehearing en banc also reached the merits. *Def. Distributed v. U.S. Dep't of State*, 865 F.3d 211 (5th Cir. 2017).  Their opinion explained that the lower court's "flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content based prior restraint." *Id.* at 212.

E.     ***Defense Distributed I*: Settlement Agreement**

87.     After the *Defense Distributed I* interlocutory appeal concluded, the district court in *Defense Distributed I* ordered the parties to engage in settlement negotiations.  The parties did so successfully and settled their dispute by agreement.

24

88.     The *Defense Distributed I* settlement amounted to a victory for the plaintiffs.  Press reports correctly understood that the State Department's decision to settle "essentially surrenders" to the constitutional challenge Defense Distributed and SAF had been pressing all along; that the settlement "promises to change the export control rules surrounding any firearm below .50 caliber – with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition – and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the internet"; and that, in the meantime, the settlement "gives [Defense Distributed] a unique license to publish data about those weapons anywhere [it] chooses."  Andy Greenberg, *A Landmark Legal Shift Opens Pandora's Box for DIY Guns*, Wired Magazine (July 18, 2018), available at https://bit.ly/2QK3is6.

89.     The *Defense Distributed I* settlement agreement is memorialized by the "Settlement Agreement": a written contract that all sides executed validly on June 29, 2018.  A copy of that instrument is attached to this complaint as Exhibit A.  Among other things, the Settlement Agreement obligates the State Department to do the following:

(a)     Settlement Agreement Paragraph 1(a) - New Rule

Settlement Agreement Paragraph 1(a) requires the State Department to draft and fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising United States Munitions List ("USML") Category I to exclude the *Defense Distributed I* Files.  The pertinent text provides as follows: "Defendants agree to the following . . . : (a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice

25

of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action."

(b)    <u>Settlement Agreement Paragraph 1(b) - Temporary Modification:</u>

Settlement Agreement Paragraph 1(b) requires the State Department to announce, while the above-referenced final rule is in development, a temporary modification, consistent with International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the *Defense Distributed I* Files; and to publish the announcement on the Directorate of Defense Trade Controls website on or before July, 27, 2018. The pertinent text provides as follows: "Defendants agree to the following . . . (b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

(c)    <u>Settlement Agreement Paragraph 1(c) - License</u>

Settlement Agreement Paragraph 1(c) requires the State Department to issue a license to the *Defense Distributed I* plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). The pertinent text provides as follows: "Defendants agree to the

**App. 158**

following . . . (c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval."

(d)     Settlement Agreement Paragraph 1(d) - Acknowledgement

Settlement Agreement Paragraph 1(d) requires the State Department to acknowledge and agree that the temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the *Defense Distributed I* Files, and that the license issued to the *Defense Distributed I* plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.  The pertinent text provides as follows: "Defendants agree to the following . . . (d)  Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any

27

such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

90.     The Settlement Agreement binds all of the parties to *Defense Distributed I* and all of this action's parties.   Settlement Agreement paragraph 7 provides that the "Settlement Agreement" shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and the respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interest of obligations of the Parties."

### F.     Settlement Agreement Fulfillment Begins

91.     After the Settlement Agreement's execution on July 27, 2018, the State Department began to fulfill—temporarily—certain of its Settlement Agreement obligations:

(a)     Settlement Agreement Paragraph 1(a) - New Rule

By July 27, 2018, the State Department had taken steps to comply with the obligation imposed by Settlement Agreement Paragraph 1(a).   It published in the Federal Register a notice of proposed rulemaking revising USML Category I to exclude the *Defense Distributed I* Files.   *See* 83 Fed. Reg. 24,198 (May 24, 2018).

(b)     Settlement Agreement Paragraph 1(b) - Temporary Modification

By July 27, 2018, the State Department had taken steps to comply with the obligation imposed by Settlement Agreement Paragraph 1(b).   It made a temporary modification to USML Category I, pursuant to 22 C.F.R. § 126.2, to "exclude" the *Defense Distributed I* Files from Category I.   A copy of that instrument is attached to this complaint as Exhibit B.

(c)     Settlement Agreement Paragraph 1(c) - License

By July 27, 2018, the State Department had taken steps to comply with the

28

obligation imposed by Settlement Agreement Paragraph 1(c).  It issued Defense Distributed a license—a letter issued by the State Department's Acting Deputy Assistant Secretary for the Directorate of Defense Trade Controls—authorizing the Defendants to publish the Published Files, Ghost Gunner Files, and CAD Files for "unlimited distribution."  A copy of that instrument is attached to this complaint as Exhibit C.

    (d)    <u>Settlement Agreement Paragraph 1(d) - Acknowledgement</u>

By July 27, 2018, the State Department had taken steps to comply with the obligation imposed by Settlement Agreement Paragraph 1(d).  It acknowledged and agreed that the temporary modification permits any United States person to access, discuss, use, reproduce, or otherwise benefit from the *Defense Distributed I* Files; and that the license issued to the *Defense Distributed I* plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.  *See* Ex. A at 2.

92.    On June 29, 2018, the parties to *Defense Distributed I* filed a joint stipulation of dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  The filing provided as follows: "Pursuant to Federal Rule of Civil Procedure 41 (a)( I )(A)(ii) and 41(a)( I )(B), and a settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson) and Defendants (the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls. and the Director, Office of Defense Trade Controls Policy), the Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action."

29

93.     On July 30, 2018, the *Defense Distributed I* district court entered an order providing that "the case is **DISMISSED WITH PREJUDICE**" and the "action is **CLOSED**."

94.     The State Department's temporary fulfillment of the Settlement Agreement obligations lasted from July 27, 2018 until the afternoon of July 31, 2018.  During that period, Defense Distributed engaged in the publication addressed *supra* at Part V.B.2 ("Defense Distributed's July 2018 Publications").

**G.     The State Department Stopped Fulfilling the Settlement Agreement**

95.     On July 30, 2018, Grewal and a group of state attorneys general (hereinafter "the States") initiated a civil action against the State Department, Defense Distributed, SAF, and Conn Williamson.  The States chose to sue in their forum of choice, the Western District of Washington's Seattle division, before Judge Robert Lasnik.  The suit was docketed in the district court as *State of Washington et al., v. United States Department of State et al.*, No. 2:18-cv-1115-RSL.

96.     Grewal explained the nature of the States' involvement in this litigation by saying the following on the record: "The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."

97.     The States' *Washington* complaint alleged that, by issuing the Temporary Modification and license, the State Department had violated the Administrative Procedure Act (APA).  The suit sought a preliminary nationwide injunction and a final judgment vacating the Temporary Modification and license.  These claims went against the State Department alone.

98.     The Settlement Agreement was never the subject of any claim in the *Washington* case.  The States never claimed that the Settlement Agreement was illegal and never sought relief against the Settlement Agreement.  Their only claims targeted two of the actions the State Department took in an attempt to fulfill the Settlement Agreement.

30

99.     Nor were Defense Distributed and SAF the subject of any claim.  The States asserted no cause of action and sought no relief against Defense Distributed or SAF.  The APA claim about the license went against the State Department alone, did not allege that Defense Distributed or SAF did anything wrong, and did not seek relief against them.  Likewise for the APA claim about the Temporary Modification.  It too went against the State Department alone, did not allege that Defense Distributed or SAF did anything wrong, and did not seek relief against Defense Distributed or SAF.

100.    On July 31, 2018, the States obtained from the United States District Court for the Western District of Washington a temporary restraining order against the State Department: "The federal government defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo ex ante as if the modification had not occurred and the letter had not been issued."

101.    A key concession occurred during the preliminary injunction proceedings: Both the State Department and the States conceded that there *is nothing inherently illegal about the computer files at issue*.  Aside from concerns about Defense Distributed's files being *on the internet*, the States and State Department took no issue with anyone's right to distribute the very same computer files via other channels.  At the preliminary injunction hearing, counsel for the States took the position that, apart from internet publication, Defense Distributed had a right to distribute digital firearms information via the mail or otherwise "hand them around domestically" without violating any law.  Counsel for the State Department agreed, stating that, "even if the

31

Court were to grant plaintiffs every ounce of relief that they seek in this case, Defense Distributed could still mail every American citizen in the country the files that are at issue here." In light of this concession, Defense Distributed engaged in the publication addressed *supra* at Part V.B.3 ("Defense Distributed's August-November 2018 Publications").

102. On August 27, 2018, the States obtained from the United States District Court for the Western District of Washington a preliminary injunction against the State Department: "The federal defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo ex ante as if the modification had not occurred and the letter had not been issued until further order of the Court." *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1264 (W.D. Wash. 2018).

103. Even though the State Department had a right to appeal the *Washington* case's preliminary injunction decision, and even though it had preserved arguments that would have succeeded in having the district court's judgment vacated or reversed, the State Department refused to appeal. It let the deadline for that interlocutory appeal come and go without taking any appellate action. The State Department refused to appeal this preliminary injunction because of partisan politics and in spite of federal legal advisors that deemed an appeal legally necessary.

104. The rest of the *Washington* case's key decisions occurred on summary judgment. On the merits, the *Washington* district court accepted both of the States' APA claims. First, the *Washington* district court held that the State Department's issuance of the Temporary Modification was "without observance of procedure required by law," 5 U.S.C. § 706, because a Congressional

notice requirement had not been met. *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130, 1141-43 (W.D. Wash. 2019). Second, the *Washington* district court held that the State Department's issuance of both the Temporary Modification and the license were "arbitrary and capricious," 5 U.S.C. § 706, because of insufficient explanation and evidentiary support in the administrative record. *Id.* at 1144-47. Neither of these claims are meritorious.

105.    The *Washington* action's final judgment orders as follows: "The July 27, 2018, 'Temporary Modification of Category I of the United States Munitions List' and letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation were unlawful and are hereby VACATED." Part of the *Washington* district court's decision addressed the First Amendment implications of vacating the Temporary Modification and license. It held the Constitution's First Amendment was "not relevant to the merits": "Whether or not the First Amendment precludes the federal government from regulating the publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation." *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130, 1147 (W.D. Wash. 2019). It also held that the First Amendment can be "abridged" so long as it is not "abrogated." *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1264 (W.D. Wash. 2018).

106.    Defense Distributed and SAF demanded that the State Department appeal. The demand asserted that a failure to appeal constituted a breach of the Settlement Agreement. The demand occurred in a January 15, 2020, letter from counsel for Defense Distributed and SAF to the State Department. A copy of that instrument is attached to this complaint as Exhibit E.

107.    Even though the State Department had a right to appeal the final judgment, and even though it had preserved arguments that would have succeeded in having the district court's judgment vacated or reversed, the State Department refused to appeal. It let the deadline for that

33

appeal come and go without taking any appellate action. The State Department refused to appeal this final injunction because of partisan politics and in spite of federal legal advisors that deemed an appeal legally necessary.

108. Defense Distributed and SAF appealed the *Washington* action's final judgment. Defense Distributed's appellant's brief showed that the district court both lacked subject-matter jurisdiction because of multiple Article III shortcomings and was wrong on the merits because the APA cannot require abridgement of the First Amendment. So rather than be squarely defeated, the States moved to dismiss both appeals as moot. Defense Distributed and SAF responded jointly, opposing the dismissal request with several categories of argument. First, the response defeated the States' mootness suggestion on its own terms. Second, it showed that mootness-based dismissals cannot occur unless and until disputes regarding the district court's subject-matter jurisdiction are resolved. Third, the response showed that, if the case were moot, *Munsingwear* required vacatur of the district court's judgment.

109. The *Washington* action's Ninth Circuit panel accepted the mootness suggestion and dismissed the appeal. *Washington v. Def. Distributed*, No. 20-35030, 2020 WL 4332902 (9th Cir. July 21, 2020). Its order gives no meaningful indication of the mootness reasoning. It says nothing about the district court's jurisdiction. And it says nothing about *Munsingwear*, silently leaving the district court's judgment intact. A petition for rehearing en banc is now pending.

### 1. The State Department disavowed the license.

110. On or before August 2, 2018, the State Department disavowed the license it had originally issued to Defense Distributed and SAF in July 2018.

111. The State Department's disavowal of the July 2018 license constitutes final agency action.

112.   The State Department's disavowal of the July 2018 license is reflected in an August 2, 2018, letter from counsel for the State Department.  A copy of that instrument is attached to this complaint as Exhibit D.

113.   The August 2, 2018, letter from counsel for the State Department established that, as of August 2, 2018, the State Department had decided to proceed as though the July 2018 license "had not been issued."  This indicates the State Department's disavowal of the July 2018 license.

114.   The August 2, 2018, letter from counsel for the State Department establishes that, as of August 2, 2018, the State Department had decided to proceed as though the license was a "nullity."  This letter indicates the State Department's disavowal of the July 2018 license.

**2.   After disavowal, the State Department refused to supply a license.**

115.   After the State Department disavowed the license it had originally issued to Defense Distributed and SAF in July 2018, the State Department refused to supply Defense Distributed and SAF with the license that Settlement Agreement Paragraph 1(c) requires the State Department to supply.

116.   The State Department's refusal to supply Defense Distributed and SAF with the license that Settlement Agreement Paragraph 1(c) requires the State Department to supply entitles them to constitutes final agency action.

117.   Defense Distributed and SAF demanded that the State Department issue a license in compliance with Settlement Agreement Paragraph 1(c) on January 15, 2020.  They did so by transmitting a letter from counsel for Defense Distributed and SAF to counsel for the State Department.  A copy of that instrument is attached to this complaint as Exhibit E.

118.   Defense Distributed and SAF demanded that the State Department issue a license in compliance with Settlement Agreement Paragraph 1(c) on February 11, 2020.  They did so by

35

transmitting a letter from counsel for Defense Distributed and SAF to counsel for the State Department.  A copy of that instrument is attached to this complaint as Exhibit F.

### 3. The State Department disavowed the Temporary Modification.

119. On or before August 2, 2018, the State Department disavowed the Temporary Modification that it had originally issued in July 2018.

120. The State Department's August 2018 disavowal of the July 2018 Temporary Modification constitutes final agency action.

121. The State Department's disavowal of the July 2018 Temporary Modification is reflected in the August 2, 2018, letter from counsel for the State Department. A copy of that instrument is attached to this complaint as Exhibit D.

122. The August 2, 2018, letter from counsel for the State Department establishes that, as of August 2, 2018, the State Department had decided to cease "implementing or enforcing" the July 2018 Temporary Modification.  This letter indicates the State Department's disavowal of the July 2018 Temporary Modification.

123. The August 2, 2018, letter from counsel for the State Department establishes that, as of August 2, 2018, the State Department had decided to proceed as though the July 2018 Temporary Modification "had not occurred."  This indicates the State Department's disavowal of the July 2018 Temporary Modification.

124. The State Department removed the July 2018 Temporary Modification from its website on July 31, 2018.  This removal indicates the State Department's disavowal of the July 2018 Temporary Modification.

### 4. After disavowal, the State Department refused to supply a Temporary Modification.

36

125.     After the State Department disavowed the July 2018 Temporary Modification, the State Department refused to supply Defense Distributed and SAF with the temporary modification that Settlement Agreement Paragraph 1(b) requires the State Department to supply.

126.     The State Department's refusal to supply Defense Distributed and SAF with the temporary modification that Settlement Agreement Paragraph 1(b) requires the State Department to supply constitutes final agency action.

**5.      The State Department failed to supply the required regulatory changes.**

127.     The State Department refused to supply Defense Distributed and SAF with the regulatory results that Settlement Agreement Paragraph 1(a) requires the State Department to supply.

128.     The State Department's refusal to supply Defense Distributed and SAF with the regulatory results that Settlement Agreement Paragraph 1(a) requires the State Department to supply constitutes final agency action.

129.     The State Department's refusal to supply Defense Distributed and SAF with the regulatory results that Settlement Agreement Paragraph 1(a) requires the State Department to supply constitutes a breach of the Settlement Agreement.

130.     The State Department issued a new final rule that pertains to the Settlement Agreement in January 2020.  *See* International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 Fed. Reg. 3819 (Jan. 23, 2020).  It did so in conjunction with a new rule issued by the Commerce Department.  *See* Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020).  These new rules do not discharge the State Department's obligations under Settlement Agreement Paragraph 1(a)

37

because they do not exclude *all* of the technical data that was the subject of *Defense Distributed I* from United States Munitions List ("USML") Category I.  Separately, these new rules do not discharge the State Department's obligations under Settlement Agreement Paragraph 1(a) because they have been enjoined by the United States District Court for the Western District of Washington.

131.    On April 29, 2020, Defense Distributed and SAF demanded that the State Department supply Defense Distributed and SAF with the regulatory results that Settlement Agreement Paragraph 1(a) requires the State Department to supply.  They did so by transmitting a letter from counsel for Defense Distributed and SAF to counsel for the State Department.  A copy of that instrument is attached to this complaint as Exhibit G.

**H.      Grewal Censors Defense Distributed**

**1.      Grewal Engages in Civil Censorship**

132.    On July 26, 2018, Grewal issued Defense Distributed a formal cease-and-desist letter.  A copy is attached to this complaint as Exhibit H.

133.    Grewal's July 26, 2018, cease-and-desist letter commanded Defense Distributed to cease publishing its digital firearms information: "You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents."  It repeatedly declared Defense Distributed's publication of digital firearms information to be a violation of New Jersey law.  It said that publication "violates New Jersey's public nuisance and negligence laws."  It said that publication "violates our public nuisance law."  It said that publication "constitute[s] a public nuisance."  It said that publication "is negligent."  It threatened to punish Defense Distributed for publishing any more digital firearms information: "If you do not halt your efforts to proceed with publication, I will bring legal action against your company before August 1, 2018."  It ended by delivering another command backed by a threat of punishment: "As the chief law enforcement

38

App. 170

officer for New Jersey, I demand that you halt publication of the printable-gun computer files. Should you fail to comply with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018."

134.    On July 26, 2018, after sending the cease-and-desist letter, Grewal issued a press release reiterating the threat: "Attorney General Grewal threatened Defense Distributed with 'legal action' if it fails to comply with his demand."  The press release also took the position that "[p]osting this material online is no different than driving to New Jersey and handing out hard-copy files on any street corner."

135.    On July 27, 2018, Defense Distributed responded to Grewal's July 26, 2018, cease-and-desist letter with a letter of its own.  The response letter explained that "all actions contemplated by Defense Distributed are fully protected by the First Amendment," and that the Attorney General's "attempts to prevent such action constitute an unconstitutional prior restraint and otherwise violate the United States Constitution."  It also explained that Defense Distributed would attempt to restrict files made available on the internet to prevent download within New Jersey.  Finally, it demanded that General withdraw his cease-and-desist command.  He did not.

136.    On July 30, 2018, Grewal took coercive action against Defense Distributed by targeting its internet service providers.

137.    DreamHost is a company that contracted to provide internet security services for Defense Distributed.  DreamHost's Acceptable Use Policy formed part of the contract between Defense Distributed and DreamHost.

138.    On July 30, 2018, Grewal sent a letter to DreamHost.  A copy is attached to this complaint as Exhibit I.

39

139.    Grewal's July 30, 2018, letter to DreamHost attempted to make DreamHost terminate its provision of services to Defense Distributed.  It declared that, by planning to publish digital firearms files on a website, "Defense Distributed is plainly planning to use the Defcad Website in a way that violates DreamHost's Acceptable Use Policy."  The letter declared that Defense Distributed's publication of digital firearms files violated New Jersey law.  It said that "posting them violates New Jersey's public nuisance and negligence laws."  It said that "posting them would . . . be illegal."

140.    On July 30, 2018, Grewal sent a copy of the July 26, 2018, cease-and desist letter to Cloudflare, Inc.'s legal department.  Cloudflare, Inc., provides internet security services for Defense Distributed.

### 2.    Grewal Engages in Criminal Censorship

141.    On November 8, 2018, New Jersey armed Attorney General Gurbir Grewal with Senate Bill 2465's Section 3(*l*)2.  S. 2465, 218th Leg., Reg. Sess. (N.J. Nov. 2018) (codified as N.J. Stat. 2C:39-9(l)2)).  The law is codified as Section (*l*)(2) of New Jersey Code of Criminal Justice 2C:39-9.  Section (*l*)(2) creates the following speech crime:

> *l*. Manufacturing or facilitating the manufacture of a firearm using a three dimensional printer. In addition to any other criminal penalties provided under law it is a third degree crime for:
>
> . . .
>
> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: "three-dimensional printer" means a computer or computer-driven machine or device capable of producing a three-dimensional

object from a digital model; and "distribute" means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

N.J. Stat 2C:39-9(l)(2).

142.   Section (*l*)(2) is a speech crime.   It outlaws the sharing of digital firearms information.  With Grewal as its prime enforcer, New Jersey's Section (*l*)(2) speech crime outlaws constitutionally protected speech that Plaintiffs would engage in but for Grewal's enforcement threats.  Calling New Jersey's Section (*l*)(2) speech crime his favorite new "tool," Grewal aims to jail Defense Distributed, SAF, the CodeIsFreeSpeech.com publishers, and anyone else that dares to exercise their right to share digital firearms information.

143.   New Jersey's Section (*l*)(2) speech crime does not criminalize conduct.   It criminalizes speech as such: any "digital instructions" that "may be used" by a person to "produce a firearm" with a "three dimensional printer."  N.J. Stat 2C:39-9(*l*)(2).  It is now a "third degree crime" to "distribute" that speech "to a person in New Jersey" (except for licensed manufacturers). *Id.*  Convictions under Grewal's new speech crime entail a prison sentence of three to five years. N.J. Stat 2C:43-6.

144.   New Jersey's Section (*l*)(2) speech crime criminalizes every conceivable mode of communication.  No meaningful form of human interaction survives.  The keystone "distribute" term means "to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute."  N.J. Stat 2C:39-9(*l*)(2).  The law also specifies that it outlaws speech delivered "by any means," including "the Internet" and including standard postal "mail."  *Id.*

41

145.     No type of digital firearms information survives New Jersey's Section (*l*)(2) speech crime either.   Section (*l*)(2) outlaws both "computer-aided design files" and "other code or instructions stored and displayed in electronic format as a digital model." N.J. Stat 2C:39-9(*l*)(2).

146.     Information's actual use is irrelevant to New Jersey's Section (*l*)(2) speech crime. Section (*l*)(2) lets Grewal jail speakers regardless of whether or not any actual danger or harm exists.   The crime occurs if the information "***may*** be used" in a proscribed way.   *Id.* (emphasis added).   Critically, the new speech crime also lacks any meaningful intent requirement.

147.     New Jersey's Section (*l*)(2) speech crime was enacted for the purpose of discriminating against and censoring Defense Distributed and SAF's members, in particular.

148.     At the Section (*l*)(2) speech crime's signing ceremony, New Jersey Governor Phil Murphy linked the bill to the cease-and-desist letter that Grewal issued to Defense Distributed:

> The Attorney General has been a national leader in this fight.  Last June he issued ***a cease and desist letter to the companies that deal in ghost guns, saying explicitly that New Jersey is off limits to them***.  He joined likeminded attorneys general in successfully stopping in federal court the release of blueprints that would have allowed anyone with a computer and access to a 3D printer the ability to build their own, untraceable firearm.  This law that we're going to sign today further backs up his efforts, and I thank him for all that he has done.  Thank you, Gurbir.

149.     At the Section (*l*)(2) speech crime's signing ceremony, Grewal said that the bill was a "stronger tool[]" that he could use to "stop" Defense Distributed founder "Cody Wilson" and "his supporters" from "release[ing] these codes online":

> [T]oday, we're . . . closing dangerous loopholes in our existing laws - loopholes that some companies and individuals have tried to exploit.  This summer, for example, ***a Texan named Cody Wilson*** promised to publicly release computer files that would let anyone, even terrorists, felons, and domestic abusers, create firearms using a 3D printer. . . .   And so back in July, we successfully challenged Cody Wilson in court.  We obtained legal orders that temporarily halted the release of these codes.  ***But his supporters are not relenting, they're still trying to release these codes online***.  And so it's clear that we need stronger tools to stop them . . . tools like the legislation crafted by Senator Cryan and that Governor Murphy is signing today.

42

150.   At the Section (*l*)(2) speech crime's signing ceremony, Grewal said that Senate Bill 2465 was "right on point" to "address[] printable guns or ghost guns" and that it was enacted "to stop the next Cody Wilson, to fight the ghost gun industry":

[E]arlier this year, we went after some of the biggest players in this industry.  We told them that they were wrong on the law.  We told them that they were, in fact, breaking the law here in New Jersey by selling those weapons here.  And we told them to stop.  And some of them complied.  But others did not, and so those investigations are ongoing at this time.

But in both of those cases, ***bad actors were trying to take advantage of loopholes because no law squarely addressed printable guns or ghost guns***.  So we had to rely on other laws, like our public nuisance law or our assault weapons law, to fight back. Now don't get me wrong:  Those laws are important and they're great tools, and they helped us stop the spread of these dangerous, untraceable weapons.  ***But a law right on point strengthens law enforcement's hand even more.***

And so today, there is no question that printable guns and ghost guns are deadly, and selling them in New Jersey is illegal.  And that's why I'm so proud to support Governor Murphy's efforts and the legislature's efforts to close those loopholes, ***to stop the next Cody Wilson, to fight the ghost gun industry***, and to regulate the next dangerous gun models before they spread into our communities.

151.   At the Senate Bill 2465 signing ceremony, Grewal threatened to "come after" "anyone who is contemplating making a printable gun" and "the next ghost gun company":

And here's my message today ***to anyone who is contemplating making a printable gun or to the next ghost gun company*** trying to sell their dangerous weapons into New Jersey: Your products are unlawful and if your break our laws ***we will come after you***. And to anyone else who thinks of trying to find other loopholes in our laws, especially to sell dangerous firearms, we're just as committed to ***stopping each of you***.

152.    A press release further touted Grewal's enforcement threats.

153.   Defense Distributed knew of the Section (*l*)(2) speech crime passage on the day that it became law and witnessed the signing ceremony.  At that time, Defense Distributed reasonably feared that Grewal would commence enforcement of the new law against Defense Distributed, its officers, its employees, and/or its agents at any moment.

43

154.    Hence, Grewal is illegally censoring three distinct categories of Defense Distributed and SAF's speech.  If not for Grewal's unconstitutional actions, Defense Distributed and SAF would be freely exercising their First Amendment rights.  These losses amount to irreparable harm in every instance.

155.    Category one is the free and open publication of digital firearms information on the internet to persons in New Jersey.  This right has been exercised in the past by Defense Distributed. If not for Grewal's ongoing censorship, this right would be exercised in the future by Defense Distributed and SAF and its members.

156.    Category two is the free and open publication of digital firearms information via the mail to persons in New Jersey.  This right has been exercised in the past by Defense Distributed. If not for Grewal's ongoing censorship, this right would be exercised in the future by Defense Distributed.

157.    Category three is the free and open offering and advertisement of digital firearms information to persons in New Jersey.  This right has been exercised in the past by Defense Distributed.  If not for Grewal's ongoing censorship, this right would be exercised in the future by Defense Distributed and SAF and its members.

158.    Grewal's criminal censorship covers all three categories of conduct.  Internet publications are covered because Section 3(l)(2) makes it a crime to distribute the banned "digital instructions" "by any means, including the Internet." N.J. Stat 2C:39-9(*l*)(2).  Mailed publications are covered because the speech crime also defines "distribute" to mean "mail."  And offers and advertisements are covered because Section 3(l)(2) defines "distribute" to mean "offer" and "advertise." *Id.*

44

159.    Grewal's civil censorship covers all three categories of conduct as well.  His cease-and-desist order said to "halt publication" of any and all so-called "printable gun computer files."  The civil lawsuits sought prior restraints against all manner of "distributing" "printable-gun computer files."  And the threats against internet service providers targeted all "computer files" with digital firearms information.

160.    Grewal's censorship of *non-internet speech* is completely unique.  Neither the federal government nor any other state government seeks to censor the non-internet speech of Defense Distributed and SAF that Grewal does. The resulting censorship of constitutionally protected speech is uniquely attributable to Grewal alone.

161.    Grewal's censorship of *internet speech* is unique as well—both in breadth and nature.  His civil and criminal censorship efforts against Defense Distributed and SAF's internet speech apply to more speech than federal officials' efforts do, impose different burdens than federal officials' efforts do, and threaten far greater penalties than federal officials' efforts do.  The resulting censorship of constitutionally protected speech is uniquely attributable to Grewal alone.

## I.    Irreparable Harm

### 1.    The State Department's illegal conduct causes irreparable harm.

162.    In the past, the State Department's illegal conduct irreparably harmed Defense Distributed and SAF by abridging rights guaranteed by the First Amendment, Second Amendment, Fourteenth Amendment, and other federal speech protections.

163.    In the past, the State Department's illegal conduct irreparably harmed Defense Distributed and SAF by causing Defense Distributed and SAF to refrain from publishing digital firearms information that Defense Distributed and SAF had a right to publish, by causing Defense Distributed and SAF to refrain from receiving digital firearms information that Defense

45

Distributed and SAF had a right to receive, and by causing Defense Distributed and SAF to refrain from republishing digital firearms information that Defense Distributed had a right to republish.

164.    In the past, the State Department's illegal conduct irreparably harmed Defense Distributed and SAF by chilling Defense Distributed and SAF's exercise of First Amendment rights.

165.    In the past, the State Department's illegal conduct irreparably harmed Defense Distributed and SAF by chilling Defense Distributed and SAF's exercise of Second Amendment rights.

166.    At present, the State Department's illegal conduct irreparably harms Defense Distributed and SAF by abridging rights guaranteed by the First Amendment, Second Amendment, Fourteenth Amendment, and other federal speech protections.

167.    At present, the State Department's illegal conduct irreparably harms Defense Distributed and SAF by causing Defense Distributed and SAF to refrain from publishing digital firearms information that Defense Distributed and SAF have a right to publish, by causing Defense Distributed and SAF to refrain from receiving digital firearms information that Defense Distributed and SAF have a right to receive, and by causing Defense Distributed and SAF to refrain from republishing digital firearms information that Defense Distributed and SAF have a right to republish.

168.    At present, the State Department's illegal conduct irreparably harms Defense Distributed and SAF by chilling Defense Distributed and SAF's exercise of First Amendment rights.

App. 178

169.    At present, the State Department's illegal conduct irreparably harms Defense Distributed and SAF by chilling Defense Distributed and SAF's exercise of Second Amendment rights.

170.    Absent relief from this Court, the State Department will continue to engage in the illegal conduct that has caused Defense Distributed and SAF irreparable harm in the past and is causing Defense Distributed and SAF irreparable harm at present.

**2.      Grewal's illegal conduct causes irreparable harm.**

171.    In the past, Grewal's illegal conduct irreparably harmed Defense Distributed and SAF by abridging rights guaranteed by the First Amendment, Second Amendment, Fourteenth Amendment, and other federal law.

172.    In the past, Grewal's illegal conduct irreparably harmed Defense Distributed and SAF by causing them to refrain from publishing digital firearms information they have a right to publish, by causing them to refrain from receiving digital firearms information they have a right to receive, by causing them to refrain from republish firearms information they have a right to republish, and by chilling their exercise of First Amendment rights.

173.    At present, Grewal's illegal conduct irreparably harms Defense Distributed and SAF by abridging rights guaranteed by the First Amendment, Second Amendment, Fourteenth Amendment, and other federal law.

174.    At present, Grewal's illegal conduct irreparably harms Defense Distributed and SAF by causing them to refrain from publishing digital firearms information they have a right to publish, by causing them to refrain from receiving digital firearms information they have a right to receive, by causing them to refrain from republishing firearms information they have a right to republish, and by chilling their exercise of First Amendment rights.

47

175.    Absent relief from this Court, Grewal will continue to engage in the illegal conduct that has caused Defense Distributed and SAF irreparable harm in the past and is causing Defense Distributed and SAF irreparable harm at present.

176.    Defense Distributed refrains from freely and openly publishing digital firearms information via the internet to persons in New Jersey for fear of being punished by Grewal.  Once that threat ceases, Defense Distributed will resume engaging in this speech with persons in New Jersey and SAF's members in New Jersey will resume receiving it, benefitting from it, and republishing it.

177.    Defense Distributed refrains from freely and openly distributing digital firearms information via the mail to persons in New Jersey for fear of being punished by Grewal. Once that threat ceases, Defense Distributed will resume engaging in this speech and SAF's members will resume receiving it, benefitting from it, and republishing it.

178.    Defense Distributed refrains from freely and openly offering and advertising its mailed digital firearms information to persons in New Jersey for fear of being punished by Grewal. Once that threat ceases, Defense Distributed will resume making offers and advertisements about its mailed publications to persons in New Jersey.

179.    SAF members have received and republished Defense Distributed's digital firearms information in the past.  But now they refrain from freely and openly receiving and republishing Defense Distributed's files for fear of being prosecuted by states like New Jersey.  Once those threats cease, SAF's members will continue to freely and openly receive and republish information from Defense Distributed.

48

180.    Because of Grewal's evident intention of enforcing Section (*l*)(2) against Defense Distributed and SAF, Defense Distributed and SAF have refrained from engaging in speech that Constitution and other federal law guarantees their right to engage in.

181.    If Defense Distributed publishes its digital firearms information via the internet by making its computer files freely and openly available for download on a website, Grewal will enforce New Jersey's Section (*l*)(2) speech crime against Defense Distributed.  If SAF members publish or republish Defense Distributed's computer files via the internet by making them available for download on a website, Grewal will enforce New Jersey's Section (*l*)(2) speech crime against them.

182.    If Defense Distributed publishes its digital firearms information via the mail by making its computer files available for shipment on physical storage devices to persons in New Jersey, Grewal will enforce New Jersey's Section (*l*)(2) speech crime against Defense Distributed. Likewise, if SAF members make Defense Distributed's computer files available for shipment on physical storage devices to persons in New Jersey, Grewal will enforce New Jersey's Section (*l*)(2) speech crime against them.

183.    If Defense Distributed engages in advertising and offering activities regarding its files to persons in New Jersey, Grewal will enforce New Jersey's Section (*l*)(2) speech crime against Defense Distributed.  Likewise, if SAF members engage in advertising and offering activities regarding Defense Distributed's files to persons in New Jersey, Grewal will enforce New Jersey's Section (*l*)(2) speech crime against them.

**VII.    Causes of Action Against the State Department**

**A.    Count One: APA § 706(2)(A).**

184.    Defense Distributed & SAF incorporate the preceding paragraphs.

App. 181

185.     The Administrative Procedure Act requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

186.     The State Department committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), by disavowing the license it had originally issued to Defense Distributed and SAF in July 2018. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful and setting it aside.

187.     The State Department committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), by refusing to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

188.     The State Department committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), by refusing to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule revising USML Category I to exclude the technical data that was the

50

App. 182

subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

189. The State Department committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), by disavowing the temporary modification it had originally issued to Defense Distributed and SAF in July 2018. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful and setting it aside.

190. The State Department committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), by refusing to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

191. The State Department committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), by refusing to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

51

**B.      Count Two: APA § 706(2)(B).**

192.     Defense Distributed & SAF incorporate the preceding paragraphs.

193.     The Administrative Procedure Act requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

194.     The State Department committed a final agency action that was "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), by disavowing the license it had originally issued to Defense Distributed and SAF in July 2018.. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful and setting it aside.

195.     The State Department committed a final agency action that was "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), by refusing to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

196.     The State Department committed a final agency action that was "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), by refusing to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule revising

App. 184

USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

197. The State Department committed a final agency action that was "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), by disavowing the temporary modification it had originally issued to Defense Distributed and SAF in July 2018. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful and setting it aside.

198. The State Department committed a final agency action that was "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), by refusing to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

199. The State Department committed a final agency action that was "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), by refusing to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

C. **Count Three: APA § 706(2)(C).**

53

200. Defense Distributed & SAF incorporate the preceding paragraphs.

201. The Administrative Procedure Act requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

202. The State Department committed a final agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), by disavowing the license it had originally issued to Defense Distributed and SAF in July 2018. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful and setting it aside.

203. The State Department committed a final agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), by refusing to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

204. The State Department committed a final agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), by refusing to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed

App. 186

rulemaking and final rule revising USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

205.    The State Department committed a final agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), by disavowing the temporary modification it had originally issued to Defense Distributed and SAF in July 2018. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful and setting it aside.

206.    The State Department committed a final agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), by refusing to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

207.    The State Department committed a final agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), by refusing to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense*

55

*Distributed I.*  Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

**D.      Count  Four: APA § 706(2)(D).**

208.    Defense Distributed & SAF incorporate the preceding paragraphs.

209.    The Administrative Procedure Act requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

210.    The State Department committed a final agency action that was "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), by disavowing the license it had originally issued to Defense Distributed and SAF in July 2018.  Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful and setting it aside.

211.    The State Department committed a final agency action that was "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), by refusing to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval.  Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

212.    The State Department committed a final agency action that was "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), by refusing to draft and to fully

56

pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule revising USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

213.    The State Department committed a final agency action that was "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), by disavowing the temporary modification it had originally issued to Defense Distributed and SAF in July 2018. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful and setting it aside.

214.    The State Department committed a final agency action that was "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), by refusing to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

215.    The State Department committed a final agency action that was "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), by refusing to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.

57

**E.      Count  Five: Breach of contract.**

216.    Defense Distributed & SAF incorporate the preceding paragraphs.

217.    Defense Distributed, SAF, and Conn Williamson timely performed all of their obligations under the Settlement Agreement.  Defense Distributed, SAF, and Conn Williamson did not commit any material breach of the Settlement Agreement.

218.    The State Department committed an unexcused material breach of the Settlement Agreement by disavowing the license it had originally issued to Defense Distributed and SAF in July 2018.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins further breaches of this kind, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

219.    The State Department breached the Settlement Agreement by refusing to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins further breaches of this kind, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF

58

App. 190

exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

220.    The State Department committed an unexcused material breach of the Settlement Agreement by refusing to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule revising USML Category I to exclude the technical data that was the subject of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins further breaches of this kind, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

221.    The State Department committed an unexcused material breach of the Settlement Agreement by refusing to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins further breaches of this kind, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

222.    The State Department committed an unexcused material breach of the Settlement Agreement by disavowing the temporary modification it had originally issued to Defense Distributed and SAF in July 2018.  Defense Distributed & SAF are therefore entitled to a judgment

that (1) declares this conduct unlawful, (2) enjoins further breaches of this kind, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

223.    The State Department committed an unexcused material breach of the Settlement Agreement by refusing to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins further breaches of this kind, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

224.    The State Department waived any and all grounds of opposition to court enforcement of the Settlement Agreement.  Settlement Agreement paragraph 4 entails the State Department's consent to "any civil, criminal, or administrative action . . .  permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement."

### F.    Count Six: Freedom of Speech and of the Press

225.    Defense Distributed & SAF incorporate the preceding paragraphs.

226.    The First Amendment of the Constitution of the United States forbids government actions abridging the freedom of speech or of the press.  It applies to the State Department.

App. 192

227.    The State Department's conduct violates the First Amendment doctrine regarding prior restraints.   *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).   The State Department's conduct constitutes a prior restraint of expression; as such, it is an unconstitutional abridgement of First Amendment freedoms because the State Department cannot carry the heavy burden of justifying a prior restraint and because the prior restraint does not operate under sufficient judicial superintendence.

228.    The State Department's conduct violates the First Amendment doctrine regarding content-based speech restrictions.  *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015). The State Department's conduct imposes content-based speech restrictions; as such, the conduct is an unconstitutional abridgement of First Amendment's freedoms because the State Department cannot carry the heavy burden of justifying a content-based speech restriction and because it does not serve a compelling governmental interest and is not narrowly drawn to serve any such interest.

229.    The State Department's conduct violates the First Amendment doctrine regarding content-neutral speech restrictions.  *See, e.g., McCullen v. Coakley*, 134 S. Ct. 2518 (2014).  Even if the State Department's conduct is deemed to impose content-neutral speech restrictions, it is an unconstitutional abridgement of First Amendment's freedoms because it does not serve a significant governmental interest and is not narrowly drawn to serve any such interest.

230.    The State Department's conduct violates the First Amendment doctrine regarding overbreadth. *See, e.g.*, *City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987).  The State Department's conduct forbids a substantial amount of constitutionally protected speech and is not narrowly tailored to prohibit only constitutionally unprotected speech; as such, it is an unconstitutional abridgement of First Amendment's freedoms.

App. 193

231.   The State Department violated Defense Distributed and SAF's First Amendment rights by disavowing the license it had originally issued to Defense Distributed and SAF in July 2018.   Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

232.   The State Department violated Defense Distributed and SAF's First Amendment rights by refusing to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval.   Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

233.   The State Department violated Defense Distributed and SAF's First Amendment rights by refusing to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed

62

App. 194

rulemaking and final rule revising USML Category I to exclude the technical data that was the subject of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

234.    The State Department violated Defense Distributed and SAF's First Amendment rights by disavowing the temporary modification it had originally issued to Defense Distributed and SAF in July 2018.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

235.    The State Department violated Defense Distributed and SAF's First Amendment rights by refusing to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment holding this conduct unlawful.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards

App. 195

Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

236. The State Department violated Defense Distributed and SAF's First Amendment rights by refusing to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

**G.     Count Seven: Right to Keep and Bear Arms**

237. Defense Distributed & SAF incorporate the preceding paragraphs.

238. The Second Amendment of the Constitution of the United States forbids laws abridging the individual right to keep and bear Arms.

239. The State Department violated the Second Amendment by subjecting Defense Distributed & SAF to an unconstitutional abridgement of Second Amendment rights. *See District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). The State Department's conduct infringes the individual right to make and acquire Arms, which is part and parcel of the right to keep and bear Arms; as such, it is an unconstitutional abridgement of Second Amendment rights.

64

240.     The State Department violated Defense Distributed and SAF's Second Amendment rights by disavowing the license it had originally issued to Defense Distributed and SAF in July 2018.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

241.     The State Department violated Defense Distributed and SAF's Second Amendment rights by refusing to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

242.     The State Department violated Defense Distributed and SAF's Second Amendment rights by refusing to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed

65

rulemaking and final rule revising USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

243. The State Department violated Defense Distributed and SAF's Second Amendment rights by disavowing the temporary modification it had originally issued to Defense Distributed and SAF in July 2018. Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

244. The State Department violated Defense Distributed and SAF's Second Amendment rights by refusing to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

App. 198

245.     The State Department violated Defense Distributed and SAF's Second Amendment rights by refusing to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

### H.     Count Eight: Due Process

246.     Defense Distributed & SAF incorporate the preceding paragraphs.

247.     The Due Process Clause of the Fifth Amendment of the Constitution of the United States forbids the federal government from depriving any person of life, liberty, or property without due process of law.

248.     The State Department violated the Due Process Clause of the Fifth Amendment of the Constitution of the United States by depriving Defense Distributed & SAF of liberty and property without due process of law.  *See, e.g.*, *Matthews v. Eldridge*, 424 U.S. 319 (1976).  The State Department's conduct deprives Defense Distributed & SAF of a license issued by the Secretary of State pursuant to federal law, and does so without supplying adequate pre-deprivation notice and an opportunity to be heard; as such, it is an unconstitutional deprivation of property without due process of law.  Defense Distributed & SAF are therefore entitled to a judgment that

67

(1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages in an amount no less than five million dollars.

249.    The State Department violated Defense Distributed and SAF's Fifth Amendment rights by disavowing the 2018 License.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

250.    The State Department violated Defense Distributed and SAF's Fifth Amendment rights by refusing to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

251.    The State Department violated Defense Distributed and SAF's Fifth Amendment rights by refusing to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule revising USML Category I to exclude the technical data that was the subject of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

252.    The State Department violated Defense Distributed and SAF's Fifth Amendment rights by disavowing the temporary modification it had originally issued to Defense Distributed and SAF in July 2018.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

253.    The State Department violated Defense Distributed and SAF's Fifth Amendment rights by refusing to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5)

69

awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

254.    The State Department violated Defense Distributed and SAF's Fifth Amendment rights by refusing to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense Distributed I*.  Defense Distributed & SAF are therefore entitled to a judgment that (1) declares this conduct unlawful, (2) enjoins such further wrongdoing, (3) awards Defense Distributed & SAF nominal damages, (4) awards Defense Distributed & SAF exemplary damages, and (5) awards Defense Distributed actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

## VIII.   Causes of Action Against Grewal.

255.    New Jersey Attorney General Gurbir Grewal denies Defense Distributed's right to publish digital firearms information in the form of computer files.  He denies Defense Distributed's right to do so via the internet; he denies Defense Distributed's right to do so via the mail; he denies Defense Distributed's right to do so via brick-and-mortar public libraries; and he denies Defense Distributed's right to do so via any other means of publication.   He also denies Defense Distributed's right to conduct secondary activities that accompany all of these publication methods, such as advertising.   In each of these respects, Grewal acts knowingly, intentionally, and selectively.  Many people engage in the activities for which Defense Distributed and SAF are being persecuted.  But Grewal does not target them as he targets Defense Distributed and SAF.

70

256.    Grewal's conduct subjects Defense Distributed and SAF to an unconstitutional abridgement of First Amendment freedoms; an unconstitutional infringement of Second Amendment rights; an unconstitutional violation of the right to equal protection of the laws; an unconstitutional deprivation of liberty and property without due process of law; an unconstitutional violation of the Commerce Clause, regulation by way of state laws that are preempted by federal law, and tortious interference with valid legal contracts.

### A.    Count Nine: 42 U.S.C. § 1983—Freedom of Speech and of the Press

257.    Defense Distributed & SAF incorporate the preceding paragraphs.

258.    The First Amendment of the Constitution of the United States forbids government actions abridging the freedom of speech or of the press.  It applies to Attorney General Gurbir Grewal by virtue of the Fourteenth Amendment of the Constitution of the United States.

259.    Grewal violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to an unconstitutional abridgement of First Amendment freedoms.

260.    Grewal violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to an unconstitutional abridgement of First Amendment freedoms.

261.    Grewal's conduct violates the First Amendment doctrine regarding prior restraints. *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).  Grewal's conduct constitutes a prior restraint of expression; as such, it is an unconstitutional abridgement of First Amendment's freedoms because Grewal cannot carry the heavy burden of justifying a prior restraint and because the prior restraint does not operate under sufficient judicial superintendence.

262.    Grewal's conduct violates the First Amendment doctrine regarding content based speech restrictions.  *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015).  Grewal's

71

conduct imposes content-based speech restrictions; as such, the restrictions are an unconstitutional abridgement of First Amendment's freedoms because they do not serve a compelling governmental interest and are not narrowly drawn to serve any such interest.

263.    Grewal's conduct violates the First Amendment doctrine regarding content neutral speech restrictions.  *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518 (2014).  Even if Grewal's conduct is deemed to impose content-neutral speech restrictions, it is an unconstitutional abridgement of First Amendment's freedoms because it does not serve a significant governmental interest and is not narrowly drawn to serve any such interest.

264.    Grewal's conduct violates the First Amendment doctrine regarding overbreadth. *See, e.g.*, *City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987).  Grewal's conduct forbids a substantial amount of constitutionally protected speech and is not narrowly tailored to prohibit only constitutionally unprotected speech; as such, it is an unconstitutional abridgement of First Amendment's freedoms.

265.    In each of these respects, Grewal's conduct results in an unconstitutional abridgement of First Amendment freedoms both facially and as applied to these circumstances.

266.    Grewal's conduct proximately caused damages to Defense Distributed and SAF, to the persons with whom Defense Distributed and SAF have communicated, to the persons who desire to communicate with Defense Distributed and SAF, and to other persons wishing to engage in similar communications.  The damages include, but are not limited to, the loss of First Amendment rights, the chilling effect on conduct protected by the First Amendment, and the substantial time and resources expended in defense of these rights.

App. 204

267.    Defense Distributed and SAF are therefore entitled to a judgment against Grewal awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

**B.      Count Ten: 42 U.S.C. § 1983—Right to Keep and Bear Arms**

268.    Defense Distributed & SAF incorporate the preceding paragraphs.

269.    The Second Amendment of the Constitution of the United States forbids laws abridging the individual right to keep and bear Arms.  It applies to Grewal in his official capacity by virtue of the Fourteenth Amendment of the Constitution of the United States.

270.    Grewal violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to an unconstitutional abridgement of Second Amendment rights.

271.    Grewal additionally violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to an unconstitutional abridgement of Second Amendment rights.

272.    Grewal's conduct violates the individual Second Amendment right to keep and bear Arms.  *See District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010).  Grewal's conduct infringes the individual right to make and acquire Arms, which is part and parcel of the right to keep and bear Arms; as such, it is an unconstitutional abridgement of Second Amendment rights.

273.    In each of these respects, Grewal's conduct constitutes an unconstitutional abridgement of Second Amendment rights both facially and as applied to these circumstances.

274.    Grewal's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the

73

**App. 205**

loss of Second Amendment rights, the chilling effect on conduct protected by the Second Amendment, and the substantial time and resources expended in defense of these rights.

275.    Defense Distributed and SAF are therefore entitled to a judgment against Grewal awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

### C.    Count Eleven: 42 U.S.C. § 1983—Equal Protection

276.    Defense Distributed & SAF incorporate the preceding paragraphs.

277.    The Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States forbids the several States from denying to any person within their jurisdictions the equal protection of the laws.  It applies to Grewal in his official capacity.

278.    Grewal violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to an unconstitutional violation of the Equal Protection Clause.

279.    Grewal additionally violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to an unconstitutional violation of the Equal Protection Clause.

280.    Grewal's conduct violates the Equal Protection Clause's doctrine regarding selective enforcement.  *See, e.g.*, *Whren v. United States*, 517 U.S. 806 (1996).  Grewal took action against Defense Distributed-but not similarly situated persons engaged in publication of the Defense Distributed I Files-because Grewal disagrees with the content of Defense Distributed's constitutionally protected speech and because Grewal dislikes the persons involved in the speech; as such, Grewal's conduct violates Defense Distributed and SAF's right to the equal protection of the laws.

74

281.    In each of these respects, Grewal's conduct constitutes an unconstitutional violation of the Equal Protection Clause both facially and as applied to these circumstances.

282.    Grewal's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, Defense Distributed and SAF's loss of Equal Protection Clause rights and the substantial time and resources expended in defense these rights.

283.    Defense Distributed and SAF are therefore entitled to a judgment against Grewal awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

**D.      Count Twelve: 42 U.S.C. § 1983—Due Process**

284.    Defense Distributed & SAF incorporate the preceding paragraphs.

285.    The Due Process Clause of the Fourteenth Amendment of the Constitution of the United States forbids the several States from depriving any person of life, liberty, or property without due process of law.  It applies to Grewal in his official capacity.

286.    Grewal violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to a deprivation of liberty and property without due process of law.

287.    Grewal additionally violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to a deprivation of liberty and property without due process of law.

288.    Grewal's conduct violates the Due Process Clause doctrine regarding vagueness. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).  Grewal's conduct forbids expression without giving fair notice of what is forbidden; as such, it is an unconstitutional deprivation of liberty and property without due process of law.

75

289.    Grewal's conduct violates the Due Process Clause doctrine regarding overbreadth. *See, e.g.*, *Coates v. City of Cincinnati*, 402 U.S. 611 (1971).  Grewal's conduct forbids a substantial amount of constitutionally protected speech; as such, it is an unconstitutional deprivation of liberty and property without due process of law.

290.    Grewal's conduct violates the Due Process Clause doctrine regarding deprivations of property.  *See, e.g.*, *Matthews v. Eldridge*, 424 U.S. 319 (1976).  Grewal's conduct deprives Defense Distributed and SAF of a license issued by the Secretary of State pursuant to federal law, and does so without supplying adequate pre-deprivation notice and an opportunity to be heard; as such, it is an unconstitutional deprivation of property without due process of law.

291.    In each of these respects, Grewal's conduct constitutes an unconstitutional abridgement of Due Process Clause rights both facially and as applied to these circumstances.

292.    Grewal's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the loss of Defense Distributed and SAF's Due Process Clause rights and the substantial time and resources expended in defense these rights.

293.    Defense Distributed and SAF are therefore entitled to a judgment against Grewal awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

**E.      Count Thirteen: 42 U.S.C. § 1983—Commerce Clause**

294.    Defense Distributed & SAF incorporate the preceding paragraphs.

295.    The Commerce Clause of Article I, Section 8 of the Constitution of the United States imposes a negative command, known as the dormant Commerce Clause, that limits the

76

**App. 208**

authority of the several States to enact laws burdening interstate commerce.  It applies to Grewal in his official capacity.

296.    Grewal violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to a deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause.

297.    Grewal additionally violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to a deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause.

298.    Grewal's conduct violates the dormant Commerce Clause doctrine regarding laws that directly regulate interstate commerce. *See, e.g.*, *Granholm v. Heald*, 125 S. Ct. 1885 (2005). Grewal's conduct directly regulates interstate commerce by projecting New Jersey law into other states.  Grewal's conduct does not serve a compelling governmental interest.  And Grewal's conduct is not the least restrictive means of accomplishing any such interest. As such, it violates the Commerce Clause.

299.    Grewal's conduct violates the dormant Commerce Clause doctrine regarding laws that discriminate against interstate commerce. *See, e.g.*, *Granholm*, 125 S. Ct. 1885.  Grewal's conduct discriminates against interstate commerce on purpose, on its face, and in effect.  Grewal's conduct does not serve a compelling governmental interest.  And Grewal's conduct is not the least restrictive means of accomplishing any such interest.  As such, it violates the Commerce Clause.

300.    Grewal's conduct violates the dormant Commerce Clause doctrine regarding all laws that implicate interstate commerce.  *See, e.g.*, *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  Grewal's conduct imposes burdens on interstate commerce that are clearly excessive in relation to putative local benefits; as such, it violates the Commerce Clause.

App. 209

301.    In each of these respects, Grewal's conduct constitutes an unconstitutional abridgement of Due Process Clause rights both facially and as applied to these circumstances.

302.    Grewal's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the loss of Dormant Commerce Clause rights in the past and the substantial time and resources expended in defense these rights.

303.    Defense Distributed and SAF are therefore entitled to a judgment against Grewal awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

**F.      Count Fourteen: 42 U.S.C. § 1983—Arms Export Control Act**

304.    Defense Distributed & SAF incorporate the preceding paragraphs.

305.    The Supremacy Clause of the Constitution of the United States provides that the Constitution of the United States and the Laws of the United States which shall be made in Pursuance thereof shall be the supreme Law of the Land.  It applies to Grewal by virtue of Article VI of the Constitution of the United States.

306.    The federal government has exclusive authority to administer and enforce the provisions of the AECA and ITAR.  Pursuant to that authority, the federal government entered into the Settlement Agreement with Plaintiffs and granted Plaintiffs a license to publish the Defense Distributed I Files.

307.    Grewal violated the AECA and ITAR by acting, under color of state law, to regulate conduct that the federal government has expressly authorized pursuant to its authority under the AECA and ITAR.  Grewal therefore violated 42 U.S.C. § 1983 by acting, under color of state law, to regulate Defense Distributed and SAF pursuant to state laws that are preempted by federal law.

78

"[I]f an individual claims federal law immunizes [the plaintiff] from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

308.    In this respect, Grewal's conduct is preempted both facially and as applied to these circumstances.

309.    Grewal's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the loss of immunity from preempted state regulation in the past and the substantial time and resources expended in defense these rights.

310.    Defense Distributed and SAF are therefore entitled to a judgment against the Defendants awarding Defense Distributed and SAF declaratory relief and injunctive relief, and attorney fees and costs.

## G.    Count Fifteen: 42 U.S.C. § 1983—Communications Decency Act

311.    Defense Distributed & SAF incorporate the preceding paragraphs.

312.    The Communications Decency Act, 47 U.S.C. § 230, immunizes service providers for information originating with a third-party user of the service.  Defense Distributed is a provider and user of an "interactive computer service" within the meaning of 47 U.S.C. § 230 because it operates an interactive online service at DEFCAD.com.

313.    Senate Bill 2465 violates Defense Distributed's rights under 47 U.S.C. § 230(c)(1) because it treats them, providers of interactive computer services, as publishers or speakers of information provided by another information content provider. Specifically, Senate Bill 2465 treats Defense Distributed as a publishers or speaker because it makes it a crime to "distribute" the

79

"information" at issue regardless of whether the information was "provided by another information content provider."

314.    Senate Bill 2465 is a "State . . . law that is inconsistent with" § 230, in direct violation of 47 U.S.C. § 230(e)(3).

315.    In this respect, Defendant Grewal's conduct is preempted both facially and as applied to these circumstances.

316.    Grewal's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the loss of immunity from preempted state regulation in the past and the substantial time and resources expended in defense these rights.

317.    Defense Distributed and SAF are therefore entitled to a judgment against the Defendants awarding Defense Distributed and SAF declaratory relief and injunctive relief, and attorney fees and costs.

### H.    Count Sixteen: Tortious Interference with the Settlement Agreement

318.    Defense Distributed & SAF incorporate the preceding paragraphs.

319.    The Settlement Agreement is an existing, valid contract between the Defense Distributed I Plaintiffs and the State Department.

320.    The Defendants committed the tort of intentional interference with an existing contract by willfully and intentionally engaging in conduct that made the State Department's performance of the Settlement Agreement burdensome, more difficult, and of less or no value to the Defense Distributed I Plaintiffs.  See, e.g., Restatement (Second) of Torts § 766 (1979); Prudential Ins. Co. of Am. v. Fin. Review Services, Inc., 29 S.W.3d 74 (Tex. 2000).

App. 212

321. The Defendants' conduct proximately caused Defense Distributed to suffer substantial actual damages in excess of $75,000 per year.

322. Plaintiff Defense Distributed is therefore entitled to a judgment against the Defendants awarding declaratory relief, injunctive relief, and attorney fees and costs.

### I. Count Seventeen: Tortious Interference with Existing Contracts

323. Defense Distributed & SAF incorporate the preceding paragraphs.

324. Defense Distributed and DreamHost had an existing, valid contract for the provision of internet security services regarding Defense Distributed's website.

325. Defendant Gurbir Grewal committed the tort of intentional interference with an existing contract by willfully and intentionally engaging in conduct that made the performance of Defense Distributed's contract with DreamHost burdensome, more difficult, and of less or no value to Defense Distributed.  *See, e.g.*, Restatement (Second) of Torts § 766 (1979); *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74 (Tex. 2000).  Defendant Gurbir Grewal's conduct proximately caused Defense Distributed to suffer substantial actual damages in excess of $75,000 per year.

326. Defense Distributed and Cloudflare, Inc. have an existing, valid contract for the provision of internet security services regarding Defense Distributed's website.

327. Defendant Gurbir Grewal committed the tort of intentional interference with an existing contract by willfully and intentionally engaging in conduct that made the performance of Defense Distributed's contract with Cloudflare, Inc. burdensome, more difficult, and of less or no value to Defense Distributed.  *See, e.g.*, Restatement (Second) of Torts § 766 (1979); *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74 (Tex. 2000).  Defendant Gurbir

81

Grewal's conduct proximately caused Defense Distributed to suffer substantial actual damages substantial actual damages in excess of $75,000 per year.

328.   Defense Distributed is therefore entitled to a judgment against Defendant Gurbir Grewal awarding declaratory relief, injunctive relief, and attorney fees and costs.

## IX.   Requests for Relief

### A.   Defense Distributed and SAF should prevail against the State Department.

329.   Defense Distributed and SAF request a judgment in their favor as to all claims against the State Department awarding them all relief they are entitled to.

330.   Defense Distributed and SAF request a judgment against the State Department declaring unlawful and setting aside the State Department's disavowal of the license it had originally issued to Defense Distributed and SAF in July 2018.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.  With respect to this conduct, Defense Distributed & SAF request an award of nominal damages, punitive damages, and actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

331.   Defense Distributed and SAF request a judgment against the State Department declaring unlawful and setting aside the State Department's disavowal of the temporary modification it had originally issued to Defense Distributed and SAF in July 2018.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.  With respect to this conduct, Defense Distributed & SAF request an award of

82

nominal damages, punitive damages, and actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

332.    Defense Distributed and SAF request a judgment against the State Department declaring unlawful the State Department's refusal to issue a letter to Defense Distributed & SAF, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that (1) *Defense Distributed I*'s Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13), and (2) for the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue the approval. Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.  With respect to this conduct, Defense Distributed & SAF request an award of nominal damages, punitive damages, and actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

333.    Defense Distributed and SAF request a judgment against the State Department declaring unlawful the State Department's refusal to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule revising USML Category I to exclude the technical data that was the subject of *Defense Distributed I.* Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future— both on a preliminary basis while this action is pending and permanently.  With respect to this conduct, Defense Distributed & SAF request an award of nominal damages, punitive damages,

App. 215

and actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

334.   Defense Distributed and SAF request a judgment against the State Department declaring unlawful the State Department's refusal to announce, while the above-referenced final rule is in development, a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that was the subject of *Defense Distributed I*. Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.  With respect to this conduct, Defense Distributed & SAF request an award of nominal damages, punitive damages, and actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

335.   Defense Distributed and SAF request a judgment against the State Department declaring unlawful the State Department's refusal to acknowledge and agree that the 2018 temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the 2018 License permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files of *Defense Distributed I*. Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.  With respect to this conduct, Defense Distributed & SAF request an award of nominal damages, punitive damages, and actual damages proximately caused by this wrongdoing in an amount no less than five million dollars.

**App. 216**

336.     Defense Distributed & SAF request an award against the State Department of costs, including reasonable attorney fees, against the State Department.

337.     Defense Distributed and SAF request any other relief against the State Department to which they are entitled.

**B.       Defense Distributed and SAF should prevail against Grewal.**

338.     Defense Distributed and SAF request a judgment in their favor as to all claims against Grewal awarding them all relief they are entitled to.

339.     Defense Distributed and SAF request a judgment against Grewal declaring that Grewal unconstitutionally abridged Defense Distributed and SAF's First Amendment freedoms. Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

340.     Defense Distributed and SAF request a judgment against Grewal declaring that Grewal unconstitutionally infringed Defense Distributed and SAF's Second Amendment rights. Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

341.     Defense Distributed and SAF request a judgment against Grewal declaring that Grewal unconstitutionally denied Defense Distributed and SAF the equal protection of the laws. Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

342.   Defense Distributed and SAF request a judgment against Grewal declaring that Grewal unconstitutionally subjected Defense Distributed and SAF to a deprivation of liberty and property without due process of law.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

343.   Defense Distributed and SAF request a judgment against Grewal declaring that Grewal unconstitutionally violated Defense Distributed and SAF's dormant Commerce Clause rights.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

344.   Defense Distributed and SAF request a judgment against Grewal declaring that federal law preempts and immunizes Defense Distributed and SAF from Grewal's civil and criminal censorship.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

345.   Defense Distributed and SAF request a judgment against Grewal declaring that Grewal's conduct constitutes tortious interference with the Settlement Agreement.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

346.   Defense Distributed and SAF request a judgment against Grewal declaring that Grewal's conduct constitutes tortious interference with the contracts between Defense Distributed and DreamHost and Cloudflare, Inc.   Defense Distributed & SAF request an injunction protecting

86

Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

347.    Defense Distributed and SAF request an award against Grewal of costs, including reasonable attorney fees and costs, pursuant to 42 U.S.C. § 1988.

348.    Defense Distributed and SAF request any other relief against Grewal to which they are entitled.

App. 219

Respectfully submitted,

BECK REDDEN LLP
By /s/ Chad Flores
Chad Flores
cflores@beckredden.com
State Bar No. 24059759
Daniel Nightingale
dhammond@beckredden.com
State Bar No. 24098886
Hannah Roblyer
hroblyer@beckredden.com
State Bar No. 24106356
1221 McKinney St., Suite 4500
Houston, TX 77010
(713) 951-3700 | (713) 952-3720 (fax)

FARHANG & MEDCOFF
Matthew Goldstein
mgoldstein@farhangmedcoff.com
D.C. Bar No. 975000
4801 E. Broadway Blvd., Suite 311
Tucson, AZ 85711
(202) 550-0040 | (520) 790-5433 (fax)

Josh Blackman
joshblackman@gmail.com
Texas Bar No. 24118169
1303 San Jacinto Street
Houston, TX 77002
(202) 294-9003 | (713) 646-1766 (fax)

Attorneys for Plaintiffs Defense Distributed
and Second Amendment Foundation, Inc.

88

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the above and foregoing document was served on the following parties and/or counsel of record through a manner authorized by Federal Rule of Civil Procedure 5(b) on November 10, 2020.


/s/ Chad Flores
Chad Flores

App. 221

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.     *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

   (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

   (b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

App. 224

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4. *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

App. 225

5. *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6. *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7. *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items.

7

App. 228

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

**App. 229**

NOTICE: **GENERAL**

07/27/18

# Temporary Modification of Category I of the United States Munitions List

Consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, the Acting Deputy Assistant Secretary for Defense Trade Controls has determined that it is in the interest of the security and foreign policy of the United States to temporarily modify United States Munitions List (USML) Category I to exclude the following technical data identified in the Settlement Agreement for the matter of Defense Distributed, et al., v. U.S. Department of State, et al, Case No. 15-cv-372-RP (W.D. Tex.) (hereinafter "Defense Distributed"):

- "Published Files," i.e., the files described in paragraph 25 of the Second Amended Complaint in Defense Distributed.
- "Ghost Gunner Files," i.e., the files described in paragraph 36 of the Second Amended Complaint in Defense Distributed.
- "CAD Files," i.e., the files described in paragraph 40 of the Second Amended Complaint in Defense Distributed.
- "Other Files," i.e., the files described in paragraphs 44-45 of the Second Amended Complaint in Defense Distributed, insofar as those files regard items exclusively: (a) in Category I(a) of the USML, as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.  Military Equipment means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

This temporary modification will remain in effect while the final rule referenced in paragraph 1(a) of the Settlement Agreement is in development.
Please see the Settlement Agreement and the Second Amended Compliant for additional information.

---

NOTICE: **GENERAL**

07/25/18

# Public Comments on USML Categories I–III



**United States Department of State**
*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington, D.C. 20522-0112*

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:   Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.,* No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as "*Defense Distributed*"). As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13). It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

1

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release. To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution). As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

2



**U.S. Department of Justice**

Civil Division
Federal Programs Branch

450 Golden Gate Ave.
Suite 7-5395
San Francisco, CA 94102

---

Stuart Robinson
Trial Attorney

Tel:  (415) 436-6635
Fax:  (415) 436-6632
stuart.j.robinson@usdoj.gov

August 2, 2018

<u>Via Electronic Mail</u>

Jeff Sprung
Assistant Attorney General
Washington Attorney General's Office
800 5th Ave.
Suite 2000
Seattle, WA 98104

> **Re:** *State of Washington, et al. v. U.S. Department of State, et al.*, **No. 2:18-cv-1115 (W.D. Wash.)**

Dear Mr. Sprung:

This letter is in response to your correspondence dated July 31, 2018, in which you "request that the federal government advise us of the steps it has taken to achieve" compliance with the Court's Order granting Plaintiffs' Emergency Motion for Temporary Restraining Order, ECF No. 23 (July 31, 2018). As you are aware, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.* at 7.  The Court did not require the Government to provide any status reports to the Court or Plaintiffs regarding compliance with the Order.  *See id.*

The Government has fully complied with the Court's Order, and Plaintiffs have provided no basis to conclude otherwise.  On July 31, 2018, the Department of State, Directorate of Defense Trade Controls ("DDTC"), removed from its website its announcement temporarily modifying Category I of the United States Munitions List to exclude technical data identified in the Settlement Agreement for the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.*, Case No. 15-cv-372 (W.D. Tex.).  Additionally, on July 31, 2018, my colleague Eric Soskin informed Josh Blackman, counsel for Defense Distributed, that the Government considers the aforementioned letter to Mr. Wilson a nullity during the pendency of the Order entered by the Court.  And on August 2, 2018, DDTC added the following to its website: "As of July 31, 2018, and in compliance with the Temporary Restraining Order

**App. 233**

issued by the United States District Court for the Western District of Washington, in *Washington v. U.S. Dep't of State*, No. C18-1115RSL, the Directorate of Defense Trade Controls (DDTC) is not implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' that was posted to the DDTC website on July 27, 2018, and has since been removed."

If you have any questions related to these matters, please contact me or Mr. Soskin.

Sincerely,

s/ *Stuart Robinson*

Stuart Robinson
(415) 436-6635

cc: Eric Soskin
Senior Counsel
U.S. Department of Justice

Jeffrey Rupert
Assistant Attorney General
Washington Attorney General's Office

Josh Blackman
Josh Blackman LLC

Joel Ard
Attorney
Immix Law Group

Page 2

# FARHANG & MEDCOFF
## ─ ATTORNEYS ─

**Matthew A. Goldstein | Partner**
mgoldstein@farhangmedcoff.com
d: 202.550.0040

4801 E. Broadway Boulevard, Suite 311 | Tucson, Arizona 85711
p: 520.214.2000 | f: 520.214.2001 | **farhangmedcoff.com**

January 15, 2020

**BY EMAIL**

Mr. Eric Soskin
Federal Programs Branch
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
eric.soskin@usdoj.gov

**Re:    Breach of Settlement Agreement**

I write regarding the Settlement Agreement of June 29, 2018 ("Settlement Agreement"), which binds the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls, and the Director of the Office of Defense Trade Controls Policy (collectively the "State Department").  Settlement Agreement Sections 1(c) and 1(d) establish the following obligations regarding a license and acknowledgement:

(c)    Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)    Defendants' acknowledgment and agreement that . . . the letter to Plaintiffs permits any [United States] person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The State Department previously issued the attached July 27, 2018 license.  But that license has been vacated, *see Washington v. U.S. Dep't of State,*, No. 2-18-1115-RSL (W.D. Wash.), and the State Department considers the license a "nullity" (the term used in Stuart Robinson's attached August 2, 2018, letter to Jeff Sprung).  Thus, the State Department is in breach of Settlement Agreement Section 1(c) and Settlement Agreement Section 1(d).

SETTLEMENT AGREEMENT BREACH
January 15, 2020
Page **2** of **2**

Defense Distributed demands that the State Department comply with both the Section 1(c) license obligation and the Section 1(d) acknowledgement obligation.  The State Department must (1) issue a license in compliance with Section 1(c), and (2) issue an acknowledgement about that license in compliance with Section 1(d).  Additionally, the State Department must appeal the *Washington* action's final judgment to the United States Court of Appeals for the Ninth Circuit and seek reversal of the district court's decision to vacate the July 27, 2018 license.

January 28, 2020 is the State Department's deadline to initiate an appeal from the *Washington* action's final judgment to the United States Court of Appeals for the Ninth Circuit.  *See* Fed. R. App. P. 4(a)(3).  We therefore ask that you respond to this demand no later than January 29, 2020.  If the State Department has not issued the license, issued the acknowledgement, and appealed the *Washington* action's final judgment by January 29, 2020, we will consider this an intentional and permanent act of wrongdoing and take legal action accordingly.

By making these demands, Defense Distributed, the Second Amendment Foundation, and Conn Williamson do not waive any claims against the State Department and other defendants for any violations of the Settlement Agreement.

Thank you for your prompt attention to this matter and please contact me at (202) 550-0040 or at mgoldstein@farhangmedcoff.com with any questions.

Sincerely,

FARHANG & MEDCOFF PLLC

Matthew A. Goldstein

cc:     Stuart Robinson (Stuart.J.Robinson@usdoj.gov)

Attachments

# ATTACHMENTS

**App. 237**



**United States Department of State**
*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington, D.C. 20522-0112*

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:   Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.,* No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as "*Defense Distributed*"). As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13). It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

1

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release.  To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution).  As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

2



**U.S. Department of Justice**

Civil Division
Federal Programs Branch

450 Golden Gate Ave.
Suite 7-5395
San Francisco, CA 94102

| | |
|---|---|
| Stuart Robinson | Tel: (415) 436-6635 |
| Trial Attorney | Fax: (415) 436-6632 |
| | stuart.j.robinson@usdoj.gov |

August 2, 2018

<u>Via Electronic Mail</u>

Jeff Sprung
Assistant Attorney General
Washington Attorney General's Office
800 5th Ave.
Suite 2000
Seattle, WA 98104

> **Re:** ***State of Washington, et al. v. U.S. Department of State, et al.*, No. 2:18-cv-1115
> (W.D. Wash.)**

Dear Mr. Sprung:

This letter is in response to your correspondence dated July 31, 2018, in which you "request that the federal government advise us of the steps it has taken to achieve" compliance with the Court's Order granting Plaintiffs' Emergency Motion for Temporary Restraining Order, ECF No. 23 (July 31, 2018). As you are aware, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.* at 7. The Court did not require the Government to provide any status reports to the Court or Plaintiffs regarding compliance with the Order. *See id.*

The Government has fully complied with the Court's Order, and Plaintiffs have provided no basis to conclude otherwise. On July 31, 2018, the Department of State, Directorate of Defense Trade Controls ("DDTC"), removed from its website its announcement temporarily modifying Category I of the United States Munitions List to exclude technical data identified in the Settlement Agreement for the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.*, Case No. 15-cv-372 (W.D. Tex.). Additionally, on July 31, 2018, my colleague Eric Soskin informed Josh Blackman, counsel for Defense Distributed, that the Government considers the aforementioned letter to Mr. Wilson a nullity during the pendency of the Order entered by the Court. And on August 2, 2018, DDTC added the following to its website: "As of July 31, 2018, and in compliance with the Temporary Restraining Order

**App. 240**

issued by the United States District Court for the Western District of Washington, in *Washington v. U.S. Dep't of State*, No. C18-1115RSL, the Directorate of Defense Trade Controls (DDTC) is not implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' that was posted to the DDTC website on July 27, 2018, and has since been removed."

If you have any questions related to these matters, please contact me or Mr. Soskin.

Sincerely,

s/ *Stuart Robinson*

Stuart Robinson
(415) 436-6635

cc:    Eric Soskin
Senior Counsel
U.S. Department of Justice

Jeffrey Rupert
Assistant Attorney General
Washington Attorney General's Office

Josh Blackman
Josh Blackman LLC

Joel Ard
Attorney
Immix Law Group

Page 2

App. 241

# FARHANG & MEDCOFF
## ATTORNEYS

**Matthew A. Goldstein | Partner**
mgoldstein@farhangmedcoff.com
d: 202.550.0040

4801 E. Broadway Boulevard, Suite 311 | Tucson, Arizona 85711
p: 520.214.2000 | f: 520.214.2001 | **farhangmedcoff.com**

February 11, 2020

**BY EMAIL**

Mr. Eric Soskin
Federal Programs Branch
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
eric.soskin@usdoj.gov

**Re:    Breach of Settlement Agreement**

Dear Mr. Soskin:

I write in follow-up to my January 15, 2020 letter to you regarding the Settlement Agreement of June 29, 2018 ("Settlement Agreement"), which binds the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls, and the Director of the Office of Defense Trade Controls Policy (collectively the "State Department").

Despite the compliance demand issued by my prior letter, the State Department has failed to issue a license in compliance with the Settlement Agreement Section 1(c); failed to issue an acknowledgement about that license in compliance with Settlement Agreement Section 1(d); and failed to appeal the final judgment in *Washington v. U.S. Dep't of State,*, No. 2-18-1115-RSL (W.D. Wash.) and seek reversal of the district court's decision to vacate the license originally issued by the State Department.  The State Department therefore remains in breach of Settlement Agreement Section 1(c) and Settlement Agreement Section 1(d).

This wrongdoing constitutes a final agency action under the Administrative Procedure Act's provisions for judicial review. *See* 5 U.S.C. § 702.  We will enforce all of our rights accordingly, and because of the State Department's failure to proffer any justification at all – let alone a "substantial justification," 28 U.S.C. § 2412(d) - such enforcement actions will include recovery of all attorney's fees incurred henceforth.

Sincerely,

FARHANG & MEDCOFF PLLC

Matthew A. Goldstein

cc:     Stuart Robinson (Stuart.J.Robinson@usdoj.gov)

# FARHANG & MEDCOFF
## ——— ATTORNEYS ———

**Matthew A. Goldstein | Partner**
mgoldstein@farhangmedcoff.com
d: 202.550.0040

4801 E. Broadway Boulevard, Suite 311 | Tucson, Arizona 85711
p: 520.214.2000 | f: 520.214.2001 | **farhangmedcoff.com**

April 29, 2020

**BY EMAIL**

Mr. Eric Soskin
Federal Programs Branch
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
eric.soskin@usdoj.gov

**Re:      emand for A    eal of   rel m nar  In   nct on**
*Washington v. U.S. Dep't of State*, No. 2:20-cv-00111-RAJ (W.D. Wash.)

Dear Eric:

I write regarding the Settlement Agreement of June 29, 2018 ("Settlement Agreement"), which binds the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls, and the Director of the Office of Defense Trade Controls Policy (collectively the "State Department").

Pursuant to Section 1(a) of the Settlement Agreement, the State Department committed to comply with the Administrative Procedures Act ("APA") in implementing a final rule transferring e port control jurisdiction over 3D gun files identified at U.S. Munitions List ("USML") Category I of the International Traffic in Arms Regulations ("ITAR") to the Commerce Department under the E  port Administration Regulations ("EAR").

Specifically, Section 1(a) of the Settlement Agreement provides as material consideration:

(a)     Defendants' commitment to draft and to fully pursue, to the e tent authori ed by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to e clude the technical data that is the subject of the Action.

As you know, on March  , 2020, Judge Richard Jones of the Western District of Washington found that the State Attorney General Plaintiffs are likely to succeed on their claim that the State Department violated the APA when it issued the final rule under 85 Fed. Reg. 3,819 (Jan. 23, 2020) revising USML Category I to e clude the subject 3D files from ITAR-control. *Washington v. United States Dep t of State*, No. 2:20-C -00111-RAJ, 2020 WL 1083720 (W.D. Wash. Mar.  , 2020).

App. 243

The e press terms of the Settlement Agreement re uire the State Department to comply with the APA in revising USML Category I to e clude the 3D gun files at issue. To the e tent that any court ruling establishes the State Department violated the APA in this rulemaking, such ruling would also establish that the State Department violated Section 1(a) of the Settlement Agreement.

The State Department must appeal Judge Jones' order and take whatever action is necessary to meet its obligations under Section 1(a) of the Settlement Agreement.

I further note that the State Department acted in bad faith by coordinating the Department of Commerce's new prior restraint under the EAR for Computer Assisted Manufacturing ("CAM") files under the final rules. *See* 85 Fed. Reg. 4,13 (Jan. 23, 2020). As you know, this constitutes a substantial change to the Commerce Department's longstanding policy that the EAR does not impose a prior restraint on public speech.

If left uncorrected, the State Department's wrongdoings constitute final agency actions under the APA provisions for judicial review, 5 U.S.C. § 702, and my clients will enforce their rights accordingly.

In writing to you regarding the above, Defense Distributed, the Second Amendment Foundation, and Conn Williamson do not waive any claims against the State Department, the Commerce Department, or any other party for claims arising out of the Settlement Agreement.

Thank you for your prompt attention to this matter and please contact me at (202) 550-0040 or at mgoldstein@farhangmedcoff.com with any uestions.

Sincerely,

FARHANG & MEDCOFF PLLC

Matthew A. Goldstein

cc:   Stuart Robinson (Stuart.J.Robinson@usdoj.gov)



## *State of New Jersey*

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
PO Box 080
TRENTON, NJ 08625-0080

GURBIR S. GREWAL
*Attorney General*

Defense Distributed
2320 Donley Dr., Suite C
Austin, TX 78758

July 26, 2018

To Whom It May Concern:

You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents. The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms—and even to make assault weapons that are illegal in my state. These computer codes are a threat to public safety, and posting them violates New Jersey's public nuisance and negligence laws. If you do not halt your efforts to proceed with publication, I will bring legal action against your company before August 1, 2018.

The computer files that you plan to publish will undermine the public safety of New Jersey residents. These files allow anyone with a 3-D printer to download your code and create a fully operational gun. More than that, the codes you plan to post will enable individuals to print assault weapons that are illegal in New Jersey. And because the printed guns would not have serial numbers, they would not be traceable by law enforcement. Worst of all, you are going to make the codes available to everyone—regardless of age, criminal status, or history of mental illness. That would undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands, and it would undermine the safety of our residents.

Not only are your codes dangerous, but posting them would also be illegal. New Jersey's law is clear: an individual who interferes with public health, safety, peace, and comfort violates our public nuisance law. *See James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-33 (App. Div. 2003). As New Jersey courts have held, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate our public nuisance law. *Id.* at 320. So when a group of manufacturers "flood[ed] the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market," New Jersey courts found they could be held responsible when their actions "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." *Id.* at 312. That is what your actions will do as well—make do-it-yourself guns available to anyone, even if the individuals are prohibited from owning guns because of prior convictions, history of mental illness, or history of domestic violence, even if the weapons they print are illegal in my



Hughes Justice Complex • TELEPHONE: (609) 292-4925 • FAX: (609) 292-3508
*New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

App. 245

Case 1:18-cv-00637-RP   Document 137-8   Filed 01/10/20   Page 3 of 3

July 26, 2018
Page 2

state, and even if they plan to use their weapons to further crimes and acts of violence. Because your actions will flood the illegal firearms market and pose a direct threat to the public safety of my state, they constitute a public nuisance.

Worse still, your comments make clear that you hope your actions will undermine all the efforts of states like New Jersey to keep guns out of criminals' hands. You have stated, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable."[1] You have also stated, "I'm not worried about public safety."[2] And on July 10, 2018, you tweeted a photo of a gravestone engraved with the words "American Gun Reform."[3] These comments show that you have no intention of precluding your printable-gun computer files, including designs for assault weapons, from winding up in the hands of criminals, minors, and the mentally ill. Not only does that reveal a lack of regard for safety, but it also shows that your interference with the public's health and safety is intentional and per se unreasonable. *James*, 359 N.J. Super. at 330.

Finally, your widespread dissemination of printable-gun computer files is negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey, and which will lead to an increase in expenditures of public funds for combatting crime and protecting our resident's health. *See id.* at 308-24 (finding a legally valid negligence claim against same manufacturers of guns that flooded the illegal market). Your planned method of making codes available and your public comments show that you are ignoring and violating your duty. By broadly sharing an inherently dangerous product, you should reasonably foresee the resulting governmental and public costs and must bear them. *Id.* at 323-24.

As the chief law enforcement officer for New Jersey, I demand that you halt publication of the printable-gun computer files. Should you fail to comply with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018.

Sincerely,

Gurbir S. Grewal
Attorney General

---

[1] Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns," Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[2] Tess Owen, "Get Ready for the New Era of 3D-Printed Guns Starting August 1," Vice News (July 18, 2018), available at https://news.vice.com/en_us/article/ev8xjn/get-ready-for-the-new-era-of-3d-printed-guns-starting-august-1.

[3] Cody R. Wilson (@Radomysisky), TWITTER (July 10, 2018, 12:25 P.M.), https://twitter.com/Radomysisky/status/1016765282017337344.



## State of New Jersey

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
PO Box 080
TRENTON, NJ 08625-0080

GURBIR S. GREWAL
*Attorney General*

Legal Department
DreamHost
707 Wilshire Boulevard, Suite 5050
Los Angeles, CA 90017

July 30, 2018

To Whom It May Concern:

I write to inform you that the website https://defcad.com/ ("Defcad Website"), operated by the company Defense Distributed, is violating your Acceptable Use Policy. Starting on Wednesday, Defense Distributed plans to publish computer files on the Defcad Website that enable anyone with a 3-D printer to download codes to create a fully operational firearm. These files specifically offer individuals, including criminals, codes they can use to create untraceable firearms—and even to make assault weapons that are illegal in my state. The codes put law enforcement safety and public safety at risk, and posting them violates New Jersey's public nuisance and negligence laws. I sent a cease and desist letter to Defense Distributed on July 26, 2018, based on violations of New Jersey law, and filed suit in state court today. Because your Acceptable Use Policy bars websites from transmitting material in violation of state law, Defense Distributed's plans will be in violation of that policy.

There is no doubt that the codes Defense Distributed will place on the Defcad Website undermine the public safety of New Jersey residents and law enforcement officers. These files allow anyone with a 3-D printer to create a fully operational gun. The codes enable individuals to print assault weapons that are illegal in New Jersey. And because these guns would not have serial numbers, they cannot be traced by law enforcement. The codes will be available to all— regardless of age, criminal status, or history of mental illness. These codes thus undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands.

Not only are these codes dangerous, but posting them would also be illegal. New Jersey's law is clear: an individual who interferes with public health, safety, peace, and comfort violates our public nuisance law. *See James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-33 (App. Div. 2003). As New Jersey courts have held, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate our public nuisance law. *Id.* at 320. So when a group of manufacturers "flood[ed] the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or

July 30, 2018
Page 2

supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market," New Jersey courts found they could be held responsible when their actions "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." *Id.* at 312. That is what Defense Distributed's actions on the Defcad Website will do—make do-it-yourself guns available to all, even if the individuals are prohibited from owning guns because of prior convictions, history of mental illness, or history of domestic violence, even if the weapons they print are illegal in New Jersey, and even if they plan to use their weapons to further crimes and acts of violence.

Indeed, Defense Distributed seeks to use the Defcad Website to undermine all the efforts of states like New Jersey to keep guns out of criminals' hands. As Defense Distributed found Cody Wilson stated, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable."[1] Wilson also stated, "I'm not worried about public safety."[2] Not only does that reveal a lack of regard for safety, but it also shows that Defense Distributed's interference with the public's safety is intentional and thus per se unreasonable. *James*, 359 N.J. Super. at 330.

As a result, Defense Distributed is plainly planning to use the Defcad Website in a way that violates DreamHost's Acceptable Use Policy. Your Policy says that the "Customer may only use DreamHost Web Hosting's Server for lawful purpose. Transmission of any material in violation of any Country, Federal, State or Local regulation is prohibited…. Also, using DreamHost's servers or network to conspire to commit or support the commission of illegal activities is forbidden."[3] Violations may "result in immediate and permanent disablement" of the customer's website. That is why I write to inform you that Defense Distributed will be using the Defcad Website to violate New Jersey law.

Sincerely,

Gurbir S. Grewal
Attorney General

---

[1] Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns," Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[2] Tess Owen, "Get Ready for the New Era of 3D-Printed Guns Starting August 1," Vice News (July 18, 2018), available at https://news.vice.com/en_us/article/ev8xjn/get-ready-for-the-new-era-of-3d-printed-guns-starting-august-1.

[3] "Acceptable Use Policy," available at https://www.dreamhost.com/legal/acceptableuse-policy/.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Defense Distributed, <br> Second Amendment Foundation, Inc., <br>     *Plaintiffs*, <br><br>       v. <br><br> Matthew J. Platkin, Attorney General of New Jersey, <br>     *Defendant*. | No. 3:21-cv-09867-MAS-TJB <br><br><br> Plaintiffs' Third Amended Complaint |

BECK REDDEN LLP
Chad Flores
cflores@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

HARTMAN & WINNICKI, P.C.
Daniel L. Schmutter
dschmutter@hartmanwinnicki.com
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

Counsel for Plaintiffs

i

App. 249

**Local Civil Rule 10.1 Statement**

The mailing addresses of the parties to this action are:

Defense Distributed
2320 Donley Drive, Suite C
Austin, Texas 78758

Second Amendment Foundation, Inc.
12500 Northeast 10th Street
Bellevue, Washington 98005

Matthew Platkin
Office of the Attorney General
RJ Hughes Justice Complex
25 Market Street, Box 080
Trenton, NJ 08625-0080

ii

**Table of Contents**

I.    Introduction ................................................................................................ 4

II.    Parties ....................................................................................................... 5

        A.    Defense Distributed ...................................................................... 5

        B.    Second Amendment Foundation, Inc. ............................................ 5

        C.    The NJAG ..................................................................................... 6

III.    Subject Matter Jurisdiction ....................................................................... 6

IV.    Venue ......................................................................................................... 7

V.    Facts .......................................................................................................... 8

        A.    Digital Firearms Information is Speech. ....................................... 8

        B.    Defense Distributed's Digital Firearms Information Publications. ...................... 10

        C.    The State Department's International Traffic in Arms Regulations. .................... 17

        D.    *Defense Distributed I*: Litigation ............................................. 19

        E.    *Defense Distributed I*: Settlement Agreement ....................... 22

        F.    Settlement Agreement Fulfillment Begins ................................. 26

        G.    The State Department Stopped Fulfilling the Settlement Agreement ................. 28

        H.    The NJAG Censors Defense Distributed ................................... 36

        I.    Irreparable Harm ....................................................................... 43

VI.    Former Causes of Action Against the State Department ....................... 47

VII.    Causes of Action Against The NJAG. .................................................. 48

        A.    Count One: 42 U.S.C. § 1983—Freedom of Speech and of the Press ............ 49

        B.    Count Two: 42 U.S.C. § 1983—Right to Keep and Bear Arms ....................... 50

        C.    Count Three: 42 U.S.C. § 1983—Equal Protection ............................ 52

        D.    Count Four: 42 U.S.C. § 1983—Due Process ................................. 53

        E.    Count Five: 42 U.S.C. § 1983—Commerce Clause ......................... 54

        F.    Count Six: 42 U.S.C. § 1983—Arms Export Control Act .................. 56

        G.    Count Seven: 42 U.S.C. § 1983—Communications Decency Act ....... 57

        H.    Count Eight: Tortious Interference with the Settlement Agreement ............ 58

        I.    Count Nine: Tortious Interference with Existing Contracts .............. 59

VIII.    Requests for Relief .............................................................................. 60

**App. 251**

**I.      Introduction**

1.      This case concerns extraordinarily important questions of free speech regarding the First Amendment right to speak about the Second Amendment.  Defense Distributed and the Second Amendment Foundation are peaceful, law-abiding organizations committed to preserving, protecting, and promoting America's individual right to keep and bear Arms in both traditional and modern contexts.  At stake now is the modern right to speak about the Second Amendment by sharing computer files with digital firearms information.  Even though federal free speech laws protect this freedom with full force, both the United States Department of State and the New Jersey Attorney General are breaking the law multiple times over with unprecedented acts of censorship.

2.      The State Department can never abridge the freedom of speech—especially where, as here, the State Department made a legally-enforceable contract to protect Defense Distributed and the Second Amendment Foundation's right to engage in the speech at issue by performing a series of administrative obligations.  But instead of performing those critical protective obligations, the State Department violated administrative law in failing to comply.  The claims against the State Department are pending elsewhere now, but still form part of the instant case's factual background.

3.      At issue here is the New Jersey Attorney General ("NJAG"), who is abridging Defense Distributed and the Second Amendment Foundation's freedom of speech as well.  He denies the right to share digital firearms information because he cannot stand to let people speak out in favor of the Second Amendment.  Through a torrent of civil and criminal enforcement actions, the NJAG has punished and threatens to continue punishing Defense Distributed and the Second Amendment Foundation's members for exercising their right to speak freely about firearms.  Hence, Defense Distributed and the Second Amendment Foundation sue Grewal to halt his censorship under 42 U.S.C. § 1983.

4

## II.     Parties

### A.     Defense Distributed

4.     Plaintiff Defense Distributed is a private business corporation that is headquartered and has its principal place of business in Austin, Texas.  It did so at all relevant times in the past.

5.     Currently and at all relevant times in the past, most of Defense Distributed's activities, including research, design, development, manufacturing, and publishing occurred in and around Austin.

6.     Currently and at all relevant times in the past, all of Defense Distributed's employees lived in or near Austin.

7.     Currently and at all relevant times in the past, a public library that displayed Defense Distributed's publications from time to time has been in Austin, Texas.

8.     Cody Wilson founded Defense Distributed.

9.     Cody Wilson serves as Defense Distributed's Director.

### B.     Second Amendment Foundation, Inc.

10.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of the State of Washington.  SAF's principal place of business is in Bellevue, Washington.

11.     SAF promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control.  Some SAF members seek to receive the computer files that Defense Distributed seeks to publish, and some SAF members seek to share their own computer files by utilizing Defense Distributed's facilities.  These SAF members seek to exchange this information because of its technical, scientific, artistic, and political value.

5

12.     SAF brings this action on behalf of itself.  SAF also brings this action on behalf of its members because at least one of its members would have standing to sue in his own right, the interests the suit seeks to vindicate are germane to the SAF's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

**C.      The NJAG**

13.     Defendant Matthew J. Platkin is the current New Jersey Attorney General.  In that capacity, he is responsible for all of the New Jersey civil and criminal enforcement efforts at issue. He is sued for declaratory and injunctive relief in his official capacity.

**III.    Subject Matter Jurisdiction**

14.     28 U.S.C. § 1331 supplies the Court with original federal question jurisdiction over this action because it arises under the Constitution and laws of the United States.

15.     28 U.S.C. § 1332 supplies the Court with original diversity jurisdiction over this action because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

16.     28 U.S.C. § 1343 supplies the Court with original federal question jurisdiction over this action because it is an action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and statutes providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

17.     28 U.S.C. § 1367 supplies the Court with supplemental subject-matter jurisdiction over the action's state-law claims because the state-law claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  The action's state-law claims do not raise novel or

6

complex issues of state law.  The action's state-law claims do not substantially predominate over the claim or claims over which the district court has original jurisdiction.

18.     This action seeks declaratory, injunctive, and other relief pursuant to the Constitution of the United States of America, 5 U.S.C. § 702, 5 U.S.C. § 705, 5 U.S.C. § 706, 28 U.S.C. § 1651(a), 28 U.S.C. § 2201, 28 U.S.C. § 2202, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

19.     There exists an active, justiciable controversy amongst the parties about whether The NJAG's civil and criminal censorship actions violate Defense Distributed and SAF's rights under the Constitution and other federal laws.  Declaratory relief will resolve this controversy and eliminate the burden imposed on Plaintiffs stemming therefrom.

**IV.     Venue**

20.     This Court constitutes a proper venue for this action because a substantial part of the events or omissions giving rise to the claims occurred here.  *See*  28 U.S.C. § 1391(e)(1)(B).

21.     This Court constitutes a proper venue for this action because a substantial part of the property that is subject of the action is situated here.  *See* 28 U.S.C. § 1391(b)(2).

22.     This action arises from actions that the NJAG took and intends to take against Defense Distributed's activities in Austin, Texas and Defense Distributed's property in Austin, Texas.  *See Def. Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020).

23.     For the reasons explained at length already, Plaintiffs submit that the correct venue to which this case should be transferred is the United States District Court for the Western District of Texas.  *See* Doc. 78-01.

**App. 255**

## V.        Facts

### A.        Digital Firearms Information is Speech.

24.        This action concerns digital firearms information.  Digital firearms information is "digital" because it exists in the form of coded computer files, as opposed to analog media like printed books.  It is "information" because it conveys knowledge without advocating action.  It pertains to both entire firearms and individual firearm components, and addresses their physical properties, production methods, and uses.

25.        Digital firearms information exists in a wide variety of computer file formats. Common formats include portable document format (.pdf) files, DWG (.dwg) files, Standard for the Exchange of Product Data ("STEP") (.stp) files, stereolithography (.stl) files, Initial Graphics Exchange Specification (.igs) files, SoLiDworks PaRT (.sldprt) files, and SketchUp (.skp) files, as well as plain text (.txt) files with notes, instructions, and comments.

26.        Digital firearms information includes, but is not limited to, what authorities refer to as "Computer Aided Design files" or "CAD files."  *See, e.g.*, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020).  CAD files are used primarily for abstract design.  Users with the requisite computer hardware, software, and expertise can employ CAD files to construct and manipulate complex two- and three-dimensional digital models of physical objects.  These models serve a wide variety of important purposes apart from object fabrication.  Examples include the computerized study of object properties, rendition of object images for product visualization, and parametric modeling of object families.   According to authorities, CAD files are not ready for insertion into

8

object-producing equipment such as computer numerically controlled machine tools and additive manufacturing equipment (e.g., 3D printers).  *See, e.g.*, *id.*

27.     Digital firearms information also includes, but is not limited to, what authorities refer to as "Computer Aided Manufacturing files" or "CAM files."  *See, e.g.*, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020).  Like CAD files, CAM files can be used to construct and manipulate the digital two-  and three-dimensional models of physical objects that serve design purposes apart from production. According to authorities, unlike CAD files, CAM files are ready for insertion into object-producing equipment such as computer numerically controlled machine tools and additive manufacturing equipment (*e.g.*, 3D printers).  *See, e.g.*, *id.*

28.     With respect to 3D-printing processes in particular, CAD files and CAM files do not produce anything automatically.  They are not functional software.  They do not self-execute. They are mere information stores.  To fabricate an object as designed in a CAD or CAM file, a user must know how and choose to orchestrate a process involving substantial additional software (to interpret and implement the files into the motions of a 3D print head), substantial additional hardware (e.g., the computer running the software, the 3D printer), substantial physical labor, substantial amounts of time, and the requisite raw materials.

29.     The physical laws governing 3D-printer fabrication processes apply to all objects, including firearms.  Even with a perfectly accurate set of digital firearms information, the most powerful software, and a state-of-the-art 3D printer, the digital model of a firearm component does not fabricate the component on its own.  Firearm component fabrication is not an automatic process.  It occurs only if and when a person chooses to perform a complex series of actions

9

entailing considered volition and judgment, such as adapting and tailoring the design, selecting suitable component materials, choosing an effective manufacturing process, and opting to personally complete an extensive set of fabrication steps with the requisite software, hardware, and raw materials.

**B.      Defense Distributed's Digital Firearms Information Publications.**

30.     Defense Distributed exists to promote the Second Amendment's individual right to keep and bear Arms.  To that end, Defense Distributed has published, is publishing, and intends to continue publishing digital firearms information to the American public.

31.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing is an important expression of technical, scientific, artistic, and political matter.  Each and every computer file at issue has these values in the abstract, apart from any application that the information's recipient might choose to devote it to. Akin to blueprints, each computer file's sole purpose is to supply information in the abstract.  It is constitutionally protected speech in every respect.

32.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing includes, but is not limited to, what authorities refer to as "Computer Aided Design files" or "CAD files."  *See, e.g.*, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020).

33.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing includes, but is not limited to, what authorities refer to as "Computer Aided Manufacturing files" or "CAM files."  *See, e.g.*, *id.*

10

34.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing includes, but is not limited to, non-CAD and non-CAM files such as plain text (.txt) files with notes, instructions, and comments.

35.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing pertains to both entire firearms and to individual firearm components.  A representative example of the digital firearms information that Defense Distributed has published concerns the single-shot pistol known as the "Liberator."

36.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing does not and is not intended to advocate action.  It especially does not advocate or intend to advocate any imminent action.

37.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing does not and is not intended to incite action.  It especially does not incite or intend to incite any imminent action.

38.     The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing does not and is not intended to produce action.  It especially does not produce or intend to produce any imminent action.

39.     None of the digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing involves "imminent" fabrication.  The 3D-printing technologies at issue necessarily require a user to knowingly apply deliberate, focused will over the course of an extended period of time to fabricate an object.

40.     Defcad.com (hereinafter "DEFCAD") is a website for which Defense Distributed is and at all relevant times has been responsible.  Via DEFCAD, Defense Distributed has published, republished, and facilitated the distribution of a wide variety of digital firearms information.

11

### 1.   Defense Distributed's 2012–2013 Publications.

41.   From approximately December 2012 to May 2013, Defense Distributed published a substantial set of computer files with digital firearms information to DEFCAD by letting any site visitor download them directly for free.  The computer files with digital firearms information published via DEFCAD during this period included the following:

(a)   files concerning a single-shot firearm known as the "Liberator";

(b)   files concerning a firearm receiver for AR-15 rifles;

(c)   files concerning a magazine for AR-15 rifles;

(d)   stereolithography (.stl) files about firearm components;

(e)    Initial Graphics Exchange Specification (.igs) files about firearm components;

(f)   SoLiDworks PaRT (.sldprt) files about firearm components;

(g)   SketchUp (.skp) files about firearm components;

(h)   Standard for the Exchange of Product Data ("STEP") (.stp) files about firearm components;

(i)   diagrams of firearm components;

(j)   renderings;

(k)    "read me" plain text files about firearm assembly methods;

(l)    "read me" plain text files about the National Firearms Act and the Undetectable Firearms Act; and

(m)   software licenses.

42.   The computer files that Defense Distributed published to DEFCAD during this period were downloaded millions of times.

12

###### 2.    Defense Distributed's July 2018 Publications.

43.    From the evening of July 27, 2018 until the afternoon of July 31, 2018, Defense Distributed published a substantial set of computer files with digital firearms information to DEFCAD by letting any site visitor download them directly for free.  The State Department provided advance approval of these publications.   The computer files with digital firearms information so published via DEFCAD during this period included the following:

(a)    files concerning a single-shot firearm known as the "Liberator";

(b)    files concerning an assembly of the AR-15 rifle and magazine;

(c)    files concerning an assembly of the AKM rifle and magazine;

(d)    stereolithography (.stl) files about firearm components;

(e)    Initial Graphics Exchange Specification (.igs) files about firearm components;

(f)    SoLiDworks PaRT (.sldprt) files about firearm components;

(g)    SketchUp (.skp) files about firearm components;

(h)    Standard for the Exchange of Product Data ("STEP") (.stp) files about firearm components;

(i)    diagrams of firearm components;

(j)    renderings;

(k)    NC files concerning fire control pocket milling;

(l)    "read me" plain text files about firearm assembly methods;

(m)    "read me" plain text files about the National Firearms Act and the Undetectable Firearms Act; and

(n)    software licenses.

13

44.     The computer files that Defense Distributed published to DEFCAD during this period were downloaded hundreds of thousands of times.

45.     During this period, Defense Distributed also published the same computer files with digital firearms information at a brick-and-mortar public library in Austin, Texas by hosting the computer files in formats that patrons could access via computer workstations.

### 3.     Defense Distributed's August–November 2018 Publications.

46.     From approximately August 2018 to November 2018, Defense Distributed distributed a substantial set of computer files with digital firearms information via the mail by making its computer files available for shipment on physical storage devices.  Defense Distributed did so by using an ecommerce platform on DEFCAD to facilitate the transaction and using the U.S. Postal Service as its means of delivering the information.  After customers entered an order using DEFCAD's online ecommerce platform, Defense Distributed put the information on a USB drive or SD card and mailed the drive or card to customers via the U.S. Postal Service.

47.     During this period, Defense Distributed also offered and advertised its mailed distribution of digital firearms information to potential recipients.  These efforts included advertisements and offers on DEFCAD itself, participation in trade shows, and e-mail advertisements.

48.     For anyone dealing with digital firearms information, the postal mail alternative to internet publication is not an adequate substitute.  Internet communication of and about Defense Distributed's digital firearms information is essential for many reasons.  Moreover, internet communication is important because it is the *only* way to ensure open source development and commitment to the public domain/ placement outside the bounds of intellectual property strictures.

14

### 4.  Defense Distributed's 2020-Present Publications.

49.  From March 27, 2020, to present, Defense Distributed published a substantial set of computer files with digital firearms information via DEFCAD.  The computer files with digital firearms information published via DEFCAD during this period include original and legacy firearms models, CAD data, CAM data, blueprints and drawings.

50.  Unlike Defense Distributed's prior periods of publication on DEFCAD, Defense Distributed in this publication period did not let DEFCAD visitors download files freely.  In this publication period, Defense Distributed used DEFCAD to facilitate secure file transfer via electronic transmissions that comply with current federal law by, *inter alia*, utilizing secure end-to-end encryption.

51.  Unlike Defense Distributed's prior periods of publication on DEFCAD, Defense Distributed in this publication period did not let DEFCAD visitors access the files at issue without any screening.  In this publication period, Defense Distributed's screening procedures deemed certain DEFCAD visitors ineligible for file distribution.

52.  Unlike Defense Distributed's prior periods of publication on DEFCAD, Defense Distributed in this publication period did not let DEFCAD make files available to persons outside the United States.

53.  Unlike Defense Distributed's prior periods of publication on DEFCAD, Defense Distributed in this publication period did *not* make its files available to residents of and persons in the State of New Jersey who lack a federal firearms license.

54.  As compared to Defense Distributed's prior methods of publication on DEFCAD, Defense Distributed's latest method of publication on DEFCAD substantially burdens Defense

15

Distributed's exercise of free speech and would not be utilized but for the wrongful actions of the State Department and the NJAG.

55.     Currently, Defense Distributed continues to publish a substantial set of computer files with digital firearms information via DEFCAD in the manner that it has done so since March 27, 2020.  The number of files published in this manner to date is at least 16,354.

### 5.     Published files will always remain online.

56.     The computer files with digital firearms information that Defense Distributed published in the past will always be available on the internet, regardless of whether or not Defense Distributed itself continues to publish them.  Without any coordination, many recipients of Defense Distributed's digital firearms information have persistently republished those same files online via their own websites.  The independently-republished versions of Defense Distributed's files are not hidden in dark or remote recesses of the internet.  Simple Google searches yield the republished Defense Distributed files with ease.

### 6.     Defense Distributed's Future Publications.

57.     To the extent that and as soon as it is legal to do so, Defense Distributed currently intends to publish the following computer files with digital firearms information online at DEFCAD by letting any site visitor download them directly for free:

(a)     The computer files that Defense Distributed published online via DEFCAD from December 2012 to May 2013.  These include CAD files, CAM files, and non-CAD and non-CAM files.

(b)     The computer files that Defense Distributed published online via DEFCAD from July 27, 2018, to July 31, 2018.  These include CAD files, CAM files, and non-CAD and non-CAM files.

16

**App. 264**

(c)     The computer files that Defense Distributed published via the mail from late August 2018 through early November 2018.   These include CAD files, CAM files, and non-CAD and non-CAM files.

(d)     The computer files that Defense Distributed published online via DEFCAD from March 27, 2020, to present.   These include CAD files, CAM files, and non-CAD and non-CAM files.

(e)     Computer files authored by Defense Distributed that Defense Distributed has not published before.   These include CAD files, CAM files, and computer files with other digital firearms information.

**C.     The State Department's International Traffic in Arms Regulations.**

58.     The Arms Export Control Act of 1976, 22 U.S.C. ch. 22 (the "AECA"), addresses the President's authority to control the import and export of defense articles and defense services.

59.     The International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130 ("ITAR"), constitute AECA's primary implementing regulations.

60.     The State Department administers the AECA and the ITAR.   Within the State Department, primary responsibility for administering the AECA and the ITAR lies with the Directorate of Defense Trade Controls ("DDTC") in the Bureau of Political-Military Affairs.

61.     The AECA provides that "no defense articles or defense services . . . may be exported or imported without a license for such export or import."   22 U.S.C. § 2778(b)(2).   It provides for criminal penalties up to a $1,000,000 fine and 20 years in prison for "[a]ny person who willfully violates any provision of this section ... or any rule or regulation issued under this section." *Id.* § 2778(c).

17

62.     The AECA authorizes the President "to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List." *Id.* § 2778(a)(1).  The President, by executive order, has delegated to the State Department the authority to regulate under the AECA and to designate defense "articles" and "services" for inclusion on the United States Munitions List ("USML"). *See* Exec. Order No. 13,637, § 1(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013).

63.     DDTC has from time to time promulgated regulations known as the International Traffic in Arms Regulations ("ITAR"). *See* 22 C.F.R. pts. 120-130 (2019). The ITAR make it unlawful to, *inter alia*, "export or attempt to export from the United States any defense article or technical data or to furnish or attempt to furnish any defense service for which a license or written approval is required" without such a license. *Id.* § 127.1(a)(1).

64.     The ITAR's definition of "export" includes the "actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner." *Id.* § 120.17(a)(1).  The ITAR also provides that a "deemed export," defined as "[r]eleasing or otherwise transferring technical data to a foreign person in the United States," constitutes an "export." *Id.* § 120.17(a)(2).

65.     The ITAR also include, at 22 C.F.R. § 121.1, the USML, which enumerates the "articles, services, and related technical data [that] are designated as defense articles or defense services" for purposes of the AECA and ITAR. Id. § 121.1(a).  The USML organizes the designated items into twenty-one categories, encompassing various forms of weaponry, ammunition, explosives, military-type equipment and vessels, toxicological agents, classified data, and more.  Each of the twenty-one categories includes as a designated item "[t]echnical data" and

18

"defense services" that are "directly related to the defense articles" listed in that category. *See, e.g.*, id. §§ 121.1(I)(i), (II)(k), (III)(e), (IV)(i), (V)(j), (VI)(g), (VII)(h).   The ITAR define "technical data" to include "[i]nformation ... required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a)(1).

**D.**   ***Defense Distributed I*: Litigation**

66.   "*Defense Distributed I*" refers to a federal civil action docketed in the United States District Court for the Western District of Texas, Austin Division as *Defense Distributed, et al. v. United States Department of State, et al.*, No. 1:15-CV-372-RP (W.D. Tex.), and in the United States Court of Appeals for the Fifth Circuit first as *Defense Distributed, et al. v. United States Department of State, et al.*, No. 15-50759 (5th Cir.) and later as *Defense Distributed, et al. v. United States Department of State, et al.*, No. 18-50811 (W.D. Tex.). *Defense Distributed I* yielded the following reported opinions:

(a)   *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015)

(b)   *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) (panel opinion)

(c)   *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 461–76 (Jones, J., dissenting)

(d)   *Def. Distributed v. U.S. Dep't of State*, 865 F.3d 211 (5th Cir. 2017) (Elrod, Jones, Smith and Clement, JJ., dissenting from the denial of rehearing en banc)

(e)   *Def. Distributed v. United States Dep't of State*, 947 F.3d 870 (5th Cir. 2020).

67.   The plaintiffs in *Defense Distributed I* were Defense Distributed, SAF, and an individual SAF member, Conn Williamson.

68.   The defendants in *Defense Distributed I* match the former defendants in this case: the United States Department of State, the Secretary of State, the State Department's Directorate

19

of Defense Trade Controls, the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs, and the Acting Director of the Office of Defense Trade Controls Policy Division. They are referred to collectively as "the State Department."

69.    *Defense Distributed I* concerned four categories of computer files defined by that action's pleadings: the "Published Files," the "Ghost Gunner Files," "CAD Files," and the "Other Files." Together, these categories of files are referred to as the "*Defense Distributed I* Files."

(a)    The "Published Files" category of *Defense Distributed I* Files consists of ten separate sets of files. It includes stereolithography (.stl) files about firearm components, Initial Graphics Exchange Specification (.igs) files about firearm components, SoLiDworks PaRT (.sldprt) files about firearm components, SketchUp (.skp) files about firearm components, Standard for the Exchange of Product Data ("STEP") (.stp) files about firearm components, diagrams of firearm components, renderings, "read me" plain text files about firearm assembly methods, "read me" plain text files about the National Firearms Act and the Undetectable Firearms Act, and software licenses. From approximately December 2012 to May 2013, Defense Distributed published these files to DEFCAD for free download by the public.

(b)    The "Ghost Gunner Files" category of *Defense Distributed I* Files consists of software, data files, project files, coding, and models containing technical information for a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts.

20

(c)     The "CAD Files" category of *Defense Distributed I* Files consists of STEP (.stp) and stereolithography (.stl) files about a lower receiver to the AR-15 rifle.

(d)     The "Other Files" category of *Defense Distributed I* Files consists of files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet; provided, however, that this category only extends insofar as those files regard items that, as of June 29, 2018, were exclusively: (i) in Category I(a) of the United States Munitions List, as well as barrels and receivers covered by Category I(g) of the United States Munitions List that are components of such items; or (ii) items covered by Category I(h) of the United States Munitions List solely by reference to Category I(a), excluding Military Equipment.

70.     *Defense Distributed I* began after the State Department used the AECA and ITAR regime to impose an illegal prior restraint on public speech concerning technical firearms data, including the *Defense Distributed I* Files.  Under this regime, the State Department required that Defense Distributed obtain prior United States government approval before publication of the *Defense Distributed I* Files could occur on the internet and at other public venues.

71.     The *Defense Distributed I* plaintiffs challenged the legality of the State Department's enforcement of the AECA/ITAR regime vis-à-vis the *Defense Distributed I* Files. In particular, they challenged the State Department's governance of the *Defense Distributed I* Files as ultra vires action not authorized by the statutes and regulations at issue, and as violations of the First, Second, and Fifth Amendments of the Constitution.

21

72.     At a preliminary stage, the district court in *Defense Distributed I* denied the *Defense Distributed I* plaintiffs' motion for a preliminary injunction. *Def. Distributed v. Dep't of State*, 121 F. Supp.3d 680 (W.D. Tex. 2015).

73.     An interlocutory appeal of the *Defense Distributed I* preliminary injunction denial was taken to the Fifth Circuit.  A divided Fifth Circuit panel affirmed the district court's decision. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  But it declined to reach the merits, ruling solely based on "the balance of harm and the public interest." *Id.* at 461.

74.     The merits of *Defense Distributed I*'s preliminary injunction were, however, reached by two important opinions.  Judge Jones emphasized the protected nature of this speech in a panel dissent: "the State Department's application of its 'export' control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint." *Id.* at 463–64. (Jones, J. dissenting).  The judges dissenting from the denial of rehearing en banc also reached the merits. *Def. Distributed v. U.S. Dep't of State*, 865 F.3d 211 (5th Cir. 2017).  Their opinion explained that the lower court's "flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content based prior restraint." *Id.* at 212.

E.     *Defense Distributed I*: **Settlement Agreement**

75.     After the *Defense Distributed I* interlocutory appeal concluded, the district court in *Defense Distributed I* ordered the parties to engage in settlement negotiations.  The parties did so successfully and settled their dispute by agreement.

76.     The *Defense Distributed I* settlement amounted to a victory for the plaintiffs.  Press reports correctly understood that the State Department's decision to settle "essentially surrenders"

22

to the constitutional challenge Defense Distributed and SAF had been pressing all along; that the settlement "promises to change the export control rules surrounding any firearm below .50 caliber – with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition – and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the internet"; and that, in the meantime, the settlement "gives [Defense Distributed] a unique license to publish data about those weapons anywhere [it] chooses."  Andy Greenberg, *A Landmark Legal Shift Opens Pandora's Box for DIY Guns*, Wired Magazine (July 18, 2018), available at https://bit.ly/2QK3is6.

77.     The *Defense Distributed I* settlement agreement is memorialized by the "Settlement Agreement": a written contract that all sides executed validly on June 29, 2018.  A copy of that instrument is attached to this complaint as Exhibit A.  Among other things, the Settlement Agreement obligates the State Department to do the following:

(a)     Settlement Agreement Paragraph 1(a) - New Rule

Settlement Agreement Paragraph 1(a) requires the State Department to draft and fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising United States Munitions List ("USML") Category I to exclude the *Defense Distributed I* Files.  The pertinent text provides as follows: "Defendants agree to the following . . . : (a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action."

23

(b)  Settlement Agreement Paragraph 1(b) - Temporary Modification:

Settlement Agreement Paragraph 1(b) requires the State Department to announce, while the above-referenced final rule is in development, a temporary modification, consistent with International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the *Defense Distributed I* Files; and to publish the announcement on the Directorate of Defense Trade Controls website on or before July, 27, 2018.  The pertinent text provides as follows: "Defendants agree to the following . . . (b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action.  The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

(c)  Settlement Agreement Paragraph 1(c) - License

Settlement Agreement Paragraph 1(c) requires the State Department to issue a license to the *Defense Distributed I* plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13).  The pertinent text provides as follows: "Defendants agree to the following . . . (c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls,

24

advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution ) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval."

(d)    Settlement Agreement Paragraph 1(d) - Acknowledgement

Settlement Agreement Paragraph 1(d) requires the State Department to acknowledge and agree that the temporary modification of USML Category I permits any United States person, to include Defense Distributed's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the *Defense Distributed I* Files, and that the license issued to the *Defense Distributed I* plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.  The pertinent text provides as follows: "Defendants agree to the following . . . (d)  Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

25

**App. 273**

78.     The Settlement Agreement binds all of the parties to *Defense Distributed I* and all of this action's parties.   Settlement Agreement paragraph 7 provides that the "Settlement Agreement" shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and the respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interest of obligations of the Parties."

**F.      Settlement Agreement Fulfillment Begins**

79.     After the Settlement Agreement's execution on July 27, 2018, the State Department began to fulfill—temporarily—certain of its Settlement Agreement obligations:

(a)     Settlement Agreement Paragraph 1(a) - New Rule

By July 27, 2018, the State Department had taken steps to comply with the obligation imposed by Settlement Agreement Paragraph 1(a).  It published in the Federal Register a notice of proposed rulemaking revising USML Category I to exclude the *Defense Distributed I* Files.  *See* 83 Fed. Reg. 24,198 (May 24, 2018).

(b)     Settlement Agreement Paragraph 1(b) - Temporary Modification

By July 27, 2018, the State Department had taken steps to comply with the obligation imposed by Settlement Agreement Paragraph 1(b).  It made a temporary modification to USML Category I, pursuant to 22 C.F.R. § 126.2, to "exclude" the *Defense Distributed I* Files from Category I.  A copy of that instrument is attached to this complaint as Exhibit B.

(c)     Settlement Agreement Paragraph 1(c) - License

By July 27, 2018, the State Department had taken steps to comply with the obligation imposed by Settlement Agreement Paragraph 1(c).  It issued Defense Distributed a license—a letter issued by the State Department's Acting Deputy

26

Assistant Secretary for the Directorate of Defense Trade Controls—authorizing the Defendants to publish the Published Files, Ghost Gunner Files, and CAD Files for "unlimited distribution."  A copy of that instrument is attached to this complaint as Exhibit C.

(d)      Settlement Agreement Paragraph 1(d) - Acknowledgement

By July 27, 2018, the State Department had taken steps to comply with the obligation imposed by Settlement Agreement Paragraph 1(d).  It acknowledged and agreed that the temporary modification permits any United States person to access, discuss, use, reproduce, or otherwise benefit from the *Defense Distributed I* Files; and that the license issued to the *Defense Distributed I* plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.  *See* Ex. A at 2.

80.      On June 29, 2018, the parties to *Defense Distributed I* filed a joint stipulation of dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  The filing provided as follows: "Pursuant to Federal Rule of Civil Procedure 41 (a)( I )(A)(ii) and 41(a)( I )(B), and a settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson) and Defendants (the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls. and the Director, Office of Defense Trade Controls Policy), the Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action."

81.      On July 30, 2018, the *Defense Distributed I* district court entered an order providing that "the case is **DISMISSED WITH PREJUDICE**" and the "action is **CLOSED**."

27

82.     The State Department's temporary fulfillment of the Settlement Agreement obligations lasted from July 27, 2018 until the afternoon of July 31, 2018.  During that period, Defense Distributed engaged in the publication addressed *supra* at Part V.B.2 ("Defense Distributed's July 2018 Publications").

**G.     The State Department Stopped Fulfilling the Settlement Agreement**

83.     On July 30, 2018, the NJAG and a group of state attorneys general (hereinafter "the States") initiated a civil action against the State Department, Defense Distributed, SAF, and Conn Williamson.  The States chose to sue in their forum of choice, the Western District of Washington's Seattle division, before Judge Robert Lasnik.  The suit was docketed in the district court as *State of Washington et al., v. United States Department of State et al.*, No. 2:18-cv-1115-RSL.

84.     The NJAG explained the nature of the States' involvement in this litigation by saying the following on the record: "The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."

85.     The States' *Washington* complaint alleged that, by issuing the Temporary Modification and license, the State Department had violated the Administrative Procedure Act (APA).  The suit sought a preliminary nationwide injunction and a final judgment vacating the Temporary Modification and license.  These claims went against the State Department alone.

86.     The Settlement Agreement was never the subject of any claim in the *Washington* case.  The States never claimed that the Settlement Agreement was illegal and never sought relief against the Settlement Agreement.  Their only claims targeted two of the actions the State Department took in an attempt to fulfill the Settlement Agreement.

87.     Nor were Defense Distributed and SAF the subject of any claim.  The States asserted no cause of action and sought no relief against Defense Distributed or SAF.  The APA

28

claim about the license went against the State Department alone, did not allege that Defense Distributed or SAF did anything wrong, and did not seek relief against them.  Likewise for the APA claim about the Temporary Modification.  It too went against the State Department alone, did not allege that Defense Distributed or SAF did anything wrong, and did not seek relief against Defense Distributed or SAF.

88.    On July 31, 2018, the States obtained from the United States District Court for the Western District of Washington a temporary restraining order against the State Department: "The federal government defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo ex ante as if the modification had not occurred and the letter had not been issued."

89.    A key concession occurred during the preliminary injunction proceedings: Both the State Department and the States conceded that there *is nothing inherently illegal about the computer files at issue*.  Aside from concerns about Defense Distributed's files being *on the internet*, the States and State Department took no issue with anyone's right to distribute the very same computer files via other channels.  At the preliminary injunction hearing, counsel for the States took the position that, apart from internet publication, Defense Distributed had a right to distribute digital firearms information via the mail or otherwise "hand them around domestically" without violating any law.  Counsel for the State Department agreed, stating that, "even if the Court were to grant plaintiffs every ounce of relief that they seek in this case, Defense Distributed could still mail every American citizen in the country the files that are at issue here."  In light of

29

this concession, Defense Distributed engaged in the publication addressed *supra* at Part V.B.3 ("Defense Distributed's August-November 2018 Publications").

90.     On August 27, 2018, the States obtained from the United States District Court for the Western District of Washington a preliminary injunction against the State Department: "The federal defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo ex ante as if the modification had not occurred and the letter had not been issued until further order of the Court." *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1264 (W.D. Wash. 2018).

91.     Even though the State Department had a right to appeal the *Washington* case's preliminary injunction decision, and even though it had preserved arguments that would have succeeded in having the district court's judgment vacated or reversed, the State Department refused to appeal.  It let the deadline for that interlocutory appeal come and go without taking any appellate action.  The State Department refused to appeal this preliminary injunction because of partisan politics and in spite of federal legal advisors that deemed an appeal legally necessary.

92.     The rest of the *Washington* case's key decisions occurred on summary judgment. On the merits, the *Washington* district court accepted both of the States' APA claims.  First, the *Washington* district court held that the State Department's issuance of the Temporary Modification was "without observance of procedure required by law," 5 U.S.C. § 706, because a Congressional notice requirement had not been met.  *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130, 1141-43   (W.D. Wash. 2019).   Second,   the   *Washington*   district   court   held   that   the   State

30

Department's issuance of both the Temporary Modification and the license were "arbitrary and capricious," 5 U.S.C. § 706, because of insufficient explanation and evidentiary support in the administrative record. *Id.* at 1144-47. Neither of these claims are meritorious.

93. The *Washington* action's final judgment orders as follows: "The July 27, 2018, 'Temporary Modification of Category I of the United States Munitions List' and letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation were unlawful and are hereby VACATED." Part of the *Washington* district court's decision addressed the First Amendment implications of vacating the Temporary Modification and license. It held the Constitution's First Amendment was "not relevant to the merits": "Whether or not the First Amendment precludes the federal government from regulating the publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation." *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130, 1147 (W.D. Wash. 2019). It also held that the First Amendment can be "abridged" so long as it is not "abrogated." *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1264 (W.D. Wash. 2018).

94. Defense Distributed and SAF demanded that the State Department appeal. The demand asserted that a failure to appeal constituted a breach of the Settlement Agreement. The demand occurred in a January 15, 2020, letter from counsel for Defense Distributed and SAF to the State Department. A copy of that instrument is attached to this complaint as Exhibit E.

95. Even though the State Department had a right to appeal the final judgment, and even though it had preserved arguments that would have succeeded in having the district court's judgment vacated or reversed, the State Department refused to appeal. It let the deadline for that appeal come and go without taking any appellate action. The State Department refused to appeal

this final injunction because of partisan politics and in spite of federal legal advisors that deemed an appeal legally necessary.

96. Defense Distributed and SAF appealed the *Washington* action's final judgment. Defense Distributed's appellant's brief showed that the district court both lacked subject-matter jurisdiction because of multiple Article III shortcomings and was wrong on the merits because the APA cannot require abridgement of the First Amendment. So rather than be squarely defeated, the States moved to dismiss both appeals as moot. Defense Distributed and SAF responded jointly, opposing the dismissal request with several categories of argument. First, the response defeated the States' mootness suggestion on its own terms. Second, it showed that mootness-based dismissals cannot occur unless and until disputes regarding the district court's subject-matter jurisdiction are resolved. Third, the response showed that, if the case were moot, *Munsingwear* required vacatur of the district court's judgment.

97. The *Washington* action's Ninth Circuit panel accepted the mootness suggestion and dismissed the appeal. *Washington v. Def. Distributed*, No. 20-35030, 2020 WL 4332902 (9th Cir. July 21, 2020). Its order gives no meaningful indication of the mootness reasoning. It says nothing about the district court's jurisdiction. And it says nothing about *Munsingwear*, silently leaving the district court's judgment intact. A petition for rehearing en banc is now pending.

**1. The State Department disavowed the license.**

98. On or before August 2, 2018, the State Department disavowed the license it had originally issued to Defense Distributed and SAF in July 2018.

99. The State Department's disavowal of the July 2018 license constitutes final agency action.

32

**App. 280**

100.     The State Department's disavowal of the July 2018 license is reflected in an August 2, 2018, letter from counsel for the State Department.  A copy of that instrument is attached to this complaint as Exhibit D.

101.     The August 2, 2018, letter from counsel for the State Department established that, as of August 2, 2018, the State Department had decided to proceed as though the July 2018 license "had not been issued."  This indicates the State Department's disavowal of the July 2018 license.

102.     The August 2, 2018, letter from counsel for the State Department establishes that, as of August 2, 2018, the State Department had decided to proceed as though the license was a "nullity."  This letter indicates the State Department's disavowal of the July 2018 license.

**2.     After disavowal, the State Department refused to supply a license.**

103.     After the State Department disavowed the license it had originally issued to Defense Distributed and SAF in July 2018, the State Department refused to supply Defense Distributed and SAF with the license that Settlement Agreement Paragraph 1(c) requires the State Department to supply.

104.     The State Department's refusal to supply Defense Distributed and SAF with the license that Settlement Agreement Paragraph 1(c) requires the State Department to supply entitles them to constitutes final agency action.

105.     Defense Distributed and SAF demanded that the State Department issue a license in compliance with Settlement Agreement Paragraph 1(c) on January 15, 2020.  They did so by transmitting a letter from counsel for Defense Distributed and SAF to counsel for the State Department.  A copy of that instrument is attached to this complaint as Exhibit E.

106.     Defense Distributed and SAF demanded that the State Department issue a license in compliance with Settlement Agreement Paragraph 1(c) on February 11, 2020.  They did so by

33

transmitting a letter from counsel for Defense Distributed and SAF to counsel for the State Department.  A copy of that instrument is attached to this complaint as Exhibit F.

**3.     The State Department disavowed the Temporary Modification.**

107.    On or before August 2, 2018, the State Department disavowed the Temporary Modification that it had originally issued in July 2018.

108.    The State Department's August 2018 disavowal of the July 2018 Temporary Modification constitutes final agency action.

109.    The State Department's disavowal of the July 2018 Temporary Modification is reflected in the August 2, 2018, letter from counsel for the State Department. A copy of that instrument is attached to this complaint as Exhibit D.

110.    The August 2, 2018, letter from counsel for the State Department establishes that, as of August 2, 2018, the State Department had decided to cease "implementing or enforcing" the July 2018 Temporary Modification.  This letter indicates the State Department's disavowal of the July 2018 Temporary Modification.

111.    The August 2, 2018, letter from counsel for the State Department establishes that, as of August 2, 2018, the State Department had decided to proceed as though the July 2018 Temporary Modification "had not occurred."  This indicates the State Department's disavowal of the July 2018 Temporary Modification.

112.    The State Department removed the July 2018 Temporary Modification from its website on July 31, 2018.  This removal indicates the State Department's disavowal of the July 2018 Temporary Modification.

34

### 4. After disavowal, the State Department refused to supply a Temporary Modification.

113. After the State Department disavowed the July 2018 Temporary Modification, the State Department refused to supply Defense Distributed and SAF with the temporary modification that Settlement Agreement Paragraph 1(b) requires the State Department to supply.

114. The State Department's refusal to supply Defense Distributed and SAF with the temporary modification that Settlement Agreement Paragraph 1(b) requires the State Department to supply constitutes final agency action.

### 5. The State Department failed to supply the required regulatory changes.

115. The State Department refused to supply Defense Distributed and SAF with the regulatory results that Settlement Agreement Paragraph 1(a) requires the State Department to supply.

116. The State Department's refusal to supply Defense Distributed and SAF with the regulatory results that Settlement Agreement Paragraph 1(a) requires the State Department to supply constitutes final agency action.

117. The State Department's refusal to supply Defense Distributed and SAF with the regulatory results that Settlement Agreement Paragraph 1(a) requires the State Department to supply constitutes a breach of the Settlement Agreement.

118. The State Department issued a new final rule that pertains to the Settlement Agreement in January 2020. *See* International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 Fed. Reg. 3819 (Jan. 23, 2020). It did so in conjunction with a new rule issued by the Commerce Department. *See* Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020). These new rules do

35

not discharge the State Department's obligations under Settlement Agreement Paragraph 1(a) because they do not exclude *all* of the technical data that was the subject of *Defense Distributed I* from United States Munitions List ("USML") Category I.  Separately, these new rules do not discharge the State Department's obligations under Settlement Agreement Paragraph 1(a) because they have been enjoined by the United States District Court for the Western District of Washington.

119.    On April 29, 2020, Defense Distributed and SAF demanded that the State Department supply Defense Distributed and SAF with the regulatory results that Settlement Agreement Paragraph 1(a) requires the State Department to supply.  They did so by transmitting a letter from counsel for Defense Distributed and SAF to counsel for the State Department.  A copy of that instrument is attached to this complaint as Exhibit G.

### H.    The NJAG Censors Defense Distributed

#### 1.    The NJAG Engages in Civil Censorship

120.    On July 26, 2018, the NJAG issued Defense Distributed a formal cease-and-desist letter.  A copy is attached to this complaint as Exhibit H.

121.    The NJAG's July 26, 2018, cease-and-desist letter commanded Defense Distributed to cease publishing its digital firearms information: "You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents."  It repeatedly declared Defense Distributed's publication of digital firearms information to be a violation of New Jersey law.  It said that publication "violates New Jersey's public nuisance and negligence laws."  It said that publication "violates our public nuisance law."  It said that publication "constitute[s] a public nuisance."  It said that publication "is negligent."  It threatened to punish Defense Distributed for publishing any more digital firearms information: "If you do not halt your efforts to proceed with publication, I will bring legal action against your company before August 1, 2018."  It ended by

36

delivering another command backed by a threat of punishment: "As the chief law enforcement officer for New Jersey, I demand that you halt publication of the printable-gun computer files. Should you fail to comply with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018."

122.    On July 26, 2018, after sending the cease-and-desist letter, the NJAG issued a press release reiterating the threat: "Attorney General Grewal threatened Defense Distributed with 'legal action' if it fails to comply with his demand."   The press release also took the position that "[p]osting this material online is no different than driving to New Jersey and handing out hard-copy files on any street corner."

123.    On July 27, 2018, Defense Distributed responded to the NJAG's July 26, 2018, cease-and-desist letter with a letter of its own.   The response letter explained that "all actions contemplated by Defense Distributed are fully protected by the First Amendment," and that the Attorney General's "attempts to prevent such action constitute an unconstitutional prior restraint and otherwise violate the United States Constitution."   It also explained that Defense Distributed would attempt to restrict files made available on the internet to prevent download within New Jersey.   Finally, it demanded that General withdraw his cease-and-desist command.   He did not.

124.    On July 30, 2018, the NJAG took coercive action against Defense Distributed by targeting its internet service providers.

125.    DreamHost is a company that contracted to provide internet security services for Defense Distributed.   DreamHost's Acceptable Use Policy formed part of the contract between Defense Distributed and DreamHost.

126.    On July 30, 2018, the NJAG sent a letter to DreamHost.   A copy is attached to this complaint as Exhibit I.

37

127.     The NJAG's July 30, 2018, letter to DreamHost attempted to make DreamHost terminate its provision of services to Defense Distributed.  It declared that, by planning to publish digital firearms files on a website, "Defense Distributed is plainly planning to use the Defcad Website in a way that violates DreamHost's Acceptable Use Policy."  The letter declared that Defense Distributed's publication of digital firearms files violated New Jersey law.  It said that "posting them violates New Jersey's public nuisance and negligence laws."  It said that "posting them would . . . be illegal."

128.     On July 30, 2018, the NJAG sent a copy of the July 26, 2018, cease-and desist letter to Cloudflare, Inc.'s legal department.  Cloudflare, Inc., provides internet security services for Defense Distributed.

### 2.     The NJAG Engages in Criminal Censorship

129.     On November 8, 2018, New Jersey armed the NJAG with Senate Bill 2465's Section 3(*l*)2.  S. 2465, 218th Leg., Reg. Sess. (N.J. Nov. 2018) (codified as N.J. Stat. 2C:39-9(l)2)).  The law is codified as Section (*l*)(2) of New Jersey Code of Criminal Justice 2C:39-9.  Section (*l*)(2) creates the following speech crime:

> *l*. Manufacturing or facilitating the manufacture of a firearm using a three dimensional printer. In addition to any other criminal penalties provided under law it is a third degree crime for:
>
> . . .
>
> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: "three-dimensional printer" means a computer or computer-driven machine or device capable of producing a three-dimensional

38

object from a digital model; and "distribute" means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

N.J. Stat 2C:39-9(l)(2).

130.  Section (l)(2) is a speech crime.  It outlaws the sharing of digital firearms information.  With the NJAG as its prime enforcer, New Jersey's Section (l)(2) speech crime outlaws constitutionally protected speech that Plaintiffs would engage in but for the NJAG's enforcement threats.  Calling New Jersey's Section (l)(2) speech crime his favorite new "tool," the NJAG aims to jail Defense Distributed, SAF, the CodeIsFreeSpeech.com publishers, and anyone else that dares to exercise their right to share digital firearms information.

131.  New Jersey's Section (l)(2) speech crime does not criminalize conduct.  It criminalizes speech as such: any "digital instructions" that "may be used" by a person to "produce a firearm" with a "three dimensional printer."  N.J. Stat 2C:39-9(l)(2).  It is now a "third degree crime" to "distribute" that speech "to a person in New Jersey" (except for licensed manufacturers). *Id.*  Convictions under the NJAG's new speech crime entail a prison sentence of three to five years. N.J. Stat 2C:43-6.

132.  New Jersey's Section (l)(2) speech crime criminalizes every conceivable mode of communication.  No meaningful form of human interaction survives.  The keystone "distribute" term means "to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute."  N.J. Stat 2C:39-9(l)(2).  The law also specifies that it outlaws speech delivered "by any means," including "the Internet" and including standard postal "mail."  *Id.*

39

**App. 287**

133.    No type of digital firearms information survives New Jersey's Section (*l*)(2) speech crime either.   Section (*l*)(2) outlaws both "computer-aided design files" and "other code or instructions stored and displayed in electronic format as a digital model."  N.J. Stat 2C:39-9(*l*)(2).

134.    Information's actual use is irrelevant to New Jersey's Section (*l*)(2) speech crime. Section (*l*)(2) lets the NJAG jail speakers regardless of whether or not any actual danger or harm exists.  The crime occurs if the information "***may*** be used" in a proscribed way.  *Id.* (emphasis added).  Critically, the new speech crime also lacks any meaningful intent requirement.

135.    New Jersey's Section (*l*)(2) speech crime was enacted for the purpose of discriminating against and censoring Defense Distributed and SAF's members, in particular.

136.    At the Section (*l*)(2) speech crime's signing ceremony, New Jersey Governor Phil Murphy linked the bill to the cease-and-desist letter that the NJAG issued to Defense Distributed:

> The Attorney General has been a national leader in this fight.  Last June he issued ***a cease and desist letter to the companies that deal in ghost guns, saying explicitly that New Jersey is off limits to them***.  He joined likeminded attorneys general in successfully stopping in federal court the release of blueprints that would have allowed anyone with a computer and access to a 3D printer the ability to build their own, untraceable firearm.  This law that we're going to sign today further backs up his efforts, and I thank him for all that he has done.  Thank you, Gurbir.

137.    At the Section (*l*)(2) speech crime's signing ceremony, the NJAG said that the bill was a "stronger tool[]" that he could use to "stop" Defense Distributed founder "Cody Wilson" and "his supporters" from "release[ing] these codes online":

> [T]oday, we're . . . closing dangerous loopholes in our existing laws - loopholes that some companies and individuals have tried to exploit.  This summer, for example, ***a Texan named Cody Wilson*** promised to publicly release computer files that would let anyone, even terrorists, felons, and domestic abusers, create firearms using a 3D printer. . . .   And so back in July, we successfully challenged Cody Wilson in court.  We obtained legal orders that temporarily halted the release of these codes.  ***But his supporters are not relenting, they're still trying to release these codes online***.  And so it's clear that we need stronger tools to stop them . . . tools like the legislation crafted by Senator Cryan and that Governor Murphy is signing today.

40

138.    At the Section (*l*)(2) speech crime's signing ceremony, the NJAG said that Senate Bill 2465 was "right on point" to "address[] printable guns or ghost guns" and that it was enacted "to stop the next Cody Wilson, to fight the ghost gun industry":

> [E]arlier this year, we went after some of the biggest players in this industry.  We told them that they were wrong on the law.  We told them that they were, in fact, breaking the law here in New Jersey by selling those weapons here.  And we told them to stop.  And some of them complied.  But others did not, and so those investigations are ongoing at this time.
>
> But in both of those cases, ***bad actors were trying to take advantage of loopholes because no law squarely addressed printable guns or ghost guns***.  So we had to rely on other laws, like our public nuisance law or our assault weapons law, to fight back. Now don't get me wrong:  Those laws are important and they're great tools, and they helped us stop the spread of these dangerous, untraceable weapons.  ***But a law right on point strengthens law enforcement's hand even more.***
>
> And so today, there is no question that printable guns and ghost guns are deadly, and selling them in New Jersey is illegal.  And that's why I'm so proud to support Governor Murphy's efforts and the legislature's efforts to close those loopholes, ***to stop the next Cody Wilson, to fight the ghost gun industry***, and to regulate the next dangerous gun models before they spread into our communities.

139.    At the Senate Bill 2465 signing ceremony, the NJAG threatened to "come after" "anyone who is contemplating making a printable gun" and "the next ghost gun company":

> And here's my message today ***to anyone who is contemplating making a printable gun or to the next ghost gun company*** trying to sell their dangerous weapons into New Jersey: Your products are unlawful and if your break our laws ***we will come after you***. And to anyone else who thinks of trying to find other loopholes in our laws, especially to sell dangerous firearms, we're just as committed to ***stopping each of you***.

140.     A press release further touted the NJAG's enforcement threats.

141.    Defense Distributed knew of the Section (*l*)(2) speech crime passage on the day that it became law and witnessed the signing ceremony.  At that time, Defense Distributed reasonably feared that the NJAG would commence enforcement of the new law against Defense Distributed, its officers, its employees, and/or its agents at any moment.

41

142.    Hence, the NJAG is illegally censoring three distinct categories of Defense Distributed and SAF's speech.  If not for the NJAG's unconstitutional actions, Defense Distributed and SAF would be freely exercising their First Amendment rights.  These losses amount to irreparable harm in every instance.

143.    Category one is the free and open publication of digital firearms information on the internet to persons in New Jersey.  This right has been exercised in the past by Defense Distributed.  If not for the NJAG's ongoing censorship, this right would be exercised in the future by Defense Distributed and SAF and its members.

144.    Category two is the free and open publication of digital firearms information via the mail to persons in New Jersey.  This right has been exercised in the past by Defense Distributed.  If not for the NJAG's ongoing censorship, this right would be exercised in the future by Defense Distributed.

145.    Category three is the free and open offering and advertisement of digital firearms information to persons in New Jersey.  This right has been exercised in the past by Defense Distributed.  If not for the NJAG's ongoing censorship, this right would be exercised in the future by Defense Distributed and SAF and its members.

146.    The NJAG's criminal censorship covers all three categories of conduct.  Internet publications are covered because Section 3(l)(2) makes it a crime to distribute the banned "digital instructions" "by any means, including the Internet." N.J. Stat 2C:39-9(*l*)(2).  Mailed publications are covered because the speech crime also defines "distribute" to mean "mail."  And offers and advertisements are covered because Section 3(l)(2) defines "distribute" to mean "offer" and "advertise." *Id.*

42

147.    The NJAG's civil censorship covers all three categories of conduct as well.  His cease-and-desist order said to "halt publication" of any and all so-called "printable gun computer files."  The civil lawsuits sought prior restraints against all manner of "distributing" "printable-gun computer files."  And the threats against internet service providers targeted all "computer files" with digital firearms information.

148.    The NJAG's censorship of *non-internet speech* is completely unique.  Neither the federal government nor any other state government seeks to censor the non-internet speech of Defense Distributed and SAF that the NJAG does. The resulting censorship of constitutionally protected speech is uniquely attributable to the NJAG alone.

149.    The NJAG's censorship of *internet speech* is unique as well—both in breadth and nature.  His civil and criminal censorship efforts against Defense Distributed and SAF's internet speech apply to more speech than federal officials' efforts do, impose different burdens than federal officials' efforts do, and threaten far greater penalties than federal officials' efforts do.  The resulting censorship of constitutionally protected speech is uniquely attributable to the NJAG alone.

### I.    Irreparable Harm

#### 1.    The State Department's illegal conduct causes irreparable harm.

150.    In the past, the State Department's illegal conduct irreparably harmed Defense Distributed and SAF by abridging rights guaranteed by the First Amendment, Second Amendment, Fourteenth Amendment, and other federal speech protections.

151.    In the past, the State Department's illegal conduct irreparably harmed Defense Distributed and SAF by causing Defense Distributed and SAF to refrain from publishing digital firearms information that Defense Distributed and SAF had a right to publish, by causing Defense

43

Distributed and SAF to refrain from receiving digital firearms information that Defense Distributed and SAF had a right to receive, and by causing Defense Distributed and SAF to refrain from republishing digital firearms information that Defense Distributed had a right to republish.

152.   In the past, the State Department's illegal conduct irreparably harmed Defense Distributed and SAF by chilling Defense Distributed and SAF's exercise of First Amendment rights.

153.   In the past, the State Department's illegal conduct irreparably harmed Defense Distributed and SAF by chilling Defense Distributed and SAF's exercise of Second Amendment rights.

154.   At present, the State Department's illegal conduct irreparably harms Defense Distributed and SAF by abridging rights guaranteed by the First Amendment, Second Amendment, Fourteenth Amendment, and other federal speech protections.

155.   At present, the State Department's illegal conduct irreparably harms Defense Distributed and SAF by causing Defense Distributed and SAF to refrain from publishing digital firearms information that Defense Distributed and SAF have a right to publish, by causing Defense Distributed and SAF to refrain from receiving digital firearms information that Defense Distributed and SAF have a right to receive, and by causing Defense Distributed and SAF to refrain from republishing digital firearms information that Defense Distributed and SAF have a right to republish.

156.   At present, the State Department's illegal conduct irreparably harms Defense Distributed and SAF by chilling Defense Distributed and SAF's exercise of First Amendment rights.

44

157. At present, the State Department's illegal conduct irreparably harms Defense Distributed and SAF by chilling Defense Distributed and SAF's exercise of Second Amendment rights.

158. Absent relief from this Court, the State Department will continue to engage in the illegal conduct that has caused Defense Distributed and SAF irreparable harm in the past and is causing Defense Distributed and SAF irreparable harm at present.

**2.      The NJAG's illegal conduct causes irreparable harm.**

159. In the past, the NJAG's illegal conduct irreparably harmed Defense Distributed and SAF by abridging rights guaranteed by the First Amendment, Second Amendment, Fourteenth Amendment, and other federal law.

160. In the past, the NJAG's illegal conduct irreparably harmed Defense Distributed and SAF by causing them to refrain from publishing digital firearms information they have a right to publish, by causing them to refrain from receiving digital firearms information they have a right to receive, by causing them to refrain from republish firearms information they have a right to republish, and by chilling their exercise of First Amendment rights.

161. At present, the NJAG's illegal conduct irreparably harms Defense Distributed and SAF by abridging rights guaranteed by the First Amendment, Second Amendment, Fourteenth Amendment, and other federal law.

162. At present, the NJAG's illegal conduct irreparably harms Defense Distributed and SAF by causing them to refrain from publishing digital firearms information they have a right to publish, by causing them to refrain from receiving digital firearms information they have a right to receive, by causing them to refrain from republishing firearms information they have a right to republish, and by chilling their exercise of First Amendment rights.

App. 293

163.    Absent relief from this Court, the NJAG will continue to engage in the illegal conduct that has caused Defense Distributed and SAF irreparable harm in the past and is causing Defense Distributed and SAF irreparable harm at present.

164.    Defense Distributed refrains from freely and openly publishing digital firearms information via the internet to persons in New Jersey for fear of being punished by the NJAG. Once that threat ceases, Defense Distributed will resume engaging in this speech with persons in New Jersey and SAF's members in New Jersey will resume receiving it, benefitting from it, and republishing it.

165.    Defense Distributed refrains from freely and openly distributing digital firearms information via the mail to persons in New Jersey for fear of being punished by the NJAG. Once that threat ceases, Defense Distributed will resume engaging in this speech and SAF's members will resume receiving it, benefitting from it, and republishing it.

166.    Defense Distributed refrains from freely and openly offering and advertising its mailed digital firearms information to persons in New Jersey for fear of being punished by the NJAG. Once that threat ceases, Defense Distributed will resume making offers and advertisements about its mailed publications to persons in New Jersey.

167.    SAF members have received and republished Defense Distributed's digital firearms information in the past. But now they refrain from freely and openly receiving and republishing Defense Distributed's files for fear of being prosecuted by states like New Jersey. Once those threats cease, SAF's members will continue to freely and openly receive and republish information from Defense Distributed.

46

168.   Because of the NJAG's evident intention of enforcing Section (*l*)(2) against Defense Distributed and SAF, Defense Distributed and SAF have refrained from engaging in speech that Constitution and other federal law guarantees their right to engage in.

169.   If Defense Distributed publishes its digital firearms information via the internet by making its computer files freely and openly available for download on a website, the NJAG will enforce New Jersey's Section (*l*)(2) speech crime against Defense Distributed.  If SAF members publish or republish Defense Distributed's computer files via the internet by making them available for download on a website, the NJAG will enforce New Jersey's Section (*l*)(2) speech crime against them.

170.   If Defense Distributed publishes its digital firearms information via the mail by making its computer files available for shipment on physical storage devices to persons in New Jersey, the NJAG will enforce New Jersey's Section (*l*)(2) speech crime against Defense Distributed.  Likewise, if SAF members make Defense Distributed's computer files available for shipment on physical storage devices to persons in New Jersey, the NJAG will enforce New Jersey's Section (*l*)(2) speech crime against them.

171.   If Defense Distributed engages in advertising and offering activities regarding its files to persons in New Jersey, the NJAG will enforce New Jersey's Section (*l*)(2) speech crime against Defense Distributed.  Likewise, if SAF members engage in advertising and offering activities regarding Defense Distributed's files to persons in New Jersey, the NJAG will enforce New Jersey's Section (*l*)(2) speech crime against them.

## VI.   Former Causes of Action Against the State Department

172.   Although Plaintiffs maintain that their claims against the NJAG and State Department are equally viable and should be contained in the same action, the Court's order of

App. 295

April 26, 2023, requires the Plaintiffs to file an amended complaint removing allegations or claims against State Department defendants.  So to comply with that order, the instant complaint no longer sues the State Department; but since the facts about the State Department's wrongdoing matter to the case against the NJAG, they continue to be pleaded for that purpose.

## VII.    Causes of Action Against The NJAG.

173.    The NJAG denies Defense Distributed's right to publish digital firearms information in the form of computer files.  He denies Defense Distributed's right to do so via the internet; he denies Defense Distributed's right to do so via the mail; he denies Defense Distributed's right to do so via brick-and-mortar public libraries; and he denies Defense Distributed's right to do so via any other means of publication.  He also denies Defense Distributed's right to conduct secondary activities that accompany all of these publication methods, such as advertising.  In each of these respects, the NJAG acts knowingly, intentionally, and selectively.  Many people engage in the activities for which Defense Distributed and SAF are being persecuted.  But the NJAG does not target them as he targets Defense Distributed and SAF.

174.    The NJAG's conduct subjects Defense Distributed and SAF to an unconstitutional abridgement of First Amendment freedoms; an unconstitutional infringement of Second Amendment rights; an unconstitutional violation of the right to equal protection of the laws; an unconstitutional deprivation of liberty and property without due process of law; an unconstitutional violation of the Commerce Clause, regulation by way of state laws that are preempted by federal law, and tortious interference with valid legal contracts.

48

A.      **Count One: 42 U.S.C. § 1983—Freedom of Speech and of the Press**

175.    Defense Distributed & SAF incorporate the preceding paragraphs.

176.    The First Amendment of the Constitution of the United States forbids government actions abridging the freedom of speech or of the press.  It applies to the NJAG by virtue of the Fourteenth Amendment of the Constitution of the United States.

177.    The NJAG violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to an unconstitutional abridgement of First Amendment freedoms.

178.    The NJAG violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to an unconstitutional abridgement of First Amendment freedoms.

179.    The NJAG's conduct violates the First Amendment doctrine regarding prior restraints.  *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).  The NJAG's conduct constitutes a prior restraint of expression; as such, it is an unconstitutional abridgement of First Amendment's freedoms because The NJAG cannot carry the heavy burden of justifying a prior restraint and because the prior restraint does not operate under sufficient judicial superintendence.

180.    The NJAG's conduct violates the First Amendment doctrine regarding content based speech restrictions.  *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015).  The NJAG's conduct imposes content-based speech restrictions; as such, the restrictions are an unconstitutional abridgement of First Amendment's freedoms because they do not serve a compelling governmental interest and are not narrowly drawn to serve any such interest.

181.    The NJAG's conduct violates the First Amendment doctrine regarding content neutral speech restrictions.  *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518 (2014).  Even if the NJAG's conduct is deemed to impose content-neutral speech restrictions, it is an unconstitutional

49

abridgement of First Amendment's freedoms because it does not serve a significant governmental interest and is not narrowly drawn to serve any such interest.

182.   The NJAG's conduct violates the First Amendment doctrine regarding overbreadth. *See, e.g.*, *City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987).  The NJAG's conduct forbids a substantial amount of constitutionally protected speech and is not narrowly tailored to prohibit only constitutionally unprotected speech; as such, it is an unconstitutional abridgement of First Amendment's freedoms.

183.   In each of these respects, The NJAG's conduct results in an unconstitutional abridgement of First Amendment freedoms both facially and as applied to these circumstances.

184.   The NJAG's conduct proximately caused damages to Defense Distributed and SAF, to the persons with whom Defense Distributed and SAF have communicated, to the persons who desire to communicate with Defense Distributed and SAF, and to other persons wishing to engage in similar communications.  The damages include, but are not limited to, the loss of First Amendment rights, the chilling effect on conduct protected by the First Amendment, and the substantial time and resources expended in defense of these rights.

185.   Defense Distributed and SAF are therefore entitled to a judgment against the NJAG awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

**B.      Count Two: 42 U.S.C. § 1983—Right to Keep and Bear Arms**

186.   Defense Distributed & SAF incorporate the preceding paragraphs.

187.   The Second Amendment of the Constitution of the United States forbids laws abridging the individual right to keep and bear Arms.  It applies to the NJAG in his official capacity by virtue of the Fourteenth Amendment of the Constitution of the United States.

**App. 298**

188.    The NJAG violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to an unconstitutional abridgement of Second Amendment rights.

189.    The NJAG additionally violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to an unconstitutional abridgement of Second Amendment rights.

190.    The NJAG's conduct violates the individual Second Amendment right to keep and bear Arms.  *See District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010).  The NJAG's conduct infringes the individual right to make and acquire Arms, which is part and parcel of the right to keep and bear Arms; as such, it is an unconstitutional abridgement of Second Amendment rights.

191.    In each of these respects, The NJAG's conduct constitutes an unconstitutional abridgement of Second Amendment rights both facially and as applied to these circumstances.

192.    The NJAG's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the loss of Second Amendment rights, the chilling effect on conduct protected by the Second Amendment, and the substantial time and resources expended in defense of these rights.

193.    Defense Distributed and SAF are therefore entitled to a judgment against the NJAG awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

51

App. 299

C.      **Count Three: 42 U.S.C. § 1983—Equal Protection**

194.    Defense Distributed & SAF incorporate the preceding paragraphs.

195.    The Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States forbids the several States from denying to any person within their jurisdictions the equal protection of the laws.  It applies to the NJAG in his official capacity.

196.    The NJAG violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to an unconstitutional violation of the Equal Protection Clause.

197.    The NJAG additionally violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to an unconstitutional violation of the Equal Protection Clause.

198.    The NJAG's conduct violates the Equal Protection Clause's doctrine regarding selective enforcement.  *See, e.g.*, *Whren v. United States*, 517 U.S. 806 (1996).  The NJAG took action against Defense Distributed-but not similarly situated persons engaged in publication of the Defense Distributed I Files-because the NJAG disagrees with the content of Defense Distributed's constitutionally protected speech and because the NJAG dislikes the persons involved in the speech; as such, the NJAG's conduct violates Defense Distributed and SAF's right to the equal protection of the laws.

199.    In each of these respects, the NJAG's conduct constitutes an unconstitutional violation of the Equal Protection Clause both facially and as applied to these circumstances.

200.    The NJAG's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, Defense Distributed and SAF's loss of Equal Protection Clause rights and the substantial time and resources expended in defense these rights.

52

201.     Defense Distributed and SAF are therefore entitled to a judgment against the NJAG awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

**D.      Count Four: 42 U.S.C. § 1983—Due Process**

202.     Defense Distributed & SAF incorporate the preceding paragraphs.

203.     The Due Process Clause of the Fourteenth Amendment of the Constitution of the United States forbids the several States from depriving any person of life, liberty, or property without due process of law.  It applies to the NJAG in his official capacity.

204.     The NJAG violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to a deprivation of liberty and property without due process of law.

205.     The NJAG additionally violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to a deprivation of liberty and property without due process of law.

206.     The NJAG's conduct violates the Due Process Clause doctrine regarding vagueness. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).  The NJAG's conduct forbids expression without giving fair notice of what is forbidden; as such, it is an unconstitutional deprivation of liberty and property without due process of law.

207.     The NJAG's conduct violates the Due Process Clause doctrine regarding overbreadth.  *See, e.g.*, *Coates v. City of Cincinnati*, 402 U.S. 611 (1971).  The NJAG's conduct forbids a substantial amount of constitutionally protected speech; as such, it is an unconstitutional deprivation of liberty and property without due process of law.

208.     The NJAG's conduct violates the Due Process Clause doctrine regarding deprivations of property.  *See, e.g.*, *Matthews v. Eldridge*, 424 U.S. 319 (1976).  The NJAG's

53

conduct deprives Defense Distributed and SAF of a license issued by the Secretary of State pursuant to federal law, and does so without supplying adequate pre-deprivation notice and an opportunity to be heard; as such, it is an unconstitutional deprivation of property without due process of law.

209.    In each of these respects, The NJAG's conduct constitutes an unconstitutional abridgement of Due Process Clause rights both facially and as applied to these circumstances.

210.    The NJAG's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the loss of Defense Distributed and SAF's Due Process Clause rights and the substantial time and resources expended in defense these rights.

211.    Defense Distributed and SAF are therefore entitled to a judgment against the NJAG awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

**E.      Count Five: 42 U.S.C. § 1983—Commerce Clause**

212.    Defense Distributed & SAF incorporate the preceding paragraphs.

213.    The Commerce Clause of Article I, Section 8 of the Constitution of the United States imposes a negative command, known as the dormant Commerce Clause, that limits the authority of the several States to enact laws burdening interstate commerce.  It applies to the NJAG in his official capacity.

214.    The NJAG violated 42 U.S.C. § 1983 by acting, under color of state law, to subject Defense Distributed and SAF to a deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause.

54

215.   The NJAG additionally violated 42 U.S.C. § 1983 by threatening, under color of state law, to subject Defense Distributed and SAF to a deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause.

216.   The NJAG's conduct violates the dormant Commerce Clause doctrine regarding laws that directly regulate interstate commerce. *See, e.g.*, *Granholm v. Heald*, 125 S. Ct. 1885 (2005).  The NJAG's conduct directly regulates interstate commerce by projecting New Jersey law into other states.  The NJAG's conduct does not serve a compelling governmental interest.  And The NJAG's conduct is not the least restrictive means of accomplishing any such interest. As such, it violates the Commerce Clause.

217.   The NJAG's conduct violates the dormant Commerce Clause doctrine regarding laws that discriminate against interstate commerce. *See, e.g.*, *Granholm*, 125 S. Ct. 1885.  The NJAG's conduct discriminates against interstate commerce on purpose, on its face, and in effect.  The NJAG's conduct does not serve a compelling governmental interest.  And the NJAG's conduct is not the least restrictive means of accomplishing any such interest.  As such, it violates the Commerce Clause.

218.   The NJAG's conduct violates the dormant Commerce Clause doctrine regarding all laws that implicate interstate commerce.  *See, e.g.*, *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  The NJAG's conduct imposes burdens on interstate commerce that are clearly excessive in relation to putative local benefits; as such, it violates the Commerce Clause.

219.   In each of these respects, The NJAG's conduct constitutes an unconstitutional abridgement of Due Process Clause rights both facially and as applied to these circumstances.

220.   The NJAG's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited

55

App. 303

to, the loss of Dormant Commerce Clause rights in the past and the substantial time and resources expended in defense these rights.

221.     Defense Distributed and SAF are therefore entitled to a judgment against the NJAG awarding Defense Distributed and SAF declaratory relief, injunctive relief, and attorney fees and costs.

**F.        Count Six: 42 U.S.C. § 1983—Arms Export Control Act**

222.     Defense Distributed & SAF incorporate the preceding paragraphs.

223.     The Supremacy Clause of the Constitution of the United States provides that the Constitution of the United States and the Laws of the United States which shall be made in Pursuance thereof shall be the supreme Law of the Land.  It applies to the NJAG by virtue of Article VI of the Constitution of the United States.

224.     The federal government has exclusive authority to administer and enforce the provisions of the AECA and ITAR.  Pursuant to that authority, the federal government entered into the Settlement Agreement with Plaintiffs and granted Plaintiffs a license to publish the Defense Distributed I Files.

225.     The NJAG violated the AECA and ITAR by acting, under color of state law, to regulate conduct that the federal government has expressly authorized pursuant to its authority under the AECA and ITAR.  The NJAG therefore violated 42 U.S.C. § 1983 by acting, under color of state law, to regulate Defense Distributed and SAF pursuant to state laws that are preempted by federal law.  "[I]f an individual claims federal law immunizes [the plaintiff] from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

**App. 304**

226.    In this respect, the NJAG's conduct is preempted both facially and as applied to these circumstances.

227.    The NJAG's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the loss of immunity from preempted state regulation in the past and the substantial time and resources expended in defense these rights.

228.    Defense Distributed and SAF are therefore entitled to a judgment against the NJAG awarding Defense Distributed and SAF declaratory relief and injunctive relief, and attorney fees and costs.

### G.    Count Seven: 42 U.S.C. § 1983—Communications Decency Act

229.    Defense Distributed & SAF incorporate the preceding paragraphs.

230.    The Communications Decency Act, 47 U.S.C. § 230, immunizes service providers for information originating with a third-party user of the service.  Defense Distributed is a provider and user of an "interactive computer service" within the meaning of 47 U.S.C. § 230 because it operates an interactive online service at DEFCAD.com.

231.    Senate Bill 2465 violates Defense Distributed's rights under 47 U.S.C. § 230(c)(1) because it treats them, providers of interactive computer services, as publishers or speakers of information provided by another information content provider. Specifically, Senate Bill 2465 treats Defense Distributed as a publishers or speaker because it makes it a crime to "distribute" the "information" at issue regardless of whether the information was "provided by another information content provider."

232.    Senate Bill 2465 is a "State . . . law that is inconsistent with" § 230, in direct violation of 47 U.S.C. § 230(e)(3).

57

App. 305

233.  In this respect, the NJAG's conduct is preempted both facially and as applied to these circumstances.

234.  The NJAG's conduct proximately caused damages to Defense Distributed and SAF, the persons they communicate with, and others.  The damages include, but are not limited to, the loss of immunity from preempted state regulation in the past and the substantial time and resources expended in defense these rights.

235.  Defense Distributed and SAF are therefore entitled to a judgment against the NJAG awarding Defense Distributed and SAF declaratory relief and injunctive relief, and attorney fees and costs.

**H.    Count Eight: Tortious Interference with the Settlement Agreement**

236.  Defense Distributed & SAF incorporate the preceding paragraphs.

237.  The Settlement Agreement is an existing, valid contract between the Defense Distributed I Plaintiffs and the State Department.

238.  The NJAG committed the tort of intentional interference with an existing contract by willfully and intentionally engaging in conduct that made the State Department's performance of the Settlement Agreement burdensome, more difficult, and of less or no value to the Defense Distributed I Plaintiffs.  *See, e.g.*, Restatement (Second) of Torts § 766 (1979); *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.,* 29 S.W.3d 74 (Tex. 2000).

239.  The NJAG's conduct proximately caused Defense Distributed to suffer substantial actual damages in excess of $75,000 per year.

240.  Plaintiff Defense Distributed is therefore entitled to a judgment against the NJAG awarding declaratory relief, injunctive relief, and attorney fees and costs.

58

App. 306

**I.      Count Nine: Tortious Interference with Existing Contracts**

241.      Defense Distributed & SAF incorporate the preceding paragraphs.

242.      Defense Distributed and DreamHost had an existing, valid contract for the provision of internet security services regarding Defense Distributed's website.

243.      The NJAG committed the tort of intentional interference with an existing contract by willfully and intentionally engaging in conduct that made the performance of Defense Distributed's contract with DreamHost burdensome, more difficult, and of less or no value to Defense Distributed.  *See, e.g.*, Restatement (Second) of Torts § 766 (1979); *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74 (Tex. 2000).  The NJAG's conduct proximately caused Defense Distributed to suffer substantial actual damages in excess of $75,000 per year.

244.      Defense Distributed and Cloudflare, Inc. have an existing, valid contract for the provision of internet security services regarding Defense Distributed's website.

245.      The NJAG committed the tort of intentional interference with an existing contract by willfully and intentionally engaging in conduct that made the performance of Defense Distributed's contract with Cloudflare, Inc. burdensome, more difficult, and of less or no value to Defense Distributed.  *See, e.g.*, Restatement (Second) of Torts § 766 (1979); *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74 (Tex. 2000).  The NJAG's conduct proximately caused Defense Distributed to suffer substantial actual damages substantial actual damages in excess of $75,000 per year.

246.      Defense Distributed is therefore entitled to a judgment against the NJAG awarding declaratory relief, injunctive relief, and attorney fees and costs.

59

## VIII.   Requests for Relief

247.   Defense Distributed and SAF request a judgment in their favor as to all claims against the NJAG awarding them all relief they are entitled to.

248.   Defense Distributed and SAF request a judgment against the NJAG declaring that The NJAG unconstitutionally abridged Defense Distributed and SAF's First Amendment freedoms.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

249.   Defense Distributed and SAF request a judgment against the NJAG declaring that the NJAG unconstitutionally infringed Defense Distributed and SAF's Second Amendment rights. Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

250.   Defense Distributed and SAF request a judgment against the NJAG declaring that the NJAG unconstitutionally denied Defense Distributed and SAF the equal protection of the laws. Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

251.   Defense Distributed and SAF request a judgment against the NJAG declaring that the NJAG unconstitutionally subjected Defense Distributed and SAF to a deprivation of liberty and property without due process of law.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

252.     Defense Distributed and SAF request a judgment against the NJAG declaring that the NJAG unconstitutionally violated Defense Distributed and SAF's dormant Commerce Clause rights.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

253.     Defense Distributed and SAF request a judgment against the NJAG declaring that federal law preempts and immunizes Defense Distributed and SAF from the NJAG's civil and criminal censorship.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

254.     Defense Distributed and SAF request a judgment against the NJAG declaring that the NJAG's conduct constitutes tortious interference with the Settlement Agreement.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

255.     Defense Distributed and SAF request a judgment against the NJAG declaring that the NJAG's conduct constitutes tortious interference with the contracts between Defense Distributed and DreamHost and Cloudflare, Inc.  Defense Distributed & SAF request an injunction protecting Defense Distributed & SAF from such unlawful conduct in the future—both on a preliminary basis while this action is pending and permanently.

256.     Defense Distributed and SAF request an award against the NJAG of costs, including reasonable attorney fees and costs, pursuant to 42 U.S.C. § 1988.

61

257.    Defense Distributed and SAF request any other relief against the NJAG to which

they are entitled.


Date: May 3, 2023                                    Respectfully submitted,

BECK REDDEN LLP                                      HARTMAN & WINNICKI, P.C.
Chad Flores                                          s/ Daniel L. Schmutter
cflores@beckredden.com                               Daniel L. Schmutter
1221 McKinney Street, Suite 4500                     dschmutter@hartmanwinnicki.com
Houston, Texas 77010                                 74 Passaic Street
(713) 951-3700                                       Ridgewood, New Jersey 07450
                                                     (201) 967-8040

                              Counsel for Plaintiffs


                                      62

App. 310

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1. *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

**App. 311**

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)    Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)    Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)    Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

App. 312

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4. *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.  *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.  *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.  *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.  *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

-   The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

-   The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items.

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

NOTICE: GENERAL

07/27/18

# Temporary Modification of Category I of the United States Munitions List

Consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, the Acting Deputy Assistant Secretary for Defense Trade Controls has determined that it is in the interest of the security and foreign policy of the United States to temporarily modify United States Munitions List (USML) Category I to exclude the following technical data identified in the Settlement Agreement for the matter of Defense Distributed, et al., v. U.S. Department of State, et al, Case No. 15-cv-372-RP (W.D. Tex.) (hereinafter "Defense Distributed"):

- "Published Files," i.e., the files described in paragraph 25 of the Second Amended Complaint in Defense Distributed.
- "Ghost Gunner Files," i.e., the files described in paragraph 36 of the Second Amended Complaint in Defense Distributed.
- "CAD Files," i.e., the files described in paragraph 40 of the Second Amended Complaint in Defense Distributed.
- "Other Files," i.e., the files described in paragraphs 44-45 of the Second Amended Complaint in Defense Distributed, insofar as those files regard items exclusively: (a) in Category I(a) of the USML, as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.  Military Equipment means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

This temporary modification will remain in effect while the final rule referenced in paragraph 1(a) of the Settlement Agreement is in development.
Please see the Settlement Agreement and the Second Amended Compliant for additional information.

NOTICE: GENERAL

07/25/18

# Public Comments on USML Categories I–III



**United States Department of State**
*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington,* D.C. 20522-0112

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:   Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.,* No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as "*Defense Distributed*"). As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13). It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

1

**App. 320**

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release.  To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution).  As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

2



**U.S. Department of Justice**

Civil Division
Federal Programs Branch

450 Golden Gate Ave.
Suite 7-5395
San Francisco, CA 94102

---

| | |
|---|---|
| Stuart Robinson | Tel:  (415) 436-6635 |
| Trial Attorney | Fax:  (415) 436-6632 |
| | stuart.j.robinson@usdoj.gov |

August 2, 2018

<u>Via Electronic Mail</u>

Jeff Sprung
Assistant Attorney General
Washington Attorney General's Office
800 5th Ave.
Suite 2000
Seattle, WA 98104

>    **Re:   *State of Washington, et al. v. U.S. Department of State, et al.*, No. 2:18-cv-1115
>    (W.D. Wash.)**

Dear Mr. Sprung:

This letter is in response to your correspondence dated July 31, 2018, in which you "request that the federal government advise us of the steps it has taken to achieve" compliance with the Court's Order granting Plaintiffs' Emergency Motion for Temporary Restraining Order, ECF No. 23 (July 31, 2018). As you are aware, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.* at 7.  The Court did not require the Government to provide any status reports to the Court or Plaintiffs regarding compliance with the Order.  *See id.*

The Government has fully complied with the Court's Order, and Plaintiffs have provided no basis to conclude otherwise.  On July 31, 2018, the Department of State, Directorate of Defense Trade Controls ("DDTC"), removed from its website its announcement temporarily modifying Category I of the United States Munitions List to exclude technical data identified in the Settlement Agreement for the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.*, Case No. 15-cv-372 (W.D. Tex.).  Additionally, on July 31, 2018, my colleague Eric Soskin informed Josh Blackman, counsel for Defense Distributed, that the Government considers the aforementioned letter to Mr. Wilson a nullity during the pendency of the Order entered by the Court.  And on August 2, 2018, DDTC added the following to its website: "As of July 31, 2018, and in compliance with the Temporary Restraining Order

**App. 322**

issued by the United States District Court for the Western District of Washington, in *Washington v. U.S. Dep't of State*, No. C18-1115RSL, the Directorate of Defense Trade Controls (DDTC) is not implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' that was posted to the DDTC website on July 27, 2018, and has since been removed."

    If you have any questions related to these matters, please contact me or Mr. Soskin.

           Sincerely,

           s/ *Stuart Robinson*

           Stuart Robinson
           (415) 436-6635

cc:    Eric Soskin
       Senior Counsel
       U.S. Department of Justice

       Jeffrey Rupert
       Assistant Attorney General
       Washington Attorney General's Office

       Josh Blackman
       Josh Blackman LLC

       Joel Ard
       Attorney
       Immix Law Group

Page 2

# FARHANG & MEDCOFF
## ATTORNEYS

**Matthew A. Goldstein | Partner**
mgoldstein@farhangmedcoff.com
d: 202.550.0040

4801 E. Broadway Boulevard, Suite 311 | Tucson, Arizona 85711
p: 520.214.2000 | f: 520.214.2001 | **farhangmedcoff.com**

January 15, 2020

**BY EMAIL**

Mr. Eric Soskin
Federal Programs Branch
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
eric.soskin@usdoj.gov

**Re:     Breach of Settlement Agreement**

I write regarding the Settlement Agreement of June 29, 2018 ("Settlement Agreement"), which binds the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls, and the Director of the Office of Defense Trade Controls Policy (collectively the "State Department").  Settlement Agreement Sections 1(c) and 1(d) establish the following obligations regarding a license and acknowledgement:

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that . . . the letter to Plaintiffs permits any [United States] person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The State Department previously issued the attached July 27, 2018 license.  But that license has been vacated, *see Washington v. U.S. Dep't of State,*, No. 2-18-1115-RSL (W.D. Wash.), and the State Department considers the license a "nullity" (the term used in Stuart Robinson's attached August 2, 2018, letter to Jeff Sprung).  Thus, the State Department is in breach of Settlement Agreement Section 1(c) and Settlement Agreement Section 1(d).

**App. 324**

SETTLEMENT AGREEMENT BREACH
January 15, 2020
Page **2** of **2**

Defense Distributed demands that the State Department comply with both the Section 1(c) license obligation and the Section 1(d) acknowledgement obligation.  The State Department must (1) issue a license in compliance with Section 1(c), and (2) issue an acknowledgement about that license in compliance with Section 1(d).  Additionally, the State Department must appeal the *Washington* action's final judgment to the United States Court of Appeals for the Ninth Circuit and seek reversal of the district court's decision to vacate the July 27, 2018 license.

January 28, 2020 is the State Department's deadline to initiate an appeal from the *Washington* action's final judgment to the United States Court of Appeals for the Ninth Circuit. *See* Fed. R. App. P. 4(a)(3).  We therefore ask that you respond to this demand no later than January 29, 2020.  If the State Department has not issued the license, issued the acknowledgement, and appealed the *Washington* action's final judgment by January 29, 2020, we will consider this an intentional and permanent act of wrongdoing and take legal action accordingly.

By making these demands, Defense Distributed, the Second Amendment Foundation, and Conn Williamson do not waive any claims against the State Department and other defendants for any violations of the Settlement Agreement.

Thank you for your prompt attention to this matter and please contact me at (202) 550-0040 or at mgoldstein@farhangmedcoff.com with any questions.

Sincerely,

FARHANG & MEDCOFF PLLC

Matthew A. Goldstein

cc:     Stuart Robinson (Stuart.J.Robinson@usdoj.gov)

Attachments

# <u>ATTACHMENTS</u>



**United States Department of State**
*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington, D.C. 20522-0112*

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:   Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.,* No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as "*Defense Distributed*"). As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13). It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

1

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release.  To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution).  As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

2



**U.S. Department of Justice**

Civil Division
Federal Programs Branch

450 Golden Gate Ave.
Suite 7-5395
San Francisco, CA 94102

| | |
|---|---|
| Stuart Robinson | Tel: (415) 436-6635 |
| Trial Attorney | Fax: (415) 436-6632 |
| | stuart.j.robinson@usdoj.gov |

August 2, 2018

<u>Via Electronic Mail</u>

Jeff Sprung
Assistant Attorney General
Washington Attorney General's Office
800 5th Ave.
Suite 2000
Seattle, WA 98104

> **Re:** ***State of Washington, et al. v. U.S. Department of State, et al.*, No. 2:18-cv-1115**
> **(W.D. Wash.)**

Dear Mr. Sprung:

This letter is in response to your correspondence dated July 31, 2018, in which you "request that the federal government advise us of the steps it has taken to achieve" compliance with the Court's Order granting Plaintiffs' Emergency Motion for Temporary Restraining Order, ECF No. 23 (July 31, 2018). As you are aware, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.* at 7. The Court did not require the Government to provide any status reports to the Court or Plaintiffs regarding compliance with the Order. *See id.*

The Government has fully complied with the Court's Order, and Plaintiffs have provided no basis to conclude otherwise. On July 31, 2018, the Department of State, Directorate of Defense Trade Controls ("DDTC"), removed from its website its announcement temporarily modifying Category I of the United States Munitions List to exclude technical data identified in the Settlement Agreement for the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.*, Case No. 15-cv-372 (W.D. Tex.). Additionally, on July 31, 2018, my colleague Eric Soskin informed Josh Blackman, counsel for Defense Distributed, that the Government considers the aforementioned letter to Mr. Wilson a nullity during the pendency of the Order entered by the Court. And on August 2, 2018, DDTC added the following to its website: "As of July 31, 2018, and in compliance with the Temporary Restraining Order

App. 329

issued by the United States District Court for the Western District of Washington, in *Washington v. U.S. Dep't of State*, No. C18-1115RSL, the Directorate of Defense Trade Controls (DDTC) is not implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' that was posted to the DDTC website on July 27, 2018, and has since been removed."

       If you have any questions related to these matters, please contact me or Mr. Soskin.

Sincerely,

s/ *Stuart Robinson*

Stuart Robinson
(415) 436-6635

cc:     Eric Soskin
        Senior Counsel
        U.S. Department of Justice

        Jeffrey Rupert
        Assistant Attorney General
        Washington Attorney General's Office

        Josh Blackman
        Josh Blackman LLC

        Joel Ard
        Attorney
        Immix Law Group

Page 2

# FARHANG & MEDCOFF
## ATTORNEYS

**Matthew A. Goldstein | Partner**
mgoldstein@farhangmedcoff.com
d: 202.550.0040

4801 E. Broadway Boulevard, Suite 311 | Tucson, Arizona 85711
p: 520.214.2000 | f: 520.214.2001 | **farhangmedcoff.com**

February 11, 2020

**BY EMAIL**

Mr. Eric Soskin
Federal Programs Branch
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
eric.soskin@usdoj.gov

**Re:     Breach of Settlement Agreement**

Dear Mr. Soskin:

I write in follow-up to my January 15, 2020 letter to you regarding the Settlement Agreement of June 29, 2018 ("Settlement Agreement"), which binds the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls, and the Director of the Office of Defense Trade Controls Policy (collectively the "State Department").

Despite the compliance demand issued by my prior letter, the State Department has failed to issue a license in compliance with the Settlement Agreement Section 1(c); failed to issue an acknowledgement about that license in compliance with Settlement Agreement Section 1(d); and failed to appeal the final judgment in *Washington v. U.S. Dep't of State,*, No. 2-18-1115-RSL (W.D. Wash.) and seek reversal of the district court's decision to vacate the license originally issued by the State Department.  The State Department therefore remains in breach of Settlement Agreement Section 1(c) and Settlement Agreement Section 1(d).

This wrongdoing constitutes a final agency action under the Administrative Procedure Act's provisions for judicial review. *See* 5 U.S.C. § 702.  We will enforce all of our rights accordingly, and because of the State Department's failure to proffer any justification at all – let alone a "substantial justification," 28 U.S.C. § 2412(d) - such enforcement actions will include recovery of all attorney's fees incurred henceforth.

Sincerely,

FARHANG & MEDCOFF PLLC

Matthew A. Goldstein

cc:     Stuart Robinson (Stuart.J.Robinson@usdoj.gov)

App. 331

# FARHANG & MEDCOFF
## ATTORNEYS

**Matthew A. Goldstein | Partner**
mgoldstein@farhangmedcoff.com
d: 202.550.0040

4801 E. Broadway Boulevard, Suite 311 | Tucson, Arizona 85711
p: 520.214.2000 | f: 520.214.2001 | **farhangmedcoff.com**

April 29, 2020

**BY EMAIL**

Mr. Eric Soskin
Federal Programs Branch
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
eric.soskin@usdoj.gov

**Re:**  emand for A  eal of  rel m nar  In  nct on
*Washington v. U.S. Dep't of State*, No. 2:20-cv-00111-RAJ (W.D. Wash.)

Dear Eric:

I write regarding the Settlement Agreement of June 29, 2018 ("Settlement Agreement"), which binds the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls, and the Director of the Office of Defense Trade Controls Policy (collectively the "State Department").

Pursuant to Section 1(a) of the Settlement Agreement, the State Department committed to comply with the Administrative Procedures Act ("APA") in implementing a final rule transferring e port control jurisdiction over 3D gun files identified at U.S. Munitions List ("USML") Category I of the International Traffic in Arms Regulations ("ITAR") to the Commerce Department under the E  port Administration Regulations ("EAR").

Specifically, Section 1(a) of the Settlement Agreement provides as material consideration:

(a) Defendants' commitment to draft and to fully pursue, to the e tent authori ed by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to e clude the technical data that is the subject of the Action.

As you know, on March  , 2020, Judge Richard Jones of the Western District of Washington found that the State Attorney General Plaintiffs are likely to succeed on their claim that the State Department violated the APA when it issued the final rule under 85 Fed. Reg. 3,819 (Jan. 23, 2020) revising USML Category I to e clude the subject 3D files from ITAR-control. *Washington v. United States Dep t of State*, No. 2:20-C -00111-RAJ, 2020 WL 1083720 (W.D. Wash. Mar.  , 2020).

DEMAND FOR APPEAL
April 29, 2020
Page 2 of 2

The e press terms of the Settlement Agreement re uire the State Department to comply with the APA in revising USML Category I to e clude the 3D gun files at issue. To the e tent that any court ruling establishes the State Department violated the APA in this rulemaking, such ruling would also establish that the State Department violated Section 1(a) of the Settlement Agreement.

The State Department must appeal Judge Jones' order and take whatever action is necessary to meet its obligations under Section 1(a) of the Settlement Agreement.

I further note that the State Department acted in bad faith by coordinating the Department of Commerce's new prior restraint under the EAR for Computer Assisted Manufacturing ("CAM") files under the final rules. *See* 85 Fed. Reg. 4,13  (Jan. 23, 2020). As you know, this constitutes a substantial change to the Commerce Department's longstanding policy that the EAR does not impose a prior restraint on public speech.

If left uncorrected, the State Department's wrongdoings constitute final agency actions under the APA provisions for judicial review, 5 U.S.C. § 702, and my clients will enforce their rights accordingly.

In writing to you regarding the above, Defense Distributed, the Second Amendment Foundation, and Conn Williamson do not waive any claims against the State Department, the Commerce Department, or any other party for claims arising out of the Settlement Agreement.

Thank you for your prompt attention to this matter and please contact me at (202) 550-0040 or at mgoldstein@farhangmedcoff.com with any  uestions.

Sincerely,

FARHANG & MEDCOFF PLLC

Matthew A. Goldstein

cc:    Stuart Robinson (Stuart.J.Robinson@usdoj.gov)

App. 333



### *State of New Jersey*

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
PO Box 080
TRENTON, NJ 08625-0080

GURBIR S. GREWAL
*Attorney General*

Defense Distributed
2320 Donley Dr., Suite C
Austin, TX 78758

July 26, 2018

To Whom It May Concern:

You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents. The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms—and even to make assault weapons that are illegal in my state. These computer codes are a threat to public safety, and posting them violates New Jersey's public nuisance and negligence laws. If you do not halt your efforts to proceed with publication, I will bring legal action against your company before August 1, 2018.

The computer files that you plan to publish will undermine the public safety of New Jersey residents. These files allow anyone with a 3-D printer to download your code and create a fully operational gun. More than that, the codes you plan to post will enable individuals to print assault weapons that are illegal in New Jersey. And because the printed guns would not have serial numbers, they would not be traceable by law enforcement. Worst of all, you are going to make the codes available to everyone—regardless of age, criminal status, or history of mental illness. That would undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands, and it would undermine the safety of our residents.

Not only are your codes dangerous, but posting them would also be illegal. New Jersey's law is clear: an individual who interferes with public health, safety, peace, and comfort violates our public nuisance law. *See James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-33 (App. Div. 2003). As New Jersey courts have held, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate our public nuisance law. *Id.* at 320. So when a group of manufacturers "flood[ed] the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market," New Jersey courts found they could be held responsible when their actions "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." *Id.* at 312. That is what your actions will do as well—make do-it-yourself guns available to anyone, even if the individuals are prohibited from owning guns because of prior convictions, history of mental illness, or history of domestic violence, even if the weapons they print are illegal in my



Hughes Justice Complex • TELEPHONE: (609) 292-4925 • FAX: (609) 292-3508
*New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

App. 334

Case 1:16-cv-00637-RP Document 23-5 Filed 05/17/18 Page 3 of 3

July 26, 2018
Page 2

state, and even if they plan to use their weapons to further crimes and acts of violence. Because your actions will flood the illegal firearms market and pose a direct threat to the public safety of my state, they constitute a public nuisance.

Worse still, your comments make clear that you hope your actions will undermine all the efforts of states like New Jersey to keep guns out of criminals' hands. You have stated, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable."[1] You have also stated, "I'm not worried about public safety."[2] And on July 10, 2018, you tweeted a photo of a gravestone engraved with the words "American Gun Reform."[3] These comments show that you have no intention of precluding your printable-gun computer files, including designs for assault weapons, from winding up in the hands of criminals, minors, and the mentally ill. Not only does that reveal a lack of regard for safety, but it also shows that your interference with the public's health and safety is intentional and per se unreasonable. *James*, 359 N.J. Super. at 330.

Finally, your widespread dissemination of printable-gun computer files is negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey, and which will lead to an increase in expenditures of public funds for combatting crime and protecting our resident's health. *See id.* at 308-24 (finding a legally valid negligence claim against same manufacturers of guns that flooded the illegal market). Your planned method of making codes available and your public comments show that you are ignoring and violating your duty. By broadly sharing an inherently dangerous product, you should reasonably foresee the resulting governmental and public costs and must bear them. *Id.* at 323-24.

As the chief law enforcement officer for New Jersey, I demand that you halt publication of the printable-gun computer files. Should you fail to comply with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018.

Sincerely,

Gurbir S. Grewal
Attorney General

---

[1] Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns," Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[2] Tess Owen, "Get Ready for the New Era of 3D-Printed Guns Starting August 1," Vice News (July 18, 2018), available at https://news.vice.com/en_us/article/ev8xjn/get-ready-for-the-new-era-of-3d-printed-guns-starting-august-1.

[3] Cody R. Wilson (@Radomysisky), TWITTER (July 10, 2018, 12:25 P.M.), https://twitter.com/Radomysisky/status/1016765282017337344.



## *State of New Jersey*

| | OFFICE OF THE ATTORNEY GENERAL | |
| --- | --- | --- |
| PHILIP D. MURPHY | DEPARTMENT OF LAW AND PUBLIC SAFETY | |
| *Governor* | DIVISION OF LAW | |
| SHEILA Y. OLIVER | PO Box 080 | GURBIR S. GREWAL |
| *Lt. Governor* | TRENTON, NJ 08625-0080 | *Attorney General* |

Legal Department
DreamHost
707 Wilshire Boulevard, Suite 5050
Los Angeles, CA 90017

July 30, 2018

To Whom It May Concern:

I write to inform you that the website https://defcad.com/ ("Defcad Website"), operated by the company Defense Distributed, is violating your Acceptable Use Policy. Starting on Wednesday, Defense Distributed plans to publish computer files on the Defcad Website that enable anyone with a 3-D printer to download codes to create a fully operational firearm. These files specifically offer individuals, including criminals, codes they can use to create untraceable firearms—and even to make assault weapons that are illegal in my state. The codes put law enforcement safety and public safety at risk, and posting them violates New Jersey's public nuisance and negligence laws. I sent a cease and desist letter to Defense Distributed on July 26, 2018, based on violations of New Jersey law, and filed suit in state court today. Because your Acceptable Use Policy bars websites from transmitting material in violation of state law, Defense Distributed's plans will be in violation of that policy.

There is no doubt that the codes Defense Distributed will place on the Defcad Website undermine the public safety of New Jersey residents and law enforcement officers. These files allow anyone with a 3-D printer to create a fully operational gun. The codes enable individuals to print assault weapons that are illegal in New Jersey. And because these guns would not have serial numbers, they cannot be traced by law enforcement. The codes will be available to all— regardless of age, criminal status, or history of mental illness. These codes thus undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands.

Not only are these codes dangerous, but posting them would also be illegal. New Jersey's law is clear: an individual who interferes with public health, safety, peace, and comfort violates our public nuisance law. *See James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-33 (App. Div. 2003). As New Jersey courts have held, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate our public nuisance law. *Id.* at 320. So when a group of manufacturers "flood[ed] the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or

Hughes Justice Complex • TELEPHONE: (609) 292-4925 • FAX: (609) 292-3508
*New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

App. 336

July 30, 2018
Page 2

supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market," New Jersey courts found they could be held responsible when their actions "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." *Id.* at 312. That is what Defense Distributed's actions on the Defcad Website will do—make do-it-yourself guns available to all, even if the individuals are prohibited from owning guns because of prior convictions, history of mental illness, or history of domestic violence, even if the weapons they print are illegal in New Jersey, and even if they plan to use their weapons to further crimes and acts of violence.

Indeed, Defense Distributed seeks to use the Defcad Website to undermine all the efforts of states like New Jersey to keep guns out of criminals' hands. As Defense Distributed found Cody Wilson stated, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable."[1] Wilson also stated, "I'm not worried about public safety."[2] Not only does that reveal a lack of regard for safety, but it also shows that Defense Distributed's interference with the public's safety is intentional and thus per se unreasonable. *James*, 359 N.J. Super. at 330.

As a result, Defense Distributed is plainly planning to use the Defcad Website in a way that violates DreamHost's Acceptable Use Policy. Your Policy says that the "Customer may only use DreamHost Web Hosting's Server for lawful purpose. Transmission of any material in violation of any Country, Federal, State or Local regulation is prohibited…. Also, using DreamHost's servers or network to conspire to commit or support the commission of illegal activities is forbidden."[3] Violations may "result in immediate and permanent disablement" of the customer's website. That is why I write to inform you that Defense Distributed will be using the Defcad Website to violate New Jersey law.

Sincerely,

Gurbir S. Grewal
Attorney General

---

[1] Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns," Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[2] Tess Owen, "Get Ready for the New Era of 3D-Printed Guns Starting August 1," Vice News (July 18, 2018), available at https://news.vice.com/en_us/article/ev8xjn/get-ready-for-the-new-era-of-3d-printed-guns-starting-august-1.

[3] "Acceptable Use Policy," available at https://www.dreamhost.com/legal/acceptableuse-policy/.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Defense Distributed, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>Matthew J. Platkin,<br>New Jersey Attorney General,<br><br>*Defendant*. | No. 3:19-cv-4753 |

## Certificate of Service

BECK REDDEN LLP
Chad Flores
cflores@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-3700

HARTMAN & WINNICKI, P.C.
Daniel L. Schmutter
dschmutter@hartmanwinnicki.com
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

I, **DANIEL L. SCHMUTTER, ESQ.**, hereby certify as follows:

1.        I am an attorney at law admitted to practice before this Court and am a member of the firm of Hartman & Winnicki, P.C., attorneys for Plaintiffs in the above-captioned matter.  On May 5, 2023, I electronically filed and served Plaintiffs' Third Amended Complaint on counsel of record on behalf of Plaintiffs.  I declare under penalty of perjury that the foregoing is true and correct.


                        By: s/ Daniel L. Schmutter, Esq.
                            Dated: January 23, 2023
                            Daniel L. Schmutter, Esq.
                            **HARTMAN & WINNICKI, P.C.**
                            74 Passaic Street
                            Ridgewood, New Jersey 07450
                            Phone: (201) 967-8040
                            Fax:    (201) 967-0590
                            dschmutter@hartmanwinnicki.com
                            *Attorneys for Plaintiffs*

**App. 339**

ue ranges for the "growth case," and J.P. Morgan's transactions data) because J.P. Morgan had access to them. We reject these arguments here for the same reasons we rejected them with respect to the revenue and EBITDA projections for 2017 and 2018. *See supra* Part III.B.

## IV.

Heinze's second cause of action arises under Section 20(a) of the 1934 Act. It alleges that the individual defendants are liable for any violations described in the first cause of action committed by a person they controlled. *See* 15 U.S.C. § 78t(a). Because Heinze has failed to state a predicate claim under Section 14(a) and SEC Rule 14a-9, he has also failed to state a claim under Section 20(a). *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996).

## V.

**[13, 14]** Finally, Heinze argues that the district court erred in not granting him leave to further amend his complaint. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave when justice so requires."). "Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Pervasive Software Inc. v. Lexware GmbH*, 688 F.3d 214, 232 (5th Cir. 2012) (quoting *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)). When the district court provides no explanation for denying leave to amend, we can affirm if the futility of amendment is "readily apparent" and the record reflects "ample and obvious grounds for denying leave to amend." *Ibid.* (quoting *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004)).

**[15]** Heinze already had one opportunity to amend his complaint. He makes "only a general request for leave to amend" and has not identified how amendment would cure the defects identified above. *Ibid.* We therefore hold that amendment would be futile and that the district court did not abuse its discretion in denying leave to amend.

\* \* \*

The district court's judgment is AFFIRMED.



**DEFENSE DISTRIBUTED; Second Amendment Foundation, Incorporated, Plaintiffs - Appellants**

**v.**

**Gurbir S. GREWAL, Attorney General of New Jersey, in his official capacity, Defendant - Appellee**

**No. 19-50723**

United States Court of Appeals, Fifth Circuit.

FILED August 19, 2020

**Background:** Distributor of information related to the three-dimensional printing of firearms and firearm ownership advocacy association brought action against nine state Attorneys General, including New Jersey Attorney General, challenging select enforcement actions taken by the Attorneys General. The United States District Court for the Western District of Texas, Robert L. Pitman, J., 364 F.Supp.3d 681, granted defendants' motions to dismiss for lack of personal jurisdiction, and, 2019 WL 2744181, denied plaintiffs' motion to alter or amend judgment. Plaintiffs appealed, as to New Jersey Attorney General's motion.

**Holdings:** The Court of Appeals, Jones, Circuit Judge, held that New Jersey Attorney General established sufficient minimum contacts with Texas to subject him to jurisdiction of Texas's courts.

Reversed and remanded.

Higginson, Circuit Judge, filed a concurring opinion.

**1. Federal Courts ⊶3581(4)**

Court of Appeals reviews the district court's dismissal for lack of personal jurisdiction de novo.

**2. Federal Courts ⊶2082**

At the motion to dismiss stage, the plaintiffs bear the burden of presenting sufficient evidence to support a prima facie case of jurisdiction.

**3. Federal Courts ⊶2791**

On a motion to dismiss for lack of personal jurisdiction, the court accepts the plaintiff's uncontroverted, nonconclusional factual allegations as true and resolves all controverted allegations in the plaintiff's favor.

**4. Constitutional Law ⊶3964**
   **Federal Courts ⊶2721, 3025(4)**

Personal jurisdiction exists where the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction comports with due process. U.S. Const. Amend. 14.

**5. Federal Courts ⊶2721**

Because Texas's long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment, inquiries into both provisions merge on a motion to dismiss for lack of personal jurisdiction. U.S. Const. Amend. 14; Tex. Civ. Prac. & Rem. Code Ann. § 17.042.

**6. Constitutional Law ⊶3964**

The due process requirement for specific jurisdiction is that the defendant has minimum contacts with the forum state such that imposing a judgment would not offend traditional notions of fair play and substantial justice. U.S. Const. Amend. 14.

**7. Constitutional Law ⊶3965(11)**
   **Federal Courts ⊶2730**

New Jersey Attorney General established sufficient minimum contacts with Texas to subject him to jurisdiction of Texas's courts, consistent with due process, with respect to action brought by distributor of information related to the three-dimensional printing of firearms and firearm ownership advocacy association; Attorney General sent cease-and-desist letter to distributor in Texas, demanding that distributor cease publication of its materials generally, rather than just to New Jersey residents, distributor alleged that letter caused it to cease publication and reduced Texans' access to materials, and Attorney General knew that letter would have a potentially devastating impact on plaintiffs and those who wished to benefit from plaintiffs' activities, including Texas residents. U.S. Const. Amend. 14.

**8. Constitutional Law ⊶3965(11)**
   **Federal Courts ⊶2730**

Nationwide injunction obtained by New Jersey Attorney General did not represent direct contacts with Texas, as would support personal jurisdiction over Attorney General, consistent with due process, in action brought by distributor of information related to the three-dimensional printing of firearms and firearm ownership advocacy association; the nationwide injunction was a nationwide order not targeting Texas but rather the plaintiffs' nationwide operations. U.S. Const. Amend. 14.

**9. Constitutional Law ⊶3965(11)**
   **Federal Courts ⊶2730**

New Jersey Attorney General's threats to companies that contracted with

distributor of information related to the three-dimensional printing of firearms, did not represent direct contacts with Texas, as would support personal jurisdiction over Attorney General, consistent with due process, in action brought by distributor and firearm ownership advocacy association; the companies that Attorney General threatened were based in California, not Texas. U.S. Const. Amend. 14.

**10. Constitutional Law ⚖3965(11)**
   **Federal Courts ⚖2730**

Live broadcast by New Jersey Attorney General, calling out founder of distributor of information related to the three-dimensional printing of firearms by name, and promising that he would "come after" anyone who was contemplating making a printable gun and "the next ghost gun company," did not represent direct contacts with Texas, as would support personal jurisdiction over Attorney General, consistent with due process, in action brought by distributor and firearm ownership advocacy association; broadcast event took place in New Jersey, not Texas. U.S. Const. Amend. 14.

**11. Constitutional Law ⚖3964**

When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes "purposeful availment," for purposes of the due process personal jurisdiction analysis. U.S. Const. Amend. 14.

   See publication Words and Phrases for other judicial constructions and definitions.

**12. Federal Courts ⚖2724(1)**

It is the defendant's contacts with the forum state, and not just the plaintiff, that must drive the personal jurisdiction analysis.

**13. Federal Courts ⚖2724(1)**

A defendant's knowledge of a plaintiffs' strong forum connections is insufficient to allow the exercise of personal jurisdiction over the defendant; that is, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum state.

**14. Constitutional Law ⚖1499**

Censorship, like libel, is damaging not just to the speaker, but to surrounding audiences, and like libel, censorship's harm occurs not just where it originates, but where it arrives. U.S. Const. Amend. 1.

**15. Federal Courts ⚖3409**

New Jersey Attorney General waived arguments that exercise of personal jurisdiction over him would not be fair and reasonable, and that under the plain text of the Texas long-arm statute, it was not proper for Texas courts to exercise jurisdiction over a state official sued in his official capacity regarding his decision to enforce his state's law, where he did not raise such arguments to the district court. Tex. Civ. Prac. & Rem. Code Ann. § 17.042.

**16. Federal Courts ⚖2724(1)**

Minimum contacts in-and-of themselves are insufficient to create jurisdiction with respect to a cause of action; the cause of action must arise from the forum-related contacts and the exercise of personal jurisdiction must be fair and reasonable.

**17. Federal Courts ⚖3391**

The general rule is that arguments not raised before the district court are waived and will not be considered on appeal.

**18. Federal Courts ⚖2701**

Questions of personal jurisdiction typically do not lend themselves to broad generalizations; they require an understanding of particular facts and an application of general principles.

Appeal from the United States District Court for the Western District of Texas, Robert L. Pitman, U.S. District Judge

Chad Flores, Esq., Beck Redden, L.L.P., Houston, TX, for Plaintiffs-Appellants.

Jeremy M. Feigenbaum, Esq., Glenn Moramarco, Assistant Attorney General, Office of the Attorney General for the State of New Jersey, Trenton, NJ, Alexander Hardiman, Esq., Attorney, Pillsbury Winthrop Shaw Pittman, L.L.P., New York, NY, Ronald Casey Low, Pillsbury Winthrop Shaw Pittman, L.L.P., Austin, TX, for Defendant-Appellee.

Before JONES, ELROD, and HIGGINSON, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal arises from the ongoing efforts of New Jersey's Attorney General Gurbir Grewal and several of his peers to hamstring the plaintiffs' distribution of materials related to the 3D printing of firearms. To defend against their efforts, the plaintiffs filed this lawsuit, alleging, *inter alia*, infringement of their First Amendment rights and state law claims. Grewal countered with a motion to dismiss for lack of personal jurisdiction. The district court, relying principally on this court's decision in *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), granted Grewal's motion. *Stroman*, however, is distinguishable from this case and does not compel dismissal. Based on well-established principles of personal jurisdiction, we conclude that Grewal is subject to the jurisdiction of Texas courts. We REVERSE and REMAND for further proceedings.

## I

Plaintiff Defense Distributed is a Texas company operated for the purpose of promoting popular access to firearms. To carry out this purpose, it produces and makes accessible information related to the 3D printing of firearms and publishes and distributes such information to the public. Plaintiff Second Amendment Foundation, Inc. ("SAF") is a nationwide, nonprofit membership organization that "promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control." Across the nation, SAF members seek the digital firearms information created by Defense Distributed, circulate their own digital firearms information by utilizing Defense Distributed's facilities, and republish digital firearms information independently.

Defense Distributed began distributing files related to the 3D printing of firearms in December 2012. It did so by publishing files to its defcad.org and defcad.com websites and letting visitors freely download them. It also distributed digital firearms information via mail and at a brick-and-mortar public library in Austin, Texas. Defense Distributed's efforts were initially met with opposition from the United States Department of State.[1] But, after a period of litigation, the parties reached a settlement agreement that granted Defense Distributed a license to publish its files.

Shortly thereafter, nine Attorneys General, including New Jersey Attorney General Grewal, filed suit on behalf of their respective states in the Western District of Washington to enjoin the State Depart-

---

**1.** *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016); *id.* at 462–76

(Jones, J., dissenting).

ment from authorizing the release of Defense Distributed's files. They argued that the State Department's license to Defense Distributed constituted an *ultra vires* about-face that violated the Administrative Procedure Act and jeopardized the states' statutory and regulatory schemes for firearms. The Western District of Washington quickly issued a temporary restraining order, followed closely by a nationwide preliminary injunction.[2]

Just before the Attorneys General sued in Washington, Defense Distributed and SAF brought the instant action in the Western District of Texas challenging select enforcement actions taken by the state Attorneys General. Of relevance to this appeal, plaintiffs alleged these actions by Grewal: (1) sending a cease-and-desist letter threatening legal action if Defense Distributed published its files; (2) sending letters to third-party internet service providers based in California urging them to terminate their contracts with Defense Distributed; (3) initiating a civil lawsuit against Defense Distributed in New Jersey;[3] and (4) threatening Defense Distributed with criminal sanctions at a live press conference. Further, these actions, coupled with the injunctive orders issued in the Washington litigation, have caused Defense Distributed to cease publication of its materials. The plaintiffs asserted, *inter alia*, that these actions infringed the exercise of their First Amendment freedoms and constituted tortious interference with

the State Department's settlement agreement.

Grewal moved to dismiss for lack of personal jurisdiction.[4] The plaintiffs, meanwhile, sought a preliminary injunction. After holding a hearing and considering the parties' arguments, the court granted Grewal's motion and dismissed the action without prejudice.

The district court's order addressed two primary issues: judicial estoppel and minimum contacts. The plaintiffs had argued that Grewal should be judicially estopped from challenging the court's jurisdiction because, in the Washington litigation, Grewal asserted that Defense Distributed had minimum contacts with Washington, and that argument was inconsistent with the position taken in Grewal's motion to dismiss. The court disagreed, concluding that Grewal's position in the Washington case "is in no way inconsistent with [his] argument here that [he] ha[s] no minimum contacts with Texas."

Next, the court determined that the plaintiffs failed to establish that Grewal had "minimum contacts with the State of Texas." The court found most instructive this court's decision in *Stroman*, in which it was held that sending a cease-and-desist letter into Texas was, by itself, insufficient to exercise personal jurisdiction over an out-of-state defendant. Just as in *Stroman*, the court explained, Grewal did not "purposefully avail [himself] of the benefits of

2. The Attorneys General later filed a motion for summary judgment, which the district court granted in part. *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130 (W.D. Wash. 2019). On appeal, the Ninth Circuit found that the case was moot and thus dismissed for lack of jurisdiction. *Washington v. Defense Distributed*, Nos. 20-35030 & 20-35064, 2020 WL 4332902 (9th Cir. July 21, 2020).

3. That lawsuit was removed to federal court before being administratively terminated in

light of the nationwide injunction issued in Washington. The plaintiffs have likewise sued in New Jersey, raising the same claims asserted in the case at bar. *See Defense Distributed v. Grewal*, D.N.J. No. 3:19-CV-4753, 2019 WL 462758. That case is currently stayed pending resolution of this one.

4. The other state Attorneys General also moved to dismiss, and the district court granted their motions. On appeal, the plaintiffs challenge only the judgment related to Grewal.

Texas law like someone actually 'doing business' in Texas" when he demanded that Defense Distributed cease publication of its materials. *See Stroman*, 513 F.3d at 484. "It follows that [Grewal] could not have reasonably anticipated being haled into federal court in Texas to defend [the enforcement of his state's laws]." The court rejected the plaintiffs' attempt to distinguish *Stroman* based on Grewal's additional alleged contacts, finding that they were either the plaintiffs' own contacts with Texas or were contacts not "expressly aimed at Texas." The district court also rejected the plaintiffs' invocation of the "effects test" pronounced in *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L.Ed.2d 804 (1984), because it believed only the plaintiffs—and not Texas more generally—were affected by Grewal's enforcement activities. Grewal's relationship to Texas, in other words, was a "mere fortuity."

The plaintiffs' motion to alter or amend the judgment was denied, and they timely appealed.

## II

In this court, the plaintiffs continue to press the arguments that the doctrine of judicial estoppel bars Grewal from arguing against personal jurisdiction, and Grewal has established sufficient minimum contacts with Texas to subject him to the jurisdiction of Texas's courts. We agree with the second argument and thus need not address the judicial estoppel claim.

**[1–3]** "We review the district court's dismissal for lack of personal jurisdiction *de novo*." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). At the motion to dismiss stage, the plaintiffs bear the burden of presenting sufficient evidence to support a prima facie case of jurisdiction. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000). We "accept the plaintiff's

uncontroverted, nonconclusional factual allegations as true and resolve all controverted allegations in the plaintiff's favor." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001).

**[4, 5]** Personal jurisdiction exists where the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction comports with due process. *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019). "Because Texas's long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment, the two inquiries merge." *Id.* Though personal jurisdiction can be general or specific, this case implicates only the latter. Texas's long-arm statute permits the exercise of specific jurisdiction over any defendant "doing business" in the state, including defendants who "commit[ ] a tort in whole or in part in th[e] state." Tex. Civ. Prac. & Rem. Code § 17.042.

**[6]** "The constitutional requirement for specific jurisdiction is that the defendant has 'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'" *Stroman*, 513 F.3d at 484 (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L.Ed. 95 (1945)). This court has framed the inquiry as a three-step analysis: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)

(quoting *Nuovo Pignone, SpA v. STOR-MAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).

**[7]** The issue on appeal is whether Grewal has established sufficient minimum contacts with Texas. The parties' arguments rely on the interpretation and application of three cases—*Stroman*; *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999); and *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L.Ed.2d 804 (1984). Grewal argues that *Stroman* controls here and compels the conclusion that he lacks the minimum contacts necessary to justify the exercise of jurisdiction. The plaintiffs aver that *Stroman* is distinguishable and posit that the district court's judgment runs counter to principles announced in *Wien Air Alaska* and *Calder*. We consider each of these cases in turn.

Stroman Realty, Inc. was a Texas-based real estate firm that sought relief in Texas federal court from attempts by the Commissioner of the Arizona Department of Real Estate to exercise regulatory authority over the company's timeshare sales business. *Stroman*, 513 F.3d at 479. "[T]he totality of the Commissioner's contacts with Texas involve[d] a cease and desist order and correspondence with Stroman's attorneys." *Id.* at 485. This court concluded that "[b]ased on such minimal known contacts, . . . [the] nonresident state official . . . could not have reasonably anticipated being haled into federal court in Texas to defend her enforcement of an Arizona statute." *Id.* at 484.

This court disagreed with Stroman's invocation of the *Calder* "effects test," as we observed that this circuit has "declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident." *Id.* at 486. "By seeking to regulate Stroman's activities involving Arizona residents or property," the court explained, "the Commissioner is not 'expressly aim[ing]' her

actions at Texas." *Id.* (alteration in original) (quoting *Calder*, 465 U.S. at 789, 104 S. Ct. at 1487). Rather, "it was Stroman who chose to market Arizona properties and transact business with Arizona residents. Arizona is simply attempting to uniformly apply its laws." *Id.* Put another way, the nexus to Texas was "based entirely on the unilateral actions and decisions of Stroman, not the Commissioner." *Id.* And "[i]n general, '[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Id.* (second alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)). To embrace Stroman's approach, the court warned, would subject state officials seeking to enforce their state's laws "to suit in any state where the validity of her state's laws were in question." *Id.*

The facts of this case bear a resemblance to those in *Stroman*. "[T]he totality of [Grewal's] contacts with Texas involves a cease and desist order" sent to Defense Distributed. *Id.* at 484. And Grewal's purpose in issuing the cease-and-desist letter ostensibly was to enforce New Jersey public nuisance and negligence laws (more on this below). Further, Grewal, like the Commissioner in *Stroman*, was sued in his official capacity and did not derive commercial benefits from performing his governmental function.

While acknowledging some of these factual similarities, the plaintiffs contend that *Stroman* is distinguishable principally because the cease-and-desist letter at issue in *Stroman* focused on activities occurring *outside* Texas whereas Grewal's cease-and-desist letter focused on activities occurring *inside* Texas. But *Stroman* expressly forecloses this distinction. "Although it may be true that the Commissioner's action against Stroman is based upon *conduct*

*which occurred entirely in Texas*, we cannot find, as Stroman urges, that the Commissioner has purposefully directed her conduct at Texas. . . . [T]he Commissioner, by proceeding with the cease and desist order, is essentially asserting nationwide authority over any real estate transactions involving Arizona residents or property." *Id.* at 485–86 (emphasis added).

**[8–10]**    The plaintiffs also maintain that *Stroman* is distinguishable because Grewal did more than just send a cease-and-desist letter. He "(1) obtained a nationwide injunction that governs the State of Texas itself and everyone in it, (2) threatened companies that contracted to provide internet security services for Defense Distributed, and last but not least, (3) stood at a live broadcast's podium to call out Defense Distributed's founder by name and promise that he would 'come after' 'anyone who is contemplating making a printable gun' and 'the next ghost gun company.'" None of these actions, however, represent direct contacts with Texas.[5] The nationwide injunction is just that—a nationwide order not targeting Texas but rather the plaintiffs' nationwide operations. *Cf. J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880–87, 131 S. Ct. 2780, 2787–91, 180 L.Ed.2d 765 (2011) (rejecting jurisdiction based on the defendant's nationwide product distribution system where the defendant did not otherwise manifest an intent to benefit from or submit to the laws of the forum state). The companies Grewal threatened are based in California, not Texas, and the broadcast event the plaintiffs reference took place in New Jersey.

*Stroman*, however, is distinguishable in at least two key respects. First, many of the plaintiffs' claims are based on Grewal's cease-and-desist letter. In contrast, Stro-

man's claim was that "Arizona's attempted exercise of regulatory jurisdiction to license timeshare resales violated the Commerce Clause by discriminatorily and unduly burdening nonresident participation in the interstate secondary timeshare market." *Stroman*, 513 F.3d at 481. Stroman's claim, in other words, was more a product of Arizona's regulatory scheme than it was the cease-and-desist letter itself. Not so for the plaintiffs' claims here, many of which are based on injuries stemming solely and directly from Grewal's cease-and-desist letter. Grewal's contact with Texas is more relevant to the personal jurisdiction inquiry than was the cease-and-desist letter analyzed in *Stroman*.

Second, and more important, *Stroman* found that the Arizona public official did not purposefully direct her conduct at Texas because she was simply "asserting nationwide authority over any real estate transactions involving Arizona residents or property." *Id.* at 486. The contrary is alleged here. Grewal's assertion of legal authority is much broader. He does not cabin his request by commanding the plaintiffs to stop publishing materials to New Jersey residents; he instead demands that the plaintiffs cease publication of their materials generally. For example, in his cease-and-desist letter, Grewal states that the plaintiffs' "widespread dissemination of printable-gun computer files is negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey." He accordingly requests that Defense Distributed "halt publication of the printable-gun computer files" without specifying that Defense Distributed cease marketing its materials to New Jersey residents.[6]

---

**5.**  But, as explained below, these actions affirm Grewal's intention to undermine Defense Distributed's operations and have significant effects on Texas.

**6.**  Grewal's letter opens with the command *"*to cease and desist from publishing printable-gun computer files *for use by New Jersey residents*.*"* Perhaps this could be interpreted as a

Grewal's conduct beyond sending the cease-and-desist letter confirms his intent to crush Defense Distributed's operations and not simply limit the dissemination of digital files in New Jersey. Grewal's enforcement actions are selective. He has not targeted the many similarly-situated persons who publish Defense Distributed's files on the internet.[7] *Cf. id.* (stressing that Arizona was "simply attempting to *uniformly* apply its laws") (emphasis added). Instead, he has focused solely on Defense Distributed. Perhaps nowhere is this better illustrated than in Grewal's efforts to enjoin the national distribution of Defense Distributed's files by suing in Washington, far from his or the plaintiffs' home state. Grewal has also threatened Defense Distributed's founder, Cody Wilson, by name, promising to "come after" "anyone who is contemplating making a printable gun" and "the next ghost gun company." Together, these actions confirm Grewal's intent to force Defense Distributed to close shop.

Relatedly, the intended effects on the plaintiffs and, by extension, the intended effects on Texas residents who would benefit from the plaintiffs' activities, are much greater than the effects at issue in *Stroman*. Whereas the Arizona Commissioner only requested that Stroman acquire a license before doing business in the state,

Grewal seeks to bar Defense Distributed from publishing its materials anywhere, not just in New Jersey. Grewal's actions, moreover, have all been taken in the name of law and order. He has projected himself across state lines and asserted a pseudo-national executive authority that the public official in *Stroman* never asserted. Because *Stroman* is distinguishable, and thus not dispositive, we consider the applicability of *Wien Air Alaska* and *Calder*.[8]

In *Wien Air Alaska*, this court considered whether the defendant, Brandt, had sufficient contacts with Texas to subject him to the jurisdiction of Texas's courts. Relying largely on *Calder*'s "effects test," the court concluded that he did. "Brandt performed several tortious actions outside of Texas directed towards Wien Air in Texas. These activities had foreseeable effects in the forum and were directed at the forum." *Wien Air Alaska*, 195 F.3d at 212. Brandt's contacts included "letters, faxes, and phone calls to Texas . . . whose contents contained fraudulent misrepresentations and promises and whose contents failed to disclose material information." *Id.* Brandt argued that these communications, standing alone, were insufficient to support a finding of minimum contacts. *Id.* at 213. The court disagreed. "When the actual content of communications with a forum

limited instruction. But, as just noted, elsewhere, Grewal orders Defense Distributed to ''halt publication of the printable-gun computer files'' lock, stock, and barrel. This latter command better captures the general tone of the cease-and-desist letter. And regardless, at this stage of the litigation, we are required to resolve all factual disputes in favor of the plaintiff. *Panda Brandywine Corp.*, 253 F.3d at 868.

7. As Defense Distributed notes in its complaint, other publishers continue to publish Defense Distributed's files to generally-accessible internet websites. ''Such files can be located with a simple Google search.'' *See also Defense Distributed*, 838 F.3d at 462

(Jones, J., dissenting) (observing that Defense Distributed's files were downloaded ''hundreds of thousands of times'').

8. The separate concurrence overstates our reliance on these cases. We do not consider them because they are factually analogous, but because they establish principles of law applicable to this case. Relatedly, we do not rely on an effects test unmoored from a minimum contacts analysis, as the concurrence suggests. The exercise of personal jurisdiction over Grewal is proper because Grewal established sufficient minimum contacts with Texas. The legal principles articulated in *Wien Air Alaska* and *Calder* (among other cases) guide us to this conclusion.

App. 348

gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Id.* "The defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas." *Id.* "It is of no use to say that the plaintiff 'fortuitously' resided in Texas. ... If this argument were valid in the tort context, the defendant could mail a bomb to a person in Texas but claim Texas had no jurisdiction because it was fortuitous that the victim's zip code was in Texas." *Id.*

[11] Similarly, Grewal's communication with Defense Distributed, specifically the cease-and-desist letter delivered into Texas, itself gives rise to distinct tort causes of action. Section 1983's intentional "tort" of unconstitutional censorship and intentional interference with a contractual relationship are just two possibilities. And when "the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Id.*

Grewal argues that the plaintiffs cherry-picked this legal proposition and ignored glaring factual differences between *Wien Air Alaska* and this case. We disagree with Grewal's initial assertion, but it is correct that the facts in the two cases are distinguishable. Even so, the principles articulated in *Wien Air Alaska* remain relevant, as do the principles announced in *Calder*.

*Calder* was a libel suit instituted by a California actress in California state court against a reporter and an editor, both of whom worked for the National Enquirer at its headquarters in Florida. *Calder*, 465 U.S. at 784–85, 104 S. Ct. at 1484. The plaintiff's libel claims were based on an article written and edited by the defendants in Florida for publication in the National Enquirer, a national weekly newspaper with a California circulation of roughly 600,000. *Id.* The California Court of Appeals held that California's assertion of

jurisdiction over the defendants was consistent with due process, and the Supreme Court affirmed. Although the Court recognized that the defendants' activities "focus[ed]" on the plaintiff, the jurisdiction inquiry turned on "the relationship among the defendant, the forum, and the litigation." *Id.* at 788, 104 S. Ct. 1482 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S. Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)). Thus, the Court focused on the contacts the defendants had created with California (and not just with the plaintiff). It found those contacts to be ample. The defendants relied on phone calls to "California sources" for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the state; and the "brunt" of that injury was suffered by the plaintiff in that state. *Id.* at 788–89, 104 S. Ct. 1482. "In sum, California [wa]s the focal point both of the story and of the harm suffered." *Id.* at 789, 104 S. Ct. 1482. Jurisdiction over the defendants was "therefore proper in California based on the 'effects' of their Florida conduct in California." *Id.*

[12, 13] Thirty years later, the Court revisited *Calder* and explained the scope of its holding:

The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. ... [T]he reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, ... the defendants' intentional

tort actually occurred *in* California. . . . In this way, the "effects" caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction.

*Walden v. Fiore*, 571 U.S. 277, 287–88, 134 S. Ct. 1115, 1123–24, 188 L.Ed.2d 12 (2014) (emphasis in original). *Walden* makes clear that *Calder* remains good law. But *Walden* also emphasizes that it is the defendant's contacts with the forum state, and not just the plaintiff, that must drive the personal jurisdiction analysis. *Id.* at 285, 134 S. Ct. 1115 ("[T]he plaintiff cannot be the only link between the defendant and the forum."); *id.* at 286, 134 S. Ct. 1115 ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."). It is insufficient for the defendant to simply have knowledge of a plaintiffs' "strong forum connections." *Id.* at 289, 134 S. Ct. 1115. That is, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* at 290, 134 S. Ct. 1115; *see also Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, ⸺ U.S. ⸺, 137 S. Ct. 1773, 1780, 198 L.Ed.2d 395 (2017) ("[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.") (alteration in original omitted) (internal quotation marks and citation omitted).

[14] Returning to the present case, Grewal argues that, unlike in *Calder*, where the content of the article served as the basis for the libel claim, the plaintiffs attribute their injury to Grewal's enforcement action and not the cease-and-desist letter. Grewal misreads the plaintiffs' complaint: they allege that Grewal's letter had a chilling effect on the exercise of their First Amendment rights (among other constitutional and Texas law violations). That chilling effect, in turn, caused them to cease publication and reduced Texans' access to the materials the plaintiffs seek to publish. The statewide impact is not unlike that of the defamatory article at issue in *Calder*, which shaped Californians' view of the defamed actress.[9] In this sense, Grewal created contacts with Texas and not just the plaintiffs.

Grewal's contacts with Texas, moreover, are more than a "mere fortuity," as the district court found. Grewal intentionally mailed the cease-and-desist letter into Texas, a contact *Walden* specifically mentioned as relevant to the personal jurisdiction inquiry. *See Walden*, 571 U.S. at 285, 134 S.Ct. 1115 ("[P]hysical entry into the State—either by the defendant in person or through an agent, goods, *mail*, or some other means—is certainly relevant contact." (emphasis added)). Further, that contact alone gave rise to distinct tort causes of action. Grewal knew that the cease-and-desist letter would "have a potentially devastating impact" on the plaintiffs—and, by extension, those who wished to benefit from the plaintiffs' activities, including Texas residents. *Calder*, 465 U.S. at 789, 104 S.Ct. 1482. And he "knew that the brunt of [the] injury would be felt by [the plaintiffs] in [Texas]." *Id.* at 789–90, 104 S. Ct. 1482; *see also Wien Air Alaska*, 195 F.3d at 211 ("The foreseeable effects

---

9.  Censorship, like libel, is damaging not just to the speaker, but to surrounding audiences.

And like libel, censorship's harm occurs not just where it originates, but where it arrives.

of a tort 'are to be assessed as *part* of the analysis of the defendant's relevant contacts with the forum.'") (emphasis in original) (quoting *Allred v. Moore & Peterson*, 117 F.3d 278, 287 (5th Cir. 1997)).

**[15–17]**  Based on the foregoing analysis, the principles discussed in *Wein Air Alaska* and *Calder* (and reaffirmed in *Walden*) control. Grewal has established sufficient minimum contacts with Texas to subject him to the jurisdiction of Texas's courts.[10] Of course, minimum contacts in-and-of themselves are insufficient to create jurisdiction. The cause of action must arise from the forum-related contacts and the exercise of personal jurisdiction must be fair and reasonable. *Seiferth*, 472 F.3d at 271. Grewal takes issue with the second of these two requirements and contends that a judgment in the plaintiffs' favor would offend traditional notions of fair play and substantial justice. We are skeptical of this argument. *See DeJoria v. Maghreb Petroleum Expl., S.A.*, 804 F.3d 373, 388 (5th Cir. 2015) ("If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice.") (internal quotation marks omitted) (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*,

414 S.W.3d 142, 154–55 (Tex. 2013)). But in any event, Grewal did not raise this argument below, either in his initial motion to dismiss or in his reply. "The general rule of this court is that arguments not raised before the district court are waived and will not be considered on appeal." *Celanese Corp. v. Martin K. Eby Const. Co.*, 620 F.3d 529, 531 (5th Cir. 2010); *see also Broad. Music, Inc. v. M.T.S. Enters., Inc.*, 811 F.2d 278, 281 (5th Cir. 1987) ("[O]bjections to personal jurisdiction or to service of process must be raised in a timely fashion, i.e., as a party's first pleading in the case, or they are waived."). We follow that rule here. The same goes for Grewal's argument that "[u]nder the plain text of the Texas long-arm statute, and the analysis by *Stroman* and other courts, it is not proper for Texas courts to exercise jurisdiction over a state official sued in his official capacity regarding his decision to enforce his state's law." Grewal should have raised these arguments timely if he intended to rely on them in this court.

### III

**[18]**  Questions of personal jurisdiction typically do not lend themselves to broad generalizations. *See Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003,

---

**10.**  We do not intend to convey that sending a cease-and-desist letter into a forum always subjects the sender to jurisdiction in the forum state. *Cf. Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006) ("There are strong policy reasons to encourage cease and desist letters. They are normally used to warn an alleged rights infringer that its conduct, if continued, will be challenged in a legal proceeding, and to facilitate resolution of a dispute without resort to litigation. If the price of sending a cease and desist letter is that the sender thereby subjects itself to jurisdiction in the forum of the alleged rights infringer, the rights holder will be strongly encouraged to file suit in its home forum without attempting first to resolve the dispute informally by

means of a letter."). Indeed, as our review of *Stroman* makes clear, sending a cease-and-desist letter may, under different circumstances, be insufficient to establish personal jurisdiction. *See also Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins.*, 921 F.3d 522, 542 (5th Cir. 2019) (reaching the same conclusion as *Stroman*, albeit under facts that are markedly different from the facts here). Today's holding is derivative of the specific language used in Grewal's cease-and-desist letter coupled with other actions he took that, together, demonstrate his intent to gut Defense Distributed's operations and restrict Texans' access to Defense Distributed's materials. That the plaintiffs' injuries are directly attributable to the cease-and-desist letter itself also weighs heavily in our analysis.

1006 (5th Cir. 1982) ("[W]hether the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state."). They require an understanding of particular facts and an application of general principles. Having carefully considered the facts of this case, we conclude that *Stroman* is distinguishable and thus not dispositive. Applying the principles discussed in *Wien Air Alaska* and *Calder*, we hold that jurisdiction over Grewal is proper. The judgment of the district court is **REVERSED** and the case is **REMANDED** for further proceedings.

STEPHEN A. HIGGINSON, Circuit Judge, concurring:

I agree that the allegations of Attorney General Grewal attempting to prevent Texas residents from publishing files online to individuals outside of New Jersey constitute purposeful direction of his activities toward the State of Texas such that he should have "reasonably anticipate[ed] being haled into court" there. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Unlike the Commissioner of the Department of Real Estate in *Stroman Realty, Incorporated v. Wercinski*, who was "simply attempting to uniformly apply its [state] laws" against those who "chose to market Arizona properties and transact business with Arizona residents," Grewal is alleged to have attempted to reach conduct that did not involve New Jersey residents or assets at all.[1] 513 F.3d 476, 486 (5th Cir. 2008). Thus, I agree that jurisdiction exists in this case where it did not in *Stroman*. But I find the limiting principles given in *Stroman* protecting state government officials, as should be assured reciprocally for Attorneys General from our three states, vitally important and binding in this circuit even after our holding today.

I disfavor parallels between this case and *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999) or *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). *Wien Air Alaska* involved a commercial dispute that is largely incomparable to the state law enforcement in this case. As we pointed out in *Stroman*, "the absence of 'commercial transactions in interstate commerce' in which a defendant 'sought a commercial benefit' preclude[s] an analogy to commercial activity cases as a basis for assertion of personal jurisdiction." 513 F.3d at 485 (quoting *Kulko v. Superior Court*, 436 U.S. 84, 97, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978)). *Wien Air Alaska* is also distinguishable because that commercial defendant engaged in multiple types of interactions beyond a cease-and-desist letter. 195 F.3d at 212–14. He contacted the plaintiff "numerous" times via "letters, faxes, and phone calls to Texas." *Id.* at 212. He also visited Texas and held other meetings in person with the plaintiff as part of an ongoing attorney-client relationship with the plaintiff. *Id.* at 214. This ongoing business relationship is a more natural fit for the "doing business" re-

---

**1.** Importantly, at the motion to dismiss phase, a plaintiff's allegations must be taken as true. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999) ("Where facts are disputed, the plaintiff presenting a prima facie case is entitled to have the conflicts resolved in his favor."). Therefore, as the majority points out, we do not resolve the factual dispute of whether Grewal did indeed threaten to enforce New Jersey nuisance laws against residents of Texas distributing the online files to residents of states other than New Jersey. If, in fact, Grewal attempted to prevent the distribution of the files only within the state of New Jersey as counsel forcefully contended in oral argument, the case would be analogous to *Stroman*, in which Arizona's Commissioner limited her enforcement to those engaging in real estate transactions in the State of Arizona.

App. 352

quirement in the Texas long-arm statute. TEX. CIV. PRAC. & REM. CODE § 17.042. Any stray language in *Wien Air Alaska* implying that a single cease-and-desist letter, even one that directly relates to the plaintiff's cause of action, creates personal jurisdiction is not tied to the facts of that case.

The comparison to *Calder* is similarly inapt, above all if it is offered by litigants to diminish the state sovereignty principles underlying *Stroman*. That case involved personal jurisdiction based on the "effects" of the commercial defendant's conduct in the forum, rather than the typical minimum contact test. 465 U.S. at 789, 104 S.Ct. 1482. This form of jurisdiction is "rare," and the Supreme Court has moved away from an effects-based analysis, instead requiring "active minimum contacts with the forum state." *Stroman*, 513 F.3d at 486, 489. In *Walden v. Fiore*, the Court explained that *Calder* should not be interpreted to confer jurisdiction whenever an individual is accused of committing a tort against a resident of the forum state:

> *Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

571 U.S. 277, 290, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). We have repeatedly refused to find jurisdiction based on conduct toward an individual who happens to be located in a state—even conduct that causes injury—where the conduct is not expressly aimed at the state. *See Stroman*, 513 F.3d at 486 ("We have declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident."); *Wien Air Alaska*, 195 F.3d at 212 ("Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum."); *see also Walden v. Fiore*, 571 U.S. 277, 285, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). Therefore, I do not agree that Grewal's cease-and-desist letter had a strong enough "effect" in Texas to create jurisdiction.

*Calder* was unique in that there was evidence in the record that the defendant's conduct affected not only the plaintiff but also at least 600,000 others in the forum state. *Calder*, 465 U.S. at 785, 104 S.Ct. 1482 (stating that the circulation of the National Enquirer in California was 600,-000 at the time of the alleged tort); *see also Walden*, 571 U.S. at 287, 134 S.Ct. 1115 ("The strength of th[e] connection [in *Calder*] was largely a function of the nature of the libel tort."). Conversely, Grewal's cease-and-desist letter injured only the plaintiffs because it threatened enforcement against only them.[2] Plaintiffs cannot rely on their connections to Texas alone to show an effect within the state based on Grewal's actions toward them as individuals he knew to be Texans. *See Walden*, 571 U.S. at 289, 134 S.Ct. 1115 ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Neva-

---

**2.** If we were to analyze the effects of Grewal's conduct by looking at the number of people affected by plaintiffs' compliance with his demands, the effects within the larger Texas population would be minimal because Defense Distributed admits that the files remain available online.

da connections."). Though he affirmatively communicated with Texas residents, "none of [Grewal's] challenged conduct had anything to do with [Texas] itself." *Id.*

The majority contends that this is the unique case in which the effect in the forum is significant enough to create jurisdiction because the plaintiffs' injuries are more directly attributable to the letter itself than in *Stroman*. This characterization is in tension with *Stroman*'s holding that "[t]here is no question that the underlying cause of action 'arises' out of the Commissioner's cease and desist order to Stroman in Texas." *Stroman*, 513 F.3d at 487. The majority does not explain how this letter more directly causes the plaintiffs' alleged injuries than the letter in *Stroman*, above all when Grewal's letter begins: "You are directed to cease and desist from publishing printable-gun computer files *for use by New Jersey residents*." (emphasis added). I am therefore unconvinced that "effects" jurisdiction based on Grewal's alleged tort is appropriate; I would instead employ the traditional minimum contacts analysis to find that the aggregate of Grewal's alleged conduct affirmatively reached out into Texas by attempting to enforce state law even when New Jersey citizens or property were not involved.

For these reasons, I agree that Grewal's conduct created minimum contacts with the State of Texas, but I do not agree that

*Wien Air Alaska* and *Calder* control the outcome of this case.[3]



**UNITED STATES of America,
Plaintiff – Appellant,**

**v.**

**Samuel Tanel CRITTENDEN,
Defendant – Appellee.**

**No. 18-50635**

United States Court of Appeals,
Fifth Circuit.

FILED August 20, 2020

**Background:** Following jury's guilty verdict on charges of possession with intent to distribute 500 grams or more of methamphetamine and conspiracy to possess with intent to distribute methamphetamine and marijuana, defendant moved for judgment of acquittal or new trial. The United States District Court for the Western District of Texas, David Briones, Senior District Judge, granted the motion. Government appealed.

**Holdings:** The Court of Appeals, Elrod, Circuit Judge, held that district court did not abuse its discretion in granting a new

---

**3.** Even if personal jurisdiction exists, there is now parallel litigation in Texas and New Jersey, and the parties, and either district court, may seek transfer under 28 U.S.C. § 1404(a). Our observation in *Stroman* was that ''[w]hen a state defends its laws in a faraway forum, it loses the benefit of having the laws examined by local state or federal courts—courts that have special expertise interpreting its laws.'' 513 F.3d at 487. From my review of cases against *government officials* who attempt to enforce a state law, so for no personal or

commercial profit, the litigation has taken place in the governmental official's state. *See generally Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (operator of classified advertising website brought action alleging that the Cook County Sheriff violated his First Amendment rights in the Northern District of Illinois); *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (religious organization and pastor sued Staten Island borough president alleging violations of their First Amendment rights in the Eastern District of New York).

stance. For these reasons, we remand this case to the BIA to determine whether Boch-Saban proved entitlement to equitable tolling.

### VI.

Accordingly, we VACATE the BIA's decision and REMAND the case for consideration on the merits of the issue of equitable tolling.



**DEFENSE DISTRIBUTED; Second Amendment Foundation, Incorporated, Plaintiffs—Appellants,**

**v.**

**Andrew J. BRUCK, Acting Attorney General of New Jersey, in his official and individual capacities, Defendant—Appellee.**

**No. 21-50327**

United States Court of Appeals, Fifth Circuit.

FILED April 1, 2022

**Background:** Publisher of computer assisted design (CAD) files for manufacture of single-round pistol using 3D printer and gun rights nonprofit group filed suit against nine state Attorneys General, including New Jersey Attorney General (NJAG), asserting First Amendment violations arising out of enforcement actions taken by Attorneys General against publisher and tortious interference with settlement agreement reached with United States Department of State in separate litigation. The United States District Court for the Western District of Texas, 364 F.Supp.3d 681, Robert L. Pitman, J., granted motion by Attorney Generals to dismiss case against them for lack of personal jurisdiction, and plaintiffs appealed. The Court of Appeals, 971 F.3d 485, reversed and remanded as to NJAG. On remand, plaintiffs added the State Department as defendant. NJAG then filed joint motion to sever his case from State Department and for transfer of venue to New Jersey federal court. The District Court, Pitman, J., 2022 WL 984870, granted motion. Plaintiffs appealed and petitioned for writ of mandamus.

**Holdings:** The Court of Appeals, Jones, Circuit Judge, held that:

(1) Court of Appeals had jurisdiction over petition for writ of mandamus to compel district court to request that New Jersey federal court return case;

(2) plaintiffs had no adequate means to obtain relief from order granting NJAG's joint motion for severance and transfer of venue, as required to obtain writ of mandamus;

(3) district court clearly abused its discretion when it granted joint motion, as required for plaintiffs to obtain writ of mandamus;

(4) claims against NJAG arose out of same transaction, occurrence, or series of transactions or occurrence as claims against State Department, and therefore weighed against severance of case against NJAG;

(5) judicial economy was not served by severance of case against NJAG;

(6) district court incorrectly weighed the private interest factors in concluding transfer was appropriate; and

(7) district court incorrectly weighed the public interest factors in concluding transfer was appropriate.

Petition granted.

App. 355

Higginson, Circuit Judge, filed dissenting opinion.

**1. Civil Rights** ⚖1457(1)

A loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury for preliminary injunction purposes. U.S. Const. Amend. 1.

**2. Mandamus** ⚖44

Mandamus is the prescribed vehicle for reviewing rulings on transfers of venue.

**3. Federal Courts** ⚖3237

Although the Fifth Circuit Court of Appeals lacks power to order a return of the case to its circuit, the All Writs Act empowers courts to issue writs of mandamus if the courts also have appellate jurisdiction, although no appeal has been perfected, and mandate that the transferor court request that the transferee court return the case. 28 U.S.C.A. § 1651.

**4. Federal Courts** ⚖3239

Under All Writs Act, Court of Appeals had jurisdiction over petition for writ of mandamus to compel Western District of Texas, which transferred case against New Jersey Attorney General (NJAG) to New Jersey federal court, to request that New Jersey court return case to Texas, in action brought by publisher of computer assisted design (CAD) files for manufacture of single-round pistol using 3D printer and gun rights nonprofit group for alleged violations of First Amendment rights and tortious interference with publisher's settlement agreement with United States Department of State; Court of Appeals was court with appellate jurisdiction, and publisher acted with diligence in pursuing relief from transfer order. U.S. Const. Amend. 1; 28 U.S.C.A. §§ 1404(a), 1651.

**5. Mandamus** ⚖1

A writ of mandamus is a drastic and extraordinary remedy reserved for really extraordinary cases.

**6. Mandamus** ⚖1

Court of Appeals will grant a petition for a writ of mandamus only if the petitioner satisfies three conditions: first, the petitioner must show that there are no other adequate means to attain the relief he desires; second, the court must be satisfied that the writ is appropriate under the circumstances; and third, the petitioner must show a clear and indisputable right to the writ.

**7. Mandamus** ⚖4(4), 44

Publisher of computer assisted design (CAD) files for manufacture of single-round pistol using 3D printer and gun rights nonprofit group had no adequate means to obtain relief from district court's orders severing their case against New Jersey Attorney General (NJAG) from case against other state Attorneys General on claims for First Amendment violations and tortious interference with settlement agreement with United States Department of State, and transfer of case against NJAG to New Jersey federal court, as required to obtain writ of mandamus to compel Texas federal district court to request that New Jersey court return case to Texas, where New Jersey court, as transferee court, could not exercise appellate review over either severance or transfer orders. U.S. Const. Amend. 1; 28 U.S.C.A. § 1651.

**8. Federal Courts** ⚖3239

Writ of mandamus under All Writs Act was appropriate to compel district court in Texas to request that New Jersey federal court return case against New Jersey Attorney General (NJAG) that had been filed in Texas, following grant of

NJAG's joint motion to sever his case from case against United States Department of State and to transfer case to New Jersey, in action by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights group for alleged violations of First Amendment rights and tortious interference with settlement agreement; issues raised had importance beyond case, as they raised preeminent questions about abridgement of plaintiffs' First Amendment rights to publish their materials, and they raised concerns about tactics suggesting abusive manipulation of federal court procedures. U.S. Const. Amend. 1; 28 U.S.C.A. §§ 1404(a), 1651.

**9. Mandamus ⬥11**

Granting a writ of mandamus would be especially appropriate where the issues implicated have importance beyond the immediate case.

**10. Federal Courts ⬥3565**

District court, by definition, "abuses its discretion" when it makes error of law.

See publication Words and Phrases for other judicial constructions and definitions.

**11. Federal Courts ⬥3582(2)**

Even if motions to sever a case against a defendant and transfer of that case to another venue are evaluated wholly independently on appeal, a transfer motion cannot stand if the severance motion was wholly unjustified. 28 U.S.C.A. § 1404(a); Fed. R. Civ. P. 21.

**12. Federal Civil Procedure ⬥388**
      **Federal Courts ⬥2901**

Procedural rule which authorizes severance of parties, and statute governing transfers among federal district courts, are both designed to facilitate just, convenient, efficient and less expensive determination, in accordance with the goal of the federal rules to ensure the "just, speedy and inexpensive determination of every action and proceeding." 28 U.S.C.A. § 1404(a); Fed. R. Civ. P. 1, 21.

**13. Federal Civil Procedure ⬥81, 241**

Although district court has broad discretion to sever parties that were otherwise properly joined by plaintiff, the impulse is toward entertaining broadest possible scope of action consistent with fairness to parties; joinder of claims, parties and remedies is strongly encouraged. Fed. R. Civ. P. 1, 21.

**14. Federal Courts ⬥2905**

On a joint motion to sever cases against multiple defendants and to transfer the case against the severed defendant to another venue, the court must weigh carefully the comparative inconvenience of splitting the suit by severance versus the advantages to be gained from a partial transfer of the severed case to another venue, and it should not sever if the defendant not transferred is so involved in the controversy transferred to another court that partial transfer would require the same issues to be litigated in two places. 28 U.S.C.A. § 1404(a); Fed. R. Civ. P. 21.

**15. Federal Courts ⬥2908**
      **Mandamus ⬥44**

District court clearly abused its discretion when it granted New Jersey Attorney General's (NJAG) joint motion to sever case against him from case against United States Department of State and to transfer case against him to New Jersey federal court, in action brought by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit group for alleged violations of First Amendment rights and tortious interference with publisher's settlement agreement with State Department, as required for writ of mandamus to issue to compel district court for

Western District of Texas to request that New Jersey court return case to it; claims against State Department were directly connected to claims pled against NJAG, as First Amendment underlay claims against both defendants, and administration of justice would not be materially advanced by litigating essentially same claims twice in different venues. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a); Fed. R. Civ. P. 1, 21.

**16. Federal Courts ⊶2905**

In most multi-defendant cases—other than those involving forum selection clauses—severance of a defendant's case from the other defendant and transfer of the severed case to another venue makes sense only where the administration of justice would be materially advanced and a defendant in one district is not so involved in the transferred controversy that the same issues would have to be litigated twice. 28 U.S.C.A. § 1404(a); Fed. R. Civ. P. 21.

**17. Federal Civil Procedure ⊶87**

The accepted basis for severance analysis considers five factors: (1) whether claims arise out of the same transaction, occurrence, or series of transactions or occurrence; (2) whether the claims present common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims. Fed. R. Civ. P. 21.

**18. Federal Civil Procedure ⊶87**

Claims against New Jersey Attorney General (NJAG) for alleged First Amendment violations and for tortious interference with settlement agreement with United States Department of State, in action brought by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit group, arose out of same transaction, occurrence, or series of transactions or occurrences as claims against State Department, and therefore weighed against severance of case against NJAG; claims against NJAG and State Department fundamentally concerned settlement agreement reached by publisher and State Department in related case and NJAG's efforts to prevent its meaningful implementation, and interference claims against NJAG could not be proven without initial proof that settlement agreement was breached, which perpetuated alleged violation of plaintiffs' First Amendment speech rights. U.S. Const. Amend. 1; Fed. R. Civ. P. 21.

**19. Federal Civil Procedure ⊶87**

On a motion for severance of a case against multiple defendants, a court is required to determine whether there is at least one common question of law, not whether all of the claims in a case involve the same question of law. Fed. R. Civ. P. 21.

**20. Federal Civil Procedure ⊶87**

Severance of a case against one of multiple defendants is inappropriate where two parties are inextricably entwined in the litigation. Fed. R. Civ. P. 21.

**21. Federal Civil Procedure ⊶87**

Judicial economy was not served by severance of case against New Jersey Attorney General (NJAG) from case against United States Department of State on claims for alleged First Amendment violations and tortious interference with settlement agreement with State Department in related case, in action brought by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit group,

despite NJAG's assertion that case was already pending in New Jersey; case was pending in New Jersey only because plaintiffs filed suit there as self-protective measure after NJAG's motion to dismiss for lack of personal jurisdiction was granted, which ruling was reversed on appeal, and NJAG chose to travel to multiple venues to pursue its enforcement campaign against publications of files on Internet for public access, while simultaneously defending itself in instant suit and pursuing litigation in other venues. U.S. Const. Amend. 1; Fed. R. Civ. P. 21.

**22. Federal Courts ⚙2902**

If severance of a case against one of multiple defendants is inappropriate, district court likewise lacks authority to transfer portion of single action for one purpose while retaining jurisdiction over remainder. 28 U.S.C.A. § 1404(a); Fed. R. Civ. P. 21.

**23. Federal Courts ⚙2905, 2906**

When the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, on a motion to transfer venue, the plaintiff's choice of forum should be respected. 28 U.S.C.A. § 1404(a).

**24. Federal Courts ⚙2905**

When a defendant is haled into court, some inconvenience is expected and acceptable; assuming that jurisdiction exists and venue is proper, the fact that litigating would be more convenient for the defendant elsewhere is not enough to justify transfer to another venue. 28 U.S.C.A. § 1404(a).

**25. Federal Courts ⚙2944**

The standard for transfer of venue is not met by showing one forum is more likely than not to be more convenient; instead, the party must adduce evidence and arguments that clearly establish good cause for transfer based on convenience and justice. 28 U.S.C.A. § 1404(a).

**26. Federal Courts ⚙2905**

Courts are required to assess four private interest factors pertinent to a motion to transfer venue: relative ease of access to sources of proof; availability of compulsory process to secure attendance of witnesses; cost of attendance for willing witnesses; and all other practical problems that make trial of case easy, expeditious and inexpensive. 28 U.S.C.A. § 1404(a).

**27. Federal Courts ⚙2908**

New Jersey Attorney General (NJAG) failed to show that sources of proof were all in New Jersey on claims by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit group for alleged violations of First Amendment speech rights and tortious interference with settlement agreement reached with United States Department of State in related suit, as private interest factor in determining propriety of transfer of case from Western District of Texas to New Jersey federal court; NJAG's assertion was conclusory and lacked proof, while plaintiffs identified proof, documents, and witnesses that were located in Texas. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a).

**28. Federal Courts ⚙2944**

Movant for transfer of venue has burden to establish good cause to transfer, which requires actual showing of existence of relevant sources of proof, not merely expression that some sources likely exist in prospective forum. 28 U.S.C.A. § 1404(a).

**29. Federal Courts ⚙2905**

The first private interest factor that a court is required to consider on a motion to transfer venue, specifically, the relative ease of access to sources of proof, does not

ask whether a transfer would prejudice the non-moving party, but which forum provides easier access to sources of proof. 28 U.S.C.A. § 1404(a).

**30. Federal Courts** �findex2908

Availability of compulsory process to secure attendance of witnesses, as private interest factor in determining propriety of transfer of case to another venue, did not weigh in favor of transfer to New Jersey federal court of suit brought by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit against New Jersey Attorney General (NJAG) for alleged First Amendment violations and tortious interference of publisher's settlement agreement with United States Department of State in related suit, arising out of NJAG's campaign to prevent publication of files on Internet for public access, where NJAG failed to identify single witness who was subject to compulsory process in New Jersey but not in Western District of Texas. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a).

**31. Federal Courts** ⚧2944

To show good cause for transfer of a case to a different venue means that a moving party clearly demonstrates the appropriateness of transfer, and where there is no demonstration by the movant, let alone a clear one, the court cannot weigh the private interest factors governing the transfer analysis against the non-movant and in favor of transfer. 28 U.S.C.A. § 1404(a).

**32. Federal Courts** ⚧2908

Other practical problems that made trial of case easy, expeditious and inexpensive, as private interest factor, did not favor transfer to New Jersey federal court of suit brought by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit against New Jersey Attorney General (NJAG) for alleged First Amendment violations and tortious interference of publisher's settlement agreement with United States Department of State, despite district court's finding that it would have to decide if it had personal jurisdiction over NJAG to consider constitutionality of New Jersey statute criminalizing manufacture of weapons with 3D printer; issue was not so novel as to require separate analysis of personal jurisdiction, and action concerned NJAG's threatened criminal enforcement action against publisher. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a); N.J. Stat. Ann. § 2C:39-9(*l*)(2).

**33. Federal Courts** ⚧2905

Public interest factors that a district court must consider on a motion for transfer of venue are administrative difficulties flowing from court congestion, local interest in having localized interests decided at home, familiarity of forum with law that will govern case, and avoidance of unnecessary problems of conflict of laws or in application of foreign law. 28 U.S.C.A. § 1404(a).

**34. Federal Courts** ⚧2908

Public interest factor of familiarity of the forum with law governing case was distinct from the public interest factor that focused on the local interest in having localized interests decided at home, and thus district court improperly considered the factors together in granting motion to transfer to New Jersey federal court the claims asserted against New Jersey Attorney General (NJAG), in action brought by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit group for alleged First Amendment violations and tortious interference. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a).

**App. 360**

**35. Federal Courts ⟿2905**

The second public interest factor that a court must consider on a motion to transfer venue, which focuses on the local interest in having localized interests decided at home, most notably regards not merely the parties' significant connections to each forum writ large, but rather the significant connections between a particular venue and the events that gave rise to a suit; important considerations include the location of the injury, witnesses, and the plaintiff's residence. 28 U.S.C.A. § 1404(a).

**36. Federal Courts ⟿2905**

The place of the alleged wrong is one of the most important factors that the court considers on a motion to transfer venue. 28 U.S.C.A. § 1404(a).

**37. Federal Courts ⟿2908**

Local interest in having localized interests decided at home, as public interest factor, weighed against transfer to New Jersey federal court of case against New Jersey Attorney General (NJAG), in action brought by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit group for alleged First Amendment violations and tortious interference with publisher's settlement agreement with United States Department of State, even if suit involved constitutionality of New Jersey statute prohibiting manufacture of firearm with 3D printer; controversy over statute was not localized to New Jersey, given that NJAG had sought to bar publisher from publishing its CAD files anywhere, district court's ruling on constitutionality of weapons statute would preclude NJAG from enforcing statute only against plaintiffs, and Texas citizens' primary recourse was suit in Texas. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a); N.J. Stat. Ann. § 2C:39-9(*l* )(2).

**38. Federal Courts ⟿2908**

Familiarity of forum with law that would govern case, as public interest factor on motion to transfer venue, did not weigh in favor of transfer to New Jersey federal court claims brought by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit group against New Jersey Attorney General (NJAG) for alleged First Amendment violations and tortious interference with publisher's settlement agreement with United States Department of State in related suit; federal courts routinely applied law of state other than forum state, New Jersey courts' familiarity with New Jersey law produced no meaningful efficiency that rendered New Jersey more convenient forum, and plaintiffs' challenge to New Jersey statute prohibiting manufacture of weapons using 3D printer was founded in First Amendment and in its overbreadth, as it purported to render illegal any speech that reached New Jersey from other states. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a); N.J. Stat. Ann. § 2C:39-9(*l* )(2).

**39. Federal Courts ⟿2908**

Unnecessary problems of conflict of laws or in application of foreign law, as public interest factor on motion to transfer venue, did not weigh in favor of transfer to New Jersey federal court suit against New Jersey Attorney General (NJAG) by publisher of computer assisted design (CAD) files for manufacture of plastic pistol using 3D printer and gun rights nonprofit group against New Jersey Attorney General (NJAG) for alleged First Amendment violations and tortious interference with publisher's settlement agreement with United States Department of State in related suit, where plaintiffs brought primarily federal law claims, and state law claims involved Texas, not New Jersey law. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a).

Appeal from the United States District Court for the Western District of Texas, USDC No. 1:18-CV-637, Robert L. Pitman, U.S. District Judge

Chad Flores, Esq., Hannah Roblyer, Attorneys, Beck Redden, L.L.P., Houston, TX, for Plaintiffs-Appellants.

Angela Cai, Office of the Attorney General for the State of New Jersey, Trenton, NJ, Alexander Hardiman, Esq., Attorney, Pillsbury Winthrop Shaw Pittman, L.L.P., New York, NY, Ronald Casey Low, Pillsbury Winthrop Shaw Pittman, L.L.P., Austin, TX, for Defendant-Appellee.

Before JONES, ELROD, and HIGGINSON, Circuit Judges.

EDITH H. JONES, Circuit Judge:

[1] Since 2013, Appellants (collectively, "Defense Distributed") have been challenging publication restraints imposed by the U.S. State Department, federal courts, and the State of New Jersey after Defense Distributed published to the Internet computer assisted design ("CAD") files for a single-round plastic pistol. Although Defense Distributed is still prevented from publishing,[1] the CAD files it published remain available to this day on countless other websites internationally. Defense Distributed has yet to secure a court decision condemning what appear to be flagrant prior restraints.[2]

The instant combined appeal and motion for mandamus relief stems from a district court order severing the case against one defendant, the Attorney General of New Jersey (NJAG),[3] and transferring it to a federal court in New Jersey. We conclude that mandamus relief is appropriate in this unusual case. Accordingly, we direct the district court to request retransfer from its counterpart in New Jersey and order other relief in accordance herewith.

### BACKGROUND

Two previous opinions of this court describe the litigation history surrounding Defense Distributed's publication of then-novel CAD files for a pistol that can theoretically be "printed" from a computer affixed to the proper equipment. *See Defense Distributed v. Grewal*, 971 F.3d 485, 488-90 (5th Cir. 2020); *Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 454-58 (5th Cir. 2016); *id.* at 461-66 (Jones, J.,

1. To be more precise, Defense Distributed published the CAD files to the Internet for a few months from December 2012 — May 2013 before the State Department claimed that to do so violated International Traffic in Arms Regulations ("ITAR"). *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 455 (5th Cir. 2016); *id.* at 461-63 (Jones, J., dissenting). The company also published to the Internet for five days in 2018 during a litigation hiatus. Further, it has published the files by hosting them at a public library in Austin, Texas, and by distributing USB drives and SD cards through the Postal Service. To date, the CAD files are still not available on the internet free from all prior restraint. As the Supreme Court declared, a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347,

373, 96 S. Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). These Appellants' First Amendment freedoms have been restrained for years.

2. The injunction motion pending before the panel is denied as moot. This denial does not imply that the motion lacks merit. The original preliminary injunction motion before the district court was denied on the basis of an incorrect finding that the district court lacked personal jurisdiction over the NJAG. Upon return of this case to the Western District of Texas, the court should entertain a motion for preliminary injunction expeditiously.

3. Gurbir Grewal was New Jersey's Attorney General when this suit was filed. He is succeeded by Andrew Bruck. For convenience, we refer to this defendant as the NJAG.

App. 362

dissenting). We quote from the more recent opinion:

Plaintiff Defense Distributed is a Texas company operated for the purpose of promoting popular access to firearms. To carry out this purpose, it produces and makes accessible information related to the 3D printing of firearms and publishes and distributes such information to the public. Plaintiff Second Amendment Foundation, Inc. ("SAF") is a nationwide, non-profit membership organization that "promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control." Across the nation, SAF members seek the digital firearms information created by Defense Distributed, circulate their own digital firearms information by utilizing Defense Distributed's facilities, and republish digital firearms information independently.

Defense Distributed began distributing files related to the 3D printing of firearms in December 2012. It did so by publishing files to its defcad.org and defcad.com websites and letting visitors freely download them. It also distributed digital firearms information via mail and at a brick-and-mortar public library in Austin, Texas. Defense Distributed's efforts were initially met with opposition from the United States Department of State.[4] But, after a period of litigation,

the parties reached a settlement agreement that granted Defense Distributed a license to publish its files.

Shortly thereafter, nine Attorneys General, including New Jersey Attorney General Grewal, filed suit on behalf of their respective states in the Western District of Washington to enjoin the State Department from authorizing the release of Defense Distributed's files. They argued that the State Department's license to Defense Distributed constituted an *ultra vires* about-face that violated the Administrative Procedure Act and jeopardized the states' statutory and regulatory schemes for firearms. The Western District of Washington quickly issued a temporary restraining order, followed closely by a nationwide preliminary injunction.[5]

Just before the Attorneys General sued in Washington, Defense Distributed and SAF brought the instant action in the Western District of Texas challenging select enforcement actions taken by the state Attorneys General. Of relevance to this appeal, Plaintiffs alleged these actions by Grewal: (1) sending a cease-and-desist letter threatening legal action if Defense Distributed published its files; (2) sending letters to third-party internet service providers based in California urging them to terminate their contracts with Defense Distributed; (3) initiating a civil lawsuit against Defense Distributed in New Jersey;[6]

---

**4.**  *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016); *id.* at 462–76 (Jones, J., dissenting).

**5.**  The Attorneys General later filed a motion for summary judgment, which the district court granted in part. *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130 (W.D. Wash. 2019). On appeal, the Ninth Circuit found that the case was moot and thus dismissed for lack of jurisdiction. *Washington v.*

*Defense Distributed*, Nos. 20-35030 & 20-35064, 2020 WL 4332902 (9th Cir. July 21, 2020).

**6.**  That lawsuit was removed to federal court before being administratively terminated in light of the nationwide injunction issued in Washington. The Plaintiffs have likewise sued in New Jersey, raising the same claims asserted in the case at bar. *See Defense Distributed v. Grewal*, D.N.J. No. 3:19-CV-4753. That case

and (4) threatening Defense Distributed with criminal sanctions at a live press conference. Further, these actions, coupled with the injunctive orders issued in the Washington litigation, have caused Defense Distributed to cease publication of its materials. The Plaintiffs asserted, *inter alia*, that these actions infringed the exercise of their First Amendment freedoms and constituted tortious interference with the State Department's settlement agreement.

Grewal moved to dismiss for lack of personal jurisdiction.[7] The Plaintiffs, meanwhile, sought a preliminary injunction. After holding a hearing and considering the parties' arguments, the court granted Grewal's motion and dismissed the action without prejudice.

*Defense Distributed v. Grewal*, 971 F.3d at 488-89 (footnotes in original). Defense Distributed appealed. This court held that the NJAG is amenable to personal jurisdiction in Texas courts. *Id.* at 488. Accordingly, the court reversed and remanded for further proceedings. *Id.*

Following our remand to the district court, Defense Distributed amended its complaint to join the State Department as a defendant for its alleged failure to comply with a Settlement Agreement reached with Defense Distributed in 2018. Shortly after, the NJAG moved to sever Defense Distributed's case against him and transfer that portion of the case to a New Jersey federal court. The State Department opposed severance, as did Defense Distribut-

ed. Nonetheless, the district court obliged the NJAG by written order both severing and transferring the case against him.

Defense Distributed immediately noticed an appeal from the severance-and-transfer order and followed with an alternate request for mandamus relief against the district judge. This court imposed a temporary stay of the case pending appeal. The New Jersey district court also stayed all proceedings pending this appeal.

### DISCUSSION

### I. Appellate jurisdiction

[2] We pretermit Defense Distributed's resort to the collateral order doctrine as a basis for appellate jurisdiction in this interlocutory appeal[8] because, in this circuit, mandamus is the prescribed vehicle for reviewing rulings on transfers of cases pursuant to 28 U.S.C. § 1404(a). *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 309 (5th Cir. 2008) (en banc); *In re Rolls Royce Corp.*, 775 F.3d 671, 676-77 (5th Cir. 2014).

[3] The twist in this case is the transfer to a district court outside the Fifth Circuit, a court over which this court exercises no control. This court lacks power to order a return of the case to our circuit. But *In re Red Barn Motors, Inc.*, 794 F.3d 481 (5th Cir. 2015), explained the path to a cognizable mandamus remedy. *Id.* at 483-84. The All Writs Act, 28 U.S.C. § 1651, empowers courts to issue writs of mandamus *if* the courts also have appellate juris-

---

is currently stayed pending resolution of this one.

**7.** The other state Attorneys General also moved to dismiss, and the district court granted their motions. On appeal, the Plaintiffs challenge only the judgment related to Grewal.

**8.** *In re Rolls Royce Corp.* asserted that our circuit has held that transfer orders do not

fall within the scope of the collateral order doctrine. 775 F.3d 671, 676 (5th Cir. 2014) (citing *Brinar v. Williamson*, 245 F.3d 515, 517 (5th Cir. 2001)). However, other cases seem to apply the doctrine to transfer orders. *See In re Sepulvado*, 707 F.3d 550, 552 (5th Cir. 2013); *In re Bradford*, 660 F.3d 226, 229 (5th Cir. 2011). We need not weigh into a potential intra-circuit split.

diction, "although no appeal has been perfected." *Roche v. Evaporated Milk Ass'n.*, 319 U.S. 21, 25, 63 S. Ct. 938, 941, 87 L.Ed. 1185 (1943). Because of the transfer, the Texas transferor court can no longer enter an appealable order in the case. *In re Red Barn*, nevertheless, approved that "several circuits, where appropriate, have endorsed the method of directing the transferor district court to request that the transferee district court return the case." *Id.* at 484 (collecting cases). To be sure, to avoid friction with sister circuits, the court held that "if we even have the power to reverse such a transfer, we should exercise it only if faced with 'a very extreme case.'" *Id.* (citing *In re Sw. Mobile Homes, Inc.*, 317 F.2d 65, 66-67 (5th Cir. 1963)). But intercircuit friction was reduced where the transferee court there, as here, stayed proceedings pending our appellate panel's decision. *Id.* The court concluded by requiring a party seeking relief from a transfer order to exercise diligence. *Id.* at 485. Because the petitioner had waited three months to file its mandamus petition, the writ was denied. *Id.*

**[4]**  In this case, of course, the notice of appeal was filed the day after the district court's order and mandamus relief formally sought within thirty-nine days while briefing was underway. Because *In re Red Barn* sets the standard, we have jurisdiction to consider the mandamus petition.

The NJAG asserts four objections to our jurisdiction. He asserts that *In re Red Barn* did not hold what we just stated it held; that other circuits would not allow a writ of mandamus where a case is transferred to another circuit; and that Defense Distributed was not diligent. Finally, he contends that because Defense Distributed may eventually challenge the transfer order in courts of the Third Circuit, the availability of appellate review disentitles him to an equitable writ. We find none of these arguments persuasive.

First, *In re Red Barn* denied the writ only for lack of petitioner's diligence. That conclusion would have been inappropriate had the panel concluded that mandamus is not available to challenge an out-of-circuit transfer order. The court's entire discussion of the writ, and a limitation where intercircuit friction may occur, would have been unnecessary. Instead, the court weighed the approaches of other circuits, noting that in particular cases a circuit court exercised jurisdiction to vacate a completed intercircuit transfer. *See In re Red Barn*, 794 F.3d at 484 n.6. This discussion would also be extraneous had the court simply been uttering *dicta* rather than explaining its rationale. And of course, the court noted that several circuits have authorized mandamus relief in these circumstances. *Id.* Finally, there is no "assuming *arguendo*" language that couches the court's ruling on mandamus in hypothetical terms.[9] In short, *In re Red Barn*'s procedural holding is not predicated on *dicta*.

Second, other circuits have adopted the same approach. *See, e.g., In re Howmedica Osteonics Corp.*, 867 F.3d 390, 399-400, 411 (3d Cir. 2017) (asserting jurisdiction to vacate intercircuit transfer order); *In re Warrick*, 70 F.3d 736, 739-40 (2d Cir. 1995) (asserting mandamus jurisdiction and distinguishing *In re Drabik*, 246 F.2d 408 (2d Cir. 1957), as not justifying denial of all relief "in these circumstances"); *A.C. Niel-*

---

**9.**  The court refers to the "potential availability" of the writ, but then cites the Supreme Court's substantive standard for granting or denying mandamus as applicable to show that the writ sought by petitioners in *In re Red* *Barn* was not "appropriate under the circumstances." *In re Red Barn*, 794 F.3d at 484-85, 485 n.7 (quoting *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 381, 124 S. Ct. 2576, 2587, 159 L.Ed.2d 459 (2004)).

*sen Co. v. Hoffman*, 270 F.2d 693, 695 (7th Cir. 1959) (concluding that the court has mandamus jurisdiction over intercircuit transfer order). Each of these circuits has applied mandamus to decide the propriety of intercircuit transfers. Although the Tenth Circuit held that a completed intercircuit transfer divested it of appellate jurisdiction, *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516-17 (10th Cir. 1991), that court went on to recognize that "technically," the district court should have deferred effectuating the transfer so that the parties could seek certification or "file a mandamus petition." *Id.* at 1520 n.9. *See also In re Nine Mile Ltd.*, 673 F.2d 242 (8th Cir. 1982)(mandamus ordered where district court erroneously transferred papers to consummate Section 1404 case transfer before appeal could be filed in transferor district). Thus, the balance of circuit court authority, in addition to the cases cited by *In re Red Barn*, favors jurisdiction in this case.

Third, the AG questions the diligence of Defense Distributed because of its failure to seek an immediate stay in the district court or file an immediate mandamus petition. Nothing in applicable precedent, however, mandates the particular method by which a party disadvantaged by an out-of-circuit transfer must bring that issue to the circuit court. Defense Distributed filed its notice of appeal the day after the district court's transfer order and promptly sought relief in this court. The defendants and district court were immediately placed on notice of Defense Distributed's intent to challenge the transfer in this court, and the actual transfer order was not docketed

until the following day. It sought mandamus relief in briefing to this court, filed thirty-nine days after the court's order.[10] The Appellants' diligence comports with this court's emphasis on "diligence" in *In re Red Barn* and with the timing of filings in *In re Howmedica*, 867 F.3d at 400.

Fourth, it is inaccurate to assert, as the NJAG does, that Defense Distributed has adequate available alternatives for appellate court review of the district court's order, which render a mandamus remedy unavailable. Unlike *In re Red Barn*, this case encompasses severance as a necessary condition of the transfer.[11] On appeal, the Third Circuit could not review the severance order, much less attempt to consolidate the case against the NJAG with the case still pending in Texas against the State Department. Therefore, on its face, this tandem order is effectively unreviewable in the transferee circuit.

Moreover, if the potential Third Circuit appeal were (arbitrarily) limited to the transfer order alone, a premier procedural treatise notes that review in the transferee court seems illusory given the application of comity and law-of-the-case principles. *See* 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE [HEREAFTER, WRIGHT & MILLER] § 3846 (4th ed. 2021); *id.* at § 3855 (similar). The likelihood of securing a retransfer by the transferee district court seems equally constrained. But even if these propositions are arguable, *see SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 178 n.7 (2d Cir. 2000) (collecting cases), the *SongByrd* decision,

---

**10.** The NJAG's contention that Defense Distributed cannot seek mandamus due to technical noncompliance with FRAP Rule 21 is frivolous. Defense Distributed's briefing, procedurally and substantively, stated clearly the relief requested and grounds for seeking mandamus relief.

**11.** The *Red Barn* district court transferred an entire case, with two defendants one of which objected strenuously, to Indiana. 794 F.3d at 483.

like that of other courts, acknowledges the availability of mandamus review in the Fifth Circuit. *Id.* at 176-77, 176 n.5.[12]

Finally, the fact that the district court here granted the transfer, rather than denying it, makes no difference. In this circuit, neither *In re Rolls Royce* nor *In re Volkswagen* limited writs of mandamus according to whether the district courts granted or denied transfer.[13] And in *Howmedica*, the Third Circuit applied mandamus to vacate the order granting transfer to the Central District of California. *In re Howmedica*, 867 F.3d at 411. Whatever the possibility of review in the transferee circuit, this has not been regarded as sufficiently effective to preclude writs of mandamus in the transferor court.[14]

## II. Mandamus

**[5, 6]** A writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary cases." *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 350 (5th Cir. 2017). This court will grant a petition for a writ of mandamus only if the petitioner satisfies three conditions. First, the petitioner must show that there are "no other adequate means to attain the relief he desires." *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380, 124 S. Ct. 2576, 159 L.Ed.2d 459 (2004). Second, the court "must be satisfied that the writ is appropriate under the circumstances." *Id.* at 381, 124 S. Ct. 2576. And third, the petitioner must show a "clear and indisputable right to the writ." *Id.*

**[7]** Defense Distributed easily satisfies the first two conditions for mandamus relief. As we just explained, the Third Circuit transferee court cannot, under normal appellate standards, exercise appellate review over either the severance or transfer orders of this Western District of Texas. *E.g., In re Red Barn*, at 484-85.

**[8, 9]** Second, granting the writ would be "especially appropriate where the issues implicated have importance beyond the immediate case." *In re JPMorgan Chase & Co.*, 916 F.3d 494, 499 (5th Cir. 2019) (quoting *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 294 (5th Cir. 2015); and *In re Volkswagen*, at 319 (internal quotation marks omitted). Before this court are "issues that implicate not only the parties' interests but those of the judicial system itself." *United States v. Bertoli*, 994 F.2d 1002, 1014 (3d Cir. 1993). Preeminent are questions about the abridgement

---

**12.** *See also Hill v. Henderson*, 195 F.3d 671, 676-77 (D.C. Cir. 1999) ("Transfer orders under § 1404 are not final appealable orders, nor, generally speaking, reviewable collateral orders. Commonly, however, courts of appeal in the circuit of origin entertain mandamus petitions to review such orders . . . . A possible explanation for finding transfer orders nonreviewable in the transferee circuit is that such orders are usually effectively subject to immediate review via mandamus in the circuit of the transferring court.") (citations omitted); *Nascone v. Spudnuts, Inc.*, 735 F.2d 763, 773 (3d Cir. 1984) (concluding that "mandamus review is appropriate" over a transfer order after deciding it did not fall within the collateral order doctrine, and recognizing the general rule that "the Plaintiff could petition the transferor appellate court

for a writ of mandamus blocking the transfer") (citation omitted).

**13.** In *In re Volkswagen*, the en banc court emphasized that review of a transfer order following final judgment was not an "adequate remedy," and observed that "venue transfer decisions are rarely reviewed." 545 F.3d at 319.

**14.** This court's decision in *Persyn v. United States*, 935 F.2d 69 (5th Cir. 1991), offers no help to the NJAG. The court there explicitly stated that seeking retransfer is *not* an adequate alternative to appellate review where, as here, both courts have subject-matter jurisdiction. *Id.* at 73.

of the Plaintiffs' first amendment rights to publish their materials. Also critical, however, are tactics suggesting the abusive manipulation of federal court procedures in order to delay or altogether avoid meaningful merits consideration of Plaintiffs' claims.

**[10, 11]** What the parties most strenuously debate is whether Defense Distributed has shown a clear and indisputable right to the writ or a clear abuse of discretion by the district court. *See Cheney* at 381, 124 S. Ct. 2576; *see also In re Volkswagen*, at 308. "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047, 135 L.Ed.2d 392 (1996) (*citing Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 2461, 110 L.Ed.2d 359 (1990) ("a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law")). We conclude that the district court clearly abused its discretion by applying the wrong legal standard for evaluating the NJAG's conjoined severance and transfer motions and by egregiously misinterpreting Defense Distributed's claims. Moreover, even if the motions are evaluated wholly independently, the transfer motion cannot stand if the severance motion was wholly unjustified. *See, e.g., Chrysler Credit Corp. v. Country Chrysler*, 928 F.2d 1509 (10th Cir. 1991); *In re Nine Mile Ltd.*, 673 F.2d at 242 (because transfer order was procedurally incorrect, mandamus ordered district court to request return of the case from the transferee court).

**A. Joint Severance and Transfer**

**[12, 13]** To explain this conclusion, we remind that the Federal Rules of Civil Procedure were enacted to ensure "the just, speedy and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. To be more precise, Fed. R. Civ. P. 21, which authorizes severance of parties, and 28 USC § 1404(a), governing transfers among federal district courts, "are [both] designed to facilitate just, convenient, efficient and less expensive determination." *In re Nintendo of America, Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014). Although a district court has broad discretion to sever parties that were otherwise properly joined by a Plaintiff,[15] "[u]nder the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

On two occasions, this court has discussed standards for joint severance and transfer motions brought by a defendant or defendants, the effect of which would require a Plaintiff to split its case into two different federal courts. In a well-known opinion, this court noted that "our jurisprudence suggests that the severance inquiry is different—and more focused on judicial efficiency—when it is combined with a section 1404 motion to transfer than when the severed case would remain in the original judicial district." *In re Rolls Royce*, 775 F.3d at 680.[16] The court quoted at length Judge Alvin Rubin's opinion explaining the problems that can arise in a

---

**15.** *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994).

**16.** Judge Higginbotham's opinion in *Rolls Royce* has been cited frequently for its application of sever/transfer considerations when one of the parties has a forum selection clause. However, the court's discussion about severance and transfer orders in multidefendant cases draws from *Liaw Su Teng* and other non-forum selection clause cases and is thus more broadly applicable here.

case involving multiple defendants when claims against one or some defendants are severed and transferred while claims against the remaining defendant are retained in the original court. *Id.*, (quoting *Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d 1140, 1148-49 (5th Cir. 1984)). Judge Rubin's list of parameters that should inform this type of proposed transfer bears repeating:

> But before thus putting asunder what the Plaintiff has joined, the court must weigh carefully whether the inconvenience of splitting the suit outweighs the advantages to be gained from the partial transfer. It should not sever if the defendant over whom jurisdiction is retained is so involved in the controversy to be transferred that partial transfer would require the same issues to be litigated in two places. [See Korbel, *The Law of Federal Venue and Choice of the Most Convenient Forum*, 15 Rutgers L.Rev. 607 (1961); Masington, *Venue in the Federal Courts—The Problem of the Inconvenient Forum*, 15 U.Miami L.Rev. 237 (1961); Note, 46 Cornell L.Q. 318 (1961)]. That being the situation here, the district court should not have severed the claims if there were any alternative. Manifestly, the Plaintiffs will suffer some inconvenience if they are forced to litigate their claims in two courts, half the world apart from each other, with not only the consequent added expense and inconvenience but also the possible detriment of inconsistent results. A single forum is also most suitable for determining possible counter- and cross-claims. The public also has an interest in facilitating a speedy and less-expensive determination in one forum of all of the issues arising out of one episode.

*Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d 1140, 1148–49 (5th Cir. 1984), *overruled on other grounds, In re Air* *Crash Disaster Near New Orleans, La., on July 9, 1982*, 821 F.2d 1147 (5th Cir. 1987).

[14] Several points made in Judge Rubin's opinion are common to this species of joint severance and transfer motions. A court must "weigh carefully" the comparative inconvenience of splitting the suit versus the advantages to be gained from a partial transfer. It should not sever if the defendant not transferred is "so involved" in the controversy transferred to another court that partial transfer would require the same issues to be litigated in two places. "Manifestly," Plaintiffs are disadvantaged by the expense and inconvenience of having to litigate in two disparate fora and by the possibility of inconsistent results. And the public has an interest in the comparative speediness and cost-savings from utilizing a single forum for the issues arising out of one episode. *See also* 15 WRIGHT & MILLER § 3845, at 86 (echoing these factors).

Other courts have agreed with *Liaw Su Teng*, and specified that in analyzing severance and transfer motions, "[b]efore effecting such a severance, a judge should weigh the convenience to the parties requesting transfer against the potential inefficiency of litigating the same facts in two separate forums." *White v. ABCO Eng'g Corp.*, 199 F.3d 140, 144 (3d Cir. 1999). Previously, the Third Circuit, explicitly endorsing Judge Rubin's view, denied severance and transfer where the defendant not transferred was more than "indirectly connected" to the Plaintiff's dispute with the defendant seeking transfer. *Sunbelt Corp. v. Noble, Denton and Assoc., Inc.*, 5 F.3d 28, 34 (3d Cir. 1993). The Second Circuit, which pioneered using severance and transfer as a permissible strategy of case management, nonetheless held it appropriate only "where the administration of justice would be materially advanced . . . ." and where a defendant in one

district is only "indirectly connected" to the claims that will be transferred to the other district. *Wyndham Assoc. v. Bintliff*, 398 F.2d 614, 618-19 (2d Cir. 1968).[17]

[15, 16] The district court here quoted *Rolls Royce*, but it misperceived and thus misapplied this court's explanation about "judicial efficiency." In the above cases, courts were not deciding ordinary Rule 21 severance motions, in which parties or claims may be split while the disputes are maintained before the same court. Severance and transfer requires two courts to engage in the work of one, prompting serious concerns about duplication of judicial resources, the consistency of rulings, and litigation costs. The circuit courts that discussed severance and transfer motions in this context have uniformly indicated an aversion to granting such motions at the expense of needless duplication of judicial effort. The rule emanating from *Rolls Royce* and *Liaw Su Teng* is that in most multidefendant cases—other than those involving forum selection clauses—severance and transfer makes sense only where the administration of justice would be materially advanced and a defendant in one district is not "so involved" in the transferred controversy that the same issues would have to be litigated twice.[18] Consequently,

the district court erred legally in finding that the State Department is only indirectly connected to claims pled against the NJAG [19] and in failing to find that the administration of justice would not be materially advanced by transfer.

The direct connection between the Plaintiffs' claims against these two defendants contradicts the district court's artful dissection of Defense Distributed's Second Amended Complaint. The court ignored the major components of the lawsuit and the overarching connection alleged between the State Department and the NJAG. Both government entities have suppressed legal speech by prohibiting the publication of the company's digital firearms files on the internet and into New Jersey. That the First Amendment protects all of the Plaintiffs' publications underlies all of their other claims.[20] The Plaintiffs' assertion of seventeen separate claims reflects the consequences of that suppression and the tortuous path they have been forced to pursue for redress. Yet, contrary to common sense and heedless of a potential for disparate constitutional rulings if the case against the NJAG remains transferred, the court belittled the First Amendment issues. According to the

---

17. WRIGHT & MILLER explains that severance and transfer of claims or parties enabled courts to avoid the rule that "[i]n suits against multiple defendants, transfer is proper only to a district in which all of them are subject to personal jurisdiction and in which venue is proper for an action against all of them." WRIGHT & MILLER § 3845, at 85. The treatise also endorses the cautious use of such orders. *Id.* at 86-87.

18. *See also Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 26, 80 S. Ct. 1470, 1474, 4 L.Ed.2d 1540 (1960)("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that Sec. 1404(a) was

designed to prevent. Moreover, such a situation is conducive to a race of diligence among litigants for a trial in the District Court each prefers").

19. The district court found the factual overlap between the claims pled against each defendant is "minuscule;" and that the claims have no "logical connection" because the defendants' actions occurred "in different places and at different times."

20. The First Amendment claims, moreover, are complex factually and legally, as they involve questions about compelling interest, narrow tailoring, and numerous types of digital firearms information that Defense Distributed has created.

district court, not *all* of Plaintiffs' claims involve the First Amendment. The court overlooked Plaintiffs' claims that directly involve both Defendants in the settlement agreement breach and in censorship under the Second Amendment and Due Process clause. And the larger point is that *none* of Plaintiffs' claims would exist if they had been allowed to publish the various digital firearms files continuously since 2013. The First Amendment is the *sine qua non* of this case.

The other larger point ignored by the district court is that the principal claims against both defendants are temporally and factually intertwined to the extent that litigation in separate courts would largely overlap. A paraphrase of the facts alleged in the Second Amended Complaint is demonstrative. Just when the Plaintiffs, after several years of litigation, thought they had obtained relief from a signed settlement agreement with the State Department, the NJAG loudly led a bevy of states in opposition. Within a span of about six months, he filed suit in Washington state, even more remote from New Jersey than Texas, and forced the joinder of Defense Distributed as a defendant there. He evidently thought the parties' fates were legally and factually connected when he sought and obtained an injunction expressly to prevent the State Department from completing the settlement with Plaintiffs. The NJAG kept up public pressure against the settlement with threats of civil and criminal punishment against Plaintiffs' president Cody Wilson personally. At this time, the State Department opted not to complete the settlement. Accordingly, the State Department did not modify relevant federal regulations, disavowed the license and exemption from regulations it had

promised Defense Distributed, and refused to appeal adverse decisions by the Washington federal court. The extent to which the NJAG's campaign influenced the State Department's alleged breaches is relevant to the claims against both defendants. At the same time, the NJAG's seminal place in the litigation is a major, though far from the only facet of his conduct that was designed to derail the settlement and independently to restrain Plaintiffs' exercise of free speech. Plaintiffs' essential claims for First Amendment violations, breach of the settlement agreement, and the NJAG's interferences cannot be understood by a factfinder without investigating and telling the whole story. Similarly, having to tell the same story in two courts would abuse Plaintiffs and the judicial process.[21]

Also plain from the complaint is that the subsidiary claims are dependent upon the primary claims identified above. To cite one instance, Defense Distributed pleads that the State Department violated the Administrative Procedure Act in various aspects of its settlement agreement breach. The Washington State litigation was also based on alleged violations of the Administrative Procedure Act. The State Department's noncompliance may have been caused by the mere fact of the Washington State litigation or by the imperative of complying with that court's injunctive decrees or by the NJAG's public campaign against the settlement. Sorting out cause and effect for these claims demands a single factfinder and judicial resolution.

The district court also erred legally by failing to conclude that the administration of justice would *not* be materially advanced by transfer of the case against the NJAG to New Jersey. *See Rolls Royce*, 775 F.3d at 680. The burden rests on the

---

**21.** The NJAG interjects that a sovereign immunity defense precludes any tortious interference claim asserted by Plaintiffs. Plaintiffs dispute the assertion. This merits defense has no place in our analysis.

NJAG as the movant to demonstrate that proposition, and he did not succeed. First, the public interest in achieving a single court's ruling on Plaintiffs' First Amendment claims cannot be overstated. Government instigated censorship of constitutionally protected speech is abhorrent to self-government; courts have a duty to prevent illegal censorship. But severance and transfer enhances the risk of conflicting rulings, which would seriously injure the Plaintiffs and throw the law in this important constitutional area into national disarray for several years.

Second, because of the complex factual interactions among Plaintiffs and these Defendants, discovery and trial for the principal claims will require many of the same witnesses. No efficiency exists from conducting two fact-based litigations half a continent apart. On the other hand, no efficiency is gained by having two courts decide the separate subsidiary claims against each Defendant. Such claims are largely legal in nature, overlapping in several instances, and best resolved on briefing to a single court that has gained familiarity with the intricacies of Plaintiffs' dozens of digital firearms files and background materials that could be published to the internet and in New Jersey. There is no obvious efficiency advantage, much less materially enhanced judicial economy from forcing Defense Distributed's case into two separate cases.

The necessity of denying severance conjoined with transfer is confirmed by proper application of *Rolls Royce* and *Liaw Su Teng.* In addition, the district court's separate and independent Rule 21 severance and Section 1404 transfer analyses are plagued with error and therefore alone justify the rebuke of mandamus. We turn first to severance.

### B. Severance

[17] In the Fifth Circuit, the accepted basis for Rule 21 severance analysis considers five factors: (1) whether claims arise out of the same transaction, occurrence, or series of transactions or occurrence; (2) whether the claims present common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *See Rolls Royce*, 775 F.3d at 680; *Paragon Office Servs., LLC v. UnitedHealthcare Ins. Co.*, 2012 WL 4442368, (N.D. Tex. Sept. 26, 2012); *Parker v. Louisiana Dep't of Pub. Safety & Corr.*, 2019 WL 5103811 (M.D. La. Oct. 11, 2019); *Calhoun v. WA DHS Child Support Div.*, 2018 WL 2865315 (N.D. Tex. June 11, 2018); *Pouncie v. Dlorah, Inc.*, 2015 WL 5178401 (N.D. Tex. Sept. 4, 2015); *Cty. of Travis v. Purdue Pharma, LP*, 2018 WL 1518848 (W.D. Tex. Mar. 28, 2018).

[18] First, as has been explained, the district court misconstrued the Second Amended Complaint. Relevant to the severance factors, it erroneously found that there was no common transaction or occurrence or series of transactions or occurrences giving rise to the Plaintiffs' claims against the Defendants. The district court compounded its error by stating that "the parties all acknowledge that the Washington Suit" had nothing to do with the settlement agreement between Defense Distributed and the State Department. This assertion is contradicted by the record. As the NJAG put it in his complaint in the Washington lawsuit, "in sum, the Government's covert agreement to deregulate the CAD files by way of the Settlement Agreement—which culminated in the enactment of the "temporary modification" on July 27, 2018—are final agency

decisions that not only failed to comply with procedural requirements, but that have far-reaching implications for national security and the safety and security of the State and people of Washington." The district court for the Western District of Washington also stated that at the heart of its decision to grant a TRO, as requested by the NJAG, was the manner in which the State Department entered into and followed through on its settlement agreement with Defense Distributed. *State v. United States Dep't of State*, 315 F. Supp. 3d 1202, 1205 (W.D. Wash. 2018). Defense Distributed's claims against both Defendants fundamentally concern the State Department's settlement agreement and the NJAG's efforts after it was signed to prevent its meaningful implementation. The interference claims against the NJAG cannot be proven without initial proof that the settlement agreement was breached. These transactions and occurrences both perpetuated the violation of Plaintiffs' First Amendment rights. The occurrences and transactions involved in Plaintiffs' principal claims are thus logically, factually, and temporally inextricable.[22]

**[19, 20]**    The district court also misapplied the second factor of the severance analysis in determining that Plaintiffs' claims do not involve common issues of law or fact. The court put the matter exactly backward, as it stated that although "many of Plaintiff's claims" arise from alleged First Amendment violations, "this is not the case for *all* of Plaintiffs' claims...."

To the contrary, a court is required to determine whether "there is at least one common question of law," not whether all of the claims in a case involve the same question of law. *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010). Further, the district court incorrectly analyzed "judicial economy" as applied to joint severance and transfer motions: according to *Rolls Royce* and *Liaw Su Teng*, severance is inappropriate where two parties are as inextricably entwined in the litigation as these defendants.

**[21]**    The NJAG's and district court's other assertions about the efficiency benefits from severance ring particularly hollow in light of the course of the litigation. For example, bifurcation and transfer of the case, the district court states, would be an economical act since there is already a case in New Jersey dealing with separate claims against the NJAG by Defense Distributed. But Defense Distributed brought that case as a self-protective measure only after the district court below had (erroneously) dismissed the NJAG from suit in the Western District of Texas. The district court cannot claim judicial efficiency is furthered when its decision directly caused the inefficient filing of that second suit. Nor is the timing of the district court's severance/transfer order persuasive, as it followed directly on the heels of this court's decision upholding jurisdiction in the Western District of Texas. Judicial economy is also less than credibly asserted by the NJAG, who chose to travel to the

---

22. The district court asserted that the claims against the NJAG largely stem from the 2018 cease-and-desist letter, public comments by the NJAG directed at dissemination of Plaintiffs' materials in New Jersey, and the law that criminalizes such dissemination. This is correct only to the extent that it highlights the similarity in Plaintiffs' First Amendment claims against both Defendants, which, though based on different facts, center on the

same publishable materials and demand uniform resolution.

Further, although we need not consider whether the NJAG is a necessary party to the litigation in the court below, *see* Fed. R. Civ. P. 19, he and his officials are plainly material witnesses to the Washington litigation, and the State Department's assertions that its settlement may have been motivated by actions of the NJAG cannot be discounted.

West Coast to pursue its campaign against Defense Distributed while simultaneously defending this case and pursuing litigation and other measures in New Jersey. The multiplication of venues has disserved judicial economy. At this point, after essentially seven years of litigation in Texas and at least two other venues over Defense Distributed's publications, to split this case into two parallel litigation tracks before two courts is beyond inefficient.[23]

The above discussion also shows why the court erred in regard to the final relevant factor involved in its severance analysis: finding no prejudice to Defense Distributed by splitting its case.[24] *See Acevedo*, 600 F.3d at 521. The court's legal and factual errors so permeate its severance order as to render it a clear abuse of discretion.

## C. Transfer Order

**[22]** Because the severance order was a clear abuse of discretion, the district court likewise "lacked authority … to transfer a portion of the single action … for one purpose while retaining jurisdiction over the remainder." *Chrysler Credit Corp.*, 928 F.2d at 1519; *In re Nine Mile Ltd.*, 673 F.2d at 244. But even setting aside severance as impermissible, any transfer of this case, in whole or in part, constitutes an abuse of the district court's discretion.

**[23–25]** A party seeking a transfer under Section 1404(a) "must show good cause" by "clearly demonstrat[ing] that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'" *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (quoting 28 U.S.C. § 1404(a)) (emphasis added). "When the transferee venue is not clearly more convenient than the venue chosen by the Plaintiff, the Plaintiff's choice should be respected." *Id.* When a defendant is haled into court, some inconvenience is expected and acceptable. Assuming that jurisdiction exists and venue is proper, the fact that litigating would be more convenient for the defendant elsewhere is not enough to justify transfer. In other words, the standard is not met by showing one forum is more likely than not to be more convenient, but instead the party must adduce evidence and arguments that clearly establish good cause for transfer based on convenience and justice. *See e.g. id.* 314-315.

**[26]** Courts are required to assess four private interest factors and four public interest factors pertinent to a transfer motion. *See In re Volkswagen*, 545 F.3d at 315. The private interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical

---

**23.** The final factor in severance analysis, whether the claims require different witnesses and sources of proof, is neutral. Plaintiffs will have to make the same proof in two proceedings about the protected nature of its information, while there is only some overlap between the witnesses for defendants.

**24.** The district court embroiders its reasoning on prejudice by implying that Plaintiffs' challenge to NJ Stat. Sec 2C:39-9(*l*)(2), a claim explicitly pled in their Second Amended Complaint, would fail for lack of personal jurisdiction over the NJAG. We do not agree. Plain-

tiffs' original allegations included threats by the NJAG to prosecute Defense Distributed and Cody Wilson to the maximum extent allowed by state law. That the legislature added a particular device to enhance such prosecution, in the form of a criminal statute passed during the pendency of this case, is comprehended in the scope of the original complaint and the briefing in the district court and this court. And finally, as we noted in the previous opinion, the NJAG waived personal jurisdiction by not asserting that defense. *Def. Distributed v. Grewal*, 971 F.3d at 496.

problems that make trial of a case easy, expeditious and inexpensive." *Id.* The public interest factors are discussed below. As with its discussion of Rule 21 severance, the district court abused its discretion factually and legally in weighing the transfer factors against the standard.

[27–29]  Regarding the first private interest factor, the movant has the burden to establish good cause, which requires an actual showing of the existence of relevant sources of proof, not merely an expression that some sources likely exist in the prospective forum. *In re Volkswagen*, 545 F.3d at 315. Here, however, the district court erred by uncritically accepting the NJAG's conclusory assertions that "the sources of proof relevant to these issues (including any non-party witnesses) are all in New Jersey." *Defense Distributed*, 1:18-cv-00637, Dkt. 121, at 15–16 (W.D. Tex.); *See e.g. Hammers v. Mayea-Chang*, 2019 WL 6728446, at *7 (E.D. Tex. Dec. 11, 2019). The NJAG's conclusory assertions lack that necessary proof, while the Plaintiffs identified proof, documents, and witnesses that are located in Texas and support maintaining Texas as the forum.[25] Weighing the first factor as "neutral" in the face of the NJAG's lack of proof and Plaintiffs' proffer abused both logic and the court's discretion. Additionally, the district court legally erred by introducing a "prejudice" consideration into the first factor. The first private interest factor does not ask whether a transfer would "prejudice" the non-moving party, but which fo-

rum provides easier access to sources of proof. *Volkswagen*, 545 F.3d at 315.

[30, 31]  Access to compulsory process for non-party witnesses is the gravamen of the second private interest factor. *See e.g. Garrett v. Hanson*, 429 F. Supp. 3d 311, 318 (E.D. Tex. 2019). Neither the NJAG nor the district court identified any witness who is subject to compulsory process in New Jersey but not in Texas. Yet the court inexplicably weighed this factor not as neutral but in favor of transfer. "To show good cause[, however] means that a moving party . . . clearly demonstrates" the appropriateness of transfer. Where there is no demonstration by the movant, let alone a clear one, the court cannot weigh a factor against the non-movant and in favor of transfer. Besides lacking support in the record, the district court's weighing of this factor in favor of New Jersey does not "reflect[ ] the appropriate deference to which the Plaintiff's choice of venue is entitled," *In re Volkswagen*, 545 F.3d at 315.[26]

[32]  The fourth private interest factor addresses "all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen*, at 315. The district court weighed this factor in favor of the NJAG because absent transfer, it would have to decide whether it has personal jurisdiction over the NJAG to adjudicate Defense Distributed's allegedly newly raised claim challenging the constitutionality of NJ Stat. § 2C:39-9($l$)(2). But as we discussed above that issue is not so novel as to require a separate analysis of

---

**25.**  For example, Defense Distributed provided details on how its activities, including research, design, development, manufacturing, and publishing, occurred in and around Austin, and how it also published the same computer files with digital firearms information at a brick-and-mortar public library in Austin, Texas by hosting the computer files in formats that patrons could access via computer

workstations. The computer servers on which Defense Distributed hosts these files for publication to the internet are also located in Texas.

**26.**  The third private interest factor, concerning the cost for willing witnesses, is agreed to be neutral, as the district court found.

personal jurisdiction. The district court itself previously recognized that "the instant action concern[ed]" The NJAG's "criminal enforcement actions," such as "threatening to enforce a criminal law against Defense Distributed." *Defense Distributed v. Grewal,* 364 F.Supp. 3d 681, 686 (W.D.Tex. 2019).[27]

**[33]** The public interest factors bearing on transfer are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *See In re Volkswagen,* at 315. No party disputes that the first factor is neutral.

**[34]** As an initial matter, the district court erroneously treated the second and the third factors together. The district court reasoned that because some of Plaintiffs' claims against the NJAG implicate New Jersey's criminal law, § 2C:39-9(*l* )(2), the District of New Jersey has a greater interest in testing the constitutionality of that statute and is better equipped than Texas courts to evaluate it. The two factors, however, are distinct in the law for good reason.

**[35, 36]** The second public interest factor, which focuses on the local interest in having localized interests decided at home, "most notably regards not merely the parties' significant connections to each forum writ large, but rather the significant connections between a particular venue and the events that gave rise to a suit." *In re Apple Inc.,* 979 F.3d 1332, 1345 (Fed. Cir. 2020). Important considerations include the location of the injury, witnesses, and the Plaintiff's residence. *See Volkswagen,* 545 F.3d at 317–18; *Zurich Am. Ins. Co. v. Tejas Concrete & Materials Inc.,* 982 F. Supp. 2d 714, 727 (W.D. Tex. 2013). Indeed, "[t]he place of the alleged wrong is one of the most important factors in venue determinations." *Watson v. Fieldwood Energy Offshore, LLC,* 181 F. Supp. 3d 402, 412 (S.D. Tex. 2016).

**[37]** Texas's "local interest in having [the] localized interests" this case implicates "decided at home" cannot be overstated. *Volkswagen,* 545 F.3d at 315. The controversy over New Jersey's statute is not "localized" to New Jersey. The AG has "projected himself across state lines and asserted a pseudo-national executive authority" in Texas by seeking "to bar Defense Distributed from publishing its materials anywhere," chilling its speech, and reducing "Texans' access to [its] materials." *Grewal,* 971 F.3d at 492-95. In these circumstances, the aggressor state's interest is considerably diminished because the Texas court's ruling will have no direct effect on New Jersey's citizens. If § 2C:39-9(*l*)(2) were declared unconstitutional in this litigation, that ruling would preclude the NJAG's enforcing the statute against these Plaintiffs. At least the NJAG would not necessarily be prevented from enforcing the law in New Jersey. Thus, the strength of New Jersey's interest in having this case decided at home is considerably less than that of Texas citizens whose primary recourse, as targets of this litigation in Texas, is a suit in Texas. And Texas courts have a significant interest in assessing the constitutionality and extraterritori-

---

**27.** And this court noted that Plaintiffs' claims encompass the "criminal actions" that the NJAG threatened "at a live press conference." *Defense Distributed,* 971 F.3d at 489. Appel- lants' brief to this court confirms that Section 2C:39- 9(*l* )(2) was the sole legal basis for the threats.

al impact of New Jersey's criminal law [28], especially a law that criminalizes speech.

[38]  The familiarity of the forum with the law that will govern the case was also improperly weighed in favor of New Jersey. "Federal judges routinely apply the law of a State other than the State in which they sit . . . ." This court is "not aware of any exceptionally arcane features of Texas, [New Jersey, or constitutional law,] that are likely to defy comprehension by a federal judge sitting in [Texas]." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 67–68, 134 S. Ct. 568, 584, 187 L.Ed.2d 487 (2013). Moreover, New Jersey courts' familiarity with New Jersey law produces no meaningful efficiency rendering New Jersey a more convenient forum. Defense Distributed pursues no claims arising under New Jersey law. Plaintiffs' challenge to Section 2C:39-9(*l*)(2) is founded in the First Amendment and the extreme breadth of this criminal law, which purports to render illegal any speech that reaches the state *from other states*. Plaintiffs lodge other claims against the NJAG predicated on other federal constitutional provisions. Thus, the Texas court's superior familiarity with Defense Distributed's Texas law claims, and the fact that the New Jersey court would be bound to Texas law concerning such claims, *see Country Chrysler*, 928 F.2d at 1516, more than offsets any efficiencies that might be gained from New Jersey courts' familiarity with New Jersey law.

[39]  The last public interest factor seeks to avoid "unnecessary problems of conflict of laws [or in] the application of foreign law." *Volkswagen*, 545 F.3d at 315. There are no risks of such a conflict here. Defense Distributed brought primarily federal law claims; and the state law claims involve Texas law, not New Jersey law.

The district court repeatedly weighed the transfer factors against Plaintiffs by asserting that they could not be disadvantaged by transfer because they had "voluntarily" instituted additional litigation in New Jersey covering similar issues against the NJAG. This is incredible. Plaintiffs filed suit in New Jersey only because this district court had erroneously closed the door to their suit in Western District of Texas. The currently stayed litigation in New Jersey has no legitimate bearing against Plaintiffs' original choice of forum.

Correctly assessed, the NJAG did not carry its burden to clearly demonstrate that transfer is clearly more appropriate than the Plaintiffs' choice of forum. The district court erred legally and factually in virtually every aspect of this issue, and its decision, which has unnecessarily lengthened this litigation even more, represents a clear abuse of discretion for which mandamus is an appropriate remedy.

**CONCLUSION**

For the foregoing reasons, we conclude that the district court's order severing and transferring of the claims against the NJAG to the District of New Jersey was a clear abuse of discretion giving rise to an appropriate exercise of the court's mandamus power.

A writ of mandamus shall issue herein directing the district court to:

(1) Vacate its order dated April 19, 2021 that severed Defense Distributed's claims against the NJAG and transferred them to

---

**28.**  The New Jersey statute applies extraterritorially because it criminalizes "distribution" of speech into the state, and "distribute" is defined to include any act of "mak[ing] available via the internet or by any other means." N.J. Stat. 2C:39-9(*l*)(2).

the United States District Court for the District of New Jersey;

(2) Request the District of New Jersey to return the transferred case to the Western District of Texas, Austin Division; and,

(3) After return, to reconsolidate Defense Distributed's case against the NJAG back into the case still pending against the State Department.

The petition for writ of mandamus is hereby GRANTED.

STEPHEN A. HIGGINSON, Circuit Judge, dissenting:

"Countless expressions can be found in the jurisprudence to support the blackletter proposition that mandamus is an extraordinary remedy for extraordinary causes." *United States v. Denson*, 603 F.2d 1143, 1146 (5th Cir. 1979) (Rubin, J.). The Supreme Court cautioned long ago that "[m]andamus, prohibition and injunction against judges are drastic and extraordinary remedies . . . reserved for really extraordinary causes." *Ex parte Fahey*, 332 U.S. 258, 259-60, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947). As we have said,

> In recognition of the extraordinary nature of the writ, we require more than showing that the court misinterpreted the law, misapplied it to the facts, or otherwise engaged in an abuse of discretion. And even reversible error by itself is not enough to obtain mandamus.

Rather, we limit mandamus to only "clear abuses of discretion that produce patently erroneous results."

*In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 290 (5th Cir. 2015) (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008)).

Today, the majority uses that extraordinary remedy to reverse a district court's discretionary transfer order, ruling that it was a clear abuse of discretion.[1] This district court's interest-of-justice *grant* of transfer is not extraordinary cause, and compelling it to be undone is our indisputable error, for many reasons.

First, Plaintiffs-Appellants Defense Distributed, the Second Amendment Foundation and Conn Williamson (hereafter DDSA) never properly requested the mandamus relief the majority has issued. *Compare* FED. R. APP. P. 21(a), *with* Notice of Appeal, *Defense Distributed*, No. 21-50327 (5th Cir. Apr. 23, 2021), *and* Brief of Appellants, *Defense Distributed*, No. 21-50327 (5th Cir. June 17, 2021). And as DDSA acknowledged in oral argument, they could not point to any reviewing court that has ever, before today, deployed mandamus authority to compel a trial court to undo a Section 1404(a) discretionary, interest-of-justice, joint severance and transfer *grant*. Oral Argument at 4:48, *Defense Distributed*, No. 21-50327 (5th Cir. Aug. 3, 2021).[2]

---

**1.** If it takes us more than half a year to explain what the district court did wrong, it is doubtful the court's error was a *clear* abuse of discretion. *See Volkswagen*, 545 F.3d at 311.

**2.** The majority cites four cases from three of our sister circuits in which a § 1404(a) transfer was reversed on mandamus. None reversed a grant of joint severance and transfer, and each is further distinguishable. In *In re Warrick*, the reversal was based on the fact that the district court completely failed to consider one of the § 1404(a) factors and transfer would have unavoidably brought

about dismissal of the claim. 70 F.3d 736, 740-41 (2d Cir. 1995). In *In re Nine Mile Ltd.*, the Eighth Circuit reversed the transfer grant only so that the district court could rule on the pending motion to reconsider transfer and the petitioner could seek review of that decision prior to actual transfer of the case. 673 F.2d 242, 243-44 (8th Cir. 1982). In *Sunbelt Corp. v. Noble, Denton & Assocs., Inc.,* there were two defendants, one of which was not subject to personal jurisdiction in the transferee court. 5 F.3d 28, 29, 33 (3d Cir. 1993). The Third Circuit denied the request of the defendant who *was* subject to personal juris-

A second obstacle is that our court has no authority to compel a federal district court in New Jersey to return a case it received and docketed on April 20, 2021, above all when, over seven weeks later, *unopposed by DDSA*, that district court took the additional step of consolidating the case it received with its pre-existing, parallel litigation, which DDSA itself filed in 2019. *See In re Red Barn Motors, Inc.*, 794 F.3d 481, 484-85 (5th Cir. 2015). Here is the pertinent chronology: After the district court granted the motion to transfer, DDSA did not, in district court, seek a stay or reconsideration. Nor did DDSA immediately seek mandamus of the district court's transfer order, *see* Notice of Appeal, *Defense Distributed v. Grewal*, No. 21-50327 (5th Cir. Apr. 23, 2021), and, in its initial filings in this court, DDSA explicitly disclaimed intention to "enjoin anything about the interlocutory transfer or severance rulings below," Appellants' Reply in Support of Appellants' Motion for a Preliminary Injunction, *Defense Distributed*, No. 21-50327 (5th Cir. June 21, 2021). DDSA did not ask the New Jersey district court to return the case to the Western District of Texas, nor did they oppose consolidation with the pre-existing New Jersey case. Hearing no opposition from DDSA, the New Jersey district court then consolidated the cases in that court. That was over half a year ago.

Third, even if all we order of our district court is a *request* to transfer the case back to Texas—so that we can resolve a constitutional showdown between New Jersey law and 3D-printed weaponry—and assuming our court can sua sponte reconfigure an appellant's notice of appeal into a nonconforming mandamus petition, still, here,

the district judge painstakingly applied the *Volkswagen* transfer factors, which we set forth with the (short-lived) promise ("we stress") that "in no case will we replace a district court's discretion with our own." 545 F.3d at 312. The district court's *Volkswagen* analysis is so comprehensive and well-reasoned as to show that had transfer been *refused*, a writ for mandamus to *compel* transfer would be well supported by the settled precedent of this court, *see Lloyd's*, 780 F.3d 283, *In re Rolls Royce Corp.*, 775 F.3d 671 (5th Cir. 2014); *In re Radmax, Ltd.*, 720 F.3d 285 (5th Cir. 2013); *Volkswagen*, 545 F.3d 304, which other courts follow and scholars credit, *see In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 57 (3d Cir. 2018) (citing *Lloyd's*); *In re Hudson*, 710 F.3d 716, 717-18 (7th Cir. 2013) (Posner, J.) (citing *Volkswagen*); *In re Apple, Inc.*, 602 F.3d 909, 911-12 (8th Cir. 2010) (citing *Volkswagen*); *In re: Apple*, No. 2021-181, 2021 WL 5291804, at *2 (Fed. Cir. Nov. 15, 2021); *In re: Hulu, LLC*, No. 2021-142, 2021 WL 3278194, at *2 (Fed. Cir. Aug. 2, 2021); 55 John Bourdeau et al., C.J.S. Mandamus § 97 (2021).

Notably, severance is not only discretionary and tied to case management prerogatives, but it is not itself subject to review through a writ of mandamus. At all. *See In re Rolls Royce*, 775 F.3d at 676. And though *Rolls Royce* held that a district court's ruling on a joint transfer and severance motion may be reviewed through mandamus, neither DDSA nor the majority opinion cites any mandamus case, ever, reversing a grant of a joint severance and transfer motion. Constructed for DDSA, the novel argument – opposite to

diction in the transferee court to sever the case and transfer only as to it. *Id.* at 33-34. In *In re Howmedica Osteonics Corp.,* reversal of transfer as to some defendants was based on a forum selection clause, and the court sev-

ered the parties and affirmed the transfer only as to those defendants not subject to the forum selection clause. 867 F.3d 390, 397-98, 411 (3d Cir. 2017).

indisputable – appears to be that New Jersey is a necessary party because the United States Department of State somehow was its pull-toy, allegedly breaching a settlement agreement whose provisions plaintiffs could not specify at oral argument as having been breached, much less that New Jersey caused the federal government to breach. Manifestly, New Jersey has no role in United States weapons export regulations.

Several additional points highlight *our* usurpation.

First, the district court here transferred to a court whose intercession these same plaintiffs had already sought, had argued on appeal in the Third Circuit to maintain, and thereafter had kept pending for over two years. In other words, the transfer was to a receiving court which had pre-existing jurisdiction over these plaintiffs' claims, at their initiation and insistence.

Second, that transfer was back to a court within the only federal circuit authorized to certify questions of interpretation of New Jersey law to the Supreme Court of New Jersey, which could interpret that law to avoid, not force, a novel and difficult constitutional showdown. *See* N.J. COURT RULES 2:12A-1. Notably, the Supreme Court recently reversed our court when we tried to force resolution of a different First Amendment collision without deferring first to one of our states'

highest court's prerogative to interpret its own law. *McKesson v. Doe*, –– U.S. ––, 141 S. Ct. 48, 208 L.Ed.2d 158 (2020).[3]

A third related, especially serious point is that removing discretion to grant transfer undermines our court's mandamus transfer precedent, which, hitherto, we have used to *require* comity, not *defy* it. And it does so imprudently, forcing a constitutional collision that may well be avoidable through certification of questions of state law, which we cannot do but the receiving circuit can. Hereafter, as to other transfer grants, our mandamus, discordantly, will reduce or remove trial judge discretion to avoid adjudicating the constitutionality of other states' laws.

Finally, we commit not just an error we told our district courts in *Volkswagen* would not occur, but another one we took pains earlier in this litigation to cabin against. *See Defense Distributed v. Grewal*, 971 F.3d 485, 496 (5th Cir. 2020). Hereafter, state attorneys general, including those within our own circuit, may not only be hailed into federal courts across the country to defend *their* state laws, but then, if a trial judge assesses interests of justice to favor transfer—say for consolidation with related claims already pending in a co-equal court whose circuit has certification authority—that is indisputable er-

---

**3.** The intimation is made that transfer should be undone, in part, because New Jersey has intentionally delayed this litigation. As noted, we have not acted promptly ourselves, on a case docketed in another circuit nearly a year ago and as to a point of law the majority now, with no precedent, says is so obvious as to be indisputable. Regardless, sufficient answer to innuendo is that this litigation, over whether governments have authority to regulate 3D printable weaponry, commonly known as ''ghost guns,'' has spanned three circuits for over a decade, without any court of original jurisdiction—courts with actual fact-finding

authority over lawyers before them—even hinting of bad faith, much less making findings to support our ire. In fact, to my knowledge, the defendants have prevailed in every district court so far, not to mention twice in this court, *Defense Distributed v. U.S. Dep't of State*, 947 F.3d 870 (5th Cir. 2020); *Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016), and before the Third and Ninth Circuits, *see Defense Distributed v. Att'y Gen. of N.J.*, 972 F.3d 193 (3d Cir. 2020); *State v. U.S. Dep't of State*, 996 F.3d 552 (9th Cir. 2021).

ror.[4]

Consistent with the New Jersey Attorney General's express and emphatic *denials*, twice to our panel, that it seeks to enforce New Jersey law in Texas, the record is devoid of enforcement measures, such as a takedown order or criminal prosecution, against DDSA. Indeed, the parties point to no prosecution even in New Jersey using New Jersey's new law, yet the majority rules today that mandamus lies to force New Jersey to defend its new law for the first time in Texas. Because this precedent, now binding as indisputable, does injury to state sovereignty and comity, not to mention district court case management discretion, it is small comfort that there is a pending dismissal motion filed by the Department of State which, if granted, may lead to re-transfer, albeit after further, up-down delay protracted by us.

Also specific to this case, it is small comfort that the most we compel is a *request*, which the New Jersey federal district court no doubt will seriously consider, informed by comity and state law priorities set forth by the Supreme Court, as well as by its own assessment of whether litigation resolving New Jersey law should be decided in Texas as well as delayed and encumbered by the national security interests implicated in the federal government's overseas export munitions restrictions, which are at the heart of the litigation in the Western District of Texas.

Mandamus rulings announce law inflexibly. Here, without precedent, our court, seemingly impatient for the last half decade, to force a difficult First (Second?) Amendment clash over government regulation of 3D printable "ghost" weapons,

supplants district courts' long-standing, fact-specific case management discretion to transfer litigation for consolidation with an existing case in another circuit, in derogation of state sovereignty, comity and constitutional avoidance principles, contrary to instruction given to us by the Supreme Court just last year.



PENN-AMERICA INSURANCE
COMPANY, Plaintiff—
Appellee,

v.

TARANGO TRUCKING, L.L.C.,
Defendant—Appellant.

No. 21-10749

United States Court of Appeals,
Fifth Circuit.

FILED April 4, 2022

**Background:** Insurer filed a declaratory judgment action seeking to have its and insured's rights determined concerning commercial general liability policy and underlying third-party claims relating to fatal accident on insured's property, and insured filed an answer and counterclaim seeking a declaration that insurer had a duty to defend and indemnify. The United States District Court for the Northern District of Texas, Karen Gren Scholer, J., 2021 WL 2581420, adopted report and recommendation of Rebecca Rutherford,

---

4. *Cf.* Response Brief of Defendant-Appellee Ken Paxton in His Official Capacity as Attorney General of Texas at 10-11, *Twitter v. Paxton*, 26 F.4th 1119 (9th Cir. 2022) (No. 21-15869) ("Where, as here, the Attorney Gener-

al of a sovereign State is sued for actions to enforce that State's law in that State, there is 'only one obvious locus' for any constitutional challenge: *in that State*.").

**DEFENSE DISTRIBUTED; Second Amendment Foundation, Incorporated, Plaintiffs—Appellants,**

**v.**

**Matt PLATKIN, Attorney General of New Jersey, in his official capacity, Defendant—Appellee.**

**No. 22-50669**

United States Court of Appeals, Fifth Circuit.

FILED September 16, 2022

Appeal from the United States District Court for the Western District of Texas, USDC No. 1:18-CV-637, Robert L. Pitman, U.S. District Judge

Chad Flores, Esq., Owen Joseph McGovern, Beck Redden, L.L.P., Houston, TX, Joshua Michael Blackman, Houston, TX, Matthew Goldstein, Clark Hill, P.L.C., Washington, DC, for Plaintiffs-Appellants.

Angela Cai, Jeremy M. Feigenbaum, Esq., Office of the Attorney General, for the State of New Jersey, Trenton, NJ, Alexander Hardiman, Esq., Attorney, Pillsbury Winthrop Shaw Pittman, L.L.P., New York, NY, for Defendant-Appellee.

Before ELROD, GRAVES, and HO, Circuit Judges.

PER CURIAM:

IT IS ORDERED that Appellants' motion to expedite the instant appeal is GRANTED. The Clerk is directed to schedule this appeal for oral argument before the next available randomly designated regular merits panel.

IT IS FURTHER ORDERED that all pending motions are CARRIED WITH THE CASE.

JAMES C. HO, Circuit Judge, joined by ELROD, Circuit Judge, concurring:

In *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), we held that the Western District of Texas was wrong to sever the case against the Attorney General of New Jersey and transfer it to the District of New Jersey. Our decision was accompanied by a well-reasoned dissent from a distinguished colleague. But it is now the law of the circuit as well as the case.

We can think of no substantive reason—and none has been offered to us—why this case should nevertheless proceed in New Jersey rather than Texas, other than disagreement with our decision in *Defense Distributed*. The Attorney General of New Jersey confirmed as much during oral argument.

So we respectfully ask the District of New Jersey to honor our decision in *Defense Distributed* and grant the request to return the case back to the Western District of Texas—consistent with the judiciary's longstanding tradition of comity, both within and across the circuits, as repeatedly demonstrated by district courts nationwide.

Federal courts across America have repeatedly granted requests to return cases back to the original transferring court, whether the request comes from a fellow Article III court or even from a litigant. Examples of such judicial courtesy include, but are far from limited to, federal courts governing New Jersey and Texas. *See, e.g., In re United States*, 273 F.3d 380, 382 n.1 (3rd Cir. 2001) ("We are most appreciative of Judge Campbell's accommodation, which enabled this court to consider the matter and prevented an unseemly tension between federal jurisdictions."); *CCA Glob. Partners, Inc. v. Yates Carpet, Inc.*, 2005 WL 8159381, *2 (N.D. Tex. 2005) ("This Court will not stand in the way of another district court attempting to correct what it

believes to have been an error made while the case was under its jurisdiction. Thus, this Court finds that in the interest of justice, the case should be transferred back to the Eastern District of Missouri.").[1]

This tradition of inter-circuit courtesy should surprise no one. After all, it's an easy tradition to respect. These cases originated elsewhere, and only ended up in the transferee court as a result of mistake. So the act of courtesy costs the transferee court nothing. In sum, there's every reason in the world for district courts across the country to avoid, as the Third Circuit has put it, "unseemly tension between federal jurisdictions." *In re United States*, 273 F.3d at 382 n.1.

So we're unsurprised that such courtesy appears to be routine practice in district courts nationwide. In fact, we're unaware of any district court anywhere in the nation to have ever denied such a request. The parties admit they have not found any. We see no reason why this case should be the first.

\* \* \*

We respectfully ask the District of New Jersey to return the case to the Western District of Texas as requested, and thereby join its sister district courts nationwide in this act of inter-district comity, mutual respect, and courtesy.



---

**1.** *See also, e.g., In re Nine Mile Ltd.,* 692 F.2d 56, 57–58 (8th Cir. 1982) (request granted returning case from the District of South Carolina to the Northern District of Iowa), *overruled on other grounds by Mo. Housing Development Comm'n v. Brice,* 919 F.2d 1306, 1311 (8th Cir. 1990); *Fine v. McGuire,* 433 F.2d 499, 500 & n.1 (D.C. Cir. 1970) (request granted returning case from the District of Maryland to the District of Columbia); *United*

*States v. Petty,* 2022 WL 1590609, *3 (W.D.N.Y. 2022) (granting request to return case to the Western District of Pennsylvania); *Tlapanco v. Elges,* 2017 WL 4329789, *3 (S.D.N.Y. 2017) (case stayed in the Eastern District of Michigan pending reconsideration of transfer); *Herman v. Cataphora Inc.,* 2013 WL 275960, *2 (N.D. Cal. 2013) (transferring case back to the Eastern District of Louisiana).

---

Hunter DOSTER, et al., Plaintiffs-
Appellees,

**v.**

Hon. Frank KENDALL, in his official capacity as Secretary of the Air Force, et al., Defendants-Appellants.

No. 22-3702

United States Court of Appeals,
Sixth Circuit.

Decided and Filed: September 9, 2022

**Background:** Servicemembers filed putative class action alleging that Department of Air Force's systematic denial of requests for religious exemptions from COVID-19 vaccine mandate violated Religious Freedom and Restoration Act (RFRA) and First Amendment. The United States District Court for the Southern District of Ohio, Matthew W. McFarland, J., 2022 WL 2974733, granted in part servicemembers' motion for preliminary injunction, and certified class. Air Force appealed. Air Force moved for emergency stay.

**Holdings:** The Court of Appeals, Kethledge, Circuit Judge, held that:

(1) district court was likely correct when it held that servicemembers satisfied commonality requirement for class certification, and

(2) Air Force failed to establish likelihood of success on merits of its argument

first instance in the district court—thus raising it for the first time on appeal." *Thomas v. Ameritas Life Ins. Corp.*, 34 F.4th 395, 402 (5th Cir. 2022).[5] Accordingly, we decline to reach this argument.

### C. Privileges or Immunities Clause Claim

[22] As Sivad-Home concedes, the Privileges or Immunities Clause protects a finite list of "uniquely federal rights," none of which she claims have been violated in this case. *Deubert v. Gulf Federal Sav. Bank*, 820 F.2d 754, 760 (5th Cir. 1987). Accordingly, we decline to address her argument on this issue.

### IV. Conclusion

For the foregoing reasons we AFFIRM the judgment of the district court.



**DEFENSE DISTRIBUTED; Second Amendment Foundation, Incorporated, Plaintiffs—Appellants,**

**v.**

**Matt PLATKIN, Attorney General of New Jersey, in his official capacity, Defendant—Appellee.**

No. 22-50669

United States Court of Appeals, Fifth Circuit.

FILED December 15, 2022

**Background:** Nonprofit and publisher of 3D printing files for gun filed suit against nine state Attorneys General, including New Jersey Attorney General (NJAG), asserting enforcement actions violated First Amendment and tortiously interfered with settlement agreement with United States Department of State. The District Court, Robert L. Pitman, J., 364 F.Supp.3d 681, granted motion by Attorneys General to dismiss for lack of personal jurisdiction, and plaintiffs appealed. The Court of Appeals, 971 F.3d 485, reversed and remanded as to NJAG. On remand, plaintiffs added State Department as defendant. The District Court, Pitman, J., 2022 WL 984870, granted NJAG's motion to sever claims against him and transfer them to District of New Jersey. The Court of Appeals, 30 F.4th 414, granted plaintiffs' mandamus petition and ordered District Court in Texas to request that district court in New Jersey transfer case back. After district court in New Jersey refused, plaintiffs moved for preliminary injunction against publication restraints imposed by NJAG. The United States District Court for the Western District of Texas, Robert L. Pitman, J., dismissed motion. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Smith, Circuit Judge, held that:

(1) vacatur of severance-and-transfer order would not revive or recreate claims against NJAG in Western District of Texas, and

(2) amendment of complaint to re-add claims against NJAG would be futile.

Affirmed.

HAYNES, Circuit Judge, concurred in the judgment only.

---

**5.** *See Thomas*, 34 F.4th at 402 (explaining that "to preserve an argument for appeal, the argument (or issue) not only must have been presented in the district court, [but] a litigant must also press and not merely intimate the argument during proceedings before the district court.") (internal quotations and citation omitted).

**1. Federal Courts ⟨⟩3581(1)**

The Court of Appeals reviews questions of law as to jurisdiction de novo.

**2. Federal Civil Procedure ⟨⟩613.1**

Vacated orders are immediately null and void.

**3. Federal Civil Procedure ⟨⟩613.1**

Typically, vacatur of a party-changing order automatically restores parties and claims to where they were before the vacated order.

**4. Federal Courts ⟨⟩2945, 3794**

Vacatur, by Court of Appeals for the Fifth Circuit, of erroneous order of District Court for the Western District of Texas severing claims that digital file publisher and nonprofit asserted against New Jersey Attorney General (NJAG), including for violation of First Amendment, from claims they asserted against other defendant and transferring claims against NJAG to district court in New Jersey would not automatically revive or recreate claims against NJAG in district court in Texas, and, thus, would not restore Fifth Circuit courts' jurisdiction over claims against NJAG; completion of transfer of files to transferee district terminated transferor court's jurisdiction over transferred claims entirely, and Court of Appeals could not reconstitute claims that existed elsewhere, out-of-circuit. U.S. Const. Amend. 1; 28 U.S.C.A. § 1404(a).

**5. Federal Courts ⟨⟩2902**

A court acting under the "interest of justice" section of the venue transfer statute may not transfer part of a case for one purpose while maintaining jurisdiction for another purpose; the section contemplates a plenary transfer of the entire case. 28 U.S.C.A. § 1404(a).

**6. Federal Courts ⟨⟩2945**

When claims are severed and transferred under the "interest of justice" provision of the venue transfer statute, the severed case is transferred in its entirety while the retained case remains in its entirety in the transferor court. 28 U.S.C.A. § 1404(a).

**7. Federal Courts ⟨⟩3587(1)**

Ordinarily, the Court of Appeals reviews the denial of a motion for leave to file an amended complaint for abuse of discretion; however, where the district court's denial of leave to amend was based solely on futility, the Court of Appeals applies a de novo standard of review. Fed. R. Civ. P. 15.

**8. Federal Courts ⟨⟩3973**

It would be futile to grant nonprofit and publisher of 3D printing file for gun leave to amend their complaint to re-add claims against New Jersey Attorney General (NJAG) for violation of First Amendment and tortious interference with settlement agreement, after District Court for the Western District of Texas erroneously severed claims against NJAG and transferred them to district court in New Jersey; first-to-file rule, which served to maximize values of economy, consistency, and comity, precluded re-filing of claims against NJAG in transferor court while severed and transferred claims remained pending before transferee court in New Jersey, and NJAG was no longer party to remainder of case before transferor court. U.S. Const. Amend. 1.

**9. Federal Courts ⟨⟩3931**

Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap.

**10. Federal Courts ⟷3932**

Under the first-to-file rule, courts prophylactically refuse to hear a case raising issues that might substantially duplicate those raised by a case pending in another court.

**11. Federal Courts ⟷3931**

The first-to-file rule is intended to maximize the values of economy, consistency, and comity.

**12. Courts ⟷90(2)**

The "rule of orderliness" means that one panel of the Court of Appeals may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or the Court of Appeals en banc.

> See publication Words and Phrases for other judicial constructions and definitions.

**13. Federal Courts ⟷3852**

Comity between courts is not a binding rule of law but one of practice, convenience, and expediency.

**14. Federal Courts ⟷3431**

When a district court has incorrectly transferred a case outside of its circuit court's jurisdiction, the expectation is that the circuit court directs the transferor district court to request that the transferee district court return the case; this tradition neatly balances the jurisdictional powers of the separate circuits with a culture of mutual respect between the sister circuits.

————

Appeal from the United States District Court for the Western District of Texas, USDC No. 1:18-CV-637, Robert L. Pitman, U.S. District Judge

———————

* Judge Haynes concurs in the judgment only.

Chad Flores, Esq., Owen Joseph McGovern, Beck Redden, L.L.P., Houston, TX, Joshua Michael Blackman, Houston, TX, for Plaintiffs-Appellants.

Angela Cai, Jeremy M. Feigenbaum, Esq., Office of the Attorney General for the State of New Jersey, Trenton, NJ, Alexander Hardiman, Esq., Attorney, Pillsbury Winthrop Shaw Pittman, L.L.P., New York, NY, for Defendant-Appellee.

Before SMITH, BARKSDALE, and HAYNES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:*

Plaintiffs Defense Distributed and the Second Amendment Foundation produce, and make accessible, information related to the 3D printing of firearms. The U.S. Government and various states have imposed restraints on the publication of that information. Since 2013, plaintiffs have challenged those restraints in federal courts as violating the First Amendment.

The instant case involves publication restraints that the defendant, first as Acting Attorney General, then as Attorney General, of New Jersey ("NJAG"), has placed on these plaintiffs.

The case has had a long journey through the justice system: This is the plaintiffs' third appeal to the Fifth Circuit. Plaintiffs initially filed in the Western District of Texas and included claims against the U.S. Department of State and NJAG. In the first appeal, we reversed the district court's decision that the NJAG was not subject to the court's personal jurisdiction. *Def. Distributed v. Grewal*, 971 F.3d 485, 488 (5th Cir. 2020), *cert. denied*, ––– U.S. ––––, 141 S. Ct. 1736, 209 L.Ed.2d 504 (2021).

On remand, the district court severed the claims against the State Department

and NJAG and transferred the claims against NJAG to the District of New Jersey per 28 U.S.C. § 1404. On appeal, we held that that decision was a clear abuse of discretion and ordered the district court to vacate its sever-and-transfer order. Because the case against NJAG now resided in New Jersey, we ordered the district court to request that the New Jersey district court transfer the case back to the Western District of Texas. *Def. Distributed v. Bruck*, 30 F.4th 414, 421 (5th Cir. 2022). The New Jersey district court refused. *Def. Distributed v. Platkin* ("*Platkin-D.N.J.*"), Civ. Ac. No. 19-04753 (FLW), 2022 WL 2967304, at *1 (D.N.J. July 27, 2022).[1] In response, plaintiffs moved, in the Western District of Texas, for a preliminary injunction against the publication restraints imposed by NJAG. The district court entered a short order holding that it lacked jurisdiction to consider claims against NJAG and dismissed the preliminary-injunction motion. Plaintiffs appealed. Because this court no longer has the power to hear the case or grant the relief requested, we affirm that dismissal.

## I.

Defense Distributed is a company that "produces and makes accessible information related to the 3D printing of firearms and publishes and distributes such information to the public." *Bruck*, 30 F.4th at 422 (quoting *Grewal*, 971 F.3d at 488). The U.S. Government and individual states have not looked kindly upon plaintiffs' distributing that information to the public. Accordingly, they have placed publication

restraints on plaintiffs after "Defense Distributed published to the Internet computer assisted design ('CAD') files for a single-round plastic pistol." *Id.* at 421. Since 2013, plaintiffs have been engaged in substantial litigation focused on removing those publication restraints.[2] We have noted in *dictum* that the governments' actions "appear to be flagrant prior restraints." *Id.*

After initial litigation, the State Department "reached a settlement agreement that granted Defense Distributed a license to publish its files." *Id.* at 422. Next, a case was filed in the Western District of Washington by the attorneys general of nine states "to enjoin the State Department from authorizing the release of Defense Distributed's files" under the settlement agreement. *Id.* Separately and concurrently, Defense Distributed and associated plaintiffs challenged the enforcement actions of certain states' attorneys general, including NJAG. *Id.*

In the present case, plaintiffs initially sued in 2018 in the Western District of Texas to enjoin NJAG. They filed an amended complaint joining the U.S. Department of State as a defendant, alleging that the Department breached the settlement agreement. The district court initially dismissed the claims against NJAG, holding that the court did not have personal jurisdiction. *See Grewal*, 971 F.3d at 488–90.

Plaintiffs then sued in New Jersey, raising similar claims against NJAG and add-

---

**1.** The New Jersey district court rejected plaintiffs' request for reconsideration and second motion to transfer. *See Def. Distributed v. Platkin*, No. 19-cv-4753, 2022 WL 14558237, at *6 (D.N.J. Oct. 25, 2022).

**2.** "Defense Distributed published the CAD files to the Internet for a few months from December 2012–May 2013 before the State

Department claimed that to do so violated [the Department's] International Traffic in Arms Regulations ('ITAR')." *Bruck,* 30 F.4th at 421 n.1 (first citing *Def. Distributed v. U.S. Dep't of State,* 838 F.3d 451, 455 (5th Cir. 2016); and then citing *U.S. Dep't of State,* 838 F.3d at 461–63 ( Jones, J., dissenting)).

ing five plaintiffs[3] to the action against NJAG. *Platkin-D.N.J.*, 2022 WL 2967304, at *3. On appeal, our circuit held that the district court had improperly dismissed NJAG for want of personal jurisdiction grounds. *Grewal*, 971 F.3d at 496.

On remand, the district court granted NJAG's motion to sever the claims against him and transferred that portion of the case to the District of New Jersey. Plaintiffs did not attempt to stay that transfer, *see Bruck*, 30 F.4th at 425, and, as a result, the case was consolidated with the other lawsuit filed by plaintiffs in New Jersey. *Platkin-D.N.J.*, 2022 WL 2967304, at *4.

Plaintiffs appealed again, and we held that the sever-and-transfer order was a clear abuse of discretion. *Bruck*, 30 F.4th at 433. Nevertheless, because the transfer had already occurred to a court outside the jurisdiction of the Fifth Circuit, we could not order its return. *Id.* at 423–24. Instead, relying on *In re Red Barn Motors, Inc.*, 794 F.3d 481 (5th Cir. 2015) (per curiam), we issued a writ of mandamus to vacate the joint sever-and-transfer order and directed the district court to request that the transferee district court return the case. *Bruck*, 30 F.4th at 423–24, 436–37. We then stated that the district court, post-return, should "reconsolidate Defense Distributed's case against the NJAG back into the case still pending against the State Department" and should decide the merits of a preliminary injunction expeditiously. *Id.* at 437.

Despite principles of comity and the desire to prevent "unseemly tension between federal jurisdictions," *In re United States*, 273 F.3d 380, 382 n.1 (3d Cir. 2001), the New Jersey district court refused to transfer the case back, relying heavily on the dissenting opinion in *Bruck. Platkin-*

*D.N.J.*, 2022 WL 2967304, at *10–12, *16 (repeatedly citing *Bruck*, 30 F.4th at 437–40 (Higginson, J., dissenting)).

So plaintiffs have sought relief against NJAG in our circuit again, moving for a preliminary injunction in the remaining case against the State Department. The district court found it lacked jurisdiction because NJAG had been terminated from the case against the State Department in this circuit. Because NJAG was not a party to the suit, the district court found it had no power to adjudicate.

Plaintiffs appealed. In the meantime, two judges on the motions panel in this case requested that the New Jersey district court return the case that our court has held to be erroneously transferred. *Def. Distributed v. Platkin*, 48 F.4th 607, 607 (5th Cir. 2022) (per curiam) (Ho, J., joined by Elrod, J., concurring). On October 25, 2022, the New Jersey district court responded to a motion for reconsideration and a second motion to transfer filed by plaintiffs, denying the requests. *Platkin*, 2022 WL 14558237, at *6.

## II.

**[1]** The key question centers on "[n]ot favoritism, nor even corruption, but *power*." *Patchak v. Zinke*, —— U.S. ——, 138 S. Ct. 897, 910, 200 L.Ed.2d 92 (2018) (plurality opinion) (citation omitted) (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 228, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995)). Specifically, the question is whether the district court has the power to adjudicate plaintiffs' request for a preliminary injunction, regardless of the transfer. We have jurisdiction to review denials of preliminary injunctions under 28 U.S.C. § 1292(a)(1). "We review questions of law

---

**3.** The Firearms Policy Coalition, Inc., the Firearms Policy Foundation, the Calguns Foundation, the California Association of Fed-

eral Firearms Licensees, Inc., and Brandon Combs, an officer and founder of several of the organizational plaintiffs.

as to jurisdiction *de novo." Ramirez-Molina v. Ziglar*, 436 F.3d 508, 513 (5th Cir. 2006) (citations omitted).

"The twist in this case is the transfer to a district court outside the Fifth Circuit, a court over which this court exercises no control. This court lacks power to order a return of the case to our circuit." *Bruck*, 30 F.4th at 423. Because of the transfer, the Western District of Texas "can no longer enter an appealable order in the case." *Id.* at 424. In *Bruck*, we attempted to resolve the issue by ordering the district court to vacate its ruling and to request the transferee court to return the case. *Id.* at 423–24, 436. Nevertheless, the New Jersey transferee court has refused,[4] so plaintiffs remain in a bind.

As a result, plaintiffs have advanced two procedural theories to establish that the district court now has jurisdiction over their new request for a preliminary injunction against NJAG. One is that our court's order to vacate the district court's sever-and-transfer order automatically "revived" plaintiffs' claims against NJAG by operation of law. The second is that Federal Rule of Civil Procedure 15 allows plaintiffs to "refile" their claims against NJAG, and they did so when they requested leave to amend to add NJAG to the existing case against the State Department in the Western District of Texas.

We face a jurisdictional thicket. On the one hand, claims that we have found were wrongly severed from an existing case in this circuit are now being adjudicated improperly in New Jersey. That creates an erroneous absence of claims in the Western District of Texas and, concurrently, an errant presence of claims against NJAG in New Jersey. The breakdown in comity across courts only adds more thorns to this tangle.

Still, we cannot declare that claims in the New Jersey district court were duplicated or refiled in some fashion in Texas. Injunctive relief is not available under plaintiffs' novel theories.

### A.

Plaintiffs allege that when we issued *Bruck*, the entry of the order vacating the district court's sever-and-transfer order automatically revived plaintiffs' claims against NJAG in the Fifth Circuit. Plaintiffs defend that contention by pointing to the black-letter-law definition of vacatur:

> When a judgment has been rendered and later set aside or vacated, the matter stands precisely as if there had been no judgment. The vacated judgment lacks force or effect and places the parties in the position they occupied before entry of the judgment, with the underlying case and the original pleadings intact.

47 Am. Jur. 2d *Judgments* § 676 (2009) (citations omitted).

**[2]** Essentially, vacatur would reestablish the *status quo ante*: Vacated orders are immediately "null and void." *United States v. Moree*, 928 F.2d 654, 656 (5th Cir. 1991). Before the severance and transfer, there was a case in the Western District of Texas, with claims against both NJAG and the Department of State. Afterward, to recreate the status quo, the case with claims against NJAG and the Department of State must be present again in the Western District of Texas.

**[3]** Plaintiffs cite *Diece-Lisa Industries, Inc. v. Disney Enterprises, Inc.*, 943 F.3d 239 (5th Cir. 2019), as the most procedurally analogous case. They rely on it for the proposition that vacatur of a party-changing order automatically restores par-

---

**4.** *See Platkin-D.N.J.,* 2022 WL 2967304, at     *35–36.

ties and claims to where they were before the vacated order. That contention is true in a typical, run-of-the-mill case, such as the intellectual property claims at issue in *Diece-Lisa*.[5] In a vacuum, the vacatur of a judgment restores the status quo.

**[4]**   But plaintiffs fire a blank when extending *Diece-Lisa* to vacatur of a case that calls into question the territorial limitations of this circuit's power. In *Diece-Lisa*, a district court misused judicial discretion to dismiss an amended complaint that added new defendants. *See id.* at 253–55. *Diece-Lisa* restored the status quo through vacatur by reinstating the defendants to the case so that the district court could properly rule on its jurisdiction over them and the validity of the claims against them. *See id.* At no point were claims against defendants removed from the court's jurisdictional control. The addition of parties in *Diece-Lisa*'s vacated order, as compared to the improper subtraction of a party with a subsequent jurisdiction transfer here, is a distinction with a difference.

Indeed, transferring the case out of our territorial jurisdiction is the crux of the issue. In *Bruck*, we cited *Red Barn*, which stated that "[i]t seems uncontroversial in this situation that a transfer to another circuit removes the case from our jurisdiction, and numerous circuits have stated that rule plainly." *Red Barn*, 794 F.3d at 484 (citations omitted); *see also Bruck*, 30 F.4th at 423–24. "Once the files in a case are transferred physically to the court in the transferee district, the transferor court loses all jurisdiction over the case." *Chrysler Credit Corp. v. Country Chrysler*, 928 F.2d 1509, 1516–17 (10th Cir. 1991) (collecting cases). For that reason, in *Bruck*, the issuance of the mandamus merely or-

dered that the district court *request* the return of the case from New Jersey— nothing more. *Bruck*, 30 F.4th at 436–37; *see also Chrysler*, 928 F.2d at 1516–20.

There was a solution to the jurisdictional morass in which plaintiffs found themselves: They could have moved for a stay of the district court's transfer order before the case was transferred. Now, that is not necessarily fair to plaintiffs, who had little reason to believe that in the worst-case scenario, an outside transferee court would refuse a request to return an improperly transferred case. *See Platkin*, 48 F.4th at 608 (Ho, J., joined by Elrod, J., concurring) ("[W]e're unaware of any district court anywhere in the nation to have ever denied such a request. The parties admit they have not found any.").

As we have made clear, plaintiffs have acted with diligence, and "[n]othing in applicable precedent . . . mandates the particular method by which a party disadvantaged by an out-of-circuit transfer must bring that issue to the circuit court." *Bruck*, 30 F.4th at 425. It is unfortunate that these otherwise valid claims cannot currently be heard in the court chosen by plaintiffs, given that a plaintiff is the "master of the claim." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Yet here, the failure to seek a stay appears fatal to their novel revival theory.

Plaintiffs attempt to get around that tricky territorial issue by positing that we do not need to "bring back to Texas the claims that are in New Jersey." Instead, vacatur would "recreat[e] claims against [NJAG] in Texas." The claims in New Jersey against NJAG can remain there

---

**5.**   *Diece-Lisa* involved a suit by the owner of the "Lots of Hugs" trademark, used in stuffed bear toys, against subsidiaries of Disney for trademark infringement. The trademark own-

er alleged that Disney entities infringed on the trademark by using a "Lots-O'-Huggin' Bear" ("Lotso") character in *Toy Story 3* and associated merchandise. 943 F.3d at 243–44.

and be dealt with separately. Plaintiffs, in essence, theorize that transferring the case to New Jersey created a new case there, with no impact on the transferred case in the Western District of Texas.

[5] The contention is a reach. NJAG was marked as terminated on the docket sheet, and the physical (or electronic) transfer of the docket is not a mere formality. The transfer ended our control over the case. *Bruck*, 30 F.4th at 423; *see also In re Sw. Mobile Homes, Inc.*, 317 F.2d 65, 66 (5th Cir. 1963) (per curiam) (holding that once the transferee court has physically received the papers governing the case, the transferor court loses jurisdiction). Accordingly, "[a] court acting under § 1404(a) may not transfer part of a case for one purpose while maintaining jurisdiction for another purpose; the section 'contemplates a plenary transfer' of the entire case." *Chrysler*, 928 F.2d at 1518–19 (quoting *In re Flight Transp. Corp. Sec. Litig.*, 764 F.2d 515, 516 (8th Cir. 1985)).

[6] Note that "[t]he severed case is transferred in its entirety while the retained case remains in its entirety in the transferor court." *Id.* at 1519 (citing 15 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3845 (4th ed. 2008)). That happened here. The case against NJAG was severed and transferred in its entirety to the District of New Jersey. Although this court has politely requested that the New Jersey district court return the case, we can do no more. That case exists in New Jersey, and the retained case against the U.S. Department of State, *sans* claims against NJAG, remains in the Western District of Texas.

Statutory authority goes nowhere, either. Section 1404(a) contains no allusions to any revival-of-claim theories.[6] Plaintiffs have not shown a single example of any case in any circuit where a court recreated claims that were transferred to another district. We are unaware of any paradigmatic cases either.

We are sympathetic to plaintiffs' concerns, and a transfer, which this court has asked for from the New Jersey district court, would resolve the issue neatly. Nevertheless, under current statutory law and caselaw, the status quo before the erroneous sever-and-transfer order cannot be recreated. This court cannot reconstitute claims that exist elsewhere, and plaintiffs' novel revival theory does not currently have a legal basis.

## B.

Plaintiffs alternatively allege that we have jurisdiction over their claims against NJAG because plaintiffs properly presented their claims by requesting leave to amend their complaint to re-add NJAG as a party to the case via Federal Rule of Civil Procedure 15(a)(2). Plaintiffs claim they properly asked for leave of court by mentioning the request in a footnote in their motion for a preliminary injunction after the district court had transferred the NJAG claims to New Jersey. They also assert that they asked again for leave of court to amend the pleadings to add NJAG as a party in their Motion to Grant as Unopposed or Set a Hearing.

Plaintiffs aver that Rule 15 is well understood to permit a plaintiff to add defendants. And because the court's obligation to exercise jurisdiction is "virtually unflag-

---

**6.** It states only, *"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might* have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

ging,"[7] the district court was required to adjudicate the point and then grant the leave to amend, as district courts should "freely give leave when justice so requires." FED. R. CIV. P. 15(b)(2). Plaintiffs allege that the district court failed to provide an adequate reason to deny leave, and the record contains none. Additionally, plaintiffs contend that they properly served NJAG with the filings through the Electronic Case Files ("ECF") system, which plaintiffs claim is standard for parties that have waived objections to the absence of summons or service.

**[7]** "Ordinarily, this [C]ourt reviews the denial of a motion for leave to file an amended complaint for abuse of discretion. However, where, as here, the district court's denial of leave to amend was based solely on futility, we apply a *de novo* standard of review . . . ." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010) (citing *Wilson v. Bruks–Klockner, Inc.*, 602 F.3d 363, 368 (5th Cir. 2010)) (emphasis added). "This [C]ourt may affirm the district court's dismissal 'on any grounds supported by the record.'" *Id.* at 153 (quoting *Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir. 2006) (per curiam)).

Plaintiffs' argument is off target. As discussed above, the district court was correct that it did not have jurisdiction over NJAG after the transfer, and that remains

so: The transfer of the case files to the district court in New Jersey ended the power of this circuit over the transferred claims. *Bruck*, 30 F.4th at 433. Again, the sever-and-transfer order created two separate suits: one in New Jersey where NJAG was a party and one in Texas where NJAG was not.

*Bruck* delineated the path the case would need to take to proceed in Texas: The district court was to request the return of the case from New Jersey, and, upon transfer back to Texas, the case was to be reconsolidated with the case against the Department of State. *Id.* at 436–37. This court did not foresee any other alternative, and an attempt to refile the same case in the transferor forum would conflict with our first-to-file rule.

**[8–11]** "Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999) (citations omitted). Courts "prophylactically refus[e] to hear a case raising issues that might substantially duplicate those raised by a case *pending* in another court." *Id.* at 604. The rule is intended to "maximize" "the values of economy, consistency, and comity."[8] *Id.* That prudential rule

---

**7.** *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)).

**8.** In *Cadle*, the court held that the district court with the second-filed action erred in dismissing the action without transferring it to the first-filed court to "decide whether the second suit filed must be dismissed, stayed, or transferred and consolidated." 174 F.3d at 606 (quoting *Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997)). The pres-

ent case is distinguishable because plaintiffs did not properly present the case before the Western District of Texas the second time, and the same case was already transferred to New Jersey. Unlike in *Cadle*, the question presented is not how to proceed with "subsequently filed cases involving substantially similar issues," 174 F.3d at 606 (quoting *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 948 (5th Cir. 1997)), but instead how to deal with the same case that has already been transferred out of the forum. It would defeat the rule's animating purpose of promoting judicial economy to force the Western District

alone is reason enough to reject plaintiffs' refiling theory.

Additionally, nothing that occurred after the transfer made NJAG a party to the remaining suit in Texas against the Department of State. First, it is improbable that inserting a request to grant leave of court to amend a pleading inside a footnote in a preliminary injunction motion is proper or follows the local rules. *See* W.D. Tex. Civ. R. 7.[9]

Moreover, plaintiffs have pointed to no cases indicating that a court must allow a plaintiff to re-add a party to a complaint that was severed and transferred out of the jurisdiction. Plaintiffs' chosen cases do not address whether a court can, let alone must, allow a plaintiff whose case has been transferred out of the circuit to refile the same claims.

These alone decide the issue, without even going into the tenuous theory that continuously mentioning a previously terminated party in captions at the district court level without leave of court satisfies the rules for service of process. In response, plaintiffs point to at least four cases where NJAG added additional parties to an existing federal civil action and served the motion through the ECF system under Rule 5. Those examples are hollow. NJAG sought leave of court to intervene in each case instead of attempting unilaterally to re-add a previously terminated party.

As discussed above, the termination of a party is not a mere formality. It brings

into question important prudential considerations, and endorsing plaintiffs' theory would encourage future plaintiffs dissatisfied with transfer decisions to bring duplicative cases continuously. Our circuit has never held that is permissible. Moreover, the district's local rules for properly presenting claims before the court are entitled to respect.

## III.

[12] So NJAG prevails. But there are prudential concerns with our ruling. As stated before, it is well established that a plaintiff is the "master of the claim." *Caterpillar*, 482 U.S. at 392, 107 S.Ct. 2425. This court has already found that the claims against NJAG should be heard in the Western District of Texas. As a matter of fairness to plaintiffs, their claims against NJAG should be heard in Texas. They chose to file in the Fifth Circuit, and it took an erroneously granted sever-and-transfer motion to move their claims to New Jersey. *Bruck* remains the law of this circuit: Plaintiffs' claims against NJAG should be heard in the Western District of Texas.[10]

[13] Courts have incorrectly transferred cases out of their jurisdiction in the past; this case is not a new phenomenon. *See Platkin*, 48 F.4th at 607–08 (Ho, J., joined by Elrod, J., concurring) (collecting cases). Comity is an old concept as well: "[A] term of international law ... [whose] best definition, in light of the derivation of

---

of Texas to transfer the same claims it already transferred to New Jersey every time the plaintiff moves to do so. It would create a procedurally recursive loop.

9. *"*When a motion for leave to file a pleading, motion, or other submission is required, an executed copy of the proposed pleading, motion, or other submission shall be filed as an exhibit to the motion for leave.*"*

10. The rule of orderliness means that *"*one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.*" Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (citation omitted).

the word, is 'courtesy.'" Arthur March Brown, *Comity in the Federal Courts*, 15 HARV. L. REV. 589, 589 (1915).[11]

When faced with inter-circuit splits in jurisdiction, courts have returned the cases to the transferor district in the interest of comity. Neither side has been able to state a single case in which a transferee court did not transfer back a case that a transferor court requested. *See Platkin*, 48 F.4th at 608 (Ho, J., joined by Elrod, J., concurring).

[14] Instead, the expectation is that circuit courts direct "the transferor district court to request that the transferee district court return the case." *Bruck*, 30 F.4th at 424 (citing *Red Barn*, 794 F.3d at 484 (collecting cases)). That tradition neatly balances the jurisdictional powers of the separate circuits with a culture of mutual respect between the sister circuits. The refusal of the District of New Jersey to retransfer is unprecedented in that regard.

The New Jersey court contends that the initial fault was in our decision to grant mandamus in *Bruck*. "[T]he purported lack of precedent with respect to this Court's refusal to transfer is preceded by the lack of precedent as to the mandamus vacating the original severance and transfer order when jurisdiction had been divested." *Platkin*, 2022 WL 14558237, at *4 (citations omitted). Still, regardless of the merits of *Bruck*, it took an error for the New Jersey court even to hear the case in the first place. The matter originated in the Western District of Texas and "only ended up in the transferee court as a result of mistake." *Platkin*, 48 F.4th at 608 (Ho, J.,

joined by Elrod, J., concurring). More importantly, the effect of that decision permits a New Jersey district court functionally to nullify a Fifth Circuit decision.

The judgment is AFFIRMED.[12]



---

**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Donald E. JONES, Jr., Defendant-Appellant.**

**No. 21-3910**

United States Court of Appeals, Sixth Circuit.

Decided and Filed: December 13, 2022

**Background:** Following denial of his motion to suppress evidence, defendant was convicted in the United States District Court for the Northern District of Ohio, Dan Aaron Polster, J., of felon in possession of firearms and ammunition, possession with intent to distribute heroin and fentanyl, possession with intent to distribute tramadol, and possession of a firearm in furtherance of a drug trafficking crime. Defendant appealed.

**Holdings:** The Court of Appeals, Larsen, Circuit Judge, held that:

(1) police officers had sufficient probable cause to stop defendant's vehicle;

---

11. Comity is not a binding rule of law but "one of practice, convenience, and expediency." *Mast, Foos, & Co. v. Stover Mfg. Co.,* 177 U.S. 485, 488, 20 S.Ct. 708, 44 L.Ed. 856 (1900).

12. Plaintiffs moved for an injunction pending appeal and to expedite the appeal and to expedite a ruling on the motion. A motions panel granted the motion to expedite the appeal and carried the remaining requests with the case. Those remaining requests are DENIED.