No. 23-3058

---

In the United States Court of Appeals for the Third Circuit

---

Defense Distributed; Second Amendment Foundation, Inc.,
*Plaintiffs—Appellants*,

v.

Attorney General of New Jersey,
*Defendant—Appellee.*

---

Appeal from the United States
District Court for the District of New Jersey
Case No. 3-21-cv-9867

---

Brief of Appellants

---

Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Josh Blackman
Josh Blackman LLC
1303 San Jacinto Street
Houston, Texas 77002
(202) 294-9003

Counsel for Appellants

# Table of Contents

Table of Contents ........................................................................ i

Table of Authorities ................................................................. iii

Jurisdictional Statement ........................................................... 1

Issues Presented ......................................................................... 2

Statement of Related Cases and Proceedings ........................... 3

Statement of the Case ................................................................ 4

I.      Facts. ................................................................................ 5

    A.      Defense Distributed used to freely publish the computer files at issue, forever committing them to the internet's public domain. ........ 5

    B.      The AG is censoring Defense Distributed's speech. ........................... 8

        1.      Civil censorship began in 2018 and remains in force. ............... 8

        2.      Criminal censorship began in 2018 and remains in force. .......... 9

II.     Procedural history. ........................................................ 10

    A.      Plaintiffs sued to vindicate their free speech rights. ........................... 10

    B.      *Grewal* (5th Cir. 2020) established personal jurisdiction in Texas. ...... 11

    C.      *Bruck* (5th Cir. 2022) established venue in Texas. ........................... 12

III.    Rulings presented for review ...................................... 13

    A.      The district court refused *Bruck*'s retransfer request. ....................... 13

    B.      The district court refused *Platkin*'s retransfer request. .................... 14

    C.      The district court refused a third retransfer request. ......................... 17

    D.      The district court granted a Rule 12(b)(6) dismissal. ......................... 18

Summary of the Argument ...................................................... 19

Standards of Review ............................................................. 23

Argument ............................................................................. 23

I.    Venue: The case should be returned to Texas. ............... 24

      A.    Comity principles require transfer. ..................... 24

      B.    Law of the case principles required retransfer. ...... 28

      C.    Transfer is required because *Bruck* was rightly decided. .................... 29

      D.    The Court should reverse and have Texas courts handle the merits. 34

II.   Merits: The complaint pleads valid claims. ................... 35

      A.    The First Amendment claims are valid. ............... 35

            1.    The computer code at issue is First Amendment speech. ........ 35

            2.    The district court misconstrued the statute. ........................... 40

            3.    The content-based censorship theory succeeds. ...................... 42

            4.    The content-neutral censorship theory succeeds. ................... 45

            5.    The overbreadth theory succeeds. ........................................... 49

      B.    The Second Amendment claims are valid. ......... 52

            1.    The complaint pleaded a Second Amendment injury. ............. 52

            2.    The AG's censorship implicates the Second Amendment. ...... 52

            3.    The AG's censorship offends the Second Amendment. ......... 54

      C.    The Due Process Clause claims are valid. ........... 55

      D.    The civil censorship claims survive. ................... 57

Conclusion .......................................................................... 59

# Table of Authorities

## Cases

*Allah v. Seiverling,*
    229 F.3d 220 (3d Cir. 2000). ......................................................... 23

*Andrews v. State,*
    50 Tenn. 165 (1871) ..................................................................... 53

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) ...................................................... 46, 49, 50

*AXA Belgium, S.A. v. Century Indem. Co.,*
    No. 09 CIV. 9703 (CM), 2010 WL 199709 (S.D.N.Y. Jan. 11, 2010) .......... 26

*Backpage.com, LLC v. Dart,*
    807 F.3d 229 (7th Cir. 2015) ......................................................... 58

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) ...................................................................... 37

*Benham v. City of Charlotte, N.C.,*
    635 F.3d 129 (4th Cir. 2011) ......................................................... 42

*Bergh v. State of Wash.,*
    535 F.2d 505 (9th Cir. 1976) ......................................................... 25

*Bernstein v. U.S. Dep't of State,*
    922 F. Supp. 1426 (N.D. Cal. 1996) ............................................... 37

*Brown v. Entm't Merchants Ass'n,*
    564 U.S. 786 (2011) ...................................................................... 48

*In re Carmona,*
    224 F. Supp. 497, 498 (S.D. Cal. 1963). ................................... 26, 27

*CCA Glob. Partners, Inc. v. Yates Carpet, Inc.*,
  2005 WL 8159381 (N.D. Tex. 2005)............................................................. 20

*Chavez v. Dole Food Co., Inc.*,
  836 F.3d 205 (3d Cir. 2016) (en banc)..........................................................31

*CIBC World Mkts. v. Deutsche Bank Sec., Inc.*,
  309 F. Supp. 2d 637 (D. N.J. 2004)................................................................31

*City of Houston, Tex. v. Hill*,
  482 U.S. 451 (1987).................................................................................... 49

*Common Cause v. Judicial Ethics Comm.*,
  473 F. Supp. 1251 (D.D.C. 1979)................................................................ 26

*Cont'l Grain Co. v. Barge FBL–585*,
  364 U.S. 19 (1960).........................................................................................31

*Crosley Corp. v. Hazeltine Corp.*,
  122 F.2d 925 (3d Cir. 1941) ........................................................................31

*Danziger & De Llano, LLP v. Morgan Verkamp LLC*,
  948 F.3d 124 (3d Cir. 2020).   ................................................................... 23

*Defense Distributed v. Attorney General of New Jersey*,
  972 F.3d 193 (3d Cir. 2020) ......................................................................... 11

*Defense Distributed v. Bruck*,
  30 F.4th 414 (5th Cir. 2022) ................................................................*passim*

*Defense Distributed v. Grewal*,
  971 F.3d 485 (5th Cir. 2020) ......................................................6, 7, 11, 33, 34

*Defense Distributed v. Platkin*,
  48 F.4th 607 (5th Cir. 2022) ................................................................*passim*

*Defense Distributed v. Platkin*,
  55 F.4th 86 (5th Cir. 2022). ................................................................*passim*

iv

*Edenfield v. Fane,*
        507 U.S. 761 (1993) ....................................................... 46

*Exxon Corp. v. U.S. Dep't of Energy,*
        594 F. Supp. 84 (D. Del. 1984) ..................................... 26

*Ezell v. City of Chicago,*
        651 F.3d 684 (7th Cir. 2011) ......................................... 53

*Feller v. Brock,*
        802 F.2d 722 (4th Cir. 1986) ......................................... 25

*Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.,*
        457 U.S. 596 (1982). ...................................................... 47

*Hill v. Colorado,*
        530 U.S. 703 (2000) ....................................................... 46

*Holder v. Humanitarian Law Project,*
        561 U.S. 1 (2010) ............................................................51

*Ill. Ass'n of Firearms Retailers v. City of Chicago,*
        961 F. Supp. 2d 928 (N.D. Ill. 2014) ............................ 53

*Jumara v. State Farm Ins. Co.,*
        55 F.3d 873 (3d Cir. 1995). .......................................31, 32

*Junger v. Daley,*
        209 F.3d 481 (6th Cir. 2000) ......................................... 37

*Maliki v. Holy Redeemer Hosp.,*
        No. CV 151591 KSH CLW, 2016 WL 4161094 (D. N.J. Aug. 5, 2016) ........ 33

*McCullen v. Coakley,*
        573 U.S. 464 (2014) ................................................45, 47, 48

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
        213 L. Ed. 2d 387 (U.S. 2022) ................................52, 53, 54

*NIFLA v. Becerra,*
    138 S. Ct. 2361 (2018) .................................................................. 44

*Penn W. Assocs. v. Cohen,*
    371 F.3d 118 (3d Cir. 2004). ........................................................15

*Reed v. Town of Gilbert, Arizona,*
    576 U.S. 155 (2015) ..................................................................... 43

*Rice v. Paladin Enters., Inc.,*
    128 F.3d 233 (4th Cir. 1997) .......................................................51

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse,*
    199 F.3d 26 (1st Cir. 1999) .......................................................... 42

*Smith v. Goguen,*
    415 U.S. 566 (1974) ..................................................................... 56

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ...............................................................36, 37

*Staples v. United States,*
    511 U.S. 600 (1994) ..................................................................... 50

*Turner Broad. Sys., Inc. v. F.C.C.,*
    512 U.S. 622 (1994) ..................................................................... 44

*In re School Asbestos Litigation,*
    977 F.2d 764 (3d Cir. 1992). ........................................................17

*In re United States,*
    273 F.3d 380 (3rd Cir. 2001) ................................................. 20, 21

*United States v. Aguilar,*
    515 U.S. 593 (1995) ..................................................................... 50

*United States v. Auernheimer,*
    748 F.3d 525 (3d Cir. 2014)........................................................ 34

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010)..................................................... 47

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001) ................................................. 37

*U. S. for Use & Benefit of Mosher Steel Co. v. Fluor Corp.,*
436 F.2d 383 (2d Cir. 1970) ................................................. 25

*Washington v. U.S. Dep't of State,*
318 F. Supp. 3d 1247 (W.D. Wash. 2018) ........................................

*Whren v. United States,*
517 U.S. 806 (1996) ............................................................

## Statutes

28 U.S.C. § 1291 ............................................................ 1

28 U.S.C. § 1331 ............................................................ 1

28 U.S.C. § 1343 ............................................................ 1

28 U.S.C. § 1391(b)(2) ..................................................... 30

28 U.S.C. § 1404(a) ........................................................ 30

42 U.S.C. § 1983 ........................................................... 1

New Jersey Code of Criminal Justice 2C:39-9(*l*)(2) .......................*passim*

## Other Authorities

Arthur March Brown, Comity in the Federal Courts,
15 Harv. L. Rev. 589 (1915). ............................................... 22

Joseph G.S. Greenlee, *The American Tradition of Self Made Arms,*
54 St. Mary's L.J. 35 (2023)............................................54, 55

Charles Alan Wright & Arthur R. Miller, et al., Federal Practice & Procedure (3d ed. West 2024)

§ 1215 ................................................................................... 36
§ 2382 ...................................................................................15
§ 4478.4 ........................................................................... 28, 29
§ 3841................................................................................... 33
§ 3847 ......................................................................... 30, 31, 32

## Jurisdictional Statement

The district court had original jurisdiction because the complaint, App.249, establishes that the action arises under the Constitution and federal law, *see* 28 U.S.C. § 1331, and is to secure civil rights relief under 42 U.S.C. § 1983, *see* 28 U.S.C. § 1343.

28 U.S.C. § 1291 gives this Court appellate jurisdiction because the appellants timely filed a notice of appeal on November 16, 2023, App.1, from the Document 188 "Opinion" of September 29, 2023, App.84, the Document 189 "Order" of September 29, 2023, App.130, and the Document 190 "Text Order" of November 2, 2023, App.131.

## Issues Presented

**Venue**. The first issue is whether this case should have been transferred back to its originating court, the United States District Court for the Western District of Texas.[1]  It entails three subsidiary questions about *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), which expressly held that this case belongs in Texas and expressly requested that the District of New Jersey return it to Texas:

    (1)    Should the case have been transferred back to the Western District of Texas because *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), warrants comity?

    (2)    Should the case have been transferred back to the Western District of Texas because *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), is law of the case?

    (3)    Should the case have been transferred back to the Western District of Texas because *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), was correctly decided?

The answer is yes for all three reasons.  *Bruck* requires transfer back to Texas.  If the Court delivers that relief, it need not reach the second issue set.

**Merits.**   The second issue is whether the case warranted a Rule 12(b)(6) dismissal.  It entails eight sets of subsidiary issues briefed in Argument Part II.[2]

---

[1] This was raised below, *see* Case No. 3:19-cv-04753 Docs. 48, 52, 54, 56, 61, 64, 78, 80; Case 3:21-cv-09867 Docs. 167, 172, 176, 178 and ruled on below, App.22-23, 58, 59, 71, 73, 75, 83.

[2] This was raised below, *see* Case No. 3:19-cv-04753 Doc. 72, and ruled on below, App.84, 130, 131.

**Statement of Related Cases and Proceedings**

*Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020).

*Defense Distributed v. Attorney General of New Jersey*, 972 F.3d 193 (3d Cir. 2020).

*Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022).

*Defense Distributed v. Platkin*, 48 F.4th 607 (5th Cir. 2022).

*Defense Distributed v. Platkin*, 55 F.4th 86 (5th Cir. 2022).

*Defense Distributed v. United States*, Case No. 23-849 C (Ct. Fed. Cl.).

**Statement of the Case**

This is yet another installment of Defense Distributed and the Second Amendment Foundation's long-running free speech case against the New Jersey AG. Once again, the case raises "issues that implicate not only the parties' interests but those of the judicial system itself." *Defense Distributed v. Bruck*, 30 F.4th 414, 427 (5th Cir. 2022). "Preeminent are questions about the abridgement of the Plaintiffs' first amendment rights to publish their materials." *Id.* "Also critical, however, are tactics suggesting the abusive manipulation of federal court procedures in order to delay or altogether avoid meaningful merits consideration of Plaintiffs' claims." *Id.*

"Since 2013, Appellants [Defense Distributed and SAF] have been challenging publication restraints imposed by the U.S. State Department, federal courts, and the State of New Jersey after Defense Distributed published to the Internet computer assisted design ('CAD') files for a single-round plastic pistol." *Bruck*, 30 F.4th at 421. At issue here is the New Jersey AG, who since 2018 has imposed upon Defense Distributed and SAF "what appear to be flagrant prior restraints." *Id.* at 421. Even though courts see that Plaintiffs' "First Amendment freedoms have been restrained for years," *id.*, no real relief has occurred because of the AG's evasive tactics, which have triggered multiple appellate reversals already. *Id.* at 427. What happened below is the worst instance of gamesmanship yet.

## I.    Facts.

### A.    Defense Distributed used to freely publish the computer files at issue, forever committing them to the internet's public domain.

Plaintiff/Appellant Defense Distributed is a Texas company founded by Cody Wilson that exists to promote the Constitution's Second Amendment. App.253. To that end, Defense Distributed authors and publishes a wide variety of digital firearms information—computer files containing First Amendment speech about the Second Amendment. App.256-265. The company's publications concern a wide variety of individual firearm components, as well as a complete single-shot firearm known as the "Liberator." *Id.* Defense Distributed also republishes other authors' files. *Id.*

Plaintiff Second Amendment Foundation, Inc. ("SAF") is a nationwide non-profit membership organization that promotes the Second Amendment by researching, educating, publishing, and litigating about it. App.253-54. Across the nation and in New Jersey, certain SAF members seek to both receive the Defense Distributed publications at issue and publish their own digital firearms information via Defense Distributed's facilities. App.253-54, 293-295.

Before the AG initiated his current campaign of civil and criminal censorship, Defense Distributed published the digital firearms information at issue on several different occasions via several different avenues. The complaint details both the precise nature of these computer files and their prior publications. App.256-265.

*These computer files are speech:* "The digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing is an important expression of technical, scientific, artistic, and political matter." App.258. "Each and every computer file at issue has these values in the abstract, apart from any application that the information's recipient might choose to devote it to." *Id.* "Akin to blueprints, each computer file's sole purpose is to supply information in the abstract." *Id.* "With respect to 3D-printing processes in particular," these computer files "do not produce anything automatically." App.257. "They are not functional software." *Id.* "They do not self-execute." *Id.* "They are mere information stores." *Id.* Hence, they are "constitutionally protected speech in every respect." App.258.

*Prior internet publications*:  Most prominently, Defense Distributed published the computer files at issue to the internet's public domain on multiple prior occasions. *See Grewal*, 971 F.3d at 488-89.  One such publication period lasted from December 2012 to May 2013.  App.260.  Another lasted from July 27 to July 31, 2018.  App.261.  In each of these periods, Defense Distributed published the files to its defcad.org and defcad.com websites (collectively "DEFCAD") and letting visitors freely download them.  Millions of downloads occurred during these publication periods.  App.260.

*Prior mail publications*: Defense Distributed also published computer files with digital firearms information via the mail.  App.262.  From late August 2018 through early November 2018, Defense Distributed did so by storing the files on USB drives and SD cards, selling them to customers DEFCAD, and shipping the USB drives and SD cards to purchasers via the Postal Service.  *Id.*  Those files' details are known and pleaded with particularity too.  *Id.*

*Prior library publications:* Furthermore, Defense Distributed published its digital firearms information by hosting the files at a brick-and-mortar public library in digital formats that patrons can access via computer workstations.  App.262*; Grewal*, 971 F.3d at 488.  The public library housing Defense Distributed's publications is in Austin, Texas.  *Id.*

Because of these many prior publications, Defense Distributed's files will exist online forever.  Without coordination, the recipients of Defense Distributed's digital firearms information are persistently republishing the files at countless websites for free download.  App.264.  The republished files are not, as one judge errantly concluded, hidden in "dark or remote recesses of the internet."[3]  Simple Google searches yield the republished files with ease. App.263.  This will remain true no matter what the AG does to punish Defense Distributed for further publication.  *Id.*

---

[3] *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1262 (W.D. Wash. 2018).

**B.    The AG is censoring Defense Distributed's speech.**

**1.    Civil censorship began in 2018 and remains in force.**

Ever since July 2018, the AG has acted under the color of state *civil* laws to censor the publication of Defense Distributed's Second Amendment speech. App.284-86.  He issued a cease-and-desist letter expressly censoring Defense Distributed, sued Defense Distributed in court, and threatened Defense Distributed's third-party service providers—all in an effort to stop the exchange of digital firearms information that Defense Distributed initiates in Texas. *Id.*

A formal cease-and-desist letter began the civil campaign on July 26, 2018. App.284-85, 334-335.  Issued by the AG to Defense Distributed, that letter declared that publishing digital firearms information on the internet violated New Jersey's "public nuisance and negligence laws." *Id.*  The AG threatened Defense Distributed to stop publishing or else: "If you do not halt your efforts to proceed with publication, I will bring legal action against your company. . . ." *Id.*

The AG next targeted Defense Distributed by attacking its internet service providers.  App.285-86, 336-37.  Under the guise of "public nuisance" law, the AG sent letters to Defense Distributed's internet hosting provider, Dreamhost, and to its internet security provider, Cloudflare. *Id.*  These letters urged—by way of threats, coercion, and intimidation—Dreamhost and Cloudflare to terminate their contracts with Defense Distributed. *Id.*

### 2.    Criminal censorship began in 2018 and remains in force.

In the wake of DEFCAD's most recent online publications, the AG escalated his censorship of Defense Distributed.  App.172-173.  He now wields a dangerous new criminal law: New Jersey Code of Criminal Justice 2C:39-9(*l*)(2).  *Id.*

Section (*l*)(2) is a speech crime by any definition.  App.172-175.  It outlaws speech—publishing digital firearms information—on penalty of imprisonment.  *Id.* With the AG as its prime enforcer, Section (*l*)(2) criminalizes constitutionally protected speech that Plaintiffs would engage in but for the AG's enforcement threats.  App.172-175.  Calling Section (*l*)(2) his favorite new "tool," the AG aims to jail Defense Distributed, SAF, and anyone else that dares to exercise their right to publish digital firearms information.  App.172-175.

The AG wields the Section (*l*)(2) speech crime to censor Defense Distributed in particular, as evidenced by the law's highly publicized enactment ceremony. App.174-75.  At that event, the AG said that Section (*l*)(2) met his demand for "stronger tools to stop them"—those sharing digital firearms information—because "a Texan named Cody Wilson," Defense Distributed, and its supporters were "not relenting" and "still trying to release these codes online."  *Id.*  He said that the Section (*l*)(2) speech crime exists "to stop the next Cody Wilson - to fight the ghost gun industry."  *Id.*  He promised to prosecute "anyone who is contemplating making

9

a printable gun." *Id.* To Defense Distributed and anyone else who dares to share this information, the AG promises this: "***we will come after you***." *Id.* (emphasis added).

All of this censorship remains in force today. The cease-and-desist letter has never been disclaimed. The coercive actions taken against internet service providers have never been disclaimed. The civil lawsuits have never been disclaimed. And the threats issued at the law's signing ceremony have never been disclaimed. If Defense Distributed or a SAF member were to publish the computer files at issue, the AG "will come after" them with every civil and criminal tool at his disposal. App.175.

## II.    Procedural history.

### A.    Plaintiffs sued to vindicate their free speech rights.

The instant action began in the Western District of Texas in 2018. App.404. Plaintiffs are Defense Distributed and SAF. App.395-96; App.253-54. The AG was sued originally, as were other state officials that are no longer in the case. *See* App.397-403. The State Department was added as a defendant later. App.133.

The complaint presents a complete array of free speech claims under uses 42 U.S.C. § 1983, all of which seek to halt the AG's censorship via any available remedy. App.249. Plaintiffs sought injunctive relief immediately and repeatedly, in one court after another, as fast as their limited litigating resources would allow. But at every key turn, the AG has used procedural gamesmanship to avoid true judicial scrutiny.

**B.**    *Grewal* **(5th Cir. 2020) established personal jurisdiction in Texas.**

The AG's first evasive maneuver in Texas was to seek dismissal for want of personal jurisdiction.  The district court granted that relief, but the Fifth Circuit reversed and remanded, holding that the AG has to answer for his censorship in Texas because he chose to target Texas itself and injure Texas itself with his wrongdoing. *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020) (App.340).

In light of this temporary disruption, Plaintiffs and others initiated a backup lawsuit in the District of New Jersey—where personal jurisdiction was unquestionable.  But at the AG's behest, the District of New Jersey refused to proceed with the backup case while the main Texas case was at the Fifth Circuit.  The AG convinced the District of New Jersey to stay the local backup case instead of grant a preliminary injunction.  Plaintiffs appealed, and this Court in a 2-1 decision deemed appellate jurisdiction lacking and let the backup case remain stayed. *Def. Distributed v. Attorney Gen. of New Jersey*, 972 F.3d 193 (3d Cir. 2020).

Once the Fifth Circuit issued *Grewal* to establish personal jurisdiction in Texas, proceedings resumed there.  Defense Distributed and SAF filed an amended complaint that (1) accounted for two new years of facts about the AG's wrongdoing, and (2) asserted Defense Distributed and SAF's related claims against the State Department.  App.133.  Then the AG's shell games resumed.

**C.** *Bruck* **(5th Cir. 2022) established venue in Texas.**

Still in Texas, the AG next moved for the district court there to (1) sever the case against the AG from the case against the State Department, and (2) transfer the severed case against the AG to New Jersey, while keeping Plaintiffs' case against the State Department in Texas. *See* App.4. The Western District of Texas granted that relief. *See id.* Plaintiffs sought Fifth Circuit relief and won another major victory.

In *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022) (App.355), the Fifth Circuit overturned the Western District of Texas' sever-and-transfer decision, holding that the "order severing and transferring of the claims against the NJAG to the District of New Jersey was a clear abuse of discretion giving rise to an appropriate exercise of the court's mandamus power." *Id.* at 436. The mandate spoke clearly:

A writ of mandamus shall issue herein directing the district court to:

(1) Vacate its order dated April 19, 2021 that severed Defense Distributed's claims against the NJAG and transferred them to the United States District Court for the District of New Jersey;

(2) Request the District of New Jersey to return the transferred case to the Western District of Texas, Austin Division; and,

(3) After return, to reconsolidate Defense Distributed's case against the NJAG back into the case still pending against the State Department.

*Bruck*, 30 F.4th at 437. The Western District of Texas complied swiftly. App.21.

Meanwhile, the District of New Jersey had received the transferred main case. But from the original time of transfer to when *Bruck* deemed that transfer unlawful, the District of New Jersey did nothing of substance with the case. *See* App.451-452. The only action concerned minor ministerial matters—nothing of substance. *Id.*

*Bruck*'s mandate for retransfer came to district court's attention immediately and repeatedly, in a procedural posture where obliging would have been perfectly easy to accomplish. But at the AG's behest, the district court below did not follow the Fifth Circuit's decision in *Bruck*. It disavowed *Bruck* in unprecedented fashion.

## III.    Rulings presented for review.

### A.    The district court refused *Bruck*'s retransfer request.

The district court's first key ruling stemmed from the *Bruck* retransfer request, which Plaintiffs properly teed up with full briefs. *See* Case No. 3:19-cv-04753 Docs. 48, 52, 54, 56. Plaintiffs asked the court below to grant the retransfer request because of comity and law of the case doctrines and also because *Bruck* was right. *See id.* The AG told the court to deny retransfer on the grounds that *Bruck* was both incorrect and undeserving of any deference. Doc. 169; Case No. 3:19-cv-4753 Doc. 57.

Instead of sending the case back to Texas, the district court—at the time it was Chief Judge Wolfson—issued an order expressly refusing to transfer. App.58 (opinion); App.59 (order). Rejection of *Bruck* is the order's lynchpin. The district

court denied retransfer by announcing that it "declines to follow the Fifth Circuit's conclusion that the local interest factor favors Texas as a forum." App.50. It refused to retransfer because the it thought that that "the Fifth Circuit both overstates Texas's interests and downplays New Jersey's." App.51. And it rejected *Bruck*'s holding about preclusive effects of a Texas decision as flatly "not true." *Id*.

The district court's transfer denial triggers an extraordinary jurisdictional standoff. A fully and fairly litigated Fifth Circuit decision that squarely resolves the controversy's venue dispute has been essentially overruled by a decision of the District of New Jersey. Realizing the error's gravity, Plaintiffs gave the court several extra opportunities to reach the correct result. But the district court never yielded.

### B.    The district court refused *Platkin*'s retransfer request.

The district court's second key ruling about retransfer occurred when Plaintiffs asked for reconsideration, when Chief Judge Wolfson was still presiding. Case No. 3:19-cv-4753 Doc. 61. In that motion, Plaintiffs both exposed the initial decision's errors and showed how a simplified procedural posture made the case for retransfer even stronger than before. *Id*.

When the district court issued its first retransfer denial, there were technically two cases before it. Case number 3:19-cv-4753 was the backup case originating in New Jersey that had been stayed ever since the first Fifth Circuit appeal (*Grewal*).

Case number 3:21-cv-9867 was the main Texas-born case that got transferred. The district court had consolidated those cases after transfer but before the Fifth Circuit issued *Bruck*. *See* App.72. Consolidation should *not* have impacted the district court's initial retransfer decision because that ministerial act had no substantive significance.[4] But the district court's transfer refusal nonetheless relied in part on perceived complications stemming from the consolidation. App.33-40.

To unquestionably remove these extraneous concerns about the backup case's relation to the man case, Plaintiffs voluntarily dismissed the backup case. *See* App.72. From then on, the only case pending below was the main case transferred from Texas—the one *Bruck* confronted.

Still reeling from the District of New Jersey's shocking move, Defense Distributed and SAF went back to Texas and sought a preliminary injunction with novel theories about the courts there still having remedial authority. *See* App.420. The district court there refused to act, sending the case to the Fifth Circuit yet again for *Defense Distributed v. Platkin*, 48 F.4th 607 (5th Cir. 2022), and *Defense Distributed v. Platkin*, 55 F.4th 86 (5th Cir. 2022).

---

[4] Consolidation did not deprive either action of its separate identity because "actions do not lose their separate identity because of consolidation," 9A Charles Alan Wright & Arthur R. Miller, et al., Federal Practice & Procedure § 2382 (3d ed. West 2024) (hereinafter "Wright & Miller"), and administrative closures have no real legal consequence, *see Penn W. Assocs. v. Cohen*, 371 F.3d 118, 121 (3d Cir. 2004).

On September 16, 2022, the Fifth Circuit in *Platkin* issued a *per curiam* order addressing several appellate motions and expediting the appeal. *Defense Distributed v. Platkin*, No. 22-50669, 48 F.4th 607 (5th Cir. 2022). Issued in conjunction with that decision was a concurring opinion (over no dissent) authored by Judge Ho and joined by Judge Elrod. *Id.* at *607-08. This *Platkin* opinion expressly requested that the district court below return the instant action to Texas: "We respectfully ask the District of New Jersey to return the case to the Western District of Texas as requested, and thereby join its sister district courts nationwide in this act of inter-district comity, mutual respect, and courtesy." *Id.*

Plaintiffs immediately brought the *Platkin* transfer request to the district court's attention. Doc. 64 at 2-3. In response, the district court issued its second decision denying retransfer. App.59 (Doc. 66 opinion); App. 71 (Doc. 67 order). The district court's second retransfer order doubles down on the first, providing the clearest picture of why the court has ultimately decided to refuse retransfer. App.65. Pages 7 through 11 of the Document 66 opinion decision give the lynchpin holdings being challenged in this appeal. App.65-69.

**C.    The district court refused a third retransfer request.**

Finally, Plaintiffs gave the district court a third chance to grant retransfer. Doc. 176.  To get appellate relief from the prior two interlocutory refusals, Plaintiffs had planned to petition this Court for a writ of mandamus.  *See id.*  But while mandamus filings were in the works, the case was reassigned from the judge that issued the first two rulings to Judge Michael Shipp, who presides currently.  In light of the reassignment, Plaintiffs sought reconsideration once more.  *Id.*[5]  Judge Shipp denied the motion for reconsideration and opted to adhere to Chief Judge Wolfson's prior decision refusing to transfer.  App.75 (opinion); App.83 (order).

No solution is coming from the Texas side of the impasse.  The Fifth Circuit in *Platkin* ended up holding that, although Plaintiffs are completely correct in demanding retransfer, technicalities prevent the Fifth Circuit from ordering it.  *Defense Distributed v. Platkin*, 55 F.4th 486 (5th Cir. 2022) (App.384).  The Fifth Circuit's *Platkin* decision rightly realizes that "the effect of that decision permits a New Jersey district court functionally to nullify a Fifth Circuit decision."  *Id.*  It fully expects Defense Distributed and SAF to obtain what they deserve from the courts of this circuit: A order transferring the case back to Texas.  *Id.*

---

[5] The motion re-advanced all of the prior transfer arguments, giving the new judge a clean shot at the issue.  Doc. 176.  That way the writ of mandamus would run against the judge that actually decided the question presented, as precedent indicates.  *See In re School Asbestos Litigation*, 977 F.2d 764, 795-798 (3d Cir. 1992).  *Id.*

**D.    The district court granted a Rule 12(b)(6) dismissal.**

Judge Shipp resolved the case on the AG's Rule 12(b)(6) motion to dismiss. *See* Doc. 181 (motion); Doc. 184 (response); Doc. 185 (reply).  Based on pleadings alone, the court issued a decision dismissing all of the Plaintiffs' claims.  App.84 (opinion).  The decision dismissed most of the claims without prejudice and offered leave to amend.  App.130; App.131.  The Plaintiffs declined that invitation and opted to stand on their existing complaint by timely filing a notice of appeal.  App.1.

## Summary of the Argument

An unprecedented jurisdictional standoff is at hand. Bedrock principles of judicial administration dictate that, once a *circuit* court resolves a matter in a case, a *district* court handling the same matter in the same case should heed the circuit's ruling—even if it disagrees with the circuit and even if it is not fully "bound" like the parties are. Yet the district court below rejected a decisive Fifth Circuit venue ruling that binds all parties because of mere disagreement. This must be reversed.

Plaintiffs filed this case where it belongs—in the Western District of Texas. Though the AG got the Western District of Texas to transfer venue to New Jersey, the Fifth Circuit in *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), vacated the transfer and held that the case should be retransferred back to Texas. But at the AG's behest, the district court below rejected *Bruck* and will not give the case back.

The district court's refusal to retransfer this case to Texas is a grave error. It should have ordered retransfer because (1) *Bruck* should be followed as a matter of comity, (2) *Bruck* should be followed as law of the case, and (3) *Bruck* was rightly decided. Any one of those points warrants retransfer standing alone. In conjunction, they make the case for retransfer overwhelming. But the district court did not yield, opting instead to keep the case in open defiance of *Bruck*. The result is an unprecedented error that disserves both this case and the federal system at large.

To resolve the unseemly discord sown by the AG's latest gamesmanship, the
Court should issue an opinion upholding and embracing the analysis delivered by
Judge Ho's opinion in *Defense Distributed v. Platkin*, 48 F.4th 607 (5th Cir. 2022):

> In *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), we
> held that the Western District of Texas was wrong to sever the case
> against the Attorney General of New Jersey and transfer it to the
> District of New Jersey.  Our decision was accompanied by a
> well-reasoned dissent from a distinguished colleague.  **But it is now the
> law of the circuit as well as the case.**
>
> **We can think of no substantive reason—and none has been
> offered to us—why this case should nevertheless proceed in New
> Jersey rather than Texas, other than disagreement with our decision
> in *Defense Distributed*. The Attorney General of New Jersey
> confirmed as much during oral argument.**
>
> **So we respectfully ask the District of New Jersey to honor our
> decision in *Defense Distributed* and grant the request to return the
> case back to the Western District of Texas**—consistent with the
> judiciary's longstanding tradition of comity, both within and across the
> circuits, as repeatedly demonstrated by district courts nationwide.
>
> Federal courts across America have repeatedly granted requests
> to return cases back to the original transferring court, whether the
> request comes from a fellow Article III court or even from a litigant.
> Examples of such judicial courtesy include, but are far from limited to,
> federal courts governing New Jersey and Texas. *See, e.g.*, *In re United
> States*, 273 F.3d 380, 382 n.1 (3rd Cir. 2001) ("We are most appreciative
> of Judge Campbell's accommodation, which enabled this court to
> consider the matter and prevented an unseemly tension between federal
> jurisdictions."); *CCA Glob. Partners, Inc. v. Yates Carpet, Inc.*, 2005 WL
> 8159381, *2 (N.D. Tex. 2005) ("This Court will not stand in the way of
> another district court attempting to correct what it believes to have been
> an error made while the case was under its jurisdiction. Thus, this Court

finds that in the interest of justice, the case should be transferred back to the Eastern District of Missouri.").

> This tradition of inter-circuit courtesy should surprise no one. After all, it's an easy tradition to respect. These cases originated elsewhere, and only ended up in the transferee court as a result of mistake. So the act of courtesy costs the transferee court nothing. In sum, there's every reason in the world for district courts across the country to avoid, as the Third Circuit has put it, "unseemly tension between federal jurisdictions." *In re United States*, 273 F.3d at 382 n.1.

> So we're unsurprised that such courtesy appears to be routine practice in district courts nationwide. In fact, we're unaware of any district court anywhere in the nation to have ever denied such a request. The parties admit they have not found any. We see no reason why this case should be the first.

*Id.* at 607-08 (Ho, J., with Elrod, J., concurring). The Court should also adhere to

*Defense Distributed v. Platkin*, 55 F.4th 486 (5th Cir. 2022), in which Judge Smith

writing for a unanimous court explained once again why comity calls for the District

of New Jersey to grant the Fifth Circuit's repeated requests for retransfer:

> This court has already found that the claims against NJAG should be heard in the Western District of Texas. As a matter of fairness to plaintiffs, their claims against NJAG should be heard in Texas. They chose to file in the Fifth Circuit, and it took an erroneously granted sever-and-transfer motion to move their claims to New Jersey. *Bruck* remains the law of this circuit: ***Plaintiffs' claims against NJAG should be heard in the Western District of Texas.***

> Courts have incorrectly transferred cases out of their jurisdiction in the past; this case is not a new phenomenon. *See Platkin*, 48 F.4th at 607-08 (Ho, J., joined by Elrod, J., concurring) (collecting cases). Comity is an old concept as well: "[A] term of international law ... [whose] best definition, in light of the derivation of the word, is

21

'courtesy.' " Arthur March Brown, Comity in the Federal Courts, 15 Harv. L. Rev. 589, 589 (1915).

> When faced with inter-circuit splits in jurisdiction, courts have returned the cases to the transferor district in the interest of comity. Neither side has been able to state a single case in which a transferee court did not transfer back a case that a transferor court requested. *See Platkin*, 48 F.4th at 608 (Ho, J., joined by Elrod, J., concurring).

> Instead, the expectation is that circuit courts direct "the transferor district court to request that the transferee district court return the case." *Bruck*, 30 F.4th at 424 (citing *Red Barn*, 794 F.3d at 484 (collecting cases)). ***That tradition neatly balances the jurisdictional powers of the separate circuits with a culture of mutual respect between the sister circuits. The refusal of the District of New Jersey to retransfer is unprecedented in that regard.***

> The New Jersey court contends that the initial fault was in our decision to grant mandamus in *Bruck*. "[T]he purported lack of precedent with respect to this Court's refusal to transfer is preceded by the lack of precedent as to the mandamus vacating the original severance and transfer order when jurisdiction had been divested." *Platkin*, 2022 WL 14558237, at *4 (citations omitted). Still, regardless of the merits of *Bruck*, it took an error for the New Jersey court even to hear the case in the first place. The matter originated in the Western District of Texas and "only ended up in the transferee court as a result of mistake." *Platkin*, 48 F.4th at 608 (Ho, J., joined by Elrod, J., concurring). More importantly, ***the effect of that decision permits a New Jersey district court functionally to nullify a Fifth Circuit decision.***

*Platkin*, 55 F.4th at 495–96 (emphasis added) (footnotes omitted).

If the Court agrees with Plaintiffs on this issue, the appeal can be fully resolved without needing to entrench the Court in the lengthy exercise of correcting the Rule 12 dismissal's thicket of errors. The case should be sent back to Texas and proceed.

## Standards of Review

Review of the district court's refusal to retransfer the case to Texas is for an abuse of discretion. *See, e.g.*, *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020). Review of the district court's Rule 12(b)(6) dismissal is *de novo. See, e.g.*, *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000).

## Argument

Primarily, Defense Distributed and SAF submit that the Court should dispose of this appeal by reaching only the issue regarding the district court's refusal to retransfer. To correct that grave error and fully resolve the appeal, the Court should enter a judgment reversing the district court's refusal to retransfer, vacating the district court's subsequent Rule 12 decision without regard to the merits, and rendering a judgment transferring this action to the United States District Court for the Western District of Texas for further proceedings. Then the courts in Texas can resolve the Rule 12 motion, requests for preliminary injunctions, and so on.

Alternatively, if the Court reaches the merits of the Rule 12(b)(6) decision for any reason, the Court should reverse the district court's dismissal and render a judgment completely denying the AG's motion because the case is fully meritorious.

## I.     Venue: The case should be returned to Texas.

First and foremost, Defense Distributed and SAF challenge the district court's repeated denial of the Fifth Circuit's request to retransfer this action to the Western District of Texas. The repeated refusal to retransfer constitutes a clear abuse of discretion necessitating reversal for three independent reasons. First, *Bruck* should have been followed as a matter of comity irrespective of the decision's merits. Second, *Bruck* should have been followed as law of the case, again irrespective of its merits. Third, *Bruck* was rightly decided and shows how a transfer analysis done *tabula rasa* would yield the same result once again. This action belongs in Texas.

### A.     Comity principles require transfer.

First, Plaintiffs have a clear and indisputable right to retransfer because comity requires deference to the Fifth Circuit's decision in *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. Apr. 1, 2022). *Bruck* resolved every material aspect of this venue dispute in expressly holding that Plaintiffs case against the AG belongs in the Western District of Texas. Part "B" of *Bruck*'s holding deems transfer wrong because of the errant initial severance decision, and—critically—Part "C" of *Bruck*'s holding deems transfer wrong *even if severance was correct*: "even setting aside severance as impermissible, any transfer of this case, in whole or in part, constitutes an abuse of the district court's discretion." *Id.* at 431-36.

As a matter of law, the rules of judicial comity dictate that both the District of New Jersey and this Court should defer to the Fifth Circuit's decision in *Bruck* and accept the Western District of Texas's retransfer request without second-guessing or relitigating venue. In this respect, Judge Ho's concurring opinion in *Defense Distributed v. Platkin*, 48 F.4th 607 (5th Cir. 2022), is correct and should be followed, and so should the panel opinion quoted above, *Platkin*, 55 F.4th at 495–96.

Precedent supports giving comity to the Fifth Circuit's decision and opposes the AG's effort at relitigation. Whereas no known decision on analogous facts rejects comity, a long line of cases employs the comity rule in accordance with Plaintiffs' position. Judge Ho's opinion collects many of these, *Platkin*, 48 F.4th at 607 & n.1, and support is more widespread too. *See Feller v. Brock*, 802 F.2d 722, 727-29 (4th Cir. 1986) ("whenever possible, coordinate courts should avoid issuing conflicting orders"); *Bergh v. State of Wash.*, 535 F.2d 505, 507 (9th Cir. 1976) ("considerations of comity require more than the usual measure of restraint . . . [R]estraint in the name of comity keeps to a minimum the conflicts between courts administering the same law, conserves judicial time and expense, and has a salutary effect upon the prompt and efficient administration of justice"); *U. S. for Use & Benefit of Mosher Steel Co. v. Fluor Corp.*, 436 F.2d 383, 385 (2d Cir. 1970) ("Comity among the district courts would obviously be furthered if these issues were referred back to the court which

originally considered them. Moreover, because the Arizona court was already familiar with the issues, the interests of efficient judicial administration commend that court as an eminently suitable forum for further related proceedings."); *AXA Belgium, S.A. v. Century Indem. Co.*, No. 09 CIV. 9703 (CM), 2010 WL 199709, at *3 (S.D.N.Y. Jan. 11, 2010) ("This is a simple matter of comity."); *Exxon Corp. v. U.S. Dep't of Energy*, 594 F. Supp. 84, 91 (D. Del. 1984) ("this Court, even though it has jurisdiction over this action, by the dictates of comity should withhold its hand so as not to review, enjoin, or otherwise interfere with the . . . court of coordinate jurisdiction"); *Common Cause v. Judicial Ethics Comm.*, 473 F. Supp. 1251, 1253 (D.D.C. 1979) ("the interests of comity compel deference"); *see also In re Carmona*, 224 F. Supp. 497, 498 (S.D. Cal. 1963).

The central rule comity cases uphold is that, when the same parties confront the same issues in multiple courts over time, the first court decision resolving the issue should control and be deferred to by the second court. The rule is no mere suggestion. Deference to the initially-deciding court is to be given "whenever possible." *Feller*, 802 F.2d at 727. The rule is not limited to discrete contexts either. It is "of great universality" because a "multitude of federal and state court cases" support it. *In re Carmona*, 224 F. Supp. at 498. Employing comity here serves all of

the rule's Article III interests, including the avoidance of needless decisional conflict and judicial inefficiency.

An exception to the comity rule exists but does not apply here. The second court might not defer if the first decision exhibits serious procedural irregularity like "collusion." *Common Cause*, 473 F. Supp. at 1253. But there is zero suggestion that anyone colluded against the AG. He just lost a major circuit decision, fair and square.

The situation therefore falls within the general comity rule. Because the Fifth Circuit and the Western District of Texas expressly resolved the venue dispute without any hint of procedural irregularity, "comity and the requirements of good judicial administration require this Court to follow them without extensively re-examining the questions involved." *In re Carmona*, 224 F. Supp. at 499.

The district court addressed comity at pages 7 through 11 of the Document 66 decision. App.65-69. Its key reasoning was that, "given the nonbinding nature of the Fifth Circuit's mandamus and the Texas District Court's transfer request, principles of comity do not weigh on this Court's transfer decision." App.67. The first key error is in the district court's assessment of *Bruck*'s "nonbinding" status. Even if *Bruck* may not technically "bind" the district court below, it undoubtedly binds the AG and Plaintiffs as a parties to the *Bruck* decision. More important than that, though, is another key error: the district court's logic proves too much.

By definition, *every* proper instance of comity involves a decision that is in a sense "nonbinding." That's the whole point of comity. It exists to govern instances where, as here, one court's somewhat "nonbinding" decision should nonetheless be followed by courts later in the same case to advance important Article III concerns. *See Platkin*, 48 F.4th 607 at 607-08 (Ho, J., concurring); *Platkin*, 55 F.4th at 495–96.

The district court in this opinion also faulted Plaintiffs for the supposed "gamesmanship" of seeking reconsideration and taking belt-and–suspenders steps to clean up the case's procedural posture. App.63. But that label is demonstrably false because of what *Platkin* rightly recognized: Plaintiffs "had little reason to believe that in the worst-case scenario, an outside transferee court would refuse a request to return an improperly transferred case." *Platkin*, 55 F.4th at 492. Every appellate decision to have studied this case's tortured history deems the Plaintiffs fully diligent. *See Bruck*, 30 F.4th at 425 ("Appellants' diligence comports with this court's emphasis on 'diligence'); *Platkin*, 55 F.4th at 492 ("As we have made clear, plaintiffs have acted with diligence"). So too here.

**B.    Law of the case principles required retransfer.**

Second, Plaintiffs have a clear and indisputable right to retransfer because law of the case principles required it. Law of the case principles are well-established. *See* Wright & Miller § 4478.4. As with comity, the rule applies regardless of whether or

not the courts here deem *Bruck* persuasive.  "Plausibility" is the rule's keystone. When one court resolves a case's venue dispute, a later court in that same action faced with the same venue dispute is to accept the first venue decision as law of the case so long as the first venue decision is "plausible."  Wright & Miller § 4478.4.

Treatises rightly recognize that this rule's policies apply with even greater force where, as here, the decision at issue is about venue transfer: "Law-of-the-case policies apply with even greater force to transfer decisions than to decisions of substantive law; transferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation."  *Id.*

The Fifth Circuit's *Bruck* decision is "plausible" and therefore earns law of the case status.  In this respect as well, Judge Ho's concurring opinion in *Defense Distributed v. Platkin*, 48 F.4th 607 (5th Cir. 2022), is correct and should be followed: *Bruck* is both "the law of the circuit as well as the case."  *Id.  Platkin*'s later main decision accorded: "*Bruck* remains the law of this circuit: Plaintiffs' claims against NJAG should be heard in the Western District of Texas."  *Platkin*, 55 F.4th at 495.

### C.    Transfer is required because *Bruck* was rightly decided.

Third, Plaintiffs have a clear and indisputable right to retransfer because *Bruck* rightly decided all of the key transfer questions presented below.  The Fifth Circuit's decision is correct both for the reasons given by Judge Jones' opinion for the court

and for additional reasons that were not reached. If analyzed without any deference as though *Bruck* did not have controlling status, the result would be the same.

28 U.S.C. § 1404(a) supplies the rule of decision: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a); *see* Wright & Miller §§ 3841–3855. All key parts of that inquiry point to Texas.

### 1. The case "might have been brought in Texas."

The Western District of Texas is where these cases "might have been brought," § 1404(a), pursuant to 28 U.S.C. § 1391(b)(2) because Austin is where key events such as the Defendants' website publication have always occurred. Indeed, that is where Defense Distributed and SAF did in fact rightly bring the original action against the AG, whose only argument was that New Jersey was a better venue—not that Texas was an improper venue.

### 2. The § 1404 public factors strongly support transfer.

The "public factors" to be analyzed under Section 1404(a) "encompass the statutory consideration of the interest of justice." Wright & Miller § 3847. They "focus on judicial economy and often include the district court's familiarity with the governing law, the local interest in deciding local controversies at home, and the

relative congestion of the courts." *Id.* They also include matters like "the enforceability of the judgment" and "practical considerations that could make the trial easy, expeditious, or inexpensive." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir. 1995). Here, all of the relevant public factors weigh heavily in favor transferring this action to Texas, both for the reasons *Bruck* gives and more.

First and foremost is the interest in judicial economy, which supplies an extraordinarily compelling reason to retransfer this action. *See, e.g.*, *Cont'l Grain Co. v. Barge FBL–585*, 364 U.S. 19, 26 (1960); *CIBC World Mkts. v. Deutsche Bank Sec., Inc.*, 309 F. Supp. 2d 637, 651 (D. N.J. 2004). Putting this case back in the Western District of Texas puts it before the same court that handled all of Defense Distributed and SAF's cases against the State Department for wrongdoing that occurred in conjunction and cooperation with the New Jersey AG's. Because these cases entail many overlapping facts and legal principles, principles of judicial economy call for them to be handled together. "The economic waste involved in duplicating litigation is obvious." *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 930 (3d Cir. 1941). Another consideration of judicial economy is the avoidance of "conflicting judgments, and unnecessary friction between courts." *Chavez v. Dole Food Co., Inc.*, 836 F.3d 205, 220 (3d Cir. 2016) (en banc). Transferring to the court handling the case against the State Department would have advanced all of these interests. A

transfer would especially enhance judicial economy here because the factual tasks entail the mastery of cutting-edge technologies.  Judge Pitman can do that most efficiently because he has been doing so ever since 2015.

### 3.    The § 1404 private factors strongly support transfer.

The "private factors" under Section 1404(a) account for the "statutory considerations of convenience of the parties and witnesses," and include the "ease of access to sources of proof" and each side's forum preference.  Wright & Miller § 3847; *accord Jumara*, 55 F.3d at 879.  Here, none of the private factors play as substantial a role as the public factors do.  But for what they are worth, the private factors clearly point in favor of transfer both for the reasons *Bruck* gives and more.

Considerations of "convenience of the parties and witnesses" point in favor of transfer.  To the extent that hearings and demonstrations need to occur, the Western District of Texas is the far more convenient venue because of its proximity to Defense Distributed's Austin headquarters.  Indeed, the Western District of Texas's Austin Division is the Plaintiffs' preferred venue.  Considerations of convenience and the interests of justice motivated Defense Distributed to file *Defense Distributed I* there three years ago, those same considerations motivated it to initiate *Defense Distributed II* there as well.  This genuine, deep-seated preference points in favor of a transfer.  *See Jumara*, 55 F.3d at 879.

The New Jersey AG might prefer this case's present venue. But that does not trump the force of so many other factors for several reasons.

First, the AG's preference is not controlling because it is weak, and maybe even nonexistent. In this respect, the Attorney General's actions speak louder than words. By going along with a score of other states to sue Defense Distributed on the other side of the country (the Western District of Washington) the New Jersey AG showed that the need for a nearby venue is of little concern to him.

Second, even if the AG had a strong preference for this venue, the law would instruct the Court to apply a discount because of the Attorney General's superior access to litigating resources. *See Maliki v. Holy Redeemer Hosp.*, No. CV 151591 KSH CLW, 2016 WL 4161094, at *2 (D. N.J. Aug. 5, 2016).

The statute's bottom line inquiry is intuitive: "when the Section 1404(a) factors—the convenience of the parties and witnesses and the interest of justice—convince the court that another proper venue is the 'center of gravity' for the dispute, transfer is appropriate." Wright & Miller § 3841 & n.7. That Texas is the action's "center of gravity" should come as no surprise. After all, for Defense Distributed this an *in personam* action to protect a speaker *in Texas* from an outside law enforcement official deploying unconstitutional censorship efforts *into Texas*. *See Grewal*, 871 F.3d at 493 ("Grewal's conduct beyond sending the cease-and-desist

letter confirms his intent to crush Defense Distributed's operations and not simply limit the dissemination of digital files in New Jersey.").

**D.     The Court should reverse and have Texas courts handle the merits.**

For all of the foregoing reasons, the Court should enter a judgment reversing the district court's refusal to retransfer, vacating the district court's subsequent Rule 12 decision without regard to the merits, and rendering a judgment transferring this action to the United States District Court for the Western District of Texas for further proceedings.  As to the district court's Rule 12 decision in particular, vacatur without regard to the merits is the correct result because it preserves the Plaintiffs' substantial right to have the case's merits decided by courts of the correct venue. Otherwise—if the district court's Rule 12 decision were to be evaluated here and now—the AG would have unjustifiably reaped the fruit of the key venue error's poisonous tree.  If not always then at least in these circumstances, vacatur of merits decisions downstream from the initial venue error is appropriate.  *See United States v. Auernheimer*, 748 F.3d 525, 539-541 (3d Cir. 2014).

If the Court agrees with Plaintiffs so far, it need not reach the appeal's second question regarding the Rule 12 decision's merits.   That and everything else in the case can be addressed by the transferee court.

**II.     Merits: The complaint pleads valid claims.**

If for any reason the Court reaches the Rule 12 decision's merits, the question presented is whether the AG's earned a complete dismissal for failure to state a claim under Rule 12(b)(6).  He did not.  The motion should have been denied across the board, especially as to the claims of censorship violating the First Amendment, Second Amendment, and Due Process Clause vagueness doctrines.

**A.     The First Amendment claims are valid.**

The complaint pleads multiple First Amendment claims with distinct legal theories.  *See* App.297-300, ¶¶ 175-185.  Specifically, Plaintiffs invoke actionable legal theories regarding prior restraints, App.297-300, ¶¶ 175-178, 179, 183-85, content-based restrictions, App.297-300, ¶¶ 175-178, 180, 183-85, content-neutral restrictions, App.297-300, ¶¶ 175-178, 181, 183-85, and overbreadth, App.297-300, ¶¶ 175-178, 182, 183-85.  All are claims upon which relief can be granted.

**1.     The computer code at issue is First Amendment speech.**

Each First Amendment claim's analysis should begin with the premise that Plaintiffs' distribution of the digital firearms information at issue qualifies as speech for all constitutional purposes.  The complaint pleaded this fully, and though the AG's motion alluded to the possibility of challenging this, Doc. 181-1 at 8 & n.2, the motion did not actually do so.  Instead, the motion expressly disclaimed such a

challenge by saying that "this Court 'need not decide this issue.'" *Id.* The motion rightly proceeded on the premise that "protected expression" is at issue. *Id.*

This is where the district court committed its most important error about the merits. Instead of taking the motion as it came—on the assumption that the complaint put "protected expression" at issue—the district court held that the complaint's allegations about the computer code's "speech" status did not suffice. App.99-100. This part of the decision constitutes error because the AG disclaimed any such challenge and, more importantly, because it is wrong on its own terms.

To sufficiently allege the "speech" status of its computer files, all that this complaint had to do was supply the "short and plain statement of the claim" that Federal Rule of Civil Procedure 8 requires. *See* Wright & Miller § 1215. Nothing about this case triggers heightened pleading requirements like those of Rule 9 or the PSLRA. Yet elevated demands are precisely what the district court made in requiring especially granular details about the nature of these computer files. App.99-100. This use of an erroneously elevated legal standard warrants reversal.

The district court also erred because Plaintiffs' complaint establishes that the files at issue constitute "speech" with a level of detail that meets any conceivable test. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First

36

Amendment."), *Bartnicki v. Vopper*, 532 U.S. 514, 526-27 (2001) (same); *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."), *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), and *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("source code is speech"). Indeed, the "speech" status of these files is what the complaint spends no less than nine full pages detailing. App.256-265. Everything the district court saw missing is there, pleaded in full detail.

Plaintiffs' complaint details every relevant facet of the computer files at issue, including specific file formats and subjects of particular files released at particular times. App.256-265. Take as just one example the "*Defense Distributed I* Files"—a known set of files that the AG threatened to jail Defense Distributed for publishing. The complaint details them with enough detail to survive any Rule 12(b)(6) inquiry:

> The "Published Files" category of *Defense Distributed I* Files consists of ten separate sets of files. It includes stereolithography (.stl) files about firearm components, Initial Graphics Exchange Specification (.igs) files about firearm

components, SoLiDworks PaRT (.sldprt) files about firearm components, SketchUp (.skp) files about firearm components, Standard for the Exchange of Product Data ("STEP") (.stp) files about firearm components, diagrams of firearm components, renderings, "read me" plain text files about firearm assembly methods, "read me" plain text files about the National Firearms Act and the Undetectable Firearms Act, and software licenses. From approximately December 2012 to May 2013, Defense Distributed published these files to DEFCAD for free download by the public.

App.268. The complaint uses similar levels of detail throughout. App.256-265.

On the issue of whether these files serve expressive purposes, the complaint is plenty clear. Each file at issue here is "an important expression of technical, scientific, artistic, and political matter." App.258. The speech this case is about "has these values in the abstract, apart from any application that the information's recipient might choose to devote it to." *Id.*

The files at issue "are used primarily for abstract design" to "serve a wide variety of important purposes apart from object fabrication." App.256. "Examples include the computerized study of object properties, rendition of object images for product visualization, and parametric modeling of object families." App.256. "Akin to blueprints, each computer file's sole purpose is to supply information in the

abstract." *Id.* These allegations defeat the district court's idea of the files at issue "serving to effectuate an entirely non-expressive function." App.96.

The complaint also speaks directly to the question of how the computer files at issue relate to "3D-printing processes in particular." App.257. According to the complaint, the computer files at issue most certainly "do not produce anything automatically." *Id.* "They are not functional software." *Id.* "They do not self-execute." *Id.* "They are mere information stores." *Id.*

Dispelling the AG and district court's contrary assumption, the complaint alleges that "[f]irearm component fabrication is not an automatic process." App.257. To make anything with 3D-printing processes and these computer files, "a user must know how and choose to orchestrate a process involving substantial additional software (to interpret and implement the files into the motions of a 3D print head), substantial additional hardware (e.g., the computer running the software, the 3D printer), substantial physical labor, substantial amounts of time, and the requisite raw materials." *Id.* Fabrication occurs "occurs only if and when a person chooses to perform a complex series of actions entailing considered volition and judgment, such as adapting and tailoring the design, selecting suitable component materials, choosing an effective manufacturing process, and opting to

personally complete an extensive set of fabrication steps with the requisite software, hardware, and raw materials." App.257-58.

More misconceptions are dispelled later in the complaint. The computer files at issue do not "advocate action," "incite action," or "produce action," let alone do so "imminently." App.259. "None of the digital firearms information that Defense Distributed has published, is publishing, and intends to continue publishing involves 'imminent' fabrication." App.259. "The 3D-printing technologies at issue necessarily require a user to knowingly apply deliberate, focused will over the course of an extended period of time to fabricate an object." *Id.*

Together, these pleadings go far and beyond the minimal "short and plain" statement required by Rule 8. The only viable challenge to the "speech" status of these computer files would be by summary judgment—not a Rule 12(b)(6) dismissal. The district court's erroneous categorization of the speech at issue is a keystone error that, once established, warrants reversal of the decision as a whole.

## 2. The district court misconstrued the statute.

Footnote 7 of the district court's opinion contains another key error. There the court ruled that the challenged criminal statute "does not appear to stop DD from discussing the best way to 3D print a firearm or from distributing non-utilizable information, such as sheet instructions." App.95. According to the district court,

"the only 'speech' that the Challenged Statute appears to regulate is digital instructions that can be "used to program" a 3D printer to construct a 3D-printed firearm." App.95. This limited view of the statute's sweep is wrong.

The speech crime does not "only restrict[] code that performs the specific function of directing a 3D printer to produce firearms wholly outside of New Jersey's regulatory framework," as the AG insisted below, Doc. 181-1 at 12-13. It applies to any "digital instructions" ("files" or "models") that "may be used" to perform certain functions *regardless of whether or not the code actually performs those functions*. N.J. Stat. § 2C:39-9(*l*)(2).

It is also wrong to say, as the AG did below, that the speech crime "does not restrict Defense Distributed from disseminating text files or any other files that lack the functional capability to directly produce firearms." Doc. 181-1 at 17. The actual speech crime has no such "functional" or "directly" limitation. It criminalizes *any* "model" that "may be used" for programming, regardless of whether the model itself is "functional" and regardless of whether it "may be used" "directly" versus "indirectly." N.J. Stat. § 2C:39-9(*l*)(2).

These retreating efforts signal the AG's realization that the speech crime as actually written cannot possibly survive First Amendment scrutiny. But the AG's effort to recast his censorship after the fact is wrong because the die is already cast. *See Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 31 (1st Cir. 1999).

No First Amendment inquiry turns on what *the AG thinks* his messages mean *after the fact*. The test looks to the perception of an objectively reasonable citizen hearing and seeing the AG's threats at the time. *See Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011). The announced *risk* of punishment causes injury even if new lawyers convince the AG to lighten the rhetoric. From this correct perspective, the AG's civil and criminal censorship today is as broad as ever—and far broader than the district court's critical footnote 7 assumes.

### 3.    The content-based censorship theory succeeds.

Plaintiffs' primary First Amendment claim asserts that the AG's civil and criminal censorship violates the constitutional doctrine of content-based speech restrictions because it triggers strict scrutiny but cannot survive it. App.297-98. To challenge this, the motion denied that the AG's speech crime triggers strict scrutiny by asserting that it is "content-neutral." Doc. 181-1 at 8-13. The Court should reject this because the laws' text makes it content based and so does its purpose.

i.    **The speech crime's plain text makes it content based.**

First, the speech crime is content-based because of what the law's text plainly proscribes. Section (*l*)(2) criminalizes speech as such and defines the crime in terms of the speech's subject matter, ideas, and message. Under this law, citizens can freely speak to each other with "digital instructions" about any topic *except the topic of 3D-printing firearms*. They can talk about how to program 3D printers to manufacture anything *except firearms*. When speech that is otherwise perfectly legal turns to the subject of firearms, Section (*l*)(2) makes the speaker a criminal. That makes Section (*l*)(2) content-based.

*Reed v. Town of Gilbert, Arizona*, 576 U.S. 155 (2015), proves that the AG's speech crime is content-based. *Reed* held that laws trigger strict scrutiny if they "target speech based on its communicative content," meaning targeting the speech's "message" or "ideas" or "subject matter." *Id.* at 163. Section (*l*)(2) does just that by banning instructive speech about a particular topic (3D firearms production), for it is "well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" *Id.* at 169.

*NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), proves as well that Section (*l*)(2)'s speech crime is content-based. Again the Court held that laws trigger strict scrutiny if they "target speech based on its communicative content," specifying this time that the rule covers laws about what citizens can "inform" each other about. *Id.* at 2371. Since strict scrutiny applies to laws restricting what citizens can "inform" each other about, *id.* strict scrutiny applies to Section (*l*)(2)'s censorship of "instructions."

It gained the AG nothing to say that "regulations of computer code are content neutral if they regulate code because of its *functional* capability," Doc. 181-1, because Section (*l*)(2) does not do that. Section (*l*)(2) criminalizes computer code (speech) because of the *ideas* and *subject* that it pertains to, and *Reed* rightly deems "idea"- and "subject"- based laws to be content-based. *Id.* at 163.

## ii. The speech crime's purpose makes it content based.

A speech restriction can also be content-based because of its purpose. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). The complaint puts this at issue by pleading that "New Jersey's Section (*l*)(2) speech crime was enacted for the purpose of discriminating against and censoring Defense Distributed and SAF's members, in particular," with plenty of plausible supporting details. App.288-89. Yet the motion said nothing of it. This independent basis for triggering strict scrutiny is valid and unchallenged.

#### 4.    The content-neutral censorship theory succeeds.

As an alternative to the claim about content-based restriction, Plaintiffs assert that the AG's censorship violates the doctrine of content-neutral speech restrictions because it triggers but cannot survive intermediate scrutiny. App297-98 ("[The AG's] conduct violates the First Amendment doctrine regarding content neutral speech restrictions."). For this claim, the AG tried to show that his censorship automatically satisfies intermediate scrutiny. Doc.69-1 at 13-17. But this flatly contradicts the complaint, which pleads that the AG's wrongdoing violates intermediate scrutiny in all relevant legal and factual senses. *See, e.g.*, App.297-98 ("Even if [the AG's] conduct is deemed to impose content-neutral speech restrictions, it is an unconstitutional abridgement of First Amendment's freedoms because it does not serve a significant governmental interest and is not narrowly drawn to serve any such interest."). In addition to several crucial matter-of-law errors, the AG's supposed Rule 12 argument is really just a veiled summary judgment effort that is procedurally premature and substantively empty.

#### i.    The asserted state interest is not legitimate.

Intermediate scrutiny cannot be survived unless the asserted state interest qualifies as legitimate. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). In this respect, the motion fails because the AG's asserted interests are *not* legitimate.

The interest at issue must be carefully defined so that the inquiry uses the proper scope. *See Hill v. Colorado*, 530 U.S. 703, 749 (2000) (Scalia, J., dissenting) ("This requires us to determine, first, what is the significant interest the State seeks to advance?"). But the AG does not do this properly or consistently. The motion shifts the AG's claimed interest, especially when trying to show its legitimacy.

The AG first claimed as his interest the "interest in preventing the dissemination of code that enables domestic terrorists, felons, and minors to produce untraceable and unregulated firearms." Doc. 181-1 at 14. This amounts to a claimed interest not in stopping certain *conduct*, but in stopping *speech about* conduct. Even assuming that a conduct-focused interest is legitimate (very disputed here), federal law certainly does *not* legitimize any such interest in suppressing speech. "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). "Without a significantly stronger, more direct connection" between the speech and a third party's criminal conduct, "the Government may not prohibit speech on the ground that it may encourage [third-parties] to engage in illegal conduct." *Id.*; *see also Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (state cannot impose a "flat ban" on solicitations by public accountants on the ground that solicitations "create[] the dangers of fraud, overreaching, or compromised independence").

The AG's other claimed interest was the interest in "preserving the ability of law enforcement to conduct serial number tracing." Doc. 181-1 at 15. But the only case cited in support of this interest's legitimacy were *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) (cited at Doc. 181-1 at 15), the fundamental tenets of which *Bruen* wholly abrogated.

### ii.    The asserted state interest is not actually advanced.

Intermediate scrutiny cannot be survived unless the challenged action actually advances the asserted interest. *See, e.g.*, *McCullen*, 573 U.S. at 486. The complaint sufficiently alleges that the AG's speech crime does *not* in fact advance his asserted interests, *see* App.296-298, and in this posture the complaint is all that matters. The motion's *ipse dixit* about the speech crime advancing the AG's interests was (a) obviously incredible and, in any event, (b) legally irrelevant on a motion to dismiss.

Once an actual summary judgment proceeding occurs, the courts will easily reject the AG's fanciful vision of censorship's efficacy because real "empirical support" of efficacy will have to be given. *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cty.*, 457 U.S. 596, 609 (1982). For now, the Court can just reject the AG's factual contradictions as procedurally inapposite.

### iii.    The speech crime is not narrowly tailored.

Intermediate scrutiny cannot be survived unless the challenged action is a *narrowly tailored* means of advancing the asserted interest.    *See, e.g.*, *McCullen*, 573 U.S. at 486.  The AG's speech crime is clearly *not* narrowly tailored.

One reason the statute cannot claim "narrow tailoring" status is substantial underinclusivity.  *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011). While it criminalizes speech by normal people, Section (*l*)(2) does nothing about the speech of firearms manufacturers or wholesalers. While it criminalizes speech regarding "firearms," New Jersey's speech crime does nothing about speech regarding other dangerous instrumentalities such as poison or bombs.  And while it criminalizes the "distribution" of digital firearms information, New Jersey's speech crime does nothing about the *possession* or *use* of that same information to, for example, produce an illegal firearm—the evil that New Jersey means to combat.

Another reason that Section (*l*)(2) is not "narrowly tailored" is that very plausible, much less restrictive alternatives exist.  Most obviously, New Jersey could achieve its ends by banning only the harmful conduct at issue—not speech that is merely and only sometimes remotely associated with that conduct.  *See Bartnicki*, 532 U.S. at 529 ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it.").

**5. The overbreadth theory succeeds.**

Plaintiffs' First Amendment claims assert that the AG's civil and criminal censorship violates the constitutional doctrine regarding overbreadth. App298-99. The central overbreadth question is whether the AG's censorship reaches a "substantial amount of constitutionally protected conduct," as opposed to just a "single impermissible application." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 458 (1987). The motion challenged this claim by arguing that Section (*l*)(2) sweeps in *no unconstitutional conduct* whatsoever. Doc. 181-1 at 17-18. On the contrary, though, Section (*l*)(2) violates the test by sweeping in massive amounts of speech that could not possibly be constitutionally proscribed.

First, Section (*l*)(2) is overbroad because it criminalizes speech regardless of its relationship to illegal conduct. A state may "suppress speech for advocating the use of force or a violation of law only if such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Ashcroft*, 535 U.S. at 253 (internal citations omitted). A "contingent and indirect" relationship to criminal conduct will not suffice, nor will an allegation that there is "some unquantified potential for subsequent criminal acts." *Id*. at 250.

Section (*l*)(2) does not target speech that is "directed to inciting or producing *imminent lawless action* and is likely to incite or produce such action"—it targets *every instance of distribution. See id.* at 253.  Virtually all the speech it covers falls squarely on the protected side of the line, either because the expression's recipients commit no illegal act at all or because, if they did, the causal link is merely contingent and indirect. *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country."). Yet this law still criminalizes every instance of "distribut[ion]" no matter what.

Second, New Jersey's speech crime is overbroad because it criminalizes sharing information about any "firearm component." This covers a wide array of generic items—such as fasteners, nuts, bolts, and screws—that have unlimited potential uses and are not unique to firearms. Even if New Jersey could criminalize certain speech about a completed "firearm," it could not possibly criminalize speech about mundane parts available to anyone in any hardware store.

Third, New Jersey's speech crime is overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain. As noted, digital firearms information is already freely circulating in the public domain, and "the Government may not . . . restrict individuals from disclosing information

that lawfully comes into their hands in the absence of a state interest of the highest order." *United States v. Aguilar*, 515 U.S. 593, 605 (1995). Yet this statute draws no distinction between truly novel "instructions" and those that everyone with a smartphone or computer has been able to obtain with simple Google search.

Yet another substantial set of speech that Section (*l*)(2) unconstitutionally criminalizes is speech done without the constitutionally-necessary scienter. States cannot criminalize speech without a stringent requirement of scienter—*i.e.*, knowledge of the fact that truly distinguishes innocent acts from guilty ones. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010). Section (*l*)(2) lacks the needed scienter element because it does not even require the speaker to *know* that instructions will "be used to program a three dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component"—let alone know that the recipient would use the information to engage in *illegal* production of a firearm. Hence, the requisite scienter requirement is missing. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247-48 (4th Cir. 1997). Even if the statute could be constitutionally applied to persons *with* the requisite scienter, the statute is overbroad because it likewise criminalizes the substantial number of persons who speak without the requisite scienter.

**B.    The Second Amendment claims are valid.**

**1.    The complaint pleaded a Second Amendment injury.**

The district court dismissed the Second Amendment claim with standing analysis that is easily disposed of.  According to the district court, Plaintiffs lacked standing to assert a Second Amendment claim because the complaint's allegations "only invoke a First Amendment injury" and not a distinct Second Amendment injury.  App.104.  But the complaint says quite clearly that the AG's censorship simultaneously delivers *both* a First Amendment *and* Second Amendment injury.  To do so, it says that the speech in question is valuable not just because it is speech (the First Amendment claim), but *also* because the speech is integral to the Constitution's "right to make and acquire Arms, which is part and parcel of the right to keep and bear Arms; as such it is an unconstitutional abridgement of Second Amendment rights."  App.299.  That injury allegation meets the district court's demand.

**2.    The AG's censorship implicates the Second Amendment.**

For his part, the AG's motion argued that the Second Amendment claims fail because "a limitation on the distribution of printable gun files does not implicate the plain text of the Second Amendment."  Doc. 181-1 at 19.  But under a proper understanding of the Second Amendment's text, *New York State Rifle & Pistol*

*Association, Inc. v. Bruen*, 213 L. Ed. 2d 387 (U.S. 2022), and this complaint, the AG's wrongdoing most certainly implicates the Second Amendment's protections.

At issue here is the right to self-manufacture firearms and to maintain them. Both are obviously implicated by a law restricting the actual production of a "firearm, firearm receiver, magazine, or firearm component," and both are likewise implicated by a law restricting *speech about* "produc[ing] a firearm, firearm receiver, magazine, or firearm component." N.J. Stat. § 2C:39-9(*l*)(2).

The Second Amendment's textual guarantee of "the right of the people to keep and bear Arms" includes the right to self-manufacture firearms and to maintain them. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to acquire a firearm"); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms."). Indeed, the textually-expressed right to "keep and bear Arms" would mean nothing if those

words did not also protect the corollary rights to acquire and/or manufacture firearms and to maintain them.

### 3.    The AG's censorship offends the Second Amendment.

The AG also argued below that, even if the Second Amendment's protections apply here, "Subsection (l)(2) is still consistent with the Second Amendment." Doc. 181-1 at 21.  Not so.  *Bruen* clearly spells the AG's defeat.

To justify a firearm regulation, the "government may not simply posit that the regulation promotes an important interest." *Bruen*, 213 L. Ed. 2d at 2126. The AG tried to do that here by touting the supposed virtues of making all citizens "go through a licensed manufacturer."  Doc. 181-1 at 22.  But that does not suffice. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 213 L. Ed. 2d at 2126. Although it is the government's burden to carry, a brief review of history and tradition reveals that self-manufactured firearms have a long and, until just recently, unregulated history.  *See* Joseph G.S. Greenlee, *The American Tradition of Self Made Arms*, 54 St. Mary's L.J. 35, 66 (2023).

The unregulated self-manufacture of firearms was common in the American colonies, beginning with gunsmiths who made and repaired militia and hunting weapons and were "extremely important and highly valued in their communities."

*Id.* at 9.   The tradition of personal gunmaking free from any major regulation whatsoever continued into the nineteenth and twentieth centuries, when "[m]any of the most important innovations in firearms technology began not in a federal armory or major firearms manufactory, but in private homes and workshops." *Id.* at 35.

Deviations from this historical tradition are decidedly few and modern.   No restrictions were placed on the self-manufacture of firearms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. *Id.* at 40. Rather, "[a]ll such restrictions have been enacted within the last decade." *Id.*   At the state level, it was not until 2016 that a small minority of states began to regulate the manufacture of arms for personal use. *Id.* at 42.

Hence, there is no American historical tradition of regulating the self-manufacture of firearms—let alone doing so by way of restrictions on speech about firearms.   Yet that is precisely what the AG's speech crime tries to do, in violation of the Second Amendment.

### C.   The Due Process Clause claims are valid.

According to the district court, App.108-109, Plaintiffs' Due Process Claims regarding vagueness cannot be brought because everything the Plaintiffs want to say is "clearly proscribed" by the statute.   Doc. 181-1 at 33.   But while it is true that *some*

of Plaintiffs' speech is clearly covered, coverage for plenty of the speech at issue is extraordinarily vague.

A crux of the vagueness problem is that New Jersey's law criminalizes code or instructions "*that may be* used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." N.J. Stat 2C:39-9(*l*)(2) (emphasis added). Yet it is impossible for a speaker to know what counts as "code . . . *that may be* used to" engage in such programming. In the same way that "(w)hat is contemptuous to one man may be a work of art to another," *Smith v. Goguen*, 415 U.S. 566, 575 (1974), what "may be used" by one programmer can be totally useless to another. Speakers like Defense Distributed cannot tell in advance on which side of the line their speech will fall.

The AG's motion below often said that the statute only covers "functional" code, as though that provides the necessary clarity. *E.g.*, Doc. 181-1 at 34. But the supposed keystone term "functional" is *nowhere in the statute*. The whole point of the Due Process Clause's vagueness doctrine is to stop situations like this, where a dramatically ambiguous criminal law is interpreted by government lawyers one way one day and a different way the next—all without real textual anchors.

### D.     The civil censorship claims survive.

Plaintiffs' case against the AG targeted both his civil *and* criminal methods of unconstitutionally censoring Defense Distributed and SAF.  Civil censorship (via cease-and-desist letters) and criminal censorship (via the speech crime) are distinct unconstitutional means the AG uses to accomplish his overall unconstitutional ends.

To warrant a total dismissal, the AG needed to have grappled with *both* of the unconstitutional means at issue—the civil and criminal aspects of his censorship. But the AG's motion argued only about the speech crime and said essentially nothing about the civil censorship efforts that are just as actionable and well pleaded.

Because of this, the AG's motion was fatally incomplete.   And so was the district court's analysis, which conflated them in the same way, App.94 n.6.  It is true that the civil and criminal aspects of the AG's wrongdoing implicate the same modes of constitutional analysis, in the sense that both trigger strict scrutiny under the First Amendment, both require a Second Amendment analysis that accords with *Bruen*, and so forth.  But that does not mean that judicial analysis of the civil censorship matches judicial analysis of the criminal censorship.  The civil censorship serves different interests than the criminal censorship and must be evaluated accordingly.  The civil censorship has a different efficacy level than the criminal censorship and must be evaluated accordingly.  Even though the constitutional

formula might be the same, each of the separate claims requires a separate analysis that utilizes formula elements particular to the action in question.

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), is on point. On analogous facts involving a "cease and desist" letter, the Seventh Circuit there rightly held that "a public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Id.* at 230. The AG did just that here by issuing cease-and-desist letters here, App.284-86, which is why *Bruck* rightly said that these "appear to be flagrant prior restraints," *Bruck*, 30 F.4th 414.

## Conclusion

The Court should enter a judgment reversing the district court's refusal to retransfer, vacating the district court's subsequent Rule 12 decision without regard to the merits, and rendering a judgment transferring this action to the United States District Court for the Western District of Texas for further proceedings.

Alternatively, if the Court reaches the merits of the Rule 12(b)(6) decision for any reason, the Court should reverse the district court's dismissal and render a judgment completely denying the AG's motion because the case is fully meritorious.

Respectfully submitted,

Daniel L. Schmutter                Chad Flores
Hartman & Winnicki, P.C.           Texas Bar No. 24059759
74 Passaic Street                  Flores Law PLLC
Ridgewood, New Jersey 07450        917 Franklin Street, Suite 600
(201) 967-8040                     Houston, Texas 77002
                                   (713) 364-6640
Josh Blackman
Josh Blackman LLC
1303 San Jacinto Street
Houston, Texas 77002
(202) 294-9003

Counsel for Appellants

# Certifications

1.    At least one of the attorneys whose name appears on this brief is a member of the bar of this Court.

2.    The text of this document's electronic version matches its paper copies.

3.    A virus detection program, BitDefender Endpoint Security Tools major version 6, has been run on the file and no virus was detected.

4.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32 because it contains 12,950 not-exempted words.

5.    This filing complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32 because it uses a proportionally spaced typeface, Equity OT 14 point.

6.    On March 13, 2024, this filing was served on the opposing party's counsel by delivering it through the Court's electronic docketing system to the following registered user of the system:

Angela Cai
Renee Greenberg
Erin Hodge
Timothy Sheehan


*/s/ Chad Flores*
Chad Flores