# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 23-3058

---

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INC.,
*Plaintiffs-Appellants*,

v.

ATTORNEY GENERAL OF NEW JERSEY,
*Defendant-Appellee*

---

On Appeal from the United States District Court for the
District of New Jersey (No. 3:21-cv-09867-MAS)

---

## BRIEF OF APPELLEE

---

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

ANGELA CAI
*Deputy Solicitor General*

TIM SHEEHAN
SAMUEL L. RUBINSTEIN
ASHLEIGH B. SHELTON
*Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
tim.sheehan@njoag.gov

*Attorneys for Appellee*

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................1

COUNTERSTATEMENT OF JURISDICTION ....................................4

COUNTERSTATEMENT OF ISSUES PRESENTED............................4

RELATED CASES AND PROCEEDINGS............................................4

COUNTERSTATEMENT OF THE CASE.............................................5

SUMMARY OF ARGUMENT ............................................................12

STANDARD OF REVIEW ..................................................................16

ARGUMENT ......................................................................................17

I.      THE COURT PROPERLY DISMISSED APPELLANTS' CLAIMS........17

  A. The Court Correctly Dismissed The First Amendment Claims.............17

    1. Appellants Did Not Adequately Plead That Their Specific Files
       Receive First Amendment Protection. .................................................17

    2.  Subsection (*l*)(2) Withstands First Amendment Scrutiny..................21

    3.  Subsection (*l*)(2) Is Not Overbroad.....................................................29

  B. The Court Correctly Dismissed The Second Amendment Claim...........31

  C. The Court Correctly Dismissed The Vagueness Claim. .........................37

II.     APPELLANTS ARE NOT ENTITLED TO A TRANSFER TO
        RELITIGATE THESE CLAIMS IN TEXAS..............................................39

  A. Appellants Cannot Justify A Transfer After Final Judgment. ...............40

  B. Appellants Cannot Justify Transfer In This Case. ..................................44

CONCLUSION ...................................................................................52

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Alstom Caribe, Inc. v. George P. Reintjes Co.*,
  484 F.3d 106 (1st Cir. 2007)..................................................................50

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .........................................................................16

*Batoff v. State Farm Ins. Co.*,
  977 F.2d 848 (3d Cir. 1992)................................................................4

*Bruni v. City of Pittsburgh*,
  941 F.3d 73 (3d Cir. 2019)........................................................... 21, 26

*CFTC v. Vartuli*,
  228 F.3d 94 (2d Cir. 2000)........................................................... 18, 19

*Chrysler Credit Corp. v. Country Chrysler*,
  928 F.2d 1509 (10th Cir. 1991) ..........................................................52

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022).........................................................................21

*CollegeSource, Inc. v. AcademyOne, Inc.*,
  597 F. App'x 116 (3d Cir. 2015) ........................................................51

*Council of Alternative Pol. Parties v. Hooks*,
  179 F.3d 64 (3d Cir. 1999).................................................................50

*Danziger & De Llano, LLP v. Morgan Verkamp LLC*,
  948 F.3d 124 (3d Cir. 2020)...............................................................17

*Def. Distributed v. U.S. Dep't of State*,
  No. 18-637, 2023 WL 2544334 (W.D. Tex. Mar. 15, 2023)................................48

*Defense Distributed v. Att'y Gen. of N.J.*,
  972 F.3d 193 (3d Cir. 2020).................................................................6

*Defense Distributed v. Bruck*,
   30 F.4th 414 (5th Cir. 2022) ........................................................... *passim*

*Defense Distributed v. Grewal*,
   971 F.3d 485 (5th Cir. 2020) ................................................. 6, 46, 47

*Defense Distributed v. Platkin*,
   48 F.4th 607 (5th Cir. 2022) .............................................................9

*Defense Distributed v. Platkin*,
   55 F.4th 486 (5th Cir. 2022) .............................................................9

*Defense Distributed v. U.S. Dep't of State*,
   838 F.3d 451 (5th Cir. 2016) .........................................................1, 5

*Defense Distributed v. USDOS*,
   121 F. Supp. 3d 680 (W.D. Tex. 2015) ...........................................24

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) .........................................................................34

*Drummond v. Robinson Twp.*,
   9 F.4th 217 (3d Cir. 2021) ...............................................................32

*Ferens v. John Deere Co.*,
   494 U.S. 516 (1990) .........................................................................41

*Green v. U.S. Dep't of Justice*,
   54 F.4th 738 (D.C. Cir. 2022) .........................................................23

*Gulf Rsch. & Dev. Co. v. Leahy*,
   193 F.2d 302 (3d Cir. 1951) ....................................................... 40, 41

*Hayman Cash Register Co. v. Sarokin*,
   669 F.2d 162 (3d Cir. 1982) ............................................................52

*Hicks v. T.L. Cannon Mgmt. Corp.*,
   No. 13-642, 2013 WL 4508440 (N.D.N.Y. Aug. 23, 2013) .................51

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ......................................................................... 14, 38

*Howmedica Osteonics Corp.*,
    867 F.3d 390 (3d Cir. 2017).......................................................... 14, 40

*In re Amendt*,
    169 F. App'x 93 (3d Cir. 2006) ............................................................41

*In re Apple*,
    602 F.3d 909 (8th Cir. 2010) ........................................................ 40, 42

*In re Cragar Indus., Inc.*,
    706 F.2d 503 (5th Cir. 1983) ...............................................................50

*In re Fed.-Mogul Glob.*,
    300 F.3d 368 (3d Cir. 2002)..................................................................40

*In re HTC Corp.*,
    889 F.3d 1349 (Fed. Cir. 2018).............................................. 40, 41, 42

*In re Nat'l Presto Indus.*,
    347 F.3d 662 (7th Cir. 2003) ........................................................ 40, 42

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
    678 F.3d 235 (3d Cir. 2012)..................................................................16

*In re Volkswagen of Am.*,
    545 F.3d 304 (5th Cir. 2008) ........................................................ 40, 42

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*,
    500 U.S. 72 (1991)................................................................................32

*Interlink Prod. Int'l v. Crowfoot*,
    No. 20-10566, 2020 WL 670794 (D.N.J. Nov. 16, 2020) ....................47

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995)...................................................... 15, 40, 45

*Karn v. U.S. Dep't of State*,
  925 F. Supp. 1 (D.D.C. 1996) ...............................................................18

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
  909 F.3d 446 (D.C. Cir. 2018) ............................................................34

*Koehring Co. v. Hyde Const. Co.*,
  382 U.S. 362 (1966) ............................................................................50

*Leroy v. Great W. United Corp.*,
  443 U.S. 173 (1979) ............................................................................45

*Lutter v. JNESO*,
  86 F.4th 111 (3d Cir. 2023) ................................................................32

*Murphy v. FDIC*,
  208 F.3d 959 (11th Cir. 2000) ............................................................51

*Nat'l Ass'n for Gun Rights v. Polis*,
  No. 24-cv-1, ECF 29 (D. Colo. May 2, 2024) ....................................33

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ....................................................................... *passim*

*Nekrilov v. City of Jersey City*,
  45 F.4th 662 (3d Cir. 2022) ................................................................16

*Paramount Pictures v. Rodney*,
  186 F.2d 111 (3d Cir. 1950)......................................................... 17, 42

*Posters 'N' Things, Ltd. v. United States*,
  511 U.S. 513 (1994).................................................................... 37, 38

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)............................................................................21

*Rigby v. Jennings*,
  630 F. Supp. 3d 602 (D. Del. 2022)............................. 18, 24, 25, 27, 30

*SongByrd, Inc. v. Est. of Grossman,*
    206 F.3d 172 (2d Cir. 2000)...................................................................... 15, 42, 43

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) ..............................................................................33

*Thorpe v. Twp. of Salisbury,*
    No. 22-2448, 2023 WL 2783255 (3d Cir. Apr. 5, 2023).........................................4

*United States v. Chi Mak,*
    683 F.3d 1126 (9th Cir. 2012) ........................................................................ 23, 30

*United States v. Cox,*
    906 F.3d 1170 (9th Cir. 2018) .............................................................................35

*United States v. Hansen,*
    599 U.S. 762 (2023).............................................................................................30

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010)...................................................................................27

*United States v. Nat'l Dairy Prods. Corp.,*
    372 U.S. 29 (1963)...............................................................................................38

*United States v. Pelullo,*
    399 F.3d 197 (3d Cir. 2005).................................................................................42

*United States v. Williams,*
    553 U.S. 285 (2008)........................................................................ 28, 30, 37, 39

*Universal City Studios v. Corley,*
    273 F.3d 429 (2d Cir. 2001)........................................................................ *passim*

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982)...................................................................................... 14, 39

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989).............................................................................................38

*Williams-Yulee v. Fla. Bar*,
  575 U.S. 433 (2015) ..................................................................................28

**Statutes**

18 U.S.C. § 922 .........................................................................................27

18 U.S.C. § 923 .........................................................................................27

26 U.S.C. § 5822 .......................................................................................33

28 U.S.C. § 1291 ..........................................................................................4

28 U.S.C. § 1331 ..........................................................................................4

28 U.S.C. § 1404 .......................................................................... 3, 8, 17, 39

28 U.S.C. § 2111 ............................................................................... 15, 42

N.J. Admin. Code § 13:54-4.7 ...................................................................27

N.J. Stat. Ann. § 2C:2-2 ...................................................................... 31, 45

N.J. Stat. Ann. § 2C:39-9(k) .....................................................................31

N.J. Stat. Ann. § 2C:39-9(*l*) .............................................................. *passim*

**Regulations**

22 C.F.R. § 120.10 .....................................................................................23

**Court Rules**

Fed. R. Civ. P. 61 ............................................................................... 15, 42

N.J. Ct. R. 2:12A .......................................................................................46

**Other Authorities**

Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3846 (4th ed.) ...................... 16, 50

Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3847 (4th ed.) ..............................40

## INTRODUCTION

Defense Distributed and the Second Amendment Foundation claim a right to distribute computer files that "allow virtually anyone with access to a 3D printer"—including terrorists, felons, and domestic abusers—to print fully functional firearms. *Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 455 (5th Cir. 2016) ("*USDOS*"). As the district court correctly held, however, Appellants' complaint is deficient in pleading their case. Because Appellants declined the court's invitation to amend, that is fatal to their claims, which all fail on the merits regardless. And at this late juncture—after the District of New Jersey has ruled on the merits, and when relitigation in the Western District of Texas would therefore only undermine judicial economy—Appellants are not entitled to a transfer either.

Affirmance would appropriately draw this long-running litigation to a close. In 2018, Defense Distributed announced its plans to disseminate computer files that enable anyone to produce firearms, even if they are not a licensed manufacturer and could not pass required background checks. And because the printed firearms lack serial numbers, they would be untraceable by law enforcement if later found at the scene of a crime. Because of these dual threats to public safety, the New Jersey Attorney General issued a cease and desist letter to Defense Distributed calling on the company not to distribute these files for use by New Jersey residents in violation of New Jersey's public nuisance and negligence laws. Just a few months later, the

1

Legislature enacted legislation that prohibits distribution of files that may be used to produce a firearm to anyone in New Jersey who is not a licensed manufacturer. The rule was simple—just as a resident must obtain a license before manufacturing any other firearm, the same is true for 3D-printed ones.

The district court correctly rejected Appellants' First Amendment, Second Amendment, and void-for-vagueness challenges. Primarily, this Court should affirm because the district court appropriately dismissed these claims without prejudice as suffering from pleading deficiencies. Although the district court afforded Appellants an opportunity to replead to cure these deficiencies, they failed to do so. In any event, even beyond the pleading problems, their claims fail as a matter of law. The First Amendment claim fails because New Jersey restricts distribution only of files that have the functional capability to produce 3D firearms and certain firearm components, not because of any message they express. New Jersey law is thus subject to intermediate scrutiny, which it easily satisfies: the law is carefully tailored to the well-established goal of preventing those who could not pass a background check from gaining access to untraceable firearms. The Second Amendment claim fails because Appellants lack standing; because the Second Amendment's plain text extends only to bearable "Arms," not computer code; and because the Second Amendment allows States to maintain their background-check laws. *E.g.*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Finally, Appellants' concession

that at least some of their conduct would be proscribed by the law dooms their void-for-vagueness challenge.

Nor is there any basis to transfer this case to the Western District of Texas for these merits questions to be relitigated anew. Initially, Appellants run into a serious procedural defect: district court orders denying transfer motions under 28 U.S.C. § 1404 are appropriately challenged via petitions for mandamus, not on appeals from final judgments. After all, Section 1404 requires courts to consider convenience to the parties and judicial economy, and Appellants can hardly show that transfer to Texas for relitigation of an already-decided dispute would be efficient. Moreover, appeals require a showing of harmful error, but Appellants cannot show that transfer would have yielded a different result on the merits—and they have not even tried. That suffices to deny this request for a post-judgment transfer. But even on its own terms, the district court's denial of transfer was within its considerable discretion; the court considered all the Section 1404 factors, and any decision transferring this case to Texas at this late date would merely produce pointless duplication. The Fifth Circuit's previous, nonbinding request to return the lawsuit cannot overcome those glaring defects, particularly since the core reason behind that request (to consolidate the case with a lawsuit pending against the U.S. State Department) has been mooted by subsequent events (that suit is no longer pending in Texas, or in any court).

## **COUNTERSTATEMENT OF JURISDICTION**

The district court had jurisdiction under 28 U.S.C. § 1331. On October 1, 2023, the court entered its order dismissing Appellants' claims without prejudice and with leave to amend. App.130-31. Appellants "stood on their complaint" and filed a notice of appeal on November 16, 2023, App.1, within the period to amend. The dismissal order thus became final once the time to amend expired, under *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 n.5 (3d Cir. 1992). *See Thorpe v. Twp. of Salisbury*, No. 22-2448, 2023 WL 2783255, at *1 n.2 (3d Cir. Apr. 5, 2023) (*Batoff* "remains good law"). This Court thus has jurisdiction under 28 U.S.C. § 1291.

## **COUNTERSTATEMENT OF ISSUES PRESENTED**

I.      Whether the district court erred in dismissing these First Amendment, Second Amendment, and Due Process void-for-vagueness claims.

II.     Whether Appellants are entitled to have this litigation transferred to the Western District of Texas notwithstanding the final judgment below.

## **RELATED CASES AND PROCEEDINGS**

The State adopts Appellants' statement of related cases. Br.3.

## COUNTERSTATEMENT OF THE CASE

In July 2018, Defense Distributed, a Texas-based company, announced plans to post computer files online that allow any individual with access to a 3D printer to produce their own firearms. App.261. Defense Distributed's files "produce, among other things, [a] single-shot plastic pistol ... and a fully functional plastic AR-15 lower receiver," and other "fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion." *USDOS*, 838 F.3d at 455; *see* App.259-61 ¶¶ 35, 43. The company does not require individuals to confirm that they are licensed manufacturers or have passed a background check before receiving and using the files. App.261. And the weapons these files print lack serial numbers, which means they cannot be traced by law enforcement if they are subsequently used in a crime. *See USDOS*, 838 F.3d at 454-55.

In response, on July 26, 2018, the NJAG sent a letter demanding that Defense Distributed "cease and desist from publishing printable-gun computer files for use by New Jersey residents." App.284; App.334. The letter explained that these files "are a threat to public safety, and posting them violates New Jersey's public nuisance and negligence laws." *Id*. And in November 2018, the Legislature enacted N.J. Stat. Ann. § 2C:39-9 (*l*)(2) ("Subsection (*l*)(2)"). This statute prohibits distribution "to a person in New Jersey who is not registered or licensed as a manufacturer" of files

"that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." *Id.*

The resulting litigation followed a complicated procedural path. After the NJAG issued his letter, but before Subsection (*l*)(2) was enacted, Appellants Defense Distributed and the Second Amendment Foundation ("SAF") filed this lawsuit in the Western District of Texas against the NJAG and other state and local officials from other jurisdictions. ECF 1.[1] On January 30, 2019, the Western District of Texas dismissed the claims against the NJAG for lack of personal jurisdiction. Appellants eventually obtained a reversal of that jurisdictional dismissal in *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020).

Before that reversal, however, Appellants—joined by additional plaintiffs—filed an additional lawsuit in the District of New Jersey, asserting near-identical constitutional claims against the NJAG. *See* No. 19-4753, ECF 17 (D.N.J.) (the "2019 DNJ Action"). To avoid two duplicative actions proceeding simultaneously, the District of New Jersey stayed this second-filed suit. *Id.*, ECF 26 (D.N.J. Mar. 7, 2019), *appeal dismissed for lack of jurisdiction*, *Defense Distributed v. Att'y Gen. of N.J.*, 972 F.3d 193 (3d Cir. 2020).

---

[1] All citations to "ECF __" refer to No. 21-cv-9867 (D.N.J.), unless otherwise stated. That docket incorporates the filings in No. 18-cv-637 (W.D. Tex.) prior to April 19, 2021, when claims against the NJAG were transferred to New Jersey.

After the Fifth Circuit reversed the personal-jurisdiction dismissal, Appellants filed a Second Amended Complaint in the Western District of Texas in November 2020. App.133. The SAC asserted various claims under the First, Second, and Fourteenth Amendments, the Commerce Clause, the Supremacy Clause, and state tort law. *Id.* ¶¶ 175-246. Moreover, whereas the prior complaint pled only claims regarding the NJAG's cease-and-desist letter, the SAC brought claims against the enforcement of Subsection (*l*)(2). App.172-77, ¶¶ 141-61. The SAC also named the U.S. State Department as a defendant and asserted four claims against it—under the Administrative Procedures Act, the First, Second, and Fifth Amendments, and state contract law. App.181-202, ¶¶ 184-254.

On April 19, 2021, the Western District of Texas severed and transferred the claims against the NJAG to the District of New Jersey. App.4-20. Appellants filed a notice of appeal in the Fifth Circuit, but did not move for a stay of the transfer. The transfer was effectuated and docketed as No. 3:21-cv-9867 (D.N.J.) (the "2021 DNJ Action"); *see* ECF 147. On June 11, 2021, the District of New Jersey consolidated that transferred case with the already-pending 2019 DNJ Action. *See* ECF 159.

Months later, on April 1, 2022, a divided panel of the Fifth Circuit vacated the Texas district court's severance-and-transfer order. *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022). The majority acknowledged that because the transfer had already been effectuated "to a district court outside the Fifth Circuit, a court over

which [it] exercises no control," the Fifth Circuit "lack[ed] power to order a return of the case." *Id.* at 423. But the majority held that it could still exercise jurisdiction to direct the Texas district court "to *request* that the transferee district court return the case." *Id.* at 424 (emphasis added); *see also id.* at 440 (Higginson, J., dissenting) (agreeing District of New Jersey would then have to conduct "its own assessment of whether litigation resolving New Jersey law should be decided in Texas"). The panel ordered the Texas district court to make such a request. *Id.* at 437; App.21.

On July 27, 2022, after receiving briefing from both parties, the District of New Jersey denied the request to retransfer. App.22. Chief Judge Wolfson disagreed with Appellants' position that comity or law-of-the-case principles "dictate" that she automatically grant retransfer, explaining the Fifth Circuit's request was by its terms "non-binding" and did not purport to preclude her "independent judgment." App.54-56. Exercising that judgment, the district court determined that Appellants' demands to transfer "the entire Consolidated Action to Texas" or to sever these two actions and transfer just the 2021 DNJ Action were inconsistent with the factors for transfer under 28 U.S.C. § 1404(a). *See* App.34-54.

Notwithstanding that unsuccessful effort for transfer, Appellants attempted to proceed in the Western District of Texas anyway. In the case then pending against the State Department, Appellants filed a motion for a preliminary injunction against the NJAG, even though all the claims against him were pending in the District of

New Jersey instead. On July 22, 2022, the Western District of Texas dismissed that motion, explaining that the NJAG was not a party in that docket. *See* No. 18-637, ECF 176 (W.D. Tex.). Appellants appealed to the Fifth Circuit, which on September 16, 2022 issued an order expediting the appeal. In a concurrence, two judges on the motions panel reiterated their "request" that the District of New Jersey retransfer the case to Texas. *See Defense Distributed v. Platkin*, 48 F.4th 607, 607 (5th Cir. 2022) (Ho, J., concurring). Ultimately, however, a merits panel affirmed the Texas district court's dismissal of Appellants' motion, agreeing that it "no longer has the power to hear the case or grant the relief requested" against the NJAG. *Defense Distributed v. Platkin*, 55 F.4th 486, 489 (5th Cir. 2022).

In the meantime, Appellants continued their efforts to pursue transfer of their claims from the District of New Jersey. Hours after Chief Judge Wolfson issued her opinion denying their motion to retransfer, Appellants voluntarily dismissed their 2019 DNJ Action without prejudice and moved for reconsideration, arguing that the case now presented a cleaner vehicle for granting retransfer of the 2021 DNJ Action alone.  *See* App.59-61. Appellants also filed a second motion in the District of New Jersey to transfer after the Fifth Circuit motions panel reiterated that "request" in a concurrence. *See* No. 19-4753, ECF 65 (Sept. 23, 2022).

On October 25, 2022, the District of New Jersey denied the second transfer motion and motion for reconsideration. App.59. The court found that Appellants had

9

improperly moved for reconsideration "based on procedural gamesmanship" and that the voluntary dismissal without prejudice of the 2019 DNJ Action did not solve the significant risk of duplicative litigation. App.63-65. The court also addressed the Fifth Circuit concurrence, finding that it did not identify new grounds to depart from her "independent conclusion that transfer would be inappropriate under Third Circuit law," and that comity does not require that the District of New Jersey "substitute the analysis of the Fifth Circuit for [its] own." App.67.

After the case was reassigned to Judge Shipp due to Chief Judge Wolfson's retirement, Appellants filed a second motion to reconsider. Judge Shipp also denied that motion, finding that Appellants failed to "identify any intervening change in the controlling law or any new evidence." App.75-83. The only change since the District of New Jersey's second opinion denying transfer was the reassignment of the judge, an "impermissible" basis for reconsideration. App.79. The court also emphasized that Appellants "had 84 days (12 weeks) to file a writ of mandamus with the Third Circuit between the filing of the Second Transfer Opinion and the reassignment of this case—they chose not to seek such relief." App.78. The district court denied Appellants' request for a stay of further district-court proceedings. App.78 n.3. By that time, the NJAG's Rule 12 motion had been fully briefed.[2]

---

[2] In accordance with a docket-cleaning order, Appellants later filed a Third Amended Complaint (TAC)—the operative pleading—which removes allegations against the State Department but is otherwise substantively identical to the SAC. *See* App.249.

Months later, on September 29, 2023, the district court granted the NJAG's motion to dismiss. App.84; 130. As to Appellants' First Amendment claims, the court found Appellants' pleading to be insufficient to state a claim. The district court noted that there is "a First Amendment distinction between expressive and non-expressive, functional computer code," but found that the TAC provided insufficient allegations regarding how the company's code operates "to conduct the necessary analysis"—that is, to decide whether they had pleaded restrictions on their expressive or non-expressive code. App.98-99. As a result, the operative complaint had not sufficiently alleged that Defense Distributed's computer code is protected speech and thus had not stated a claim for First Amendment protection. *Id.*

The other claims likewise required dismissal. The Second Amendment claims failed under both Article III and Rule 12(b)(6). As to Article III, the district court found that the TAC did not sufficiently plead any injury-in-fact because Appellants did not identify any member who seeks to use the files to self-manufacture arms in New Jersey. App.104. On the merits, the court held the files allowing individuals to 3D-print weapons are not themselves bearable "Arms" and thus fall outside the text of the Second Amendment right. App.102. Next, the court dismissed the void-for-vagueness challenge to Subsection (*l*)(2), reasoning that the statute "clearly defines the type of digital files and the methods of distribution that qualify as prohibited conduct." App.109. Finally, the court dismissed the Equal Protection, Commerce

Clause, preemption, and tortious interference claims, App.105-08, 110-28, none of which Appellants press on appeal.

While the district court granted Appellants a lengthy opportunity to amend—thirty days, followed by another fourteen, App.130-31—Appellants did not amend the TAC, and instead stood on their complaint. This appeal follows.

## SUMMARY OF ARGUMENT

I.      The district court properly dismissed the TAC.

A.      The district court correctly rejected Appellants' First Amendment claim for a threshold reason: they did not plausibly allege that their printable gun files are protected expression. As the district court explained, whenever a litigant claims First Amendment protection for computer code, a fact-intensive analysis of the code is required to determine whether it communicates ideas (and is protected) or instead is to be executed "'mechanically' and 'without the intercession of the mind'" (and is not protected). *Universal City Studios v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001). Appellants have not pled sufficient facts for that analysis. And although the district court gave them an opportunity to amend, they refused to do so, instead standing on a complaint lacking crucial allegations. That is sufficient to affirm.

Additionally, even assuming Subsection (*l*)(2) burdens protected expression, it is a content-neutral regulation subject to intermediate scrutiny, which it withstands easily. A measure is content neutral if it applies to the code based on its "functional

capability," namely its "capacity to instruct a computer to" take an action, instead of its "capacity ... for conveying information to a human being." *Corley*, 273 F.3d at 454. Subsection (*l*)(2) plainly regulates code based on its "functional capability": it restricts code that performs the specific function of directing a 3D printer to produce unregulated firearms, and does not restrict the exchange of ideas about such firearms. And the law withstands intermediate scrutiny. It advances the important interest in preventing distribution of code that enables individuals who would fail a background check—including terrorists, felons, and domestic abusers—to produce unserialized firearms. Further, Subsection (*l*)(2) is tailored to that goal, since it restricts only the distribution of functional code, while leaving open channels to exchange ideas about 3D printing firearms. And the statute does not even impose that restriction across the board; it limits code to licensed manufacturers who are subject to the background-check and serialization requirements. Nor is this carefully calibrated law overbroad, particularly when understood in conjunction with its "knowing" mens rea.

      B.    Appellants' Second Amendment claim fails for lack of standing and on the merits. As to standing, Appellants fail to plead that the law injures their right to keep and bear arms, as they identify no New Jersey member who would otherwise be using a 3D printer to create their own firearm, and fail to satisfy redressability, as Appellants do not challenge the separate prohibition on using these functional files to produce arms. On the merits, Appellants fail to state a Second Amendment claim

for two reasons. For one, computer files are not bearable "Arms" protected by the text of the Second Amendment. *Bruen*, 597 U.S. at 28. For another, restrictions on these files are consistent with the Nation's historical tradition. States have long required a license to manufacture or sell firearms and for firearms to be "marked" before entering commerce, and *Bruen* confirmed that States may require residents to pass a background check before obtaining arms. Subsection (*l*)(2) merely precludes using 3D printing in ways that bypass such background checks.

C.     The district court also properly dismissed the void-for-vagueness claim. Initially, because Appellants concede some of their printable gun files are "clearly covered" by the statute, they "cannot raise a successful vagueness claim." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010). In any event, the statute provides fair notice of the conduct proscribed: Subsection (*l*)(2) is limited to functional code, enumerates specific file types as illustrative examples, and is limited to "knowing" distribution, which "mitigate[s]" any purported vagueness. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

II.     Appellants' request to transfer this dispute to the Western District of Texas likewise falls short.

A. Denials of transfers under Section 1404 are appropriately challenged via petitions for mandamus, not on appeals from final judgments. *See In re Howmedica Osteonics Corp.*, 867 F.3d 390, 401 (3d Cir. 2017). After all, Section 1404 requires

14

courts to consider questions of convenience to the parties and judicial economy, *see Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995), and Appellants can hardly show that transfer to Texas for a relitigation of an already-decided case would be efficient. Moreover, appeals require the challenger to show harmful error, *see* 28 U.S.C. § 2111; Fed. R. Civ. P. 61, but Appellants cannot show transfer would have yielded a different result on the merits—and they have not even tried. *See SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 178-79 (2d Cir. 2000). Appellants were well aware that they could have pursued mandamus at this Court, but they chose not to do so, and they cannot now justify a post-judgment transfer.

B. Moreover, the district court did not abuse its discretion in finding that this action belonged in New Jersey, and multiple intervening developments confirm that a transfer would be inappropriate. This case properly belongs in New Jersey, where challenges to state officials' enforcement of their laws are regularly heard; where the judges are best equipped to handle questions of state law; and where no knotty issues of personal jurisdiction need to be resolved. And although Appellants claim that this case should have been transferred to Texas so that it could have been consolidated with their claims against the State Department to avoid conflicts and inefficiencies, the claims against the State Department are no longer pending in Texas either; they were dismissed in part and transferred in part in 2023, and Appellants did not appeal. The efficiencies Appellants claim are thus illusory; rather, tremendous inefficiencies

would follow from relitigation in Texas. Those intervening circumstances similarly address Appellants' arguments about comity and law of the case, as the Fifth Circuit specifically requested retransfer of the case at a time when there were still pending claims against the State Department in Texas to allow reconsolidation of the claims and thus avoid conflict. While comity never required the District of New Jersey to agree, "changed circumstances" vitiate any assertion that comity or law-of-the-case principles support Appellants' transfer request at this time, when there is no longer a case in Texas with which to reconsolidate these claims. *See, e.g.*, Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3846 (4th ed.).

## STANDARD OF REVIEW

This Court exercises plenary review of Rule 12(b)(6) dismissals, "accepting all well-pled factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor." *Nekrilov v. City of Jersey City*, 45 F.4th 662, 668 (3d Cir. 2022). Dismissal is proper if the "well-pleaded factual allegations" do not "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). This Court likewise exercises plenary review of dismissals for lack of Article III standing, considering only "the allegations of the complaint and documents referenced therein and attached thereto." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

This Court reviews a decision to deny transfer under 28 U.S.C. § 1404(a) for abuse of discretion. *See Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020). After final judgment, review is also subject to the harmful-error standard; that is, this Court will only reverse the denial of transfer if it finds that "a different result would have been reached had the suit been transferred." *Paramount Pictures v. Rodney*, 186 F.2d 111, 116 (3d Cir. 1950).

## ARGUMENT

## I.   THE COURT PROPERLY DISMISSED APPELLANTS' CLAIMS.

### A.   The Court Correctly Dismissed The First Amendment Claims.

Appellants' First Amendment claims run into three problems. First, the TAC does not plausibly allege that the particular printable gun files Appellants wish to distribute are protected speech. Second, even assuming that these files are protected speech, Subsection (*l*)(2) is a content-neutral regulation that is subject to, and easily withstands, intermediate scrutiny. Third, Subsection (*l*)(2) is not overbroad.

> 1.   *Appellants Did Not Adequately Plead That Their Specific Files Receive First Amendment Protection.*

The district court correctly found that Appellants did not plead sufficient facts to allege that their files are protected speech. Appellants opted not to amend to offer the missing detail. This Court can affirm on this narrow ground alone.

The essential ingredient in any First Amendment lawsuit is the regulation of protected speech. As courts have held, computer code "can"—but does not *always*—

"merit First Amendment protection." *Corley*, 273 F.3d at 449. Some computer code will "convey information capable of comprehension and assessment by a human being," and courts have found that such "conveying … renders instructions 'speech' for purposes of the First Amendment." *Id.* at 447-48. Said another way, code that communicates ideas does not lose protection merely because the code requires some "execution by a computer," much like "a musical score is no less 'speech' because it specifies performance on an electric guitar." *Id.*

But other computer files do not "convey information" for human evaluation; instead, they direct users to follow instructions "'mechanically' and 'without the intercession of the mind or the will of the recipient.'" *Id.* at 449 (quoting *CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000)). This category of functional code does not receive First Amendment protection. *Id.* As courts have held, the fact that such code "use[s] words as triggers and a human being as a conduit, rather than programming commands as triggers and semiconductors as a conduit" is "irrelevant," *Vartuli*, 228 F.3d at 111, since the code is "merely a means of commanding a computer to perform a function." *Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 9 n.19 (D.D.C. 1996). Were the rule otherwise, "an AI-operated lawnmower which runs on code with no human involvement" might receive First Amendment protection, App.99 n.11, and safety regulations of "self-driving vehicles" could be challenged as compelled speech, *Rigby v. Jennings*, 630 F. Supp. 3d 602, 616 n.15 (D. Del. 2022). The first question

is thus whether the code communicates with "the user of the program" versus "the computer (never protected)," *Corley*, 273 F.3d at 449, and deciding which category applies requires "careful and particularized analysis," *Vartuli*, 228 F.3d at 112.

The TAC does not contain sufficient allegations to plausibly support that the files regulated by Subsection (*l*)(2) are protected speech; indeed, it does not have sufficient allegations for the court to engage in this nuanced analysis at all.[3] As the district court explained, because the First Amendment's reach turns on how the files operate, a suit claiming the right to distribute such files "requires detailed, technical allegations regarding the types of computer code at issue," "how that code is used (i.e., precisely how the writer or user of the code might interact with the code)," "whom or what is communicating through the code," "and for what purpose the computer code operates[]." App.99. That is especially so because "the alleged 'speech' may be serving to effectuate an entirely non-expressive function: printing a firearm with little human involvement." App.96. The TAC, however, lacks alleged facts needed "for the Court to conduct the necessary analysis." App.99. The most the TAC discloses about Defense Distributed's files is to acknowledge that some "are ready for insertion into ... 3D printers," App.257 ¶ 27 (citing CAM files), an alleged fact indicating the files operate mechanically, and merit no First Amendment

---

[3] The NJAG never "disclaimed" this argument, as Appellants erroneously contend, Br.35-36, and instead specifically preserved the issue while noting the district court could dismiss Appellants' claims on other grounds. *See* ECF 181-1 at 8 & n.2.

protection. Because the TAC lacks alleged facts to state their claim, the district court correctly granted dismissal without prejudice and with leave to amend.

Appellants' responses misunderstand the problem. Appellants do not dispute the First Amendment standard, and rely on the same precedents as the district court. *See* Br.36-37. Instead, Appellants claim their allegations suffice to plausibly show protected speech is being regulated. But while the TAC includes a list of "specific file formats," Br.37, (*e.g.*, ".stl" or ".igs" files, App.261), it alleges nothing regarding how they operate, and provides no detail regarding if or how the file "produces a firearm" or what level of human engagement is needed, App.99. Likewise, to the extent the TAC describes what "a user must" do to execute code generally, Br.39, it does so without reference to the files they actually seek to disseminate—the relevant question. *See* App.257 ¶¶ 28-29. Appellants deride this as a "heightened pleading" rule, Br.36, but the district court simply required the same factual detail that other federal courts have found necessary to conduct the First Amendment test. After all, Appellants must plead sufficient factual allegations that, if taken as true, entitle them to win their case. Their failure to plausibly allege code that gets First Amendment protection is all the more puzzling given that the district court invited Appellants to

amend and even spelled out what facts to include, and yet they declined to do so. Dismissal was proper given Appellants' litigation choices.[4]

## 2.   *Subsection (l)(2) Withstands First Amendment Scrutiny.*

Even assuming Appellants' files constitute protected speech, Subsection (*l*)(2) is a content-neutral law subject to intermediate scrutiny. Because the law advances New Jersey's public safety interests in a tailored way, it satisfies that standard.

1. Intermediate scrutiny applies. Which level of scrutiny applies "depends on whether [a law] is content based or content neutral." *Bruni v. City of Pittsburgh*, 941 F.3d 73, 83 (3d Cir. 2019). A law is content-based "if it target[s] speech based on its communicative content"—*i.e.*, "if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). But that a law requires some analysis of the speech to determine if a violation occurred does not automatically mean the law "discriminat[es] based on" the content expressed. *Id.* at 73-74. Instead, "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *Id.* at 72.

---

[4] To be clear, it is doubtful Appellants could *ever* demonstrate that the code at issue is protected speech, as Subsection (*l*)(2) only regulates fully functional printable gun files. But at a minimum, the limited allegations that Appellants were willing to put before this Court fall short, a sufficient basis for this Court to affirm.

As numerous courts have explained, regulations of computer code are content-neutral if they regulate code because of its functional capability, rather than because of any expressive message. *Corley* involved a challenge to the Digital Millennium Copyright Act, which not only "backed with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls," but also sanctioned persons who "*traffic* in a technology primarily designed to circumvent" such digital walls. 273 F.3d at 435. In rejecting a challenge to the restrictions on distribution of decryption code, the Second Circuit held the DMCA content-neutral. It distinguished laws that apply to code because of concerns with their "functional capability" (*i.e.*, regulations tied to code's "capacity to instruct a computer to decrypt" software) from laws that target files based on the "capacity ... for conveying information to a human being." *Id.* at 454 (finding that if the State "seeks to justify" its law based on function, "incidental regulation on speech" does not make the law content-based).

*Corley* faithfully applies traditional content-neutrality doctrine, because asking whether a law targets code's "speech" or "functional" aspects is the proper way to evaluate whether the restriction is justified "without reference to the content of the regulated speech." *Id.* at 454; *see id.* at 451 (explaining that the "realities" of code "require a First Amendment analysis that treats code as combining nonspeech and speech elements, *i.e.*, functional and expressive elements"). Unsurprisingly, the D.C. Circuit likewise reached the same conclusions in rejecting similar challenges.

*See Green v. U.S. Dep't of Justice*, 54 F.4th 738, 745-46 (D.C. Cir. 2022) (reasoning that although the DMCA "requires reading computer code to determine what digital act the code carries out, it is nonetheless content neutral," because the statute "cares about the expressive message in the code 'only to the extent that it informs' the code's function," and finding *Austin* "virtually dispositive" on this question).

Courts have applied this test to remarkably similar contexts. In *United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012), the Ninth Circuit adopted the same functionality analysis in rejecting a First Amendment challenge in a case involving computer files subject to the Arms Export Control Act's (AECA) and International Traffic in Arms Regulations' (ITAR) treatment of "information ... required for" the production of "defense articles." *Id.* at 1130 (quoting 22 C.F.R. § 120.10(a)(1)). The panel rejected the argument that the restrictions were necessarily content-based just because they cover information regarding defense articles. *Id.* at 1134-36. Instead, "the AECA and its implementing regulations are content-neutral" because the statute "does not rest upon disagreement with the message conveyed," but on the function of producing weapons, and thus "defines the technical data based on its *function* and not its viewpoint." *Id.* (reasoning that contrary arguments "mistakenly focus on the nature of the content incidentally restricted, and not the nature of the statute"); *see also, e.g.*, *Defense Distributed v. USDOS*, 121 F. Supp. 3d 680, 694 (W.D. Tex.

23

2015) (holding ITAR content neutral as-applied to Defense Distributed's code, since the ITAR regulates based on function, not "on the message it is communicating").

Subsection (*l*)(2) is likewise content-neutral. It only restricts files that perform the specific *function* of directing a 3D printer to produce firearms. *See* N.J. Stat. Ann. § 2C:39-9(*l*)(2) (limiting distribution only of files that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component"). It does not restrict components that express ideas advocating for firearms; that "discuss[] the best way to 3D print a firearm"; or even that provide "sheet instructions" for doing so. App.95 n.7. In other words, the statute focuses on a computer file's *function*—namely, whether it enables a printer to create a firearm—"not whether the code expresses any particular idea." *Rigby v. Jennings*, 630 F. Supp. 3d 602, 617 (D. Del. 2022) (rejecting First Amendment challenge to similar Delaware law). That the statute limits distribution to licensed manufacturers, N.J. Stat. Ann. § 2C:39-9(*l*)(2), only confirms the point: the law seeks to ensure the function of producing firearms remains with those licensed to do so—it does not reflect any effort to give manufacturers more expressive rights than anyone else. Finally, that the statute "requires analysis of whether the code is functional and what the code's function is" does not make it content-based, because that inquiry "is not concerned with stifling expression of any idea. It is concerned with controlling the distribution of untraceable firearms." *Rigby*, 630 F. Supp. 3d at 617. In short, the law

applies based on the computer file's "functional capability," not any "capacity ... for conveying information to a human being." *Corley*, 273 F.3d at 454.

Appellants misunderstand the scope of New Jersey law. At no time do they refute *Corley* and its progeny, or dispute that restrictions on computer files based on functional capability are not content-based. Instead, Appellants urge a strained reading of Subsection (*l*)(2) to forbid more than what the text says; more than what the State believes is prohibited; and more than the district court found to be covered. *See* Br.41, 44. Appellants insist that the statute prohibits files that do not "actually perform th[e] function" of "directing a 3D printer to produce firearms." Br.41. But the text says otherwise: it restricts only files "that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." N.J. Stat. Ann. § 2C:39-9(*l*)(2). And Appellants' extensive focus on the phrase "may be used" makes no sense: that phrase plainly refers to files that are capable of programming a printer to make a firearm, and excludes anything not capable of performing that function. *See* App.95 n.7 (finding that "non-utilizable information" is not covered); *Rigby*, 630 F. Supp. 3d at 618 (agreeing same language in Delaware statute "is narrowly focused on distributing functional code"). Properly construed, Subsection (*l*)(2) does not forbid individuals to "speak" or "talk about"

the "topic of 3D-printing firearms," Br.43; it restricts distribution of files that direct

a 3D printer to produce firearms. It is thus content-neutral.[5]

2. Subsection (*l*)(2) survives intermediate scrutiny, as it is "narrowly tailored

to serve a significant governmental interest" and does not "burden substantially more

speech than is necessary to further the government's legitimate interests." *Bruni*, 941

F.3d at 88-89; *see also id.* at 89  (emphasizing a law "need not be the least restrictive

or least intrusive means of serving the government's interest").

New Jersey has a significant interest in preventing the dissemination of files

that enable the production of untraceable firearms to persons who cannot lawfully

possess weapons—including terrorists, felons, domestic abusers, and minors. *See*

App.50 (acknowledging "New Jersey's interests in the constitutionality of a law

enacted to prevent its citizens from manufacturing deadly weapons entirely outside

of the state's regulatory regime"). There is no question New Jersey has a powerful

interest in ensuring residents can only possess firearms after undergoing background

checks, which ensure "that those bearing arms in the jurisdiction are, in fact, 'law-

abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9. Nor is there a serious

dispute that "preserving the ability of law enforcement to conduct serial number

tracing"—to identify the owner of a firearm based on its unique identifier, if that

---

[5] Appellants' bare allegation that Subsection (*l*)(2) was enacted to target Defense Distributed offers nothing to the analysis, Br.44, because even assuming that is so, legislatures may respond to the *functional* threat its files present.

firearm turns up at a crime scene—is likewise "a substantial or important interest." *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).[6] Subsection (*l*)(2) advances that interest by ensuring individuals cannot produce unserialized weapons, particularly those for whom "the state's regulatory regime" bars possession. App.50. The TAC illustrates the issue: it confirms Defense Distributed would allow "any site visitor" to download printable gun files that make unserialized weapons regardless of whether they can pass a background check. *E.g.*, App.264 ¶ 57.

Subsection (*l*)(2) sweeps no further than necessary to achieve these interests. Most importantly, it does not impose a blanket ban on distributing the functional files to New Jersey, but instead limits their distribution only to licensed firearms manufacturers. That is because the statute is concerned not with the files themselves, but with distribution in ways that circumvent background checks and serialization requirements—which all manufacturers must follow. *See, e.g.*, 18 U.S.C. § 922(t)(1) (requiring background check before firearm can pass from licensed manufacturer to unlicensed buyer); *id.* § 923(g)(1), (7) (subjecting manufacturers to inspections, recordkeeping, and investigation-related requirements); N.J. Admin. Code § 13:54-4.7(b) (theft-prevention); 18 U.S.C. § 923(i) (serialization). And Subsection (*l*)(2) "prohibits only the distribution of functional code," *Rigby*, 630 F. Supp. 3d at 618—

---

[6] *Marzzarella*'s means-end test no longer applies to Second Amendment claims after *Bruen*, but such scrutiny still governs Appellants' leadoff First Amendment claim.

Case: 23-3058    Document: 29    Page: 36    Date Filed: 05/24/2024


the files that most directly threaten public safety. The statute therefore "leaves ample alternative channels to communicate about how to use a 3D-printer to manufacture" a firearm, *id.*: it "does not prohibit" any person from "exchanging information about how to use their 3D-printer to manufacture a firearm," instructing others "on how to program their 3D-printer to make the firearm of their choice," *id.*, or advocating in favor of 3D printing firearms. *See* App.95 n.7. And finally, because the interest is in protecting public safety in the State and in protecting New Jersey's background-check system, it prohibits distribution to persons in New Jersey alone.

Appellants' first response as to tailoring—that the law is "underinclusive"—lacks merit. Br.48. As an initial matter, Appellants ignore that the First Amendment has no "freestanding" under-inclusiveness test. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). In any event, each "underinclusiveness" point is misguided. That Subsection (*l*)(2) does not apply to "manufacturers or wholesalers," Br.48, confirms the law is tailored: the State only prevents distribution of code where it would enable individuals to evade background checks—to which manufacturers and wholesalers are subject. And Subsection (*l*)(2) does not address the printing of "poison or bombs" because the Legislature is unaware of any code that enables a 3D printer to produce poison or a bomb; States may enact a statute to solve a real-world problem without addressing speculative fears. *See Williams-Yulee*, 575 U.S. at 449.

Nor is the law rendered unnecessary or insufficiently tailored because it also separately restricts using the functional code to "produce" an illegal firearm. N.J. Stat. Ann. § 2C:39-9(*l*)(1). Just as numerous firearm provisions prohibit both the unlawful possession and the unlawful transfer of a firearm—including by restricting straw purchasing—Section 2C:39-9(*l*) operates in the same manner: it both restricts individuals such as terrorists and felons from using the functional code to produce a weapon (Subsection (*l*)(1)) and prohibits persons from providing them the functional code allowing them to do so (Subsection (*l*)(2). Appellants' position would beget extraordinary public-safety problems: once the functional code is distributed to New Jersey residents (including, as Appellants propose, via a public website without user verification, App.264 ¶ 57), law enforcement will not know which individuals have downloaded the code and which prohibited persons have produced any firearms with a 3D printer, nor will they be able to trace the firearms once used. Terrorists, felons, and domestic abusers who wish to evade the State's laws would have an easy path for doing so, absent restricting access to the functional code itself.

3.    *Subsection (l)(2) Is Not Overbroad.*

Nor can Appellants prevail by repackaging their First Amendment claims as overbreadth theories. Appellants bear a heavy burden: the "strong medicine" of overbreadth invalidation, which invalidates even lawful applications of a statute, is warranted only if its unconstitutional applications are "substantial, not only in an

absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292-93 (2008). Appellants therefore must show a "lopsided ratio" of invalid-to-valid real-world applications. *United States v. Hansen*, 599 U.S. 762, 770 (2023) ("To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep.").

Appellants cannot meet that burden. The TAC does not even try: it is devoid of *any* allegation regarding such a ratio. And as explained above, Subsection (*l*)(2) "is narrowly focused on distributing functional code" and does not sweep in any legitimate speech—it excludes instructions on how to use the code or discussions of the virtues of printing guns. *See Rigby*, 630 F. Supp. 3d at 618 (rejecting overbreadth challenge); App.95 n.7; *Chi Mak*, 683 F.3d at 1136 (rejecting overbreadth challenge to federal arms control statute because the law "delineate[s] narrowly the scope of information subject to arms controls").[7] Appellants' overbreadth claim thus rests on the same core mistakes about Subsection (*l*)(2) refuted above—that it "criminalizes speech" and prohibits "every instance of distribution." Br.49-50.

---

[7] Appellants' analogy (at 50) to laws that target incitement to violence is therefore inapt, as Subsection (*l*)(2) restricts code solely based on its *functional* capability, not any tendency to "incite" persons to engage in lawless action or convey any message.

Finally, Appellants' remaining claims about the law's scope also misconstrue Subsection (*l*)(2). While the law covers functional files that can produce a "firearm component," that does not cover "generic items—such as fasteners, nuts, bolts, and screws," Br.50; instead, "firearm component" is used in the same statutory section to refer to the parts that are housed by the frame or receiver—*e.g.*, "the hammer, bolt or breechblock, action, and firing mechanism." N.J. Stat. Ann. § 2C:39-9(k). That express reference to these firearms-specific components indicates that neighboring Subsection (*l*)(2) similarly excludes generic nuts and screws. And Appellants' claim that the law lacks a cabined scienter is simply wrong, *see* Br.41; "knowledge" is the default mens rea for provisions in New Jersey's criminal code, *see id.* § 2C:2-2(c)(3), and the State has consistently recognized that a person violates Subsection (*l*)(2) only if he knows the files he distributed "may be used" to program a 3D printer to produce firearms. Just as Subsection (*l*)(2) is directly tailored to lawful interests, the law is not overbroad in protecting those interests.[8]

## B.    The Court Correctly Dismissed The Second Amendment Claim.

Appellants' Second Amendment claim fails both for lack of standing under Article III and for failure to state a legal claim under Rule 12(b)(6).

---

[8] Appellants maintain a separate analysis is required for their claims against civil and criminal enforcement mechanisms, but they "ma[de] no effort to separate their nine Counts in this manner." App.94 n.6; *see also* Br.57 (admitting "the same modes of constitutional analysis" apply). If the First Amendment allows this conduct to be criminally sanctioned under Subsection (*l*)(2), logically it allows civil sanctions too.

1. Initially, the district court properly held that Appellants failed to sufficiently plead standing as to their Second Amendment claim. *See Lutter v. JNESO*, 86 F.4th 111, 124 (3d Cir. 2023) (standing is assessed claim-by-claim). "At the pleading stage, to have Article III standing," a plaintiff "must plausibly allege (i) an injury-in-fact (ii) that is fairly traceable to the conduct of the party sued, and (iii) that is judicially redressable." *Id.*; *see also* App.103-04 (noting that associational standing requires identifying a member with standing to sue). In considering injury, courts first assess the protected interest alleged, and then ask whether that interest has been injured. *See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991) (courts assess standing "by reference to the statutory and constitutional provision whose protection is invoked"). To evaluate traceability and redressability, courts then assess whether the injury to that legally protected interest has a "causal connection" to the challenged law, *Lutter*, 86 F.4th at 127, and would "likely" be remedied by an injunction preventing that law's enforcement, *id.* at 128.

Appellants fail to plausibly allege injury-in-fact. They assert that the protected interest in the Second Amendment claim is the "right to make and acquire Arms." Br.52.[9] But the TAC never actually alleges that SAF or its New Jersey members

---

[9] Appellants' premise is dubious; because the Second Amendment provides for the right to keep and bear arms, "no court, modern or otherwise, [holds] that the Second Amendment secures a standalone right to *sell* guns." *Drummond v. Robinson Twp.*, 9 F.4th 217, 230 (3d Cir. 2021); *see Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 690

have access to a 3D-printer and would make any firearms using the files at issue. App.104; *see also Nat'l Ass'n for Gun Rights v. Polis*, No. 24-cv-1, ECF 29 at 16 (D. Colo. May 2, 2024) (finding no standing where no plaintiff "testified that they had access to a 3D printer" or "attempted to 3D print a [firearm]"). Appellants have therefore not pled a single plaintiff or member whose purported interest in making or acquiring firearms was injured. *See* App.253-54. Appellants could have amended their pleading to do so, but declined. That is fatal.

Appellants also fail to plead that this injury is traceable to Subsection (*l*)(2) and redressable by a court order granting their relief. Even without Subsection (*l*)(2), New Jerseyans who are not licensed manufacturers are still precluded from using files to "manufacture or produce" firearms by the separate prohibition in N.J. Stat. Ann. § 2C:39-9(*l*)(1)—which the TAC does not challenge. Indeed, Appellants' prior admissions suggest Subsection (*l*)(1) is valid: below, they agreed that 26 U.S.C. § 5822 can permissibly require firearms makers to obtain ATF's "advanced approval" *before* making a firearm. No. 19-4753, ECF 72 at 29 n.7. But given Subsection (*l*)(1), no New Jerseyan can cite Subsection (*l*)(2) as the cause of their inability to legally print firearms. And an order enjoining enforcement of Subsection (*l*)(2) would not redress their claimed Second Amendment injury while Subsection (*l*)(1) is in effect.

---

& n.24 (9th Cir. 2017) (en banc) (same). But even accepting the premise, Appellants' theory fails on the standing grounds discussed above.

33

*Cf. Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (no redressability where same prohibition was embodied in a separate, unchallenged law). That dooms Appellants' standing.

2. The district court also correctly found that Appellants' Second Amendment theory fails to state a claim. Under *Bruen*'s two-step framework, courts first assess whether the Amendment's "plain text covers" a plaintiff's own "conduct." 597 U.S. at 17, 24. If it does not cover the conduct, "the analysis can stop there." *Id.* at 18. If it does, the law is still constitutional if it falls within "the Nation's historical tradition of firearm regulation." *Id.* at 24. Appellants' challenge fails both steps.

*First*, the Second Amendment's text does not cover distribution of computer files. For Second Amendment purposes, the "definition of 'arms' is fixed according to its historical understanding": "bearable arms." *Id.* at 28 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). That refers only to arms that one can "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 32 (quoting *Heller*, 554 U.S. at 584). Even if a weapon created by a 3D printer can be an arm, the "computer codes" themselves do "not constitute an 'Arm' under the Second Amendment." App.102. They are not "bearable," and "cannot be worn for defense, taken into ones hands, or used to cast down an enemy." *Id.*; *cf. also United States v. Cox*, 906 F.3d 1170, 1186 (9th Cir.

2018) (agreeing that if an item is not "a weapon in itself" or an "armour of defence," it is not "a bearable arm'").

Appellants' sole response—that the functional files can eventually be used to manufacture firearms, *see* Br.53—is a red herring. For one, Appellants' actual claim is only against Subsection (*l*)(2)'s restriction on distribution of computer files—not the use of those files to produce arms, regulated by the unchallenged Subsection (*l*)(1). That matters: *Bruen* instructs courts to assess whether the "plain text covers an individual's conduct." 597 U.S. at 17. And the exclusive conduct proposed here— distributing or receiving computer files—falls far outside the textual right to keep and bear arms. The analysis "stop[s] there." *Id.* at 18.

*Second*, even if the files themselves were somehow "arms," Subsection (*l*)(2) still satisfies the Second Amendment under history and precedent. *Bruen* confirmed that States may require residents "to undergo a background check" to keep or carry arms—as such checks "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring) (same). And that is what Subsection (*l*)(2) does: it does not prevent law-abiding, responsible citizens from accessing 3D-printed firearms, but rather requires obtaining such arms via a licensed manufacturer, ensuring that they first undergo the usual background check. *See* N.J. Stat. Ann. § 2C:39-9(*l*)(2) (forbidding distribution only to recipients who are "not registered or licensed as a

manufacturer"); *id.* § 2C:39-9(*l*)(1) (prohibiting "a person who is not registered or licensed to do so as a manufacturer" from using 3D printer to manufacture a firearm).

Given *Bruen*'s express approval of background checks, it is unsurprising that Subsection (*l*)(2) is consistent with *Bruen*'s historical framework, which provides that modern restrictions withstand Second Amendment scrutiny if they are supported by "historical analogue[s]." 597 U.S. at 30. As a general matter, courts ask whether the analogues "impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Id.* at 29; *see id.* (describing these as the "how and why" of the laws). "[T]wins" are not necessary; analogues are sufficient even where the modern restriction "is not a dead ringer for historical precursors." *Id.* at 30. That is especially true in the face of "dramatic technological changes," which "may require a more nuanced approach." *Id.* at 27.  Indeed, it is hard to conceive of a more "dramatic technological change" that was "unimaginable at the founding" than 3D-printed firearms. *Id.* at 27-28.

Subsection (*l*)(2) follows a well-established tradition of requiring a license to manufacture or distribute arms. Early American governments barred manufacture or distribution of gunpowder without a license. *See* Statutory Addendum at 1 (1775 Connecticut law forbidding "export[]" of gunpowder "without ... license," and similar 1651 Massachusetts and 1821 Providence laws). And States similarly required gun barrels and gunpowder to be marked by state inspectors before entering

commerce to protect public safety. *Id.* at 2 (1805 Massachusetts law appointing officials to "prove all musket barrels and pistol barrels" and imposing fine for manufacturing or selling guns not proved and marked; similar 1821 Maine law; 1795 and 1809 Pennsylvania and Massachusetts laws requiring gunpowder stored in public magazine be proved and marked). Like these historical laws, Subsection (*l*)(2) minimally "burden[s] the right of armed self-defense," *Bruen*, 597 U.S. at 29, since these laws do not deprive individuals of access to arms, but only ensure that their arms have been obtained through regulated channels for licensing. And they are "comparably justified." *Id.* Just as the historical laws ensured firearm components and gunpowder would be traceable by the State, Subsection (*l*)(2) likewise ensures that individuals cannot 3D-print their own untraceable firearms. While the historical laws are not "dead ringer[s]," *Bruen* does not so demand: our Nation's historical tradition of firearms regulation paved the way for Subsection (*l*)(2).

### C.     The Court Correctly Dismissed The Vagueness Claim.

Finally, the void-for-vagueness challenge likewise fails. A statute is only void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. A law need only provide "relatively clear guidelines as to prohibited conduct," *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 525 (1994); it may "not [be] automatically invalidated

as vague simply because difficulty is found in determining whether certain marginal offenses fall within [its] language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963); *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").

Appellants' critique that Subsection (*l*)(2) lacks notice of what files it covers runs into an immediate problem: any challenger "whose speech is clearly proscribed cannot raise a successful vagueness claim" tied to their "lack of notice." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010). Appellants readily admit "that *some* of [their] speech is clearly covered" by Subsection (*l*)(2), Br.55-56; *see* App.287-88 ¶¶ 130, 133, acknowledging their intent to disseminate code "that may be used to program a three-dimensional printer to manufacture or produce a firearm"; files that "are ready for insertion into object-producing equipment" like "3D printers"; and files that direct a printer to make "a single-shot firearm known as the 'Liberator,'" "AR-15 rifle and magazine," and/or "AKM rifle and magazine." App.257-65 ¶¶ 27, 33, 43, 57. That disposes of their vagueness claim.

In any event, the law's text contains "clear guidelines." *Posters*, 511 U.S. at 525. The district court correctly noted that the term "may be used," "in the context it is used, appears to refer to any digital instruction *with the capability* to program a 3D printer to produce a firearm." App.109. Contrary to Appellants' strained reading,

the phrase "may be used" refers not to subjective intent, but to the functional ability "to program a three-dimensional printer." N.J. Stat. Ann. § 2C:39-9(*l*)(2). And the statute includes illustrative examples of the functional files it covers: "computer-aided design files" and other files "displayed in electronic format as a digital model." *Id.* Finally, the law prohibits only "knowing" distribution, which "mitigate[s] a law's vagueness." *Hoffman*, 455 U.S. at 499.

Appellants' resort to hypothesizing marginal cases about whether a particular file is "functional"—including as new file types or technologies develop in the future—is no basis to invalidate the statute. After all, "[c]lose cases can be imagined under virtually any statute." *Williams*, 553 U.S. at 306. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* This law provides persons of ordinary intelligence "fair notice of the types and files prohibited by the statute and what function those files cannot be used to perform." App.109. Legality turns on the functionality of the computer files, and the distributor's knowledge of that fact.

## II.    APPELLANTS ARE NOT ENTITLED TO A TRANSFER TO RELITIGATE THESE CLAIMS IN TEXAS.

At this late stage, there is no basis to retransfer the case to the Western District of Texas, where litigation would have to start over. First, Appellants cannot justify their extraordinary demand for a 28 U.S.C. § 1404(a) transfer after a final judgment

already issued. Second, the district court did not abuse its considerable discretion in finding this action belonged in New Jersey, and multiple intervening developments confirm that a transfer would be inappropriate.

## A.    Appellants Cannot Justify A Transfer After Final Judgment.

Appellants cannot support reversal of the district court's denial of their motion to transfer after final judgment. Instead, as this Court has explained, the appropriate mechanism by which to challenge orders denying a transfer is a timely petition for mandamus, *not* an appeal following issuance of a final judgment on the merits. *See Howmedica*, 867 F.3d at 401; *In re Fed.-Mogul Glob.*, 300 F.3d 368, 378 (3d Cir. 2002); *In re Nat'l Presto Indus.*, 347 F.3d 662, 663 (7th Cir. 2003); *In re Volkswagen of Am.*, 545 F.3d 304, 318-19 (5th Cir. 2008) (en banc); *In re Apple*, 602 F.3d 909, 912 (8th Cir. 2010); *In re HTC Corp.*, 889 F.3d 1349, 1352 n.5 (Fed. Cir. 2018). This Circuit has likewise explained that transfer orders under Section 1404(a) "must be reviewed before trial." *Gulf Rsch. & Dev. Co. v. Leahy*, 193 F.2d 302, 305 (3d Cir. 1951), *judgment aff'd by equally divided court*, 344 U.S. 861 (1952).

There are multiple reasons why ordering a Section 1404(a) transfer after final judgment is inappropriate. For one, a Section 1404(a) decision requires assessing the convenience of parties and witnesses and judicial economy. *See, e.g.*, *Jumara*, 55 F.3d at 879 (discussing Section 1404(a) factors); Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3847 (4th ed.). But after final judgment, Section 1404(a)'s objective

of avoiding "unnecessary inconvenience and expense" will undermine transfer, as it necessarily requires duplicative relitigation. *See HTC Corp.*, 889 F.3d at 1352-53 & n.5 (citing *Gulf Rsch.*, 193 F.2d at 305). Transferring a case after final judgment requires parties to relitigate the merits in another forum, exactly "the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990). That is why a transfer-denial order "must be reviewed before trial, if at all." *Gulf Rsch.*, 193 F.2d at 305.

Appellants make no showing otherwise. To the contrary, they openly state that "the Rule 12 decision's merits" must be "addressed by the transferee court" in Texas anew if they prevail on transfer. Br.34. But such repetitious litigation is the opposite of judicial economy and party convenience. *See In re Amendt*, 169 F. App'x 93, 96 (3d Cir. 2006) (avoiding "[a]djudicating almost identical issues in separate fora" is "the most important factor" in § 1404(a) transfer analysis). While Appellants' brief exclusively makes arguments about why the district court should have granted this transfer, Appellants do not explain why transfer would still be the convenient and efficient choice now—after final judgment—and they cite no circuit decision finding a Section 1404(a) transfer appropriate post-judgment. Because this dispute has been litigated to final judgment in the District of New Jersey, relitigating it in Texas would not serve the "practical considerations" animating Section 1404(a).

For another, Appellants lack a "remedy for an improper failure to transfer the case by way of an appeal from an adverse final judgment because [they cannot] show [they] would have won the case had it been tried in" the proposed court. *Volkswagen*, 545 F.3d at 318-19. Appeals are generally subject to a harmless-error analysis under Federal Rule of Civil Procedure 61 and 28 U.S.C. § 2111. *See* Fed. R. Civ. P. 61 (no "error by the court or a party" may be grounds for "disturbing a judgment or order" unless it "affect[s] any party's substantial rights"); 28 U.S.C. § 2111 (similar). Thus, litigants who appeal a transfer after final judgment confront the "formidable task" of "show[ing] that a different result would have been reached had the suit been transferred," namely, that they "lost the case because of the handicap of the transfer." *SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 178-79 (2d Cir. 2000); *see also Nat'l Presto*, 347 F.3d at 663; *Apple*, 602 F.3d at 912; *HTC Corp.*, 889 F.3d at 1352 n.5. In other words, denial of a transfer is "probably … incorrectible on appeal (after final judgment)" because the challenger "could hardly show that a different result would have been reached had the suit been transferred." *Paramount Pictures v. Rodney*, 186 F.2d 111, 116 (3d Cir. 1950) (en banc).

Appellants cannot establish that transfer would produce a different result. For one, they do not even try to satisfy this standard. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("[A]ppellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."). Moreover, Appellants

42

cannot "demonstrate at least a high likelihood that the outcome of the litigation in the transferor court would have been different from the outcome in the transferee court." *Songbyrd*, 206 F.3d at 179. Such a showing could not rely on "speculative concerns about the likely predisposition of local judges and juries" *Id.* Instead, the harmful-error showing turns on "substantive differences in outcome-determinative law applicable to an issue." *Id.* Indeed, it is not clear that such a showing could ever be made as between two courts applying federal law, *see id.* (assessing differences across state venues on "an issue governed by state law"), and Appellants cite no case doing so. In any event, they identify no "outcome-determinative" splits on the merits that would justify a transfer after final judgment.

That Appellants now face this heightened burden is purely the result of their own litigation choices. Appellants acknowledged that mandamus was available to challenge the District of New Jersey orders denying transfer. *See* No. 19-4753, ECF 78-1 at 4 (Appellants arguing to Judge Shipp that absent reassignment, they "would now be petitioning the Third Circuit for a writ of mandamus against Chief Judge Wolfson's transfer refusals"); ECF 80 at 1, 3 (same). Appellants even informed the district court that on appellate review "after final judgment," they might not be able to demonstrate "the *harm* (as opposed to just the error) stemming from a wrongful transfer refusal." *Id.* at 3. The NJAG likewise confirmed mandamus was the proper method to obtain review of a court order denying transfer. *See* ECF 79 at 8-11. Yet

43

Appellants inexplicably did not seek mandamus after the District of New Jersey thrice denied transfer. *See* App.78 (district court noting "Plaintiffs had 84 days (12 weeks) to file a writ of mandamus with the Third Circuit" prior to reassignment, yet "chose not to seek such relief").[10] Whatever the reason for their choices, Appellants can now prevail only if they show relitigation in Texas promotes judicial economy and efficiency and that the transfer denial was harmful error. They cannot.

### B.    Appellants Cannot Justify Transfer In This Case.

Even assuming transfer after final judgment can be justified, the district court did not abuse its discretion in denying the transfer here—and transfer is particularly inappropriate now. Neither comity nor law-of-the-case principles support a different result, especially given developments post-dating the Fifth Circuit's opinions.

Initially, the district court did not abuse its considerable discretion in holding that this case belonged in the District of New Jersey. As a general matter, Appellants have not cited any *Ex Parte Young* challenge to the enforcement of a state statute that has been reviewed by a federal court sitting outside the official's State. *See, e.g.*, *Grewal*, 971 F.3d at 499 n.3 (Higginson, J., concurring) (finding that in all "cases against *government officials* who attempt to enforce a state law, so for no personal

---

[10] *See also, e.g.*, Oral Arg. at 4:03, *Defense Distributed v. Platkin*, No. 22-50669 (5th Cir. Nov. 8, 2022) ("[Judge Haynes] So you haven't appealed what the New Jersey judge did to the Third Circuit? [Counsel] Not yet, Your Honor. [Court] Isn't that the place to go?"), *available at* https://tinyurl.com/2s38uk75.

or commercial profit, the litigation has taken place in the governmental official's state"). After all, the States have a weighty interest in having the constitutionality of their public-safety laws evaluated by the jurisdictions in which they sit, especially because a "decision" finding a law "facially unconstitutional" would "prevent the" official from enforcing its terms to protect that State's residents. App.52-53. In *Ex Parte Young* cases, there is thus a particularly strong "local interest in deciding local controversies at home." *Jumara*, 55 F.3d at 879.

That is especially true when, as here, the constitutional challenge turns on the scope of the State's own law. Federal courts in a particular state—here, the District of New Jersey and this Court—have "familiarity" with their laws, *id.* at 879-80, and are thus "better qualified to construe [New Jersey] law, and to assess the character of [New Jersey's] probable enforcement of that law, than are judges sitting elsewhere," *Leroy v. Great W. United Corp.*, 443 U.S. 173, 186 (1979). Appellants' First Amendment and void-for-vagueness claims alike rely heavily on their view of both what state law means and how it will be enforced—including the meaning of "may be used" and the applicable mens rea for the offense. *See* Br.40-42, 51, 55-56. It thus matters that, to take one example, the district court properly understood that another New Jersey law already imposes a "knowing" mens rea as a default for such criminal statutes. *See supra* at 31; N.J. Stat. Ann. § 2C:2-2(c)(3). The court was therefore correct to predict that state statutory interpretation principles would "most

45

likely" bear upon this challenge, App.54, and its merits decision confirms that they

did, *see* App.100, 108-09. Moreover, if doubt remains as to the scope of New Jersey

law, only this Circuit has "authority to certify questions of New Jersey state law to

the Supreme Court of New Jersey." App.47; *see also* N.J. Ct. R. 2:12A.

The district court also did not abuse its discretion in concluding that litigation

in Texas would introduce fact-intensive and time-consuming questions not present

in New Jersey. As the district court explained, there remained an "issue of personal

jurisdiction in the transferee forum" that "is not settled": whether Texas courts have

jurisdiction over the NJAG. App.42. The Fifth Circuit had held that, at the Rule

12(b)(1) stage, Appellants' allegations sufficed for personal jurisdiction over the

NJAG for claims tied to his cease-and-desist letter. *Grewal*, 971 F.3d at 492 & n.6.

But the panel based its holding on *allegations* regarding the geographic scope of the

NJAG's planned civil enforcement, *id.*, and it "recognized that certain factual

disputes regarding personal jurisdiction" would have to be resolved as the case went

beyond the Rule 12(b)(1) stage, including regarding the intent animating the NJAG's

cease-and-desist letter and the reach of his proposed enforcement. App.41. And the

Texas court would also have had to resolve the question whether it has jurisdiction

over the NJAG with respect to enforcement of Subsection (*l*)(2)—a criminal law

with no connection to Texas, and one enacted months after the NJAG sent his cease-

and-desist letter. *See Grewal*, 971 F.3d at 491 (noting "totality of [the then-NJAG's] contacts with Texas involves a cease and desist order").

The need to resolve these threshold factual and legal issues in one forum but not the other appropriately bore on the district court's transfer analysis. *See Interlink Prod. Int'l v. Crowfoot*, No. 20-10566, 2020 WL 6707946, at *8-9 (D.N.J. Nov. 16, 2020) (agreeing that if "knotty" jurisdictional issues exist in one forum but not in the other, case is properly heard in forum that "obviates the need for the parties and the Court to expend limited resources on jurisdictional preliminaries"). Appellants believe that they can ultimately prevail on these jurisdictional questions, but never deny that litigating the case in Texas would require expenditure of judicial resources to resolve them—a resource concern not present in New Jersey, where jurisdiction is undisputed. *See* 971 F.3d at 497 n.1 (Higginson, J., concurring); App.41-42. Relitigating the merits in Texas is already inefficient; requiring such relitigation if it also introduces unresolved jurisdictional questions is especially inappropriate.[11]

---

[11] The district court also rightly found that the private interest factors are largely "in equipoise" and do not offset these compelling judicial-economy and public-interest concerns. App.44; *see* Br.32 (admitting that "none of the private factors play as substantial a role as the public factors do"). In particular, Appellants' preference for Texas counts for little when they fought to have identical claims adjudicated in New Jersey in their 2019 DNJ Action—which they only dismissed as a gambit to seek reconsideration of the first denial of retransfer. Nor is Texas the "center of gravity" of the dispute, because claims challenging "a state's cross-border enforcement" are deemed to arise "where the relevant state officials are located." App.43. The NJAG's participation in multistate litigation in the Western District of Washington is a non-

Moreover, the case against transfer has only strengthened since the district court ruled. As explained above, not only would transfer now produce extraordinary inefficiencies after the District of New Jersey already evaluated and dismissed the merits claims, *see supra* at 40-41, but Appellants' arguments supporting transfer to Texas have also evaporated. Their primary argument that the public factors support transfer under Section 1404(a) is that the litigation should be "[t]ransferr[ed] to the court handling the[ir] case against the State Department" to avoid "economic waste" and the risk of "conflicting judgments" between this lawsuit and that one. Br.31. But that premise no longer holds: the Texas district court is no longer "handling" that case because it dismissed it over a year ago, concluding that the equitable claims are moot and that the contract claims warranted transfer to the Court of Federal Claims. *Def. Distributed v. U.S. Dep't of State*, No. 18-637, 2023 WL 2544334, at *8 (W.D. Tex. Mar. 15, 2023). The Court of Federal Claims dismissed all remaining claims on March 13, 2024. Yet Appellants did not (1) appeal the dismissal of the equitable claims, (2) challenge transfer of the contract claims, or (3) appeal the dismissal of the contract claims. In other words, there is no longer a basis to argue that transfer

---

sequitur, *see* Br.33, as that case sought to enjoin proposed *federal* regulations, which says nothing about the appropriate venue for a challenge to New Jersey laws.

to Texas avoids conflicts or produces any efficiencies, because the State Department case is no longer pending there—or anywhere.[12]

For the same reasons, Appellants' positions regarding comity and law-of-the-case doctrines are entirely misplaced. *See* Br.25 (urging this Court to retransfer case without even considering Section 1404 factors in light of Fifth Circuit's request). When the Fifth Circuit issued its 2022 opinions requesting a retransfer, there were two proceedings: one in Texas with claims against the State Department, and one in New Jersey asserting claims against the NJAG. 30 F.4th at 429-31. That was core to the Fifth Circuit's conclusions, which rested on the view that "split[ting] this case into two parallel litigation tracks before two courts is beyond inefficient" and that it "enhances the risk of conflicting rulings." *Id.* at 431, 433. Indeed, a crucial reason the Fifth Circuit requested return of this case was for "reconsolidat[ion]" of these claims "back into the case still pending" against the State Department. *Id.* at 437. But there is no longer a pending Texas case. Nor is there any risk of conflict or inefficiency, as the State Department case was resolved on mootness (for equitable claims) and on venue (for contract claims), whereas the final judgment below was

---

[12] Nor is that the only example of subsequent events that vitiate the arguments for transfer. The district court below held that Appellants' state-law tortious interference claims "could require application of Texas law," App.53, a point that it held favored Texas. But that no longer bears on the analysis; the District of New Jersey has since dismissed these tort claims on sovereign immunity grounds without having to assess Texas law, App.126-28, and Appellants do not challenge that part of the decision.

issued on the merits. Transfer today would not combine "temporally and factually intertwined" litigations; it would instead produce "needless duplication of judicial effort" by requiring relitigation of an already-decided case. *Id.* at 429-30.

Appellants' comity and law-of-the-case arguments therefore collapse. Fresh consideration of the Section 1404 factors "is perfectly appropriate" when there are "changed circumstances, particularly when such developments" directly bear on the underlying venue considerations. Wright & Miller § 3846; *see also Koehring Co. v. Hyde Const. Co.*, 382 U.S. 362, 365 (1966) (noting the court can consider whether "changed conditions" merit a different decision on Section 1404(a) transfer); *In re Cragar Indus., Inc.*, 706 F.2d 503, 505 (5th Cir. 1983) (noting that if "the case then is better tried in the original forum for reasons which became known after the original transfer order," prior transfer order does not automatically control); *Alstom Caribe, Inc. v. George P. Reintjes Co.*, 484 F.3d 106, 116 n.5 (1st Cir. 2007) (finding that retransfer could be proper where "the intervening five years of litigation have sufficiently altered matters that comity would not be offended" by revisiting the issue). As this Court has explained, law-of-the-case rules do not apply when "new evidence has become available," *Council of Alternative Pol. Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999), and "comity" has "considerably less persuasive value" once the circumstances change, such as where "developments in the second-filed action have outpaced the initial suit," *CollegeSource, Inc. v. AcademyOne, Inc.*, 597

F. App'x 116, 122 (3d Cir. 2015). Because courts "analyze whether, under the facts as they exist at th[e] time, the matter should be transferred," the "doctrine of comity" ultimately falls away when "the primary factor driving" the previous transfer opinion "no longer exists." *Hicks v. T.L. Cannon Mgmt. Corp.*, No. 13-642, 2013 WL 4508440, at *3, 5 (N.D.N.Y. Aug. 23, 2013). So it is here.

To be clear, the State continues to believe that Appellants misunderstand how comity and law-of-the-case principles operate generally—indeed, the district court's decisions were correct when they issued, even before these changed circumstances. After all, the Fifth Circuit recognized that it was issuing its ruling after this case had been transferred to New Jersey—and after the New Jersey court had consolidated it with another pending action—and thus "lack[ed] power to order a return of the case to our circuit." *Bruck*, 30 F.4th at 423. The Fifth Circuit therefore admitted its request for retransfer would only be a "request," *id.* at 437, leaving the New Jersey court to conduct "its own assessment of whether litigation resolving New Jersey law should be decided in Texas," *id.* at 440 (Higginson, J., dissenting).

Nor can comity and law-of-the-case principles mandate compliance with such a nonbinding request. *See, e.g., Murphy v. FDIC*, 208 F.3d 959, 966 (11th Cir. 2000) (law-of-the-case principles did not bar transferee court from reconsidering merits holding by transferor court that was inconsistent with transferee's circuit precedent). Otherwise, the territorial limitations on circuits' jurisdiction would be meaningless,

51

and multiple jurisdictions could issue rulings that effectively bind a single litigation at once—one via jurisdictional authority, the others via comity. Moreover, nothing about the State's rule would produce "a vicious circle of litigation," Br.29; since the Fifth Circuit "issued a non-binding request for retransfer," the transferee's decision denying transfer ends the dispute, "allowing the litigation to proceed in this forum," App.56. Simply put, although the transferor court's decisions made while it retained jurisdiction over the case are entitled to law-of-the-case effect, *see Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982); *Chrysler Credit Corp. v. Country Chrysler*, 928 F.2d 1509, 1520 (10th Cir. 1991), a nonbinding request made after the lawsuit left its jurisdiction logically is not. That said, there is no need for this Court to wade into the dispute, because Appellants cannot satisfy the stringent test that governs transfer appeals after final judgment, *supra* at 40-44, and because the changed circumstances are overwhelming, *supra* at 48-49. On any of these bases, it would be inappropriate to transfer this dispute to Texas at this juncture.

## <u>CONCLUSION</u>

This Court should affirm the judgment of the district court.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:    /s/ Tim Sheehan
       Tim Sheehan
       Deputy Attorney General
       Office of the New Jersey Attorney General

Dated: May 24, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1) and L.A.R. 31.1(c), I certify that:

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 12,883 words, excluding sections exempted by Fed. R. App. P. 32(f), and thus does not exceed the 13,000-word limit.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

3.      This brief complies with L.A.R. 31.1(c) in that prior to being electronically mailed to the Court today, it was scanned by the following virus detection software and found to be free from computer viruses:

> Company: McAfee, Inc.
> Product:  McAfee Endpoint Security, version 10.7.0.2687

4.      This brief complies with L.A.R. 31.1(c) in that the text of the electronic brief is identical to the text of the paper copies.


Dated: May 24, 2024

                              /s/ Tim Sheehan
                              Tim Sheehan
                              Deputy Attorney General
                              Office of the New Jersey Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2024, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Tim Sheehan
Tim Sheehan
Deputy Attorney General
Office of the New Jersey Attorney General

**Fed. R. App. P. 28(f) Addendum Of Statutory Provisions**

| Jurisdiction & Year | Citation | Relevant Language |
|---|---|---|
| Massachusetts 1651 | Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890), *original available at* https://tinyurl.com/6228rssp | "no person (except for the defence of themselves and their Vessels at Sea) shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates, upon penalty of forfeiting all such Powder as shall be transporting or transported, or the value thereof." |
| Connecticut 1775 | 15 The Public Records of the Colony of Connecticut 191 (1890), *original available at* https://tinyurl.com/5bzaydmu | "no ... gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the license of the General Assembly or his Honor the Governor and Committee of Safety ..." |
| Providence, Rhode Island 1821 | The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City 37, at 135 (1835), *original available at* https://tinyurl.com/5n93w4p7 | "any person ... who shall keep, have, possess or transport any gunpowder within the town of Providence, contrary to the provisions of this act, or who shall sell any gunpowder therein, without having a license therefor, then in force, shall forfeit and pay a fine ..." |

| Massachusetts 1805 | Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to Feb. 28, 1807, at 259-60 (1807), *original available at* https://tinyurl.com/mrxuc3vd | appointing "provers of fire arms" whose "duty it shall be to prove all musket barrels and pistol barrels" and imposing fine for manufacturing, selling or delivering muskets or pistols "without having the barrels proved and stamped as aforesaid," to "prevent" firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." |
|---|---|---|
| Maine 1821 | Laws of the State of Maine 546 (1830), *original available at* https://tinyurl.com/2p8dke6 | appointing "provers of the barrels of all new, or unused firearms" to "prove and try the strength of" firearm barrels and imposing fine for selling "any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified according to the provisions of this Act" |
| Massachusetts 1809 | 2 General Laws of Massachusetts from the Adoption of the Constitution to Feb. 1822, at 199 (1823), *original available at* https://tinyurl.com/4w99snt3 | requiring that inspectors "inspect, examine and prove all gunpowder" manufactured in-state or stored in a public magazine and that each cask be marked "Massachusetts Inspected Proof" or "Condemned" |
| Pennsylvania 1795 | An Abridgement of the Laws of Pennsylvania from 1700 to Apr. 2, 1811, at 548 (1811), *original available at* https://tinyurl.com/5x4w2hak | appointing inspectors to inspect, prove and mark "all gunpowder" stored in public magazine and prohibiting "importing" or "sell[ing]" gunpowder that was not "inspected and marked as aforesaid" |