No. 23-3058

_____

In the United States Court of Appeals for the Third Circuit

_____

Defense Distributed; Second Amendment Foundation, Inc.,
*Plaintiffs—Appellants*,

v.

Attorney General of New Jersey,
*Defendant—Appellee.*

_____

Appeal from the United States
District Court for the District of New Jersey
Case No. 3-21-cv-9867

_____

Reply Brief of Appellants

_____

Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040

Josh Blackman
Josh Blackman LLC
1303 San Jacinto Street
Houston, Texas 77002
(202) 294-9003

Chad Flores
Flores Law PLLC
917 Franklin Street,
Suite 600
Houston, Texas 77002
(713) 364-6640

Counsel for Appellants

# Table of Contents

Table of Contents ...................................................................... i

Table of Authorities .................................................................. ii

Argument ................................................................................. 1

I.    Venue: The case should be returned to Texas................................ 1

      A.    The refusal to retransfer was harmful error. ....................... 1

      B.    Appellate relief is available now. ....................................... 2

II.   Merits: The complaint pleads valid claims. .................................. 5

      A.    The First Amendment claims are valid. .............................. 5

            1.    The computer code at issue is First Amendment speech...........5

            2.    The content-based censorship theory succeeds. ....................... 8

            3.    The content-neutral censorship theory succeeds.....................10

      B.    The Second Amendment claims are valid. ......................... 11

      C.    The Due Process Clause claims are valid. .......................... 18

            1.    Standing to assert the vagueness claim exists...........................18

            2.    The statute has no scienter requirement.................................19

            3.    An implied scienter requirement would not suffice. .............. 20

      D.    The civil censorship claims survive.................................. 22

Conclusion ............................................................................. 28

# Table of Authorities

## Cases

*Andrews v. State,*
    50 Tenn. 165 (1871) ..................................................................... 12

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) ..................................................................... 10

*Backpage.com, LLC v. Dart,*
    807 F.3d 229 (7th Cir. 2015) ........................................................ 24

*Boyce Motor Lines v. United States,*
    342 U.S. 337 (1952) ..................................................................... 19

*Colautti v. Franklin,*
    439 U.S. 379 (1979) ..................................................................... 19

*City of Austin v. Reagan National Advertising of Austin, LLC,*
    142 S. Ct. 1464 (2022) ................................................................... 8

*Commodity Futures Trading Comm'n v. Vartuli,*
    228 F.3d 94 (2d Cir. 2000) ............................................................. 6

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................ 11, 12

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ........................................................ 12

*Green v. United States Dep't of Justice,*
    54 F.4th 738 (D.C. Cir. 2022) ........................................................ 9

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ........................................................................ 18

*In re: Howmedica Osteonics Corp,*
    867 F.3d 390 (3d Cir. 2017) ............................................................4

*Ill. Ass'n of Firearms Retailers v. City of Chicago,*
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ...........................................12

*Joseph E. Seagram & Sons, Inc. v. Hostetter,*
    384 U.S. 35 (1966) ..................................................................20, 21

*Jumara v. State Farm Ins. Co.,*
    55 F.3d 873 (3d Cir. 1995)...........................................................4

*Luis v. United States,*
    578 U.S. 5 (2016) .........................................................................12

*McGowan v. Maryland,*
    366 U.S. 420 (1961) ................................................................20, 21

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) ......................................................12

*New York State Rifle & Pistol Association, v. Bruen,*
    142 S.Ct. 2111 (2022). ...........................................................11, 13

*NIFLA v. Becerra,*
    138 S. Ct. 2361 (2018)...................................................................8

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972) ................................................................20, 21

*Reed v. Town of Gilbert, Arizona,*
    576 U.S. 155 (2015).......................................................................8

*Screws v. United States,*
    325 U.S. 91 (1945) .......................................................................19

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ............................................................................9

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ....................................................................... 13

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ................................................................ 20, 21, 22, 23

*Winters v. New York*,
    333 U.S. 507 (1948) ........................................................................... 20, 21

*United States v. National Dairy Products Corp.*,
    372 U.S. 29 (1963) ............................................................................. 20, 21

*United States v. Rahimi*,
    No. 22-915, 2024 WL 3074728, at *10 (U.S. June 21, 2024) ....................... 17

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ............................................................................6

**Statutes**

28 U.S.C.A. § 2111 ......................................................................................3

**Rules**

Fed. R. Civ. P. 8 ..........................................................................................5

Fed. R. Civ. P. 61 .........................................................................................3

**Other Authorities**

Charles Winthrop Sawyer,
    Firearms in American History 145 (1910) ......................................... 13

David A. Hounshell,
    From the American System to Mass Production, 1800-1932 (1984). ............... 16

James B. Whisker,
    The Gunsmith's Trade 5 (1992) .......................................................... 13

John G.W. Dillin,
    The Kentucky Rifle 96 (1975) ............................................................ 15

Joseph G. S. Greenlee,
    The American Tradition of Self-Made Arms, 54 ST. MARY'S L.J.
    (forthcoming 2022) .................................................................... *passim*

Laws of Va., Feb. 1676-77, Va. Stat. at Large, 2 Hening 403 (1823) ..........................

Lindsay Schakenbach Regele, Industrial Manifest Destiny: American
    Firearms Manufacturing and Antebellum Expansion, 92 Bus. Hist.
    Rev. 57, 64 (2018) ............................................................................ 15

7 The Writings of Thomas Jefferson (Paul Ford ed., 1904) ..................................... 14

M.L. Brown,
    Firearms in Colonial America: The Impact on History and
    Technology 1492-1792 127 (1980) ....................................................... 14

Sohaib Jabran et al., Functional Reverse Engineering of Strategic and
    Non-Strategic Machine Tools 42 (Wasim Ahmed Khan et. al. eds.,
    1st ed. 2021). .................................................................................. 16

# Argument

## I.  Venue: The case should be returned to Texas.

### A.  The refusal to retransfer was harmful error.

First and foremost, the Court should hold that the district court's repeated denial of the Fifth Circuit's request to retransfer this action to the Western District of Texas was reversible error.  In particular, it was a clear abuse of abuse of discretion because (1) *Bruck* should have been followed as a matter of comity, because (2) *Bruck* should have been followed as law of the case, and because (3) *Bruck* was rightly decided.  *See* Br. of Appellants at 24-34.

The AG's most fundamental error concerns timing.  The Court's task, as always, is one of *review*—not first view.  It is to review the decision of the district court *on the record that was before the district court at that time*.  And as the appellants' brief shows in full detail, the district court decisions at issue were—at the time the district court made them, on the record that then existed—clear abuses of discretion.  For this reason, the AG's various arguments about later case developments, *see* AG Br. at 48-49, are inapposite.

The AG's new-developments argument also has no answer to a key point made in full already: "Part 'B' of *Bruck*'s holding deems transfer wrong because of the errant initial severance decision, and—critically—Part "C" of Bruck's holding

deems transfer wrong *even if severance was correct*: 'even setting aside severance as impermissible, any transfer of this case, in whole or in part, constitutes an abuse of the district court's discretion.'" Br. of Appellants at 24. Because of this, the AG is wrong to say that further developments regarding claims against the State Department change the bottom line.

If something about the procedural posture has changed since the district court rendered its decision, the AG is free to try and argue that on remand in Texas. The "fresh consideration" it wants, AG Br. at 50, can occur *if the AG presents a request for that in the first instance below*. That kind of case reinvention cannot occur for the first time on appeal, when the record is closed to the kind of factual development it would necessarily have to entail. In this posture, the only question validly presented is whether the district court committed reversible error on the record before it. And for the three reasons shown in full detail, it clearly did.

**B.      Appellate relief is available now.**

Though not Plaintiffs' primary submission, the Court if necessary should hold that appellate relief from the district court's transfer decision is available because the Rule 12 dismissal was wrong. In that scenario—if the Court determines that any part of the case should have survived the Rule 12 challenge—all of the AG's arguments about relief via mandamus versus an appeal fall away. The transfer inquiry would

then look exactly like it does in the interlocutory mandamus posture that all agree would be appropriate for relief. *See* AG Br. at 14-15. In other words, if the district court's Rule 12 dismissal was wrong, this case will go back down for vast amounts of further litigation—all of which will implicate the Section 1404 issues like "convenience to the parties and judicial economy" that the AG admits would warrant appellate relief now because of future litigation's prospects. AG Br. at 15.

Though the Court *could* resolve the appeal that way, it need not and in Plaintiffs'' primary view should not do so. Instead, the Court should hold that appellate relief from this transfer decision is available immediately, *without needing to adjudicate the appellate issues regarding the Rule 12 motion*.

In this respect, the AG misreads both 28 U.S.C. § 2111 and Federal Rule of Civil Procedure 61. AG Br. at 15. Those authorities do *not* condition appellate relief on a showing that, but for the erroneous transfer decision, the case would receive a "different result on the merits." *Id.* The statute cares only about whether the error "affect[ed] substantial rights of the parties," 28 U.S.C.A. § 2111, and the Rule likewise cares only about whether the error "affect[ed] any party's substantial rights." Fed. R. Civ. P. 61. Though a "different result on the merits" is one way of showing that an error affected "substantial rights," it is not the only way.

*In re: Howmedica Osteonics Corp*, 867 F.3d 390 (3d Cir. 2017) (cited by the AG at 14-15), does not hold otherwise. It says only that mandamus can *sometimes* supply the *most* sufficient relief—not that it *always* supplies the *only* possible relief.

*If* Plaintiffs' aim were to remedy 100% of the damage done by an erroneous transfer decision, mandamus might be the only "adequate" remedy. But because Plaintiffs here seek to vindicate slightly less than 100% of the damage done by this retransfer refusal, both immediate mandamus *or a later appeal* can be "adequate." For while only an immediate mandamus can adequately remedy the injury of wasting time and resources on an adjudication in the wrong venue, a later appeal can adequately vindicate the core right that Plaintiffs press for here—their right to have the correct venue perform the controlling adjudication.

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995) (cited by the AG), disproves the AG's theory of appellate power by holding that analogous appellants are entitled to the kind of appellate relief that Plaintiffs now seek. As is true here, *Jumara*'s failure-to-transfer challenge arose in an appeal from a final judgment—not an interlocutory mandamus. *Id.* at 886 ("the district court's order is final and appealable"). As is true here, *Jumara*'s lower court erred by failing to transfer pursuant to Section 1404(a). *Id.* at 875, 883. *Jumara* rightly resolved that appeal by doing what the Court here should do: It vacated the district court's refusal to transfer

via Section 1404(a) and "direct the district court to order the transfer." *Id.* at 883. The AG's position cannot be accepted because it contradicts *Jumara*, which was rightly decided and constitutes binding panel precedent regardless.

## II.  Merits: The complaint pleads valid claims.

### A.  The First Amendment claims are valid.

If for any reason the Court reaches the Rule 12 decision's merits, the Court should hold that the motion should have been denied because the complaint pleads valid First Amendment claims.  *See* Br. of Appellants at 35-52.  Each First Amendment claim's analysis should begin with the premise that Plaintiffs' distribution of the digital firearms information at issue qualifies as speech for all constitutional purposes, *id.* at 35-40—a keystone premise that, once established, defeats virtually every point the AG makes both under that label and otherwise.

### 1.  The computer code at issue is First Amendment speech.

The district court's most crucial error below was rudimentary.  Instead of applying Rule 8's principles of *pleading* sufficiency to see whether the complaint contained a "short and plain statement" of the First Amendment claims, Fed. R. Civ. P. 8, the court applied rules of *evidentiary* sufficiency to fault the complaint for not expressly marshalling every jot and tittle of the First Amendment claims' proof.  The

district court's use of an obviously incorrect legal standard clearly warrants reversal. *See* Br. of Appellants at 35-52. In doubling down, the AG makes two key mistakes.

First, the AG's position about pleading requirements is unprecedented. No court anywhere has ever held that this kind of First Amendment claim's *complaint* has to supply granular details about a computer file's "speech" status.

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) (cited by the AG at 12), says nothing about how to *plead* First Amendment claims. *Corley* is about how to *prove* them. It arose from a final judgment entered after a trial—not a Rule 12 motion to dismiss. *Id.* at 436. So it concerned the sufficiency of *evidence* proving First Amendment "speech" status—not the sufficiency of pleadings asserting it. *Id.* Of course that evidentiary inquiry involved a "fact-intensive analysis." *Id.* at 449. But fact-intensive work is the stuff of summary judgments and trials.[1] Rule 8 requires only a "short and plain" claim statement, which Plaintiffs' complaint gave plenty of.

Second, the AG's position ignores complaint paragraphs 24 through 55. App.257-264. In those 29 paragraphs, the complaint goes chapter and verse through every relevant facet of the "speech" status inquiry to show that all of the computer files at issue here warrant First Amendment protection. *Id.* Pages 19 through 20 of

---

[1] The same is true of *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) (cited by the AG at 18). It too says nothing about how to *plead* First Amendment claims because it too was an appeal from a trial concerning *evidentiary* sufficiency. *Id.* at 98.

the AG's brief are where he gives the supposedly-clinching complaint analysis.  Yet every point made there obviously fails.

This central AG argument is obviously wrong: "while the TAC includes a list of 'specific file formats,' Br.37, (e.g., ".stl" or ".igs" files, App.261), it alleges nothing regarding how they operate."  AG Br. at 20.  But as the first brief already showed, Br. of Appellants at 37-40, the complaint does exactly that in plenty of detail.

The files in question operate by "convey[ing] knowledge without advocating action."  App.265, ¶24.  They operate as "models" that "serve a wide variety of important purposes apart from object fabrication."  App.265, ¶26.  They operate to allow "the computerized study of object properties, rendition of object images for product visualization, and parametric modeling of object families."  *Id.*  They operate to let users "construct and manipulate the digital two- and three-dimensional models of physical objects that serve design purposes apart from production."  App.257, ¶-27.  When these files operate, they "do not produce anything automatically." App.257, ¶ 28.  They "are not functional software."  *Id.*  They "do not self-execute." *Id.*  They are "mere information stores."  *Id.*  With full detail throughout, the complaint goes on to provide all of the detail that the AG demands.

This keystone premise has major trickle down effects in the appeal. *If* the AG is right about the files at issue *not* constituting First Amendment speech, then of course his task of winning later issues (e.g., is the law "content-based"?) is easier. But because the AG's threshold position is wrong, all of the later arguments that rely on that erroneous keystone fall with ease.

### 2.    The content-based censorship theory succeeds.

Plaintiffs' primary First Amendment claim validly asserts that the AG's civil and criminal censorship violates the constitutional doctrine of content-based speech restrictions. The controlling cases are *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155 (2015), and *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), both of which show that the AG's censorship triggers strict scrutiny but cannot survive it. *See* Br. of Appellants at 42-45.

*City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (cited by the AG at 12), does not control. Section (*l*)(2) does not, as was the case in *City of Austin*, "require[] an examination of speech only in service of drawing neutral, location-based lines." *Id*. at 1271 (emphasis added). Section (*l*)(2) requires an examination of speech in service of drawing *content-based* lines—lines defining the criminalized "message" and "ideas" and "subject matter." *City of Austin* rightly acknowledged that strict scrutiny applies where, as in *Reed* and as here,

the speech restriction ends up "singl[ing] out specific subject matter for differential treatment." *Id.* (quoting *Reed*, 576 U.S. at 169).

Decisions about the Digital Millennium Copyright Act like *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001), and *Green v. United States Dep't of Justice*, 54 F.4th 738 (D.C. Cir. 2022) (cited by the AG at 22-23), do not control. They all turned on the fact that the DMCA regulated code *only* in its functional capacity. But as the Plaintiffs' have already shown in this claim's threshold point about "speech" status, the computer files at issue here do *not* exist are *not* being regulated in a merely functional capacity.

If the AG's speech crime covered only computer files that "will be" used to manufacture firearms, this would be a totally different case. But the statue doesn't say "will be." The statute applies to any computer file that "may be" used in that way. So if someone shares these computer files just for viewing purposes—having no intention to ever make a firearm, and never going on to make a firearm—the AG's speech crime makes them a criminal regardless. That statutory distinction is crucial and cannot be fixed after the fact by clever lawyering. *See* Br. of Appellants at 42.

9

### 3.   The content-neutral censorship theory succeeds.

Plaintiffs' alternative First Amendment claim validly asserts that the AG's censorship violates the doctrine of content-neutral speech restrictions because it triggers but cannot survive intermediate scrutiny.  *See* Br. of Appellants at 45-48.  On the question of whether the asserted state interest is legitimate, the AG's position still runs headlong into *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it.").  *Id.* at 45-46.  On the issue of whether the state interest is actually advanced, the AG has not answer for the key procedural point: Regardless of whether he might some day *prove* the advancement of his aims, the complaint states a valid claims because it pleads that "the AG's speech crime does not in fact advance his asserted interests."  *Id.* at 47 (citing App.296-298).  Finally, the simplest ground for reversal here is that "very plausible, much less restrictive alternatives exist."  Br. of Appellants at 48.  In particular, "New Jersey could achieve its ends by banning only the harmful conduct at issue—not speech that is merely and only sometimes remotely associated with that conduct."  *Id.*  The AG does not answer this.

### B.    The Second Amendment claims are valid.

If for any reason the Court reaches the Rule 12 decision's merits, the Court should also hold that the motion should have been denied because the complaint pleads valid Second Amendment claims. *See* Br. of Appellants at 52-55.   The AG's efforts to avoid any Second Amendment limitations here fail for several reasons.

To make the position clear, Plaintiffs' point is *not* that the speech and activities at issue lack a Second Amendment textual hook *and are protected anyhow*.   The point is that the requisite textual hook exists because the Second Amendment phrase "keep and bear Arms" necessarily entails both acquiring and/or making personal firearms and speaking about those topics.   Just as a law criminalizing personal printing presses would violate the First Amendment, so too does the criminalization of personal gunsmithing violate the Second.   And of course, what the AG does is even worse, since his edicts are the equivalent of making it a crime *to talk about* printing presses. No matter how they are framed, the AG's efforts cannot survive the historical inquiry required by *New York State Rifle & Pistol Association, v. Bruen*, 142 S.Ct. 2111 (2022).

The Second Amendment's term "Arms" covers "all instruments that constitute bearable arms," including "those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).   It therefore

does not matter that the particular kind of manufacturing method at issue now was not an existence then.

It is also clear that the personal firearm manufacturing activities at issue are covered by the Second Amendment phrase "keep and bear," which necessarily entails an individual right to make or acquire Arms. *See Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair"); *see also Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) ("protected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ( "the right to keep and bear arms . . . must also include the right to *acquire* a firearm . . ." (emphasis in original)).

12

Thus, because the AG's proscriptions implicate the Second Amendment's protections, the AG has the burden of demonstrating the requisite historical tradition supporting these laws; it is not the Plaintiffs' burden to disprove that historical tradition. *See Bruen*, 142 S.Ct. 2111. Even so, authorities already make it clear that the nation's historical legal traditions have never witnessed anything like them. The pertinent history contains no "relevantly similar" laws because there is no

Self-manufactured firearms in America have a long and, until just recently, unregulated history. *See* Joseph G.S. Greenlee, The American Tradition of Self-Made Arms, 54 St. Mary's L.J. 35, 66 (2023). "Private gunmaking is steeped in history and tradition, dating back to long before the Founding." *VanDerStok v. Garland*, 86 F.4th 179, 197 (5th Cir. 2023) (Oldham, J., concurring), *cert. granted*, 144 S. Ct. 1390 (2024). "Millions of law-abiding Americans work on gun frames and receivers every year." *Id.*

This is no new trend. It is a well-established tradition. While "[i]n the large gunsmith shops of the cities it is probable that many many minds were given to the making of a gun . . . in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." Charles Winthrop Sawyer, Firearms in American History 145 (1910); *see also* James B. Whisker, The Gunsmith's Trade 5 (1992).

During the Revolutionary War, when the British attempted to prevent the Americans from acquiring firearms and ammunition, Americans were forced to manufacture their own firearms and gunpowder to survive. *See* Greenlee, *supra*, at 12–15 (citing M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 127 (1980)).  Due to the circumstances of the war, "[n]early every able bodied male between 16 and 60 . . . [had] to provide his own arms" and some men "built their arms themselves." *Id.* at 25.  "When the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void." *Id.* at 16.  Indeed, the colonies themselves solicited firearm manufacturers, including those engaged in private manufacture and others outside of the firearms industry, to increase domestic production.  *Id.* at 18–23.

Thomas Jefferson understood the right very well.  Describing the landscape of firearms in early America in 1793, he wrote that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."  Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, *in* 7 The Writings of Thomas Jefferson 325–26 (Paul Ford ed., 1904).

After the Revolutionary War, "gunsmithing was a universal need in early America" and "many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." Greenlee, *supra*, at 29. This tradition extended to pioneers, mountain men, and explorers whose need to make and repair firearms was a survival necessity. *Id.* at 32.

The AG's supposedly modern notion of citizens making their own firearms in cooperation with others is not modern at all. Although some early riflemakers forged their firearm parts from scratch, "there were gunsmiths who did not forge out their barrel blanks, but purchased them in bulk from some factory like that of Eliphalet Remington." John G.W. Dillin, The Kentucky Rifle 96 (1975). These riflemakers then fitted their barrels "to hand-made stocks with American factory or English locks." *Id.*

3D printers and CNC milling machines in particular are the modern-day manifestation of firearm milling technology—technology that has never before been regulated in American history. Personal firearm technology dates back to the early nineteenth century. *See, e.g.*, Lindsay Schakenbach Regele, Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion, 92 Bus. Hist. Rev. 57, 64 (2018) (explaining that "Federal support of small arms

manufacturing has been well documented," and that federal funds supported the development of the first firearm milling machine in the 1810s).

The earliest known milling machine originated at a factory operated by Simeon North, who had a contract with the War Department to manufacture firearms. David A. Hounshell, From the American System to Mass Production, 1800-1932 28–29 (1984). Beginning in 1820, John H. Hall, a cooper, cabinetmaker, and boatbuilder, improved upon North's milling machine, "develop[ing] three classes of milling machines, which he used to finish [firearm] parts." *Id.* at 39–41. Building on these innovations, John T. Parsons invented the first numerical control (NC) milling machine in the 1940s. Sohaib Jabran et al., Functional Reverse Engineering of Strategic and Non-Strategic Machine Tools 42 (Wasim Ahmed Khan et. al. eds., 1st ed. 2021).

During all of these foundational time periods, anyone with the requisite skill had an essentially unfettered right to build their own firearms; "[o]ne need not have had a wealthy patron or sponsor, or work for king and nobility, to make guns." Greenlee, *supra*, at 41 (internal citation omitted); Whisker, *supra*, at 6 ("Even those apprentices who had never completed an apprenticeship might enter the trade. No guild, union or government agency attempted to regulate the gun making business….He need not take any examination. He need not present one of his guns

to any examining board."); *id.* at 90 ("Gunsmiths considered it to be their right to make guns without regulation or interference."). Thus, there is no American historical tradition of regulating the self-manufacture of firearms in any significant respect—let alone a historical tradition of proscribing it with the censorship tools now deployed by the AG

*United States v. Rahimi*, No. 22-915, 2024 WL 3074728, at *10 (U.S. June 21, 2024), is not to the contrary. Its logic upholds only new laws that are "relevantly similar" to "founding era regimes in both why and how it burdens the Second Amendment right." *Id.* at *9. But on the "why" issue, there is no relevantly similar historical tradition of regulating the self-manufacture of firearms. And more importantly, on the "how" issue, there is definitely no relevantly similar historical tradition of doing so by way of speech suppression. Indeed, the relevant tradition is precisely to the contrary. *See* Greenlee, *supra* at 22 & nn. 117-120. Paul Revere freely published gunpowder recipes in colonial newspapers, and "'[p]rinting presses throughout the colonies worked overtime, making and distributing broadsides and pamphlets with explicit instructions for manufacturing gunpowder and locating and preparing the ingredients." *Id.* The AG never grapples with this, the truly relevant tradition in question.

### C.    The Due Process Clause claims are valid.

If for any reason the Court reaches the Rule 12 decision's merits, the Court should also hold that the motion should have been denied because the complaint pleads valid Due Process Clause claims.  *See* Br. of Appellants at 55-57.

### 1.    Standing to assert the vagueness claim exists.

The no-standing rule of *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (cited by the AG at 14), does not apply here for two reasons.  First *HLF*'s no-standing rule does not apply because the challenged statute does *not* clearly proscribe *all* of Plaintiffs' speech.  *HLF*'s rule rejects standing for a vagueness claim only if the challenged statute "clearly proscribes" *all* of a plaintiff's speech; in such a case, standing does not exist because the plaintiff must necessarily assert "hypothetical circumstances" concerning the "speech of others."  *Id.* at 19-20.  Here by contrast, though the statute might "clearly proscribe" *some* of Plaintiffs' speech, it does *not* "clearly proscribe" all of Plaintiffs' speech.  The statute is dangerously ambiguous as to plenty of Plaintiffs' speech.

Second, *HLF*'s no-standing rule does not apply because the Plaintiffs here assert a category of vagueness challenge that *HLF* did not confront.  The losing *HLF* plaintiffs did "not argue that the material-support statute grants too much enforcement discretion to the Government."  *Id.*  Plaintiffs here *do* assert that.

## 2.    The statute has no scienter requirement.

As to scienter, the AG wrongly says that Section (*l*)(2) "is limited to 'knowing' distribution, which 'mitigate[s]' any purported vagueness."   AG Br. at 14.   The statute does *not* contain that kind of scienter requirement, and even if it did, such a scienter requirement would not supply the supposed save.

Scienter requirements do *not* exist in the statute at issue here, New Jersey Code of Criminal Justice Section 2C:39-9(*l*)(2).   The contrast revealed by neighboring provisions establishes this.   They require scienter by using words like "knowingly" and "intend."   The crime about defacing firearms occurs only if done "knowingly," N.J.S.A. § 2C:39-9(e), the crime about transporting firearms occurs only if done "knowingly," N.J.S.A. § 2C:39-9(i), and the crime about making weapons occurs only if the person "intended to produce" a proscribed item, N.J.S.A. § 2C:39-9(d).[2]   Section 2C:39-9(*l*)(2) expresses no such scienter element.   The Section 2C:39-9(*l*)(2) speech crime makes it illegal to "distribute" speech "by any means"—knowingly or not; and it criminalizes speech because of what the speech

---

[2] To matter here, the scienter requirement has be stated in the provision itself. *See Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("Because of the absence of a scienter requirement *in the provision* . . . ." (emphasis added)), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), *Boyce Motor Lines v. United States*, 342 U.S. 337, 339 n.3 (1952) (the statute itself imposed the scienter requirement); *Screws v. United States*, 325 U.S. 91 (1945) (same).

"may" accomplish—not because of what the speaker "intended" it to accomplish. N.J.S.A. § 2C:39-9(*l*)(2).

### 3.  An implied scienter requirement would not suffice.

Furthermore, even if Section 2C:39-9(*l*)(2) imposed a scienter requirement like "knowingly" or "intended," the vagueness violation would remain nonetheless. The most that *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) (cited by the AG at 14), says is that express scienter requirements "*may* mitigate a law's vagueness," *id.* at 499 (emphasis added)—not that they always do. *See id.* at 498 ("These standards should not, of course, be mechanically applied."). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Id.*  The "nature of this enactment" shows that whatever scienter the AG might try to imply will not save its constitutionality.

On the contrary, nearly every circumstantial factor deemed relevant by *Village of Hoffman Estates* makes the Section 2C:39-9(*l*)(2) vagueness violation *more* severe, not less.  *See Village of Hoffman Estates*, 455 U.S. at 498-99 nn.10-14 (applying *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972), *United States v. National Dairy Products Corp.*, 372 U.S. 29 (1963), *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35 (1966), *McGowan v. Maryland*, 366 U.S. 420 (1961)), *Winters v. New York*,

333 U.S. 507 (1948)), and *Boyce Motor Lines v. United States*, 342 U.S. 337 (1952)).  To wit,

- Section 2C:39-9(*l*)(2)'s crime is *not* limited to "business activities," which matters under *Papachristou*, 405 U.S. at 162 (applied by *Village of Hoffman Estates*, 455 U.S. at 498 n.10), and *National Dairy Products Corp.*, 372 U.S., (applied by *Village of Hoffman Estates*, 455 U.S. at 498 n.11).

- This law offers no administrative clarification process, which matters under *Hostetter*, 384 U.S. at 49 (applied by *Village of Hoffman Estates*, 455 U.S. at 498 n.12), and *McGowan*, 366 U.S. at 428 (applied by *Village of Hoffman Estates*, 455 U.S. at 498 n.12).

- The Section 2C:39-9(*l*)(2) proscription imposes criminal penalties (not just civil), which matters under *Winters*, 333 U.S. at 515 (applied by *Village of Hoffman Estates*, 455 U.S. at 499 n.13).

- Section 2C:39-9(*l*)(2) stems from no "long history of regulation," which matters under *Boyce Motor Lines*, 342 U.S. at 341 (applied by *Village of Hoffman Estates*, 455 U.S. at 499 n.14).

"Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates*, 455 U.S. at 499.  Where, as here, "the

law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* With or without an express scienter requirement, the Section 2C:39-9(*l*)(2) speech crime fails the Due Process Clause's vagueness test.

### D. The civil censorship claims survive.

If for any reason the Court reaches the Rule 12 decision's merits, the Court should finally hold that Plaintiffs' claims regarding *civil* censorship survive because they are meritorious and were essentially unchallenged below. *See* Br. of Appellants at 57-58. The AG's brief says little about these claims. Relegated to footnote 8 on page 31 is the only supposed answer: "Appellants maintain a separate analysis is required for their claims against civil and criminal enforcement mechanisms, but they 'ma[de] no effort to separate their nine Counts in this manner.'" AG Br. at 31 n.8. That little response fails, yielding the cleanest basis for reversal of all.

Both below and in this Court, Plaintiffs argued that the AG's civil censorship constitutes an adequate and independent basis for upholding every claim at issue in this case. Indeed, the action started out as being *only* about the AG's July 2018 cease-and-desist letter because the speech crime had not yet been enacted. The speech crime's unprecedented severity and lack of tailoring make it an easy target for relief. But the case as to the AG's civil censorship is even clearer, especially now that the AG has once again refused to meaningfully grapple with it.

In the pleadings below, Plaintiffs made perfectly clear that the case regarding the AG's civil censorship exists independently of the wrongdoing that stems from the speech crime. Complaint Part V.H. pleads that "The NJAG Censors Defense Distributed" in two distinct ways, expressly separating the civil censorship from the criminal censorship. App.284-291, ¶¶ 120-149. Each gets it own heading with separate details fleshing out all of the operative facts. The civil censorship is pleaded distinctly from the criminal censorship in 120-128 and 142-149. App. 284-291. Lest there be any doubt, complaint paragraphs 142 through 147 establish in no uncertain terms that the civil censorship is actionable independent of the criminal censorship. Paragraphs 142 through 145 set forth the three distinct categories of speech that the AG is censoring, and paragraph 147 states that the AG's civil censorship in particular "covers all three categories of conduct":

> **142. Hence, the NJAG is illegally censoring three distinct categories of Defense Distributed and SAF's speech. If not for the NJAG's unconstitutional actions, Defense Distributed and SAF would be freely exercising their First Amendment rights. These losses amount to irreparable harm in every instance.**
>
> 143. Category one is the free and open publication of digital firearms information on the internet to persons in New Jersey. This right has been exercised in the past by Defense Distributed. If not for the NJAG's ongoing censorship, this right would be exercised in the future by Defense Distributed and SAF and its members.
>
> 144. Category two is the free and open publication of digital firearms information via the mail to persons in New Jersey. This right

has been exercised in the past by Defense Distributed. If not for the NJAG's ongoing censorship, this right would be exercised in the future by Defense Distributed.

145. Category three is the free and open offering and advertisement of digital firearms information to persons in New Jersey. This right has been exercised in the past by Defense Distributed. If not for the NJAG's ongoing censorship, this right would be exercised in the future by Defense Distributed and SAF and its members.

146. The NJAG's criminal censorship covers all three categories of conduct. Internet publications are covered because Section 3(l)(2) makes it a crime to distribute the banned "digital instructions" "by any means, including the Internet." N.J. Stat 2C:39-9(l)(2). Mailed publications are covered because the speech crime also defines "distribute" to mean "mail." And offers and advertisements are covered because Section 3(l)(2) defines "distribute" to mean "offer" and "advertise." Id.

**147. The NJAG's civil censorship covers all three categories of conduct as well. His cease-and-desist order said to "halt publication" of any and all so-called "printable gun computer files." The civil lawsuits sought prior restraints against all manner of "distributing" "printable- gun computer files." And the threats against internet service providers targeted all "computer files" with digital firearms information.**

App.290-291 (emphasis added). The complaint then incorporated these allegations into every "Count" that followed. *See, e.g.*, ROA.297, ¶ 175. That clearly suffices.

Legally, Plaintiffs' claims regarding the AG's civil censorship are just as sound as the others because of *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015). The first brief fully explained why *Backpage.com* establishes this, Br. of Appallants at 58, and the AG does not even mention *Backpage*.

Factually, Plaintiffs' claims regarding the AG's civil censorship are even stronger than the others because of the civil censorship's broader scope. As to the speech crime, the AG repeatedly hangs his hat on arguments about the statute supposedly covering only "functional" computer files. That point is wrong for reasons already explained. But more importantly here, no such argument for a limited scope of prohibitions can be made about the AG's civil censorship.

Apart from the speech crime, the AG has for all of these years been censoring the Plaintiffs with civil legal proscriptions via the July 2018 cease-and-desist letter, *which is in not even arguably limited to "functional" computer code*. App.334-335. When the AG chose to reach out and enact a policy of affirmatively and specifically censoring Defense Distributed in particular, the AG did *not* limit that censorship command to "functional" computer files. Instead, the AG's 2018 cease-and-desist letter demands that Defense Distributed stop publishing any and all "printable-gun computer files." ROA.334-335. That is no term of art. The AG just made it up to cover as much of Defense Distributed's then-published speech as possible.

Critically, Plaintiffs' complaint gives maximum detail about the actual "printable-gun computer files" that Defense Distributed was freely publishing until the AG started the civil censorship. App.258-261. These computer files—the files that the AG censored with the July 2018 cease-and-desist letter—include the files

described in the complaint as "Defense Distributed's 2012–2013 Publications" and the files described in the complaint as "Defense Distributed's July 2018 Publications." *Id.* Nothing about this course of wrongdoing is hypothetical, conjectural, or unknown. It is completely concrete.

These well-pleaded details show that the AG's civil censorship of everything that Defense Distributed was publishing as of July 2018 goes far beyond the supposed "functional" file limitation. With the civil legal tools that *Backpage.com* rightly deems fully unconstitutional, the AG censored mere "diagrams of firearm components" and "renderings." App.260, 261. This civil censorship even reached beyond that, covering "'read me' plain text files about firearm assembly methods." *Id.* Amazingly, the AG's civil censorship even extended to "'read me' plain text files about the National Firearms Act and the Undetectable Firearms Act." *Id.*

Standing is another key issue as to which the civil/criminal distinction is critical. The AG's no-standing arguments are all unique to the speech crime; none apply to the civil censorship efforts because standing to challenge that ongoing harm has been unquestionable ever since 2018.

The district court had no excuse for ignoring the civil aspect of the AG's censorship. Plaintiffs pressed their arguments about the civil censorship fully in their response to the motion to dismiss, Doc. 72, which are as compelling now as they

were then.    Thus, regardless of what happens to the claims regarding the speech crime, Plaintiffs' claims regarding the AG's civil censorship should not have been dismissed for failure to state a claim.

## Conclusion

The Court should enter a judgment reversing the district court's refusal to retransfer, vacating the district court's subsequent Rule 12 decision without regard to the merits, and rendering a judgment transferring this action to the United States District Court for the Western District of Texas for further proceedings.

Alternatively, if the Court reaches the merits of the Rule 12(b)(6) decision for any reason, the Court should reverse the district court's dismissal and render a judgment completely denying the AG's motion because the case is fully meritorious.

Respectfully submitted,

_Chad Flores_

| | |
|---|---|
| Daniel L. Schmutter | Chad Flores |
| Hartman & Winnicki, P.C. | Texas Bar No. 24059759 |
| 74 Passaic Street | Flores Law PLLC |
| Ridgewood, New Jersey 07450 | 917 Franklin Street, Suite 600 |
| (201) 967-8040 | Houston, Texas 77002 |
| | (713) 364-6640 |
| Josh Blackman | |
| Josh Blackman LLC | |
| 1303 San Jacinto Street | |
| Houston, Texas 77002 | |
| (202) 294-9003 | |

Counsel for Appellants

# Certifications

1.    At least one of the attorneys whose name appears on this brief is a member of the bar of this Court.

2.     The text of this document's electronic version matches its paper copies.

3.    A virus detection program, BitDefender Endpoint Security Tools major version 6, has been run on the file and no virus was detected.

4.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32 because it contains 6,125 not-exempted words.

5.    This filing complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32 because it uses a proportionally spaced typeface, Equity OT 14 point.

6.    On June 25, 2024, this filing was served on the opposing party's counsel by delivering it through the Court's electronic docketing system to the following registered user of the system:

Angela Cai
Renee Greenberg
Erin Hodge
Timothy Sheehan


*/s/ Chad Flores*
Chad Flores