# U.S. Court of Appeals
# for the Third Circuit

No. 23-3058

Defense Distributed; Second Amendment Foundation, Inc.,
*Appellants*

v.

Attorney General of New Jersey

_____

Appeal from the U.S. District Court, D.N.J.
Judge Michael A. Shipp
No. 3:21-cv-09867

Before: Krause, Scirica, and Rendell, *Circuit Judges*
Argued Nov. 4, 2024; Filed Feb. 12, 2026

_____

Opinion of the Court

Krause, *Circuit Judge*.

When it comes to the regulation of firearms, the Second Amendment is the usual battleground. But in this case, where the regulation relates to 3D-printing of ghost guns, the fray shifts into First Amendment territory and treads fresh ground on the constitutional protections afforded to computer code.

Appellant Defense Distributed is a developer and online publisher of computer files that allow anyone with a 3D printer, including members of Appellant Second Amendment Foundation, Inc., to produce a fully functional, single-shot plastic pistol that has no serial number and cannot be traced by law enforcement.  After the Attorney General of New Jersey and the New Jersey legislature took action to prohibit the distribution of such files to residents who are not registered or licensed as gun manufacturers, Appellants sued, claiming that New Jersey's actions impermissibly burdened the distribution of Defense Distributed's computer code in contravention of the First Amendment.  But while it is certainly true that some computer code falls under the purview of the First Amendment, purely functional code with no actual or intended expressive use does not.  Because Appellants failed to plead sufficient factual matter to permit the Court to assess whether Defense Distributed's code is covered, let alone protected by, the First Amendment, we will affirm the District Court's dismissal of the complaint with prejudice.

## I.    BACKGROUND

### A. Factual Background

Defense Distributed is a Texas-based company that produces and distributes "digital firearms information" (DFI) used specifically to manufacture functional firearms and firearm components using a 3D printer.  Members of the Second Amendment Foundation, a non-profit membership organization based in the State of Washington, would like to

2

receive Defense Distributed's DFI.  DFI is an expansive term, one that Defense Distributed uses to describe the variety of "coded computer files" it distributes through its website, including "files concerning a single-shot firearm known as the 'Liberator,'" "files concerning a firearm receiver for AR-15 rifles," and "files concerning a magazine for AR-15 rifles." App. 260-61; *see also* App. 256.  These files take several forms, including both "Computer Aided Manufacturing" (CAM) files—which can be used to construct and manipulate digital models of physical objects and are "ready for insertion into object-producing equipment" like 3D printers—and "Computer Aided Design" (CAD) files—which Appellants allege serve a similar function but are not ready for insertion into 3D printers.

The DFI also includes some common file types, like plain text (.txt) files about firearm assembly methods, the National Firearms Act and the Undetectable Firearms Act, and portable document format (.pdf) files, alongside the more technical "stereolithography (.stl) files," "Initial Graphics Exchange Specification (.igs) files," "SoLiDworks PaRT (.sldprt) files," "SketchUp (.skp) files," and "Standard for the Exchange of Product Data ('STEP') (.stp) files," all of which are "about firearm components."  App. 256, 260-61.  The complaint does not identify which of the more technical files identified, if any, are CAM or CAD files.

Initially, anyone who visited the website could download the files directly.  But in July 2018, the Attorney General of New Jersey (NJAG) issued a letter threatening legal

3

action if, by August 1, Defense Distributed did not "cease and desist from publishing printable-gun computer files for use by New Jersey residents" because they could be used to create untraceable firearms and assault weapons illegal in the state, and so their publication violated New Jersey's public nuisance and negligence laws.    App. 334.    Defense Distributed complied, and the files were not published on the website as of July 31.    Instead, from August to November, Defense Distributed operated its website as an ecommerce platform and mailed USB drives or SD cards with the files on them to customers who placed orders.

Then, in November 2018, the New Jersey legislature followed up with legislation that made it a crime for:

> (1) a person who is not registered or licensed to do so as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, to use a three-dimensional printer or similar device to manufacture or produce a firearm, firearm receiver, magazine, or firearm component; or

> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to

> program a three-dimensional printer to
> manufacture or produce a firearm, firearm
> receiver, magazine, or firearm component.

N.J. Stat. Ann. § 2C:39-9(*l*)(1)-(2) (the New Jersey Statute).

Defense Distributed resumed publication of its files on its website in 2020 and continues to do so. Now, however, the files are transferred through secure, encrypted transmissions rather than user generated downloads, and unlike prior periods of publication, there are screening procedures in place which "deem[] certain [website] visitors ineligible for file distribution." App. 263. Given the New Jersey Statute, Defense Distributed's distribution excludes "residents of and persons in the State of New Jersey who lack a federal firearms license" and those outside the United States. App. 263.

## B. Procedural History

This case comes to us with an extensive procedural history. Appellants filed suit in the Western District of Texas in July 2018 (the Texas Action), alleging that the NJAG's cease-and-desist letter was an unconstitutional restraint on speech. The district court in Texas initially dismissed the Texas Action for lack of personal jurisdiction in January 2019, after which Appellants, along with five additional plaintiffs, filed a complaint and motion for preliminary injunction in the District of New Jersey. The claims brought in this second action were largely identical to the Texas Action but included

new allegations that the New Jersey Statute amounted to criminal censorship.

After filing suit in New Jersey, Appellants appealed the dismissal of the Texas Action to the Fifth Circuit, and the District of New Jersey stayed proceedings pending resolution of that appeal.  When the Fifth Circuit reversed the dismissal, Appellants amended their complaint in the revived Texas Action to add claims related to the New Jersey Statute and to add the United States Department of State as a second defendant alongside the NJAG.  The NJAG, however, moved to sever the claims against it from those asserted against the Department of State and to transfer them to New Jersey.

In April 2021, the Texas district court granted severance and transferred the claims against the NJAG in the Texas Action to the District of New Jersey.  The next day, Appellants filed another notice of appeal to the Fifth Circuit.  Importantly, they did not move to stay the transfer order, so the claims against the NJAG were docketed in the District of New Jersey, where the NJAG subsequently moved for their consolidation with the preexisting District of New Jersey suit.  Appellants did not oppose the motion to consolidate before the court-ordered deadline, so the District Court substantively consolidated the cases in June 2021.

Almost two months after the transfer had occurred, and nearly a week after the District Court consolidated the cases, Appellants for the first time challenged the transfer of the claims against the NJAG in the Texas Action to the District of

New Jersey by petitioning the Fifth Circuit for a writ of mandamus. Five days later, the Fifth Circuit issued an order purporting, post hoc, to stay the Texas district court's transfer. Thereafter, on April 1, 2022, a divided Fifth Circuit panel issued its opinion in *Defense Distributed v. Bruck*, 30 F.4th 414 (5th Cir. 2022), holding that the Western District of Texas had abused its discretion both in severing the claims against the NJAG from those against the Department of State and in transferring that part of the Texas Action to the District of New Jersey. The Court noted that it "lacks power to order a return of the case to our circuit," *id.* at 423, but issued a writ of mandamus ordering the Texas district court to vacate its transfer decision and to "[r]equest" that the District Court in New Jersey return the transferred (and, at this point, consolidated) case. *Id.* at 437. The Texas district court promptly made the request to the New Jersey District Court.

Back in the Third Circuit, the New Jersey District Court ordered briefing on the Texas district court's request, construed Appellants' responsive letter as a motion to retransfer the consolidated action back to the Western District of Texas, and, in July 2022, denied that motion.

Nonetheless, Appellants sought to continue litigating against the NJAG in Texas. In the action pending there against the Department of State (i.e., the case from which the NJAG had been severed), Appellants moved for a preliminary injunction against the NJAG. But the Texas district court denied that motion because the NJAG was no longer a party to the case. Again, Appellants appealed, and, in September 2022,

a Fifth Circuit motions panel expedited the appeal, with a concurrence by Judge Ho that again requested that the District Court in New Jersey return the case to Texas. *Def. Distributed v. Platkin*, 48 F.4th 607, 608 (5th Cir. 2022) (Ho, J., concurring) ("[W]e're unaware of any district court anywhere in the nation to have ever denied such a request.").

Concurrent with the expedited appeal in the Fifth Circuit, Appellants filed a second motion to retransfer in the New Jersey District Court in light of Judge Ho's concurrence. The District Court denied this renewed motion, concluding that it lacked "valid legal justification" insofar as the basis for the motion rested "entirely on the concurrence" from the Fifth Circuit. *Def. Distributed v. Platkin*, No. 19-04753, 2022 WL 14558237, at *4 (D.N.J. Oct. 25, 2022). It also noted that "the Fifth Circuit's request may have been improvidently made," and observed "comity in no way requires that [the District Court] substitute the analysis of the Fifth Circuit for [its] own." *Id.*

In December 2022, a merits panel of the Fifth Circuit affirmed the Texas district court's denial of Appellants' motion for a preliminary injunction, concluding that it "no longer has the power to hear the case or grant the relief requested." *Def. Distributed v. Platkin*, 55 F.4th 486, 489 (5th Cir. 2022). After observing that the case was "marked as terminated on the docket sheet" and was "transferred in its entirety to the District of New Jersey," the Fifth Circuit concluded that "[a]lthough this court has politely requested that the New Jersey district court return the case, we can do no more." *Id.* at 493.

8

Meanwhile, litigation proceeded in the District of New Jersey. While the case was pending there, the presiding judge retired, and the matter was reassigned. Appellants again sought reconsideration of their transfer motion in light of this development, but they again were unsuccessful. The District Court noted that Appellants "d[id] not identify any intervening change in the controlling law or any new evidence" and that reconsideration simply because a case has been reassigned is "impermissible." *Def. Distributed v. Platkin*, No. 21-9867, 2023 WL 3996346, at *2-3 (D.N.J. June 14, 2023). It also observed that although Appellants had three months "to file a writ of mandamus with the Third Circuit between the filing of the Second Transfer Opinion and the reassignment of this case—they chose not to seek such relief." *Id.* at *2. Accordingly, the District Court denied reconsideration.

On the merits, the District Court granted the NJAG's Rule 12 motion to dismiss all of Appellants' claims.[1] *See Def. Distributed v. Platkin*, 697 F. Supp. 3d 241, 250 (D.N.J. 2023). It held that Appellants lacked standing to bring a Second

---

[1] In the District Court, Appellants asserted violations of the First Amendment, the Second Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Commerce Clause, the Arms Export Control Act, and the Communications Decency Act, as well as two claims of tortious interference with contract. Because this appeal is limited to the District Court's dismissal of Appellants' First Amendment, Second Amendment, and Due Process claims, we likewise limit our discussion of the District Court's decision to those claims.

Amendment challenge to the New Jersey Statute, which criminalized the manufacture of 3D-printed arms without a license, because the complaint did not allege that Defense Distributed, Second Amendment Foundation, or Second Amendment Foundation's members were prevented from 3D printing a firearm or had attempted and could not do so. *Id.* at 260-61. It also dismissed Appellants' Due Process claim, concluding that the New Jersey Statute gives a person of ordinary intelligence "fair notice of the types and files prohibited by the statute and what function those files cannot be used to perform" and "because there is no risk of discriminatory enforcement of the statute." *Id.* at 264.

Finally, addressing the First Amendment claims of unconstitutional speech restriction, prior restraint, and overbreadth, the District Court (1) adopted the distinction between expressive computer code, which it held is protected speech, and functional computer code, which it concluded might not be protected; (2) concluded that Appellants had not pleaded sufficient facts regarding the code's expressiveness for the Court to assess which type of code it was; and (3) declined to reach the issues of content-neutrality, prior restraint, and overbreadth because of the pleading deficiency. *Id.* at 257-59. The Court gave Appellants leave to amend with instructions as to what additional information it required, *id.* at 259, but Appellants elected to stand on their complaint. This timely appeal followed.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and § 1343.  We have jurisdiction under 28 U.S.C. § 1291.  We review a district court's dismissal for lack of standing and for failure to state a claim de novo, considering only the allegations in the complaint and any documents attached or referenced therein, while accepting all well-pleaded factual allegations as true and drawing reasonable inferences therefrom in the plaintiff's favor.  *Nekrilov v. City of Jersey City*, 45 F.4th 662, 668 (3d Cir. 2022); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).  On the other hand, we review the denial of a motion to transfer under 28 U.S.C. § 1404(a) for abuse of discretion.  *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020).

## III.    DISCUSSION

On appeal, Appellants contend (1) that the District Court should have transferred this case back to the Western District of Texas; (2) that the District Court erred by dismissing the Second Amendment claim for lack of standing; (3) that the New Jersey Statute is void for vagueness under the Due Process Clause of the Fourteenth Amendment; and (4) that the code Defense Distributed seeks to distribute is protected by the First Amendment.  We address each argument below.

11

### A. Transfer

Appellants' primary challenge is to "the district court's repeated denial of the Fifth Circuit's request to retransfer this action to the Western District of Texas." Opening Br. at 24. They argue that the law-of-the-case doctrine and principles of comity each separately required retransfer and, alternatively, that transfer was appropriate under 28 U.S.C. § 1404(a). We disagree and address each of these arguments in turn.

<u>First</u>, Appellants contend that they have a "clear and indisputable right to retransfer" under the law-of-the-case doctrine because of the Fifth Circuit's holding in *Bruck* that the district court in Texas abused its discretion by severing and transferring Appellants' claims against NJAG. Opening Br. at 28-29. That doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). While law-of-the-case serves important values like judicial efficiency and respect for prior determinations in litigation, it is not an inexorable command, and it "does not limit the tribunal's power" to decide a case. *Id.* Rather, the doctrine "governs [a court's] exercise of discretion," *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998), and because it "only extends to issues that were actually decided in prior proceedings," *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 62 (3d Cir. 2023) (quoting *Farina v. Nokia, Inc.*, 625 F.3d 97, 117 n.21 (3d Cir. 2010)), it presupposes that the predecessor court had jurisdiction over the matter when its decision issued.

12

That was not the case here. As the Fifth Circuit repeatedly observed, "[t]he transfer of the case files to the district court in New Jersey ended the power of [the Fifth] [C]ircuit over the transferred claims. Again, the sever-and-transfer order created two separate suits: one in New Jersey where NJAG was a party and one in Texas where NJAG was not." *Platkin*, 55 F.4th at 494 (citation omitted). The Fifth Circuit thus recognized that its decision in *Bruck* was not issued in "the same case," but rather as part of a different action that remained in Texas. *See Bruck*, 30 F.4th at 423 ("This court lacks power to order a return of the case to our circuit."). So while it may well be true that "*Bruck* remains the law of [the Fifth] [C]ircuit," *Platkin*, 55 F.4th at 495, that does not make it the law of the case before us.

Second, Appellants contend that principles of comity "dictate" retransfer to the Western District of Texas. Opening Br. at 25. But their argument falters out of the gate because it is "not a rule of law, but one of practice." *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488 (1900). As the Supreme Court has explained, "[c]omity persuades; but it does not command." *Id.* In cases of doubt, comity may counsel in favor of "deference . . . to the judgments of other co-ordinate tribunals," but it "demands of no one that he shall abdicate his individual judgment" on a question of law. *Id.* at 489.

In this case, the New Jersey District Court weighed the interests of comity and concluded that there was no binding order from the originating court to which comity would be owed. Instead, there was only a non-binding request from the

13

Western District of Texas, a request the New Jersey District Court declined after recognizing that the cases had already been consolidated and "duly consider[ing]" the Fifth Circuit's opinion "[a]s a matter of inter-circuit courtesy." *Platkin*, 2022 WL 14558237, at *4 (citation modified). This situation differs from the cases cited by Appellants that featured orders, rather than non-binding requests. So we cannot say that the District Court abused its discretion, much less ignored any legal duty to retransfer on the basis of comity.

Third, § 1404(a) does not require retransfer. That statute provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). The NJAG did not consent to retransferring the case to Texas. Thus, as the movant, Appellants bear the burden of demonstrating the need for transfer, meaning they must show that the balancing of public and private interests tilts in their favor. *Jumara v. State Farm Ins.*, 55 F.3d 873, 879 (3d Cir. 1995). If the movant makes this showing, the district court still has discretion to grant the transfer. *See id.* at 878.

Section 1404(a) "vest[s] district courts with broad discretion" in transferring cases, but we have identified several factors district courts must consider. *Id.* at 883. As to the public interest, courts must consider (1) the enforceability of the judgment; (2) the practical considerations that make trial easy, expeditious, or inexpensive; (3) the court congestion in

the fora; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the judge with applicable state law in diversity cases. *Id.* at 879-80. District courts must also consider private interest factors, including (1) each party's forum preference; (2) where the claims arose; (3) the convenience to parties and witnesses; and (4) the location of books and records.[2] *Id.* at 879.

Here, the District Court conducted a methodical analysis of each of the enumerated factors, concluding that the private interest factors, as well as the public interest factors regarding enforceability of the judgment, court congestion, and familiarity with applicable law were either in equipoise or marginally favored New Jersey. *See Def. Distributed v. Platkin*, 617 F. Supp. 3d 213, 232-40 (D.N.J. 2022). The District Court conducted an extensive analysis of the most contested factors: practical considerations and local interest in deciding local controversies at home. *Id.* It considered the implications of transferring the entire consolidated action versus only the claims in the Texas Action, the likelihood of duplicative outcomes in each scenario, and the efficiencies to be gained by litigating in a jurisdiction able to certify questions to the New Jersey Supreme Court. *Id.* at 234-37. In addressing

---

[2] In the unusual case where transfer is sought after final judgment, the movant must also show that the result would have been different had the suit been transferred. *See Paramount Pictures v. Rodney*, 186 F.2d 111, 116 (3d Cir. 1950); *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 663 (7th Cir. 2003).

the local interests, the District Court weighed the potential consequences for New Jersey's regulation of firearms and the fact that it is New Jersey's law being challenged; considered the Fifth Circuit's take on these issues; and explained its reluctance to transfer back to Texas now-consolidated claims that included non-Texas plaintiffs who were never in the Texas Action. *Id.* at 237-40. Weighing all these considerations, the District Court ultimately concluded that transfer was not appropriate. *Id.* at 239-40.

Given the District Court's thorough consideration of the relevant factors, we cannot say that it abused its discretion by denying Appellants' motion under § 1404(a).

\*       \*       \*

Appellants misconstrue the demands of comity and the law-of-the-case doctrine, and they do not show the District Court "base[d] its decision upon a clearly erroneous finding of fact, an erroneous conclusion of law, or an improper application of law to fact." *Satterfield v. Dist. Att'y Phila.*, 872 F.3d 152, 158 (3d Cir. 2017) (citation modified). Accordingly, we will affirm the District Court's denial of Appellants' motion to retransfer this case to the Western District of Texas.

**B. Second Amendment Claim**

Appellants next dispute the District Court's determination that they lack standing to bring a Second Amendment challenge to the New Jersey Statute. For standing to challenge the enforcement of a statute, a plaintiff "must

16

show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021) (citation modified) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). Because a plaintiff must make such a showing "for each claim that [it] press[es] and for each form of relief that [it] seek[s]," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), standing "often turns on the nature and source of the claim asserted," *Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 288 (3d Cir. 2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

Both Defense Distributed and the Second Amendment Foundation claim that the NJAG's threatened enforcement of the New Jersey Statute violates the Second Amendment by "infring[ing] the individual right to make and acquire Arms." App. 299. Putting aside the novelty of their asserted Second Amendment right to "self-manufacture firearms . . . free from any major regulation whatsoever," Opening Br. at 53-55, we agree with the District Court that Appellants have failed to plead that the alleged violation of this right resulted in any actual and concrete Second Amendment injury.

As the District Court observed, the operative complaint includes "no allegation" that Defense Distributed, the Second Amendment Foundation, "or any member of either entity attempted to or was prevented from 3D printing a firearm but could not do so." *Platkin*, 697 F. Supp. 3d at 261. This omission is fatal, for even accepting the merits of their claim

17

as true for standing purposes, *see FEC v. Cruz*, 596 U.S. 289, 298 (2022), Appellants have not alleged that the New Jersey Statute prevented them or any of their members from exercising that putative Second Amendment right.[3]

On appeal, Appellants contend that they need not allege that anyone was prevented from or unable to 3D print a firearm, but only that the computer files themselves (i.e., the alleged speech) are "integral to the Constitution's 'right to make and acquire Arms.'" Opening Br. 52 (quoting App. 299). But "to be sufficiently particularized, an injury must affect the plaintiff in a personal and individual way," *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (citation modified), and nothing in the operative complaint indicates that Appellants (or any members) sought to self-manufacture a 3D printed firearm and were prevented from doing so by the New Jersey Statute. Nor does the complaint support the inference that a burden on Appellants' ability to share files that would enable *others* to self-manufacture firearms intrudes upon Appellants' own purported right to self-manufacture. As a

---

[3] The complaint asserts that the Second Amendment Foundation "also brings this action on behalf of its members because at least one of its members would have standing to sue in his own right." App. 254. Appellants have not invoked associational standing before us, but even if they had, their pleading deficiency would taint their associational standing claims as well. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (insisting on a proper showing of injury-in-fact to an organizational plaintiff).

result, Appellants do not have Article III standing for their Second Amendment claim, and the District Court correctly dismissed it.

### C. Due Process - Vagueness

Appellants next argue that the District Court erred by dismissing their claim that subsection (*l*)(2) of the New Jersey Statute is void for vagueness under the Due Process Clause. To recap, that provision bars the distribution of "digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used" to manufacture 3D firearms and parts to New Jersey residents who are not registered or licensed as firearms manufacturers.  N.J. Stat. Ann. § 2C:39-9(*l*)(2).  Specifically, Appellants contend the statute's use of the phrase "may be used" makes it "impossible for a speaker to know what counts" as prohibited conduct. Opening Br. at 56.  A statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). While they concede that "*some* of [their] speech is clearly covered," Appellants nonetheless maintain that the statute's application to other speech is vague because "what 'may be used' by one programmer can be totally useless to another." Opening Br. at 55-56.  We disagree for two reasons.

<u>First</u>, for due process purposes, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)). And here, read in context, the statute covers a narrow category of files and code, and within that narrowed category, circumscribes distribution of only that code which may be used for a particular function. Specifically, the statute regulates only the distribution of "digital instructions in the form of computer-aided design files" and "other code or instructions stored and displayed in electronic format as a digital model." N.J. Stat. Ann. § 2C:39-9(*l*)(2). This precision excludes the vast majority of extant code and file formats from its purview and provides "individuals and law enforcement officers with relatively clear guidelines as to prohibited conduct." *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 525 (1994). And the statute narrows its prohibition even further by clarifying that, within that category, it reaches only those files, code, or instructions "that may be used to program a three-dimensional printer to manufacture or produce" a firearm. N.J. Stat. Ann. § 2C:39-9(*l*)(2). As a result, the statute does provide a person of ordinary intelligence fair notice of what is proscribed and does not invite arbitrary enforcement.

<u>Second</u>, by characterizing the statute as limiting the distribution of code "'that may be used to' *engage in such programming*," Appellants manufacture ambiguity. Opening Br. at 56 (citation modified). The characterization, of "engag[ing] in such programming," invokes a broader category

of conduct that includes acts reliant upon the subjective abilities of a given programmer.  But the statute does not cover that broader category.  It only covers the specified files, code, and instructions that "one may use to engage in the process of programming a 3D printer to manufacture a firearm." N.J. Stat. Ann. § 2C:39-9(*l*)(2).

In any event, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306.  Accordingly, the Supreme Court has "struck down statutes that tied criminal culpability to . . . wholly subjective judgments without . . . narrowing context." *Id.*  But the New Jersey Statute does not suffer from such indeterminacy.  Instead, it ties criminal culpability to a defendant's distribution of a specific type of code or file that, irrespective of any other uses it may have, is able to "program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." N.J. Stat. Ann. § 2C:39-9(*l*)(2).  Whether a code or file meets these criteria involves "clear questions of fact," and while "it may be difficult in some cases to determine whether these clear requirements have been met," "courts and juries every day pass upon" such technical inquiries.  *Williams*, 553 U.S. at 306 (citation modified).  In such instances, the problem of close cases "is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Id.*  So Appellants' vagueness challenge fails too.

21

### D. First Amendment Claim

Finally, we reach the heart of the case before us, which raises a complicated question of first impression for our Court—whether regulations of computer code trigger constitutional scrutiny under the First Amendment. In the District Court, Appellants contended that all computer code is protected expression, *see Platkin*, 697 F. Supp. 3d at 258 n.11, and, as discussed above, the District Court rejected this argument, concluding that some functional code "may not be speech," *id.* at 258. Appellants' argument before us appears unchanged, except to add that the allegations about Defense Distributed's code in the complaint establish protected expression under "any conceivable test." Opening Br. at 36-37. To assess these contentions and the sufficiency of the complaint, we must determine whether, and under what circumstances, code enjoys First Amendment coverage.

Before turning to the merits of that question, however, some background proves helpful, so we frame our analysis with a basic overview of what code is, how we interact with it, and the difficulty of assessing its constitutional salience. We then consider the First Amendment's application to the code before us.

### 1. Applicable Concepts and Principles

Generally speaking, code is "prepared by a programmer" and "instruct[s] [a] computer to perform certain functions." *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670,

22

674 (3d Cir. 1991). We often interact with it in the form of software or computer programs, which package code to serve a particular purpose. *See Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222, 1229-30 (3d Cir. 1986); *see also* Xiangnong Wang, *De-Coding Free Speech: A First Amendment Theory for the Digital Age*, 2021 Wis. L. Rev. 1373, 1381 (2021). In this way, code is ubiquitous; it powers products as varied as self-driving cars, internet search engines, facial recognition software, web browsers, word processing systems, and home appliances.

Plainly, code is functional. It provides much of the architecture for modern society. In doing so, it frequently functions mechanically—like a machine with which one tinkers until it is capable of producing a specific outcome or completing a desired task with little to no meaningful human engagement. Just as there is nothing inherently expressive in building a functional car engine, one could also argue that there is nothing inherently expressive in building purely functional code. But some code is more than functional. Code is based in language. *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001). And code may, at times, communicate ideas and information.

The interplay between function, communication, conduct, and language makes the constitutional salience of code difficult to discern. This puzzle squarely implicates the sometimes-implicit threshold inquiry of First Amendment *coverage* as distinct from First Amendment *protection*. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[W]e have

rejected 'the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.'" (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968))); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."); *see also* Frederick Schauer, *Free Speech: A Philosophical Enquiry* 90 (1982) ("[W]hen we say that certain acts, or a certain class of acts, are covered by a right, we are not necessarily saying that those acts will always be protected.  We are saying only that these acts have a facial claim to be considered with reference to the reasons underlying the decision to put those acts within the coverage of a right.").

We are not the first court to consider these nuances and their First Amendment implications.  Indeed, some twenty-five years ago, three of our sister circuits grappled with the issue.  These cases—*Bernstein v. United States Department of Justice*, 176 F.3d 1132 (9th Cir. 1999), *reh'g granted, opinion withdrawn*, 192 F.3d 1308 (9th Cir. 1999),[4] *Junger v. Daley*, 209 F.3d 481 (6th Cir. 2000), and *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001)—are often cited as the origin for a "code is speech" theory of First Amendment coverage in which *all* code is presumptively protected by the First Amendment and thus subject to constitutional scrutiny.

---

[4] Though vacated pending a rehearing that was ultimately withdrawn as moot, the Ninth Circuit's decision in *Bernstein* is nonetheless illuminating.

*See* Wang, *supra*, at 1380, 1385-89 (collecting cases and describing the development of "code is speech" theory). And, consistent with that understanding, Appellants rely on these cases for their argument here. But fresh appraisal of their contents reveals a more complicated landscape that warrants our attention.

The Ninth Circuit was the first to address the issue in *Bernstein v. United States Department of Justice*. There, a professor who wished to publish the code for his encryption algorithm brought a facial challenge to the export-control regulation requiring him to obtain a prepublication license. 176 F.3d at 1136. In its reasoning, the Ninth Circuit recognized the distinction between source code and object code, a distinction we have also drawn.

Source code is the text of a program written in a programming language that may be read and understood by humans. *Id.* at 1140; *Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC*, 38 F.4th 331, 336 n.5 (3d Cir. 2022) ("'Source code' refers to the human-readable statements—written in a syntax defined by a programming language like JavaScript or Python—that make up a computer program."). But a computer cannot use source code until it has been compiled into a machine language called object code. *Bernstein*, 176 F.3d at 1140. Object code is meant to be read by computers, not humans. *Id.*; *see also Pyrotechnics Mgmt.*, 38 F.4th at 336 n.5. To determine whether the challenged regulations exhibited "'a close enough nexus to expression, or to conduct commonly associated with expression,'" such that

there was a risk of censorship, the court first had to decide "whether encryption source code is expression for First Amendment purposes." *Bernstein*, 176 F.3d at 1139 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988)). The opinions of the fractured panel anticipated the debate that has since emerged.

The majority concluded that the "encryption software, in its source code form and as employed by those in the field of cryptography, must be viewed as expressive for First Amendment purposes." *Id.* at 1141 (footnote omitted). It reasoned that (1) source code, unlike object code, is meant for human understanding,[5] and (2) although not all uses of source code would be expressive, the record demonstrated that, in cryptography, it was "the preferred means" of expressing "cryptographic ideas," and was put to actual expressive uses like "precisely articulat[ing] hypotheses and formal empirical testing," and "facilitating peer review." *Id.* at 1140-41. In a concurring opinion, Judge Bright observed that "encryption source code also has the functional purpose of controlling computers and in that regard does not command protection under the First Amendment." *Id.* at 1147 (Bright, J., concurring). The dissent, meanwhile, concluded that "[e]ncryption source code is a building tool," and although

---

[5] The court ultimately "express[ed] no opinion" on whether object code was, or could be, expressive because the record contained no information regarding its "expressive uses." *Bernstein v. U.S. Dep't of Just.*, 176 F.3d 1132, 1141 n.15 (9th Cir. 1999).

academics can share their code "to reveal the encryption machine they have built," its "ultimate purpose . . . [is] to perform the function of encrypting messages." *Id.* at 1148 (Nelson, J., dissenting).

The Sixth Circuit encountered this issue in *Junger v. Daley*, where a different professor challenged the same combination of encryption regulations at issue in *Bernstein* because he wanted to freely post on his website the encryption source code he "wr[ote] to demonstrate how computers work." 209 F.3d at 483-84. Sweeping more broadly than the Ninth Circuit, the court concluded that source code is "protected by the First Amendment" because it "is an expressive means for the exchange of information and ideas about computer programming." *Id.* at 485.

Unlike the Ninth Circuit, the Sixth Circuit paid no mind to actual expressive use, but gave primacy to the mere *possibility* of expressive use. As a result, it treated all source code as not only covered by the First Amendment, but protected and subject to heightened scrutiny. It reasoned that in the same manner that "a musical score cannot be read by the majority of the public" and is "not traditional speech," but is nonetheless "used as a means of communication among musicians," computer source code may also be "unintelligible to many" but is still "the preferred method of communication among computer programmers." *Id.* at 484. The court acknowledged that source code has both expressive and functional features but concluded that consideration of functional capacity was best accounted for in "the analysis of

permitted government regulation" through the application of intermediate scrutiny. *Id.* at 484-85. It remanded for application of that standard of review without deciding whether the regulations—or their amendments—could stand.

Last, we consider the Second Circuit's analysis in *Universal City Studios, Inc. v. Corley*, where the defendant, who posted online the source and object code for software designed to unlock DVD encryption protections, raised a First Amendment defense to the anti-trafficking provision of the Digital Millenium Copyright Act. 273 F.3d at 439, 452-54. The court's decision in *Corley* built directly on its earlier disposition in *Commodity Futures Trading Commission v. Vartuli*, 228 F.3d 94 (2d Cir. 2000), which predetermined the constitutional salience of "two ways in which a programmer might be said to communicate through code." *Corley*, 273 F.3d at 449.

The first way was a programmer's use of code to communicate "to the computer." *Id.* This, the *Corley* court held, is "never protected" because "the interaction between 'programming commands as triggers and semiconductors as a conduit,' even though communication, is not 'speech' within the meaning of the First Amendment." *Id.* at 449 & n.23 (quoting *Vartuli*, 228 F.3d at 111).

The second was a programmer's communication "to the user of the program"—that is, a lay consumer. *Id.* at 449. In the court's view, that communication could be, but is "not necessarily[,] protected," depending on whether it implicates

28

First Amendment interests or conveys information that engages in the intercession of mind or will of the recipient. *Id.* As to this category, the court cautioned that "[m]omentary intercession of human action" required to cause a code product to perform its function does not "diminish the nonspeech component" or bring it under the purview of the First Amendment. *Id.* at 451.

Against that backdrop, *Corley* itself addressed a third category—a programmer's communication through code "to another programmer," presumably one capable of understanding code. *Id.* at 449. Within this third category, the Second Circuit presumed both source code and object code are protected by the First Amendment because they are able to convey information comprehensible to a human. *Id.* at 446, 448. Its analysis went on to discern the appropriate standard of review, *id.* at 450-51, which the Second Circuit, like the Sixth Circuit in *Junger*, concluded was intermediate scrutiny, *see id.* at 454. Applying that standard, it upheld the provision of the statute, reasoning it applied only because of the code's "capacity to instruct a computer to decrypt CSS," and "[t]hat functional capability is not speech within the meaning of the First Amendment." *Id.*

In sum, the Second Circuit's treatment of the issue also focused on the "manner" of intended and actual use, *see id.* at 449, but with unique emphasis on who or what interacted with the code and how they did so, and specific recognition that at least some lines of communication are not subject to the First Amendment at all. And, in the context of

29

programmer-to-programmer communications through code, it set aside any distinction between object and source code. *Id.* at 446.

### 2. Coverage Depends on Expressive Use

We join our sister circuits in holding that computer code can be covered by the First Amendment. But we also hold that coverage cannot be assumed because code is inherently functional. *See* Orin S. Kerr, *Are We Overprotecting Code? Thoughts on First-Generation Internet Law*, 57 Wash. & Lee L. Rev. 1287, 1291-93 (2000). To invoke the protections of the First Amendment, the proponent must show that the particular use of the code burdened by a regulation involves the expression or communication of ideas in a way that implicates the First Amendment. Purely functional code with no expressive purpose, use, or intent is simply not covered by the First Amendment.

It is this possibility—that some code is purely functional and therefore outside the First Amendment's purview—that debunks the analogy the *Junger* court drew between code and musical scores to justify a blanket application of the First Amendment to code. *See* 209 F.3d at 484. That analogy has intuitive appeal. As described in *Junger*, a score cannot be understood without training, and it is the preferred means of communication among musicians. But "[m]usic is one of the oldest forms of human expression," *Ward*, 491 U.S. at 790, and there is no purely functional use of a music score. The playing and composition of music are

inherently expressive in every instance, and unlike code, a musical score is not capable of making a purely inexpressive task or act occur by the very fact of its having been written.

In contrast, conduct that merely has the capacity to communicate something does not necessarily warrant First Amendment coverage. Robbing a bank, for example, "provides the most instructive way to teach someone how to rob a bank." Kerr, *supra*, at 1292. So, too, is "kicking someone in the shins . . . an excellent way of communicating the concept of kicking someone in the shins." *Id.* But we do not have a First Amendment right to do either because our jurisprudence recognizes that the mere capacity to communicate does not transform physical conduct into protected speech. *Id.*

The same is true in cyberspace. Laws that prevent the distribution of destructive viruses or ransomware are not per se unconstitutional on the ground that they infringe upon coders' freedom of expression. Nor does the First Amendment provide absolute protection against tort liability for manufacturers whose products cause damage because they run on defective code. In short, a blanket protection because "code is speech" is no more viable in cyberspace than it is in physical space. *See id.* at 1291-93; Wang, *supra*, at 1389.

Appellants next argue that all of Defense Distributed's code is protected because it is "information," invoking the Supreme Court's decisions in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), and *Sorrell v. IMS Health Inc.*, 564 U.S. 552

(2011).  But these cases do not support such a broad reading of First Amendment protection for "information" writ large. *Sorrell* addressed a statute that prohibited pharmacies from selling prescriber data to certain buyers and included dictum saying that "the creation and dissemination of information are speech within the meaning of the First Amendment."  564 U.S. at 570.   In its holding, however, the Court assumed the underlying information was a "mere commodity" rather than speech and struck down the law prohibiting the sale of that information to certain buyers.  *Id.* at 571.  It did so not because of the underlying information, but because the law operated as a form of viewpoint discrimination and because the government specifically intended to suppress marketing messages conflicting with the goals of the state.[6]  *See id.* at 571, 580.

*Bartnicki*, for its part, addressed federal and state wiretapping statutes that prohibited disclosure of information acquired by illegally intercepting communications.  532 U.S. at 519-20, 525.  The case involved the interception of a private phone call between union leaders and the subsequent delivery of a recording of that call.  *Id.* at 518-19.  There, the Court reasoned that the "*purpose* of such a delivery [was] to provide

---

[6] Though the Court mused that there was "a strong argument" that the underlying information was "speech for First Amendment purposes," it did not decide as much, and its observation does not compel Appellants' desired outcome under the distinct facts before us.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

the recipient with the text of recorded statements . . . like the delivery of a handbill or a pamphlet," so the law was a regulation of "pure speech" rather than a regulation of conduct focused on the "'use' of the contents." *Id.* at 526-27 (emphasis added). It is notable that the underlying information in *Bartnicki* was itself within the core of the First Amendment's classic speech protections. *See id.* at 517-18 (describing a "cellular telephone conversation about a public issue," namely strategy in a teachers' union's collective bargaining negotiations). The Court nonetheless relied on the *purpose* of the distribution as the key consideration in its First Amendment analysis. Again, the mere dissemination of information in the abstract was not the driver of First Amendment doctrine.

This is particularly salient given the unique features of code that remove it from the realm of "pure speech." The question before us bears greater resemblance to the cases in which courts have addressed whether the First Amendment applies to navigational charts and concluded that, although they convey information, they are not covered by the First Amendment. *See Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1035-36 (9th Cir. 1991) (distinguishing information in a book about mushrooms from aeronautical charts because "[a]eronautical charts are highly technical tools. They are graphic depictions of technical, mechanical data[, and] [t]he best analogy to an aeronautical chart is a compass. . . . The chart itself is like a physical 'product' while the . . . book is pure thought and expression"); *see also* Robert Post, *Recuperating First Amendment Doctrine*, 47 Stan. L. Rev.

33

1249, 1254 (1995) ("Navigation charts do not receive First Amendment protection . . . because we interpret them as speaking monologically to their audience, as inviting their audience to assume a position of dependence and to rely on them.").

Drawing on these cases and discussion, we hold that the determination of whether code enjoys First Amendment protection requires a fact-based and context-specific analysis. Such analysis is shaped by the technical nature of the code (e.g., source code or object code), how that code is used in context (e.g., precisely how the writer or user of the code might interact with the code), who is communicating through the code and the intended recipient of the communication (e.g., programmer-to-human communication, human-to-machine communication, and so forth), for what purpose or purposes the computer code operates (e.g., to perform a function, to express an idea, or some combination thereof), and what, if anything, the code communicates.

But, as explained below, we do not have occasion today to go beyond recognition of this fact-based and context-specific inquiry because, here, Appellants failed to plead any of these indicia of expressiveness that are necessary to trigger First Amendment coverage.

*3. Appellants Have Not Pleaded Facts Sufficient to Assess Whether Defense Distributed's Code is Implicated by the Statute or Covered by the First Amendment*

With this framework as our guide, we agree with the District Court that Appellants' operative complaint lacks the information necessary to determine whether the coded computer files Defense Distributed seeks to distribute are expressive or functional and, consequently, whether it implicates the First Amendment.

The complaint alleges that the digital firearms information "includes, but is not limited to . . . 'Computer Aided Design files' or 'CAD files,'" as well as "'Computer Aided Manufacturing files' or 'CAM files,'" and "non-CAD and non-CAM files such as plain text (.txt) files." App. 258-59. CAD files can be used "to construct and manipulate complex two- and three-dimensional digital models of physical objects" and they "are not ready for insertion into" 3D printers. App. 256-57. CAM files can be used "to construct and manipulate the digital two- and three-dimensional models of physical objects" but "*are* ready for insertion into" 3D printers. App. 257 (emphasis added). And, "[w]ith respect to the 3D-printing processes in particular, CAD files and CAM files do not produce anything automatically. They are not functional software. They do not self-execute. They are mere information stores." App. 257. The complaint then alleges that the coded computer files include, by way of example, the following: "files concerning a single-shot firearm known as the

35

'Liberator,'" "files concerning an assembly of the AR-15 rifle and magazine," "files concerning an assembly of the AKM rifle and magazine," "stereolightography (.stl) files about firearm components," "Initial Graphics Exchange Specification (.igs) files about firearm components," and "'read me' plain text files about the National Firearms Act and the Undetectable Firearms Act." App. 261.

These allegations fall short of plausibly alleging that Defense Distributed's code triggers First Amendment coverage. Because "the plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," a complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). And here, Appellants' allegations suffer from two fatal deficiencies: (1) they do not allege how sharing their coded computer files violates the New Jersey Statute; and (2) they have not plausibly pleaded that Defense Distributed's code is covered by the First Amendment.

As to the first deficiency, the statute by its terms regulates code that "may be used to program" a 3D printer. N.J. Stat. Ann. § 2C:39-9(*l*)(2). Consistent with our previous analysis of the statute's scope, it simply does not prohibit or burden the distribution of things like "files about the National Firearms Act." App. 261. But the complaint fails to identify, or provide information sufficient to infer, which aspects of the digital firearms information *are* proscribed by the statute.

36

While the complaint lists a variety of file types (e.g., (.igs), (.stl), (.skp) (.pdf) (.stp)), it is unclear which, if any, of those are CAD or CAM files. It is unclear what information those files provide, how they are used, whether they are part of the 3D printing process, or what ideas they convey, if any. And, by way of further example, it does not make clear what the "files concerning" the Liberator or an AR-15 magazine are. App. 261. From the face of the complaint, we have no way to determine whether those files include details about the Liberator's history or a comparison of the AR-15 magazine to the magazines of other weapons, in which case the statute has nothing to say about their distribution.

The second deficiency is that, even assuming the digital firearms information includes code whose distribution is limited by the New Jersey Statute because it "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component," N.J. Stat. Ann. § 2C:39-9(*l*)(2), the complaint does not include sufficient allegations to assess whether that code is covered by the First Amendment. Appellants allege only that "digital firearms information . . . is an important expression of technical, scientific, artistic, and political matter" and that "[e]ach and every computer file at issue has these values in the abstract." App. 258. But we must "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). Setting aside

such conclusory allegations, Appellants' complaint is left with nothing sufficient to assess whether there is a plausible entitlement to relief.

It is not lost on us that CAD and CAM files may not, as a technical matter, fit neatly within the source-code/object-code framework. After all, useful as it is for a First Amendment analysis of that code and analogous files, different file formats could raise somewhat different issues, and here, we have a variety in play (.dwg, .stp, .stl, .igs, .sldprt, .skp, .txt). Ultimately, however, we have no occasion to consider the specific properties of CAD and CAM files, nor whether those properties suggest they are protected by the First Amendment, because the complaint does not sufficiently explain the technical nature of those files. Indeed, the District Court provided Appellants with an opportunity to amend their complaint and include additional allegations that would enable the Court to assess whether they have plausibly alleged that the code at issue is covered by the First Amendment. Appellants declined to do so, and the District Court therefore correctly dismissed their complaint with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's order.

*Counsel for Appellants*
Charles R. Flores     **[ARGUED]**
FLORES LAW

Joshua Blackman

*Counsel for Appellees*
Angela Cai          **[ARGUED]**
Timothy Sheehan
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY

*Counsel for Amicus Appellee County Prosecutors Association of New Jersey*
William P. Miller
BERGEN COUNTY OFFICE OF PROSECUTOR

*Counsel for Amicus Appellee Everytown for Gun Safety Support Fund*
Aaron C. Esty
EVERYTOWN LAW